32

United States District Court
Southern District of Texas
FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

**JUL 0 1 2002**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOHN GILBERT | § | CIVIL ACTION NO. B-01-054 |
| | § | |
| VS. | § | |
| | § | |
| JIM HOGG COUNTY, TEXAS, | § | |
| ISAAC BOLCH, in his Individual | § | JURY DEMANDED |
| and Official Capacities, and | § | |
| GILBERT YBANEZ, in his | § | |
| Individual and Official Capacities | § | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

COME NOW DEFENDANTS, Jim Hogg County, Texas; Isaac Bolch, in his Individual and

Official Capacities; and Gilbert Ybanez, in his Individual and Official Capacities, and file this their

Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c) and would respectfully

submit unto the Court the following:

### I.
### SUMMARY JUDGMENT EVIDENCE

| | |
|---|---|
| **Exhibit A** | **Plaintiff's First Amended Complaint.** |
| **Exhibit B** | **Deposition of Defendant Isaac Bolch.** |
| **Exhibit C** | **Police Report** |
| **Exhibit D** | **INS Firearms Policy** |
| **Exhibit E** | **Deposition of Plaintiff John Gilbert** |
| **Exhibit F** | **Certificate of Compliance for Jim Hogg County Jail dated 4/6/99** |

1

**Exhibit G**       **Affidavit of Isaac Bolch**

## II.
## STATEMENT OF THE CASE

This is a case is brought under 42 U.S.C. § 1983 alleging false arrest and detention, excessive force, and unconstitutional jail conditions. (Ex. A). Plaintiff also brings pendent state law claims of assault, false arrest, false imprisonment, negligence, intentional infliction of emotional distress and defamation. (Ex. A.) This action arises out of Plaintiff's arrest on April 7, 1999, by Defendant Isaac Bolch, a Jim Hogg County Sheriff's deputy, at a time when Gilbert Ybanez was sheriff of Jim Hogg County. (Ex. A.)

Plaintiff seeks actual damages of $1,000,000.00, exemplary damages of $1,000,000.00, and all fees, costs and interest. (Ex. A.)

## II.
## STATEMENT OF FACTS

1.   On April 7, 1999, Plaintiff was driving a friend's 1994 Mustang GT in Hebbronville, Texas.

2.   At the same time, Defendant Isaac Bolch was patrolling Hebbronville in the course and scope of his authority as a Jim Hogg County sheriff's deputy.

3.   The cars being driven by Plaintiff and Bolch were approaching each other from opposite directions and would ultimately pass one another. (Ex. B at 41.)

4.   Bolch noticed that the Mustang GT driven by Plaintiff lacked a front license plate. (Ex. B at 41; Ex. G.)

5.   As the Mustang came closer to Bolch's patrol car, Bolch was able to see that the front seat passenger accompanying Plaintiff was not wearing a seatbelt. (Ex. B at 41,43; Ex. G.)

6.   When the two cars became parallel to another, Bolch heard Plaintiff "rev" the engine of the Mustang GT. (Ex. B at 41; Ex. G.)

2

7.     Bolch determined that he had probable cause to pull Plaintiff over based on the lack of license plate, failure of the front seat passenger to wear a seatbelt and excessive muffler noise. (Ex. B at 46; Ex. G.)

8.     After Bolch activated the police car's lights and turned to follow Plaintiff, Plaintiff pulled his car over to the side of the road. (Ex. B at 43.)

9.     Bolch identified himself, stated the reasons why he pulled Plaintiff over, and asked for Plaintiff's driver's license and insurance. (Ex. B. at 44.)

10.    Plaintiff's tone of voice was very confrontational when he spoke to Bolch. (Ex. B at 44; Ex. G.)

11.    Plaintiff informed Bolch that he had a weapon in the car. (Ex. B at 48; Ex. G.)

12.    Bolch immediately asked him where the gun was, to which Plaintiff replied that it was on the back seat. (Ex. B at 48.)

13.    Bolch asked why Plaintiff had the weapon, because Bolch did not recognize Plaintiff. (Ex. B at 47-48; Ex. G.)

14.    Plaintiff replied that he was a Border Patrol agent. (Ex. B at 48; Ex. G.)

15.    It was not until Plaintiff reminded Bolch they had previously spoken to each other that Bolch recalled the brief meeting when Plaintiff and other Border Patrol agents arrived at a convenience store where Bolch and another deputy were located. (Ex. B at 35; Ex. G.)

16.    Because there was a gun in the vehicle and because Bolch was standing close to oncoming traffic, Bolch asked Plaintiff to exit the Mustang and stand at the rear of the vehicle. (Ex. B at 51.)

17.    Bolch and Plaintiff were standing several feet away from an elementary school's grounds on a weekday afternoon. (Ex. B at 53; Ex. C; Ex. G.)

18.    Bolch interpreted Plaintiff's mannerisms and words to be aggressive and Plaintiff's stance to be threatening. (Ex. B at 94; Ex. G.)

19.    Bolch proceeded to ask Plaintiff a series of questions in order to see whether Plaintiff had any exemptions to prosecution for unlawful carrying of a weapon. (Ex. B at 56; Ex. G.)

20.    Bolch asked Plaintiff if he was a certified Texas peace officer, whether he was traveling, whether he had a concealed handgun permit, or whether he was going to or from his employment as a Border Patrol agent; Plaintiff responded "No" to these questions. (Ex. B at 61; Ex. G.)

21.    Bolch knew that Plaintiff's Border Patrol credentials allowed him to carry a weapon while on duty. Bolch knew of no provision that allowed Plaintiff to carry a weapon as an off-duty Border Patrol agent. (Ex. B at 62-63; Ex. G.)

22.    Because Plaintiff did not fit any of the exemptions provided for unlawful carrying of a weapon under the laws of Texas, Bolch informed Plaintiff that he could be arrested. (Ex. B at 67.)

23.    Plaintiff responded with profane language. (Ex. B at 67; Ex. G.)

24.    Bolch placed Plaintiff under arrest for unlawful carrying of a weapon and disorderly conduct. (Ex. B at 74, Ex.C; Ex. G.)

25.    Bolch escorted Plaintiff to his police car, opened the door and told Plaintiff to be mindful of his head and legs when getting into the car. (Ex. B at 77; Ex. G.)

26.    After Plaintiff was seated, Bolch closed the car door without incident and transported Plaintiff to the county jail. (Ex. B at 77, 86; Ex. G.)

27.    Upon arrival at the jail, Bolch assisted Plaintiff in exiting the vehicle and turned custody of Plaintiff over to the jailer. (Ex. B at 86-87; Ex. G.)

4

28.  Bolch then left the jail and had no further interaction with Plaintiff. (Ex. B at 87-88; Ex. G.)

29.  Plaintiff was ultimately released from jail several hours later, after all charges against him were dropped.(Ex. E, pg. 131 at 18-15; 132 at 1-4; 135 at 14-16.)

30.  The Jim Hogg County Jail had passed inspection on April 6, 1999, the day prior to Plaintiff's arrest. (Ex. F.)

### III.
### ARGUMENT AND AUTHORITY

#### A.    Standard for Summary Judgment.

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence

of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

**B.    Summary Judgment Evidence Shows that Defendants Not Liable under 42 U.S.C. § 1983.**

**1.    Defendants entitled to qualified immunity for claims brought against them in their individual capacities**

Defendants Bolch and Ybanez are entitled to dismissal of all claims against them in their individual capacities as they are entitled to qualified immunity. A governmental official is only liable under section 1983 "'if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights' of the person affected." *Rheaume v. Texas Dept. of Public Safety*, 666 F.2d 925 (5th Cir. 1982)(quoting *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. 1981)). An officer is entitled to qualified immunity when he has acted in good faith, believing that his actions were within his lawful authority, when his belief was objectively reasonable, based on circumstances at the time he acted. *See Douthit v. Jones*, 619

F.2d 527, 534 (5th Cir. 1980); *Barker*, 651 F.2d 1107.

Defendants Bolch and Ybanez have plead qualified immunity as required.  *See Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).  Plaintiff must disprove the official's immunity by showing the official lacked good faith. *Barker*, 651 F.2d at 1121.  Good faith consists of both subjective and objective components.  *Id.;  Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979).  The subjective element of good faith "requires that a plaintiff show that the official's action, although labeled as 'reckless' or 'grossly negligent,' falls on the actual intent side of those terms, rather than on the side of simple negligence." *Bogard*, 586 F.2d at 412; *Garris v. Rowland*,  678 F.2d 1264, (5th Cir. 1982).

**Deputy Bolch:**        Assuming *arguendo* that immigration agents are authorized to carry firearms at all times and Bolch was misinformed as to the law (which is discussed *infra*), the United States Supreme Court has upheld a police officer's right to qualified immunity in situations where the officer mistakenly infringed on an individual's constitutional rights because the officer did not know that he was violating a person's rights. *Anderson v. Creighton,* 483 U.S. 635, 644, 107 S.Ct. 3034, 3041, 97 Ed.2d 523 (1987) ("...it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officers ... should not be held personally liable."); *Presley v. City of Benbrook*, 4 F.3d 405 (5th Cir. 1993).

Bolch questioned Plaintiff in order to see if he fit any exemption to the state law prohibiting the carrying of weapons.  (Ex. B at 61; Ex. G.)  Bolch asked Plaintiff if he was a certified Texas peace officer, whether he was traveling, whether he had a concealed handgun permit, or whether he was going to or from his employment as a Border Patrol agent; Plaintiff responded "No" to these questions.  (Ex. B at 61; Ex. G)  Bolch knew that Plaintiff's Border Patrol credentials allowed him

to carry a weapon while on duty. (Ex. B at 62-63; Ex. G) Bolch knew of no provision that allowed Plaintiff to carry a weapon as an off-duty Border Patrol agent. (Ex. B at 62-63; Ex. G.) Thus, based on his knowledge of the elements of that cause of action and Plaintiff's responses, Defendant Bolch had an objectively reasonable belief that Plaintiff violated the state statute against unlawfully carrying a weapon. (Ex. G; Ex. B at 67.) Bolch also determined that based on the time and place of Plaintiff's use of profanity, i.e. in front of an elementary school on a weekday afternoon, Plaintiff was committing disorderly conduct. (Ex. G; Ex. B pg. 68 at 20-25.) It was for these reasons that Plaintiff was arrested, for unlawfully carrying a weapon and disorderly conduct. (Ex. G.) No other reasons came into play concerning Plaintiff's arrest, although Bolch could also have arrested Plaintiff for his violations of traffic law. (Ex. G; Ex. B at 57.) Bolch acted in good faith when arresting Plaintiff and is thus entitled to qualified immunity.

**Sheriff Ybanez**:    Plaintiff claims that Defendant Ybanez violated his rights by "approving Plaintiff's arrest and detention and by having Plaintiff charged with untrue allegations of criminal conduct." The allegation alone is too tenuous to hold water but, because Bolch reasonably determined that there was probable cause for Plaintiff's arrest, qualified immunity will apply to claims related to false arrest brought against other governmental employees such as Defendant Ybanez. *See Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). Plaintiff further claims that Defendant Ybanez violated his rights by subjecting him to unconstitutional jail conditions. These allegations are also without basis (*see infra*). The Jim Hogg County Jail passed inspection the day before Plaintiff's arrest. (Ex. F.)

Defendant Ybanez neither participated in Plaintiff's arrest nor jailed him, nor took any active role in any event made the subject of this lawsuit. In order to hold a sheriff liable under section 1983, the sheriff must be personally involved in the acts which caused the injury or there must be

a causal connection between the act of the sheriff and the constitutional violation to be redressed. *Lozano v. Smith,* 718 F.2d 756, 758 (5th Cir.1983); *Lozano v. Smith,* 718 F.2d at 768;*Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir.1986). Plaintiff has been unable to establish that Defendant Ybanez acted in bad faith so as to waive his immunity and has further been unable to prove Ybanez took any affirmative action to violate his rights.   Therefore, all claims against Ybanez should be dismissed.

### 2.      Defendant Jim Hogg County entitled to summary judgment

Plaintiff claims that Jim Hogg County violated his rights because it allegedly had a policy, custom and practice of harassing Border Patrol agents. *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). However, the competent summary judgment evidence shows that Plaintiff was arrested and incarcerated in good faith for Plaintiff's violations of Texas law, and not as a result of any alleged policy, custom or practice of discrimination against Border Patrol agents.  Further, as Plaintiff's own testimony shows, there is no evidence that would support an inference that Jim Hogg County had a custom, policy or practice of harassing Border Patrol agents.  (Ex. E, pg. 55 at 5-9).

Plaintiff nevertheless claims that the County must have a policy of harassing Border Patrol agents because a few Border Patrol agents were detained by sheriff's deputies.  Plaintiff must prove this alleged policy exists by demonstrating that Defendant Jim Hogg County had a custom, policy or custom which caused the alleged constitutional deprivation. *Monell*, 436 U.S. at 690-91; *Brooks v. George County, Miss.*, 84 F.3d 157, 165 (5th Cir. 1996).  Constant and persistent, not isolated, violations constitute custom and policy. *Webster v. City of Houston*, 735 F.2d 838, (5th Cir. 1984); *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984).

Plaintiff advances that this alleged policy of Jim Hogg County harassing Border Patrol agents

9

is established by a total of four alleged incidences over the seven years that he was in Hebbronville. (Ex. E, pg. 51 at 24-25; 52 at 1-2; 56; 63; 64.)    Two or three of these four alleged incidences, of which one involves Plaintiff and forms the basis of this lawsuit, occurred when the agents were off-duty in their personal vehicles, and at least two were based on their violations of traffic laws. (Ex. E, pg. 56-57, 63-65.) Plaintiff admitted there is no law that allows Border Patrol agents to violate traffic laws. (Ex. E, pg. 61 at 6-10.) Plaintiff further admitted that he does not know the reason why the agent in the marked vehicle was detained, i.e. whether he was speeding or disregarding traffic signals in a non-emergency situation, etc. (Ex. E, pg. 56-57.)  However, Plaintiff reluctantly agreed that Border Patrol agents should be stopped if they violate traffic laws, even if they are driving marked vehicles. (Ex. E, pg. 57 at 11-15.) Plaintiff further admitted that he did not know why any of the other agents were stopped, or whether they were ticketed or not. (Ex. E, pg. 57, 64-65.) These four examples cited by Plaintiff do not rise to "constant and persistent" violations which would constitute custom and policy. *Webster,* 735 F.2d 838; *Bennett,* 728 F.2d 762.  In fact, Plaintiff does not know if these agents were stopped <u>because</u> they were Border Patrol agents.  The competent summary judgment evidence shows that Jim Hogg County did not have a policy, custom or practice of harassing Border Patrol agents, and Plaintiff has no evidence to contradict this showing.

Any claims that the County detained Plaintiff in unconstitutional jail conditions are without merit as the county passed the Texas Commission on Jail Standards' inspection the day prior to Plaintiff's arrest. (Ex. F.) Furthermore, Plaintiff's claims, even if accepted as true, do not rise to the level of constitutional violations.  Plaintiff  was merely held for several hours in a cell which he claims had feces in and around the toilet.  He was also allegedly given a mattress with pubic hairs on it. (Ex. E, pg. 101 at 22-25, 102 at 2-12.) These conditions even if true do not constitute cruel and unusual punishment or rise to the level of being unconstitutional.  Plaintiff additionally testified

that county jail employees did everything correctly when it came to booking him into jail and processing him. (Ex. E, pg. 105 at 24-25, pg. 106 at 1-12.) Accordingly, all of Plaintiff's claims against Jim Hogg County must fail.

### 3.    Supremacy Clause does not apply to present situation

Plaintiff has based his claim on the mistaken belief that federal law permits Border Patrol agents to carry weapons off duty. While Plaintiff can point to an internal Immigration and Naturalization Service (INS) firearms policy to support his argument, there is no <u>law</u> that clearly delineates when federal law enforcement officials, who are not certified peace officers in the State of Texas, may carry their weapons. *See* TEX. CRIM. PROC. CODE ANN. §2.12 (Vernon 2001); *Sanchez v. State*, 582 S.W.2d 813, 814 (Tex.Crim.App. 1979, reh'g denied)(holding Border Patrol officers are not certified peace officers in the State of Texas.)

The Supremacy Clause provides several ways in which federal law may trump state law. Congress can expressly provide that a certain law preempts state law. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). When preemption is not expressly provided for, Congress' intent to preempt state laws in a particular area may reasonably be inferred if the scheme of federal regulation is sufficiently comprehensive and "left no room" for supplemental state regulation. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Preemption of a whole field will also be inferred where the area is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Ibid.; see Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Additionally, state law is voided to the extent that it actually conflicts with federal law, that is when it is impossible to comply with both state and federal law or when state law hinders the

11

furtherance of Congress' purposes. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248 (1963); *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. *See generally Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984).

Plaintiff advances three sources of authority for his proposition that he is entitled to carry a weapon whether on-duty or off-duty because he is employed as a Border Patrol officer. The first is the INS Firearms Policy, which interprets Section 287(a) of the Immigration and Nationality Act. The policy manual's interpretation of Section 287(a) allows Border Patrol agents who have received the necessary training to carry firearms on and off duty. (Ex. D at 1-2). However, this policy manual is not law and creates no substantive rights, as it clearly states. (Ex. D., Commentary 1 at 4, Commentary 2 at 6.)

Plaintiff's two other purported sources of authority for his proposition that federal agents may carry weapons at all times are federal law, namely 8 U.S.C. § 1357 and 8 C.F.R. § 287 (f). However, neither specifically address whether a federal officer may carry a weapon at all times. Section 287(a) makes no mention of whether or not immigration agents are authorized to carry weapons while off duty. It states:

> "Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States."

8 U.S.C. § 357 (a)(5) (1996). Likewise, 8 C.F.R. § 287 does not state whether or not an immigration agent is authorized to carry a weapon while off duty. Section 287.5(f), entitled "Power and authority to carry firearms," provides:

"The following immigration officers who have successfully completed basic immigration enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to carry firearms provided that they are individually qualified by training and experience to handle and safely operate the firearms they are permitted to carry, maintain proficiency in the use of such firearms, and adhere to the provisions of the enforcement standard governing the use of force in Sec. 287.8(a):

(1) Border Patrol agents. . . "

Simply because these federal provisions allow Border Patrol agents to carry weapons does not mean that they allow an individual who happens to be employed as a Border Patrol agent to carry a weapon at all times, in violation of state law. Congress has made no express preemption in this field, nor is there any implied preemption. States are free to supplement federal firearms laws, and many states including Texas have passed laws prohibiting an individual from carrying a concealed firearm without a permit, unless they meet enumerated exceptions.

Proposed legislation which is pending before a subcommittee in the United States House of Representatives indicates that the federal government has not conclusively spoken as to whether or not off-duty officers may carry concealed weapons in states with concealed weapons laws. The purpose of H.R. 218 is to amend the U.S. Code to exempt current and former law enforcement officers from state laws "prohibiting the carrying of concealed handguns." H. R. 218, 107th Cong. (2001). There would be no need to exempt federal law enforcement officers from state concealed weapon laws if the federal officers were already authorized to carry concealed weapons without a permit under federal law. This proposed legislation seems to acknowledge that state and federal law enforcement officers may run afoul of state concealed weapons laws by carrying their law enforcement weapon at a time when doing so may be contrary to state law.

The Supreme Court has not disfavored state laws when it is not readily apparent that the state

13

law conflicts with federal law. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law);" *Avocado Growers*, 373 U.S. 132 (1963), at 146-147, 83 S.Ct., at 1219-1220 ("[W]e are not to conclude that Congress legislated the ouster of this [state] statute ... in the absence of an unambiguous congressional mandate to that effect"); *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 780, 67 S.Ct. 1026, 1033, 91 L.Ed. 1234 (1947) ("Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States") (opinion of Frankfurter, J.)

Because federal law does not specifically address the issue of whether or not Border Patrol agents may carry weapons off-duty, we must look to the laws of the State of Texas to see how the state sovereign has addressed this issue on which the federal sovereign has not clearly spoken. Texas statutes provide that it is unlawful for an individual to knowingly carry a handgun on or about his person. TEX. PEN. CODE ANN. §46.02 (Vernon 2001). There are numerous exceptions to this provision, including an exemption for peace officers. TEX. PEN. CODE ANN. §46.15 (Vernon 2001). Border Patrol officers are not considered peace officers under Texas law. TEX. CRIM. PROC. CODE ANN. § 2.122 (Vernon 2001). Texas' laws regarding the unlawful carrying of a weapon do not apply to an individual who is traveling or possesses a concealed weapons permit. TEX. PEN. CODE ANN. §46.15 (Vernon 2001). Federal law has made it clear that Border Patrol officers are able to carry weapons during working hours. However, because federal law makes no mention of whether Border Patrol agents may carry weapons off duty, Texas law supplements the void in federal law in this particular area. Thus, off-duty Border Patrol agents may not carry weapons in violation of Texas

14

statutes.

Plaintiff may argue that the INS firearms policy manual allows him to carry his weapon at all times. However, this manual is not law and creates no substantive rights. Additionally, the contents of the INS firearms manual cannot be expected to be known by a Jim Hogg County sheriff's deputy. Therefore, barring some clear, direct federal mandate, all federal agents are required to obtain concealed firearms permits in order carry concealed weapons while off-duty in the State of Texas.

**C.    Defendants Bolch and Ybanez Entitled to Summary Judgment in their Official Capacities as to Plaintiff's State Law Claims**

Plaintiff has brought claims of false arrest, false imprisonment, intentional infliction of emotional distress and defamation against Defendant Bolch and Ybanez in their individual capacities, a claim of assault against Defendant Bolch in his individual capacity and a claim of negligence against Defendants Bolch and Jim Hogg County.

Under Texas law, police officers sued in their individual capacities are entitled to official immunity from suits arising out of performance of discretionary duties in good faith as long as they are acting within their authority. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994).

Under Texas law, an officer's investigation of a crime and arrest of a suspect are discretionary duties within police authority. *See Wyse v. Dep't of Pub. Safety*, 733 S.W.2d 224, 227 (Tex.App.-Waco 1986, writ ref'd n.r.e.); *Dent v. City of Dallas*, 729 S.W.2d 114, 117 (Tex.App.-Dallas 1986, writ ref'd n.r.e.); *Antu v. Eddy*, 914 S.W.2d 166, 171 (Tex.App.-San Antonio 1995, no writ). The first and third criteria for official immunity have been met by Defendant Bolch as he acted in the course and scope of his work and performed discretionary duties in the arrest and

detention of Plaintiff; thus the only inquiry remaining is as to good faith. Defendant Ybanez took no action in Plaintiff's arrest and detention. However, even if it were established that Ybanez took some incidental role such as "approving" Plaintiff's arrest, as is advanced by Plaintiff, this action is still in the course and scope of Ybanez's employment and would be discretionary. The only examination that need be made would be as to good faith.

Texas' test for good faith is the same test used by federal courts for § 1983 inquiries into qualified immunity. *City of Lancaster*, 883 S.W.2d at 656. Texas courts "look to whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Id.* Official immunity and qualified immunity each "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* An officer who reasonably believes that his actions are lawful is entitled to immunity from liability if he pleads such immunity unless it can be shown by the plaintiff that the officer lacked good faith. *Barker*, 651 F.2d at 1120. Once the officer has shown that he was acting in his official capacity and within the scope of authority, "the burden shifts to the plaintiff to breach the official's immunity by showing that the official lacked good faith." 651 F.2d at 1121 (citations omitted); *Rheaume v. Texas Dept. of Public Safety*, 666 F.2d 925 (5th Cir. 1982). It is insufficient for plaintiff to simply establish the illegality of his arrest. *Saldana v. Garza*, 684 F.2d 1159, 1166 (5th Cir.1982); *Cruz v. Beto*, 603 F.2d 1178, 1183 (5th Cir. 1979). The plaintiff's burden to controvert an officer's verification that he acted in good faith is very high. *See City of Lancaster*, 883 S.W.2d at 657.

Plaintiff claims that Defendants Bolch and Ybanez are liable in their individual capacities for false arrest/false imprisonment, intentional infliction of emotional distress resulting from the

16

arrest and defamation. However, as discussed previously, Defendant Bolch acted in good faith by arresting Plaintiff for his violations of state law; Defendant Ybanez neither arrested Plaintiff, nor jailed him. Even assuming that Defendant Ybanez did "approve" Plaintiff's arrest, this could not be said to have been in bad faith as Plaintiff had been arrested in good faith for Plaintiff's violations of state law. Not only does Plaintiff have no evidence supporting these causes of action, Defendants are entitled to official immunity.

### 1.    False arrest/ False imprisonment

The elements of false imprisonment and false arrest are: (1) a willful detention; (2) performed without consent; and (3) without the authority of law. *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex.1985) (per curiam); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Wal-Mart Stores, Inc. v. Cockrell*, 61 S.W.3d 774, 777 (Tex.App.-Corpus Christi 2001, no pet.). If the alleged detention was performed with the authority of law, then no false imprisonment occurred. *Cockrell*, 61 S.W.3d at 777 (*citing Wal-Mart Stores, Inc. v. Resendez*, 962 S.W.2d 539, 540 (Tex.1998)). The plaintiff must prove the absence of authority in order to establish the third element of both a false imprisonment and false arrest cause of action. Plaintiff's claims of false arrest and false imprisonment fail because Defendant Bolch had probable cause to arrest Plaintiff for unlawfully carrying a weapon and disorderly conduct, as well as for the multiple traffic offenses for which Plaintiff was liable but not charged. Plaintiff's arrest and imprisonment were performed with the authority of law and were thus not illegal.

### 2.    Defamation

To recover for defamation, the plaintiff must prove that the defendant: (1) published a statement to a third party; (2) that was false or defamatory concerning the plaintiff; (3) while acting

with negligence regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568,

571 (Tex.1998); *Clarke v. Denton Publishing Co.*, 793 S.W.2d 329, 331 (Tex.App.--Fort Worth

1990, writ denied); *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex.App.-Hous. (14 Dist.)

1997) A statement is defamatory if it tends to injure a person's reputation, exposing the person to

public hatred, contempt, ridicule, or financial injury. *Einhorn v. LaChance,* 823 S.W.2d 405, 410-

11 (Tex.App.-Houston [1st Dist.] 1992, writ dism'd w.o.j.). Allegedly defamatory statements should

be construed as a whole and based on how a person of ordinary intelligence would perceive the

entire statement. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex.2000).

    In the instant case, Plaintiff testified that his defamation claim is based on the physical act

of his arrest, not because there was any kind of publication made about him to a third party. (Ex.

E, pg. 67 at 24-25, 69 at 5-25; 70 at 1, 7-10). This clearly does not meet the legal requirements for

a cause of action for defamation.

### 3.    Intentional Infliction of Emotional Distress

    To establish a cause of action for intentional infliction of emotional distress, the plaintiff

must present sufficient proof of severe emotional distress, wholly apart from any outrageous conduct

on the defendant's part. *Tidelands Auto, Club v. Walters*, 699 S.W.2d 939, 944 (Tex.App. -

Beaumont 1985, ref. n.r.e.); *Regan v. Lee*, 879 S.W.2d 133, 136 (Tex.App.-Houston [14[th] Dist.]

1994, no writ) (holding intentional infliction of emotional distress cause of action is designed to

compensate plaintiff for severe emotional distress, not to punish defendant for offensive behavior).

More than mere worry, anxiety, vexation, embarrassment, anger, difficulty concentrating, or feelings

of insecurity are required. *Gorges Foodservice, Inc. v. Huerta*, 964 S.W.2d 656, 668-669 (Tex.App.

- Corpus Christi 1997, no pet.). Plaintiff testified that he has not sought treatment for any mental

18

or physical condition that allegedly resulted from his arrest. (Ex. E, pg. 130 at 19-22.) Not only does Plaintiff's description of his "damages" fail to rise to the level necessary for intentional infliction of emotional distress, he has no evidence that Defendants ever intentionally caused him severe emotional distress. Furthermore, Plaintiff has no evidence to support an inference that to arrest someone for illegal possession of a handgun or for a traffic violation goes beyond all reasonable bounds of decency. Therefore, this claim must fall.

### 4. Conspiracy and Joint Enterprise

Plaintiff has also claimed that the allegedly tortious actions committed by Defendant Bolch and Ybanez in their individual capacities were the result of a conspiracy and joint enterprise. If all of the Defendants' acts fall under qualified/ official immunity, there can be no conspiracy claim. *City of Lancaster*, 883 S.W.2d at 656. Additionally, without proof of Plaintiffs' claims, there can be no finding of a joint enterprise by Defendants to commit same.

The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). The elements of a joint enterprise are: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *Texas Dept. of Transp. v. Able,* 35 S.W.3d 608, 613 (Tex.2000) (citing to Restatement (Second) of Torts §§ 491 cmt. c (1965); *Blount v. Bordens Inc.,* 910 S.W.2d 931, 933 (Tex.1995); *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995).

19

Gilbert admitted in his deposition that he has no evidence to support any claim that Defendants Bolch and Ybanez acted together or conspired to arrest him, or any other Border Patrol agent for that matter. The relevant testimony is as follows:

> Q: What is it that you say that Mr. Bolch and Mr. Ybanez did to conspire against you?
> A: Arresting me.
>
> Q: . . .You don't have any evidence that Sheriff Ybanez and Isaac Bolch got together---
> A: No
> Q: and talked about, "Let's go arrest"---
> A: No
> Q: "John Gilbert."
> A: Exactly.
>
> Q: And you don't know if that was a plan of theirs, to arrest you?
> A: No. I have no evidence to show that.
>
> Q: Do you have anything that would show that Mr. Ybanez, the sheriff at the time, and Mr. Bolch got together and planned to arrest any Border Patrol agent?
> A: I have no evidence of that, no.

(Ex. E, pgs. 53 at 12-15; 54 at 15-25; 55 at 5-9.) Gilbert has no evidence of any objective, agreement or plan between Defendants Bolch and Ybanez, much less any evidence of any other element of conspiracy or joint enterprise, such as a meeting in furtherance thereof or a pecuniary interest. These claims must fall.

Officers are entitled to official immunity even in cases involving allegations of intentional torts such as those advanced by Plaintiff. *See Hudson v. Vasquez*, 941 S.W.2d 334, 336-37 (Tex.App.-Corpus Christi 1997, pet. filed) (assault); *Victory v. Bills*, 897 S.W.2d 506, 507-10 (Tex.App.-El Paso 1995, no writ) (assault and battery); *Antu*, 914 S.W.2d at 170-72 (false arrest,

20

assault and negligent infliction of emotional distress); *Ervin v. James*, 874 S.W.2d 713, 715-18

(Tex.App.-Houston [14th Dist.] 1994, writ denied) (assault and negligence).   Both individual

Defendants thus entitled to qualified/ official immunity.   Because the facts as alleged by Plaintiff

and the evidence as produced by the Plaintiff do not waive sovereign immunity or official immunity,

all of Plaintiff's claims must fail and be dismissed.


WHEREFORE, PREMISES CONSIDERED, Defendants, Jim Hogg County, Texas; Isaac

Bolch, in his Individual and Official Capacities; and Gilbert Ybanez, in his Individual and Official

Capacities, pray that this Court dismiss Plaintiff's claims against them with prejudice.   Defendants

also request any other relief, at law or in equity, to which they may show themselves to be justly

entitled.

Signed on July 1, 2002.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone:  (956) 541-1846
Facsimile:  (956) 541-1893

By: _____

Eileen Leeds
State Bar No. 00791093
Federal I.D. No. 16799
Attorney in Charge

Amy Lawler Gonzales
State Bar No. 24029579
Federal I.D. No. 28489

Attorneys for Defendants

21

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has on July 1, 2002 been delivered to counsel listed below, via certified mail, return receipt, requested.

Mr. Michael R. Cowen
MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520

_Eileen Leeds_
_____
Eileen M. Leeds

## CERTIFICATE OF CONFERENCE

The Rules for the United States District Court for the Southern District of Texas do not require counsel to confer regarding motions for summary judgment. Accordingly, a certificate of conference is not required.

_Eileen Leeds_
_____
Eileen M. Leeds

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN GILBERT | § | CIVIL ACTION NO. B-01-054 |
| | § | |
| VS. | § | |
| | § | |
| JIM HOGG COUNTY, TEXAS, | § | |
| ISAAC BOLCH, in his Individual | § | JURY DEMANDED |
| and Official Capacities, and | § | |
| GILBERT YBANEZ, in his | § | |
| Individual and Official Capacities | § | |

## ORDER SETTING HEARING

On this the _____ day of _____, 2002, came on to be considered, Defendants' Motion for Summary Judgment. After considering same, the Court is of the opinion that a hearing should be held.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendants' Motion for Summary Judgment be and is hereby set for hearing on the ___ day of _____, 2002 at ____ a.m. o'clock in this Honorable Court.

SIGNED FOR ENTRY on this the _____ day of _____, 2002.


_____
UNITED STATES MAGISTRATE JUDGE


Mr. Michael R. Cowen, MICHAEL R. COWEN, P.C., 765 E. 7th Street, Suite A, Brownsville, Texas 78520
Ms. Eileen M. Leeds, WILLETTE & GUERRA, L.L.P., 3505 Boca Chica Blvd., Ste. 460, Brownsville, Texas 78521

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN GILBERT | § | CIVIL ACTION NO. B-01-054 |
| | § | |
| VS. | § | |
| | § | |
| JIM HOGG COUNTY, TEXAS, | § | |
| ISAAC BOLCH, in his Individual | § | JURY DEMANDED |
| and Official Capacities, and | § | |
| GILBERT YBANEZ, in his | § | |
| Individual and Official Capacities | § | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this day, came on to be heard Defendants' Motion for Summary Judgment filed in this cause. All parties appeared by and through respective counsel. The Court after examining the pleadings and summary judgment evidence and hearing the arguments of counsel is of the opinion and finds that Defendants, Jim Hogg County, Texas; Isaac Bolch, in his Individual and Official Capacities; and Gilbert Ybanez, in his Individual and Official Capacities, are entitled to summary judgment.

IT IS THEREFORE ORDERED ADJUDGED and DECREED that Defendants' Motion for Summary Judgment be and is GRANTED, that Plaintiff take nothing as against Defendants, Jim Hogg County, Texas; Isaac Bolch, in his Individual and Official Capacities; and Gilbert Ybanez, in his Individual and Official Capacities, and that all claims against Defendants, Jim Hogg County, Texas; Isaac Bolch, in his Individual and Official Capacities; and Gilbert Ybanez, in his Individual and Official Capacities, be and are DISMISSED with prejudice.

All relief requested and not expressly granted is hereby denied.

Signed this the _____ day of _____, 2002.

_____
UNITED STATES MAGISTRATE JUDGE

Mr. Michael R. Cowen, MICHAEL R. COWEN, P.C., 765 E. 7th Street, Suite A, Brownsville, Texas 78520
Ms. Eileen M. Leeds, WILLETTE & GUERRA, L.L.P., 3505 Boca Chica Blvd., Ste. 460, Brownsville, Texas 78521

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN GILBERT              }

VS.                       }       CIVIL ACTION NO. B-01-054

JIM HOGG COUNTY, TEXAS,   }
ISAAC BOLCH, in his Individual   }
and Official Capacities, and       }       JURY DEMANDED
GILBERT YBANEZ, in his       }
Individual and Official Capacities  }

## PLAINTIFF'S FIRST AMENDED COMPLAINT

John Gilbert, Plaintiff, files this Plaintiff's First Amended Complaint, bringing suit against Defendants Jim Hogg County, Texas, Isaac Bolch, in his individual and official capacities, and Gilbert Ybanez, in his individual and official capacities.

### PARTIES

1.1    Plaintiff John Gilbert is an individual residing in Cameron County, Texas.

1.2    Defendant Jim Hogg County, Texas is a political subdivision of the State of Texas. It can be served with process by serving County Judge Agapito Molina, at the Jim Hogg County Courthouse.

1.3    Defendant Isaac Bolch is an individual residing in Texas. He may be served with process by personal service wherever he may be found.

1.4    Defendant Gilbert Ybanez is an individual residing in Jim Hogg County, Texas. He may be served with process at 401 N. Karen, Hebbronville, Texas 78361.

### JURISDICTION

2.1    This Court possesses Federal Question jurisdiction because Plaintiff is bringing claims under 42 U.S.C. § 1983.



## VENUE

3.1    Venue is proper in the Southern District of Texas because the acts giving rise to Plaintiff's cause of action occurred in the Southern District of Texas.

3.2    Venue is proper in the Southern District of Texas because Defendant Jim Hogg County, Texas is located in the Southern District of Texas.

3.3    Venue is proper in the Southern District of Texas because Defendant Ybanez resides within the Southern District of Texas.

## FACTS

4.1    At all times relevant to this lawsuit, Plaintiff was employed by the United States federal government as a Border Patrol agent.

4.2    As a United States Border Patrol agent, Plaintiff was authorized by federal law to carry a firearm, both while on-duty and while off-duty.

4.3    At all times material to this lawsuit, Defendant Gilbert Ybanez was Sheriff of Jim Hogg County, Texas.

4.4    At all times material to this lawsuit, Defendant Isaac Bolch was employed by Defendant Jim Hogg County, Texas as a Sheriff's Deputy.

4.5    As Sheriff, Defendant Ybanez was a policymaker for Defendant Jim Hogg County, Texas.

4.6    During the time that Defendant Ybanez was sheriff of Jim Hogg County, Texas, friends and family members of Jim Hogg County Sheriff Department personnel were involved in narcotics trafficking.

4.7    United States Border Patrol agents arrested friends and family of Jim Hogg County Sheriff's Department personnel for narcotics offenses.

4.8    For example, on or about August 6, 1998, Plaintiff Gilbert arrested Jose Ybanez, the relative of Defendant Ybanez, with approximately 13.88 pounds of cocaine and approximately 203 pounds of marijuana.

4.9    The Jim Hogg County Sheriff's Department adopted a policy, practice, and/or custom of harassing United States Border Patrol agents.

4.10    For example, a Jim Hogg County Sheriff's deputy stopped and ticketed a Border Patrol agent who was driving a marked Border Patrol vehicle.

4.11    The policy, practice, and/or custom of harassing United States Border Patrol agents included a pattern and practice of unjustified traffic stops.

4.12    On or about April 7, 1999, Plaintiff Gilbert was driving in a 1994 Ford Mustang in Hebbronville, Texas.

4.13    As part of the Jim Hogg County Sheriff's Department's policy, practice, and/or custom of harassing United States Border Patrol agents, on or about April 7, 1999 Defendant Bolch stopped Plaintiff's vehicle.

4.14    At all times material to this lawsuit, including the April 7, 1999 stop and arrest, Defendant Bolch was acting under color of state law, and was acting in the course and scope of his employment with the Jim Hogg County Sheriff's Department.

4.15    Plaintiff is a drug awareness officer with the D.A.R.E. program.

4.16    Defendant Bolch stopped Plaintiff Gilbert in front of the school where he was a drug awareness officer.

4.17    Defendant Bolch knew that Plaintiff was a United States Border Patrol agent.

4.18    Defendant Bolch told Plaintiff Gilbert that he stopped Plaintiff because Plaintiff's passenger was not wearing a seat belt.

4.19    Defendant Bolch could not have known whether or not Plaintiff's passenger was wearing a seat belt because the windows in the 1994 Mustang were darkly tinted.

4.20    Defendant Bolch also claimed that Plaintiff revved his engine.

4.21    Defendant Bolch's claim was false; Plaintiff did not rev his engine.

4.22    Defendant Bolch did not have probable cause to stop Plaintiff.

4.23    Defendant Bolch's stopping Plaintiff was illegal and unconstitutional.

4.24    Plaintiff had his government-issued handgun in the Mustang.

4.25    Plaintiff informed Defendant Bolch that he was a United States Border Patrol agent.

4.26    Plaintiff informed Defendant Bolch that he had a government-issued handgun in the vehicle.

4.27    Defendant Bolch instructed Plaintiff to step out and walk to the rear of the vehicle.

4.28    Plaintiff complied with Defendant Bolch's instructions.

4.29    Defendant Bolch asked Plaintiff whether he had a Texas concealed handgun permit.

4.30    Plaintiff replied that he did not.

4.31    Defendant Bolch asked whether Plaintiff was a law enforcement officer.

4.32    Plaintiff replied that he was a United States Border Patrol agent.

4.33    Defendant Bolch asked Plaintiff whether he was going to or from work.

4.34    Plaintiff replied that he was not.

4.35    Defendant Bolch asked Plaintiff whether he was on duty.

4.36    Defendant Bolch replied that he was not.

4.37    Defendant Bolch told Plaintiff that Plaintiff had no authority to carry a firearm

while off duty.

4.38    Plaintiff attempted to show Defendant Bolch his credentials--which explicitly permit him to carry a firearm--but Defendant Bolch would not listen.

4.39    Plaintiff explained to Defendant Bolch that federal law permitted him to carry a firearm; but Defendant Bolch did not care.

4.40    Defendant Bolch arrested Plaintiff, alleging that Plaintiff was guilty of unlawful carrying of a firearm in violation of Texas Penal Code § 46.02.

4.41    Defendant Bolch handcuffed Plaintiff.

4.42    Defendant Bolch took Plaintiff into a marked Jim Hogg County Sheriff's vehicle.

4.43    Before Plaintiff could get his entire body inside the vehicle, Defendant Bolch slammed the door against Plaintiff's left knee, pinning it between the cage and the door. This action injured Plaintiff's knee.

4.44    Defendant Bolch did not ticket the passenger in the Mustang for not wearing a seatbelt.

4.45    Defendant Bolch transported Plaintiff to jail.

4.46    Plaintiff was stripped of his shoes and his possessions.

4.47    Employees of the Jim Hogg County Sheriff's Department seized Plaintiff's government-issued firearm and credentials, supposedly as evidence.

4.48    Rene Ruiz, an employee of the Jim Hogg Sheriff's Department, fingerprinted and photographed Plaintiff.

4.49    Ruiz asked Plaintiff to sign his fingerprints so that they could be forwarded to the FBI.

4.50    The forwarding of the prints to the FBI would result in Plaintiff receiving an FBI

number.

4.51    As a federal law enforcement officer, Plaintiff was concerned about having an FBI number. The fact that Plaintiff has an FBI number will come up every time that Plaintiff undergoes a periodic background investigation, and it will put Plaintiff at a disadvantage in seeking promotions.

4.52    Ruiz unnecessarily asked Plaintiff a series of personal and humiliating conditions.

4.53    Plaintiff asked Ruiz where Plaintiff was to be held.

4.54    Ruiz informed Plaintiff that he was to be held in the back with the other inmates.

4.55    Because Plantiff was a law enforcement agent, he asked to be left in the holding cell, separate from the general population.

4.56    Plaintiff feared for his safety among the general population.

4.57    Nevertheless, Plaintiff was locked in a cell in the area where the other inmates were housed.

4.58    Although Plaintiff's cell was locked, the remainder of the cells whether the other inmates were housed were unlocked.

4.59    The inmates and what appeared to be a trustee were allowed to walk up and down a hallway where Plaintiff was housed.

4.60    The condition of Plaintiff's cell was deplorable.

4.61    There was feces in and around the toilet.

4.62    There were pubic hairs embedded in the mattress cover.

4.63    The mattress had not been washed in a very long time.

4.64    During his arrest and detention, Plaintiff availed himself of his free speech rights guaranteed by the First and Fourteenth Amendments to the United States

Constitution, as well as the Texas Constitution, and protested his unlawful arrest and detention.

4.65    In retaliation, Defendants Bolch and Ybanez charged Plaintiff with disorderly conduct.

4.66    All of the charges against Plaintiff were later dismissed.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983

5.1    The conduct of Defendants, as set forth above, violated Plaintiff's civil and constitutional rights.

5.2    Specifically, Defendant Bolch violated Plaintiff's rights by falsely arresting and detaining him. This conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

5.3    Defendant Bolch also violated Plaintiff's rights by using excessive force in slamming the door on his knee. This conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

5.4    Defendant Ybanez violated Plaintiff's rights by approving Plaintiff's arrest and detention, and by having Plaintiff charged with untrue allegations of criminal conduct. This conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

5.5    Defendants Ybanez and Jim Hogg County, Texas violated Plaintiff's rights by detaining him in unconstitutional jail conditions, including the feces on the toilet, the pubic hairs in the mattress, and the unwashed mattress. This conduct and these conditions violated Plaintiff's rights under the Fourth, Fifth, and Fourteenth

Amendments of the United States Constitution.

5.6     Defendant Jim Hogg County, Texas is liable for Defendant Ybanez's violations of Plaintiff's rights because, as sheriff, Defendant Ybanez was a policymaker for Jim Hogg County, Texas.

5.7     Defendant Jim Hogg County, Texas is liable for the actions of Defendants Bolch and Ybanez because there was a policy, practice and/or custom of harassing Border Patrol agents.

## SECOND CAUSE OF ACTION

## FALSE ARREST/FALSE IMPRISONMENT

6.1     The conduct of Defendants Ybanez and Bolch, in their individual capacities only, constitute false arrest and false imprisonment.

6.2     Defendant Bolch willfully detained Plaintiff when he arrested him and caused him to be held in jail.

6.3     Defendant Ybanez willfully detained Plaintiff when he approved Plaintiff's detention.

6.4     The arrest and detention of Plaintiff was without Plaintiff's consent.

6.5     Defendants Bolch and Ybanez had no authority of law to arrest and imprison Plaintiff because there was no probable cause to arrest and detain Plaintiff, and because Plaintiff violated no law.

## THIRD CAUSE OF ACTION

## NEGLIGENCE

7.1     Defendant Bolch was negligent in slamming the door of the Jim Hogg County Sheriff's vehicle on Plaintiff's knee.

7.2    As a direct and proximate result of Defendant Bolch's negligence, Plaintiff suffered damages.

7.3    Defendant Jim Hogg County is liable for Defendant Bolch's negligence under the Texas Tort Claims Act.

## FOURTH CAUSE OF ACTION

### ASSAULT

8.1    The actions of Defendant Bolch (in his individual capacity) in slamming the door on Plaintiff's knee constituted an assault.

8.2    As a direct and proximate result of Defendant Bolch's assault, Plaintiff suffered damages.

## FIFTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

9.1    The Conduct of Defendnats Bolch and Ybanez (in their individual capacities) constituted intentional infliction of emotional distress.

9.2    Defendants Bolch and Ybanez acted intentionally or recklessly in falsely arresting and detaining Plaintiff, and in their treatment of Plaintiff during the arrest and detention.

9.3    The conduct of Defendants Bolch and Ybanez was extreme and outrageous; it was outside all possible bounds of decency, reprehensible, and completely intolerable in a civilized society.

9.4    As a direct and proximate result of Defendants Bolch and Ybanez's outrageous conduct, Plaintiff suffered severe emotional distress.

## SIXTH CAUSE OF ACTION

## DEFAMATION

10.1    The conduct of Defendants' Bolch and Ybanez (in their individual capacities) constituted defamation.

10.2    Defendants published a false statement about Plaintiff when they caused him to have an arrest record (falsely indicating that there was probable cause to arrest him) and an FBI number.

10.3    These false statements were defamatory, especially to a federal law enforcement officer.

10.4    Defendants acted with negligence and malice regarding the truth of the statements.

10.5    As a result of Defendants Bolch and Ybanez's defamation, Plaintiff has suffered damages.

## CONSPIRACY

11.1    Defendants Bolch and Ybanez (in their individual capacities only) were involved in a conspiracy to harass Border Patrol agents. The common law torts set out in this Petition were committed in furtherance of that conspiracy. Therefore, Defendants Bolch and Ybanez (in their individual capacities only) are vicariously liable for one another's tortious conduct.

## JOINT ENTERPRISE

12.1    Defendants Bolch and Ybanez were engaged in a joint enterprise. Therefore, they are each vicariously liabile (in their individual capacities only) for each others tortious conduct.

## DAMAGES

13.1  As a direct and proximate result of Defendants' tortious' and illegal conduct, as set forth above, Plaintiff has suffered damages, including:

    (a)     Mental anguish;

    (b)     Pain and suffering;

    (c)     Loss of liberty and freedom; and

    (d)     Loss of earning capacity.

    For these losses, Plaintiff seeks to recover actual damages in the amount of $1,000,000.00.

13.2  Plaintiff also seeks to recovery attorney's fees and expert fees under 42 U.S.C. §1988.

13.3  Plaintiff also seeks to recover prejudgment interest, post judgment interest, and costs of court.

### MALICE/EXEMPLARY DAMAGES

14.1  Defendants' conduct, as described above, constitutes malice as that term is defined by the Texas Civil Practice and Remedies Code.

14.2  Defendants are therefore liable for exemplary or punitive damages.

14.3  Plaintiff prays that the jury and the Court award $1,000,000.00 in exemplary or punitive damages.

    WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that, after trial on the merits, he be awarded judgment against Defendants, jointly and severally, for $1,000,000 in actual damages, $1,000,000 in exemplary damages, attorneys' fees, expert fees, court costs, prejudgment interest, and post judgment interest.

RESPECTFULLY SUBMITTED,

MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____
        Michael R. Cowen
        S.D. Tex. ID No. 19967
        Texas Bar No. 00795307

## CERTIFICATE OF SERVICE

I, Michael R. Cowen, certify that I sent a copy of the above and foregoing document to Defendants' counsel on this the 1st day of August, 2001 by facsimile and regular mail.

Eileen M. Leeds
Willette & Guerra, L.L.P.
3505 Boca Chica Blvd.
Brownsville, Texas 78521

_____
Michael R. Cowen

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN GILBERT, | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | B-01-54 |
| JIM HOGG COUNTY, TEXAS, | § | |
| ET AL, | § | JURY DEMANDED |
| DEFENDANTS | § | |

VIDEOTAPED AND ORAL DEPOSITION OF:

ISAAC BOLCH

AUGUST 29, 2001

# COMPRESSED COPY



EXHIBIT
B
ALL-STATE LEGAL®

# *Compex Legal Services*

*Houston     San Antonio     Dallas     Austin*

*(800) 969-6424*

Case 1:01-cv-00054    Document 32    Filed in TXSD on 07/01/2002    Page 39 of 137
JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29/

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                   BROWNSVILLE DIVISION
3    _____

4    JOHN GILBERT,                      )
          PLAINTIFF                     )
5                                       )    CIVIL ACTION NO.
     VS.                                )    B-01-54
6                                       )
     JIM HOGG COUNTY, TEXAS,            )
7    ET AL,                             )    JURY DEMANDED
          DEFENDANTS                    )
8    _____   )
9
10
11
12
              ORAL/VIDEOTAPED DEPOSITION OF ISAAC BOLCH
13
                       AUGUST 29, 2001
14
15
16
17
18
19
20
21
22
23
24
25

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29

Page 6

1    Q    And so, you know, basically, what -- what -- what
2    we're going to go through here in a deposition?
3    A    Yes, sir.
4    Q    Okay. Just for formality, if you need to take a
5    break for any reason, let me know and I'll let you take a
6    break. I'm here to ask the questions, not to torture you.
7    A    Thank you.
8    Q    Where do you live right now?
9    A    I live at 4803 Sid -- 2 words. Sid Katz, S-I-D,
10   second word, K-A-T-Z, Drive, San Antonio, Texas.
11   Q    How long have you lived there?
12   A    It's been about eight months, or so.
13   Q    Where'd you live before that?
14   A    I lived -- Before that, I lived at 227 Lewis
15   Street, San Antonio, Texas.
16   Q    How long did you live there?
17   A    It was, approximately, five or six months.
18   Q    And before that?
19   A    I lived at the 1200 block of North Smith in
20   Hebbronville, Texas. I don't remember the exact address.
21   Q    Okay. That's fine. How long did you live there?
22   A    Just a couple of months.
23   Q    Is -- Sid Katz Drive, is that a home?
24   A    It's the manager's apartment for the Ronald
25   McDonald House Charities.

Page 7

1    Q    And how about the street on the -- the Lewis
2    Street residence? Was that a home?
3    A    Well, that was the manager's house of the downtown
4    Ronald McDonald House.
5    Q    And how'd you end up there?
6    A    My mother is the manager of the Ronald McDonald
7    House, previously the -- the downtown and now the Medical
8    area -- Center area.
9    Q    Well, that's a worthy job.
10   A    Excuse me?
11   Q    That is a worthy job. I'm -- I'm complimenting
12   your mother's job.
13   A    Thank you.
14   Q    What is the address on your driver's license?
15   A    427 McNeel Road.
16   Q    Okay. And what city?
17   A    San Antonio, Texas.
18   Q    Okay. And of course, you -- when was the last
19   time you lived at that address?
20   A    That's my mailing address; that's where I receive
21   mail. I cannot receive mail at 4803 Sid Katz or 227 Lewis
22   Street.
23   Q    Okay. The McNeel Road address, what is it? I
24   mean, what --
25   A    It's my grandmother's house.

Page 8

1    Q    Okay. So, the -- the mail would go to your
2    grandmother's house?
3    A    Correct.
4    Q    And if someone was to call your grandmother's
5    house and asked if you lived there, they'd say "no" because
6    you don't?
7    A    Right. That's why I have give the number --
8    telephone number to the manager's apartment at the Ronald
9    McDonald House.
10   Q    Okay. Thank you. What year did you get out of
11   high school?
12   A    1993.
13   Q    What high school?
14   A    Thomas Jefferson here in San Antonio.
15   Q    You graduated?
16   A    Yes, sir.
17   Q    What'd you do after you graduated?
18   A    I went to Laredo, Texas, where my father had a oil
19   field service company, and I worked for him from '93 to,
20   approximately, '96, I believe.
21   Q    What were your job duties there at the oil field
22   service company?
23   A    Well, I started out as the janitor, and then I
24   became what's called an operator's helper, which is an oil
25   field -- they go out to the locations and test oil wells.

Page 9

1    And then, after sometime, I became the communications
2    manager.
3    Q    And you left that job in '96?
4    A    Right.
5    Q    And you were a communications manager, at that
6    time?
7    A    That's correct.
8    Q    Then what was your position or employment?
9    A    My next position from there was working for the
10   United Independent -- Correction. I worked for ITS Security
11   in Laredo as a security guard.
12   Q    How long did you do that?
13   A    I would say for about a year.
14   Q    About '96 to '97, more or less?
15   A    Yes.
16   Q    And did you do anything between working for your
17   dad's oil field company and working for ITS Security?
18   A    No. As a matter of fact, I held both jobs for a
19   short period of time.
20   Q    Okay. But there was no gap of --
21   A    No.
22   Q    There's no gap between the -- the employments?
23   A    No, sir.
24   Q    Did you have any position with ITS Security, other
25   than security guard?

Page 14

1    A   (Witness nods affirmatively.)
2    Q   And when did you graduate from the Laredo Police
3  Academy.
4    A   Early August of 1998.
5    Q   Who was the -- your friend, the lieutenant there
6  at the Webb County Sheriff's --
7    A   His name is -- Boy, I can't remember, but he was
8  also the -- the principal of Alexander B. -- I mean, John B.
9  Alexander High School in Laredo, Texas.  I -- His name
10  escapes me right at this point.
11    Q   You can't remember a first name or a last name?
12    A   My goodness.  Raul -- I think his name was Raul,
13  I know his first name was Raul.  I don't remember his last
14  name.
15    Q   Okay.  That's fine.  So, how long was the police
16  academy?  How many months, more or less?
17    A   It was from September of 1997 until August 1998.
18  September 23rd, 1997, until early August '98.
19    Q   Between graduating high school and starting the
20  police -- the police academy, did you have any other kind of
21  education?
22    A   I attended, on and off, Laredo Community College.
23    Q   What kind of courses did you take?
24    A   Mainly your core curriculum basics with -- I was
25  leaning towards a business-type degree, at that time.

Page 15

1    Q   Did you take anything in criminal justice or law
2  enforcement?
3    A   Not at all.
4    Q   What kind of training did you get there in the --
5  How many hours a week -- Let me start all over again.  How
6  many hours a week was the police academy?
7    A   Sixteen.
8    Q   Sixteen hours a week?
9    A   Yes, sir.
10    Q   What kind of things did you do at the police
11  academy?
12    A   We did intensive study of the Texas Penal Code,
13  Code of Criminal Procedure, arrest, search and seizure, use
14  of force, dealing with individuals with mental disability,
15  multicultural diversity and other TCLEOSE, Texas Commission
16  on Law Enforcement Officer Education Standard training,
17  patrol procedures.
18    Q   Were you taught anything about working with
19  Federal law enforcement?
20    A   Yes.
21    Q   What were you taught about working with Federal
22  law enforcement?
23    A   Specifically --
24    Q   I'm sorry (phone ringing).
25    A   Specifics escape me at this -- this point, but in

Page

1  a lot -- a lot of the instructors -- as a matter of fact, a
2  few of the instructors were Federal law enforcement agent
3  either retired or doing that on a part-time basis, and --
4  and a lot of our training was based on examples throughou
5  their career, etc.
6    Q   Did you get -- ever have any training regarding --
7  at the police academy, regarding the need or desire to
8  cooperate with Federal law enforcement?
9    A   Specifically, no.
10    Q   Okay.  Were you ever taught about which Federal
11  law enforcement agents could carry a firearm?
12    A   No.  Oh, well, yes, we were, in our Code of
13  Criminal Procedures class and our Penal Code class.
14    Q   Okay.  So, you learned the Penal Code definition
15  of who could and could not carry a firearm?
16    A   Correct.
17    Q   Were you ever taught that there might be some kind
18  of Federal law about authorizing or not authorizing certain
19  agents to carry firearms?
20    A   Well, to that extent, all we were taught, as far
21  as that, is that State law can be stricter, not less
22  restrictive, than Federal law.  So, in other words -- Let me
23  give you an example they gave us.
24    Q   Okay.
25    A   Whereas -- And this is how they put it.  Whereas

Page 17

1  you can burn the flag of the United States in Washington,
2  DC, and protest, it is a violation of the Texas Penal Code.
3  So, Texas law could be more strict, not less strict.
4    Q   And were you taught that it would be okay to
5  arrest somebody for burning the -- the Texas -- the
6  United -- the United States flag in Texas?
7    A   Yes.  It was -- If you acted under the -- your
8  powers vested by the Code of Criminal Procedure, while
9  enforcing a Texas law, that you acted in good faith and it
10  was a valid arrest.
11    Q   And they never told you that maybe the first
12  amendment of the United States Constitution would trump the
13  Texas law if the two conflicted?
14    A   It's not my -- As a peace officer, it was not our
15  duty to interpret to an extent; that's for the courts to
16  decide.  We just went on the elements of the offense.
17    Q   Okay.
18    A   If each element of the offense was met, then that
19  individual had violated Texas law and could be arrested.
20    Q   Right.  And this is something that's just real
21  important.  I mean, in the training they gave you.  I mean --
22    A   Okay.
23    Q   They never taught you, for example, that the
24  United States court says you have a constitutional right to
25  burn a flag and that any State law saying that that's

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29

Page 22

1    Q    Did you get to receive any training while you were
2  at the Duvall -- I'm sorry -- the San Diego Police
3  Department?
4    A    No.
5    Q    Did you ever have to work in conjunction with
6  Border Patrol agents there?
7    A    Yes.
8    Q    Did you ever work with John Gilbert --
9    A    No. Never.
10   Q    -- at that time?
11   A    Never.
12   Q    Had you ever met him while you were at the San
13  Diego Police Department?
14   A    No.
15   Q    What kind of things would you do with Border
16  Patrol agents?
17   A    Basically, in San Diego, we didn't have as much
18  contact with Border Patrol as we did in Hebbronville because
19  the station was in Freer, Texas, which is a good ways down
20  the road.
21      So, basically, if we ever -- if we ever had any contact
22  with them, it was informal contact, just, you know, late
23  shift, we'd see them park or they'd see us park and we'd
24  just chat.
25   Q    You never worked on the same bust together or none

Page 23

1  of that?
2    A    At one point, one of our officers was fired upon
3  by an individual and Border Patrol agents assisted in
4  backing up our department, Duvall County. And it was San
5  Diego PD, Duvall County and Border Patrol.
6    Q    Okay. And -- But John Gilbert was one -- not one
7  officer you worked with there?
8    A    No.
9    Q    And did you receive any kind of training while you
10  were there?
11   A    No.
12   Q    Where was your next job?
13   A    The Duvall County Sheriff's Department.
14   Q    Why'd you -- Why'd you switch from San Diego PD to
15  Duvall County?
16   A    On December 31st, 1998, the position was
17  eliminated by the City Council, due to budgetary reasons.
18  They didn't have enough money.
19   Q    Did you have any problems with San Diego?
20   A    No.
21   Q    So, it was a friendly termination?
22   A    Yes.
23   Q    Did you ever get disciplined while you were there?
24   A    Never.
25   Q    Never written up for anything?

Page 24

1    A    No.
2    Q    How long did it take you to get a job with
3  Duvall -- I'm sorry. You said Duvall County Sheriff?
4    A    Yes, sir.
5    Q    Okay. How long did it take you to get a job with
6  the Duvall County Sheriff?
7    A    I think the next day. As a matter of fact, it --
8  it was a couple of days later because that was New Year's
9  Day. There was no staff. I waited until the sheriff came
10  back, which was probably the day after that.
11   Q    Was it a full-time job?
12   A    Yes, sir.
13   Q    What was your position?
14   A    Jailer and transport officer.
15   Q    And what were your -- your duties?
16   A    In the jail, my duties were to take care of the
17  inmates, provide for them their meals, medication, and also
18  to maintain order in the jail, which we never really had
19  much problem with because it was such a small jail. We
20  didn't have very many inmates.
21   Q    Okay. And transport officer?
22   A    If there was ever a need for an individual to be
23  transported, say, to a prison with the State -- the Texas
24  Department of Corrections, or even hospital visits, court
25  dates, etc., we would -- we would be in charge of -- I would

Page 25

1  be in charge of transporting them where they needed to go.
2    Q    Did you -- Did you apprehend suspects in this
3  position?
4    A    No.
5    Q    How long did you have that position?
6    A    About a month.
7    Q    Did you receive any training during that month?
8    A    No.
9    Q    What was your next position?
10   A    Deputy sheriff with Jim Hogg County Sheriff's
11  Department.
12   Q    Why'd you switch jobs?
13   A    Because I wanted to be a patrol officer. I wanted
14  to be out on the street again.
15   Q    What did they pay you at Duvall County?
16   A    It was in the $7.00 -- 6.50 to $7.00, 7.50 range,
17  between there. I don't recall exactly.
18   Q    They don't pay you much to risk your life, do
19  they?
20   A    No. They don't. It wasn't about the money.
21   Q    I guess not. I tell my staff that they should be
22  grateful they don't have to have people shoot at them. What
23  did -- So, what was your position with Jim Hogg County?
24   A    Deputy sheriff.
25   Q    And how much did you get paid at that?

Page 30

1    Q    Were you ever accused, other than possibly the
2  arrest of John Gilbert, where you're accused of conduct not
3  becoming an officer?
4    A    Never.
5    Q    What's Sergeant Navarez' first name?
6    A    David.
7    Q    Do you know if he still works there?
8    A    Yes.  He's captain now.
9    Q    So, in August 1999, you left to go back to school
10 at UTSA?
11   A    That's correct.
12   Q    And you moved back to San Antonio?
13   A    Yes.
14   Q    Did you get a job while you were there at UTSA?
15   A    Yes.  I did.
16   Q    What was the next job you had?
17   A    Smith Legacy Security.
18   Q    And what was that?
19   A    The position?
20   Q    Well, what is Smith Legacy?  Is that a security
21 guard company?
22   A    Yes.
23   Q    Were you a security guard?
24   A    Yes.
25   Q    And what'd you do as a security guard?

Page 31

1    A    Well, I -- my post, so to speak, was at a hotel in
2  downtown San Antonio.
3    Q    Which one?
4    A    The Woodfield Suites.
5    Q    And what'd you do there?
6    A    I was -- I was a security officer.
7    Q    Did you ever have any problems?
8    A    No.
9    Q    How long did you work there?
10   A    Let's see, from -- for about two years.  Almost
11 two years.
12   Q    Did you carry a firearm?
13   A    No.
14   Q    Did you own a firearm?
15   A    Yes.
16   Q    Did you have a Concealed Weapons permit?
17   A    No.
18   Q    Were you still a licensed peace officer?
19   A    Yes.
20   Q    Are you still a licensed peace officer to this
21 day?
22   A    For about two more days.
23   Q    And you have been continuously since -- since you
24 were first licensed?
25   A    Right, but my -- my commission's not active.

Page 32

1    Q    Okay.  Well, how long has it been inactive?
2    A    Since I resigned with Jim Hogg County.
3    Q    Okay.  Could you legally carry a concealed weapon
4  after you --
5    A    No.
6    Q    -- left Jim Hogg County?  Did you ever get in
7  trouble for carrying a concealed weapon after that?
8    A    No.
9    Q    Have you ever been arrested after that, for any
10 reason?
11   A    No.
12   Q    What was your next job after Smith Legacy
13 Security?
14   A    Well, I'm currently employed by Smith Legacy
15 Security, and I volunteer one weekend a month at the Ronald
16 McDonald House.
17   Q    Have you had any other employment since you left
18 Jim Hogg County?
19   A    No.
20   Q    And you're moving?
21   A    Right.
22   Q    And where are you moving to?
23   A    Las Vegas, Nevada.
24   Q    That's fun.  What are you going to do there?
25   A    I intend to further my education at the University

Page 33

1  of Nevada Las Vegas.
2    Q    Why that school?
3    A    I have a friend that -- that I worked with at
4  Smith Legacy Security who moved over there, and basically
5  change of scenery.
6    Q    Okay.  That's a nice change.  Do you have a job
7  lined up there, yet?
8    A    I have a job unofficially with the -- He's a
9  security officer at a casino, and basically, I could have a
10 job there.  I'm -- I'm also weighing other options.
11   Q    That probably pays better than Smith Legacy,
12 doesn't it?
13   A    Yes.
14   Q    I've always heard in Las Vegas you make some --
15 you make some money.  I mean, there's nothing wrong with
16 making money.  I'm not criticizing you.  I want to go back
17 now to -- to Jim Hogg County.
18   A    Sure.
19   Q    Did you have any training, with regard to the --
20 or working with the Border Patrol when you were at Jim Hogg
21 County?
22   A    No
23   Q    Did you ever work with the Border Patrol?
24   A    Yes.
25   Q    What kind of things would you do with the Border

Page 38

1    A    No, not at all.
2    Q    Or over 18 -- Between 18 and 35?
3    A    No. I don't know.
4    Q    It would be a fairly small number, wouldn't it?
5    A    Oh, I'm sure. Unfortunately.
6    Q    Had you ever heard of any kind of animosity that
7    the Border Patrol guys were using their superior salaries to
8    date the local women, rather than having them date the Jim
9    Hogg County guys?
10    A    Well, as far as I knew every Jim Hogg County
11    deputy that I knew was either married or in a committed
12    relationship, as I was. So I don't -- I don't -- I never
13    heard of anything like that, but --
14    Q    Have you ever heard of law enforcement officers in
15    South Texas dating single women, regardless of the fact that
16    they're married or in a committed relationship?
17    A    Have I ever heard of --
18    Q    Of that happening.
19    A    I've heard of -- Not necessarily just law
20    enforcement officers. Yes, I've heard of that.
21    Q    I mean, that, unfortunately, is a common
22    occurrence in our culture.
23    A    Definitely.
24    Q    But you weren't doing that?
25    A    Right.

Page 39

1    Q    Do you know if anyone in the Jim Hogg County
2    Sheriff's Department had any ties to any narcotics or alien
3    smuggling organizations?
4    A    Not that I know of.
5    Q    Had you heard any rumors about that?
6    A    Not until I was shown this lawsuit.
7    Q    Okay. And you don't know whether or not Border
8    Patrol withheld information from Jim Hogg County Sheriff's
9    Department because they were worried it would get back to
10    some kind of narcotics trafficking organization?
11    A    I don't understand.
12    Q    Do you have any -- Do you have any knowledge, one
13    way or another, as to whether Border Patrol would withhold
14    information from Jim Hogg County Sheriff's people because
15    they were worried it would get back to the -- to the drug
16    traffickers?
17    A    That Border Patrol withheld information from Jim
18    Hogg, thinking that Jim Hogg might disclose this --
19    Q    Right.
20    A    -- to the -- I had never heard of that, but
21    it's --
22    Q    Do you know who Jose Ibanez is?
23    A    Not personally. I read about him in this lawsuit.
24    Q    Had you ever heard about him before?
25    A    No.

Page 40

1    Q    You didn't -- You don't know what kind of
2    relationship -- what relation he had with the sheriff?
3    A    No. Well, he's related to the sheriff, I believe.
4    Q    But you don't know what the relationship is?
5    A    Nephew, cousin, something. I'm not sure.
6    Q    You had never heard that the sheriff had a
7    relative that had been busted with dope?
8    A    No, never heard that.
9    Q    That's something that would normally have made
10    news in a small town, wouldn't it?
11    A    Well, I'm sure it -- I'm sure it would, but I
12    was -- according to this lawsuit, I was not employed at the
13    time that occurred.
14    Q    Right. You didn't start until February '99;
15    correct?
16    A    That's correct.
17    Q    And I think the arrest happened on August 6th of
18    '98.
19    A    Right.
20    Q    So, you -- you weren't employed at the arrest and
21    it's your position that you didn't know about the arrest?
22    A    Right.
23    Q    Did you -- Before you arrested Mr. Gilbert, did
24    you call in and talk to anybody back at the station?
25    A    No. I believe I ran his driver's license, but

Page 41

1    that was -- that was the extent of it.
2    Q    You made the decision to arrest him all on your
3    own?
4    A    Yes.
5    Q    How -- How many -- How big was the Jim Hogg County
6    Sheriff's Department when you were there?
7    A    I couldn't tell you exactly. There was 15, 16
8    deputies and some supervisory personnel, along with jailers,
9    dispatchers, etc.
10    Q    And who was the sheriff?
11    A    Gilbert -- Gilberto Ibanez. Gilbert Ibanez.
12    Q    Tell me about the stop of Mr. Gilbert.
13    A    The stop of Mr. Gilbert occurred on -- I believe
14    it was April 7th, as the law states -- the lawsuit
15    stipulates, and we were -- we were approaching each other on
16    a -- it was either a two- or a four-lane street, with a
17    30-mile-per-hour speed limit. I had noticed -- And I
18    unfortunately, omitted it from my report, but the first
19    thing I noticed was that the 1994 black Mustang GT in
20    question was missing a front license plate.
21    As it got closer, I noticed that the passenger was not
22    wearing a safety belt, and when I became parallel with
23    Mr. Gilbert's vehicle, I heard him rev the engine. After
24    that, I -- when it was safe to do so, I turned around,
25    started following Mr. Gilbert, ran his -- while I called in

Page 46

1    citation based on somebody -- revving their engine is what
2    they -- they -- they term exhibition of speed.
3        Q    It's "Exhibition of Acceleration," actually, I
4    believe.
5        A    "Exhibition."
6        Q    But don't you actually have to accelerate, not
7    just rev the engine but you've got to take off (descriptive
8    sound)?
9        A    Well, that why I didn't -- did not pull him over.
10   I was not sure about that. I was sure that his -- The way
11   in which he was using his automobile, he was in violation of
12   the muffler.
13       Q    So, as far as your probable cause to pull him
14   over, what was it?
15       A    No front license plate --
16       Q    Okay.
17       A    -- no seat belt front seat passenger --
18       Q    Okay.
19       A    -- and revving his engine or the muffler statute.
20       Q    Violation of the --
21       A    Right.
22       Q    -- muffler -- muffler standard? And as far as
23   anything that he would have done personally, it would have
24   been the no front license plate and the revving of the
25   engine, violating the muffler standard, according to you?

Page 48

1    he informed me that he had a weapon in the car, and I asked
2    him where it was and he said it was in the rear seat.
3        Q    Okay. Did he tell you that he was a Border Patrol
4    agent before he told you he had the weapon?
5        A    No. He said "I have a weapon in the vehicle."
6    And I said "Where is it," because I didn't want him reaching
7    for it --
8        Q    Right.
9        A    -- because I didn't know who he was. I said
10   "Where is it?" And he said "In the back." And I said "What
11   do you have a weapon for?" And he said that he was a Border
12   Patrol agent.
13       Q    And there -- Would you have ever known he had a
14   weapon in that car if he hadn't have told you he was a
15   Border Patrol agent?
16       A    Yes.
17       Q    How would you have known that?
18       A    Because it was sitting on the backseat in plain
19   view.
20       Q    And you would have looked in the backseat?
21       A    Definitely.
22       Q    Why would you have looked in the backseat during a
23   traffic stop?
24       A    I look around the whole vehicle to make sure that
25   the situation is safe for me and the other passenger --

Page 47

1        A    That's correct.
2        Q    No other reason to pull him over?
3        A    No.
4        Q    Okay. So, he was somewhat confrontational with
5    you. He wanted to know why you pulled him over?
6        A    That's correct.
7        Q    And how did you respond?
8        A    I -- I -- I restated what I had stated before,
9    that I pulled him over because his passenger was not wearing
10   her seat belt and because he revved his engine.
11       Q    Did you mention the no front license plate to him?
12       A    I don't believe so.
13       Q    Okay.
14       A    It slipped my mind.
15       Q    Okay.
16       A    Or I might have. I -- I don't know.
17       Q    You don't know one way or another?
18       A    Right.
19       Q    How did -- How did it make you feel when he used
20   that kind of tone of voice with you?
21       A    At the time, I was pretty much used to it; that's
22   my job. And I didn't know him from any other traffic stop
23   that I've ever made, so I extended as much courtesy and
24   professionalism as I could.
25       After I had made those initial -- the initial contact,

Page 49

1        Q    Okay.
2        A    -- or the occupants of the vehicle.
3        Q    Do you consider it a -- a courtesy for one officer
4    to tell another one, when he gets pulled over, that there's
5    a weapon in the car?
6        A    I -- I consider it a courtesy, if that's the way
7    you want to term it, for anybody, regardless of whether
8    they're an officer or not, to inform a peace officer or any
9    kind of law enforcement officer that's effecting a lawful
10   detention, via a traffic stop, to inform somebody that they
11   have a weapon in the vehicle.
12       Q    That's something you should -- It's not a threat.
13   It's something you should tell the officer, so he'll know?
14       A    Definitely.
15       Q    And you didn't view it as a threat when he told
16   you there was a weapon in the car?
17       A    No. I did not.
18       Q    It was just a piece of information he was giving
19   you.
20       A    Right.
21       Q    It's much better for you to hear it from him than
22   for you to notice it and worry --
23       A    Right.
24       Q    -- what's this guy going to do?
25       A    Right. That's correct.

13 (Pages 46 to 49)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                        08/2

Page 54

1     Q   And what time was this?
2     A   About fourish. 4:00 clock.
3     Q   What time was -- What school was that?
4     A   I believe it was an elementary school.
5     Q   Do you know what time school got out there?
6     A   No. I don't.
7     Q   Were there any students around?
8     A   No.
9     Q   Any parents around?
10    A   Not that I'm aware of.
11    Q   Okay. Did you know that he was the DARE officer
12   at that school? Not until now?
13    A   No. Actually, that's -- that's debateable,
14   whether he was or not, but --
15    Q   Why do you say that?
16    A   He didn't claim -- Because as I understand it, the
17   DARE program only has one representative for each area --
18    Q   Okay.
19    A   -- and the DARE officer position was filled, at
20   that time, by an individual in State government, not a
21   Federal agent. It's very highly --
22    Q   Who -- Who filled it?
23    A   I've heard that it was -- I've heard two -- two
24   different.
25    Q   Okay.

Page 55

1     A   I've heard that it was -- And -- And he never
2    claimed -- Let me first be -- He never claimed to be a DARE
3    officer on that stop at all.
4     Q   Okay.
5     A   I never learned anything about that until I was
6    served with the first lawsuit.
7     Q   Okay.
8     A   But there was a Judge Salinas out of San Diego --
9     Q   Okay.
10    A   -- area. And then, we had our own DARE officer at
11   the Jim Hogg -- Jim Hogg County Sheriff's Department.
12    Q   Okay. So, you -- you -- So, you -- you -- You
13   don't --
14    A   Not --
15    Q   You don't know, one way or another, for sure
16   whether he had any involvement in that school?
17    A   Right.
18    Q   But you doubt that he was actually the DARE
19   officer?
20    A   Right. But he never even brought that up, so it
21   wasn't really an issue.
22    Q   At the time, it was not an issue?
23    A   Right.
24    Q   Okay. So, you've got him standing there. He's
25   out -- He leaves the gun in the car; correct?

Page 56

1     A   Right.
2     Q   You don't feel threatened by -- that he's going to
3    shoot you at -- at anytime during the stop, do you?
4     A   No.
5     Q   Okay. So, what happens next?
6     A   At that time, I asked him a series of questions to
7    see if he had any defenses to prosecution under unlawful
8    carrying of a weapon.
9     Q   So, you -- Well, you had him stand over there.
10   You were already considering arresting him and you were
11   going to ask him the questions to see if he had a defense;
12   is that correct?
13    A   Actually, I was just -- I was just seeing if there
14   was a law being broken --
15    Q   Okay.
16    A   -- at that time. I already knew that he had
17   revved his engine.
18    Q   Right.
19    A   That was a violation. I knew that his passenger
20   was not wearing a seat belt. I knew that was a violation.
21   And there was no front plate.
22    Q   All right. Would you -- Would you have arrested
23   him for the revving of the engine?
24    A   No, probably not.
25    Q   Would you have arrested him for the no front

Page 57

1    license plate?
2     A   You know, I have arrested people for no license
3    plate light in the back, that were not law enforcement
4    officers of any type. You can take an individual as long as
5    it's not -- Well -- And it's about to change -- Open
6    container or speeding, you have to issue a citation. Any
7    other offense, you can arrest, take them in to stand there
8    before the magistrate.
9     Q   But why --
10    A   So, it's possible.
11    Q   But would you --
12    A   Yes. It is possible.
13    Q   Realistically --
14    A   Yes.
15    Q   -- tell the truth, would you have arrested him?
16    A   Well, I just told you that I've arrested people
17   for less.
18    Q   Okay. So, is it your -- anytime you saw a car
19   driving with no front license plate, you'd pull them over
20   and arrest them?
21    A   Not everytime, no.
22    Q   Why would you do it sometimes?
23    A   It depends on how, in my opinion, the ends of
24   justice could best be served.
25    Q   I mean, let's be honest, if -- if you have a hunch

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                        08/29.

Page 62

1    Q   Did he -- Did you ask to see his credentials as a
2    Border Patrol agent, at that time?
3    A   No. I didn't.
4    Q   Did he offer to let you see his credentials as a
5    Border Patrol agent, at that time?
6    A   Yes. He did.
7    Q   Did you look at them?
8    A   No. I didn't.
9    Q   Why not?
10   A   Because I'm familiar with what -- what they say.
11   Q   What do they say?
12   A   The person -- I'm paraphrasing here. The -- The
13   person named above is entitled to effect arrest, carry a
14   firearm, etc., etc., while in the performance of official
15   duties.
16   Q   So, you don't think it says he can carry a firearm
17   otherwise?
18   A   Right.
19   Q   You've never seen the -- the Immigration
20   Naturalization Service for Firearms policy, have you?
21   A   Policy?
22   Q   Yeah.
23   A   No. I have not seen that.
24   Q   So, you're not aware that Federal law permits a
25   Border Patrol agent to carry firearms during both duty and

Page 63

1    no duty hours -- nonduty hours?
2    A   And that was Federal law?
3    Q   Federal law.
4    A   What was the code? I'm sorry?
5    Q   It's part of -- It's in the Federal regulations,
6    under the INS Firearms policy.
7    A   Policy?
8    Q   Right.
9    A   Okay.
10   Q   I'm asking you: Did you ever know that?
11   A   No.
12   Q   And as far as you're concerned -- With the
13   training you got, even if that was the Federal regulation,
14   as far as you're concerned, the State law would trump the
15   Federal law?
16   A   Right.
17   Q   And you'd follow State law and not Federal law?
18   A   That's correct.
19   Q   Because that's what you were trained to do?
20   A   Right.
21   Q   And nothing from Jim Hogg County trained you to do
22   anything different?
23   A   No. Correct.
24   Q   If that's a constitutional violation, that's the
25   fault of your training, not your fault?

Page 64

1    A   If -- If I violated somebody's constitutional
2    rights?
3    Q   By doing that. If in fact, the -- the
4    Constitution of -- of the United States says Federal law is
5    supreme and overrides the State law, it's not really your
6    fault. It's the fault of the training you got that told you
7    to do it?
8    A   I would have to say that I'm responsible for my
9    own actions --
10   Q   Okay.
11   A   -- and I acted in good faith --
12   Q   But as far as the --
13   A   -- due to my knowledge, training and experience.
14   Q   But your training taught you to do what you did;
15   correct?
16   A   My -- My knowledge, training and experience, yes.
17   Q   But you were trained to do what you did; is that
18   correct?
19   A   Yes.
20   Q   And if -- if in doing what you did was illegal,
21   it's because you were trained to do something that was
22   illegal? I'm not asking you to admit it was illegal.
23   Hypothetically, if what you did was illegal, it's because
24   you were trained to do it?
25   A   I would have a -- a hard time answering that

Page 65

1    because, to this day, I've only seen now -- And I haven't
2    even seen it -- but a policy, you know, regulations --
3    Q   I'm not asking you to admit it's illegal. The
4    judge is going to decide what's legal and illegal.
5    A   Okay.
6    Q   I'm saying: Assuming, without admitting that it
7    was illegal, if it was, you did it because you were trained
8    to do it, not because you decided to do something illegal on
9    your own?
10   A   It was a totality of the circumstances involving
11   my knowledge, training, experience and education.
12   Q   But your training was one of the --
13   A   One of the things, yes.
14   Q   You trained -- You told me you were trained --
15   A   Right.
16   Q   -- that State law trumped Federal law; correct?
17       THE REPORTER: I'm sorry. I can't --
18       MR. COWEN: I'm sorry.
19       THE REPORTER: He's speaking lower --
20       MR. COWEN: Okay.
21       THE REPORTER: -- than you are, and I
22   apologize --
23       THE WITNESS: Okay.
24       THE REPORTER: -- but I didn't get the end.
25       THE WITNESS: It's one of the things -- The

17 (Pages 62 to 65)

Page 70

1  aware of anyone else who heard him say the word "shit"?
2      A   I'll answer like I did a while back. I've already
3  answered this question about twice. No. I do not
4  believe -- To my knowledge, there was nobody else around --
5      Q   Okay.
6      A   -- to my knowledge.
7      Q   And so -- But your belief, because it was a public
8  place and there was a -- hypothetically, someone could have
9  heard him, that was enough to arrest him for it?
10     A   Well, there was a school right there. He could
11  have incited immediate breach of the peace or offended
12  somebody by using these words.
13     Q   How do you incite an immediate breach of the peace
14  by saying "Y'all don't do shit"?
15     A   Well, when you use offensive language towards a
16  peace officer who is lawfully detaining you, people could --
17  could take great offense.
18     Q   What will they do? I mean, what are you worried
19  about? Are you worried about everyone joining in and --
20  and -- and bum-rushing you because this guy said you don't
21  do shit and they're all going to say "Yeah. That's right.
22  He doesn't do shit. Let's go get him."
23     A   Actually, I was just using the wording that they
24  use in the Texas Penal Code.
25     Q   Okay.

Page 71

1      A   I was not worried about -- about an immediate
2  breach of the peace, but that's how it's worded. I was
3  worried that somebody could -- since he was standing feet
4  away from a school, somebody could have been offended.
5      Q   If you're sitting in a restaurant and you hear
6  someone else at the next table saying "Oh, that
7  motherfucker," would you have arrested him?
8      A   It's quite possible.
9      Q   For using the word "motherfucker" in conversation
10  at a restaurant?
11     A   Yes. It's possible.
12     Q   And if I said, for example, "George Bush, he's
13  full of shit," you might arrest me for that, too?
14     A   It depends on who you're talking to or the
15  circumstances.
16     Q   Okay. Well, let's say I'm at a restaurant, I'm
17  drinking a beer with my friend and you're sitting at the
18  next table having a cup of coffee, you're on duty and I said
19  "That George Bush doesn't know shit," would you have
20  arrested me?
21     A   It's possible.
22     Q   And I say it, you know, where people can hear
23  me --
24     A   It's possible.
25     Q   -- at the next table?

Page 72

1      A   It's possible.
2      Q   And you think there's nothing wrong with that?
3      A   Well, there's other -- I'm assuming there's other
4  people in this restaurant, besides just you and I?
5      Q   Oh, yeah. Absolutely, there are people in the
6  restaurant that would probably hear me.
7      A   Yes.
8      Q   You think it's fine to arrest them?
9      A   It's possible.
10     Q   And --
11         MS. GONZALES: Mr. Cowen, could we take a
12  short break now?
13         MR. COWEN: Yeah.
14         MS. GONZALES: Thank you. I'm sorry.
15         MR. COWEN: It's okay.
16         MS. GONZALES: I need to use the restroom.
17         THE VIDEOGRAPHER: We're off the record. The
18  time is 4:12.
19         (Recess from 4:12 p.m. to 4:18 p.m.)
20         THE VIDEOGRAPHER: We're back on the record.
21  The time is 4:18.
22     Q  (BY MR. COWEN): Have you ever received any kind of
23  training in constitutional rights that people have?
24     A   Yes, sir.
25     Q   Other than their Fourth Amendment rights, like

Page 73

1  Miranda and stuff?
2      A   Yes.
3      Q   Any of the training involve free speech?
4      A   Yes.
5      Q   What kind of training did you get regarding
6  freedom of speech?
7      A   We -- Basically, in the Laredo Regional Police
8  Academy, we went over the First Amendment of the
9  Constitution.
10     Q   What'd you learn?
11     A   It's a pretty broad question.
12     Q   Yeah. It's a very broad question.
13     A   Okay. Well, the -- the class was several hours
14  long and we learned quite a bit about it. People are
15  entitled to freedom of expression as long as -- And the
16  age-old example they give is cannot yell "Fire!" in a
17  crowded theater, for example.
18     Q   Right. How about as far as profanity? Did you
19  ever learn that profanity can be protected speech?
20     A   Yes.
21     Q   Cuss words, even in a public place, can be
22  protected speech?
23     A   They can be, yes.
24     Q   And -- And how did you -- What kind of training
25  did you get as to whether or not you should arrest someone

Page 78

1  knee, it had to have been something -- from something else?
2      A   Yes.
3      Q   Do you have any idea what that something else
4  could have been?
5      A   No.
6      Q   Did you have --
7      A   He's --
8      Q   Did you have any --
9      A   Wait.  Can I answer that question?
10     Q   Yes.
11     A   I'd like to -- As a law enforcement officer, I --
12  I can -- if you're asking me to speculate how he could have
13  gotten it, he could have been involved in some kind of
14  altercation or work-related incident where he bruised his
15  knee, if he had one.
16     Q   Let's just speculate.  But you're not aware that
17  he was -- wasn't actually in one that could have bruised his
18  knee?
19     A   Oh, I'm sorry.  I thought you were asking me --
20     Q   No.  I was asking for speculation.
21     A   All right.
22     Q   Now, I'm asking a follow-up question.
23     A   Okay.  Which is?
24     Q   Were you aware that -- Do you have any knowledge
25  as to whether or not he was in such an incident that could

Page 79

1  have bruised his knee around that time?
2      A   No.
3      Q   You just know, as a fellow officer, that that is a
4  possibility?
5      A   Yes.  I've had many scrapes and bruises, bite
6  marks.
7      Q   You would have had no justification for hitting
8  his knee?
9      A   No.
10     Q   I mean, he didn't try to get out of the car and
11  you had to slam it to keep him in there?
12     A   No.
13     Q   So -- Okay.  You get him in the car.  What do you
14  do next?
15     A   I sit down in the driver's side -- Mind you, I'm
16  still having to keep an eye on an occupied vehicle that's on
17  a traffic stop, with another offender that's in the front
18  seat of -- of that vehicle still.  So, I'm -- I'm sitting in
19  the front seat.
20     Q   The other offender?  That's the person that didn't
21  have the seat belt on; right?
22     A   Correct.
23     Q   And you call them "offenders"?
24     A   Right.
25     Q   Okay.  So, you got the offender -- seat belt

Page 80

1  violater is still in there with a gun with the car; right?
2      A   Right.  So --
3      Q   Okay.  You -- You didn't take the gun out before
4  this?
5      A   No.  Actually, I probably -- Once I got the
6  handcuffs -- I'm not sure if I secured -- I think I
7  secured -- I'm not sure.  I probably, when he stepped out of
8  the vehicle, got it and put it on the -- the trunk of the
9  car or something of that nature, but like I said, I couldn't
10  be a hundred percent sure.
11     But if not, at the time I put the handcuffs, I either
12  sat down in the front -- I think I sat down in the front
13  seat with -- with my eyes on the passenger occupant of the
14  vehicle, while asking him a few more questions, such as --
15  or -- No.  I Mirandised him later.  But I asked him
16  questions to make sure he didn't have any defense to
17  prosecution.  I was already, pretty much, sure or I was
18  getting some information about whose -- whose vehicle it was
19  or something, because the registration didn't come back to
20  his name, as I recall it.
21     Q   Okay.  Do you know whose car it was?
22     A   No.
23     Q   You never arrested the passenger, did you?
24     A   No.
25     Q   You never ticketed the passenger, did you?

Page 81

1      A   No.
2      Q   Well --
3      A   I gave her a verbal -- verbal warning.
4      Q   Why'd you give her a warning, but you arrested a
5  Border Patrol officer?
6      A   Because -- Well, it's two-fold.  Number one, I did
7  not believe that the offense -- I -- I had other things to
8  deal with, number one.  I had an arrest.  I had arrested
9  in -- person in my custody in the back of my vehicle.
10     I did not feel that it was a good thing to do to waste
11  more time, especially considering the irate nature of
12  Mr. Gilbert, to take the time to write out a citation or
13  even a written warning.  So -- And also, I -- I didn't want
14  to have to tow the vehicle, so if -- if I arrested her, too,
15  which -- if I would have arrested her, I would have had to
16  tow the vehicle, as well.
17     Q   But if you had gave her a ticket, you wouldn't
18  have to tow the vehicle?
19     A   Right.  But I --
20     Q   How long -- How long would it take you to give her
21  a ticket?
22     A   Well, it would -- it would have taken a while.  It
23  would have taken ten -- maybe ten minutes.
24     Q   Well, why does it take ten minutes to give someone
25  a ticket?

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29/

---

Page 86

1    Q   He didn't sit there and cuss at you or nothing?
2    A   No. No.
3    Q   Did he complain. or argue, or threaten you in any
4  way?
5    A   No.
6    Q   Okay. What happened -- Okay. What happens when
7  you get to the -- Do you get to the station or where do you
8  go?
9    A   I took him to the -- Our -- Our department was
10  located with the jail. so I -- I was taking him to the jail.
11  I pulled up to -- We have a electronic door -- operated door
12  that -- I called the dispatcher and told her to open the
13  sallyport so that I could drive in. The gate closed behind
14  us. And that's just standard procedure so nobody can
15  escape.
16    Q   Right.
17    A   And then, I opened the door for him, I helped him
18  out, I checked my weapon into the -- There's lockers
19  provided --
20    Q   All right.
21    A   -- when entering the -- the jail. I checked my
22  weapon. I took him back to where the jailer -- the jailer's
23  office, which is right across from the holding cell, and I
24  told the jailer that he was under arrest. And he -- The
25  jailer already knew, i'm sure, because the dispatch office

---

Page 87

1  is real close to the jailer's office and whenever there was
2  going to be an arrestee coming in, the dispatcher would tell
3  the jailer that there is an arrestee coming in so -- to kind
4  of get, you know, things started.
5    A   A copy of his driver's license would be printed by
6  the -- the dispatcher, if somebody was being arrested, so
7  that the jailer could get started on the -- the personal
8  information of the arrested individual.
9    Q   All right.
10    A   And I turned the -- the -- Mr. Gilbert over to the
11  jailer. I told him the charges and the classifications, so
12  he would know first because he has to do a security
13  assessment. And I walked back -- I left him in the custody
14  of the jailer, and I walked back to the -- the deputy's
15  office to start doing the -- the complaint that I had to
16  sign and some other limited paperwork on the detention and
17  then write my arrest report.
18    Q   Now, when you were taking him from the car to the
19  jailer, did he give you any problems?
20    A   No.
21    Q   Did he say anything?
22    A   No.
23    Q   Did he appear to be uncooperative in any way, at
24  that point in time?
25    A   No.

---

Page 88

1    Q   Okay. Up to the point where you got back to go
2  start writing your complaint. did you hear him say anything?
3    A   Can you repeat that? I missed that.
4    Q   Up -- Up to the point -- From the time you left
5  the vehicle until the time you got back --
6    A   To the deputy's room --
7    Q   -- Yeah -- to start writing your complaint. did
8  you hear Mr. Gilbert say anything?
9    A   No. Nothing.
10    Q   Did you see him uncooperative in any way. shape.
11  or form?
12    A   No.
13    Q   Did you have -- hear him say anything else after
14  that? I mean, did you ever --
15    A   No. I never had contact with him after that.
16    Q   Well, you said he was not cooperative with Jailer
17  Rene Ruiz. How do you -- How did you know that?
18    A   Because the jailer told me later.
19    Q   So. as far as things that you have personal
20  knowledge of, that's -- we've kind of reached the end;
21  right?
22    A   Yes.
23    Q   Anything else, you know, from here on out is
24  things you've heard from other people?
25    A   Excuse me?

---

Page 89

1    Q   If I ask you questions about things that happened
2  later in time --
3    A   Right.
4    Q   -- it's going to have to be things you've heard
5  from other people?
6    A   That's correct.
7    Q   Okay. You heard he was noncooperative. What'd
8  you hear about that?
9    A   He resisted on submitting to fingerprints --
10    Q   What did he do?
11    A   -- as far as I know. He told them he didn't want
12  to do it, he wasn't going do it. And then, the jailer
13  finally -- or -- And like I said, this is all secondhand
14  knowledge. The jailer finally told him, Hey, you know. you
15  have to get fingerprinted. that's policy. and you can't be
16  released.
17       Even if the -- the JP was there -- right then and
18  there. he couldn't be released until he was fingerprinted,
19  which -- which so happens that the JP was there quickly.
20    Q   Okay. So -- But he did consent to being
21  fingerprinted?
22    A   Yes.
23    Q   He just said he didn't want to and wasn't going
24  to?
25    A   Well, he was hesitant.

---

Page 94

1    A    No.
2    Q    Okay.
3    A    I didn't said say that.
4    Q    All right. What mannerisms is the question. You
5    said he had mannerisms that caused you to believe --
6    A    His body language, his facial expression, his
7    tone, his selection of -- of words.
8    Q    Okay. Well, let's go to body language. What body
9    language did he exhibit?
10   A    Well, when we're -- when we're speaking in the
11   back of the patrol -- Correction -- in front of the patrol
12   vehicle and behind his vehicle, he had a tense, standoffish,
13   aggressive -- what I would consider a -- a threat -- a
14   threatening stance.
15   Q    All right. Did you do anything to address that?
16   A    Well, I'm sure I told him to relax; that usually
17   was my --
18   Q    Okay. Okay. That's body language. Gestures?
19   What gestures did he use that -- that caused you to think
20   that he might be a -- you know, a problem?
21   A    Well, as I was trained, when you're -- when you're
22   trying to deescalate a situation, you use hand gestures with
23   your palms facing up, like in a pleading motion with that
24   individual, whereas his fists were closed tightly or
25   pointing, which is directly confrontational; that -- that

Page 95

1    would be his -- How did you phrase it, as --
2    Q    Gestures.
3    A    -- gestures.
4    Q    Okay. Facial expressions? What facial
5    expressions were there that gave you concern?
6    A    Well, he had his brow furled. I believe that's
7    the term. He -- He had a -- And you know, he was upset, and
8    I -- I know that, too. A lot of people, as you stated
9    earlier, get upset on traffic -- traffic stops, but he
10   seemed almost -- almost irate and he -- his facial
11   expressions were of -- they were similar to other facial
12   expressions that I had seen just before, you know, somebody
13   does something that's not too great for me or anybody else.
14   Q    Now, are you positive that he said the words
15   "Y'all never do shit anyways" before you arrested him?
16   A    Yes. I'm positive.
17   Q    Okay. In your report, you said "Mr. Gilbert was
18   advised that he could be placed under arrest for unlawful
19   carrying of a weapon. Mr. Gilbert then stated 'Y'all never
20   do shit anyways.'"
21   So, you told him he might possibly be arrested, but
22   then he said that and then you arrested him; correct?
23   A    That's correct.
24   Q    Okay. Did you hear anything else about any kind
25   of bad conduct he had at the jail, other than not wanting

Page 96

1    his prints taken?
2    A    No. Well, I've heard what -- what he alleges
3    or -- he alleges through you.
4    Q    Well, I'm talking about as far as things that he
5    did.
6    A    Have I heard anything?
7    Q    Yeah.
8    A    Not that I can recall; that's over two years ago.
9    Q    Didn't you have better things to do than pull
10   someone over for revving their engines and arresting
11   somebody -- a Border Patrol agent for having a gun?
12   A    At the time?
13   Q    Yeah.
14   A    No. I had nothing better to do.
15   Q    Do you think that this arrest and detention was a
16   good use of taxpayer dollars?
17   A    Yes. I -- I -- That's kind of -- Considering
18   the -- the time and effort that it took and the considerable
19   amount of taxpayer dollars, if -- if that's what -- I don't
20   think it was very many taxpayer dollars, and yes, I do think
21   it was appropriate and --
22   Q    You'd do it again?
23   A    Yes.
24   Q    And you refused to look at his credentials? You
25   never looked at them?

Page 97

1    A    Well, I looked at them later on.
2    Q    After you arrested him?
3    A    Yes.
4    Q    And they did say that he had the right to carry a
5    gun?
6    A    While in the performance of duty.
7    Q    You're sure that's what it says?
8    A    I'm sure that's what it said.
9    Q    Let's see if I still have them or if I left them
10   in Brownsville. Did anyone -- After you arrested
11   Mr. Gilbert, were you ever reprimanded for doing so?
12   A    Never.
13   Q    Did they ever tell you you did anything wrong?
14   A    No.
15   Q    Did anyone ever tell you that it's -- it's not
16   okay to arrest someone for saying the word "shit"?
17   A    Nobody told me that. Was I right?
18   Q    What? It says in the performance of those duties
19   he can carry a gun.
20   A    Right.
21   Q    And you interpret that to mean only while he's on
22   duty?
23   A    Well, you're not performing your duties if you're
24   not on duty.
25   Q    And if you're not sure, you just go ahead and

JOHN GILBERT VS. JIM HOGG COUNTY        ISAAC BOLCH                                    08/29/



Page 102

1  witness read the same and subscribed his name thereto.
2      I further certify that I am neither attorney or counsel
3  for. nor related to or employed by. any of the parties to
4  the action in which this deposition is taken. and further
5  that I am not a relative or employee of any attorney or
6  counsel employed by the parties hereto or financially
7  interested in the action.
8      IN WITNESS WHEREOF, I have hereunto set my hand and
9  affixed my Seal of Office on this the _____ day of
10  _____, A.D. 2001.
11
12
13
                    _____
14                  ANGELITA JIMENEZ, Certified
                    Court Reporter in
                    and for the State of Texas
15
    Certificate No. of Reporter: 6016
16  Expiration of Current Certification: 12/31/02
    Business Address:   Compex Legal Services. Inc.
17             3300 Nacogdoches. Suite 220
               San Antonio. Texas 78217
18  Telephone No.:    (210) 646-6424
19
20
21
22
23
24
25

COMPEX LEGAL SERVICES. (800) 969-6424

boy 5:14 14:7
breach 70:11,13 71:2
  74:6
break 6:5,6 72:12
briefly 34:20
bring 19:5
broad 73:11,12
broken 35:2 56:14
brought 55:20 90:10
brow 95:6
brownsville 1:2 2:4,9
  97:10 101:2
bruised 77:17,20,25
  78:14,17 79:1
bruises 79:5
budgetary 23:17
building 53:21
bum-rushing 70:20
bunch 27:3 60:3,4
  74:19
burglarized 35:3
burn 17:1,25
burning 17:5 18:7
Bush 71:12,19
Business 102:16
business-type 14:25
bust 22:25
busted 40:7
B-01-54 1:5 101:5

_____C_____
C 2:1 74:9
call 8:4 40:24 69:23
  79:23 82:24
called 8:24 34:6 41:25
  45:23 86:12
calls 27:13
came 24:9 34:22 75:11
  75:12 85:5 101:15
Cameron 27:2
campus 11:2,6,10
captain 30:8
car 42:17,21 48:1,14
  49:5,16 55:25 57:18
  58:8,9 76:16 77:6,8
  79:10,13 80:1,9,21
  82:8,12 84:9,11,15,19
  85:20 87:18
care 24:16 83:6
career 16:5 90:25
carefully 101:22
Carrier 61:19
carry 12:1 16:11,15,19
  18:10,22 19:24 20:4
  28:16 31:12 32:3
  61:5 62:13,16,25 66:7
  83:19 97:4,19 98:5
carrying 32:7 56:8 59:7
  66:14,14,23 75:14
  83:20 95:19
cars 74:21
case 18:3,4 19:14 21:3
  98:17
casino 33:9
catch 34:10

cause 27:21 34:4 42:18
  42:21 46:13 101:21
caused 92:19 93.3 94:5
  94:19
cell 86:23
Center 7:8
certain 16:18 66:13
Certificate 4:8 102:15
Certification 102:16
Certified 2:15 3:5 61:8
  101:12 102:13
certify 101:14 102:2
chance 5:20
change 34:5,6 42:7
  57:5 100:5,5
changes 4:7 100:4
Chapter 74:3
charge 24:25 25:1 76:5
charges 87:11 90:9,12
  90:13
Charities 6:25
chat 22:24
checked 86:18,21
Chica 2:8
chief 21:19
children 27:12
circumstance 74:15
circumstances 51:15
  65:10 71:15
citation 45:25 46:1
  57:6 81:12 82:3 93:8
citations 90:14
cited 36:24 45:25 58:17
city 7:16 23:17
civil 1:5 3:7 101:5
claim 54:16
claimed 35:2 55:2,2
class 16:13,13 28:7,9
  73:13 74:9 92:24
  93:9,12,14
classes 11:23
classifications 87:11
classify 93:13
clause 20:19 98:13
clear 75:12,12
clock 54:2
close 74:16 87:1
closed 77:11,12 86:13
  94:24
closely 11:9
closer 41:21
code 12:14 15:12,13
  16:12,13,14 17:2,8
  19:4,5 20:2,3 45:3,14
  63:4 66:16,18,23
  70:24 74:4
coffee 71:18
College 14:22
come 77:19 80:19
coming 50:23 61:13,22
  87:2,3
commission 10:18,21
  15:15 28:9 100:24
commissioned 10:14
  101:13
commission's 31:25

commit 68:23
committed 38:11,16
  68:20,25
committing 92:21
common 38:21
communications 9:1,5
Community 14:22
Comp 26:22
company 8:19,22 9:17
  30:21
compex 3:3 101:16
  102:16
complain 86:3
complaint 87:15 88:2,7
complaints 43:17
completion 21:6
complied 76:6
complimenting 7:11
comply 52:18
computer-aided 101:23
concealed 31:16 32:3,7
  61:19
concern 95:5
concerned 63:12,14
  74:25 90:19
concerning 101:21
condition 45:5
conditions 82:4
conduct 30:2 59:9,10
  59:11,17,20 68:25
  74:4 75:16,17 95:25
conflict 18:17,21 20:6
conflicted 17:13
conflicts 36:8
confrontational 44:19
  47:4 83:15 94:25
confronted 50:9
confused 66:11
conjunction 22:5 66:20
consent 89:20
consider 49:3.6 94:13
considerable 96:18
considerably 37:15
considering 56:10
  81:11 96:17
consisted 10:6
Constitution 17:12
  20:19 64:4 73:9
  74:25
constitutional 17:24
  63:24 64:1 72:23
  74:10
contact 22:18,21,22
  44:1,20 47:25 88:15
container 57:6
continually 45:5
continuing 11:22 28:3
  28:6
continuously 31:23
contradict 98:14
contradiction 98:21
contrary 75:6
control 50:1 84:11
  91:21 92:1
controversy 101:21
convenient 34:20

conversation 34:23
  35:1 71:9 82:25
conversations 13:13
  84:9 85:19,23
convicted 90:22
conviction 90:25 91:3
cooperate 16:8
cooperative 88:16
copy 87:5
core 14:24
correct 5:10,11,15,16
  5:25 8:3 9:7 16:16
  18:7,8,12 20:14,17
  26:11 28:25 29:1,8,10
  30:11 40:15,16 43:10
  47:1,6 49:25 50:3
  51:13 55:25 56:12
  58:23 60:13 61:6
  63:18,23 64:15,18
  65:16 66:4 68:11
  75:4,19 79:22 84:7
  89:6 90:8 95:22,23
  100:15
Correction 9:10 94:11
corrections 24:24
  100:4
Council 23:17
counsel 3:11 102:2,6
county 1:6 3:6 13:12,16
  14:6 20:15 21:12
  23:4,5,13,15 24:3,6
  25:10,15,23 27:2,25
  29:11,21 32:2,6,18
  33:17,21 36:1,4,12
  37:9,15,20 38:9,10
  39:1,8,14 41:5 44:6
  51:4,8 55:11 63:21
  100:19 101:6,11,13
couple 6:22 24:8
course 7:18
courses 14:23 28:4,5
court 1:1 17:24 24:24
  82:5,5 101:1 102:14
courtesy 47:23 49:3.6
courts 17:15 98:1
cousin 40:5
cowen 2:2,3 4:6 5:5,8
  65:18,20 66:3 72:11
  72:13,15,22 98:23
  99:1
credential 19:22,25
  66:25
credentials 52:4,5,8,10
  62:1,4 96:24
crime 28:7 68:21,23
crimes 90:22
criminal 15:1,13 16:13
  17:8 20:2 27:16,21
  66:18 90:25
criteria 66:12
criticizing 33:16
cross 27:11
crossing 57:12
crowded 73:17 74:13
cuff 76:18
cuffed 82:7

culture 38:22
cup 71:18
Current 102:16
currently 32:14 61:8
curriculum 14:24
cuss 73:21 75:2 86:1
cussed 90:1
custodial 91:22
custody 81:9 87:13
cut 93:5

_____D_____
D 100:1
dad's 9:17
DARE 54:11,17,19
  55:2,10,18
date 12:25 13:23 38:8,8
  82:5
dates 12:18,20 24:25
dating 38:15
David 30:6 34:21
day 3:1 24:7,9,10 31:21
  59:5 65:1 98:8
  100:21 101:15 102:9
days 24:8 31:22 34:18
DC 17:2
DEA 19:10
deal 10:7 26:17 81:8
dealing 15:14
deals 11:25
debateable 54:13
December 13:22,22,24
  23:16
decide 17:16 65:4
  92:19,23
decided 13:14 65:8
  91:6
decision 41:2
declined 35:7
dedicate 21:6
deescalate 94:22
deescalating 11:24
DEFENDANTS 1:7
  101:7
DEFENDANT(S) 2:6
defense 11:23 56:11
  66:13 67:11 80:16
defenses 56:7
Definitely 10:10 37:23
  38:23 48:21 49:14
  53:1 84:4 90:21
  91:18
definition 16:14
degree 14:25
delighted 50:14
demanded 1:7 44:21
  101:7
demeanor 82:22
department 13:13,16
  21:11,14,15 22:3,13
  23:4,13 24:24 25:11
  27:25 28:21 29:12,22
  36:1,4 39:2,9 41:6
  44:7 55:11 68:2,5,7
  68:10 86:9

gave 16:23 17:21 26:22
81:3,17 93:22,25 95:5
George 71:12,19
gestures 94:18,19,22
95:2,3
gets 49:4
getting 80:18 82:20
gilbert 1:4 22:8 23:6
30:2 34:14,17 36:19
40:23 41:11,11,12,13
41:25 81:12 82:7
84:18 85:8,17,18,19
87:10 88:8 95:17,19
97:11 101:4
Gilberto 41:11
Gilbert's 41:23 84:11
girlfriend 51:4
give 8:7 12:14 16:23
19:13 50:17 73:16
81:4,20,24 87:19
91:25 92:9,9,20 93:4
given 19:3 101:25
gives 19:22
giving 19:17 49:18
67:10,10
go 6:2 8:17,12 12:13,20
25:1 29:15,16 30:9
33:16 42:7 44:2,4
51:18 52:15 53:12
61:2 67:13 70:22
82:3 85:4 86:8 88:1
92:23 93:20 94:8
97:25 98:5
going 6:2 13:18 32:24
49:24 51:25 56:2,11
61:5,12,22 65:4 67:25
70:21 82:6,8 84:20
87:2 89:4,12,23 92:23
93:20,21,24
gonzales 2:7 5:23 72:11
72:14,16 98:24
good 5:9 13:15 17:9
22:19 36:4,10 44:6
45:5 64:11 81:10
90:25 92:13 96:16
goodness 14:12
gotten 78:13
government 19:5,22,24
19:25 54:20
graduate 14:2
graduated 8:15,17
20:23
graduating 14:19
grandmother's 7:25
8:2,4
grass 51:21 53:15
grateful 25:22
great 70:17 95:13
greeting 44:5
GT 41:19
guard 9:11,25 10:11
30:21,23,25
guards 27:12
GUERRA 2:7
guess 18:4 25:21 53:13
74:15

gun 10:23 12:1 18:10
18:22 19:24 51:11
55:25 59:2 76:13
80:1,3 96:11 97:5,19
98:5
guy 49:24 70:20 92:23
guys 38:7,9

### H

HAGGE 2:11
hand 94:22 102:8
handcuffs 76:1 80:6,11
Handgun 61:19
hands 75:21
happen 77:12
happened 36:17 40:17
43:19 51:10 86:6
89:1 90:9
happening 38:18
happens 51:14 56:5
67:9 75:9 86:6 89:19
happy 35:6
harassing 36:12
hard 64:25
harmful 74:14
having 5:4 19:8 37:10
38:8 58:8 71:18
79:16 85:5 90:25
92:1 96:11
head 77:3,5
Health 19:4
hear 36:11,21 49:21
59:23 71:5,22 72:6
88:2,8,13 89:8 95:24
heard 33:14 36:14,15
36:18,20,22 37:7 38:6
38:13,14,17,19,20
39:5,20,24 40:6,8
41:23 54:23,23 55:1
60:6,8,12,16,22,25
69:5,17 70:1,9 75:3
88:24 89:4,7 96:2,6
hearing 69:10
Hebbronville 6:20
22:18 37:18
held 9:18 12:25
help 34:10
helped 85:7 86:17
helper 8:24
her 43:11 47:10 81:3,4
81:14,15,17,20 82:1,2
82:4,5,5 84:18,19
85:7 86:12
hereto 3:12 102:6
hereunto 102:8
hesitant 89:25
hesitated 84:24
Hey 89:14
he'll 49:13
high 8:11,13 11:8 14:9
14:19
highly 54:21
Hispanic 35:11
hit 42:1 76:11 77:5,15
77:22,22

hitting 79:7
hogg 1:6 20:15 25:10
25:23 27:24 29:11,21
32:2,6,18 33:17,20
35:25 36:4,11 37:9,15
38:9,10 39:1,8,14,18
39:18 41:5 44:6 51:3
51:7 55:11,11 63:21
101:6
hold 11:22 12:15 66:1
holding 86:23
home 6:23 7:2
honest 57:25
hospital 24:24
hostile 68:14
hotel 31:1
hour 21:25 26:1,2,23
hours 3:2 15:5,6,8
26:17,24 28:3 63:1,1
73:13
house 6:25 7:3,4,7,25
8:2,5,9 32:16
houses 60:4
how'd 7:5
hunch 57:25
hundred 67:24 80:10
84:21
hypothetical 19:18
hypothetically 64:23
70:8

### I

Ibanez 39:22 41:11,11
idea 13:15 35:8 37:24
78:3
identified 43:25 44:5
illegal 1:1 44:25 64:20
64:22,22,23 65:3,4,7
65:8 84:6
imagine 36:8
immediate 70:11,13
71:1 74:6
immediately 44:20
Immigration 62:19
important 17:21
inactive 32:1
inc 3:4 101:17 102:16
incident 59:12 77:20
78:14,25 90:5
incite 70:13 74:6
incited 70:11
Including 21:18
increasingly 82:9,13,21
Independent 9:10 11:2
13:10
INDEX 4:1
indicating 60:1
indication 50:17
individual 13:11 17:19
23:3 24:22 35:12
54:20 57:4 66:12
68:15 83:2 87:8
94:24
individuals 15:14 34:9
inform 49:8,10 82:5

informal 22:22 28:19
information 36:7 39:8
39:14,17 49:18 80:18
87:8
informed 44:8 48:1
initial 47:25,25
inmates 24:17,20
INS 63:6
Instead 26:25
instructors 16:1,2
intend 32:25
intensive 15:12
Interdepartment 36:5
interest 13:14 90:19
interested 102:7
interpret 17:15 97:21
interpretation 66:19
74:12
inventory 58:3
investigations 27:16
investigator 10:20
Investigators 10:17
involve 73:3
involved 78:13
involvement 55:16
involving 65:10
irate 44:19 81:11 82:9
82:13,21 91:14 93:9
95:10
irrelevant 83:1
isaac 1:12 2:13 3:1,13
4:4 5:3,9 100:3,17
101:18
ISD 13:9 21:4
issue 55:21,22 57:6
I-S-A-A-C 5:13

### J

jail 24:16,18,19 59:4,7
85:21 86:10,10,21
91:24 92:13 95:25
jailer 24:14 86:22,24
86:25 87:3,7,11,14,19
88:16,18 89:12,14
90:7
jailers 41:8
jailer's 86:22 87:1
janitor 8:23
Jefferson 8:14
jerk 13:5
jim 1:6 20:15 25:10,23
27:24 29:11,21 32:2,6
32:18 33:17,20 35:25
36:3,11 37:9,15 38:8
38:10 39:1,8,14,17,18
41:5 44:6 51:3,7
55:11,11 63:21 101:6
JIMENEZ 2:14 3:5
101:12 102:13
job 7:9,11,12 8:21 9:3
11:6,9,18 12:3,3,6,15
13:8 20:24 21:2,9,10
23:12 24:2,5,11 27:5
30:14,16 32:12 33:6,8
33:10 47:22

jobs 9:18 25:12
john 1:4 14:8 22:8 23:6
30:2 34:14,17 101:4
joined 21:17
joining 70:19
Jose 39:22
JP 89:17,19
judge 55:8 65:4 69:23
JURY 1:7 101:7
just 6:4,22 10:8,11
12:23,25 17:16,20
18:18 19:12,17,17
21:2 22:22,24 26:14
27:2,13 29:4 36:7,7
38:19 44:21 46:7
49:18 50:23 52:12,21
53:5 56:13,13 57:16
69:6 70:23 72:4 76:5
78:16 79:3 82:22,23
83:4,8,12 86:14 89:23
90:15,13 91:12 92:9
93:4 95:12 97:25

justice 15:1 57:24
68:18 82:6 90:19
91:8
justification 79:7
justify 58:7

### K

Katz 6:9,23 7:21
keep 50:1 74:11 79:11
79:16
kind 10:2 11:20 12:11
14:20,23 15:4,10
16:17 22:15 23:9
28:19 29:18 33:25
35:1 38:6 39:10 40:1
47:20 49:9 50:6
67:13 72:22 73:5,24
78:13 84:24 87:3
88:20 93:19 95:24
96:17
knee 77:15,17,19 78:1
78:15,18 79:1,8
knew 29:6 35:22 38:10
38:11 56:16,19,20
60:11 86:25
know 6:1,5 14:13 18:18
18:19 22:22 27:2
30:7 34:3 35:18 36:9
36:19 37:12,13,14
38:3 39:1,4,7,22 40:1
40:4,21 42:14 47:5,16
47:17,22 48:9 49:13
50:24 51:25 54:5,11
55:15 57:2 58:10,23
63:10 65:2 66:24
68:1 69:4 71:19,22
77:17,19 79:3 80:21
82:11,12,20 83:16
84:25 85:15 87:4,12
88:17,23 89:11,14
90:1,2,18,24 91:20
93:19 94:20 95:7,8,12
98:12,13

26:16,22,24 46:7
51:21 66:7 72:17
93:5,20,20 99:2
**offended** 59:21 60:5
68:24 69:2 70:11
71:4 74:5,8,23 75:3
**offender** 79:17,20,25
**offenders** 79:23
**offense** 17:16,18 57:7
68:19 70:17 81:7
**offensive** 70:15
**offer** 52:10 62:4
**office** 86:23,25 87:1,15
102:9
**officer** 10:22 11:3,7,8
11:13 12:13 13:16
15:16 17:14 18:22
21:23 23:7 24:14,21
25:13 28:16,21 30:3
31:6,18,20 33:9 35:19
35:23 36:15 37:1
49:3,8,8,9,13 51:12
54:11,19 55:3,10,19
61:9,9 70:16 78:11
79:3 81:5 84:2 90:24
91:3
**officers** 11:15,21,21
13:12 21:16,19 23:2
36:13 38:14,20 57:4
66:6,17,19,21 93:18
**offices** 2:3 3:3 101:16
**official** 35:5 62:14
**Oh** 16:12 37:17 38:5
71:6 72:5 78:19
**oil** 8:18,21,24,25 9:17
**omitted** 41:18 42:15
**once** 26:1 35:20 75:17
77:8 80:5
**oncoming** 51:16
**one** 10:7 11:8 18:24
20:6,15 21:19 23:2,2
23:6,6 31:3 32:15
36:6 39:12 47:17
49:3,4 50:24 53:12
54:17 55:15 60:12,16
60:24 65:12,13,25
66:1 78:15,17 81:6,8
82:17 90:3
**only** 12:4 18:25 54:17
60:12,16 65:1 66:15
61:9 97:21 98:20
**open** 57:5 86:12
**opened** 76:21 86:17
**operated** 86:11
**operating** 84:11
**operator's** 8:24
**opinion** 57:23 74:23
93:7
**options** 33:10 91:9,12
**ORAL/VIDEOTAPED**
1:12
**order** 24:18 27:7,8,9,10
**organization** 39:10
**organizations** 36:9
39:3
**original** 3:12

**other** 9:24 14:20 15:15
16:22 21:4 30:1
32:17 33:10 36:9
37:7 41:15 42:10,14
45:19,21,22 47:2,22
48:25 57:7 60:21
69:9,10,16,25 72:3,3
72:25 74:21 75:7
79:20 81:7 87:16
88:24 89:5 90:3,4
91:9,11 92:1,18,21,22
95:11,25
**otherwise** 62:17 100:15
**out** 8:10,23,25 18:14
25:14 51:17 52:17,21
53:1,3,9,11,12,13,13
54:5 55:8,25 79:10
80:3,7 81:12 82:2
86:18 88:23 93:15
98:1
**over** 12:13,20 15:5 18:3
20:10 33:4 34:9,13
36:16,24 37:1 38:2
42:18,21 43:14,15,17
43:20,21 44:8,21,22
46:9,14 47:2,5,9 49:4
50:10,15,18,21 51:3,7
52:25 53:20 56:9
57:19 58:15 59:3,19
73:8 75:1 77:9 85:7
87:10 92:1 96:8,10
**overall** 82:22
**overheads** 42:1 43:15
**overrides** 64:5
**overtime** 26:19,21,25
27:5
**own** 31:14 41:3 55:10
64:9 65:9 66:19
**o'clock** 3:2,3 101:16
**O-L-C-H** 5:14

---

**P**

**P** 2:1,1 3:10
**PAGE** 4:10 100:5
**paid** 25:25
**palms** 94:23
**paperwork** 87:16
**parallel** 41:22
**paraphrasing** 62:12
**parents** 54:9
**park** 22:23,23
**part** 63:5
**particular** 11:22
**parties** 3:12 102:3,6
**part-time** 16:3
**pass** 98:23
**passenger** 41:21 43:7,8
44:9 46:17 47:9
48:25 51:21 56:19
80:13,23,25 84:9,15
84:17
**passengers** 42:21 43:1
**passing** 34:13 74:21
**patrol** 15:17 18:10,22
19:22,23 20:1,3 22:6

22:16,18 23:3,5 25:13
28:15 33:20,23 34:1
34:22 35:23 36:1,3,12
36:15,16,22,23 37:4,5
37:9,12 38:7 39:8,13
39:17 48:3,12,15 50:5
51:12,20,23 52:3
61:23 62:2,5,25 66:6
66:21 81:5 82:19
85:5 93:17 94:11,11
96:11
**pay** 21:24 25:15,18
26:21 27:5
**paying** 26:25
**pays** 53:11
**PD** 23:5,14
**peace** 11:13,15,21
17:14 31:18,20 49:8
61:9 66:17,18,21
70:11,13,16 71:2 74:7
82:6
**Penal** 15:12 16:13,14
17:2 20:3 66:16,23
70:24 74:4
**pennies** 26:16
**people** 12:8 25:22 27:2
27:20 39:14 50:11,14
57:2,16 58:4,5,17
60:4,4 16:15 68:3,24
69:14 70:16 71:22
72:4,5,23 73:14 88:24
89:5 95:8
**percent** 67:24 80:10
84:21
**perfect** 45:9
**performance** 62:14
97:6,18
**performing** 97:23
**period** 9:19
**permit** 31:16 61:20
**permits** 62:24
**person** 62:12,13 69:1
79:20 81:9 101:18
**personal** 87:7 88:19
**personality** 35:10
**personally** 39:23 46:23
68:1 100:2
**personnel** 41:8
**phone** 15:24
**photograph** 77:25
**phrase** 95:1
**piece** 49:18
**place** 50:10 67:18
68:24 70:8 73:21
75:21
**placed** 92:5 95:18
**placing** 75:13
**plain** 48:18
**PLAINTIFF** 1:4 101:4
**PLAINTIFF(S)** 2:2
**plate** 41:20 42:1,3
46:15,24 47:11 56:21
57:1,3,19 58:3,9,11
58:13,21 59:4
**pleading** 94:23
**point** 14:10 15:25 21:2

23:2 36:18 44:17
51:2 52:2 67:16 76:7
87:24 88:1,4 93:20
**pointing** 94:25
**police** 11:3,10 13:15,18
14:2,15,20,20 15:6,10
16:7 18:13 20:23,25
21:1,4,11,23 22:2,13
73:7 82:12
**policy** 37:5 62:20,21
63:6,7 65:2 89:15
98:20,21,21
**polite** 58:21
**political** 90:16
**populated** 37:22
**population** 37:20,24
**position** 9:8,9,24 10:25
21:18,18,22 23:16
24:13 25:3,5,9,23
30:19 40:21 54:19
**positive** 95:14,16 98:12
98:16
**possibility** 79:4
**possible** 57:10,12 67:2
71:8,11,21,24 72:1,9
**possibly** 30:1 50:25
95:21
**post** 31:1
**powers** 17:8 18:13
**precedent** 18:4
**premises** 53:22,23
**prescription** 19:5,6,8
**pretty** 47:21 50:7 73:11
80:17
**prevent** 45:5
**previously** 7:7
**principal** 14:8
**printed** 87:5
**prints** 96:1
**Prior** 35:22
**prison** 24:23
**private** 10:17,19
**probable** 27:21 34:4
42:18,20 46:13
**probably** 24:10 33:11
56:24 59:6 72:6 80:5
80:7
**probation** 26:2,4,10
**probationary** 26:6,7
**problem** 24:19 94:20
**problems** 23:19 29:18
31:7 37:10 85:6
87:19
**procedure** 3:7 15:13
17:8 20:3 51:20
86:14
**procedures** 15:17
16:13 66:18
**produces** 45:16
**profanity** 59:12 60:7,9
60:12,15,17 67:18
73:18,19 74:5,7 76:15
90:5
**professionalism** 47:24
**program** 28:8 54:17
**promise** 82:4

23:2 36:18 44:17
51:2 52:2 67:16 76:7
87:24 88:1,4 93:20
**proof** 44:13
**prosecution** 56:7 80:17
**protected** 73:19,22
74:2
**protest** 17:2
**provide** 24:17 29:9
44:14
**provided** 86:19
**provision** 74:10
**proximity** 74:16,17
**public** 3:16 59:14 67:18
68:24 70:7 73:21
100:23
**pull** 34:8,13 37:1 42:18
43:14 46:9,13 47:2
50:15 57:19 58:15
59:19 96:9
**pulled** 36:15,24 43:15
43:20,21 44:8,21 47:5
47:9 49:4 50:18,21
51:3,7 52:25 59:3
86:11
**pulling** 42:21 43:17
44:22 50:10 53:20
75:1
**purpose** 3:14 29:3
**pursuant** 3:6 101:14
**put** 16:25 26:10 42:2,8
43:15 80:8,11 93:14
**p.m** 3:2,3 72:19,19
101:16

---

**Q**

**qualified** 101:13
**question** 18:5,25 21:3
41:20 69:7,15,15,18
69:21,24 70:3 73:11
73:12 78:9,22 93:6
94:4
**questions** 6:6 56:6,11
61:4 67:10 69:20,24
80:14,16 89:1 98:24
**quickly** 89:19
**quite** 50:25 71:8 73:14
**quote** 67:22

---

**R**

**R** 2:1,2,3
**racial** 68:1
**ran** 40:25 41:25
**range** 25:16 37:14
**rates** 74:22
**rather** 38:8 92:19
**Raul** 14:12,12,13
**reached** 88:20
**reaching** 48:6
**read** 39:23 100:3 102:1
**Ready** 5:5
**real** 10:11 17:20 87:1
**Realistically** 57:13
**realize** 5:17
**really** 24:18 55:21
58:20 64:5 85:25
91:9
**rear** 48:2 51:18 58:9

86:14
standing 53:10 55:24
  71:3
standoffish 94:12
start 15:5 40:14 87:15
  88:2,7
started 8:23 13:9 20:24
  21:1 26:1 28:21
  41:25 76:1 85:4 87:4
  87:7
starting 14:19
state 3:6 16:21 17:25
  18:11,15,22,23,23
  19:7 20:2,8,9 24:23
  37:5 54:20 63:14,17
  64:5 65:16 66:3,21,25
  68:17 93:18 98:22
  100:18,23 101:10,14
  102:14
stated 47:8 74:5 75:8
  95:8,19
states 1:1 17:1,6,12,24
  18:15 19:22,25 20:19
  41:14 61:9 64:4
  66:18 74:24 100:3,3
  100:14 101:11
station 22:19 40:24
  86:7
status 26:2,6,7
statute 18:18 45:4,23
  46:19
step 51:18 53:1,3,9,11
  53:11
stepped 80:7
still 13:17 30:7 31:18
  31:20 34:19 79:16,18
  80:1 97:9 98:8,18
STIPULATED 3:11
stipulates 41:15
stipulations 3:8 4:2
stood 51:21
stop 34:5,12,13,24
  35:14,15 41:12,13
  47:22 48:23 49:10
  50:8 51:25 52:2,7,15
  53:4 55:3 56:3 60:18
  60:19 61:2 74:21
  79:17 83:1
stopped 35:18 74:20
stops 27:18 50:12 53:8
  61:16 95:9
store 34:20
strained 36:6
strategy 11:23
street 2:4 6:15 7:1,2,22
  25:14 41:16
streets 29:4
strict 17:3,3
stricter 16:21
struck 34:23
stuck 13:1,7
students 11:11 12:10
  54:7
study 15:12
stuff 29:7 36:9 73:1
subjects 28:13

submitted 42:6
submitting 89:9
subscribed 100:21
  102:1
Suite 2:4,8 3:4 101:17
  102:17
Suites 31:4
superior 38:7
supervision 101:24
supervisory 41:8
supposing 59:2
supremacy 20:19 98:13
supreme 20:20 64:5
sure 33:18 36:17 37:17
  37:19,21 38:5 40:5,11
  40:11 42:12,14 46:10
  46:10 48:24 50:16
  55:15 67:25 80:6,7,10
  80:16,17 86:25 94:16
  97:7,8,25 98:2,4,7,8
suspected 27:20,21
suspects 25:2
suspicious 34:3
switch 23:14 25:12
sworn 5:4 100:3,21
  101:19
S-I-D 6:9

### T

T 3:10,10 100:1
table 71:6,18,25
take 6:4,5 14:23 15:1
  24:2,5,16 26:3 28:6
  35:5 46:7 57:4,7
  68:13 70:17 72:11
  80:3 81:12,20,24
taken 3:1 59:4 81:22,23
  96:1 102:4
taking 86:10 87:18
talk 40:24 82:25
talking 59:24 71:14
  74:15 96:4 98:12
tall 85:14
taught 15:18,21 16:10
  16:17,20 17:4,23 18:2
  64:14
taxpayer 96:16,19,20
TCLEOSE 15:15
TCLEOSE-approved
  28:4
technical 58:1,4,6
techniques 11:24
telephone 2:5,9 8:8
  102:18
tell 13:1,4 25:21 41:7
  41:12 42:13 48:3
  49:4,13 57:15 59:16
  83:3 87:2 97:13,15
tells 50:4,5 51:10
ten 81:23,23,24
tend 50:11 74:6
tense 94:12
Tenth 18:13
term 46:2 49:7 95:7
termination 23:21

test 8:25
testified 5:4
testify 101:19
testimony 43:8 101:25
texas 1:1,6 2:4,9 3:4,6
  3:14 5:15 6:10,15,20
  7:17 8:18 10:17
  12:13 14:9 15:12,15
  17:2,3,5,6,9,13,19
  21:11 22:19 24:23
  28:3 29:17 38:15
  61:8 66:23 70:24
  92:17 98:13,22
  100:18,23 101:1,6,10
  101:14,18 102:14,17
Thank 6:7 7:13 8:10
  72:14
theater 73:17 74:13
their 16:5 24:17 38:7
  46:1 51:4 58:8,9
  72:25 96:10
theory 50:20,24
thereon 3:15
thereto 102:1
they'd 8:5 22:23
thing 41:19 52:1 53:6
  59:7 81:10 91:15,21
  98:20
things 15:10 22:15
  33:25 65:13,25 66:1
  81:7 87:4 88:19,24
  89:1,4 96:4,9
think 13:21,22,24
  14:12 24:7 26:5
  34:18 36:18 37:3,6,19
  37:19 40:17 45:10
  59:15,16,20 62:16
  66:9 67:23 68:1,6
  72:2,8 80:6,12 85:2
  94:19 96:15,20,20
thinking 13:22 39:18
Thomas 8:14
though 37:20 84:10
thought 69:18 78:19
  91:2
threat 49:12,15 94:13
threaten 86:3
threatened 56:2 76:13
threatening 94:14
three 82:3
through 6:2 27:24 28:3
  43:1,2,3,3,11,25 44:2
  44:3,4 67:25 96:3
throughout 16:4 50:8
throwing 92:12
ticket 81:17,21,25 82:4
  82:18 91:13,17 92:20
  93:4,22,25
ticketed 80:25
ties 39:2
tightly 94:24
time 5:2 7:19 9:6,19
  10:20 14:25 19:4
  21:6,9,17 22:10 26:22
  26:22,24 34:23 35:6
  35:15 40:13 42:12

43:16 47:21 54:1,3,5
  54:20 55:22 56:6,16
  60:20 62:2,5 64:25
  67:17,24 69:9,25
  72:18,21 76:5 79:1
  80:11 81:11,12 85:3
  87:24 88:4,5 89:2
  90:3,12 91:8,14 93:5
  93:18 96:12,18 98:25
  99:3
times 34:6
tinted 42:24 43:4
title 45:25
today 42:11 50:24
together 22:25
told 17:11 18:6 20:15
  20:21 35:4,5,20 42:10
  44:21,24 48:4,14
  49:15 57:16 64:6
  65:14 67:16 75:13,21
  76:4 77:3,9 83:7,10
  84:18 86:12,24 87:11
  88:18 89:11,14 90:3
  92:4 94:16 95:21
  97:17
tone 47:20 50:6 83:12
  83:14 94:7
torture 6:6
totality 65:10
touching 101:20
tow 81:14,16,18 84:20
towards 13:19,19 14:25
  70:15
town 40:16 61:17 74:20
to-wit 101:18
traffic 27:11,18 34:12
  34:12 35:14,15 45:3
  47:22 48:23 49:10
  50:8,11 51:17,17,25
  52:2 53:4,8,10 60:18
  60:19 61:2 74:21
  79:17 93:8 95:9,9
traffickers 39:16
trafficking 39:10
trained 18:20 20:7,18
  28:20 34:19 63:19,21
  64:17,21,24 65:7,14
  65:14 66:3,8,9,11,24
  67:1,3 94:21
training 10:2,4,5,9
  11:18,20,21 12:5,7,11
  12:12 15:4,16 16:4,6
  17:21 20:12 22:1
  23:9 25:7 27:24 28:2
  28:10,12,15,18,19,21
  29:3,9 33:19 63:13,25
  64:6,13,14,16 65:11
  65:12 66:1,20 72:23
  73:3,5,24 75:5
transcript 100:3,4,14
transcription 101:23
transmission 84:22
transport 24:14,21
  91:24
transported 24:23
transporting 25:1

85:24
travelling 61:14
trespassed 35:3
trial 50:23
tried 76:9,11
trouble 32:7
true 19:17,21 91:1
  100:15 101:24
truly 58:20
trump 17:12 18:11
  20:10 63:14 66:25
trumped 65:16
trumps 66:4
trunk 58:1 80:8
trust 51:23
truth 57:15 101:19,20
try 13:5 79:10
trying 12:23 68:6 94:22
turn 75:21 76:2
turned 41:24 87:10
twenties 85:11
twice 70:3 83:8
two 17:13 20:6 31:10
  31:11,22 36:8 41:16
  54:23,23 82:2 96:8
two-fold 81:6
type 10:12 57:4

### U

U 3:10
Uh-huh 84:1 85:22
UISD 13:17,20,23
unarmed 10:22
unconstitutional 18:1,2
  75:1
uncooperative 87:23
  88:10
under 17:7 37:25 56:7
  63:6 66:8,16,21 74:3
  75:13 86:24 92:5
  95:18 101:24
undersigned 100:2
understand 39:11
  54:16
understanding 18:4,11
undocumented 34:8
unfortunately 38:5,21
  41:18
unhappiness 50:8
unhappy 50:11
unit 85:5
united 1:1 9:10 11:2
  13:9,10 17:1,6,6,12
  17:24 19:21,25 20:19
  21:4 64:4 74:24
  101:1
University 29:17 32:25
unlawful 56:7 66:14,22
  75:14 95:18
unofficially 33:8
unsafe 91:16
until 13:21 14:17,18
  24:9 39:6 40:14
  54:12 55:5 88:5
  39:18

Case 1:01-cv-00054    Document 32    Filed in TXSD on 07/01/2002    Page 57 of 137
JOHN GILBERT VS. JIM HOGG COUNTY              ISAAC BOLCH                                   08/29/0

Page

---
**7**
---
7th 2:4 41:14
7.50 25:16
765 2:4
78217 101:18 102:17
78228 3:14
78520 2:4
78521 2:9

---
**9**
---
9.42 26:2,13
93 8:19
956 2:5,5,9,10
96 8:20 9:3,14
97 9:14 13:22,24
98 14:18 40:18
99 40:14

‡Date
Apr 08 1999

### JIM HOGG CO. SHERIFF'S DEPARTMENT
### 211 E. GALBRAITH

```
----------------------------------------------------------------------
Incident # 990407803              Case # 99JH0224     Document #
----------------------------------------------------------------------
Suspect:
GILBERT, JOHN ANTHONY        BORDER PATROL            AGE:  33  SEX: M
103 N. ELM ST.               U.S. IMMIGRATION BORDER P  RACE: WHIT
HEBBRONVILLE      TX 78361   802 N. SIGRID AVE.        DOB: 04/06/66
                                                       DL#: 10824600
                             361-527-3256              SS#:
----------------------------------------------------------------------
Offense  : UNLAWFUL CARRYING WEAPON     UCR Code : 26
Date     : 04/07/99                     Time : 04:14P- 05:00P
Location : 1000 N. SMITH AVE.
Weapon   :
M / O    :
----------------------------------------------------------------------
Vehicle Owner's Name     License#  Yr Color Model   Make      Style      Id
NORBERTO MONARREZ        TGK78H    94 BLACK MUSTANG GT FORD    2 DOOR
----------------------------------------------------------------------
```

On Wednesday, April 7, 1999 at approximately 4:14 P.M. this reporting Deputy Isaac Bolch was on Traffic Enforcement Patrol.  This reporting Deputy observed a black Ford Mustang with two occupants.  The front seat passenger was not wearing a seatbelt.  As the Mustang passed this reporting Deputies Patrol Unit the operator apparently reved the engine, because this reporting Deputy heard excessive or unusual noise from the mufflers.  This reporting Deputy initiated a traffic stop on the vehicle.  This reporting Deputy greeted the driver, identified himself as a Peace Officer, and notified the driver of the reason of the stop.  The driver (identified as John Anthony Gilbert 04-06-1966), immediately began arguing with this reporting Deputy.  Mr. Gilbert then identified himself as a Border Patrol Agent and stated that he (s) had a handgun in the vehicle.  Mr. Gilbert (s) was then asked to step out of the vehicle.  This reporting Deputy then asked if he (s) was going to or from work, or if he (Gilbert) was on duty.  Mr. Gilbert stated that he was not on duty and he was not going to or coming from work.  Mr. Gilbert (s) was advised that he could be placed under arrest for Unlawful Carrying of a Weapon.  Mr. Gilbert (s) then stated, "Y'all never do shit anyways."  At that point Mr. Gilbert was placed under arrest for Unlawful Carrying of a Weapon and Disorderly Conduct.  Mr. Gilbert's weapon (Beretta .40 Cal. handgun Serial #BER05857OM), was logged into evidence and receipt was issued to Mr. Golbert (s).  Unlawful Carrying of a Weapon under the Penal Code 46.02 only exempts Peace Officers as defined by Code of Criminal Procedures 2.12.  Mr. Gilbert was transported to the Jim Hogg County Sheriff's Department and booked.  Mr. Gilbert was not cooperative with Jailer Rene Ruiz.  Mr. Gilbert (s) was Mirandized at 4:24 P.M. and charged with Unlawful Carrying of a Weapon and Disorderly Conduct.

```
----------------------------------------------------------------------
Officer 1: BOLCH, ISAAC                Officer 2:
Disposition Code : AA
```



EXHIBIT
C
ALL-STATE LEGAL®

```
Incident # 991407303                    Case # 99CH0024    Document #

Suspect:
GILBERT, JOHN ANTHONY           BORDER PATROL              AGE: 33  S
103 N. ELM ST.                  U.S. IMMIGRATION BORDER P  RACE: W
HEBBRONVILLE        TX 78361    801 N. SIGRID AVE.         DOB: 04/06/
                                                          DL#: 1092460
                      361-527-3256                         SS#:

Offense  : UNLAWFUL CARRYING WEAPON    UCR Code : 26
Date     : 04/07/99                    Time : 04:14P- 05:00P
Location : 1000 N. SMITH AVE.
Weapon   :
M / O    :                             Dept Code:

Vehicle Owner's Name        License#  Yr Color Model    Make        Style
NORBERTO MONARRET           TGK78H    94 BLACK MUSTANG GT FORD       2 DOO
```

On Wednesday, April 7, 1999 at approximately 4:14 P.M. this reporting Deputy Isaac Bolch was on Traffic Enforcement Patrol. This reporting Deputy observed a black Ford Mustang with two occupants. The front seat passenger was not wearing a seatbelt. As the Mustang passed this reporting Deputies Patrol Unit the operator apparently reved the engine, because this reporting Deputy heard excessive or unusual noise fr the mufflers. This reporting Deputy initiated a traffic stop on the vehicle. This reporting Deputy greeted the driver, identified himself as Peace Officer, and notified the driver of the reason of the stop. The driver (identified as John Anthony Gilbert 04-06-1966), immediately began arguing with this reporting Deputy. Mr. Gilbert then identified himself a Border Patrol Agent and stated that he (s) had a handgun in the vehicle Mr. Gilbert (s) was then asked to step out of the vehicle. This reporing Deputy then asked if he (s) was going to or from work, or if he (Gilbert) was on duty. Mr. Gilbert stated that he was not on duty and he was not going to or coming from work. Mr. Gilbert (s) was advised that he could b placed under arrest for Unlawful Carrying of a Weapon. Mr. Gilbert (s) then stated, "Y'all never do shit anyways." At that point Mr. Gilbert was placed under arrest for Unlawful Carrying of a Weapon and Disorderly Conduct. Mr. Gilbert's weapon (Beretta .40 Cal. handgun Serial #BER35557CM), was logged into evidence and receipt was issued to Mr. Golbert (s). Unlawful Carrying of a Weapon under the Penal Code 46.02 onl exempts Peace Officers as defined by Code of Criminal Procedures 2.12. Mr Gilbert was transported to the Jim Hogg County Sheriff's Department and booked. Mr. Gilbert was not cooperative with Jailer Rene Ruiz. Mr. Gilbert (s) was Mirandized at 4:14 P.M. and charged with Unlawful Carrying of a Weapon and Disorderly Conduct.

```
Officer 1: BOLCH  ISAAC                Officer 2:
Disposition Code : AA
```

U.S. Department of Justice
Immigration and Naturalization Service

# INS FIREARMS POLICY



*AUGUST 1996*

ADMINISTRATIVE MANUAL SECTION 20.012



# Memorandum



HQNFU 50/15.1.1-P

| Subject | Date |
|---|---|
| Implementation of the Immigration and Naturalization Service Firearms Policy | AUG - 8 1996 |

**To**
Headquarters Management Team
Firearms Review Board
   Members/Alternates
Director of Training
Chief, Border Patrol Academy
Chief, Immigration Officer Academy
Regional Directors
District Directors
Chief Patrol Agents
Officers in Charge
Patrol Agents in Charge
Port Directors

**From**
Office of the Commissioner

    Attached is the final version of the revised Immigration and Naturalization Service (INS) Firearms Policy, Section 20.012 of the Administrative Manual. This policy has been negotiated with both the National Immigration and Naturalization Council and the National Border Patrol Council, and incorporates all changes agreed upon by the Service and the Unions. Field input was included prior to negotiations with the Union.

    This version of the INS Firearms Policy supersedes all previous policies regarding the Service's Firearms Program and shall be effective immediately.

    The revised Firearms Policy provides needed standardization in the issuance, control, carrying, and use of firearms. It will ensure the continuance of disciplined and professional conduct by all immigration officers involved in the enforcement of the immigration laws. The revised Policy will also demonstrate the Service's commitment to promote and protect the human rights of all individuals and to ensure the immigration laws are enforced fairly and with compassion. All of us must rededicate ourselves to upholding the highest standards of conduct. I am fully committed to ensuring that allegations of abuse or misconduct are aggressively pursued and that, when proven malfeasance occurs on the part of any immigration employee, appropriate disciplinary action will be taken.

ADMINISTRATIVE MANUAL SECTION 20.012

IMMIGRATION AND NATURALIZATION SERVICE FIREARMS POLICY

| SUBSECTION | | PAGE NUMBER |
|---|---|---|
| 1 | Purpose .................................................................. | 1 |
| 2 | Authority of Immigration Officers to Carry Firearms........................ | 1 |
| 3 | Definitions | |
| | Authorizing Officials..................................................... | 2 |
| | Immediate Subordinate Official (of an Authorizing Official) .... | 2 |
| | Basic Immigration Law Enforcement Training...................... | 2 |
| | INS Firearms Program....................................................... | 3 |
| | Basic Marksmanship Instruction and Practical Pistol.............. | 3 |
| | Courses (BMI/PPC) | |
| | Semi-Automatic Pistol Transition Training (SATT) Course..... | 3 |
| | Tactical Firearms Instruction (TFI).................................... | 3 |
| | Reportable Shooting Incidents........................................... | 3 |
| 4 | Responsibilities | |
| | Commissioner.............................................................. | 4 |
| | Chairman, Firearms Review Board................................... | 4 |
| | Administrator, National Firearms Unit.............................. | 5 |
| | The Office of Internal Audit (OIA).................................. | 6 |
| | Shooting Incident Review Committee (SIRC)...................... | 7 |
| | Authorizing Officials..................................................... | 7 |
| | Firearms Control Officers (FCO).................................... | 8 |
| | Ammunition Control Officers (ACO).............................. | 8 |
| | Firearms Instructions.................................................... | 9 |
| | Range Safety Officers ................................................. | 10 |
| | Individual Service Officers Authorized to Carry Firearms..... | 10 |
| 5 | Service Officers Authorized to Carry Firearms............................. | 10 |
| 6 | Guidelines for Carrying Firearms.............................................. | 11 |
| 7 | Deadly Force Involving Firearms.............................................. | 13 |
| 8 | Compliance with the INS Firearms Policy.................................... | 14 |
| 9 | Firearms Aboard Commercial Aircraft......................................... | 15 |
| 10 | Firearms in Foreign Assignments.............................................. | 17 |
| 11 | Reporting of Shooting Incidents................................................ | 17 |
| 12 | Investigation of Reportable Shooting Incidents | |
| | Authorizing Officials..................................................... | 19 |
| | Immediate Subordinate Official....................................... | 21 |

<u>SUBSECTION</u>                                                                                                    <u>PAGE NUMBER</u>

25        Service Armory Operations....................................................        44

26        Shipment of Firearms for Repair.............................................        45

27        Maintenance and Repairs of Firearms.......................................        46

28        Authority for Service Training Specialist/Armorers to Possess
           Service Firearms at other than Government-owned Locations......        47

29        Firearms Program Field (Site) Inspections.................................        47

30        Firearms Inspection at Field (Site) Locations.............................        48

31        Authorized Levels of Firearms Reserves...................................        48

32        Transfers of Service-Issued Firearms......................................        49

33        Storage and Maintenance of Firearms, Ammunition and Related
           Equipment..................................................................        49

34        Seized Firearms.............................................................        50

35        Firearms and Ammunition Acquisition......................................        50

36        Lost or Stolen Service Firearms.............................................        50

37        Asset Management Information System, Firearms Inventory
           Module (AMIS/FIM)........................................................        51

38        Firearms Safety..............................................................        51


<u>Appendix 1A</u>

List of INS Authorized Firearms..............................................        53
    (Prior to the Effective Date of this Policy)

<u>Appendix 1B</u>

List of INS Authorized Firearms..............................................        56
    (After the Effective Date of this Policy)

<u>Appendix 2</u>

Notice to Service Officers of Personal Responsibility Under
            the INS Firearms Policy.....................................        59

<u>Appendix 3</u>

Shooting Incident Reports.....  ..  .......................................        60

## IMMIGRATION AND NATURALIZATION SERVICE FIREARMS POLICY

Administrative Manual Section 20.012

**NOTE:  Nothing in this policy shall be construed in a manner that conflicts with any provision of law, government-wide rules or regulations, or the provisions of the applicable Collective Bargaining Agreement, including those dealing with the obligation of the Service concerning physically disabled employees, including but not limited to, the Rehabilitation Act of 1973 and the Pregnancy Discrimination Act of 1978.**

1.   <u>Purpose</u>: Section 20.012 of the Administrative Manual provides policy and procedural information regarding all aspects of the Service's Firearms Program.  Accordingly, this document performs the following functions:

    A.   Describes the authorities and responsibilities of Service officers in regard to the Service's Firearms Program;

    B.   Provides guidance for the issuance, control, carrying and use of firearms by Service officers;

    C.   Provides guidelines for the use of deadly force, and the reporting and reviewing of incidents involving the discharge of firearms;

    D.   Provides procedures for the acquisition of firearms, ammunition, and related equipment;

    E.   Describes the Service's firearms training and qualification programs;

    F.   Describes the functions and responsibilities of the Firearms Review Board (FRB);

    G.   Describes the functions and responsibilities of the National Firearms Unit (NFU);

    H.   Describes the functions and responsibilities of the Shooting Incident Review Committee (SIRC);

    I.   Supersedes the November 1989 revision of the INS Firearms Policy in Section 4210 of the Administrative Manual.

2.   <u>Authority of Immigration Officers to Carry Firearms</u>

    A.   The authority of certain Immigration Officers to carry firearms is derived from the Attorney General's statutory responsibility for the enforcement of the immigration laws.  The Attorney General is empowered by Section 103 of the Immigration and Nationality Act to control and guard the boundaries of the United States against the illegal entry of aliens.  This authority has been delegated to the Commissioner pursuant to 28 C.F.R. Section 105 and 8 C.F.R. Section 2.1.

    B.   Section 287 of the Act empowers Immigration Officers to perform certain acts and duties, including the arrest of illegal aliens, and certain felons, without a warrant and to execute any warrant or other process issued by any officer under any law regulating the admission, exclusion, or expulsion of aliens.

    (b)  Border Patrol Basic Training Course after 1950;

    (c)  Immigration Detention Enforcement Officer Basic Training Course after 1977; or,

    (d)  Other than Permanent Full-time (OTP) Immigration Inspector Basic Training Course after 1991 in the case of individuals who are OTP inspectors.

D. <u>INS Firearms Program</u> - The INS Firearms Program means the INS program which encompasses all aspects of the Service's activities related to firearms, ammunition, and related equipment.

E. <u>Basic Marksmanship Instruction and Practical Pistol Courses (BMI/PPC)</u> - The terms "Basic Marksmanship Instruction" and "Practical Pistol Course" relate to the firearms training that is conducted as part of the Basic Immigration Law Enforcement Training provided by the Border Patrol Academy and Immigration Officer Academy or training substantially equivalent thereto as determined by the Commissioner with the approval of the Deputy Attorney General. Substantially equivalent training includes the Federal law enforcement basic firearms training programs provided at the Federal Law Enforcement Training Center (FLETC) or other similar law enforcement programs which are approved by the Director of Training on a case-by-case basis. It includes training in the appropriate use of deadly force, marksmanship, firearms handling and operating techniques, immediate action drills, tactical use of firearms, and judgement firearms training. In order to successfully complete the Basic Marksmanship Instruction and Practical Pistol Courses, an officer must achieve a minimum score of 70% on the INS handgun qualification course. In addition, an officer must achieve a score of 100% in the judgement portion of the Judgement Pistol Shooting (JPS) course and minimum score of 70% on the marksmanship portion of that course.

F. <u>Semi-Automatic Pistol Transition Training (SATT) Course</u> - The INS course developed to train INS Officers who have previously successfully completed the revolver-based Basic Marksmanship Instruction and Practical Pistol Courses in the different skills required with a semi-automatic pistol. Completion of the SATT course does not satisfy the Basic Marksmanship Instruction and Practical Pistol Courses training requirements.

G. <u>Tactical Firearms Instruction (TFI)</u> - Tactical Firearms Instruction means Academy and post-Academy training that includes basic firearms retention, the use of cover and concealment, proper reloading procedures, the use of firearms in searches, tactical maneuvering with a firearm, tactical live-fire drills, proper defensive positioning when in contact with a suspect, and the use of voice commands and physical actions to control situations.

H. <u>Reportable Shooting Incident</u> - A reportable shooting incident means any incident involving the discharge of a firearm which occurs as described in Subsection 3.H.(1)-(4). Such an incident must be reported in accordance with the instructions contained in Subsection 11. Reportable shooting incidents are defined as:

    (1) Any incident which involves the discharge of a firearm by a Service employee, either intentional or unintentional, which occurs under the following circumstances:

       (a)  While on duty (except for intentional discharges which occur during firearms training, practice, or qualification, and do not cause any injury to a person or animal, or damage to private, public, or government property); or,

C.    Administrator, National Firearms Unit

(1)    The Administrator of the National Firearms Unit (NFU) is responsible for the development and implementation of administrative and operational procedures related to the Firearms Program.

(2)    Under the direction of the Firearms Review Board, the responsibilities of the Administrator of the National Firearms Unit include:

(a)    Standardizing firearms, ammunition, and related equipment Service-wide;

(b)    Correcting deficiencies and resolving issues and concerns within the INS Firearms Program;

(c)    Assisting the field in reducing unnecessary officer-involved shootings;

(d)    Conducting ongoing research, development and testing on firearms, ammunition, and related equipment; conducting market surveys; and acquiring all firearms and ammunition;

(e)    Based upon that research, development and testing, determining which firearm(s) or related equipment are suitable for procurement and issuance to Service officers;

(f)    Updating the list of approved personally-owned firearms which may be purchased and carried by officers on and off duty;

(g)    Managing the Service's Asset Management Information System, Firearms Inventory Module (AMIS/FIM), including the oversight of all acquisition, transfer, and disposal of firearms;

(h)    Operating the Service's armories and overseeing all maintenance, repair and alteration of all Service-owned firearms, as well as any Service-approved firearms sent in by Service officers for inspection, maintenance, modification, and/or repair. Responsibilities shall include the training, skills development, equipping and technical oversight of armorers located at the NFU, Service Academies, and designated field locations;

(i)    Determining Service-wide firearms, ammunition, and target inventory requirements and distributing firearms, ammunition, and targets to INS offices and the INS staff at the Service Academies;

(j)    Receiving all seized and excess firearms from INS offices, and determining disposition;

(k)    Assisting the Firearms Review Board with the analysis of shooting incidents for the purpose of recommending changes regarding firearms-related equipment, policy, or training;

E.    Shooting Incident Review Committee (SIRC)

(1)    The SIRC functions as a subcommittee of the Firearms Review Board and will review shooting incident investigations to determine the following:

(a)    The Authorizing Official's local INS investigation of the reportable shooting incident has been properly and competently conducted;

(b)    The Authorizing Official's proposed final report of the local INS investigation of the reportable shooting incident is complete in every detail;

(c)    The level of force used by individual INS officers who are involved in the incident was appropriate and consistent with the INS deadly force and non-deadly force policies;

(d)    The Authorizing Official's proposed disposition of the incident, including any corrective and/or disciplinary action, is appropriate and consistent with the circumstances of the incident, and is consistent with final dispositions resulting from similar incidents which have previously occurred within the Service.

(2)    Upon completion of the review of the proposed final report and disposition, the SIRC shall provide the Authorizing Official with appropriate analyses, observations, and recommendations regarding the reporting, investigation, and disposition of the incident;

(3)    The SIRC shall periodically review the reasonableness of the INS deadly force policies and standards and provide recommendations to the FRB as necessary.

F.    Authorizing Officials

(1)    Authorizing Officials are responsible for all aspects of the Service's firearms program as it relates to offices and personnel under their supervision, and for ensuring compliance with the INS Firearms Policy by all officers within their jurisdiction.

(2)    Authorizing Officials shall establish and maintain a single, coordinated Firearms Program within their jurisdiction. At Headquarters and each Regional and District Office, one program shall be assigned lead responsibility for the Firearms Program within that jurisdiction. The lead program shall designate one firearms instructor as the Senior Firearms Instructor.

(3)    Authorizing Officials shall designate a Firearms Control Officer as described in Subsection 4.G. and an Ammunition Control Officer as described in Subsection 4.H.

(4)    The authority of an Authorizing Official will not be exercised by any person temporarily assigned to the position normally held by the Authorizing Official unless the authority is specifically conveyed in writing by the Authorizing Official or higher authority.

(5)    Authorizing Officials shall be responsible for selecting a combination of journeyman and supervisory Border Patrol Agents or Special Agents from within their jurisdiction to conduct Service investigations of reportable shooting incidents involving Service employees. Authorizing Officials are also responsible for ensuring that these officers

(2)   Ammunition Control Officers shall be responsible for:

   (a)   Overseeing the receipt of ammunition, and posting notice of receipt of ammunition into the Asset Management Information System, Firearms Inventory Module (AMIS/FIM);

   (b)   Directing the issuance of ammunition, and oversight of the maintenance of up-to-date records of issuance of each type of ammunition for each program on the Ammunition Log Sheet, Form G-484;

   (c)   Overseeing the entry of data in AMIS/FIM of monthly ammunition usage by each program within each office in their area of accountability;

   (d)   Conducting periodic physical inventories of ammunition and entering the data into AMIS/FIM.

I.   Firearms Instructors

(1)   Authorizing Officials shall designate INS officers to perform full-time or collateral duties as Firearms Instructors.    Subsection 23.D(4)(a)-(f) outlines training for officers designated as Firearms Instructors.

(2)   Designation of Firearms Instructors shall be based on the following criteria:

   (a)   A working knowledge of firearms and firearms training;

   (b)   An aptitude for providing instruction in firearms; and,

   (c)   A score of 85% or higher on the last two quarterly qualifications for all firearms that the individual is authorized to carry.

(3)   Firearms Instructors are responsible for conducting firearms training, practice and qualification activities within their assigned area of jurisdiction.

   (a)   During firearms training, practice or qualification sessions, Firearms Instructors are responsible for taking all reasonable steps to ensure the safety and security of all involved Service personnel and property.   They are also authorized to remove any person from the range who refuses to comply with safety instructions or otherwise poses a safety risk.

   (b)   Firearms Instructors shall have absolute authority to resolve disputes regarding the scoring of targets.

   (c)   The Senior Firearms Instructor at each location is responsible for scheduling other Firearms Instructors and Range Safety Officers to assist with firearms training, practice or qualification sessions.

   (d)   The responsibilities of the Senior Firearms Instructor shall include acquisition of local range facilities, training and qualifications, and consolidation of orders for firearms, ammunition and related equipment.

Officers to perform inspectional duties requiring the carrying of a handgun will maintain a sufficient quantity of unassigned Inspections Program handguns for this purpose.

(7)    Immigration Officers and other Service employees who are granted the authority to carry a firearm, either individually or as a class, by the Commissioner with the approval of the Deputy Attorney General; and,

(8)    Officers who are responsible for supervising the activities of those officers listed above.

6.    <u>Guidelines for Carrying Firearms</u>:

A.    (1)    Service authorization to carry a personally-owned handgun during duty hours or non-duty hours shall be limited specifically to Service-approved handguns in accordance with Subsection 18 and Appendix I (A and B). Where an officer is authorized under Subsection 21 to carry a non-standard Service-issued or approved handgun <u>exclusively</u> for an approved undercover operation, the officer is authorized to carry the handgun during duty and non-duty hours until such time as the undercover operation is completed or terminated.

B.    (1)    Service officers listed in Subsection 5.A.(1)-(8) are <u>required</u> to carry a Service-issued or approved handgun, and may be required to carry other firearms, during duty hours in the performance of their normal duties.

(2)    Exceptions to this requirement are:

(a)    Immigration Inspectors who were employed prior to November 1, 1989, and were granted a written personal exemption from the requirement prior to that date; and,

(b)    Adjudications Officers who are not assigned to conduct inspections.

(3)    This subsection is not intended to require a Service officer to carry a handgun or other firearm while performing duties where the carrying of a firearm is inappropriate, such as performing routine office work, testifying in court, etc.

(4)    Additionally, as outlined in Subsection 17.B., except in emergency situations, officers may decline to carry a longarm.

C.    Service-issued or approved firearms shall be carried loaded with the Service-designated number of rounds for that firearm. Only Service-issued ammunition is authorized for duty carry and use by INS officers.

D.    As described in Subsection 24, INS officers must be able, at any time, to demonstrate an acceptable level of proficiency with each type of firearm they are authorized to carry.

E.    INS officers must be able to demonstrate an acceptable knowledge of the elements necessary to justify the use of deadly force.

F.    The authority of either a single officer or a group of officers to carry a firearm during duty and/or non-duty hours may be withdrawn or restricted by the Authorizing Official when the withdrawal


DEPOSITION EXHIBIT

Gilbert 2

(2)    Any refusal by a pilot, or other airline or airport security personnel, to allow an armed Service officer to board an aircraft shall be documented in a written report by the officer and forwarded through official channels to his or her Authorizing Official. The Authorizing Official shall forward the report to the National Firearms Unit and to the appropriate airline carrier, with a copy to the Authorizing Official with jurisdiction over the airport at which the incident occurred.

10.    <u>Firearms in Foreign Assignments</u>:

A.    The statutory and implied authorities for an INS Officer to carry a firearm do not apply in any foreign assignment. Accordingly, Service officers serving in foreign assignments shall not carry a firearm without the specific written concurrences of <u>all</u> of the following managers:

(1)    Foreign District Director;

(2)    Director, Office of International Affairs;

(3)    Executive Associate Commissioner for Field Operations; and

(4)    Deputy Commissioner.

In addition to the above approvals, all authorizations to carry firearms in a foreign assignment are subject to the approval of the Department of State and the host country.

B.    District Directors serving in foreign countries shall ensure compliance with this policy and the laws of the host country.

C.    The guidelines in Subsections 10(A) and (B) do not apply to temporary entries by on-duty officers into Mexico or Canada. These entries shall be coordinated through the Office of International Affairs. All such arrangements will be made in compliance with applicable Service policies.

11.    <u>Reporting of Shooting Incidents</u>

A.    Any Service employee who participates in or observes a reportable shooting incident, as defined in Subsection 3.H., shall orally report the incident to a supervisor. Unless the reporting employee is physically incapacitated or otherwise unable, the report shall be made within one hour of the time the incident occurs or within one hour of the time the employee becomes aware of the incident. If the incident occurs while the employee is on duty, the employee must report the incident prior to going off duty. The oral report shall be made either in person, or via radio or telephone and will be comprised of the following information, if known:

(1)    The date, time, and location of the shooting incident;

(2)    The identity and current location of any injured or deceased person(s), including an assessment of the extent of the injuries;

(3)    The identity, physical description, and current location of any individual(s) known to be involved in, or to have witnessed the incident, including suspects who are at large;

as practical, to the INS Command Center at (202) 616-5000. The report should contain all information known about the incident at the time.

(1)     In any shooting incident where there is a death, serious injury, evidence of criminal misconduct by a Service employee, or an allegation of criminal misconduct by a Service employee, the Authorizing Official shall ensure that the incident has been reported to the law enforcement authorities having jurisdiction.

(2)     Until the incident is resolved, the Authorizing Official shall be responsible for responding to requests for information about the incident from the public, the media, and other agencies with a "need to know" after coordinating such information releases with the appropriate Office of Press Information.

(3)     Following the initial report of the incident and during the Service investigation, the Authorizing Official shall ensure that copies of all investigative reports, any other pertinent documents and copies of all printed and televised media reports are provided to the appropriate Regional Director and to the Office of Internal Audit.

(4)     Upon completion of the local Service investigation of the incident, and prior to the initiation of any disciplinary action(s), the Authorizing Official shall send a copy of the proposed final report to the Office of Internal Audit for preparation and submission to the Shooting Incident Review Committee (SIRC). The Authorizing Official shall delay the initiation of disciplinary action until the recommendation of the SIRC is received.

(5)     The Authorizing Official shall also provide a written report of the final disposition of the incident to the Office of Internal Audit.

E.     Upon receipt of a report of a shooting incident, the INS Command Center will immediately notify the Office of Internal Audit (HQOIA).

F.     The Office of Internal Audit shall evaluate the initial report of the incident, contact the Authorizing Official to confirm receipt of the report, and notify appropriate Headquarters and Department of Justice offices.

G.     Following receipt of the Authorizing Official's final report of the Service investigation of a reportable shooting incident, the Office of Internal Audit shall provide a copy to the National Firearms Unit for permanent retention. The NFU shall be immediately informed by the OIA of any incident that involves officer safety.

12.     Investigation of Reportable Shooting Incidents

A.     Authorizing Officials

(1)     In any incident where a law enforcement agency other than INS has the primary investigative jurisdiction, the Authorizing Official shall ensure that only the following actions are taken until contact with the responsible law enforcement agency has been made:

(a)     Collect and report shooting incident information in accordance with Subsection 11;

B.   Immediate Subordinate Officials

(1)   Upon notification that a reportable shooting incident has occurred and that an investigation has been directed by the Authorizing Official, the Immediate Subordinate Official shall:

(a)   Open a file on the incident, obtain an incident tracking number from the OIA, and comply with the other instructions contained in Appendix 3 and/or the INS Shooting Incident Investigation Manual.

(b)   Assign at least two investigating officers, as defined in Subsection 4.F.(5), to conduct the local Service investigation of the incident. No investigating officer who has a conflicting relationship with the involved employee(s) shall be assigned to the investigation.

(c)   Direct that the investigating officers respond to the scene of the incident as soon as possible and initiate the investigation.

(d)   Ensure that when any bargaining unit employee is compelled by or through the Agency to provide any information that could reasonably lead to disciplinary action against him or her (other than the initial verbal notification outlined herein), he or she is advised in writing of his or her right to Union representation in accordance with the applicable provisions of the law and the governing Collective Bargaining Agreement. Under normal circumstances, the decision by a bargaining unit employee to obtain Union representation prior to providing the requested report or statement shall not delay the employee's response longer than 48 hours, as set forth in the Collective Bargaining Agreement.

(e)   Ensure that supervisory or investigative officers involved in the local INS investigation of the shooting incident are aware that any information provided by any employee under threat of disciplinary action by the Service or through any other means of coercion cannot be used against such employee in any type of action other than administrative action(s) taken by the Service consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1966).

(f)   Direct that supervisory personnel present at the scene:

(i)   Remind Service employees of their rights to Union representation and of their Constitutional protections against self-incrimination.

(ii)   Ensure that all Service employees who are involved in the incident have been identified and advised that they will be interviewed by the investigating officers and that they are to remain on duty until the initial interview has been completed or they are released by a supervisor. (If the interview cannot be conducted within a reasonable period of time or the employee is physically or mentally unable to participate in the interview, the Immediate Subordinate Official shall direct the necessary rescheduling for this requirement.) Employees directed to remain on

status report of the investigation(s) at 30 day intervals until the employee is returned to full duty status. The report may be oral or in writing, and will inform the employee of the status of the investigation(s) to the extent known by the Service and an estimated time of completion of the investigation(s).

E.  Service officers who are involved in shooting incidents may be tested in accordance with the Service's Drug-Free Workplace Program:

   (1)  Reasonable Suspicion testing may be required when there are articulable facts that the shooting incident was the result of illegal drug use. The decision to direct an INS officer to report for Reasonable Suspicion Testing in accordance with the INS Drug Free Workplace Plan shall be based on articulable information, facts, and circumstances which lead supervision to believe that reasonable suspicion exists that the officer is using illegal drugs as defined in the INS Drug Free Workplace Plan. All such determinations must be approved by a higher level of management than the level of management making the initial determination.

   (2)  Upon written request, an employee who has been tested for drugs in accordance with this Subsection will be provided a copy of the written justification (which may include such matters as the dates and times of reported drug related incidents, reliable/credible sources of information, and the rationale leading to the test) for such testing no later than 48 hours after the employee is sent for testing.

14.  Shooting Incident Review Committee (SIRC)

A.  The membership of the Shooting Incident Review Committee shall be comprised of the following:

   (1)  Director, Office of Internal Audit, or the Assistant Director for Internal Investigations;

   (2)  Chairperson, Firearms Review Board;

   (3)  The Administrator of the INS National Firearms Unit, or his or her Deputy;

   (4)  The Executive Associate Commissioner for Field Operations, or his or her Deputy; and

   (5)  A representative from the Department of Justice, Office of the Deputy Attorney General;

B.  Meetings of the SIRC shall be scheduled to occur on the same day as the FRB meetings.

15.  Service Firearms Review Board

A.  The voting membership of the Service Firearms Review Board shall be comprised of the following:

   (1)  Director, Law Enforcement Support, (Chairperson);

   (2)  Associate Commissioner for Enforcement,

   (3)  Assistant Commissioners for Border Patrol, Detention and Deportation, Inspections, Intelligence and Investigations, or their Deputy;

the Enforcement Programs and Inspections are responsible for providing funding to the National Firearms Unit for the acquisition of Service firearms, ammunition, related equipment and supplies for their respective programs and coordinating the issuance of these items with the National Firearms Unit.

B.  Based on the duty assignment, Authorizing Officials shall issue officers under their jurisdiction firearms listed for the officer's job category in Appendix 1(A or B). Except in emergency situations, officers may decline to carry a longarm.

C.  The Authorizing Official's decision on which longarms are appropriate for issuance for a particular duty assignment should be based on the performance characteristics of the firearm and cartridge, effective range or penetrating ability, environment, etc. Guidelines for longarms are provided in Appendix 4. These guidelines shall be updated periodically by the National Firearms Unit.

D.  Firearms shall be issued only to officers who have successfully completed Service-approved training as defined under Subsection 3.E., demonstrate proficiency (safe operating techniques and/or immediate action drills), and are currently qualified with that particular type of firearm.

E.  Offices issuing an employee a firearm shall record the issuance of the firearm on Form G-571, Defensive Weapons Control Card for Temporary Authorizations. The Form G-571 will also be used to document the authorization of personally-owned handguns.

F.  In order to support and encourage participation of Service officers in competitive shooting events, the National Firearms Unit will issue competition shooting equipment when available. When competition shooting equipment is received from the National Firearms Unit at an INS office, it shall be issued immediately to the Service officer to whom it was assigned.

   (1)  The National Firearms Unit shall prepare a Form G-504, Record of Property Shipped-Received, showing that the competition shooting equipment was shipped to a particular INS officer.

   (2)  A separate property card, Form G-571, listing only the competition shooting equipment shall be executed in duplicate and shall contain the following notation in capital letters:

        COMPETITION SHOOTING EQUIPMENT - THIS EQUIPMENT IS NOT TO BE TRANSFERRED EXCEPT AS DIRECTED BY THE NATIONAL FIREARMS UNIT, UNLESS THE OFFICER IS TERMINATING EMPLOYMENT WITH THE SERVICE.

   (3)  Both copies of the property card shall be initialled by the Service officer to whom the competition shooting equipment is issued.

   (4)  The original property card shall be filed with the officer's regular property card and the duplicate shall be forwarded with a copy of the G-504 to the National Firearms Unit.

18.  Approved Firearms

A.  Authorization to carry handguns during duty or non-duty hours shall be limited specifically to those Service-approved handguns, by job category, as listed in Appendix 1(A or B) (See exception for undercover firearms in Subsection 21).

(6)     Prior to recommending approval of the request, the Firearms Instructor shall verify that the requesting officer has successfully completed the requisite INS firearms training course.

(7)     The requesting officer shall also be required to comply with the provisions in Subsection 24, which includes the demonstration of proficiency and satisfactory completion of the qualification course with the handgun.

J.      Authorizing Officials shall approve requests to carry a Service-approved, personally-owned handgun when such requests comply with this policy. The Firearms Control Officer shall create a Form G-571 Defensive Weapon Control Card for Temporary Authorizations for each authorized personally-owned handgun.

K.      When the transition to the Service pistol is completed, Service-issued or approved semi-automatic pistols in 40 S&W caliber will replace all other pistols listed in Appendix 1A. Appendix 1B reflects these changes. The National Firearms Unit shall update the list of authorized firearms contained in Appendix 1B on a periodic basis.

L.      The National Firearms Unit may immediately discontinue one or more of the firearms listed in Appendix 1(A or B) if a significant problem is discovered which affects the safety or reliability of the firearm.

M.      Officers may be authorized to have up to two Service-approved handguns to allow flexibility in choosing suitable duty firearms. The Service shall provide one Service-issued handgun to each officer. Officers who are authorized to carry a personally-owned handgun will not be required to surrender their Service-issued handgun.

N.      Because the Service provides appropriate longarms for specific duties, Service officers are not authorized to carry or use personally-owned shotguns or rifles on official duty.

O.      Authorizing Officials are required to ensure periodic inspections of each officer's authorized firearm(s) are conducted to determine compliance with this policy. These inspections shall be conducted by the Firearms Instructor or Range Safety Officer in conjunction with the function and safety inspections. Inspections of the general condition and functioning of firearms may also be performed by first-line supervisors. The inspections will include the overall condition and functioning of the firearm and verification of the model and serial number. In addition, the ammunition carried by the officer may also be inspected to ensure that it is Service-issued and in good condition.

19.     Holsters and Ammunition Carriers

A.      Holsters and ammunition carriers that are currently authorized shall remain authorized until an officer completes the transition to a .40 caliber semi-automatic pistol.

B.      Officers may purchase holsters and/or magazine carriers that meet the following specifications:

(1)     For standard uniformed duty:

(a)     Holsters must be direct-draw, belt-mounted on the strong-side, and equipped with a thumb-break retaining strap;

F.    (1)    The Service's purpose in issuing practice ammunition is to enable officers to maintain proficiency and/or improve their shooting skills.

(2)    It is expected that officers will expend this ammunition on a regular basis.

(3)    In order to receive additional practice ammunition, officers are required to turn in expended casings. Other than the initial issuance of practice ammunition, replacement practice ammunition shall be issued upon receipt of expended casings totaling at least 50% of the amount of ammunition to be issued. In circumstances where officers practice on ranges that require that the expended casings be left behind, this fact shall be documented and this requirement shall not apply.

(4)    While officers shall make reasonable efforts to locate all expended casings, it is recognized that a number of factors may make full recovery impossible. Officers are expected to turn in all expended cases located. If less than 50% of an individual's expended casings are turned in, the officer shall be required to submit an explanatory memorandum to the Ammunition Control Officer in order to receive additional practice ammunition.

(5)    Service officers shall expend practice ammunition at appropriate locations and times in accordance with all applicable laws, ordinances, and policies.

G.    Based on the Firearms Instructor's assessment, Authorizing Officials shall provide additional handgun ammunition for supervised practice to Service officers who fail to qualify or are consistently marginal in demonstrating proficiency in order to improve their ability. This should be a reasonable amount, sufficient to qualify or improve marginal proficiency.

H.    Service officers may request ammunition for use in competitive handgun and rifle shooting events by submitting a memorandum to the Authorizing Official. If such ammunition is available in the local inventory and issuance will not cause a shortage for duty, training, practice, or qualification use, it shall be issued to the officer. Ammunition not in the inventory may be requisitioned through the National Firearms Unit. Approval of requests for the purchase of ammunition for competitive shooting is subject to availability of funding and concurrence of the Assistant Commissioner of the funding program. Ammunition issued for competitive shooting events is limited to ammunition available on INS contracts. Officers who receive ammunition for use in competitive shooting are required to maintain a record of the use of ammunition and submit evidence of participation in competitive events to the Ammunition Control Officer, who will forward a copy to the National Firearms Unit.

I.    Ammunition for practice and/or sighting-in with appropriate longarms shall be issued at the range prior to firing the quarterly qualification course as follows:

(1)    12 gauge rifled slug         5 rounds
(2)    12 gauge 00 Buck            5 rounds
(3)    9mm or .40 caliber         20 rounds
(4)    .223 55 grain FMJ-BT       20 rounds
(5)    .308 150 grain FMJ-BT      20 rounds

J.    In accordance with Subsection 4.H., Ammunition Control Officers shall determine ammunition requirements for all programs within their jurisdiction based on specific guidelines issued by the

requirements for instructor training and have been assigned to perform the full-time or part-time collateral duty of Firearms Instructor.

B.   Quarterly Training

(1)   In conjunction with the quarterly firearms qualifications for Service officers, Authorizing Officials shall schedule the remainder of the work day for additional firearms-related training.  The training shall consist of a combination of classroom instruction and practical exercises and shall be accomplished during the regular work day.  All hours spent in this training and related travel shall be compensated in accordance with applicable laws, government-wide regulations and policies.  The training shall be provided by Service personnel who have been trained as instructors using a course of training that has been reviewed and approved by the Director of Training and the Firearms Review Board.  This training may be conducted on any part of the Service's Firearms program.  However, certain issues must be addressed bi-annually, such as the use of deadly force.  The following topics are examples of subjects that shall be discussed in the training sessions:

(a)   Service policy on the use of deadly force;

(b)   Other subsections of the INS Firearms Policy that involve complex issues or require clarification;

(c)   Escalation of force, including training on the use of intermediate force devices;

(d)   Proper judgement in shoot/don't shoot situations;

(e)   Tactical use of firearms;

(f)   Practical firing exercises (other than standard INS qualification courses);

At the discretion of the Authorizing Official, other firearms related topics may be added as needed.

(2)   All training must be documented, with course guidelines and lesson plans developed in coordination with the Training Division, and retained in a separate quarterly training file.  These files shall be subject to review during routine field inspections.  Attendance logs shall be maintained that indicate that Service officers have received the above training.

The Training Division shall develop and disseminate the necessary lesson plans and training aids to be used during the Quarterly Training Day sessions.  The attendance of all officers at this training must be documented and preserved by the Senior Firearms Instructor in a separate training file for each quarter.  These files shall be subject to review during routine field inspections.

*Administrative Manual Section 20.012 — INS Firearms Policy*                                    33

(d)     In each instance where a Basic Trainee officer fails to successfully complete the Basic Marksmanship Instruction and Practical Pistol Courses, the primary firearms instructors shall prepare a memorandum outlining the reasons for the officer's failure. The report will include the instructor's analysis of the reasons for the failure and any recommendations for improving the Basic Marksmanship Instruction and Practical Pistol Courses. These reports shall be submitted to the Director of Training through channels. The Director of Training shall ensure that a copy is promptly forwarded to the National Firearms Unit for appropriate dissemination and/or action.

(e)     During the first month of each quarter, the Director of Training will prepare a summary report specifying the number of Basic Trainee officers who failed to successfully complete the Basic Marksmanship Instruction and Practical Pistol Courses for the preceding quarter and the reasons for such failures. The report shall include a comparison of the rate of failure with the overall number of officers who successfully completed the Basic Marksmanship Instruction and Practical Pistol Courses during the same period. The report shall be forwarded to the National Firearms Unit, which will distribute copies of the report to the Firearms Review Board and both Union Councils.

(3)     <u>Other INS Officers</u>

(a)     This subsection applies to INS officers who meet all of the following requirements:

(i)     successful completion of Basic Marksmanship Instruction and Practical Pistol Courses as defined in Subsection 3.E.;

(ii)    successful completion of the initial one year period of non-supervisory probationary employment; and

(iii)   completion of remedial firearms training as described in Subsection 23.C.(1)(c).

(b)     Those officers described in Subsection 23.C.(3)(a) who, for reasons beyond their control, continue to be unable to demonstrate an acceptable level of proficiency with the handgun may be reassigned to a position other than those listed in Subsection 5.A.(1)-(8) (with the exception of Adjudications Officer positions that do not require the performance of duties as an Immigration Inspector). Such reassignment shall not obligate the Service to pay relocation expenses and shall not involve reassignment to a position which has non-competitive promotion potential beyond the position from which the officer is reassigned.

(c)     Those officers described in Subsection 23.C.(3)(a) who, for reasons which reasonably appear to be within their control, continue to be unable to demonstrate an acceptable level of proficiency with the handgun may be removed from employment in accordance with applicable laws, government-wide regulations and Service policies.

National Firearms Unit for inclusion in their file and on the National Firearms Unit's database of Firearms Instructors.

(e)   Authorizing Officials shall ensure that Firearms Instructors within their jurisdiction meet the minimum annual training requirement. Authorizing Officials shall schedule attendance of additional firearms training courses for Firearms Instructors on regular duty time. Unless funded by a higher Service organizational level, all costs associated with firearms training will be funded at the local level.

(f)   Failure of INS Firearms Instructors to successfully complete the required minimum of non-INS annual training shall result in suspension of the Firearms Instructor's designation by the National Firearms Unit.

(g)   The foregoing certification requirements do not apply to Range Safety Officers.

(4)   All Service firearms training shall be in compliance with this policy and other INS training policies.

(5)   A database for all Firearms Instructors and Range Safety Officers shall be maintained by the National Firearms Unit. Updated information pertaining to firearms courses and training attended by Firearms Instructors and Range Safety Officers shall be included in the database.

E.   Night (Low-Level Light) Firearms Training

(1)   Authorizing Officials shall ensure that all officers under their jurisdiction participate in a minimum of one training session per year for the purpose of familiarizing officers with firing conditions found under night (low-level light) conditions.

The Training Division shall prepare and disseminate lesson plans and training aids and materials necessary to provide a uniform course of training for the use of firearms under night (low-level light) conditions on any of the various types of range facilities used throughout the Service.

(2)   Sunglasses or similar devices shall not be used to simulate night or low-level light conditions.

(3)   At a minimum, the familiarization course shall require officers to fire at least 50 rounds at distances not to exceed 25 yards.

(4)   The targets will be scored, but the scores shall not be recorded.

(5)   Authorizing Officials shall maintain records of officers who participate in this training.

F.   Precision Shooting (Counter Sniper) Firearms Training:

(1)   Acting through the National Firearms Unit, the Border Patrol Tactical Team (BORTAC) shall be responsible for overseeing all Precision Shooting (Counter Sniper) training for all Special Units in INS Enforcement and Inspections programs.

    (b)    An officer who qualifies with any Service-issued or approved revolver shall be authorized to carry any other Service-issued or approved revolver.

    (c)    Because of the similarity in the mechanical functioning and safety features, Service officers who are authorized to carry two Service-approved double-action-only semi-automatic pistols are not required to qualify with both pistols. Likewise, officers who are authorized to carry two Service-approved decocker type semi-automatic pistols are not required to qualify with both pistols. However, officers carrying a mixture of the two types of semi-automatic pistols are required to qualify with both.

(4)    Service officers, including Headquarters, Regional, District, Sector and Academy staff officers, who are authorized to carry firearms other than handguns shall, on a quarterly basis, be required to demonstrate their proficiency with each such type of firearm in order to carry the firearm. Officers who fail to demonstrate proficiency with any type of firearm shall not be issued or allowed to carry that type of firearm until such time as the officer demonstrates proficiency in the use of that type of firearm.

    (a)    Where the operating characteristics of Service longarms are different, officers authorized to carry such longarms shall qualify quarterly with each different type of longarm.

B.    <u>Firearms Qualification Courses</u>

(1)    Only those qualification and familiarization courses that have been approved by the Firearms Review Board shall be used in determining firearms proficiency of INS officers.

(2)    No portion or stage of any firearms qualification or familiarization course may be waived or altered.

(3)    Officers, including Basic Trainees, who are unable to assume a required firing position because of a limited range of physical movement shall be allowed to utilize a safe adaptive shooting stance. Firearms Instructors shall work with these officers to develop an appropriate stance.

(4)    The successful completion of a firearms qualification course will not be based upon scoring of individual phases of the course, but rather the total scoring of the course.

C.    <u>Revocation of Authorization to Carry a Firearm Due to Inability to Demonstrate Acceptable Proficiency</u>

(1)    Unless one of the exceptions in Subsection 24 applies, in instances where a Service officer has been provided remedial training in accordance with Subsection 23.C. and remains unable to demonstrate acceptable proficiency with a handgun, the Authorizing Official shall provide the officer with written notice of revocation of the officer's authorization to carry the handgun. The revocation shall apply to the carrying of the handgun during duty and non-duty hours, regardless of whether the handgun is Service-issued or Service-approved, personally-owned. If the handgun is Service-issued, the Authorizing Official shall require the Service officer to turn it in. The officer shall not be assigned to duties that normally require the carrying of a handgun.

(3)     If the detailed Service officer is performing duties that are routinely performed by officers who do not carry a firearm, the officer may be exempted from the requirement to qualify until he or she returns to his or her permanent duty station.

F.   Officers Unable to Qualify Due to a Temporary Physical Condition

(1)     A Service officer may be granted an exception to Subsection 24.A.(1)(a), i.e., passing the quarterly firearms qualification with a handgun, due to a temporary physical condition which affects the officer's ability to qualify or makes it inadvisable to require the officer to qualify, but does not affect the officer's ability to properly utilize a handgun. Accordingly, an officer granted such an exception is excused from participating in quarterly qualifications for the period for which the exception is granted. A temporary physical condition may be caused by injury, surgery, illness or pregnancy, and normally will not exceed 180 days. On a case-by-case basis, extensions may be granted. Under no circumstances will an exception be granted for more than 270 days.

(2)     An exception shall not be granted for non-physical conditions or mental trauma related to mental illness deemed by a mental health professional to adversely affect the officer's judgement regarding the use of deadly force. Such mental disability shall require immediate revocation of authority to carry a firearm.

(3)     Officers granted an exception must be able, at any time, to demonstrate an acceptable level of proficiency with the requirements listed in Subsection 24.A.(1)(b)-(d).

(4)     Officers requesting an exception must provide the Authorizing Official with a written doctor's recommendation. The recommendation must describe the nature of the disability and the anticipated duration of the disability.

(5)     The Authorizing Official's decision regarding the granting of an exception and the duration thereof shall be based on all available relevant information. Such information may include the medical documentation submitted by the officer, records of the officer's prior firearms qualifications and the recommendations of the Firearms Instructor(s) and supervisory personnel.

(6)     The authority to grant exceptions is limited to Authorizing Officials.

(7)     Service officers granted an exception from qualifying quarterly shall receive a written authorization to continue carrying handgun(s). The written notice shall include a specific expiration date of the exception, and a description of the handgun(s) the officer is authorized to carry

(8)     Officers shall qualify within 30 days of the expiration of the exception.

G.   Requirement to Qualify with Duty or Hazard-Free Ammunition

The ammunition used for the qualification course shall be duty or hazard-free ammunition, unless the use of that ammunition is specifically prohibited due to range or other limitations, or a safety-related firearm or ammunition problem is discovered. Authorizing Officials will notify the National Firearms Unit in writing of such problems, prohibitions, or limitations.

or are otherwise unable to demonstrate an acceptable level of proficiency. Upon completing the review, the Form G-109 for each location shall be signed by the Authorizing Official and retained for three years.

(3)    A copy of the Form G-109 with the signed certification shall also be sent to the National Firearms Unit, where it shall be retained indefinitely.

K.    Conducting Quarterly Qualifications

(1)    Failure of any officer to comply with safety instructions during quarterly qualifications may result in the removal of the officer from the range for that day by the Firearms Instructor or the Range Safety Officer.

(2)    Quarterly qualifications shall be conducted with a minimum ratio of one Firearms Instructor or Range Safety Officer for every six officers on the firing line.

(3)    Any officer who sees any condition that is unsafe or life threatening should immediately call "CEASE FIRE" in a voice that can be heard by all shooters.

(4)    At their discretion, Firearms Instructors may conduct the qualifications using a Hot Range or Cold Range. A Hot Range requires shooters to reload without command at the end of each string of fire unless instructed otherwise. Failure to reload prior to starting the next string of fire will not be an alibi. A Cold Range requires that the Firearms Instructor provide commands for loading and reloading.

(5)    Shooters are to keep their fingers outside the trigger guard unless they are ready to fire. Shooters should not anticipate the command to fire. All shooters shall stop firing immediately when the "CEASE FIRE" command is given.

(6)    Shooters are to keep their firearm(s) holstered, slung, or pointed in a safe direction downrange at all times.

(7)    The Ready Pistol, Ready Rifle, or Ready Shotgun position is 45 degrees down from the horizontal with the muzzle pointed down range.

(8)    Shooters shall not move forward of the firing line unless instructed to do so by the Firearms Instructor. If a shooter drops any item, including a firearm, cartridge, magazine, or speedloader, the shooter shall not pick the item up until the Firearms Instructor instructs the shooter to do so. Once on the firing line, shooters shall stay in place and not move away from the firing line unless instructed to do so by the Firearms Instructor. Shooters must be prepared by having all necessary equipment with them when on the firing line. Firearms Instructors shall ensure that all shooters are given clear instructions regarding all required equipment prior to instructing them to go to the firing line.

(9)    All loading and reloading shall be done on the firing line and will be done from speedloaders, magazines, speed loops, dump pouches or from the pocket(s). All loose ammunition must be carried in pockets or other carriers. No ammunition boxes or other unauthorized paraphernalia will be allowed on the firing line.

C.   Training Specialists/Armorer(s) assigned to the Training Division shall conduct repairs to training firearms assigned to the Service Academies, those handguns issued to Basic Trainee officers while at the Academies, and those Service-issued or approved handguns issued to detailed instructors or Academy Training staff.

D.   The National Firearms Unit shall oversee the Field Armorer Program. This program will provide limited armorer training to Firearms Instructors, and certify that they have completed the necessary training to perform certain minor repairs on Service-approved or issued firearms. Firearms Instructors will be taught which repairs they are authorized to perform to ensure that Service firearms are in proper working order. Firearms Instructors Service-wide shall be trained through this program.

E.   Parts, tools and on-going training for Training Specialists/Armorers will be provided by the National Firearms Unit.

F.   Service Armorers at the National Firearms Unit shall inspect all new firearms received from vendors and all firearms shipped in for repair or re-issuance. Appropriate action shall be taken immediately when a firearm does not meet Service standards.

26.   Shipment of Firearms for Repair

A.   Firearms needing repair shall be processed into the AMIS/FIM in accordance with the INS Personal Property Operations Handbook, Chapter 21, and shipped via registered U.S. Mail, the Service's current contract delivery service, or bonded motor freight company to the Service Armory in accordance with the instructions in this Subsection.

(1)   The shipping office will tag each firearm to indicate the location code and name of the officer to whom it is issued or belongs, and a brief description of the problem or necessary repair.

(2)   All firearms forwarded for repair shall be listed on a Form G-504, Report of Property Shipped-Received, generated utilizing the AMIS/FIM. The office shipping the firearm (consignor) will make three copies of the Form G-504.

(a)   The original Form G-504 shall be mailed to the Service Armory and a copy enclosed with the firearms shipment. A copy will also be retained by the shipping office.

(b)   Upon receipt of the firearm, the Service Armory will return a signed copy of the Form G-504 to the shipping office.

(c)   Upon completion of repairs, the Service Armory will return the original Form G-504, including the armorer's repair comments, with the repaired firearm to the shipping office.

(d)   A copy of the Form G-504, also containing the armorer's repair comments, will be placed in the individual firearm file maintained by the Service Armory.

(3)   When the Service Armory receives a firearm which is not repairable, the armorer shall notate the original Form G-504 and immediately return the form to the shipping office.

Operator manuals shall be provided to all INS officers for all Service-owned and approved firearms that they are authorized to carry.

28. Authority for Service Training Specialists/Armorers to Possess Service Firearms at other than Government-owned Locations.

A. In conjunction with their official duties, Service Training Specialists/Armorers will be authorized to possess Service firearms during duty hours at other than Government-owned locations.

B. The official duties granting authority to possess Service firearms at other than Government locations to Service Training Specialists/Armorers shall be limited to transporting firearms, providing security for firearms, function-firing firearms sent in for evaluation or repair, conducting tests and evaluations of firearms, conducting field inspections of firearms, and conducting firearms training.

C. Firearms authorized for Service Training Specialists/Armorers are limited to those listed in Appendix 1(A-B).F.

D. In order to possess firearms in conjunction with their official duties, Training Specialists/ Armorers must comply with this policy, including Subsection 3.E. pertaining to Basic Marksmanship Instruction and Practical Pistol Courses and 6.D. pertaining to demonstration of firearms proficiency. In addition, they must be Service-certified Firearms Instructors in compliance with Subsection 23.D.

E. Training Specialists/Armorers are not Immigration Officers and do not have the authority described in Section 287 of the Immigration and Nationality Act.

F. The authority of Training Specialists/Armorers to possess firearms in conjunction with their official duties shall not extend to off-duty hours.

G. A memorandum granting this authority, signed by the Chairman of the Firearms Review Board and the Administrator of the National Firearms Unit, shall be provided to each Training Specialist/Armorer.

H. This authority may be rescinded at any time as described in Subsection 6.F. when in the best interests of the Service.

29. Firearms Program Field (Site) Inspections

A. The Office of Internal Audit, through the Field Assessment Program, shall review field office practices relating to the INS policy on firearms, firearms training, quarterly qualifications, reporting of incidents regarding firearms, the storage, transfer, and safekeeping of firearms and ammunition, and compliance with other requirements described in the INS Firearms Policy.

B. Field inspections shall also be conducted by Service Armorers on a periodic basis to ensure compliance with the Firearms Policy and provide an assessment of the overall condition of Service firearms and ammunition in the field. In addition, an inspection will be conducted of firearms storage facilities in INS field offices.

C.    Handguns in excess of the allowable reserve shall be shipped promptly, on a continuing basis, to the Service Armory for retention and reissue within the purchasing program.

32.    Transfers of Service-issued Firearms

A.    When an officer is transferred to a new duty station and remains within the same program element, the originally issued handgun shall be retained by the officer.

B.    The property card of a transferring officer will be sent separately to the new duty location. An attached Form G-504 shall be used to document the transfer of the property card.

C.    When an officer is transferred to another program, his or her issued firearm must be returned to the issuing program.

D.    The Authorizing Official shall ensure that each acquisition, disposal, issuance, retrieval or transfer of a firearm is documented in accordance with guidelines contained in this policy. All such transactions shall immediately be entered in the Asset Management Information System, Firearms Inventory Module (AMIS/FIM) by the Firearms Control Officer or his or her designee.

33.    Storage and Maintenance of Firearms, Ammunition, and Related Equipment

A.    Each Service officer who is authorized to carry a firearm is responsible for taking reasonable measures to ensure the safe storage, general care and maintenance of his or her issued firearm(s) and ammunition.

B.    Offices shall be equipped with a sufficient number of individual secure gun lockers for the storage of each officer's firearm(s), ammunition and related equipment. Pending the availability of individual secure gun lockers, officers' firearm(s) should be secured in a locked container when not in use.

C.    The Service shall provide locking security devices to secure shoulder weapons in all appropriate vehicles. If no such device is available, unattended shoulder weapons must be locked in the trunk of the vehicle or otherwise secured. Even if secured, Service-owned firearms shall not be left unattended in vehicles for extended periods of time unless there is no feasible alternative.

D.    While off-duty, officers shall not leave Service-owned firearms in unattended vehicles unless the firearm is locked in the trunk of the vehicle or other secure area such as a locked glove box inside a locked vehicle.

E.    All unissued, unattended Service firearms and ammunition shall be stored in locked firearms storage vaults or safes in a secure area. Unissued Service ammunition shall be kept in a cool, dry environment, and be rotated periodically. Unissued firearms shall be stored in a dry environment and shall not be stored in wall lockers, closets, or in other unsecured, unattended areas of Service facilities.

F.    The Authorizing Official shall restrict access to unissued firearms to an individual officer designated as the Firearms Control Officer (FCO) in accordance with Subsection 4.G. Security controls shall not prevent emergency access by other authorized personnel.

channels to the Authorizing Official describing the circumstances surrounding the loss within 48 hours of the discovery. Extensions may be granted consistent with the Collective Bargaining Agreement.

B.  The Authorizing Official, or a member of his or her staff, shall notify the local law enforcement authorities and the local Office of the Federal Bureau of Investigation (FBI) of the loss or theft of a firearm as soon as possible. The FBI should be requested to enter the missing firearm into the National Crime Information Center (NCIC) as soon as possible. The Authorizing Official shall initiate an administrative inquiry into the loss or theft of a Service-owned firearm.

C.  When a Service-owned firearm is lost or stolen, a Form G-504 shall be prepared and forwarded to the National Firearms Unit for updating the Asset Management Information System, Firearms Inventory Module. A copy of all memorandums or reports related to the loss or theft of the firearm shall be attached to the Form G-504.

D.  When a Service-owned firearm is lost or stolen, a Regional Board of Survey may be conducted in accordance with applicable property management regulations. A copy of the results of the Board of Survey shall be forwarded to the National Firearms Unit for updating of the AMIS/FIM.

37.  Asset Management Information System, Firearms Inventory Module (AMIS/FIM)

A.  The INS Asset Management Information System, Firearms Inventory Module is a main-frame computer-based system created to assist Service managers in the administration and control of the INS firearms inventory. The National Firearms Unit shall be responsible for maintaining the AMIS/FIM, entering information into the system about Service-issued or approved firearms, and tracking the transfer of firearms within the Service. Information concerning the acquisition, disposition, or transfer of firearms shall be reported to the National Firearms Unit using the Form G-504.

B.  Authorizing Officials are responsible for conducting physical inventories of firearms biennially in accordance with the Justice Property Management Regulations (JPMR) under Section 128-1.5202.

C.  In accordance with Subsection 4.G., Authorizing Officials shall designate an Assistant Chief, an appropriate Assistant District Director, or other appropriate senior management official as the Firearms Control Officer with primary responsibility for the overall inventory control, maintenance, and security of Service firearms.

D.  Copies of the physical inventory report shall contain certifications by the actual personnel performing the physical inventory at each location. Copies shall be retained at the District, Sector, Region, Service Academy, Service Armory, and Headquarters levels for reference, should inventory discrepancies arise.

E.  Boards of Survey shall be conducted in accordance with applicable property management regulations on any inventory discrepancies. A copy of the results of the Board of Survey shall be forwarded to the National Firearms Unit for updating of the AMIS/FIM.

38.  Firearms Safety

A.  Firearms safety rules are designed to prevent injury to innocent persons or property and to protect the officer from mental trauma and/or legal action resulting from unintentional injury to persons

### APPENDIX 1A
### List of INS Authorized Firearms
### (Prior to the Effective Date of this Policy)

NOTE: No new authorizations for any handgun listed exclusively in this appendix shall be granted after the effective date of this policy.

Service officers are limited to carrying the firearms listed for each program and job category as follows:

A.  All Service officers listed under Subsection 5.A.(1)-(8) are authorized to carry the following handguns:

    (1)  Smith & Wesson .357 Magnum revolvers
    (2)  Ruger .357 Magnum revolvers
    (3)  Colt .357 Magnum revolvers.
    (4)  Glock 17, 19 and 21 pistols
    (5)  SIG-Sauer P220, P225, P226 pistols
    (6)  Heckler & Koch P7 M8 and M14
    (7)  Walther P5 and P88

B.  The following classes of officers are also authorized to carry the Remington 870 Police shotgun:

    (1)  Border Patrol Agents, including Border Patrol Aircraft Pilots;
    (2)  Special Agents, including Special Agents Assigned to Sector Anti-smuggling Units and Immigration Agents;
    (3)  Deportation Officers;
    (4)  Detention Enforcement Officers;
    (5)  Immigration Inspectors.

C.  The following classes of officers are also authorized to carry the M-14 rifle or the Heckler and Koch MP5A2/A3 SMG or Colt SMG:

    (1)  Border Patrol Agents, including Border Patrol Aircraft Pilots.

D.  The following classes of officers are also authorized to carry the Colt AR-15A1/A2 rifle or the M16A1/A2 automatic weapon:

    (1)  Border Patrol Agents, including Border Patrol Aircraft Pilots;
    (2)  Investigations Division, Specialized Tactical Team (STT) members;
    (3)  Detention and Deportation Tactical Innovation and Control Team (TIAC) members.

E.  The following classes of officers are also authorized to carry special weapons:

    (1)  Investigations Division, Specialized Tactical Teams (STT);
    (2)  Border Patrol Division, Sector Emergency Response Teams (SERT) members;
    (3)  Border Patrol Tactical Team (BORTAC) members.

        (a)  Special weapons for those officers listed in E.(1) are limited to the following weapons:

(2)    Revolvers with other barrel lengths, not to exceed 4-inches, may be temporarily issued to officers conducting functions in which their assigned firearm is not appropriate. For example, a Border Patrol Agent may be issued a 3-inch barrel revolver for plain clothes assignments.

J.    <u>Barrel Length of Service-Authorized Revolvers:</u>

(1)    Minimum barrel length - 1.75 inches

(2)    Maximum barrel length - 4 inches

|       |        |                                        |
|-------|--------|----------------------------------------|
| (i)   |        | Remington 700-P bolt-action rifle      |
| (ii)  |        | Remington M40 XBKS bolt-action rifle   |
| (iii) |        | Steyr SSG bolt-action rifle            |
| (iv)  |        | Gas launcher, Model M79                |
| (v)   |        | Gas launcher, 37mm                     |

(b)     Special weapons for those officers listed in Appendix 1B.E.(2) include all weapons listed above, as well as the Remington 870 short-barreled shotgun with pistol grips.

(c)     Special weapons for those officers listed in Appendix 1B.E.(3) include all weapons listed above, as well as the Heckler and Koch HK33A2 or 53A2/A3 rifle and the M203 gas launcher.

F.     Service personnel employed as Training Specialists/Armorers assigned to the National Firearms Unit, may, while on duty and in conjunction with their official duties, possess, transport, maintain, or use, for the purpose of repairing, testing or evaluating, any firearm, either in the Service inventory, or under consideration by the Service for adoption or acquisition. This authority also extends to the Service personnel who are employed as the Administrator, Deputy Administrator, or an Assistant Administrator of the National Firearms Unit.

G.     Service personnel employed as Training Specialists/Armorers assigned to the Service Academies, may, while on duty and in conjunction with their official duties, possess, transport, maintain, or use, for the purpose of repairing any firearm in the Service inventory.

H.     Service officers, regardless of their job classification series or working title, currently assigned the collateral duty of Firearms Instructor, may, at the discretion of the Authorizing Official, when in the performance of their official duties as a Firearms Instructor, for training purposes only, possess, transport, maintain, or use, any firearm in the Service inventory.

(1)     This authorization is specifically intended to allow Authorizing Officials the discretion of permitting Firearms Instructors to train and practice with all firearms used by Service personnel in order to permit the Firearms Instructor to develop and retain a higher than normal level of performance with the firearm, and to ensure the Firearms Instructor's personal competence to provide instruction to other officers with all firearms those officers may be authorized to carry.

I.     Barrel Length of Service-issued Revolvers:

(1)

| Title                  | Barrel Length       |
|------------------------|---------------------|
| Border Patrol Agents   | 4-inch barrel       |
| BP Aircraft Pilots     | 3-inch barrel       |
| Special Agents         | 3-inch barrel       |
| Immigration Agents     | 3-inch barrels      |
| Deportation Officers   | 3 or 4-inch barrel  |
| Detention Officers     | 3 or 4-inch barrel  |
| Immigration Inspectors | 3 or 4-inch barrel  |
| Immigration Examiners  | 3 or 4-inch barrel  |

## APPENDIX 2
## NOTICE TO SERVICE OFFICERS OF PERSONAL RESPONSIBILITY UNDER THE INS FIREARMS POLICY

As an INS Service Officer who is authorized to carry a firearm, you are required to comply with and be thoroughly familiar with all aspects of the INS Firearms Policy. You have been provided a complete copy of the INS Firearms Policy and have been given the opportunity to discuss the contents of this document with your supervisor or other management official. Due to the critical nature of certain aspects of the Firearms Policy, your attention is particularly directed to the following subsections:

Subsection 6. <u>Carrying Firearms</u> - This subsection specifically requires that no officer shall be authorized to carry a firearm unless that officer has successfully completed Basic Marksmanship Instruction and Practical Pistol Courses as defined in Subsection 3 of the INS Firearms Policy, demonstrated proficiency, and is currently qualified with that particular firearm. It specifically limits the authorization to carry personally-owned firearms during duty hours and non-duty hours to designated Service-approved revolvers and semi-automatic pistols.

Subsection 7. <u>Deadly Force Involving Firearms</u> - This subsection contains policy and guidelines for the use of deadly force regarding firearms.

Subsections 11 and 12. <u>Reporting and Investigation of Shooting Incidents</u> - These subsections outline the notification, reporting, and investigative procedures following a shooting incident. Responsibilities and assignments for all involved INS Service Officers are contained in these subsections and Appendix 3.

By signing this statement, you acknowledge your possession of a copy of the INS Firearms Policy and your personal obligation to comply with all sections of the policy.


_____                    _____
Officer's Name (Printed)                           Officer's Signature


_____                    _____
Date                                               Duty Station/Branch or Unit


_____                    _____
Supervisor's Name (Printed)                        Supervisor's Signature

**APPENDIX 4**
**Guidelines for Use of Service Rifles**
**and Automatic Weapons**

I.     The following guidelines for issuance of Service rifles and automatic weapons are provided for Authorizing Officials. This is based on information obtained from military units, other federal law enforcement agencies, manufacturers, and actual testing and is presented as an aid in clarifying appropriate usage.

    A.     9mm or .40 S&W caliber weapons - 9mm or .40 S&W caliber automatic weapons such as the Heckler and Koch MP5 or Colt SMG are suitable for close range, urban and rural situations. Notable characteristics are as follows:

        (1)     The maximum effective range is approximately 100 yards in the semi-automatic mode and 25 to 35 yards in the automatic mode.

        (2)     These weapons are highly maneuverable. Their compact size is excellent for restricted movement in close quarters or dense vegetation.

        (3)     These weapons are concealable, unobtrusive, and easily transportable.

        (4) .   These weapons possess a quick pointing ability which allows rapid target acquisition.

        (5)     They are controllable with minimal muzzle rise using proper techniques.

    B.     Caliber .223 Weapons - .223 weapons, such as the M16, are suitable for short to medium range urban and rural situations. Notable characteristics are as follows:

        (1)     The maximum effective range is approximately 300 yards in the semi-automatic mode and 50 to 80 yards in the automatic mode.

        (2)     These weapons are effective for routine patrol duties because of their light weight, overall size, and mild recoil.

        (3)     These weapons have a relatively flat trajectory, and sighting adjustments are generally not needed under 200 yards.

        (4)     They are highly maneuverable and relatively compact.

        (5)     They possess a quick pointing ability which allows relatively rapid target acquisition.

        (6)     This ammunition is able to defeat most body armor.

    C.     Caliber .308 Weapons - .308 weapons, such as the M14 or the Remington 700-P, should be used in medium to long range rural situations. Notable characteristics are as follows:

        (1)     These weapons are particularly effective when operating in an environment where greater range and penetration are desirable.

        (2)     The maximum effective range is approximately 600 yards. The range is limited by positive target identification and operator skill.

**Appendix 5**
**Request for Authorization to Carry a Personally-Owned, Service-Approved Firearm**

Date:_____

To:  Firearms Authorizing Official, _____
                                   (Enter name of duty station and District/Sector)

From:   Requesting Officer's Name:_____

        Requesting Officer's Title:_____

        Requesting Officer's Branch:_____

I request authorization to carry the below-listed Service-approved, personally-owned firearm in conjunction with my official duties as an Officer of the Immigration and Naturalization Service. I certify the following: I am the legal owner of this handgun; it meets the requirements for personally-owned firearms contained in Subsection 18 of the Service's Firearms Policy; it is listed in Appendix 1B; and it has not been modified from the original factory condition except as allowed under the INS Firearms Policy.

Make:_____    Model:_____    Caliber:_____

Serial Number:_____

I understand that this authorization may be revoked at any time in accordance with the INS Firearms Policy.

Requesting Officer's Signature:_____

**Recommendation of Firearms Instructor or Senior Firearms Instructor**

Date:_____

I have inspected the above described firearm and certify that the description of the firearm is correct. I also certify that the firearm is in proper operating condition and complies with all requirements of the Service's Firearms Policy. If this request involves a semi-automatic pistol, I also certify that the Requesting Officer has successfully completed the Service's required semi-automatic pistol training course. In accordance with this information, I recommend approval of this request.

Signature:_____

Printed Name:_____

**Action of Authorizing Official**

Date:_____

This request is:  _____ Approved    _____ Denied

Signature:_____

Printed Name:_____

Title:_____

Dist:        Original - Official Personnel File of Requesting Officer, for permanent retention
             Copy - Authorizing Official, for personal retention
             Copy - Firearm Instructor or Senior Firearms Instructor, for personal retention
             Copy - Requesting Officer, for personal retention
             Copy - National Firearms Unit, for record purposes
             Copy - Local Firearms Inventory Control Officer, for record purposes



Office of Investigative Agency Policies

RECEIVED
DEPARTMENT OF JUST

95 OCT 17 AM 45

Washington, D.C. 20530

E XECUTIVE SECRETARIAT

October 16, 1995

**MEMORANDUM FOR THE ATTORNEY GENERAL**

THROUGH:          THE DEPUTY ATTORNEY GENERAL    10/17/95

FROM:             LOUIS J. FREEH
                  DIRECTOR, INVESTIGATIVE AGENCY POLICIES

SUBJECT:          Resolution 14

PURPOSE:          To obtain approval for implementation of
                  Resolution 14, which is attached

TIMETABLE:        Immediate

DISCUSSION:       Resolution 14 creates a uniform Department of
Justice deadly force policy.  This Resolution represents
consensus recommendations of the Executive Advisory Board of the
Office of Investigative Agency Policies.  No party to the
Resolution has advised that it wishes to appeal it.

RECOMMENDATION:   Approval 7

APPROVE          _____        Concurring component:

DISAPPROVE       Date: October 17, 1995        OLC   RJB 10/13/95

OTHER            _____

Attorney General on all investigative policies, procedures and activities that warrant uniform treatment or coordination ...

Order Number 1814-93, Sections (b)(2) and (9).

I am satisfied that this policy and the commentaries uphold the sanctity of human life and provide clear direction to law enforcement officials who, in the face of extraordinary danger, must resort to the use of deadly force. I have reviewed them with members of the OIAP Executive Advisory Board ("EAB") and there are no objections to them.

### Conclusion

As I noted above, this Resolution and attachments have been approved by the EAB. Further, I have been advised that no OIAP member agency will appeal this Resolution or the attachments.

Dated: October 16, 1995
       Washington, D.C.

LOUIS J. FREEH
Director of Investigative
Agency Policies

## POLICY STATEMENT

## USE OF DEADLY FORCE

I.  Permissible Uses.  Law enforcement officers and correctional officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person.

A.  Fleeing felons.  Deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe:  (1) the subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death, and (2) the escape of the subject would pose an imminent danger of death or serious physical injury to the officer or to another person.

B.  Escaping prisoners.  1.  Unless force other than deadly force appears to be sufficient, deadly force may be used to prevent the escape of a prisoner committed to the custody of the Attorney General or the Bureau of Prisons

a.  if the prisoner is escaping from a secure institution or is escaping while in transit to or from a secure institution; or

b.  if the prisoner is otherwise effecting his or her escape in a manner that poses an imminent danger to the safety of other prisoners, staff, or the public (such as by attempting to ignite explosives).

2.  The use of deadly force is not permitted if the subject is in a non-secure facility or a facility under the control of the Immigration and Naturalization Service, and (a) has not used or threatened the use of force likely to cause serious physical injury in his or her escape attempt, and (b) has not otherwise manifested an imminent threat of death or serious physical injury to the officer or community.

3.  The use of deadly force is not permitted if the subject is in transit to or from a non-secure facility and is not accompanied by persons who are in transit to or from a secure facility and the subject (a) has not used or threatened the use of force likely to cause serious physical injury in his or her escape attempt, and (b) has not otherwise manifested an imminent threat of death or serious physical injury to the officer or community.

2.  The public safety benefits of using such force outweigh the risks to the safety of the officer or other persons.

VI.  **Vicious Animals.**  Deadly force may be directed against dogs or other vicious animals when necessary in self-defense or defense of others.

VII.  **Rights of Third Parties.**  Nothing in this policy and the attached commentary is intended to create or does create an enforceable legal right or private right of action.

<u>Commentary Regarding the Use of Deadly Force</u>
<u>in Non-Custodial Situations</u>

<u>I.  Introduction</u>

The Department of Justice hereby establishes a uniform
policy with respect to the use of deadly force in both custodial
and non-custodial situations.  This commentary does not address
the use of deadly force upon subjects relinquished to persons or
facilities responsible for detention or incarceration.  All other
uses of deadly force are addressed in this commentary.  The
policy and this commentary provide practical guidance for
officers who must make grave decisions regarding the use of
deadly force under the most trying of circumstances.  The policy
also is intended to maintain uniformity among the various
Departmental components and to achieve uniform standards and
training with respect to the use of deadly force.  Although each
component may still develop and conduct its own training on
deadly force, the policy governs the use of deadly force under
all circumstances.

The policy is the product of discussion among the
various law enforcement agencies whose personnel are called upon
to make decisions regarding the use of deadly force, of review of
the current policies governing the use of force, and of advice of
legal counsel from various Department components, including those
charged with law enforcement, defense of civil actions filed
against the government, enforcement of civil rights, and
provision of constitutional advice.  In developing the policy, it
became apparent that decisional law provides only limited
guidance regarding the use of deadly force.[1]  In addition, as a
matter of principle, the Department deliberately did not
formulate this policy to authorize force up to constitutional or
other legal limits.[2]

---

[1]  Many issues addressed in the policy and this memorandum
have never been addressed in reported decisions or the law
remains unresolved.  Courts would step outside their proper role
if they formulated detailed policies with respect to the
procedures governing deadly force; in contrast, the Department
has the discretion to determine what the policy should be and to
provide guidance to its employees with regard to these solemn
issues.  Cases arise in procedural postures--typically civil tort
or civil rights actions, or motions to dismiss or overturn
criminal charges or convictions--in which a wrongful act on the
part of the government may not lead to recovery or sanctions.  As
a result, the court often does not reach the question of whether
the use of force was wrongful.

[2]  The leading Fourth Amendment cases in this area are
<u>Tennessee v. Garner</u>, 471 U.S. 1(1985) and <u>Graham v. Connor</u>, 490
U.S. 386(1989).

officer or others if such force is not used by the officer; the
officer's knowledge that the subject will likely acquiesce in
arrest or recapture if the officer uses lesser force or no force
at all; the capabilities of the subject; the subject's access to
cover and weapons; the presence of other persons who may be at
risk if force is or is not used; and the nature and the severity
of the subject's criminal conduct or the danger posed.

Deadly force should never be used upon mere suspicion
that a crime, no matter how serious, was committed, or simply
upon the officer's determination that probable cause would
support the arrest of the person being pursued or arrested for
the commission of a crime. Deadly force may be used to prevent
the escape of a fleeing subject if there is probable cause to
believe: (1) the subject has committed a felony involving the
infliction or threatened infliction of serious physical injury or
death, and (2) the escape of the subject would pose an imminent
danger of death or serious physical injury to the officer or to
another person.

As used in this policy, "imminent" has a broader
meaning than "immediate" or "instantaneous." The concept of
"imminent" should be understood to be elastic, that is, involving
a period of time dependent on the circumstances, rather than the
fixed point of time implicit in the concept of "immediate" or
"instantaneous." Thus, a subject may pose an imminent danger
even if he or she is not at that very moment pointing a weapon at
the officer if, for example, he or she has a weapon within reach
or is running for cover carrying a weapon or running to a place
where the officer has reason to believe a weapon is available.

## IV. Lesser Means

Intermediate force. If force lesser than deadly force
could reasonably be expected to accomplish the same end, such as
the arrest of a dangerous fleeing subject, without unreasonably
increasing the danger to the officer or to others, then it must
be used. Deadly force is not permissible in such circumstances,
although the reasonableness of the officer's understanding at the
time deadly force was used shall be the benchmark for assessing
applications of this policy.

Verbal warnings. Before using deadly force, if
feasible, officers will audibly command the subject to submit to
their authority. Implicit in this requirement is the concept
that officers will give the subject an opportunity to submit to
such command unless danger is increased thereby. However, if
giving such a command would itself pose a risk of death or
serious bodily harm to the officer or others, it need not be
given.

- 3 -

## Commentary Regarding the Use of Deadly Force in Custodial Situations

### I.  Introduction

     The Department of Justice hereby establishes a uniform
policy with respect to the use of deadly force in both custodial
and non-custodial situations.  This commentary addresses the use
of deadly force in custodial situations including conditions of
prison unrest and when a subject is escaping custody.  The policy
and this commentary provide practical guidance for officers who
must make grave decisions regarding the use of deadly force under
the most trying of circumstances.  The policy also is intended to
achieve uniformity among the various Departmental components,
which previously had established their own standards for the use
of deadly force.  Although each component may still develop and
conduct its own training on deadly force, the policy governs the
use of deadly force within any facility dedicated to the
incarceration of persons or by any officer who is responsible for
the transporting or custody of persons incarcerated or to be
incarcerated.  Those portions of the policy which address
custodial or prison situations specifically, do not apply to
officers who are merely detaining an arrestee or transporting an
arrestee from the place of arrest; nor do these portions of the
policy apply to the transporting of an arrestee to a facility
dedicated to incarceration.  In addition, the Immigration and
Naturalization Service (INS) officers, in INS controlled
facilities, are not authorized to use deadly force except in
self-defense or defense of others.

     The policy is the product of discussion among the
various law enforcement agencies whose personnel are called upon
to make decisions regarding the use of deadly force, of review of
the current policies governing the use of force, and of advice of
legal counsel from various Department components, including those
charged with law enforcement, defense of civil actions filed
against the government, enforcement of civil rights, and
provision of constitutional advice.  In developing the policy, it
became apparent that decisional law provides only limited
guidance regarding the use of deadly force.[1]  In addition, as a

---

     [1]  Many issues addressed in the policy and this memorandum
have never been addressed in reported decisions or the law
remains unresolved.  Courts would step outside their proper role
if they formulated detailed policies with respect to the
procedures governing deadly force in arrests, prison riots, and
escapes; in contrast, the Department has the discretion to
determine what the policy should be and to provide guidance to
its employees with regard to these solemn issues.  Cases arise in
procedural postures-- typically civil tort or civil rights
actions, or motions to dismiss or overturn criminal charges or
convictions--in which a wrongful act on the part of the
government may not lead to recovery or sanctions.  As a result,

evolving.   Reasonableness is not to be viewed from the calm
vantage point of hindsight.

### III.   Deadly Force Generally

The Department of Justice recognizes and respects the
integrity and paramount value of all human life.  Consistent with
that primary value, but beyond the scope of the principles
articulated here, is the Department's full commitment to take all
reasonable steps to prevent the need to use deadly force as
reflected in Departmental training and procedures.   Yet even the
best prevention policies are on occasion insufficient, as when a
serious prison disturbance occurs, or when a prisoner confined to
a secure facility attempts to escape from custody.  With respect
to these situations and in keeping with the value of protecting
all human life, the touchstone of the Department's policy
regarding the use of deadly force is <u>necessity</u>.  Use of deadly
force must be objectively reasonable under all the circumstances
known to the officer at the time, including the nature and the
severity of prison disturbance, whether officers at the facility
carry firearms, the use or threat of use of force upon the
officer or others in any escape attempt, and the escapee's
response to any warning.

The necessity to use deadly force arises when all other
available means of preventing imminent and grave danger to
officers or other persons have failed or would be likely to fail.
Thus, employing deadly force is permissible when there is no safe
alternative to using such force, and without it the officer or
others would face imminent and grave danger.  An officer is not
required unreasonably to place his or her life, that of another
officer, another prisoner or suspect, or the public in danger of
death or serious injury before using deadly force.   Persons who
have been determined to require confinement in a secure facility
ordinarily pose such a danger when attempting to escape.

### IV.   Prison Control

No force, deadly or non-deadly, may be used wantonly,
maliciously or sadistically by prison officials against
prisoners.   Force may never be used solely for the purpose of
causing harm.  Deadly force may be used in maintaining or
regaining control of a prison, correctional institution, or any
portion or facility of such an institution, in the event of a
mutiny, rebellion, riot, or disturbance that threatens the safety
of inmates, prison staff, or other persons.  Deadly force may be
used only when it is necessary and the officer reasonably
believes that the subject is him or herself participating in a
disturbance.  Participation for these purposes is more than
simply being in the area where others are visibly creating the
disturbance, particularly if the subject has had no opportunity
to exit that area.  On the other hand, in considering the use of

· 3 ·

than "immediate" or "instantaneous." The concept of "imminent" should be understood to be elastic, that is, involving a period of time dependent on the circumstances, rather than the fixed point of time implicit in the concept of "immediate" or "instantaneous." Thus, for example, a prisoner may pose an imminent threat, even if he or she is not at that very moment in possession of a weapon, if he or she is running to a place where the officer has reason to believe a weapon is available.

Once an escape is no longer in progress, but has been accomplished, that is, once the subject is no longer in the immediate environs of the facility, officers must attempt to effect a rearrest of the subject. In such cases, the policy pertaining to escaping prisoners is no longer applicable. Deadly force would then be authorized only consistent with the policy governing the use of such force in circumstances other than those of escaping prisoners.

## VI.    Destruction of Property

In accord with the policy permitting the necessary use of deadly force to maintain control of prisons and correctional institutions and to stop attempted escapes, deadly force may be used when someone is destroying or attempting to destroy property, if the loss of or damage to the property could contribute directly to an escape or attempted escape, serious physical injury, or death. Examples of this type of situation include using explosives in order to effect an escape from prison or attempting to disable a fire truck during a fire within an institution. If the destruction of property does not reasonably appear to be likely to so contribute to an escape, serious physical injury, or death, using deadly force would probably be unreasonable and thus forbidden.

## VI.    Lesser Means

Verbal warnings.  The Department of Justice requires that before using deadly force, if feasible, officers will audibly command the subject to submit to their authority. Implicit in this requirement is the concept that officers will give the subject an opportunity to submit to such command unless the danger is increased thereby. However, if giving such a command would itself pose a risk of death or grievous bodily harm to the officer or others, it need not be given.

Warning shots.  Within or from the immediate environs of a secure facility, warning shots may be fired as an intermediate measure at the discretion of the officer if verbal warnings are to no avail. If the officer determines that the firing of a warning shot is a necessary step to deterring or preventing an escape or preventing the loss of life or the infliction of serious physical injury, the officer may fire

- 5 -

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION


JOHN GILBERT § 
§
VS. §        CIVIL ACTION NO. B-01-054
§
JIM HOGG COUNTY, TEXAS, ET AL §

---

CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF JOHN ANTHONY GILBERT

JUNE 10, 2002

---

*PREPARED FOR MS. LEEDS BY:*


## SCHWAB COURT REPORTING SERVICE

2900 CENTRAL BOULEVARD, SUITE C
P. O. BOX 3665
BROWNSVILLE, TEXAS 78520

**(956) 544-5126 • FAX (956) 542-8842**





Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   JOHN GILBERT              )
                              )
 4   VS.                      )  CIVIL ACTION NO. B-01-054
                              )
 5   JIM HOGG COUNTY, TEXAS,  )
     ISAAC BOLCH, in his      )
 6   Individual and Official  )
     Capacities, and GILBERT  )
 7   YBANEZ, in his           )
     Individual and Official  )
 8   Capacities               )

 9

10              ORAL DEPOSITION OF

11            JOHN ANTHONY GILBERT

12               June 10, 2002

13

14

15       ORAL DEPOSITION OF JOHN ANTHONY GILBERT,

16   produced as a witness at the instance of the

17   Defendants, and duly sworn, was taken in the

18   above-styled and numbered cause on the 10th day of

19   June, 2002 before Renee W. Crouch, Certified

20   Shorthand Reporter in and for the State of Texas,

21   reported by computerized stenotype machine, at the

22   offices of Michael R. Cowen, P.C., 765 East 7th

23   Street, Suite A, Brownsville, Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

Page 2

```
 1        A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4      Michael R. Cowen
        MICHAEL R. COWEN, P.C.
 5      765 East 7th Street, Suite A
        Brownsville, Texas  78520
 6

 7   FOR THE DEFENDANTS:

 8      Eileen M. Leeds
        WILLETTE & GUERRA, L.L.P.
 9      International Plaza
        3505 Boca Chica Boulevard, Suite 460
10      Brownsville, Texas  78521

11

12

13              INDEX

14

15

16   JOHN ANTHONY GILBERT

17   Questions by Ms. Leeds.........................3

18   Witness' Signature Page/Corrections...........160

19   Reporter's Certificate........................162

20

21              EXHIBITS

22   EXHIBIT      DESCRIPTION           PAGE

23   No. 1    Copy of CRF              108
     No. 2    Firearms Policy          110
24

25
```

Page 3

```
 1         JOHN ANTHONY GILBERT,
 2   having been first duly sworn, testified as follows:
 3                  EXAMINATION
 4      Q  (BY MS. LEEDS)  Would you please state
 5   your name for the record.
 6      A  John Anthony Gilbert.
 7      Q  Mr. Gilbert, we are here today for a
 8   lawsuit that you have filed against Jim Hogg County,
 9   correct?
10      A  Yes, ma'am.
11      Q  Have you been deposed before?
12      A  In this particular --
13      Q  No, just any deposition.
14      A  Ever?
15      Q  Yes.
16      A  Yes, ma'am.
17      Q  Okay.  Under what circumstances?
18      A  Numerous ones.  I'm a border patrol agent,
19   so I've gone -- I've been deposed numerous times.
20      Q  Okay.  I'm not talking about court
21   testimony.  Are you talking about court testimony?
22      A  Like depose me as the defendant's
23   attorneys come talk to me.
24      Q  Under oath?
25      A  Yes.
```

Page 4

```
 1      Q  Okay.  So you have been in this situation
 2   before where there have been attorneys that ask you
 3   questions and you have been placed under oath and
 4   those responses are supposed to be given under oath?
 5      A  Yes, ma'am.
 6      Q  Okay.  How many times have you testified
 7   in a court of law?
 8      A  I couldn't give you an exact number.
 9      Q  More or less.
10      A  Ten.
11      Q  Okay.  Where have these been?
12      A  Laredo.  Wilmington.  North Carolina.
13   Corpus, I believe, a couple of times.
14      Q  Okay.  What about down here in the Valley?
15      A  In Brownsville?  No, ma'am.
16      Q  McAllen?
17      A  No, ma'am.  Nowhere in the lower Valley.
18      Q  Okay.  Where do you currently live?
19      A  I currently live at 1216 Squaw Valley.
20   And that is in Brownsville, Texas.
21      Q  How long have you lived there?
22      A  Oh, two weeks.
23      Q  Okay.
24      A  I just sold my home.  I sold my home.  And
25   I also own that home as well.  So I moved out of one
```

Page 9

1  high school?
2      A  My 11th year.
3      Q  You left high school in your 11th year,
4  but you obtained your GED in '84?
5      A  Yes.
6      Q  Okay.  Why did you leave high school?
7      A  My father passed away.
8      Q  Okay.  And ...
9      A  And what?
10     Q  I mean, why did that cause you to leave
11 high school?
12     A  Well, because my mother and father were on
13 a fixed income at that time.  And when my father
14 passed away -- my father was the sole provider of
15 the home, so my mother had to get a job.  And being
16 that I was the oldest, I went ahead and got out of
17 school to help my mom with all the --
18     Q  How many brothers and sisters do you have?
19     A  I have one younger brother and one younger
20 sister.
21     Q  How much younger?
22     A  My sister is 34, and my brother is 32.
23     Q  And you are?  What's your date of birth?
24     A  37, I believe.  '66.
25     Q  Okay.

Page 10

1      A  35 -- 36.
2      Q  What's your date of birth?
3      A  4/6 of 1966.
4      Q  Okay.
5      A  '66, '76, '86, '96.
6      Q  No.  I'm thinking.  6/66?
7      A  Oh, no.  I know.  People look at that, and
8  they're like, "Wow."  At least it's not June 6,
9  1966.  Then we would --
10     Q  Right.
11     A  I would have to look in the mirror to see
12 if I didn't have any marks on my head.
13     Q  Okay.  So we go to Texas Southmost.  Did
14 you have some time in between Texas Southmost and
15 Hallmark?
16     A  To be honest with you, ma'am, I can't
17 remember that.  It was 20 years ago.
18     Q  Okay.  What about -- in Hallmark -- you
19 said you left Hallmark -- how much time did you have
20 to go in the Hallmark program?
21     A  I would say I was more than halfway
22 through the program.
23     Q  Okay.  And you said you got a tentative
24 offer?
25     A  I had applied with the Border Patrol.  And

Page 11

1  after I applied with the Border Patrol, I got my
2  results back.  Upon receiving my results, I passed
3  the entrance exam.
4          So then I was waiting for the
5  interview process.  And I knew that the interview
6  was going to take place in the original location
7  where I had applied, which was back in Brownsville.
8  So I came back to Brownsville waiting for the oral
9  interview.
10         And then subsequent to that, Congress
11 had put a freeze, so they didn't hire again for like
12 the next four or five years.  So in that four or
13 five year time span, I went -- you know, obviously I
14 couldn't wait, so I went ahead and applied with the
15 Cameron County Sheriff's Department, and then I was
16 hired.
17     Q  Why didn't you go back and finish
18 Hallmark?
19     A  Once again, my mother, you know, she
20 didn't have the financial resources, so I decided to
21 come back and help my mother.
22     Q  Where is the Hallmark school?
23     A  I couldn't tell you the physical address.
24 I know it's on the southwest side of San Antonio.
25     Q  San Antonio?

Page 12

1      A  Actually, it's right next to the
2  San Antonio Police Department Academy.
3      Q  Okay.
4      A  Stinson Airfield.
5      Q  Stinson?
6      A  I think it's Stinson, S-T-I --
7      Q  S-T-I?
8      A  I believe.
9      Q  Okay.
10     A  Back then.  It might not be there now.
11     Q  No.  I understand.  You think it was
12 around 1987 that you joined the Cameron County
13 Sheriff's Department?
14     A  More or less.
15     Q  Okay.
16     A  I know it was '92 when I quit.
17     Q  When you left?  Okay.
18     A  And I was there for about four to five
19 years, so it was about that time span.
20     Q  Okay.  In what capacity were you hired?
21     A  As -- with the Sheriff's Department?
22     Q  Yes.
23     A  I started out as a detention officer.  And
24 by the time I quit my employment with them, I had
25 worked up to a booking officer.

Page 17

1   Q Five and a half months?
2   A (Nodding)
3   Q And is that where you get your formal
4 training to become a border patrol agent?
5   A Yes, ma'am. That's where it initiates.
6   Q Is there any other school like that that
7 you have to go to for an extended period of time
8 after you graduate from this one?
9   A Yes, ma'am.
10   Q What's that?
11   A It's on the job for one year. You are in
12 a classroom environment -- I don't know now, but
13 when I came through 10 years ago, it was -- I
14 believe it was three days in the field, and then
15 your two days, you'd go -- we would go to the
16 university or to the college in Laredo and we would
17 have two classroom days, eight hours structured on
18 both days.
19   Q Okay. Now, you say the college in Laredo.
20 What's the name of that college?
21   A I knew you were going to ask me that.
22 Laredo --
23   Q It's associated with the police academy,
24 is it not?
25   A Yes. It's like Texas A&M -- it's got this

Page 18

1 big long --
2   Q But there's a particular school in Laredo
3 that is for law enforcement, peace officer type
4 training?
5   A Yes. But our training had nothing to do
6 with that. We had our own federal agents -- they
7 just pretty much lent us a room at the university.
8   Q Oh, okay.
9   A And we had our classroom instruction
10 there.
11   Q Okay. So you were being trained by border
12 patrol people?
13   A Yes, ma'am, by instructors.
14   Q Okay. Where did you live when you were in
15 high school?
16   A At 2155 Central Boulevard.
17   Q Is that a home or an apartment?
18   A At the time it was a mobile home park.
19   Q Is your mom still alive?
20   A Yes, she is.
21   Q Where does she live now?
22   A She lives at 4008 North Expressway 83 in
23 Brownsville, Texas.
24   Q Is that a house?
25   A Yes.

Page 19

1   Q And where is your -- what's your sister's
2 last name? What is your sister's name?
3   A Her married name or -- her married name is
4 Sherrie Gomez.
5   Q With an "S," Sherrie?
6   A Yes, S-H-E-R-R-I-E.
7   Q I-E?
8   A Yes, ma'am. Sherrie Lynn.
9   Q And your brother?
10   A Daniel Gilbert.
11   Q Are either of them living in town?
12   A No, ma'am.
13   Q Where does Sherrie live?
14   A South Padre Island. Well, I guess that's
15 town.
16   Q I meant -- I should say Cameron County.
17   A Okay. Yes, ma'am. Sherrie Gilbert.
18   Q She lives on South Padre?
19   A Yes.
20   Q And her husband's name is?
21   A Steve Gomez.
22   Q Does she work?
23   A My sister works -- they own a company.
24   Q Okay.
25   A They are self-employed.

Page 20

1   Q On the Island?
2   A Yes. It's Steve Gomez & Associates.
3   Q What about Daniel? Where does he live?
4   A He lives in San Antonio.
5   Q Okay. Does Sherrie have any children?
6   A No.
7   Q Do you have any children?
8   A Yes.
9   Q How many?
10   A One.
11   Q What age?
12   A 4.
13   Q And are you married?
14   A Yes.
15   Q Okay. What is your wife's name?
16   A Nelly.
17   Q How long have you been married?
18   A Eight months.
19   Q Is Nelly the mother of the child?
20   A No.
21   Q Who's the mother of the child?
22   A Rosie Bradley.
23   Q And where does Rosie live?
24   A That's a good question. She lives in San
25 Benito. I don't know exactly where. Sometimes she

Page 25

1 kind of trouble at all, and then you're off
2 probation. And then you have a remainder of two
3 years that you're career conditional.
4    Q Okay. These exams, are they written,
5 oral, or practical?
6    A Yes, all three.
7    Q Okay. What do they entail?
8    A Immigration law, statutory law, criminal
9 law, deportation law, exclusionary law, amendments.
10    Q And when you say amendments, you mean to
11 the Constitution?
12    A Yes.
13    Q The U.S. Constitution?
14    A Yes.
15    Q You don't have to learn the Texas
16 amendments?
17    A The Texas amendments? No, because we're a
18 federal agency, so --
19    Q I'm being facetious. Texas has a billion
20 amendments.
21    A No.
22    Q Okay. You mentioned immigration law,
23 statutory law. What do you mean by statutory law?
24    A Where you derive your authority to carry
25 out your responsibilities as a border patrol agent.

Page 26

1    Q And the reason I'm asking you, does
2 statutory law differ from immigration law?
3    A Oh, yes. All those statutes of law that I
4 just cited out are totally different from one
5 another.
6    Q Okay. How is -- you said where you derive
7 your authority to do what you need to do. What is
8 it that immigration law tells you that's different
9 from statutory law?
10    A Well, in the sense --
11    MR. COWEN: I'm going to object to
12 the form of that question as asking for a legal
13 conclusion beyond the training of this witness.
14    But you can answer.
15    THE WITNESS: The -- you need to be a
16 little more specific. When you say statutory --
17    Q (BY MS. LEEDS) Let's go back. When I
18 said what you do in the classes, you mentioned
19 immigration law and then you said statutory law.
20    And I just want to know, when you say
21 statutory law, how is that different from the other
22 areas of law that you mentioned, like deportation
23 law? You mentioned exclusionary law. How are those
24 different and separate from the one you called
25 statutory law?

Page 27

1    A Okay. Statutory law is -- I'll give you
2 an example. Statutory law is where I derive my
3 authority to enter onto private lands, where I have
4 my authority to stop and board a conveyance.
5    Q Okay.
6    A The immigration law tells me where I
7 derive my authority. And it's sections of law that
8 says, based on A, B, C, D, this is what you need in
9 order to enter, reside, remain, or be excluded from
10 the United States. This is under certain sections
11 of law --
12    Q And let me stop you for a moment. Those
13 are statutes too, right? When you refer to
14 immigration law, you're talking about statutes, are
15 you not? Or do you know what a statute is?
16    A You're talking about the INA, the
17 Immigration and Nationality Act.
18    Q And my question is: Is it a law No. 4
19 blah, blah, blah that you refer to when you are
20 talking about immigration -- let me try to make this
21 easy.
22    In our -- what we refer to as a
23 statute is a law, any law.
24    A Any law.
25    Q And what I'm trying to identify is if the

Page 28

1 section that you say is statutory law is different
2 from, let's just use immigration law, even though
3 what you're calling immigration law --
4    A They are one in the same. Now I
5 understand. They are one in the same.
6    Q Okay. That's what I was trying to get at.
7 They are all statutes. They are all laws. They are
8 just different sections. And the one that you're
9 calling statutory maybe is a little more procedural
10 and broad. It doesn't directly go to immigration.
11 It doesn't directly go to deportation.
12    A Well, it directly gives you your
13 authorities under certain guidelines as to what your
14 specific job entails.
15    Q Okay. But these other ones are still
16 statutes --
17    A As well.
18    Q -- in the broad sense?
19    A Some are under the INA. Some are under
20 the Code of Federal Regulations. Some are under the
21 Immigration, IRCA --
22    Q Right. Don't worry. We're not --
23    A Immigration Reform Control --
24    Q -- testing you on that.
25    A -- Act of 1986 or --

Page 33

1  Q  And what do you do there?
2  A  It's an update of everything that you've
3  learned from the time you entered on duty into the
4  Border Patrol up until the time that you go to
5  journeyman's school. Everything that you learn is
6  taught to you again just to make sure.
7       And then if there's any other
8  inserts, any type of updates in law that has changed
9  since you entered on duty, they will give you those
10  new sections of law.
11  Q  Does everybody that's here in the South
12  Texas area go to this school in New Mexico?
13  A  Everybody in the United States.
14  Q  There's only one place?
15  A  For journeyman's school, yes.
16  Journeyman's school is -- every border patrol agent
17  will go to that school.
18  Q  How frequently do you go to journeyman's
19  school?
20  A  After your three years -- your third year
21  you go in. Then you go again for your senior
22  school.
23  Q  Okay. Tell me about senior school.
24  A  Senior school is like journeyman's school,
25  but it's -- now you have more years in the patrol.

Page 34

1  Q  Right. When do you go to senior school?
2  A  When you become a GS-11.
3  Q  Maybe we ought to discuss that. I forgot.
4       When you start Border Patrol, what GS
5  rating are you?
6  A  It depends on your qualifications, your
7  skills.
8  Q  Even when you just go to the first year?
9  A  When you first apply, you can either --
10  you'll either enter on duty as a GS-5, which is the
11  lowest scale. Or if you've got college, military,
12  any type of background that pertains to that field
13  of work, then you can go in as a GS-7.
14  Q  Okay. When you get out of your first
15  year's training, or probation, I should say, do you
16  get bumped?
17  A  Yes. If you're a 5, you'll go to a 7.
18  Q  Two grades?
19  A  Yeah. That's how they work. It's 5, 7,
20  9, 11, 13, on and on.
21  Q  Okay. What about after your three years
22  of career conditional?
23  A  Then you go to a 9.
24  Q  A GS-9?
25  A  (Nodding)

Page 35

1  Q  Okay. When you go to journeyman's school,
2  are you a GS-9?
3  A  Yes.
4  Q  Is it just time that will get you to
5  GS-11?
6  A  No.
7  Q  What gets you --
8  A  It's a competitive scale.
9  Q  And is senior school only for GS-11s? Or
10  is that time associated?
11  A  GS-11's.
12  Q  Okay. So whether you've been there enough
13  time or not, it's not until you're a GS-11 that you
14  will go to senior school?
15  A  Exactly.
16  Q  Okay. And is senior school the same thing
17  as journeyman's school, only at a different level?
18  A  More advanced.
19  Q  Okay. What other schools are there?
20  A  There's an undeterminable amount of
21  schools that --
22  Q  Well, I mean, these formal kinds of things
23  that -- I know you've got training all the time.
24  A  All the time. All the time.
25  Q  I'm talking about schools, you know, these

Page 36

1  specific things that you will be going to or have
2  gone to. Have you gone -- what GS are you now?
3  A  I'm an 11-5.
4  Q  Okay. Have you gone to --
5  A  I've gone to all the schools.
6  Q  The senior school?
7  A  No. I'm up to go to the senior school, I
8  think, in August.
9  Q  This summer?
10  A  Yes.
11  Q  Okay.
12  A  And that's tentatively.
13  Q  Okay.
14  A  You know, you never know what -- I mean, I
15  might get detailed.
16  Q  No. I understand. Do you know if there
17  are any other schools like that that are -- you
18  know, that you do? Other than regular, you know,
19  staying on top of things, are there any other formal
20  schools that you know of?
21  A  There's a lot of formal advanced schools
22  that you can go to, but those are upon your request.
23  In other words, there's BORSTAR. There's BORTAC.
24  There's emergency response teams. There's SWAT
25  teams. There's all these -- those are formal

Page 41

1    A  1993?
2    Q  Yes.
3    A  From him was the assistant patrol agent in
4  charge.
5    Q  Okay.  Do you remember who that was?
6    A  His name is Fred Cordova.
7    Q  And do you know where he is?
8    A  He's still the acting patrol agent in
9  charge -- or the assistant patrol agent in charge.
10    Q  Now, is this the person that you would
11  report to, or was this --
12    A  No.  Anything after the immediate first
13  line supervisor is upper management, and you never
14  even deal with them.
15    Q  Okay.  Well, Carl Rhodes was there the
16  whole time you were in Hebbronville, correct?
17    A  Yes.  And he's still there to this day.
18    Q  Was he a supervisor of yours the whole
19  time?
20    A  He was my field training officer when I
21  first got there.  He was an 11, a GS-11 field
22  training officer.  Then he became a GS-12
23  supervisory patrol agent.  And now he's a GS-13
24  field operation supervisor.  He's upper management
25  now.  And he is there.

Page 42

1    Q  You are now a senior patrol agent,
2  correct?
3    A  Yes, ma'am.
4    Q  What was your position while you were in
5  Hebbronville?
6    A  Well, my GS-11 senior patrol agent was a
7  promotion to Brownsville.  So prior to that, I was a
8  border patrol agent.
9    Q  And that's what it's called?
10    A  Yeah, just a border patrol agent.
11    Q  And what GS were you --
12    A  Nine.
13    Q  Okay.  And your promotion was when?
14        MR. COWEN:  Can we take a one minute
15  break?
16        MS. LEEDS:  Okay.  No problem.
17        (Brief Recess)
18    Q  (BY MS. LEEDS)  Do you remember when it
19  was that you were promoted, what date?
20    A  I got my instructions, I want to say, in
21  February.
22    Q  Of '99?
23    A  Of '98.
24    Q  '98?  Okay.  Because --
25    A  I think.

Page 4_

1    Q  Okay.  When did you move to Brownsville?
2    A  '98, I think.
3    Q  Okay.
4    A  I think it was '98.
5    Q  Well, close enough.
6    A  When did the incident --
7    Q  Let me get -- yeah.  Hang on.
8    A  -- take place?  I think it was in '98.
9    Q  Let's go from there.
10        MR. COWEN:  Sorry I left the file
11  over there.  I can grab it if you need it.
12        THE WITNESS:  No.
13        I'm almost sure it's '98.
14    Q  (BY MS. LEEDS)  4/7/99.
15    A  Okay.  Then it was in '99.
16    Q  Okay.  How close after this incident that
17  we're here on today did you move to Brownsville?
18    A  Maybe a month.
19    Q  Had you already gotten your orders?
20    A  Yeah.  I got my orders like in February,
21  and then I was waiting for the budget to go through
22  to fund it.
23    Q  Okay.  But physically you probably
24  moved -- this happened in April.  You probably moved
25  in May?

Page 44

1    A  May.  As a matter of fact, I think it was
2  May.
3    Q  Okay.  What changed in your duties -- you
4  know, and I know you're supposed to catch the bad
5  guys.  But from your position in Hebbronville as
6  border patrol agent to senior agent, what changed --
7    A  More management type skills.  In other
8  words, as a senior patrol agent now, I would
9  manage -- or I manage the junior agents, the 9's and
10  the 7's out in the field.
11    Q  Okay.  Have you occupied the position of
12  field training officer?
13    A  Yes.
14    Q  Okay.  With how many people?
15    A  The class that I -- six, I believe.
16    Q  Have you been a first line supervisor?
17    A  I've been an acting first line supervisor.
18    Q  Here in Brownsville?
19    A  Brownsville -- yes.
20    Q  And when you say "acting," were you just
21  substituting for someone who was out?  Or had the
22  position been vacant and you were occupying it?
23    A  I would say more that somebody was just
24  absent for some time and I took -- I assumed the
25  duties of my first line supervisor.

Page 49

1  Isabel. And then anything west, we take care of as
2  far as Harlingen. And then Harlingen station has
3  their own area.
4      Q  Okay. I was going to ask if there is a
5  Harlingen station.
6      A  Yes, there is.
7      Q  Is there a Willacy County station?
8      A  No. We go by sectors. There's a
9  station -- well, there's one sector. Like there's
10 McAllen sector. And then within the sector there's
11 stations.
12     Q  Right. Okay. I guess I should say is
13 there -- there's a Harlingen sector or station?
14     A  Harlingen station. Brownsville station.
15 Mercedes, I don't know which other ones there are.
16 And they are all within the McAllen sector.
17     Q  Sector. Who is your current direct
18 supervisor now?
19     A  Al Alcaraz.
20     Q  And what position is he in?
21     A  He's a first line supervisor.
22     Q  You report to him?
23     A  Every day.
24     Q  Okay. Do you have any other supervisor
25 that you report to, that you report to?

Page 50

1      A  No.
2      Q  Okay. Who determines your schedule?
3      A  Al Alcaraz.
4      Q  Who determined your schedule in
5  Hebbronville?
6      A  The first line supervisor.
7      Q  Okay. And that was Cruz Rodriguez?
8      A  At that time, yes.
9      Q  Okay. When you were in Hebbronville,
10 where did you live?
11     A  123 North Elm, Apartment -- they never had
12 numbers. It was the one downstairs on the left. I
13 think it was like maybe 3, I think. I would just
14 put 3 on my mailbox, you know, on my --
15     Q  It would get there?
16     A  And it would get there, but there was
17 really never a number there.
18     Q  Okay. Who did you live there with?
19     A  I lived there with David De La Rosa.
20     Q  Is he a border patrol agent?
21     A  He was. He just transferred.
22     Q  Transferred --
23     A  To a different agency.
24     Q  Okay. To where?
25     A  With the Federal Air Marshals, I think.

Page 51

1      Q  Your GS carries over, doesn't it, if you
2  stay in the federal system? Or do you know?
3      A  In some agencies it does.
4      Q  Okay. Did you live at 123 North Elm the
5  whole time you were in Hebbronville?
6      A  No. I lived at 214 Southwest Seventh
7  Street in Premont, Texas.
8      Q  Southwest which street?
9      A  Seventh.
10     Q  Seventh, Premont?
11     A  (Nodding)
12     Q  House or apartment?
13     A  House.
14     Q  Who did you live there with?
15     A  I lived by myself. I owned -- I bought
16 it.
17     Q  Have you sold that property?
18     A  Yes.
19     Q  How long did you live there?
20     A  About two years. And then I -- the drive
21 started getting too far, so I went ahead and just
22 rented it out. And then I moved back to 123 -- I
23 mean, to -- yeah, 123 North Elm.
24     Q  Okay. How long were you in Hebbronville?
25     A  From 1993 --

Page 52

1      Q  Six years?
2      A  -- to 1999. Almost seven years.
3      Q  Okay. I guess it's time to get down to
4  the nitty-gritty. We're here on a lawsuit that you
5  have filed complaining of a violation of your
6  constitutional rights, correct?
7      A  Correct.
8      Q  Okay. And do you recall your attorney
9  receiving some things called interrogatories? They
10 were questions that were sent about, you know, what
11 evidence do you have --
12     A  Yes.
13     Q  And you recall answering those?
14     Q  Okay.
15     A  The ones that were applicable.
16     Q  Okay. And then your attorney sent them to
17 us. You did not type these, right?
18     A  No, ma'am.
19     Q  Okay. You have complained about a
20 conspiracy between the sheriff and Deputy Sheriff
21 Bolch?
22     A  Yes.
23     Q  Okay. What is it that they did together
24 that you claim is a conspiracy?

Page 57

1  location.
2  Q  Okay.  Do you know --
3  A  And then ask him what the --
4  Q  Okay.  This was Mr. McCarty?
5  A  Yeah.
6  Q  Or McCarthy?
7  A  McCarty.
8  Q  Okay.  Do you know if he had his lights or
9  siren on at the time this stop was made?
10  A  I don't know.
11  Q  Okay.  You're not saying that border
12  patrol agents in marked vehicles should not be
13  stopped if, say, they run a red light, should they?
14  A  No.  If it's a violation of a traffic law,
15  well, yeah, by all means.
16  Q  Okay.  Do you know why Mr. McCarty was
17  stopped?
18  A  No, I don't.
19  Q  Do you know if it was a violation of a
20  traffic law?
21  A  I'm not sure.
22  Q  Okay.  But, certainly, you would not argue
23  that even if you are in a marked border patrol car
24  and you violate a traffic law that a deputy would
25  have the right to stop you?

Page 58

1      MR. COWEN:  Objection, form, to the
2  extent it calls for a legal conclusion.
3      You can answer it to your
4  understanding of the law.
5      THE WITNESS:  Under my understanding,
6  provided that the agent is on official business and
7  he violates a law, or as you're saying, a violation
8  of some traffic law, if he's got his lights on, then
9  no, I don't think he has any justification to stop
10  the individual because it is an emergency vehicle.
11  Q  (BY MS. LEEDS)  Okay.  Let's --
12  A  So if he's responding to an emergency, no,
13  I guess -- I think he would be allowed -- in my
14  personal opinion would be allowed to run a light or
15  speed.
16  Q  Okay.  We're not talking about responding
17  to an emergency, because you don't know if
18  Mr. McCarty was responding to an emergency, right?
19  A  I also don't know that he wasn't.
20  Q  Correct.  But as we sit here today, you do
21  not know if he had his lights and siren on?
22  A  Once again, I don't know if he did not or
23  if he did.
24  Q  Did he have his lights and siren on?
25  A  I do not know.

Page 59

1  Q  Okay.  And in the absence of knowing that,
2  assume with me for a moment that he did not have his
3  lights and siren on so that it would not be apparent
4  to a law enforcement officer that he was on an
5  emergency call, okay?
6  A  Okay.
7  Q  And he runs a stop sign.
8  A  Okay.
9  Q  Does a deputy sheriff have justification
10  in stopping a marked border patrol car if a border
11  patrol car runs a stop sign?
12      MR. COWEN:  Objection to the form of
13  the question to the extent that it asks for a legal
14  conclusion.
15      You can answer as to what your
16  understanding of the law is.
17      THE WITNESS:  In my opinion, if the
18  agent is responding to a call that requires him not
19  to show up with lights and sirens and all this
20  racket to advise whoever he's going to go apprehend,
21  to let them know he's coming, yeah, I think he's --
22  in my opinion, I think he's justified in going
23  through a light without having any type of emergency
24  equipment on --
25  Q  (BY MS. LEEDS)  I said stop sign.

Page 60

1  A  Or stop sign, running a stop sign, if it's
2  going to hamper the agent's ability to effect his
3  arrest or his stop or his location.
4  Q  Okay.  Now, you keep saying in your
5  opinion.  Is there anything in your training or
6  anything that you have been told or cautioned on
7  that obviously -- strike that.
8      So, in your opinion, border patrol
9  agents in marked border patrol vehicles are allowed
10  to violate state traffic laws?
11  A  That's being vague.
12  Q  Well, you keep saying in your opinion he
13  can run a stop sign --
14  A  Under certain circumstances, yes.
15  Q  Okay.  Now --
16  A  I can give you an example to clarify that.
17  Q  Go ahead.
18  A  If there's a border patrol agent on duty
19  and he's responding to a call from another agent or
20  a sensor advising that there is possible narcotics
21  trafficking in progress, by the agent responding to
22  that call with lights going, sirens going, by the
23  time that agent arrives to that location, basically
24  he's advising the drug smugglers, "Hey, it's me, the
25  border patrol agent.  Here I come."

Page 65

1  think one was -- and I don't remember who, but it
2  was the sticker that's on the window --
3      Q  Registration or the inspection?
4      A  The inspection sticker.  They stopped him
5  for that.  And two vehicles traveling head on, you
6  know, one traveling 55 miles an hour and the other
7  one going 55, that particular agent couldn't see
8  how, at a combined speed of 110 miles an hour, that
9  that sheriff's deputy would have been able to see a
10  3 by 3 piece of paper and stopped him.
11      Q  Okay.  Do you know if he was ticketed or
12  anything?
13      A  I don't know.
14      Q  Okay.  Anybody else?
15      A  Off the top of my head right now I can't
16  recall.
17      Q  Okay.  How many agents are in the
18  Hebbronville office?
19      A  Now?  I have no idea.  I've been gone for
20  the last three years or so, so I don't know how many
21  are there.
22      Q  How many were there when this incident
23  happened?
24      A  Forty.
25      Q  Do they all live in pretty much that area?

Page 66

1      A  They live either in Hebbronville, Laredo,
2  Premont, or Fal.
3      Q  How long does it take to get from Laredo
4  to Hebbronville?
5      A  About one hour.
6      Q  Okay.  Do you know what a joint enterprise
7  is?
8      A  Define it.
9      Q  I'm asking you if you know what it is.
10  And if you don't know, that's fine.
11      A  That's fine.
12          MR. COWEN:  Does that have something
13  to do with drug smuggling?  Sorry.  Bad joke.
14      Q  (BY MS. LEEDS)  You have made the claim
15  that you have been defamed by what occurred here.
16      A  Yes, ma'am.
17      Q  You -- and we asked you what form was the
18  publication.
19          And the answer is a little -- I'm not
20  sure I understand your answer, and that's why I'm
21  asking you this, because the question was, "Please
22  describe in detail all factual information,
23  statements you have obtained, and materials in your
24  possession for which you have accessed which show or
25  tend to show that Defendants Bolch and Ybanez

Page 67

1  defamed you."
2          Do you understand what defamation is?
3      A  Defamation of character.
4      Q  Okay.  And it says, "Include in your
5  answer the form of the publication, whether oral or
6  written, and to whom it was communicated."
7          What is it that you say Mr. Bolch or
8  Mr. Ybanez did to defame you?
9      A  Arresting --
10          MR. COWEN:  I'm going to object to
11  the question to the extent that it calls for him to
12  have a legal knowledge of Texas tort law that he may
13  not have.
14          However, you can answer as to your
15  understanding, but with the understanding that we're
16  not going to be bound if he doesn't understand what
17  a fact is that we can't go in and add that fact in
18  later.
19      Q  (BY MS. LEEDS)  You're suing them for
20  defamation, correct?
21      A  Correct.
22      Q  What do you understand defamation to be?
23      A  To defame someone's character.
24      Q  Okay.  You just reused the word.  Change
25  the word defame.  To do what?  What have they done

Page 68

1  to you?
2      A  The simple fact that I was arrested.
3      Q  No.  What have they done to you?  Not what
4  caused it.  What have they done to you?  When you
5  say defame your character, what do you mean?
6      A  By placing me under arrest, arresting me
7  in front of a high school, junior high where I'm the
8  drug awareness officer at a time where parents,
9  teachers, and the children were coming out of the
10  school, they all -- Hebbronville is a very small
11  town, so they all know who I am.
12          To see me being handcuffed, the
13  weapon taken away, my gun, my badge, leaning over
14  the hood of a vehicle, or the trunk of a vehicle in
15  handcuffs, and then placed in a sedan where I'm
16  confined to a cage in the presence of all those
17  people, in my understanding, is being defamed.
18      Q  Okay.  Do you know if Mr. Bolch or
19  Mr. Ybanez have ever spoken badly about you to third
20  parties?
21      A  Yes.
22      Q  Whom have they talked to?
23      A  To a gentleman by the name of Shoan.
24      Q  Shoan?
25      A  Shoan.

Page 65 - Page 68

Page 73

1   enforcement agencies?
2       A  For all of them.
3       Q  Okay.
4       A  But it has to go through our dispatcher.
5       Q  Right.  Okay.  I asked you when had the
6   K-9 position become open.  Do you remember when it
7   was that you applied for it?
8       A  No, ma'am, I don't.
9       Q  Okay.  Do you have to go to a training for
10  that?
11      A  Yes, ma'am.
12      Q  And when and where was the training?
13      A  When would be immediately after being
14  selected for the position.  Where is in El Paso,
15  Texas.  The amount of time, I believe, is eight
16  weeks.
17      Q  Was anybody selected for the position?
18      A  Yes.
19      Q  Who?
20      A  I don't recall, but I know the position
21  was filled.
22      Q  And you don't remember when?
23      A  No, I don't.
24      Q  Do you know if that person filled that
25  position before or after you came to Brownsville?

Page 74

1       A  I don't recall.
2       Q  Okay.  So are you saying that the training
3   is -- you're selected first and then you train?
4       A  Yes.
5       Q  How many people put in for the position?
6       A  I wouldn't be able to -- I can tell you I
7   put in for it.  I don't know how many people --
8       Q  You don't know how many competitors you
9   had?
10      A  I don't know how many competitors I had.
11  I know it's a very desirable position simply
12  because, you know, it is an increase in pay and
13  you're allotted a government vehicle.
14      Q  Okay.  How much money were you making when
15  you were in Hebbronville at the end?
16      A  At the end?  Gross, 55, maybe.
17      Q  Okay.  And that was at a GS step 4 -- GS-9
18  step 4?
19      A  GS-9.  I think it was either GS-9 step 4
20  or 5, somewhere in that area.
21      Q  Okay.  And when you were --
22      A  And that's gross.  That's not my base --
23  you know, that's --
24      Q  No.  I understand.
25      A  -- weekends, holidays, night differential.

Page 7

1   All these other --
2       Q  Right.  What -- well, your base is based
3   on the GS-9, though, right?
4       A  Yes.
5       Q  You don't recall what that was?
6       A  No, I don't.
7       Q  Okay.  When you were transferred to
8   Brownsville and became a GS-11, what was your pay?
9       A  I came in as an 11/1, a GS-11 step 1.
10  Here recently there's been a pay increase.  So at
11  that time, I want to say my base pay was forty-two.
12      Q  Okay.
13      A  Base pay.
14      Q  You don't know what your gross was?
15      A  When I -- like one year after I got here?
16      Q  Right.
17      A  Probably sixty.
18      Q  Okay.  How much extra -- I mean, where
19  does this extra money come from --
20      A  What do you mean?
21      Q  -- over your base?
22      A  Night differential, holiday pay, weekend
23  pay, administrative uncontrolled overtime.
24      Q  So you get paid more if you have to work
25  on weekends or nights?

Page 76

1       A  On Sundays.  Sunday is a premium day.
2       Q  How -- so you're not just salaried?
3       A  No.
4       Q  So when are -- what days -- what is it --
5   when can you work where you get paid more?  You said
6   holidays.  Nights?
7       A  Nights.
8       Q  How much more do you get paid if you work
9   nights?
10      A  I wouldn't be able to tell you.  I don't
11  know.
12      Q  Okay.  Sundays?
13      A  Sunday pay.
14      Q  What other days -- so if you --
15      A  45 Act.
16      Q  What's that?
17      A  Overtime.
18      Q  Okay.
19      A  And then there's AUO, which is
20  administrative uncontrolled overtime.
21      Q  That's when there's a situation, right?
22      A  No.  That's -- okay.  The pay scale is
23  kind of difficult to explain, but I'll give it a
24  shot.
25      Q  Well, I'm just trying to figure out what

Page 81

1    Q  And why weren't you driving your own
2  vehicle?
3    A  It's too long to park in the -- Marie's
4  parking lot for lunch.
5    Q  Okay.  Who was your passenger?
6    A  Ms. Garcia.
7    Q  And what's her first name?
8    A  Melissa.
9    Q  Where had you two been?
10    A  Marie's Restaurant.
11    Q  There was only two of you in the car,
12  right?
13    A  That's it.
14    Q  Okay.  And where is Marie's Restaurant
15  located?
16    A  On North Smith in Hebbronville.
17    Q  In Hebbronville?
18    A  On the north end of town.
19    Q  And what had you gone there for?
20    A  Lunch.
21    Q  Who is -- what kind of relationship do you
22  have with Ms. Garcia?
23    A  Then or now?
24    Q  Then.
25    A  Then, she was a friend of mine.

Page 82

1    Q  Is she no longer a friend of yours?
2    A  Well, I haven't -- since I moved here, I
3  don't --
4    Q  Okay.  How good of a friend?  Would you
5  have called her a girlfriend?  Were you dating her
6  or just a friend?
7    A  Well, we like dated on and off.
8    Q  Okay.  Do you know how many different --
9  or just tell me:  How many women did you date while
10  you were in Hebbronville?
11    A  I have no idea.
12    Q  Would you say -- how many women between
13  the ages of 18 and 35 are there in Hebbronville,
14  single women?
15    A  Between ages 18 and 35, single?  Not many.
16  I mean, the town is a small town.
17    Q  I understand.  Do you know?
18    A  Do I --
19    Q  I mean, are there many?
20    A  An actual number?  Not many.
21    Q  Okay.  But Melissa was one of these,
22  right?
23    A  Yes.
24    Q  Okay.  Did you find that women liked going
25  out with guys with badges in uniforms?  Were they

Page 83

1  drawn to that?  Do you think they are?
2    A  I would think that they were drawn to the
3  individual behind the badge, not just the badge.
4    Q  Well, that's what you would like.
5    A  Well, yeah.
6    Q  But do you know if that --
7    A  Well, that's what I think.  I mean, as far
8  as I'm concerned --
9    Q  Okay.  Did you know Mr. Bolch in any kind
10  of social capacity?
11    A  No, not really.
12    Q  Okay.  How many times had you met him?
13    A  Fifty.
14    Q  Under what circumstances?
15    A  On duty.
16    Q  Doing what?
17    A  Backing him up on traffic stops, him
18  coming to the checkpoint to pick up intoxicated deer
19  hunters, or people having car trouble.  Just a
20  multitude of things.
21    Q  Okay.  Do you know how long -- do you know
22  how long he was in Hebbronville?
23    A  Two years, maybe.  I really don't know.
24    Q  Okay.  Other than just seeing him on duty,
25  did you ever see him in any kind of social capacity

Page 84

1  at all?
2    A  I would see him, not speak to him.  But I
3  mean, like if he was off duty, I mean, I knew what
4  kind of car he drove and he knew what kind of car I
5  drove and, you know --
6    Q  Okay.  How long was Norbert in
7  Hebbronville?
8    A  He got there much after I did.  I would
9  say he's been in the Border Patrol maybe seven to
10  eight years, which he spent all of that time there.
11    Q  In Hebbronville?
12    A  In Hebbronville.  And then after I
13  transferred, he stayed there.  And then he got a
14  promotion to Laredo after I left, I believe.
15    Q  This car was -- what kind of car was it?
16    A  It was a Mustang.
17    Q  What color?
18    A  Black.
19    Q  What year, do you know?
20    A  Probably mid Nineties.
21    Q  Okay.  Did you pick up Melissa?
22    A  I don't recall.
23    Q  Where were you headed when you were
24  stopped?
25    A  Back to my house.  No.  She picked -- I

Page 81 - Page 84

Page 89

1 And he says, "Okay." He says, "Do
2 you have a concealed handgun permit?"
3 And I said, "No, I don't."
4 He says, "Are you a law enforcement
5 officer?"
6 And I looked at him and I said
7 something like, "Isaac, it's me," or something to
8 that effect. And I thought for a second and I said,
9 "Okay. Yes, I am a law enforcement officer."
10 He says, "Who do you work for?"
11 And I said, "I work with the Border
12 Patrol." And the whole time I'm thinking why is he
13 asking me? I had just -- the night before I had
14 just -- he had had a traffic stop and I backed him
15 up on that traffic stop. And then I reasoned to
16 myself, well, maybe he just doesn't recognize me
17 because I'm not in a uniform.
18 So then he says, "Are you a law
19 enforcement officer?"
20 And I said, "Yes, I am."
21 And he says, "Who do you work for?"
22 And I said, "Border Patrol."
23 And he says, "Are you on duty right
24 now?" No. He says, "Are you on your way to work,"
25 I think he said.

Page 90

1 And I said "No."
2 He says, "Are you coming from work?"
3 And I said "No."
4 Then he said, "Are you on duty at
5 this time?"
6 And I said, "No, Isaac. It's my day
7 off. I'm coming from Marie's Restaurant."
8 And he says, "Did you know that I
9 could arrest you for unlawful carrying of a weapon?"
10 No. Before that he says, "You have no authority to
11 carry your weapon."
12 He says -- I said, "Well, as a matter
13 of fact, I do, Isaac." And I pulled out my badge
14 and I showed it to him and I showed him where it
15 says that, you know, the United States
16 Immigration -- I can't remember the exact wording,
17 but it says, you know, effect warrantless arrests,
18 carry a firearm and under the authority of the
19 Attorney General of the United States.
20 His response to that was, "Well, I
21 don't care what your authority says. You're in
22 Texas right now. And as long as you're in Texas,
23 you're going to go by Texas laws."
24 So I said, "Okay, Mr. Bolch. Let me
25 ask you a question. What country is Texas in?"

Page 91

1 And he says, Well, it's in the United
2 States."
3 And I said, "Well, I work for the
4 United States Government." I said, "I understand
5 that the Texas Penal Code does not recognize a
6 border patrol agent as a peace officer, but the
7 Texas Penal Code also doesn't recognize an FBI agent
8 as a Texas peace officer."
9 And I said, "I mean, I understand
10 what you're telling me," I said, "but I don't fall
11 under the Texas Penal Codes. I fall under the Code
12 of Federal Regulations and the Immigration and
13 Nationality Act."
14 And then, once again, he says, "Well,
15 you're in Texas right now. As long as you're in
16 Texas, you're going to go by Texas laws."
17 So I said "Okay."
18 And he kept on going back and telling
19 me, you know, he could do this and he could do that.
20 And finally I said, "Look, listen, Isaac, I'm not
21 going to sit here and argue with you as to who has
22 more authority to do what. Apparently you know your
23 authority and where you derive it from, and I know
24 my authority and where I derive it from." I said,
25 so -- and by now there's you know, people standing

Page 92

1 in front of the high school and everybody is looking
2 and seeing what's going on. And I said, "Look, you
3 know, I'm not going to stand here in front of all
4 these people that I deal with and argue with you."
5 I said, "If you feel the need to
6 arrest me, then go ahead and do so. Otherwise, put
7 me back in the car, give me my ticket or whatever
8 you need to do and let me go. But I'm not going to
9 stand here and argue with you anymore."
10 And at that time he asked me to turn
11 around, lean up against the car, place my hands
12 behind my back. I did that. Then he turned me
13 around, he walked me to the vehicle, and he opened
14 the driver's side rear door of his sedan, and I
15 attempted to get in the sedan. But getting in the
16 vehicle with your hands behind your back, and that
17 cage being so close to the seat, it was kind of
18 difficult for me to get in, so I kind of got in
19 sideways.
20 And where the door opens and closes
21 right here, there's like a post -- actually, the
22 door hinge where the door opens and closes. Well,
23 right next to that there's a steel pipe and it's the
24 frame to the cage that goes all the way around the
25 vehicle.

Page 97

1  He says, "Yeah, okay," and then he
2  left. And he came back a little while later and he
3  says, you know, "The sheriff is busy right now."
4       I said "Okay."
5       Then they took everything off me,
6  they strip-searched me, they took my clothes off,
7  they -- a full search.
8  Q  Uh-huh.
9  A  Then they fingerprinted me, made me sign
10  my fingerprints I guess to submit them off to the
11  FBI. Then they photographed me and then they put me
12  in a little holding cell. I was in that holding
13  cell -- I don't have an accurate time of all of this
14  stuff because everything was taken from me. I
15  didn't have a watch. I didn't have anything. So
16  these are all just estimated times. So I was there,
17  I guess, two hours in that cell.
18       And then I waited -- I waited for
19  some time. And then the booking officer came out
20  and opened the little holding cell thing and told me
21  to follow him. And then he took me into another
22  room and he got me this big hairy mattress.
23       And I said, "What is this for?"
24       And he says, "Well, so we can put you
25  in a cell."

Page 98

1       And I said, "You know, you can't put
2  me in a cell. There's all these people in this
3  cell. And I would say 70 percent of the people that
4  are in that cell I know them. I mean, I put them --
5  I arrested them and had them incarcerated. And if
6  you --" and I think I might have used the words, "If
7  you put me in this cell, that would be the
8  equivalent of putting a rabbit in a cage with a
9  bunch of pit bulls. I mean, if they find out who I
10  am, they are going to kill me."
11       And he was like, "Well, you know, I'm
12  just following orders. That's what they told me to
13  do." But he never told me who gave him that order
14  to do it.
15       And then I said "Okay." Well, I
16  mean, there's not much I could do about that. So
17  they put me in the cell. And while I was in that
18  cell, there were people that were roaming around
19  free. I guess it was like a trustee that's allowed
20  to walk around.
21       They put me in the cell. There was
22  other people walking up and down that little
23  corridor. The cell that I was in had feces in and
24  around the outskirts of the commode area. That
25  mattress -- when I said hairy earlier, I meant there

Page 99

1  was pubic hairs imbedded in this little mattress.
2  Q  How many people were in this cell that
3  they put you in?
4  A  I don't recall.
5  Q  How many beds were there or places to put
6  mattresses?
7  A  I couldn't tell you. I didn't really
8  count them. I pretty much just sat there minding my
9  own business, didn't talk to anybody.
10  Q  Okay. Well, is this the cell that
11  supposedly you -- the person is going to stay in,
12  sleep in?
13  A  Yes.
14  Q  Okay.
15  A  Because it had a bunk and I don't remember
16  how many -- you know, and it had a commode and it
17  had a toilet.
18  Q  That was my question.
19  A  Yes.
20  Q  Do you remember how many bunks were in
21  there?
22  A  No. I don't know.
23  Q  Okay. When -- was there any problem --
24  did you object at all when they were going to
25  fingerprint you?

Page 100

1  A  I asked them what the fingerprints were
2  for. I said, "Why are you guys fingerprinting me?"
3       And they said, "Well, because they
4  need to be -- we are going to submit them to the
5  FBI."
6  Q  Did you refuse to be fingerprinted at any
7  time?
8  A  No.
9  Q  Do you remember the name of the booking
10  guy?
11  A  There were several of them there. I
12  remember one person's name. I don't know who --
13  Q  Okay. Which one do you remember?
14  A  Ruiz.
15  Q  Ruiz?
16  A  Ruiz or something.
17  Q  Okay.
18  A  As a matter of fact, I think he was the
19  same individual that I had asked, "Hey, can I talk
20  to the sheriff?" And I think he was -- because he
21  was like the cool -- I mean, he was nice to me. He
22  was -- well, they all were. All the whole -- the
23  whole --
24  Q  Jail?
25  A  -- booking officer staff, you know,

Page 97 - Page 100

| Page 105 | Page 107 |
|---|---|
| 1      MR. COWEN: Objection to the form of | 1    Q Does that say that a border patrol |
| 2 the question as far as he's not a legal scholar | 2 agent -- |
| 3 subject and does not have knowledge of all the legal | 3    **A On duty and non-duty hours I can carry the** |
| 4 standards of what may or may not constitute a | 4 **weapon.** |
| 5 constitutional violation. However, he may answer as | 5    Q Is that what the -- |
| 6 to his understanding. | 6    **A Yes.** |
| 7    Q (BY MS. LEEDS) Do you remember the | 7    Q -- Federal Regulation says? Or is that |
| 8 question? | 8 what your INS policy says? |
| 9    **A Could you repeat the question?** | 9    **A No, both.** |
| 10    Q Sure. You used to book people into jails. | 10    Q Both? |
| 11    **A Yes, ma'am.** | 11      MR. COWEN: And just for the record, |
| 12    Q Okay. Was there anything about the way | 12 I'm going to object to any questioning on what the |
| 13 they booked you into this jail that you say is -- | 13 law says or doesn't say. The law is what it is and |
| 14 violated your constitutional rights? | 14 that's a matter for the court to decide, not for the |
| 15      MR. COWEN: Same objection. | 15 cross-examination of witnesses. But if you want to |
| 16      THE WITNESS: The simple fact that I | 16 waste our time doing it, you're certainly welcome to |
| 17 was booked in. And that's my understanding. | 17 do so. |
| 18    Q (BY MS. LEEDS) Okay. That -- I got -- | 18    Q (BY MS. LEEDS) While I'm looking for |
| 19    **A The simple fact that I was booked in and** | 19 this, you are not a Texas peace officer, correct? |
| 20 **there was no justified cause to even arrest me in** | 20    **A No, ma'am.** |
| 21 **the first place, in my understanding, is violation.** | 21      THE WITNESS: Could I take like just |
| 22      MS. LEEDS: Okay. I need to object. | 22 a -- |
| 23 Nonresponsive. | 23      MS. LEEDS: Yes. I'm sorry. |
| 24    Q (BY MS. LEEDS) I'm not asking you about | 24      THE WITNESS: I have to go to the |
| 25 the fact that you were booked in. I'm asking you | 25 rest room. |

| Page 106 | Page 108 |
|---|---|
| 1 about the procedures that they followed, the way | 1      MS. LEEDS: Yeah. We haven't even |
| 2 they did it. Was there anything wrong with the way | 2 taken a break. Yes, please. I'm sorry. |
| 3 they did it? | 3      (Recess taken) |
| 4    **A The actual booking process itself?** | 4    Q (BY MS. LEEDS) Mr. Bolch, you had |
| 5    Q In other words, when Bolch left you there, | 5 mentioned a particular CFR that is -- |
| 6 from then until the time you left, was there | 6      MR. COWEN: Object to the form. |
| 7 anything that anybody did and the way they did it | 7    Q (BY MS. LEEDS) -- a federal regulation, |
| 8 that you would have said was wrong? | 8 did you not? |
| 9    **A To my knowledge, no.** | 9      MR. COWEN: He's not Mr. Bolch. |
| 10    Q Okay. And I'm asking you that because you | 10    Q (BY MS. LEEDS) Oh, you're not Mr. Bolch? |
| 11 used to do that very thing. | 11 I thought I was deposing -- I'm sorry. |
| 12    **A Exactly.** | 12      Mr. Gilbert, you mentioned a |
| 13    Q So the way they took your name, the way | 13 particular CFR. Could you repeat that number? |
| 14 they -- the fact that they took all your belongings, | 14    **A It's 287-A, I believe.** |
| 15 they are supposed to do all of that? | 15    Q And let me hand you what we will mark as |
| 16    **A Yes.** | 16 Gilbert 1 and ask you if this is the section that |
| 17    Q If they are booking you into jail, right? | 17 you are referring to that authorizes you to carry |
| 18    **A Yes.** | 18 firearms? |
| 19    Q Okay. Why did you have your gun with you? | 19      MR. COWEN: I'm just going to object |
| 20    **A I carry my gun with me all the time.** | 20 to the question as far as it calls for a legal |
| 21    Q Okay. What is it that you claim gives you | 21 conclusion. |
| 22 the authority to carry your gun all the time? | 22      But you can answer it as you |
| 23    **A What is it that I -- Section 287-A --** | 23 understand the law. |
| 24    Q Well, does -- | 24      THE WITNESS: Yes, ma'am. |
| 25    **A -- of the Code of Federal Regulations.** | 25    Q (BY MS. LEEDS) Okay. And that is |

Page 113

1   Q Okay. But the second half of that
2 sentence which you read is referring to the kind of
3 gun you can carry for an approved undercover
4 operation.
5   A Exactly. And during my non-duty hours if
6 I'm required to -- while I am off duty, I am still
7 on duty, because at any time, I can be activated
8 onto immediate duty right then and there simply by a
9 phone call to say, "Mr. Gilbert, do you know what,
10 you're back on the clock. You need to come to work
11 right now."
12      So, therefore, I have to have access
13 to my gun at all times in the event that I need to
14 go to whatever it is that they may require me to do,
15 whether it's an undercover --
16   Q Where does this policy say that? Where
17 does this policy say that?
18   A This policy does not say that.
19   Q Okay. And I'm talking specifically about
20 the sentence that you read.
21   A Yeah.
22   Q The part you read, which was, "The officer
23 is authorized to carry the handgun during duty and
24 non-duty hours until such time as the undercover
25 operation is completed" refers to somebody that's

Page 114

1 doing an undercover operation, right, that sentence?
2   A If -- yes, if you want to single out that
3 one sentence, yes.
4   Q Okay. Is there --
5      MR. COWEN: Eileen, I'd like to
6 object to this whole line of questioning as being
7 misleading. And I'm allowed -- because that's not
8 the section, as you may know if you've read the
9 whole thing, I don't know if you have or you have
10 not, but that is not the section that empowers the
11 officer to carry one.
12      MS. LEEDS: Objection to the sidebar.
13      MR. COWEN: I am not -- may I finish
14 my objection, please?
15      MS. LEEDS: No, you can't.
16      MR. COWEN: I am going to finish my
17 objection. The preceding page --
18      MS. LEEDS: You cannot --
19      MR. COWEN: -- on page 10 --
20      MS. LEEDS: I understand --
21      MR. COWEN: No. You're asking
22 misleading questions. And when --
23      MS. LEEDS: Excuse me. You don't
24 have to yell.
25      MR. COWEN: I can finish --

Page 115

1      MS. LEEDS: I'll yell louder than you
2 will, Michael.
3      MR. COWEN: Well, Eileen --
4      MS. LEEDS: I can ask the question --
5      MR. COWEN: Eileen, you're going to
6 let me finish making my objection --
7      MS. LEEDS: You can't object.
8      MR. COWEN: I can object. I can make
9 whatever objection --
10      MS. LEEDS: You cannot talk on the
11 record.
12      MR. COWEN: I can. This is not state
13 court. This is federal court, number one. And,
14 number two, even in state court when you're asking
15 these kind of misleading questions --
16      MS. LEEDS: I am not asking
17 misleading questions.
18      MR. COWEN: Yes, you are. Let me --
19      MS. LEEDS: I am asking --
20      MR. COWEN: -- please finish --
21      MS. LEEDS: -- him to --
22      MR. COWEN: -- my objection.
23      MS. LEEDS: -- read --
24      MR. COWEN: Eileen, let me finish my
25 objection --

Page 116

1      MS. LEEDS: -- the sentence.
2      MR. COWEN: -- or we're going to end
3 the deposition right now if you don't let me finish
4 a sentence without interrupting me.
5      MS. LEEDS: Fine.
6      MR. COWEN: Now, my objection is when
7 you ask about a -- you're asking him about a
8 provision other than the provision we have cited as
9 authorizing him to carry a gun, and then you're
10 trying to trick him by using a different section
11 into saying that the law is something other than
12 what it is. And that is wholly improper.
13      MS. LEEDS: I am not trying to trick
14 him. I am talking about a sentence, a portion of a
15 sentence that he read out of context. I did not
16 trick him with asking him to read --
17      MR. COWEN: But you're asking him --
18      MS. LEEDS: -- this section.
19      MR. COWEN: -- about Section 6 --
20      MS. LEEDS: Yes, I --
21      MR. COWEN: -- instead of Section 5.
22      MS. LEEDS: -- know there is another
23 section, Michael.
24      MR. COWEN: Then why are you wasting
25 our time with it, then?

Page 113 - Page 116

Page 121

1    Q  Okay.  And it --
2    A  Well, yes, it is.
3    Q  All right.  And it refers to the law,
4  Section 287 that we talked about before?
5    A  Yes.
6    Q  Okay.  The law does not say you can carry
7  on and off duty.
8          MR. COWEN:  Objection to the form.
9  Calls for interpretation of statute and legal
10  opinion.
11    Q  (BY MS. LEEDS)  This Exhibit No. 1 does
12  not say you can carry on and off duty, does it?
13          MR. COWEN:  Objection to the form.
14  That's not the law that the statute -- that the
15  section refers to.
16    Q  (BY MS. LEEDS)  Does Exhibit 1 say you
17  can carry on and off duty?
18          MR. COWEN:  Objection to the form to
19  the context of the question we're having.  And I'd
20  like to just say for the record, Exhibit 1 is 8-CFR,
21  which is the Code of Federal Regulation.  It's not a
22  statute.
23          Subject to that, you can answer the
24  question.
25    Q  (BY MS. LEEDS)  Better yet.  Does

Page 122

1  Exhibit 1 say you can carry on or off duty?
2    A  It says neither way whether it's on or off
3  duty, no.
4    Q  Okay.  It doesn't say you can carry --
5  well--
6    A  It doesn't say you can carry it on duty or
7  it doesn't say that you can carry it off duty and it
8  doesn't say that you cannot carry it off duty.  So
9  it's how you interpret it, how you want to interpret
10  it.  It simply says that you can carry a firearm.
11    Q  You are authorized to --
12    A  To carry --
13    Q  -- carry a firearm?
14    A  -- a firearm.  It does not specify whether
15  it's during duty or non-duty.  So it's an
16  interpretation --
17    Q  So you --
18    A  -- as to what --
19    Q  -- would agree --
20    A  I interpret it as in --
21    Q  You would agree with me that the words
22  that are on this paper here do not say you are
23  authorized to carry a firearm off duty.  Those words
24  do not --
25    A  That exact wording, correct, I agree with

Page 123

1  that.
2    Q  And we'll need to -- okay.  Now, are you
3  familiar with the Texas Concealed Weapons law?
4    A  No, ma'am.
5    Q  Do you know -- what are elements of an
6  offense?
7          MR. COWEN:  Objection to the extent
8  it asks for a legal conclusion.
9          You can answer the question.
10          THE WITNESS:  Of an offense?
11    Q  (BY MS. LEEDS)  When you arrest somebody,
12  what is it that you try to find out?
13    A  Whether the individual had the knowledge,
14  the ability, and the intent.
15    Q  Of what?
16    A  To commit whatever offense it is that he
17  committed.
18    Q  Okay.  What is it that you're trying to
19  find out about that offense?
20    A  Well, if a crime, in fact, took place.
21    Q  Okay.  And you ask them questions
22  regarding what kinds of facts?
23    A  Just articulable facts, leading up to
24  whatever reasonable or probable cause is to stop
25  that -- or stop, detain, whatever.

Page 124

1    Q  Whatever it is that you're doing?
2    A  Exactly.
3    Q  Right.  Okay.  Do you know those to be
4  elements of an offense?  In other words, you have
5  to -- for you to have probable cause to stop,
6  detain, et cetera, there are certain things that
7  you've got to find out if they did?
8    A  Articulable facts.
9    Q  So that's correct, right?
10    A  Now, are you referring -- I have no idea
11  how state law is.
12    Q  No.  I'm not asking you state law.
13    A  Okay.  As long as we were on the same
14  sheet of music.
15    Q  Right.  Yes.
16    A  For federal?  Yes.
17    Q  Yeah.  You find out --
18    A  Articulable facts --
19    Q  -- what they did?
20    A  -- leading up to what --
21    Q  You try to find out what they did.
22    A  Exactly.
23    Q  Okay.  And if they fit -- you know, if you
24  can check off enough boxes, there's probable cause?
25    A  Yes.

Page 129

1  when you first get hired. And there's no set --
2  because it's such a long investigation, sometimes
3  they take five years. Sometimes it may take longer.
4  It just depends how often you've moved, credit
5  history. All different types of things.
6     Q  How is your credit history?
7     A  To my knowledge it's well.
8     Q  Is there anything else that could keep you
9  from becoming a first line supervisor if you sought
10 the position other than, as you claim, this
11 particular incident?
12    A  No.
13    Q  Have you had any other kind of write-ups
14 or disciplinary problems at all?
15    A  Let me see. Yes.
16    Q  Tell me about them.
17    A  I lost my binoculars during the course of
18 my duties.
19    Q  Okay. What else?
20    A  I think that's it.
21    Q  So if we get your personnel file, you
22 should just have one write-up in there for losing
23 your binoculars?
24    A  That's what I'm thinking. In ten -- to my
25 knowledge -- I mean, it's possible that I might have

Page 130

1  something in my file that I don't know about.
2     Q  That you don't know about? Okay.
3     A  I have a government credit card that -- I
4  was detailed, came back on detail -- from detail and
5  then you have to submit a voucher. I was counseled
6  on that, but it was beyond my control simply because
7  I submitted my voucher at the allotted time.
8            However, it took Region up in
9  Washington five or six months to reimburse me, so it
10 took that five or six months for me to pay back my
11 government credit card. And I was given just some
12 oral admonishment and told, "Don't do it again."
13    Q  Okay. Anything else?
14    A  To my knowledge, no.
15    Q  Okay. Have you sought any K-9 position
16 while you've been in Brownsville?
17    A  No. There's no positions available. They
18 are filled.
19    Q  Have you seen any medical personnel or
20 healthcare practitioner of any kind as a result of
21 this incident?
22    A  No, ma'am.
23    Q  Meaning mental health or physician?
24    A  No, ma'am.
25    Q  Did you see any doctor as a result of the

Page 131

1  injury to your knee?
2     A  No, ma'am.
3     Q  When were those pictures taken?
4     A  The day I got out of jail, I went back to
5  the house. It was the next morning I took the
6  picture. I didn't have access to a camera.
7     Q  Okay. What day of the week did this occur
8  on?
9     A  I'm not -- I don't know, ma'am.
10    Q  Okay. How long --
11    A  It was the day after my birthday. That's
12 all I remember. It was my birthday gift from the
13 county.
14    Q  How long did you stay in jail?
15    A  I had no concept of time because I didn't
16 have a watch. I could give you a -- what I felt.
17 It felt to me, I don't know, ten hours.
18    Q  How long did it really take? What time
19 did this happen?
20    A  I don't know.
21    Q  What time did --
22    A  I think it was -- it was about the time
23 kids were getting out of school, so it was between
24 3:00 and 4:00.
25    Q  What time did you get out of jail?

Page 132

1     A  It was dark. I think it -- maybe 7:00,
2  maybe.
3     Q  P.M.?
4     A  Yes.
5     Q  Okay. What happened for you to get out of
6  jail? I mean, what -- did you call somebody? What
7  happened?
8     A  After being in jail for a while, I was
9  allowed to use the phone. And the first person I
10 called was my first line -- or I called a first line
11 supervisor, which was George Diaz. And I told him
12 that I was in jail and I had been arrested and
13 charged with unlawful carrying of a weapon.
14           And he told me that he would be right
15 over to get me out. But I never saw -- he never
16 showed up. And I don't know what transpired. Some
17 more time went by and then they took me out of the
18 cell and they took me into this little room, and
19 there was a J.P. there. He was charging me with the
20 unlawful carrying of a weapon.
21           And then while I was in that waiting
22 area, that was when the sheriff came into the
23 office. Apparently -- and this is speculation.
24 This is secondhand, after the fact that my
25 supervisor told me that the sheriff called to the

Page 129 - Page 132

Page 137

1  who I was.
2     Q  You've made the claim that kind of like
3  the sheriff was out to get you because you had
4  arrested a relative of his.  Why is it that you're
5  making that claim?
6     A  It was -- the time span was just, to me,
7  so coincidental after arresting the sheriff's family
8  member that --
9     Q  Do you know how close of a family member
10  he is?
11     A  I believe it was his nephew.
12     Q  When was it that you arrested him?
13     A  Just prior to me being arrested.  I
14  couldn't give you an exact date.  I don't recall.
15     Q  Okay.  Do you know if Bolch knew about
16  this arrest?
17     A  I don't know.
18     Q  Are you just assuming that because you had
19  arrested a member of the sheriff's family that all
20  the deputies knew and then that's why they were out
21  to get you?
22     A  Well, I knew that the sheriff -- that the
23  deputies knew that his family member had been
24  arrested.
25     Q  How is it that you know that?

Page 138

1     A  Because for some unknown reason, the Drug
2  Enforcement Administration was -- when you asked me
3  earlier what day of the week it was, I think it was
4  a weekend.
5     Q  Weekend?
6     A  I think.
7     Q  Okay.
8     A  And that's all just totally off the wall
9  from --
10     Q  Just a memory popped in.
11     A  Yes.  For some unknown reason, DEA had
12  declined the prosecution on the marijuana and the
13  cocaine, and we were told to turn the case over to
14  the Jim Hogg County Sheriff's Department.
15     Q  Who told you?
16     A  The Drug Enforcement Administration who --
17  the individuals that I spoke with over the phone
18  with the Drug Enforcement Administration, the DEA,
19  were actual Jim Hogg County sheriff's deputies that
20  were assigned to the DEA task force.  And they said
21  decline the prosecution -- or they declined the
22  case, and so then we were told to turn the case over
23  to the Jim Hogg County Sheriff's Department.
24     Q  Okay.  Do you know what happened to it?
25     A  To what?

Page 139

1     Q  The case.
2     A  No, I don't.
3     Q  Do you know if they were prosecuted?
4     A  I know that the marijuana, the cocaine,
5  the vehicle, and the nephew and another individual
6  that was in the vehicle, I can't recall what his
7  name was, they were all turned over to the sheriff.
8  What happened to -- I know that --
9     Q  My question was:  Were they prosecuted?
10  Do you know?
11     A  I don't know.  I know they were --
12     Q  Okay.  I mean, you did your part of the
13  job.  You don't know what happened after that?
14     A  Yeah.  I don't know what happened after
15  that.
16     Q  Okay.  Who were the deputies that were
17  assigned to the task force?
18     A  Johnny Guardian and Sammy Torres, I think.
19     Q  Do you know if they are still with the
20  task force?
21     A  I have no idea.
22     Q  Have you filed any other lawsuits?
23     A  No, ma'am.
24     Q  Have you ever been arrested for anything
25  else?

Page 140

1     A  I got arrested when I was like 15, 16.
2     Q  Okay.  After 18 have you been arrested?
3     A  After 18?  I got arrested for reckless
4  driving.
5     Q  When was that?
6     A  '99.  It was here.  It was since I got
7  here.
8     Q  Okay.  Brownsville?
9     A  Yes, ma'am.
10     Q  Where did this occur?
11     A  In Brownsville.
12     Q  I know but --
13     A  Oh, the actual stop?
14     Q  The stop, uh-huh.
15     A  Was on 802 and -- is it Robindale?  Is
16  that like where the hospital used to be?
17     Q  Yes.  And what happened to that?  Did he
18  give you a ticket?
19     A  Yes.
20     Q  Did you pay the fine?
21     A  Yes.  Well, actually, that was the end
22  result was that I was charged -- or I was -- they
23  initially had stopped me for a DWI.  I refused to
24  take the Intoxilyzer, so based on that refusal, I
25  was automatically charged with the DWI.  And they

Page 137 - Page 140

Page 145

1    A  On my person, no.
2    Q  Well, what about anyplace?
3    A  The SF-86, the national security
4  questionnaire that states, you know, do you -- or
5  have you ever been charged with or arrested for --
6    Q  Okay.  That's a maybe in the future,
7  right?
8    A  Yes.
9    Q  Okay.  I'm talking about now --
10    A  Now, no.
11    Q  -- are there any documents that would show
12  that right now you have -- you have suffered a loss
13  in earning capacity?
14        MR. COWEN:  Objection to the form of
15  the question as to how it defines loss of earning
16  capacity.
17        Subject to that, you can answer.
18        THE WITNESS:  No.
19    Q  (BY MS. LEEDS)  Do you have any documents
20  or any evidence that would show that what happened
21  here was intentional?
22    A  No.
23    Q  Do you have any restrictions on your
24  driver's license?
25    A  No.

Page 146

1    Q  And you -- the car wasn't yours, so you
2  don't have the title to it.
3    A  No, ma'am.
4    Q  You mentioned that you had -- you've
5  arrested many people for carrying weapons without
6  permits?
7    A  No, I never said that, not right now at
8  any time during this --
9    Q  Oh, no, no, no.  I'm talking about in your
10  responses.
11    A  Oh, yes, ma'am.  I've arrested people for
12  numerous violations of different types and as a
13  result of that had weapons with them.
14    Q  Okay.  Have you ever arrested anybody
15  for --
16    A  Specifically, no.
17    Q  -- illegally carrying a firearm?  Not just
18  that you're being -- you know, it's a stop and they
19  happen to have a weapon.
20    A  And it's a big load of dope?
21    Q  Right, right.
22    A  No, ma'am.
23    Q  Okay.  But not specifically for the
24  firearms violation?
25    A  No, ma'am.

Page 147

1    Q  Okay.  You wanted to add something?  I
2  heard a breath.
3    A  Well, I was going to mention that the --
4  me personally, no.  Once the case has been done, if
5  there is, let's say, a large amount of drugs and the
6  individual carrying the drugs has a weapon, well,
7  then it becomes an aggravated and then we won't, but
8  the district attorney or the U.S. attorney will file
9  a --
10    Q  A separate charge?
11    A  Yeah.
12    Q  Okay.  Yeah, I gotcha.
13        You have made the claim that
14  Mr. Bolch was not justified in arresting you.  Are
15  you aware that he has stated that you said or that
16  you voiced something at the scene which caused him
17  to arrest you for disorderly conduct?
18    A  Well, as I said before, I was not charged
19  with disorderly conduct.  It was --
20    Q  That wasn't my question.  My question is:
21  Are you aware that he --
22    A  Your question was --
23    Q  -- said that you made a statement?
24    A  And that's why he charged me with
25  disorderly conduct.  And I'm saying that I was not

Page 148

1  charged with disorderly conduct.  I was only charged
2  with unlawful carrying of a weapon.  That was
3  dropped to the disorderly conduct.  But at the time,
4  no.
5    Q  I'm talking about when you and Mr. Bolch
6  are out there.
7    A  Yes.
8    Q  Okay.  He has made the statement that you
9  said something which additionally caused him to
10  arrest you, besides the weapon incident.
11    A  What statement was that?
12    Q  Okay.  Did you ever say in the discussions
13  that you were having with him, "You-all never do
14  shit anyways"?
15    A  No.
16    Q  You did not make that statement?
17    A  No.  No, ma'am.
18    Q  Okay.  Are you aware at all that when he
19  arrested you, he arrested you for -- you want to
20  clarify something?
21    A  Well, at no time did I ever lose my
22  composure or say anything to that nature until I had
23  a door wedged between my knee.  But I never said
24  anything to that -- you know.  Excuse my language,
25  but I might have said like, "Open the fucking door,"

Page 153

1  here, and two there. And then --
2  Q  And from then on, you would stay within
3  K-9 and go wherever those positions were available
4  to you?
5  A  Wherever they needed me, yes.
6  Q  Okay. And do you think you're excluded
7  from applying for a K-9 position here in
8  Brownsville?
9  A  Excluded from applying? No. I can apply.
10  Whether I get the position, well, that's, you know,
11  speculation. I have no idea.
12  Q  Have you -- did you apply for this
13  promotion?
14  A  For -- yes, I did.
15  Q  Okay. And you got that one?
16  A  Yes. Prior to this incident.
17  Q  Have you applied to -- for anything else
18  since this incident?
19  A  Bike patrol.
20  Q  Okay.
21  A  The bicycle patrol.
22  Q  And what happened there?
23  A  But it's not a promotion. It's just a
24  collateral duty. And I was selected. I'm on the
25  bike patrol now.

Page 154

1  Q  You are on the bike patrol. That's why
2  you cycle?
3  A  That's where the 200 miles a week come in.
4  Q  That helps.
5  A  I'm the guy with the white on the bicycle
6  drenched. That's me.
7  Q  Do you know what you applied for first,
8  the promotion to Brownsville or K-9?
9  A  I applied for -- I've been applying for
10  Brownsville since the day I got to Hebbronville, you
11  know. I was like, "I don't want to be here no
12  more."
13  So in answer to your question, I
14  mean, yeah, I applied for --
15  Q  Brownsville.
16  A  -- Brownsville way before -- I got to
17  Hebbronville and the next day I was applying for
18  Brownsville.
19  Q  Was that something that you had to --
20  could you only apply when there were openings? Or
21  did you just have like --
22  A  There has to be a vacancy.
23  Q  So do you remember -- and the same thing
24  in K-9, right?
25  A  Exactly. There has to be a vacancy.

Page 155

1  Q  Do you know which occurred first for what
2  happened?
3  A  Well, I had put in several -- I had put in
4  for several Brownsville, Harlingen, the whole
5  Valley. And at that time, I just -- I didn't have
6  enough time in service and I was, per se, the low
7  man on the totem pole, so I would always get passed
8  up and passed up and passed up.
9  The K-9 position, I had more than
10  enough seniority, more than enough time for the
11  position, and I was not given the position. I was
12  not told why I wasn't given the position. It was
13  given to a junior -- somebody that had less time in
14  than me, somebody that had less experience than I.
15  Q  Who?
16  A  I don't know what the name -- I mean, I
17  just know I was the senior guy, you know. Out of
18  the 40 of us, you know, I was like highest of the
19  troops.
20  Q  Okay. And you don't recall when that was
21  in relation to when you applied for the Brownsville
22  transfer?
23  A  I applied -- let me see. I got -- got my
24  notice in February, on or about. It usually takes
25  six months, maybe, so six months.

Page 156

1  Q  You mean to move?
2  A  No. You apply --
3  Q  Oh, okay.
4  A  -- and it takes about six months before --
5  you know, because you've got thousands of people
6  throughout the United States that are putting in for
7  the same job. So they have to review every
8  applicant, so it takes about six months.
9  MR. COWEN: I need to tell them to go
10  ahead and wait for me.
11  MS. LEEDS: I'm almost done.
12  MR. COWEN: Well, it's already 1:40,
13  so I just need to let them know they need to wait
14  for me.
15  Q  (BY MS. LEEDS) Okay. You said that it
16  takes about six months --
17  A  Six months.
18  Q  -- for the application to be processed,
19  right?
20  A  To be processed. And I got selected in
21  February, so go --
22  Q  In February.
23  A  -- six months back from that, more or
24  less.
25  Q  Gotcha. And in relation to that, do you

Page 161

```
 1
 2        I, JOHN ANTHONY GILBERT, have read the
          foregoing deposition and hereby affix my signature
 3        that same is true and correct, except as noted
          above.
 4                                               .
 5
 6
                        JOHN ANTHONY GILBERT
 7
 8
 9
10   THE STATE OF              )
11   COUNTY OF                 )
12
13        Before me,                    , on this day
     personally appeared JOHN ANTHONY GILBERT, known to
14   me (or proved to me on the oath of
     _____ or through
15   _____ (description of identity
     card or other document)) to be the person whose name
16   is subscribed to the foregoing instrument and
     acknowledged to me that he executed the same for the
17   purposes and consideration therein expressed.
18        (Seal) Given under my hand and seal of office
     this      day of          ,     .
19
20
21                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF
22
23
24
25
```

Page 163

```
 1   in the action in which this proceeding was taken,
 2   and further that I am not financially or otherwise
 3   interested in the outcome of this action.
 4        Further certification requirements pursuant to
 5   the Federal Rules of Civil Procedure will be
 6   complied with after they have occurred.
 7        CERTIFIED to by me this 24th day of June, 2002.
 8
 9
10                     Renee W. Crouch
11                     Texas CSR 5645
                       Expiration Date:  12/31/03
12                     SCHWAB COURT REPORTING SERVICE
                       2900 Central Boulevard, Suite C
13                     P.O. Box 3665
                       Brownsville, Texas  78520
14                     (956) 544-5126
15
16
17
18
19
20
21
22
23
24
25
```

Page 162

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3   JOHN GILBERT            )
                            )
 4   VS.                    )  CIVIL ACTION NO. B-01-054
                            )
 5   JIM HOGG COUNTY, TEXAS, )
     ISAAC BOLCH, in his     )
 6   Individual and Official )
     Capacities, and GILBERT )
 7   YBANEZ, in his          )
     Individual and Official )
 8   Capacities              )
 9
10             REPORTER'S CERTIFICATION
          ORAL DEPOSITION OF JOHN ANTHONY GILBERT
11                    JUNE 10, 2002
12        I, Renee W. Crouch, Certified Shorthand
13   Reporter in and for the State of Texas, hereby
14   certify to the following:
15        That the witness, JOHN ANTHONY GILBERT, was
16   duly sworn by the officer and that the transcript of
17   the deposition is a true record of the testimony
18   given by the witness;
19        That the deposition transcript was submitted on
20   _____ to the witness or to the attorney
21   for the witness for examination, signature, and
22   returned to Schwab Court Reporting Service by
23   _____ ;
24        I further certify that I am neither counsel
25   for, related to, nor employed by any of the parties
```

Page 164

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3   JOHN GILBERT            )
                            )
 4   VS.                    )  CIVIL ACTION NO. B-01-054
                            )
 5   JIM HOGG COUNTY, TEXAS, )
     ISAAC BOLCH, in his     )
 6   Individual and Official )
     Capacities, and GILBERT )
 7   YBANEZ, in his          )
     Individual and Official )
 8   Capacities              )
 9
10          ORAL DEPOSITION OF JOHN ANTHONY GILBERT
                      JUNE 10, 2002
11
12                  FURTHER CERTIFICATION
13
14        The original deposition was/was not returned to
15   Schwab Court Reporting Service by            ;
16        If returned, the attached Changes and Signature
17   page(s) contain(s) any changes and the reasons
18   therefor;
19        If returned, the original deposition was
20   delivered to Ms. Eileen M. Leeds, Custodial
21   Attorney;
22        That the deposition was delivered in accordance
23   with the Federal Rules of Civil Procedure, and that
24   a copy of this certificate was served on all parties
25   shown herein.
```

**-$-**

$10,000 [1]        71:14
$100 [2] 135:4     135:8
$200 [1] 141:17

**-'-**

'66 [2]    9:24     10:5
'76 [1]    10:5
'84 [2]    5:23     9:4
'86 [1]    7:12     10:5
'92 [1]    12:16
'96 [1]    10:5
'97 [1]    63:20
'98 [6]    42:23    42:24    43:2
    43:4   43:8    43:13
'99 [5]    5:14    42:22    43:15
    70:22  140:6

**-1-**

1 [7]      2:23    75:9     108:16
    121:11  121:16  121:20  122:1
10 [7]     1:12    17:13    24:21
    24:22  114:19  162:10  164:10
10,000 [1]         72:6     77:18
100-dollar [2] 133:25 134:25
108 [1]    2:23
10824600 [1]       141:25
10th [1]   1:18
11 [4]     34:20    41:21    150:25
    151:2
11's [2]   46:18    46:23
11-5 [1]   36:3
11/1 [1]   75:9
110 [2]    2:23     65:8
11th [1]   9:2      9:3
12/31/02 [1]       165:5
12/31/03 [1]       163:11
1204 [1]   5:9
1204-B [1]         5:17
1216 [1]   4:19
123 [4]    50:11    51:4     51:22
    51:23
13 [2]     22:24    34:20
15 [1]     140:1
16 [1]     140:1
160 [1]    2:17
162 [1]    2:18
1781 [1] 5:3
18 [5]     7:14     82:13    82:15
    140:2  140:3
1966 [2] 10:3      10:9
1985 [1] 7:10
1986 [1] 28:25
1987 [2] 8:10      12:12
1991 [1] 8:11
1992 [2] 15:14     15:15
1993 [4] 38:18     38:19    41:1
    51:25

1999 [3] 5:13      52:2     62:16
1:40 [1]   156:12

**-2-**

2 [2]      2:23     110:23
20 [1]     10:17
200 [1]    154:3
2001 [3] 85:19     86:6     86:8
2002 [6] 1:12      1:19     162:10
    163:7  164:10  165:2
21 [1]     112:16
214 [1]    51:6
2155 [1] 18:16
21st [2]   38:19    128:21
24 [1]     72:13
24th [1]   163:7
25 [4]     77:16    77:16    77:16
    77:18
287 [1]    121:4
287-A [3]          106:23   108:14
    120:16
2900 [2] 163:12    165:6

**-3-**

3 [5]      2:16     50:13    50:14
    65:10  65:10
3.6 [1]    120:15
32 [1]     9:22
34 [1]     9:22
35 [3]     10:1     82:13    82:15
3505 [1] 2:9
36 [1]     10:1
3665 [2] 163:13    165:7
37 [1]     9:24
3:00 [1] 131:24

**-4-**

4 [5]      20:12    27:18    74:17
    74:18  74:19
4/6 [1]    10:3
4/7/99 [1]         43:14
40 [1]     155:18
40,000 [3]         77:12    77:18
    77:19
4008 [1] 18:22
401 [1]    165:5
45 [1]     76:15
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 [1]            142:2
46 [1]     16:15
460 [1]    2:9
4:00 [1] 131:24
4th [1]    15:15

**-5-**

5 [6]      34:17    34:19    74:20
    116:21  120:9   120:10
50,000 [1]         77:19
52 [1]     16:10
544-5126 [2]       163:14   165:8

55 [4]     65:6     65:7     74:16
    135:20
5645 [1] 163:11

**-6-**

6 [5]      10:8     111:8    116:19
    120:5  120:5
6/66 [1] 10:6

**-7-**

7 [2]      34:17    34:19
7's [2]    44:10    46:18
70 [1]     98:3
765 [2]    1:22     2:5
78520 [3]          2:5      163:13
    165:7
78521 [1]          2:10
7:00 [1] 132:1
7th [2]    1:22     2:5

**-8-**

8-CFR [1]          121:20
802 [1]    140:15
83 [1]     18:22

**-9-**

9 [3]      34:20    34:23    150:25
9's [3]    44:9     46:18    71:22
940 [1]    112:24
956 [2]    163:14   165:8
96 [2]     29:3     29:5
90 [1]     29:2

**-A-**

A&M [1]            17:25
Abel [1] 13:8
abilities [1]      71:6
ability [4]        60:2     103:12
    120:20  123:14
able [6]   7:20     62:7     65:9
    74:6   76:10   93:15
above [1]          161:3
above-styled [1]            1:18
absence [1]        59:1
absent [1]         44:24
academic [1]       6:11
academically [1]            6:20
academy [4]        8:7      12:2
    17:23  24:14
accept [1]         141:10
accepted [1]       141:12
access [2]         113:12  131:6
accessed [1]       66:24
accordance [2]     164:22
accredited [1]     6:20
accurate [2]       62:10   97:13
acknowledged [1]            161:16
act [8]    27:17    28:25    45:23
    54:1   70:1    76:15   91:13

120:17
acted [1]          135:5
acting [2]         41:8     44:17
    44:20
action [6]         1:4      128:7
    162:4  163:1   163:3  164:4
activated [1]      113:7
activities [1]     45:9
actual [5]         16:23    82:20
    106:4  138:19  140:13
add [2]    67:17    77:18   147:1
additional [1]     24:23
additionally [1]            148:9
address [2]        11:23    144:8
adequate [1]       14:16
Administration [5]          77:8
    77:9   138:16  138:18  138:18
administrative [4]          75:23
    76:20  77:1    77:6
admonishment [1]            130:12
advanced [2]       35:18   36:21
adverse [1]        128:7
advise [2]         59:20   103:19
advised [1]        133:1
advising [2]       60:20   60:24
Aeronautics [2]             6:16
    7:6
affect [1]         47:7
affix [1] 161:2
afterwards [2]     8:15     13:22
again [17]         8:9      11:11
    11:19  32:19   33:6   33:21
    46:5   58:22   64:5   64:25
    91:34  93:17   103:2  128:1
    130:12  135:9  135:11
against [4]        3:8      53:13
    92:1   133:19
age [2]    20:11
agencies [2]       16:2     51:3
    73:1
agency [6]         25:18    46:22
    47:2   50:23   72:15  72:16
agent [49]         3:18     17:4
    25:25  33:16   37:14  40:14
    41:3   41:8    41:9   41:23
    42:1   42:6    42:8   42:10
    44:6   44:6    44:8   45:6
    45:8   45:16   46:5   46:11
    47:12  50:20   55:3   55:8
    55:19  56:5    56:21  58:6
    59:18  60:18   60:19  60:21
    60:23  60:25   61:19  62:21
    63:3   64:20   65:7   69:2
    72:19  79:24   91:6   91:7
    107:2  127:24  142:24
agent's [1]        60:2
agents [16]        18:6     31:21
    44:9   45:19   48:23  54:11
    55:12  55:16   57:12  60:9
    61:8   64:24   65:17  72:5
    136:1  143:20
ages [2]   82:13    82:15
aggravated [1]     147:7
ago [2]    10:17    17:13

| | | | |
|---|---|---|---|
| 60:9 | 60:18 | 60:25 | 61:8 |
| 61:18 | 63:3 | 64:8 | 69:2 |
| 79:24 | 84:9 | 89:11 | 89:22 |
| 91:6 | 107:1 | 128:17 | 133:1 |
| 142:3 | 142:4 | 142:24 | 143:20 |

**BORSTAR** [1] 36:23
**BORTAC** [1] 36:23
**bought** [2] 51:15 80:17
**Boulevard** [4] 2:9 18:16
163:12 165:6
**bound** [2] 61:13 67:16
**Box** [2] 163:13 165:7
**boxes** [1] 124:24
**Bradley** [4] 20:22 21:5
22:8 22:9
**break** [2] 42:15 108:2
**breath** [1] 147:2
**Brief** [1] 42:17
**Brigadier** [1] 112:24
**bring** [1] 152:18
**brings** [1] 77:19
**broad** [2] 28:10 28:18
**brother** [3] 9:19 9:22
19:9
**brothers** [2] 9:18 22:20
**Brown** [3] 48:19 48:19
48:25
**Brownsville** [48] 1:2
1:23 2:5 2:10 4:15
4:20 5:4 5:13 5:15
6:3 8:4 11:7 11:8
18:23 21:2 38:16 40:13
40:14 42:7 43:1 43:17
44:18 44:19 47:15 47:20
48:5 48:13 48:14 49:14
73:25 75:8 130:16 140:8
140:11 153:8 154:8 154:10
154:15 154:16 154:18 155:4
155:21 157:12 157:19 162:2
163:13 164:2 165:7
**Brunswick** [1] 15:18
**budget** [1] 43:21
**built** [1] 5:18
**bulls** [1] 98:9
**bumped** [1] 34:16
**bunch** [6] 29:12 47:6
98:9 125:18 135:25 136:1
**bunk** [1] 99:15
**bunks** [1] 99:20
**Bureau** [1] 16:4
**business** [3] 56:18 58:6
99:9
**busted** [1] 150:9
**busy** [1] 97:3
**bygones** [2] 136:3 136:3

**calls** [13] 55:17 55:18
58:2 67:11 70:3 101:17
108:20 121:9 125:3 125:25
127:3 149:12 150:2
**camera** [1] 131:6
**Cameron** [6] 8:10 8:11
11:15 12:12 19:16 23:1
**cannot** [6] 114:18 115:10
122:8 125:5 125:11 135:6
**Capacities** [6] 1:6 1:8
162:6 162:8 164:6 164:8
**capacity** [8] 12:20 32:20
83:10 83:25 126:18 144:24
145:13 145:16
**car** [31] 57:23 59:10 59:11
63:3 64:8 80:19 81:11
83:19 84:4 84:4 84:15
84:15 85:2 85:3 86:10
86:13 86:15 86:16 86:18
87:3 87:5 87:18 88:14
92:7 92:11 95:9 95:12
95:15 95:16 95:21 146:1
**card** [3] 130:3 130:11 161:15
**care** [7] 8:4 8:5 22:14
48:20 48:25 49:1 90:21
**career** [6] 23:17 23:20
23:24 25:3 34:22 38:9
**Carl** [2] 39:8 40:18 41:15
**Carl's** [1] 126:9
**Carlos** [1] 13:11
**Carolina** [1] 4:12
**carries** [1] 51:1
**carry** [39] 25:24 48:8
54:5 90:11 90:18 106:20
106:22 107:3 108:17 109:7
109:25 110:4 110:16 111:13
111:17 111:20 112:16 112:18
113:3 113:23 114:11 116:9
120:2 120:6 120:17 120:22
121:6 121:12 121:17 122:1
122:4 122:6 122:7 122:8
122:10 122:12 122:13 122:23
133:4
**carrying** [18] 90:9 96:18
109:4 110:5 111:9 120:1
126:25 127:10 132:13 132:20
133:24 134:8 134:18 134:20
146:5 146:17 147:6 148:2
**cars** [1] 56:2
**case** [6] 78:7 138:13 138:22
138:22 139:1 147:4
**catch** [1] 44:4
**Cathy** [3] 125:14 125:15
125:24
**caught** [1] 93:6
**caused** [3] 68:4 147:16
148:9
**cautioned** [1] 60:6
**cautious** [1] 61:5
**cell** [18] 97:12 97:13 97:17
97:20 97:25 98:2 98:3
98:4 98:7 98:17 98:18
98:21 98:23 99:2 99:10
101:10 104:8 132:18
**center** [3] 16:1 88:16
88:17

**Central** [3] 18:16 163:12
165:6
**certain** [6] 27:10 28:13
32:9 60:14 61:3 124:6
**certainly** [1] 57:22 107:16
**certificate** [5] 2:18 6:8
7:23 152:4 164:24
**certification** [4] 7:17
162:9 163:4 164:12
**Certified** [1] 1:19 162:12
163:7 165:1
**certify** [2] 162:14 162:24
**cetera** [1]
**CFR** [2] 108:5 108:13
**CFR-287** [1] 109:1
**chance** [1] 126:9
**change** [9] 13:13 29:8
29:14 29:16 39:14 39:21
39:21 67:24 160:2
**changed** [5] 29:1 29:6
33:8 44:3 44:6
**changes** [4] 142:15 160:1
164:16 164:17
**changing** [1] 29:4
**character** [3] 67:3 67:23
68:5
**charge** [10] 40:14 41:4
41:9 41:9 127:2 127:8
133:19 133:24 141:8 147:10
**charged** [17] 64:12 126:20
126:23 126:24 127:11 127:12
128:3 132:13 134:3 134:8
140:22 140:25 145:5 147:18
147:24 148:1 148:1
**charging** [1] 132:19
**check** [1] 124:24
**checkpoint** [1] 83:18
**Chica** [1] 2:9
**chief** [2] 13:9 62:21
**child** [6] 20:19 20:21 21:10
21:12 21:14 21:15
**children** [4] 20:5 20:7
68:9 144:12
**Christmas** [1] 16:20
**circumstances** [7] 3:17
60:14 61:3 61:20 61:21
64:21 83:14
**cited** [2] 26:4 116:8
**Civil** [6] 1:4 1:24 162:4
163:5 164:4 164:23
**claim** [12] 52:25 54:8
66:14 102:13 104:25 106:21
129:10 137:2 137:5 143:19
144:23 147:13
**claimed** [1] 101:9
**clarify** [5] 60:16 62:25
72:9 95:6 148:20
**class** [5] 16:8 16:10 44:15
**classes** [1] 26:18
**classifying** [1] 15:6
**classroom** [4] 17:12 17:17
18:9 24:6
**clear** [1] 55:25
**click** [1] 22:7

**clock** [1] 113:10
**close** [5] 43:5 43:16 92:17
94:21 137:9
**closed** [1] 93:9 94:21
**closes** [2] 92:20 92:22
**clothes** [1] 97:6
**cocaine** [2] 138:13 139:4
**Code** [6] 28:20 91:5 91:7
91:11 106:25 121:21
**Codes** [1] 91:11
**coincidental** [1] 137:7
**collateral** [1] 153:24
**college** [7] 5:24 6:2
6:22 17:16 17:19 17:20
34:11
**color** [1] 84:17
**combined** [1] 65:8
**coming** [9] 14:4 15:5
59:21 68:9 83:18 87:22
90:2 90:7 128:20
**comment** [1] 136:12
**commit** [1] 123:16
**committed** [1] 123:17
**commode** [2] 98:24 99:16
102:3
**communicate** [2] 14:13
30:24
**communicated** [1] 67:6
**company** [1] 19:23
**competitive** [1] 35:8
**competitors** [2] 74:8 74:10
**complain** [1] 103:14 104:4
**complained** [1] 52:20
**complaining** [1] 52:5
**complete** [3] 24:24 24:25
31:2
**completed** [2] 113:25 120:13
**complicated** [2] 78:8
78:10
**complied** [1] 163:6
**composure** [1] 148:22
**computerized** [1] 1:21
**concealed** [2] 89:2 123:3
**concept** [3] 103:10 103:11
131:15
**concerned** [3] 83:8 142:10
142:11
**conclusion** [8] 26:13 58:2
59:14 70:3 108:21 123:8
127:4 150:3
**conclusions** [1] 53:3
**conditional** [4] 23:18 23:20
25:3 34:22
**conditioner** [1] 93:8
**conditions** [2] 101:23 102:10
**conduct** [12] 134:1 134:4
134:6 134:9 134:18 134:21
135:1 147:17 147:19 147:25
148:1 148:3
**conferred** [1] 120:16
**confined** [1] 68:16
**Congress** [2] 11:10 29:18

-C-

**C** [4] 2:1 27:8 163:12
165:6
**cage** [10] 68:16 92:17 92:24
93:3 93:6 94:4 94:19
95:2 95:3 98:8
**California** [1] 47:6

GILBERT VS. JIM HOGG COUNTY          Multi-Page™          doors - fin

JOHN ANTHONY GILBERT  6/10/0

| | | | |
|---|---|---|---|
| 92:22 | 92:22 | 93:5 | 93:5 |
| 93:7 | 93:11 | 93:11 | 93:15 |
| 93:22 | 94:3 | 94:19 | 94:20 |
| 94:24 | 95:3 | 95:4 | 95:12 |
| 136:11 | 148:23 | 148:25 | |

**doors** [1]    93:9
**dope** [1] 146:20
**double** [1]    13:10
**down** [10]    4:14    21:3
52:3    71:5    88:2    88:3
88:3    93:3    98:22    104:15
**downstairs** [1]  50:12
**DPS** [1] 72:15
**draw** [1] 94:9
**drawn** [2]    83:1    83:2
**drenched** [1]    154:6
**drive** [4]51:20    80:25    86:15
86:16
**driver's** [11]    88:4    88:9
88:12    88:13    88:21    88:23
92:14    95:12    95:17    141:24
145:24
**driving** [7]    81:1    87:2
87:18    95:22    140:4    141:9
141:16
**drop** [4] 46:12    133:24  135:15
141:8
**dropout** [2]    16:11    16:13
**dropped** [1]    148:3
**dropping** [1]    134:6
**drove** [2]    84:4    84:5
**drug** [6] 60:24    66:13    68:8
138:1    138:16    138:18
**drugs** [6]    144:13  144:13
144:13  144:14  147:5  147:6
**due** [1]    135:4
**duly** [4]  1:17    3:2    109:16
162:16
**during** [23]    13:13    13:15
13:17    14:23    16:19    32:5
38:25    40:4    40:25    63:19
86:11    110:19    111:21  111:23
112:19  113:5    113:23  120:17
122:15  128:1    129:17  146:8
157:1
**duties** [8]    13:24    15:2
37:15    39:20    44:3    44:25
45:2    129:18
**duty** [45]    5:12    31:23
33:3    33:9    34:10    55:16
56:10    56:16    60:18    83:15
83:24    84:3    89:23    90:4
107:3    109:4    109:8    110:1
110:5    110:6    110:16  110:19
111:13  111:18  111:21  111:23
112:19  113:6    113:7    113:8
113:23  120:3    120:6    120:18
121:7    121:12  121:17  122:1
122:3    122:6    122:7    122:8
122:15  122:23  153:24
**DWI** [3] 140:23  140:25  142:19

-E-

**E** [2]    2:1    2:1
**earning** [4]    126:18  144:24

| | |
|---|---|
| 145:13 | 145:15 |

**east** [4]    1:22    2:5    48:20
48:24
**easy** [2] 27:21    77:11
**eat** [1]    85:4
**eating** [1]    87:22
**Educate** [1]    144:12
**effect** [6]    60:2    89:8
90:17    95:25    133:23  136:17
**eight** [5] 17:17    20:18    73:15
77:12    84:10
**eight-hour** [1]    77:21
**Eileen** [3]    2:8    114:5
115:3    115:5    115:24  164:20
**either** [7]    19:11    34:9
34:10    66:1    74:19    93:13
118:12
**El** [3]    73:14    151:17  152:5
**elected** [1]    13:22
**elections** [1]    13:16
**elementary** [1] 144:21
**elements** [2]    123:5    124:4
**eleven** [1]    71:22
**eligible** [1]    71:7
**Elm** [3]    50:11    51:4    51:23
**eloquent** [1]    30:21
**emergency** [8]    36:24    56:24
58:10    58:12    58:17    58:18
59:5    59:23
**employed** [2]    7:21    162:25
**employment** [3]    12:24
24:17    142:16
**empowers** [1]  114:10
**en** [1]    56:17
**enacts** [1]    29:18
**encompass** [2] 48:16    48:16
**end** [6]    45:14    74:15    74:16
81:18    116:2    140:21
**end-of-the-month** [1]    45:8
**enforce** [1]    37:16
**enforcement** [12]    15:9
15:25    18:3    59:4    73:1
89:4    89:9    89:19    120:14
138:2    138:16  138:18
**engine** [2]    78:22    88:7
**engines** [1]    7:19
**English** [1]    31:5
**entail** [1]    25:7
**entailed** [1]    71:9
**entails** [1]    28:14
**enter** [4] 27:3    27:9    34:10
37:19
**entered** [4]    5:12    31:3
33:3    33:9
**enterprise** [1]  66:6
**entrance** [1]    11:3
**entry** [1]37:20
**envelope** [1]  158:10
**environment** [1]    17:12
**equipment** [1]  59:24
**equivalent** [1]  98:8

**Eric** [1]  165:4
**errata** [1]    159:17
**escape** [1]    14:3
**establish** [1]    77:23
**estimated** [1]    97:16
**et** [1]    124:6
**event** [1]    113:13
**everybody** [7]    15:10    33:11
33:13    37:4    37:7    92:1
119:9
**evidence** [7]    52:11    54:16
54:20    54:25    55:9    143:19
145:20
**evolve** [1]    29:9
**evolves** [1]    29:9
**ex** [1]    63:12
**exact** [9]    4:8    70:13
70:20    90:16    95:24    122:25
133:22  136:16  137:14
**exactly** [21]    5:14    8:18
20:25    24:3    29:20    30:23
35:15    40:2    53:11    54:22
56:1    56:4    61:24    88:15
106:12  113:5    119:7    124:2
124:22  152:14  154:25
**exam** [3]    11:3    24:15
31:13
**examination** [4]    3:3
30:18    30:19    162:21
**examined** [1]    32:19
**example** [4]    27:2    29:11
60:16    77:11
**exams** [1]    25:4
**except** [1]    161:3
**exception** [1]    23:2
**excluded** [3]    27:9    153:6
153:9
**exclusionary** [2]    25:9
26:23
**exclusively** [1] 112:17
**Excuse** [2]    114:23  148:24
**executed** [1]    161:16
**exercise** [1]    120:16
**Exhibit** [6]    2:22    110:23
121:11  121:16  121:20  122:1
**EXHIBITS** [1] 2:20
**exists** [1]    61:14
**exit** [1]  158:8
**expenses** [2]    143:7    143:8
**experience** [1]  155:14
**Expiration** [2]  163:11  165:5
**explain** [2]    76:23    93:24
**explosives** [1]  128:4
**expressed** [1]  161:17
**expression** [1]  93:13
**expressway** [2] 18:22    48:24
**extended** [1]    17:7
**extent** [7]    58:2    59:13
67:11    70:2    109:15  123:7
143:23
**extra** [2] 75:18    75:19

-F-

**F** [1]    16:5
**F-350** [1]    80:24
**face** [1] 93:13
**faces** [1] 104:11
**facetious** [1]    25:19
**fact** [17] 44:1    67:17    67:17
68:2    90:13    100:18  101:20
103:14  104:4    105:16  105:19
105:25  106:14  123:20  125:1
132:24  150:14
**facts** [4] 123:22  123:23  124:8
124:18
**factual** [1]    66:22
**fail** [1]    24:16
**fair** [1]    110:8
**Fal** [1]    66:2
**Falfurrias** [3]    48:7    48:8
69:4
**fall** [3]    32:1    91:10    91:11
**familiar** [2]    123:3    158:13
**family** [4]    137:7    137:9
137:19  137:23
**far** [4]    49:2    51:21    83:7
105:2    108:20  136:22  142:9
**Farms** [1]    48:1
**father** [6]    9:7    9:12
9:13    9:14    21:23    22:17
**faxed** [1]    133:10
**FBI** [4]    16:5    91:7    97:11
100:5
**February** [6]    15:15    42:21
43:20    155:24  156:21  156:22
**feces** [2] 98:23    102:3
**federal** [18]    1:24    15:25
18:6    25:18    28:20    50:25
51:2    91:12    106:25  107:7
108:7    109:16  115:13  121:21
124:16  127:24  163:5    164:23
**fellow** [1]    56:21
**felt** [2]    131:16  131:17
**field** [24]    17:14    24:5
34:12    38:25    39:1    39:2
39:4    39:7    39:8    39:17
40:6    40:22    41:20    41:21
41:24    44:10    44:12    45:10
45:11    45:12    45:17    45:19
45:24    46:1
**Fifty** [2] 83:13    136:23
**figure** [2]    76:25    77:11
**file** [6]    43:10    129:21  130:1
147:8    157:10  159:3
**filed** [6] 3:8    52:5    85:8
85:18    86:6    139:22
**fill** [1]    46:12
**filled** [3]    73:21    73:24
130:18
**finally** [2]    91:20    93:15
**financial** [2]    11:20    141:12
**financially** [1]  163:2
**fine** [6]    66:10    66:11    116:5
133:25  135:1    140:20

GILBERT. VS. JIM HOGG COUNTY     Case 1:01-cv-00054    Document 32    Filed in TXSD on 07/01/2002    Page 128 of 137    Multi-Page    highest - language

JHN ANTHONY GILBERT 6/10/02

**highest** [1]   155:18

**himself** [1]   88:10

**hinge** [1]   92:22

**hire** [1]   11:11

**hired** [6]   11:16   12:20   15:15
128:10   128:10   129:1

**hiring** [1]   47:6

**history** [2]   129:5   129:6

**Hogg** [11]
  1:5   3:8
63:16   72:15   138:14   138:19
138:23   143:16   162:5   164:5

**hold** [1]   14:22

**holding** [4]   97:12   97:12
97:20   110:25

**holiday** [1]   75:22

**holidays** [2]   74:25   76:6

**home** [12]   4:24   4:24
4:25   9:15   18:17   18:18
23:6   72:22   85:2   87:18
95:19   136:20

**honest** [2]   10:16   141:2

**hood** [1]   68:14

**hospital** [1]   140:16

**hour** [3]   65:6   65:8   66:5

**hours** [14]   17:17   72:13
77:12   77:14   97:17   107:3
110:19   111:11   111:23   112:10
113:5   113:24   120:18   131:17

**house** [11]   5:18   18:24
51:12   51:13   80:17   84:25
85:1   85:5   95:19   95:20
131:5

**Houston** [1]   47:21

**human** [2]   152:13   152:15

**humans** [1]   152:11

**hunch** [1]   150:18

**hung** [1]   93:2

**hunters** [1]   83:19

**hurt** [1]   149:1

**husband's** [1]   19:20

 

**-I-**

**I-50's** [1]   45:15

**I-E** [1]   19:7

**ID** [3]   142:6   142:9   142:11

**idea** [5]   65:19   82:11   124:10
139:21   153:11

**identify** [3]   27:25   88:10
142:23

**identity** [1]   161:15

**illegally** [1]   146:17

**illicit** [1]   144:13

**imagine** [1]   87:19

**imbedded** [2]   99:1   102:5

**immediate** [4]   13:9   40:4
41:12   113:8

**immediately** [1]   73:13

**immigration** [21]   16:6
25:8   25:22   26:2   26:8
26:19   27:6   27:14   27:17
27:20   28:2   28:3   28:10
28:21   28:23   37:16   90:16

**91:12**   120:12   120:14   120:17

**impact** [2]   29:22   29:22

**imply** [1]   149:7

**importance** [1]   102:21

**improper** [1]   116:12

**improperly** [1]   56:6

**INA** [2]   27:16   28:19

**inappropriate** [1]   56:15

**inappropriately** [1]   63:9
64:19

**incarcerated** [4]   98:5
101:21   133:2   159:6

**incident** [13]   43:6   43:16
62:22   65:22   80:7   129:11
130:21   142:17   142:19   144:25
148:10   153:16   153:18

**incidents** [1]   143:18

**Include** [1]   67:4

**income** [1]   9:13

**increase** [3]   72:6   74:12
75:10

**increases** [1]   71:23

**INDEX** [1]   2:13

**Indicating** [1]   23:15

**individual** [13]   1:6   1:7
58:10   83:3   100:19   123:13
139:5   147:6   159:6   162:6
162:7   164:6   164:7

**individually** [1]   120:19

**individuals** [2]   138:17   143:15

**infirmary** [1]   15:8

**information** [3]   15:4   47:25
66:22

**inhumane** [1]   102:9

**initiates** [1]   17:5

**injury** [1]   131:1

**inmates** [2]   14:2   14:13

**INS** [6]   61:22   107:8   110:3
110:4   111:2   120:24

**inserts** [1]   33:8

**inside** [1]   93:2

**insofar** [2]   61:12   101:17

**inspection** [2]   65:3   65:4

**instance** [4]   1:16   16:19
30:20   71:23

**instead** [2]   77:20   116:21

**instruct** [3]   45:20   118:12
118:13

**instruction** [1]   18:9

**instructions** [1]   42:20

**instructor** [1]   30:25

**instructors** [1]   18:13

**instrument** [1]   161:16

**insurance** [5]   88:9   88:13
88:15   88:18   88:23

**intent** [1]   123:14

**intentional** [1]   145:21

**interested** [1]   163:3

**interests** [1]   37:2

**International** [1]   2:9

**interpret** [3]   122:9   122:9

**122:20**

**interpretation** [2]   121:9
122:16

**interrogatories** [2]   52:9
150:14

**interrupting** [1]   116:4

**intervened** [1]   135:9

**interview** [3]   11:5   11:5
11:9

**intoxicated** [1]   83:18

**Intoxilyzer** [1]   140:24

**investigation** [4]   127:24
128:1   128:2   129:2

**investigators** [1]   16:6

**IRA** [4]   29:3   29:3   29:5
29:5

**IRCA** [1]   28:21

**IRS** [1]   16:7

**Isaac** [14]   1:5   54:4
54:16   87:23   88:24   89:7
90:6   90:13   91:20   93:4
95:23   96:3   162:5   164:5

**Isabel** [3]   40:15   48:17
49:1

**Island** [2]   19:14   20:1

**Islands** [1]   47:11

**issued** [4]   109:16   112:16
112:24   112:25

**itself** [2]   16:22   106:4

 

**-J-**

**J.P** [13]   132:19   133:12
133:16   133:17   134:11   134:23
134:23   135:3   135:10   135:12
135:12   135:18

**jail** [29]   13:1   13:7   14:2
14:4   95:22   95:23   96:5
96:13   96:14   96:17   100:24
101:14   101:22   103:18   104:19
104:25   105:13   106:17   131:4
131:14   131:25   132:6   132:8
132:12   136:6   136:22   158:6
158:13   158:23

**jailer** [1]   13:9

**jails** [1]   105:10

**James** [1]   5:21

**Javier** [1]   64:20

**Jim** [10]   1:5   3:8   63:16
72:15   138:14   138:19   138:23
143:16   162:5   164:5

**jive** [1]   152:6

**job** [10]   8:2   8:9   9:15
17:11   28:14   32:16   118:9
118:16   139:13   156:7

**John** [20]   1:3   1:11
1:15   2:15   3:1   3:6
23:12   54:9   54:10   54:12
54:21   135:20   161:2   161:6
161:13   162:3   162:10   162:15
164:3   164:10

**Johnny** [1]   139:18

**joined** [1]   12:12

**joint** [1]   66:6

**joke** [1]   66:13

**journals** [1]   143:3

**journeyman's** [9]   32:21
33:5   33:15   33:16   33:18
33:24   35:1   35:17   37:4

**Juana** [1]   22:17

**judge** [2]   112:9   141:2

**June** [7]   1:12   1:19   8:17
10:8   162:10   163:7   164:10

**junior** [4]   44:9   68:7
144:20   155:13

**jurisdictional** [1]   47:8

**jury** [3]   22:3   22:8   22:10

**Justice** [1]   142:12

**justification** [3]   56:19
58:9   59:9

**justified** [3]   59:22   105:20
147:14

 

**-K-**

**K-9** [24]   70:12   70:17   71:7
72:5   72:10   72:16   73:6
130:15   142:13   150:15   151:2
151:4   151:10   151:14   151:14
151:15   151:20   153:3   153:7
154:8   154:24   155:9   157:1
157:8

**keep** [6]   31:22   32:16   60:4
60:12   129:8   143:3

**keeps** [1]   29:4

**kept** [3]   91:18   93:14   104:14

**keys** [1]   86:13

**kidding** [1]   159:11

**kids** [2]   125:19   131:23

**kill** [1]   98:10

**kind** [27]   6:7   25:1
30:14   46:12   71:8   71:11
76:23   77:22   80:23   81:21
83:9   83:25   84:4   84:4
84:15   92:17   92:18   93:12
95:17   96:15   112:20   113:2
115:15   129:13   130:20   137:2
142:15

**kinds** [4]   7:1   30:17
35:22   123:22

**knee** [5]   93:3   93:7   131:1
143:12   148:23

**knew** [11]   11:5   17:21
84:3   84:4   88:11   136:25
137:15   137:20   137:22   137:23
142:25

**knowing** [2]   54:4   59:1

**knowledge** [16]   67:12   69:16
69:20   69:24   101:18   105:3
106:9   123:13   128:16   129:7
129:25   130:14   134:3   143:21
134:23   150:4

**known** [2]   128:5   161:13

**knows** [1]   95:20

 

**-L-**

**L.L.P** [1]   2:8

**lands** [1]   27:3

**language** [3]   31:5   31:8
148:24

| | | | |
|---|---|---|---|
| 2:4 56:7 63:7 115:2 | 115:23 116:1 116:5 116:13 | **nickname** [1] 135:22 | 58:1 59:12 62:4 70:2 |
| 116:23 | 116:18 116:20 116:22 117:1 | **night** [2] 74:25 75:22 89:13 | 70:9 79:3 102:1 102:8 |
| **mid** [1] 84:20 | 117:5 117:7 117:11 117:14 | **nights** [4] 75:25 76:6 | 102:16 102:22 103:6 105:1 |
| **might** [8] 12:10 21:7 | 117:18 117:23 118:1 118:3 | 76:7 76:9 | 105:15 109:9 109:18 110:7 |
| 36:15 55:20 98:6 129:25 | 118:6 118:10 118:12 118:15 | **Nine** [1] 42:12 | 114:12 114:14 114:17 115:6 |
| 136:5 148:25 | 118:18 119:5 119:20 119:23 | **Nineties** [1] 84:20 | 115:9 115:22 115:25 116:6 |
| **miles** [3] 65:6 65:8 | 121:11 121:16 121:25 123:11 | **nitty-gritty** [1] 52:4 | 118:9 121:8 121:13 121:19 |
| 154:3 | 125:7 126:2 126:14 127:9 | **nodded** [1] 136:5 | 123:7 125:3 125:25 127:3 |
| **military** [1] 34:11 | 145:9 149:16 150:6 156:11 | **Noe** [1] 141:6 | 145:14 149:12 150:2 |
| **minding** [1] 99:8 | 156:15 159:14 164:20 | **non-duty** [9] 107:3 110:19 | **objections** [1] 117:24 |
| **mine** [1] 81:25 | **multitude** [2] 31:17 83:20 | 111:21 111:23 112:19 113:5 | **obtained** [3] 9:4 66:23 |
| **minute** [2] 42:14 94:23 | **music** [1] 124:14 | 113:24 120:18 122:15 | 133:10 |
| **mirror** [1] 10:11 | **must** [1] 87:17 | **Nonresponsive** [1] 105:23 | **obviously** [4] 11:13 13:11 |
| **misleading** [5] 112:13 114:7 | **Mustang** [2] 84:16 88:16 | **nor** [2] 30:15 162:25 | 60:7 87:17 |
| 114:22 115:15 115:17 | **muster** [1] 64:24 | **Norbert** [2] 80:18 84:6 | **occupied** [1] 44:11 |
| **mitigating** [1] 61:3 | | **Norbert's** [2] 80:19 85:3 | **occupying** [1] 44:22 |
| **mobile** [1] 18:18 | **-N-** | **Norberto** [3] 79:22 80:12 | **occur** [2] 63:18 128:7 |
| **molding** [1] 45:7 | **N** [1] 2:1 | 80:13 | 131:7 140:10 |
| **mom** [3] 9:17 18:19 23:6 | **name** [28] 3:5 13:10 | **north** [6] 4:12 18:22 | **occurred** [4] 66:15 155:1 |
| **moment** [3] 27:12 59:2 | 13:11 17:20 19:2 19:2 | 50:11 51:4 51:23 56:11 | 157:19 163:6 |
| 62:8 | 19:3 19:3 19:20 20:15 | 81:16 81:18 | **off** [34] 15:5 25:1 65:15 |
| **Monarrez** [1] 79:22 | 21:4 21:8 21:19 21:23 | **NOTARY** [1] 161:21 | 82:7 84:3 90:7 94:25 |
| **Monetary-wise** [1] 71:12 | 22:23 23:11 31:2 41:6 | **noted** [1] 161:3 | 95:20 96:21 97:5 97:6 |
| **money** [4] 74:14 75:19 | 68:23 69:10 81:7 100:9 | **nothing** [5] 18:5 63:5 | 97:10 109:4 109:7 110:1 |
| 150:21 150:23 | 100:12 106:13 139:7 144:4 | 96:10 96:11 119:2 | 110:4 110:6 110:16 110:13 |
| **month** [4] 24:15 24:22 | 155:16 161:15 | **notice** [1] 155:24 | 111:18 113:6 120:2 120:6 |
| 43:18 45:15 | **names** [8] 22:4 22:7 | **now** [67] 7:3 12:10 17:12 | 121:7 121:12 121:17 122:1 |
| **months** [19] 7:14 8:15 | 22:16 104:10 104:13 125:10 | 17:19 18:21 21:17 28:4 | 122:2 122:7 122:8 122:23 |
| 8:21 16:19 16:25 17:1 | 125:11 125:13 | 29:2 29:3 29:12 29:21 | 124:24 138:8 143:9 |
| 20:18 24:21 24:23 130:9 | **narcotics** [3] 14:3 37:18 | 30:10 33:25 36:2 37:11 | **offense** [5] 123:6 123:10 |
| 130:10 155:25 155:25 156:4 | 60:20 | 37:15 38:3 40:13 41:10 | 123:16 123:19 124:4 |
| 156:8 156:16 156:17 156:23 | **national** [1] 145:3 | 41:23 41:25 42:1 44:8 | **offer** [1] 10:24 |
| 157:2 | **Nationality** [3] 27:17 91:13 | 45:3 47:9 47:17 48:5 | **offered** [1] 8:2 |
| **mood** [1] 135:14 | 120:17 | 48:18 48:19 49:18 60:4 | **office** [4] 45:13 65:18 |
| **Morales** [1] 80:13 | **nature** [1] 148:22 | 60:15 65:15 65:19 69:4 | 132:23 161:18 |
| **morning** [1] 131:5 | **near** [2] 144:1 144:16 | 70:11 72:10 81:23 89:24 | **officer** [43] 12:23 12:25 |
| **mother** [7] 9:12 9:15 | **necessarily** [3] 40:1 46:25 | 90:22 91:15 91:25 97:3 | 13:4 13:25 14:1 14:17 |
| 11:19 11:21 20:19 20:21 | 151:6 | 104:16 111:12 113:11 116:3 | 14:18 14:25 15:3 18:3 |
| 22:17 | **need** [24] 26:7 26:15 | 116:6 119:25 120:9 120:24 | 38:21 38:22 39:1 39:3 |
| **mother's** [1] 21:23 | 27:8 43:11 45:18 46:2 | 123:2 124:10 125:22 126:16 | 39:8 40:6 40:22 41:20 |
| **motioned** [1] 95:18 | 46:6 47:24 48:9 55:20 | 128:18 143:25 144:18 145:9 | 41:22 44:12 59:4 68:8 |
| **mouth** [1] 104:15 | 92:5 92:8 100:4 103:19 | 145:10 145:14 146:7 150:23 | 89:5 89:9 89:19 91:6 |
| **move** [6] 14:23 38:13 | 105:22 110:13 113:13 123:2 | 150:25 151:2 153:25 159:14 | 91:8 96:16 96:24 97:19 |
| 43:1 43:17 94:20 156:1 | 125:20 125:22 135:24 156:9 | **Nowhere** [1] 4:17 | 100:25 104:16 107:19 111:20 |
| **moved** [14] 4:25 5:1 | 156:13 156:13 | **number** [18] 4:8 46:22 | 112:15 112:18 113:22 114:11 |
| 5:15 5:16 5:19 43:24 | **needed** [2] 8:5 153:5 | 46:23 50:17 82:20 108:13 | 144:1 144:5 144:11 149:19 |
| 43:24 51:22 80:17 80:18 | **needs** [4] 45:17 45:21 | 115:13 115:14 135:21 141:24 | 162:16 |
| 82:2 129:4 144:18 151:13 | 56:21 72:16 | 142:1 142:5 142:6 142:8 | **officers** [2] 96:14 120:13 |
| **moves** [1] 142:14 | **neither** [3] 30:15 122:2 | 142:9 142:11 142:12 159:11 | **offices** [1] 1:22 |
| **Ms** [102] 2:16 3:4 | 162:24 | **numbered** [1] 1:18 | **official** [4] 1:6 1:7 |
| 30:15 30:17 42:16 42:18 | **Nelly** [6] 20:16 20:19 | **numbers** [1] 50:12 | 56:18 58:6 162:6 162:7 |
| 43:14 53:10 53:21 54:7 | 21:17 22:11 22:20 23:8 | **numerous** [3] 3:18 3:19 | 164:6 164:7 |
| 58:11 59:25 61:17 62:12 | **Nelly's** [2] 21:19 22:16 | 146:12 | **often** [1] 129:4 |
| 66:14 67:19 70:7 70:11 | **nephew** [2] 137:11 139:5 | | **oldest** [1] 9:16 |
| 78:9 78:12 79:6 81:6 | **never** [19] 8:8 8:22 | **-O-** | **once** [10] 11:19 58:22 |
| 81:22 85:25 86:3 87:11 | 13:4 36:14 41:13 50:11 | | 64:7 86:9 91:14 104:16 |
| 94:12 101:22 102:2 102:11 | 50:17 79:8 98:13 101:6 | **Oak** [1] 5:3 | 104:16 147:4 149:2 152:4 |
| 102:19 103:3 103:9 105:7 | 132:15 132:15 141:3 142:21 | **oath** [4] 3:24 4:3 4:4 | **one** [53] 4:25 9:19 9:19 |
| 105:18 105:22 105:24 107:18 | 146:7 148:13 148:23 149:5 | 161:14 | 17:8 17:11 20:10 23:2 |
| 107:23 108:1 108:4 108:7 | 149:9 | **object** [15] 26:11 53:1 | 24:7 24:21 26:4 26:24 |
| 108:10 108:25 109:12 109:21 | **new** [4] 16:20 32:25 33:10 | 61:1 61:10 99:24 101:16 | 28:4 28:5 28:8 33:14 |
| 110:11 112:7 112:10 112:12 | 33:12 | 105:22 107:12 108:6 108:19 | 39:18 42:14 45:16 47:19 |
| 114:12 114:15 114:18 114:20 | **next** [8] 8:19 8:19 11:12 | 109:14 114:6 115:7 115:8 | 49:9 50:12 53:8 55:4 |
| 114:23 115:1 115:4 115:7 | 12:1 46:11 92:23 131:5 | 119:3 | 56:17 65:1 65:6 65:7 |
| 115:10 115:16 115:19 115:21 | 154:17 | **objecting** [2] 112:10 112:12 | 66:5 75:15 79:11 82:21 |
| | **nice** [1] 100:21 | **objection** [37] 53:18 53:21 | 87:24 100:12 100:13 103:15 |
| | | | 114:3 114:11 115:13 118:20 |
| | | | 126:16 126:18 128:8 128:25 |

processed [3]      104:24   156:18
156:20
produce [1]        61:15
produced [1]       1:16
professional [1]              135:6
program [8]        7:13     7:15
7:16     10:20    10:22    16:17
16:22    16:23
programs [1]       29:12
progress [1]       60:21
promoted [2]       42:19    47:1
promotion [6]      42:7     42:13
84:14    153:13   153:23   154:8
promotions [1]     142:14
proof [2]          88:9     88:13
proper [1]         118:9
property [1]       51:17
prosecuted [2]     139:3    139:9
prosecution [2]    138:12   138:21
protecting [1]     53:6
protection [2]     94:7     94:15
protocol [1]       46:6
prove [2]          151:19   151:21
proved [1]         161:14
provided [6]       14:1     47:4
48:9     58:6     120:18   159:17
provider [1]       9:14
provision [2]      116:8    116:8
provisions [1]     1:24
pubic [2]          99:1     102:5
public [2]         102:21   161:21
publication [2]    66:18    67:5
Puerto [1]         47:10
pulled [3]         88:1     90:13
135:10
purpose [2]        7:15     7:16
purposes [1]       161:17
pursuant [2]       1:23     163:4
pursuit [2]        61:24    62:9
put [24]           11:11    15:8     15:9
38:2     50:14    70:14    70:24
74:5     74:7     92:6     97:11
97:24    98:1     98:4     98:7
98:17    98:21    99:3     99:5
103:15   118:4    155:3    155:3
158:15
putting [4]        15:6     93:4
98:8     156:6

-Q-

qualifications [2]           34:6
71:2
qualified [2]      70:4     120:19
questioning [2]    107:12   114:6
questionnaire [1]            145:4
questions [10]     2:16     4:3
21:25    50:24    96:9     114:22
115:15   115:17   123:21   126:17
quit [2]           12:16    12:24
quite [2]          5:13     110:18
quiz [1]           7:18

-R-

R [4]      1:22    2:1     2:4
2:4
R-H-O                        39:9
R-H-O-D-E-S [1]              39:10
rabbit [1]         98:8
racket [1]         59:20
radio [3]          55:22    55:24    56:3
raise [2]          71:8     71:9     71:11
ranch [1]          136:2
rate [2]           15:12    16:11
rather [1]         135:7
rating [1]         34:5
re-closed [1]      93:16
reached [1]        93:4
reaction [1]       157:24   157:25
read [19]          31:7     78:15    110:14
112:4    112:14   112:20   113:2
113:20   113:22   114:8    115:23
116:15   116:16   117:2    117:8
118:19   118:23   119:8    161:2
reading [2]        111:22
reads [2]          117:20   118:1
real [2]           78:4     112:5
realize [1]        133:13
really [10]        47:18    48:6
50:17    78:11    83:11    83:23
93:10    99:7     131:18   157:25
rear [1]           92:14
reason [11]        22:2     24:17
26:1     72:10    72:21    78:19
88:5     125:20   138:1    138:11
160:2
reasonable [1]     123:24
reasoned [1]       89:15
reasons [3]        79:11    149:11
164:17
receive [1]        77:15
received [1]       7:23
receiving [1]      11:2     52:9
recently [1]       75:10
Recess [2]         42:17    108:3
reciprocating [1]            7:19
reckless [3]       140:3    141:8
141:16
recognize [4]      89:16    91:5
91:7     110:24
recognized [1]     104:11
record [10]        1:25     3:5
53:6     55:25    107:11   109:25
115:11   117:25   121:20   162:17
red [2]            57:13    150:9
reduced [1]        134:20
refer [6]          27:13    27:19    27:22
111:5    118:23   119:8
referring [4]      108:17   112:21
113:2    124:10
refers [6]         113:25   118:20
119:6    119:9    121:3    121:15
Reform [1]         28:23
refrain [1]        119:18

refusal [1]        140:24
refuse [1]         100:6
refused [1]        140:23
regarding [2]      123:22   143:13
Region [2]         72:3     130:8
Registration [1]             65:3
regular [1]        36:18
regulation [4]     61:14    107:7
108:7    121:21
Regulations [3]    28:20    91:12
106:25
reimburse [1]      130:9
related [3]        22:4     22:11
162:25
relation [2]       155:21   156:25
relationship [1]             81:21
135:23
relative [1]       137:4
rely [1]           55:13
remain [2]         13:13    27:9
remainder [1]      25:2
remained [2]       14:25    86:18
remarried [1]      21:7
remember [35]      10:17    15:12
16:9     40:16    41:5     42:18
62:7     63:24    64:1     64:2
64:10    65:1     73:6     73:22
90:16    95:24    99:15    99:20
100:9    100:12   100:15   105:7
110:11   110:15   125:19   126:8
131:12   135:13   143:1    154:23
157:2    157:3    157:4    157:5
157:6
remembered [1]               88:19
removed [1]        32:4
render [1]         70:4
Renee [3]          1:19     162:12
163:10
renewal [1]        128:1
rented [1]         51:22
repeat [2]         105:9    108:13
report [5]         41:11    49:22
49:25    49:25    96:23
reported [1]       1:21
Reporter [2]       1:20     162:13
Reporter's [2]     2:18     162:9
Reporting [4]      162:22   163:12
164:15   165:6
reports [1]        45:9
reprimanded [1]              128:6
request [3]        36:22    37:25
38:13
requested [1]      61:15
require [1]        113:14
required [3]       77:20    110:10
113:6
requirements [1]             31:19
163:4
requires [2]       59:18    159:5
reside [1]         27:9
residence [1]      5:11
resources [2]      11:20    141:12

refusal [1]        140:24
respect [1]        135:4
responding [8]     55:16    56:20
58:12    58:16    58:18    59:18
60:19    60:21
response [2]       36:24    90:20
136:5
responses [2]      4:4      146:11
responsibilities [2]         25:25
39:24
responsibility [2]           47:18
48:12
rest [1]           107:25
Restaurant [4]     81:10    81:14
85:4     90:7
restrictions [1]             145:23
result [5]         130:20   130:25
140:22   144:24   146:13
results [3]        11:2     11:2
144:12
returned [4]       162:22   164:14
164:16   164:19
reused [1]         67:24
review [1]         156:7
reviewed [1]       62:12
revved [2]         78:22    88:7
Rhodes [6]         39:8     40:3
40:18    41:15    125:16   125:24
Rico [1]           47:10
rid [2]            152:8    152:18
right [78]                   8:13     10:10
12:1     16:24    16:24    21:17
24:11    27:13    28:22    29:12
29:21    30:9     30:11    30:13
31:6     32:6     34:1     38:4
46:2     47:8     48:15    49:12
52:18    53:10    54:5     55:1
55:23    56:25    57:25    58:18
65:15    70:23    71:19    72:2
72:23    73:5     75:2     75:3
75:16    76:21    81:12    82:22
87:18    89:23    90:22    91:15
92:21    92:23    94:8     97:3
102:13   102:17   103:10   103:11
104:17   106:17   109:1    113:8
113:11   114:1    116:3    119:6
121:3    124:3    124:9    124:15
132:14   142:7    145:7    145:12
146:7    146:21   146:21   149:2
149:22   154:24   156:19   158:20
rights [7]         52:6     101:11
101:15   101:24   102:7   104:25
105:14
risks [1]          15:7
roaming [1]        98:18
Robert [2]         23:12    69:10
Robindale [1]      140:15
Rodriguez [2]      40:11    50:7
rolled [1]         88:2     88:3
rollover [1]       94:7     94:15
roof [1]           95:14
room [6]           18:7     97:22    107:25
132:18   134:13   136:10
roommate [2]       63:13    63:14
roommates [1]      80:10
Rosa [5]           50:19    63:11    63:22

112:21  112:23  142:14

**specifically** [9] 54:8   85:13
109:7  110:4  111:12  111:17
113:19  146:16  146:23

**specify** [1]  122:14

**speculate** [1]  63:25

**speculation** [5] 125:4   126:1
132:23  149:13  153:11

**speech** [3]  102:14  103:10
103:11

**speed** [2]  58:15  65:8

**spent** [1]  84:10

**spoke** [2]  133:11  138:17

**spoken** [2]  68:19  85:9

**Squaw** [4]  4:19   5:2
5:9   5:17

**staff** [1] 100:25

**stand** [2]  92:3  92:9

**standard** [3]  46:21  104:20
112:16

**standards** [2]  32:9  105:4

**standing** [3]  91:25  134:12
149:3

**star** [1]  135:21

**start** [4]  8:17  8:19  34:4
96:23

**started** [7]   12:23  38:20
51:21  93:10  95:22  96:9
135:11

**state** [13]   1:20   3:4
32:24  60:10  61:8  115:12
115:14  124:11  124:12  149:18
161:10  161:21  162:13

**statement** [4]  147:23  148:8
148:11  148:16

**statements** [2]  66:23  111:5

**states** [15]   1:1   15:16
27:10  31:3  33:13  47:10
90:15  90:19  91:2  91:4
109:17  145:4  156:6  162:1
164:1

**station** [10]  48:19  48:19
49:2  49:5  49:7  49:9
49:13  49:14  94:14  133:1

**stationed** [1]  38:12

**stations** [1]  49:11

**status** [2]  23:25  30:6

**statute** [6]  27:15  27:23
109:22  121:9  121:14  121:22

**statutes** [5]  26:3  27:13
27:14  28:7  28:16

**statutory** [13]  25:8  25:23
25:23  26:2  26:9  26:16
26:19  26:21  26:25  27:1
27:2  28:1  28:9

**stay** [9]  6:5  24:25  38:13
48:14  51:2  99:11  131:14
135:7  153:2

**stayed** [7]  38:15  39:15
39:16  71:20  84:13  95:8
96:23

**staying** [1]  36:19

**stealth** [1]  61:2

**steel** [1]  92:23

**stenotype** [1]  1:21

**step** [7]  71:22  72:1  74:17
74:18  74:19  75:9  87:3

**Steve** [2]  19:21  20:2

**sticker** [2]  65:2  65:4

**still** [13]  13:23  18:19  28:15
39:13  40:12  41:8  41:17
48:7  54:6  113:6  136:17
139:19  151:5

**Stinson** [3]  12:4  12:5
12:6

**stop** [33] 27:4  27:12  30:5
56:10  56:15  56:19  56:24
57:9  57:25  58:9  59:7
59:11  59:25  60:1  60:1
60:3  60:13  61:19  62:3
63:21  64:22  86:11  89:14
89:15  123:24  123:25  124:5
140:13  140:14  144:19  146:18
149:23  150:9

**stopped** [25]  56:6  56:8
57:13  57:17  63:3  63:10
63:15  63:23  64:6  64:10
64:19  64:25  65:4  65:10
78:18  78:19  79:1  79:12
84:24  87:23  88:5  140:23
143:16  144:2  144:16

**stopping** [2]  55:15  59:10

**stops** [5]  31:16  31:17
83:17  143:18  143:22

**street** [5]  1:23   2:5
51:7  51:8  56:11

**streets** [1]  15:5

**strike** [1]  60:7

**strip-searched** [1]  97:6

**structured** [1]  17:17

**stuck** [1]  95:1

**stuff** [4] 15:10  85:11  96:14
97:14

**subject** [5]  62:22  105:3
109:18  121:23  145:17

**subjects** [1]  15:5

**submit** [4]  71:4  97:10
100:4  130:5

**submitted** [2]  130:7  162:19

**subscribed** [1]  161:16

**subsection** [3]  111:9  112:16
120:15

**subsequent** [1]  11:10

**subsequently** [1]  8:8

**substituting** [1]  44:21

**successfully** [1]  120:13

**such** [5] 31:16  53:23  111:21
113:24  129:2

**suffered** [3]  126:17  144:23
145:12

**suicidal** [1]  15:7

**suing** [2]  67:19  158:3

**Suite** [5] 1:23   2:5   2:9
163:12  165:6

**summer** [1]  36:9

**Sunday** [2]  76:1  76:13

**Sundays** [2]  76:1  76:12

**supe** [1]  45:12

**supervisor** [28]  13:6  13:9
40:4  40:8  40:9  40:11
40:17  40:20  40:23  41:13
41:18  41:24  44:16  44:17
44:25  45:2  45:23  45:25
46:3  46:14  49:18  49:21
49:24  50:6  127:22  129:9
132:11  132:25

**supervisors** [4] 45:13  46:19
46:23  157:18

**supervisory** [4] 41:23  45:7
46:11  127:21

**support** [1]  144:23

**supposed** [3]  4:4  44:4
106:15

**supposedly** [1] 99:11

**surprised** [1]  96:15

**SWAT** [1]  36:24

**sworn** [3]  1:17   3:2
162:16

**system** [1]  51:2

— **-T-**

**takes** [6] 48:19  48:25  155:24
156:4  156:8  156:16

**taking** [3]  95:23  144:13
149:11

**talks** [1] 109:3

**tangible** [1]  150:16

**task** [3]  138:20  139:17  139:20

**taught** [1]  33:6

**TCLEOSE** [1]  159:5

**teachers** [1]  68:9

**team** [2] 47:24  152:13

**teams** [2]  36:24  36:25

**teased** [1]  126:5

**technical** [1]  6:17

**telling** [3]  64:2  91:10
91:18

**tells** [2] 26:8  27:6

**ten** [6]  4:10  128:19  128:20
128:21  129:24  131:17

**ten-hour** [2]  77:21  77:24

**tend** [1] 66:25

**tentative** [1]  10:23

**tentatively** [2]  8:2  36:12

**tenure** [2]  13:18  63:19

**test** [5]  32:15  46:4  46:8
46:10  151:15

**testified** [2]  3:2  4:6

**testify** [1]  125:21

**testimony** [4]  3:21  3:21
144:15  162:17

**testing** [1]  28:24

**tests** [2] 32:6  32:19

**Texas** [48]   1:1   1:5
1:20   1:23   2:5   2:10
4:20   6:2   6:13   7:8
8:13  10:13  10:14  17:25
18:23  25:15  25:17  25:19
33:12  37:24  37:25  51:7
63:16  67:12  73:15  90:22
90:22  90:23  90:25  91:5

**specifically** [9] 54:8   85:13
91:7  91:8  91:11  91:15
91:16  91:16  107:19  123:3
149:18  162:1  162:5  162:13
163:11  163:13  164:1  164:5
165:5  165:7

**Thank** [1]   159:15

**Thanksgiving** [1]  16:20

**theirs** [1]  54:24

**therefor** [1]  164:18

**therefore** [1]  113:12

**therein** [1]  161:17

**thinking** [3]  10:6  89:12
129:24

**third** [2] 33:20  68:19

**thought** [3]  89:8  94:23
108:11

**thousands** [1]  156:5

**three** [15]   17:14  23:16
23:17  23:21  23:24  24:5
25:6  32:5  32:18  33:20
34:21  38:25  39:5  65:20
143:15

**through** [9]   10:22  17:13
43:21  59:23  62:9  62:9
73:4  95:15  161:14

**throughout** [2]  39:16  156:6

**ticket** [2]  92:7  140:18

**ticketed** [1]  65:11

**times** [14]   3:19   4:6
4:13  29:8  64:6  80:15
80:16  83:12  85:9  85:12
97:16  104:3  113:13  135:24

**title** [2]  37:12  146:2

**today** [5]   3:7  43:17
58:20  61:18  62:14

**together** [5]   52:24  53:16
54:8  54:17  55:7  135:25
136:1

**toilet** [1]  99:17

**tone** [2]  119:3  119:21

**too** [4]  27:13  51:21  81:3
117:14

**took** [19] 8:23  40:16  44:24
95:20  96:21  97:5  97:6
97:21  106:13  106:14  123:20
130:8  130:10  131:5  132:17
132:18  136:9  136:9  142:21

**top** [3]  36:19  40:21  65:15

**Torres** [1]  139:18

**tort** [2]  67:12  101:18

**totally** [1]  26:4

**totem** [1]  155:7

**towards** [2]  69:23  119:4

**town** [6] 19:11  19:15  68:11
81:18  82:16  82:16

**towns** [1]  48:15

**track** [1] 21:2

**traffic** [21]   55:19  55:22
55:23  55:24  56:3  57:14
57:20  57:24  58:8  60:10
61:9  62:1  63:4  83:17
89:14  89:15  143:18  143:22
149:18  149:23  149:23

**trafficking** [1]  60:21

## -Y-

**yards** [1]    136:23

**Ybanez** [12]    1:7    53:13
54:16    55:2    55:6    66:25
67:8    68:19    69:11    69:21
162:7    164:7

**year** [26] 5:7    5:22    8:25
9:2    9:3    11:13    16:18
17:11    23:13    23:14    23:21
24:7    24:8    32:19    33:20
34:8    39:15    39:18    39:20
71:15    71:16    72:6    75:15
84:19    86:8    128:21

**year's** [2]    16:20    34:15

**yearly** [1]    32:15

**years** [24]    10:17    11:12
12:19    17:13    23:16    23:17
23:21    23:24    25:3    33:20
33:25    34:21    51:20    52:1
52:2    65:20    83:23    84:10
127:25    128:19    128:20    128:22
128:24    129:3

**yell** [3]    93:8    114:24    115:1

**yellow** [1]    136:7

**yells** [1] 77:4

**yet** [4]    29:6    121:25    127:17
142:18

**you-all** [2]    148:13    149:8

**younger** [3]    9:19    9:19
9:21

**yourself** [2]    77:23    142:23

Texas Commission on Jail Standards

CERTIFICATE OF COMPLIANCE

This is to certify that the

# JIM HOGG COUNTY JAIL

Has Been Duly Inspected On

## April 6, 1999

and Has Been Found That Date

**To Be In Compliance With**

The Minimum Jail Standards of the Texas Commission on Jail Standards

Under Authority of
Government Code,
Chapter 511

INSPECTOR



EXECUTIVE DIRECTOR



EXHIBIT
F

# TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**

Jack E. Crump



P.O. Box 12985
Austin, Texas 78711
Voice: 512/463-5505
Fax: 512/463-3185
tcjs@mail.capnet.state.tx.us

May 3, 1999

Sheriff Gilberto Ybanez
Sheriff, Jim Hogg County
211 E. Galbraith
Hebbronville, TX  78361-3404

Dear Sheriff Ybanez:

I have just signed a Certificate of Compliance attesting to your jail's compliance with Texas Minimum Jail Standards.

Congratulations! This accomplishment demonstrates superior day to day management and interest on your part.

The citizens of your county should be as proud of you as is the Jail Commission.

Sincerely,

Jack E. Crump
Executive Director

JEC:lvl

cc:    Judge Agapito Molina, Jr., Jim Hogg County
       Inspector Shannon Herklotz

---

Judge Larry T. Craig, Chairman        Comm. J.D. Johnson, Vice-Chairman        Sheriff Terry G. Box, McKinney
Patrick O. Keel, Austin                Manuel Rivera, M.D., El Paso             Sheriff Carmella Jones, Claude
C.O. Hadnot, Hillister                                                          Marcia Saunders, Lake Kiowa

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN GILBERT | § | CIVIL ACTION NO. B-01-054 |
| | § | |
| VS. | § | |
| | § | |
| JIM HOGG COUNTY, TEXAS, | § | |
| ISAAC BOLCH, in his Individual | § | JURY DEMANDED |
| and Official Capacities, and | § | |
| GILBERT YBANEZ, in his | § | |
| Individual and Official Capacities | § | |

## AFFIDAVIT OF ISAAC BOLCH

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned, on this day appeared Isaac Bolch, who is personally known to me, and who, after being duly sworn, according to law upon his oath deposed and said the following:

1.  "My name is Isaac Bolch, I am over 21 years of age, of sound mind, and capable of making this Affidavit. The facts stated herein are true and correct and within my personal knowledge.

2.  I was employed by the Jim Hogg County Sheriff's Department as a deputy at all times relevant to this lawsuit.

3.  I stopped and arrested John Gilbert while I was working as a sheriff's deputy. I had probable cause to stop Mr. Gilbert because I saw that the car which he was driving did not have a front license plate, and I also saw that his front seat passenger was not wearing a seat belt, which are violations of Texas law. Additionally, as the Mustang GT which Mr. Gilbert was driving passed me, I could hear that Mr. Gilbert did not control the muffler noise of the car, which is also a violation of Texas law. Based on these observations and I determined that I had probable cause to stop Mr. Gilbert.

4.  I did not recognize Mr. Gilbert when I pulled him over. Mr. Gilbert told me that he had a gun on the back seat of the car. I immediately asked him to exit the car. I



EXHIBIT
G
ALL-STATE LEGAL®

asked him why he had the gun, and he told me that he was a Border Patrol agent. It was then that Mr. Gilbert reminded me that we had once met very briefly at a Maverick Market convenience store.

5.     I asked Mr. Gilbert a series of questions in order to determine whether he fit under an exemption to Texas state law which prohibits unlawfully carrying a weapon. His answers established that he did not fit into any of the exemptions provided by Texas law.  These answers included that he was not a certified peace officer, he was not traveling, and that he was not working, or going to or coming from his employment as a Border Patrol officer.

6.     Due to these responses, I determined that Mr. Gilbert was violating Texas state laws prohibiting the unlawful carrying of weapons.

7.     I knew that Border Patrol agents' credentials allowed them to carry a weapon while they were on duty, but I did not know of any law whatsoever that would have allowed Mr. Gilbert to lawfully carry a concealed weapon while off-duty.

8.     I felt that Mr. Gilbert's stance and gestures were aggressive, as was the tone of voice which he used towards me.  I asked him to relax because, in my opinion, he was becoming irate.

9.     Mr. Gilbert also used profanity while responding to me, including using the word "shit."  Based on my knowledge and experience, I determined that this was disorderly conduct, based on the location we were at, in front of the elementary school.

10.    I arrested Mr. Gilbert for breaking Texas law through disorderly conduct and by unlawfully carrying a weapon, although I could have arrested him for the traffic violation as well.  I did not arrest him for any reason other than his violations of the law.

11. I remained calm and professional throughout my interaction with Mr. Gilbert. I never lost my temper or acted discourteously towards him.

12. I did not close the police door on Mr. Gilbert's knee. In fact, I told Gilbert to mind his head and his knees before I closed the door. The door did not strike any part of Mr. Gilbert's body.

13. I then transported Mr. Gilbert to the Jim Hogg County jail and released him to their custody. I have neither seen or spoken with Mr. Gilbert since

Further affiant sayeth not.

_Isaac Bolch_

Isaac Bolch

SUBSCRIBED AND SWORN TO BEFORE ME on the _28_ day of _June_ , 2002, to certify which witness my hand and seal of office.

_Shirley E. Greelon_

Notary Public, State of Texas

_SHIRLEY E. GREELON_

Printed or typed name

Comm. Expires: _3/26/06_