

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 2 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOHN GILBERT | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-54 |
| | § | |
| JIM HOGG COUNTY, TEXAS, | § | |
| ISAAC BOLCH, in his Individual | § | JURY DEMANDED |
| and Official Capacities, and | § | |
| GILBERT YBANEZ, in his | § | |
| Individual and Official Capacities | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND MOTION FOR SANCTIONS**

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiff John Gilbert files this response, in which he shows that the Court should deny

Defendants' Motion for Summary Judgment because there are fact issues that necessitate a jury trial.

## I.

### SUMMARY JUDGMENT STANDARDS

Summary judgment is only proper when the pleadings, discovery products on file, and

affidavits show that there are no genuine issues about any material fact and that the movant is

entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986). If there are disputed factual issues, then summary judgment is

improper and a jury must resolve the factual disputes.

## II.

### PLAINTIFF'S VERSION OF THE FACTS

Plaintiff's version of the facts of this case, which is supported by the summary judgment

evidence attached to this response, is as follows:

John Gilbert is a United States Border Patrol agent.   During the times relevant to this lawsuit, he was stationed in Hebbronville, Texas. The United States Border Patrol issued a firearm to him. The United States Border Patrol also informed him that he could carry a firearm both on-duty and off-duty. Further, the INS Administrative Manual's Firearms Policy clearly stated that he could carry a firearm, both on-duty and off-duty. (A copy of the INS Firearms Policy is attached as Exhibit D).

On August 6, 1998, John Gilbert arrested Jose Ybanez, a relative of Sheriff Ybanez, with approximately 13.88 pounds of cocaine and 203 pounds of marijuana.

On April 7, 1999, Gilbert was driving his friend's Mustang GT in Hebbronville, Texas. He was complying with Texas traffic laws while he was driving. The Mustang had a front license plate, and he did not rev his engine or make excessive muffler noise. The passenger in the front seat was not wearing her seatbelt, but the windows of the Mustang were darkly tinted, and no one outside the vehicle could have seen that the passenger was unbelted. Gilbert had his government-issued pistol on the floorboard of the back seat of the vehicle.

Despite the fact that Gilbert was not violating any laws, Defendant Bolch, a Jim Hogg County Sheriff's deputy, pulled him over. Gilbert and Bolch knew each other, and Bolch knew that Gilbert was a Border Patrol agent. Gilbert had backed Bolch up at least 50 times prior to the arrest. (Exhibit A, at 83:9 - 84:5). He had even backed him up on a traffic stop the day before. (Exhibit A, at 89:11-15).

After Bolch pulled him over, Gilbert politely informed Bolch that there was a pistol in the vehicle. (Exhibit A, at 22-25). At that point, Bolch began asking Gilbert questions that appeared to be an attempt to justify arresting him for possessing the U.S. government-issued firearm.  He asked him if he had a concealed handgun permit. (Exhibit A, at 89:1-3).  Gilbert replied that he did

not, but he was a Border Patrol agent. (Exhibit A, at 89:1-22). Bolch then asked Gilbert whether he was on duty, or on his way to or from work. (Exhibit A, at 89:23 - 90:7). Bolch then told Gilbert that he had no authority to carry a weapon, and that he could be arrested for carrying it. (Exhibit A, at 90:9-11). In response, Gilbert told Bolch that he did, in fact, have authority to carry a weapon. Exhibit A, at 90:8-19). He showed Bolch his badge and credentials from the INS, which explicitly stated that he could carry a firearm. (Exhibit A, at 90:8-19). Bolch replied, "Well, I don't care what your authority says. Your're in Texas right now. And as long as you're in Texas, you're going to go by Texas laws." (Exhibit A, at 90:20-23, 91:14-16). Bolch then arrested Gilbert for carrying a firearm. (Exhibit A, at 92; Exhibit G).

Gilbert did not use any profanity during his arrest.[1] Nevertheless, Bolch also charged him with disorderly conduct. (Exhibit G; Exhibit B). Bolch claimed that he did so because Gilbert told him, prior to the arrest, "Y'all never do shit anyways." (Exhibit B, at 75:9-19). However, Gilbert denies that he made that statement. (Exhibit A, at 148:12 - 149:9). Further, as is shown below, such a statement would not constitute disorderly conduct under Texas law.

In arresting Gilbert, Bolch told him to exit the Mustang, turn around, lean up against the car, and place his hands behind his back. (Exhibit A, at 92:10-19). Bolch then handcuffed Gilbert's hands behind his back. (Exhibit F). Bolch then turned Gilbert around and walked him to the police car. (Exhibit A, at 92). Bolch opened the rear door of the police car, and told Gilbert to get in. (Exhibit A, at 92). There was a cage that separated the front seat and rear seat parts of the police car, and that cage had a steel frame that went next to the door. (Exhibit A, at 92-93). It was difficult for Gilbert–with his hands handcuffed behind his back, to get all the way inside the police car. (Exhibit

---

[1]After being arrested, when Bolch slammed the door on his leg and injured his knee, Gilbert may have exclaimed something to the effect of "Open the fucking door." (Exhibit A, at 148:18 - 149:1). However, prior to that point, while he was being arrested, he denies using any profanity. (Exhibit A, at 148:12 - 149:9).

A, at 92-93). His left leg got hung up where the cage came down between his knee. (Exhibit A, at 93:1-11). Bolch then slammed the door, which caught Gilbert's leg between the post of the cage and the door. (Exhibit A, at 93:1-11). Gilbert screamed in pain. (Exhibit A, at 93:1-11). Bolch watched him for a while, and then opened the door, allowed Gilbert to get his foot all of the way in, and then re-closed the door. (Exhibit A, at 93:12-17).

Bolch then drove Gilbert to jail. During the drive, Gilbert asked Bolch, "Isaac, why are you taking me to jail?" (Exhibit A, at 95:21-25). Bolch replied, "You'll see when you get there." (Exhibit A, at 96:1-2). Gilbert then asked, "Isaac, are you sure that's what you want to do? You want to take me to jail?" (Exhibit A, at 96:3-5). Bolch replied, "Oh, I'm more than sure. I've been wanting to do this for a long time." (Exhibit A, at 96:6-7).

After Bolch took Gilbert to the jail, jail personnel photographed and fingerprinted him. (Exhibit A, at 97:9-12). Gilbert asked why he was being fingerprinted. The jailer responded, "We are going to submit them to the FBI." (Exhibit A, at 100:1-5). They then put him in a cell with an unwashed mattress. (Exhibit A, at 97:18 -99:1). There were pubic hairs imbedded in the mattress. (Exhibit A, at 98:24 - 99:1) There was also feces in and around the toilet of the cell. (Exhibit A, at 98:23-24). Worse, he was placed in a cell containing other inmates, some of whom Gilbert had arrested himself. (Exhibit A, at 98:1-14). Gilbert complained to his jailer, "if you put me in this cell, that would be the equivalent of putting a rabbit in a cage with a bunch of pit bulls. I mean, if they find out who I am, they are going to kill me." (Exhibit A, at 98:1-10). The jailer responded, "Well, you know, I'm just following orders. That's what they told me to do." (Exhibit A, at 98:11-14).

Gilbert was incarcerated for a couple of hours. During that time, he endured these horrendous jail conditions, and was in great fear that another inmate would take his life. (Exhibit F). Since his arrest, he has also worried that it will affect his career. He will have to disclose and

explain this arrest on a periodic basis for the rest of his career because the Border Patrol does a periodic review of its agents' records.

## III.

## STATEMENT OF DISPUTED FACTS

Plaintiff has attached evidence that disputes the following facts set out by Defendants in their motion for summary judgment. These factual disputes preclude summary judgment.

- In Paragraph 4 of their Statement of Facts, Defendants state, "Bolch noticed that the Mustang GT driven by Plaintiff lacked a front license plate." Plaintiff disputes this factual assertion, and has attached evidence that the Mustang did in fact have its front license plate. Further, Plaintiff notes that the police report from the day of the arrest does not mention anything about a missing front license plate. Similarly, Bolch did not tell Sheriff Ybanez anything about a missing front license plate. Apparently, Bolch did not tell anyone about a missing front license plate until he was deposed in this case.

- In Paragraph 5 of their Statement of Facts, Defendants state, "As the Mustang came closer to Bolch's patrol car, Bolch was able to see that the front seat passenger accompanying Plaintiff was not wearing a seatbelt." Plaintiff disputes this factual assertion, and has attached evidence showing that the windows on the Mustang GT were too darkly tinted for Bolch to have seen whether or not the passenger was belted.

- In Paragraph 6 of their Statement of Facts, Defendants state, "When the two cars became parallel to another, Bolch heard Plaintiff 'rev' the engine of the Mustang GT." Plaintiff has attached evidence showing that he denies revving the engine.

- In Paragraph 7 of their Statement of Facts, Defendants state, "Bolch determined that he had probable cause to pull Plaintiff over based on the lack of license plate, failure of the front seat passenger to wear a seatbelt and excessive muffler noise." Plaintiff contends that Bolch did not have probable cause to pull him over, and has attached evidence showing that Bolch's preferred reasons for pulling him over were false.

- In Paragraph 10 of their Statement of Facts, Defendants state, "Plaintiff's tone of voice was very confrontational when he spoke to Bolch." Plaintiff denies this assertion, and has attached evidence refuting it.

- In Paragraph 12 of their Statement of Facts, Defendants state, "Bolch immediately asked him where the gun was, to which Plaintiff replied it was on the back seat." Plaintiff disputes this fact and denies that the gun was in the back seat. Plaintiff

testified in his deposition that the gun was on the floorboard in the rear of the vehicle. (Exhibit A, at 88:12-20).

- In Paragraph 13 of their Statement of Facts, Defendants state, "Bolch asked why Plaintiff had the weapon, because Bolch did not recognize Plaintiff." Plaintiff testified in his deposition that he had met Bolch 50 times. (Exhibit A, at 83:9-20), and that he had backed up Bolch on a traffic stop the night before. (Exhibit A, at 89:10-15).

- In Paragraph 15 of their Statement of Facts, Defendants intimate that the only time Bolch had met Plaintiff was a "brief meeting when Plaintiff and other Border Patrol Agents arrived at a convenience store where Bolch and another deputy were located." However, Plaintiff testified in his deposition that he had met Bolch 50 times (Exhibit A, at 83:9-20), and that he had backed up Bolch on a traffic stop the night before. (Exhibit A, at 89:10-15).

- In Paragraph 18 of their Statement of Facts, Defendants state, "Bolch interpreted Plaintiff's mannerisms and words to be aggressive and Plaintiff's stance to be threatening." Plaintiff has attached evidence showing that he did not act in an aggressive or threatening manner toward Bolch.

- In Paragraph 23 of their Statement of Facts, Defendants state that after Bolch informed Plaintiff that he could be arrested for carrying his government-issued firearm, "Plaintiff responded with profane language." However, in his deposition, Plaintiff denied using profanity at any point prior to Bolch slamming the door on his knee. (Exhibit A, at 148:12 - 149:9).

- In Paragraph 25 of their Statement of Facts, Defendants stated, "Bolch escorted Plaintiff to his police car, opened the door, and told Plaintiff to be mindful of his head and legs when getting in the car." In Paragraph 26, they stated, "After Plaintiff was seated, Bolch closed the car door without incident and transported Plaintiff to the county jail." However, Gilbert testified that when Bolch slammed the car door, he caught Gilbert's leg between the door and the post of the cage, injuring Gilbert's knee. (Exhibit A, at 93:1-17).

Additionally, Plaintiff requests that the Court sanction Defendants for including many of these clearly-disputed factual assertions in their Motion for Summary Judgment. Not only had Defendants taken Plaintiff's deposition prior to filing their Motion for Summary Judgment, they even attached a copy of it as Exhibit E. Therefore, there was no excuse for Defendants misleading the Court by suggesting that there were no fact issues as to whether there was a front license plate on the

Mustang, whether Bolch had only met Plaintiff once, whether Bolch used profanity prior to being arrested, and whether Bolch hurt Plaintiff's knee when he slammed the car door. Given that this is the second time in this case that Defendants have engaged in this kind of behavior, (See Defendants' Motion to Dismiss and Plaintiff's response thereto), Plaintiff suggests that a monetary sanction is in order to remind Defendants and their counsel of their obligations under Federal Rule of Civil Procedure 11.

## IV.

### 1983 CLAIMS FOR FALSE ARREST

The Court should not grant summary judgment on Plaintiff's claims under 42 U.S.C. § 1983. Section 1983 provides a cause of action for individuals who have been "deprived of any rights, privileges, or immunities secured by the Constitution and law" of the United States by a person or entity acting under color of state law. 42 U.S.C. § 1983. Under the Fourth and Fourteenth Amendments, Gilbert has a Constitutional right to be free from illegal arrests. This right has been clearly established since at least 1992. *See Duckett v. City of Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992) ("An individual has a federally protected right to be free from unlawful arrest and detention ... and violation of this right may be grounds for suit under 42 U.S.C. § 1983"). To show that an arrest was illegal, Gilbert must show that there was no probable cause for the arrest. *Baker v. McCollan*, 443 U.S. 137, 144-45, 99 S. Ct. 2689, 2694-95, 61 L. Ed. 2d 433 (1979). There is probable cause when the arresting officer "possesses knowledge that would warrant a prudent person's belief that [the suspect] had already committed or was committing a crime." *Id.*

Bolch arrested Gilbert on charges of carrying a firearm in violation of Texas Penal Code § 46.02, and disorderly conduct in violation of Texas Penal Code § 42.01. However, the summary judgment evidence shows that there was no probable cause to arrest Gilbert for either offense.

### A.    Under Federal Law, John Gilbert was Authorized to Carry a Pistol

John Gilbert is a United States Border Patrol Agent. As a Border Patrol Agent, he is authorized by federal law to carry a firearm. 8 U.S.C. § 1357(a) ("an officer or employee of the [INS] may carry a firearm); 8 C.F.R. § 287(f) (Border Patrol agents authorized to carry firearms). Because the language of 8 U.S.C. Section 1357(a) and 8 C.F.R. Section 287(f) do not limit a Border Patrol agent's right to carry a firearm to on-duty hours, it is clear that they give him to right to carry a weapon both on-duty and off-duty. This obvious interpretation of the law is echoed in the INS Administrative Manual's Firearms Policy, which authorizes Border Patrol Agents "to carry firearms, during duty and non-duty hours. . . ." The Firearms Policy, which is a federal regulation, carries the force of law. Therefore, there was no probable cause to arrest John Gilbert for carrying a firearm.

### B.    Gilbert Was Not "Carrying" A Firearm

Texas Penal Code § 42.01 does not criminalize firearm ownership; it merely makes it illegal for certain persons to carry a handgun "on or about his person." Tex. Penal Code § 41.01(a). Texas courts have interpreted the phrase "on or about his person" to mean that the accused must not only own the gun, he must have it "near by, close at hand, convenient of access, and within such distance of the party so that, without materially changing his position, the party could get his hand on it." *Courtney v. State*, 424 S.W.2d 440, 441 (Tex.Crim.App.1968). Basically, the weapon must be within arm's reach. *Contreras v. State*, 853 S.W.2d 694, 696 (Tex. App.–Houston [1ˢᵗ Dist.] 1993).

Gilbert's pistol was not within arm's reach; it was on the floorboard of the rear of the vehicle, immediately behind the driver's seat. (Aff; Depo). Gilbert was seated in the driver's seat. Because he could not have reached the pistol without "materially changing his position," he was not carrying it on or about his person. *Cf. Courtney*, 424 S.W.2d at 441. Given that Bolch could plainly see that the pistol was not within Gilbert's arm's reach, he did not have probable cause to arrest him for

carrying the weapon.

### C.    Bolch Is Not Entitled to Qualified Immunity on the Firearm Issue

Defendant Bolch is not entitled to qualified immunity because he claims to have erroneously believed that Border Patrol Agents could not legally carry firearms during off-duty hours.  Such a belief was objectively unreasonable.

There is a two-prong inquiry to determine whether a Defendant is entitled to qualified immunity.  First, does the evidence show that a constitutional right has been violated.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  If there is evidence of a constitutional violation, the second step is to determine whether the constitutional right was clearly established.  *Id.* at 201.  That is, was the officer's conduct objectively reasonable in light of the legal rules that were clearly established at the time of his actions.  *See Wilson v. Layne*, 526 U.S. 603, 614 (1999).

Bolch's supposed belief that Border Patrol Agents could not carry firearms was not objectively reasonable for several reasons.  First, his alleged belief ignored the clear wording of a federal statute, 8 U.S.C. § 1357(a), and two clearly worded federal regulations–8 C.F.R. § 287(f) and the INS Administrative Manual's Firearms Policy.  All of these legal authorities were in effect years prior to the arrest.  Second, his reasoning was based on his misunderstanding of the Supremacy Clause.  Defendant Bolch testified:

> Q.    But assume that the United States government gives a credential to a Border Patrol Agent saying "Border Patrol agent, you are authorized by the Federal government to carry a gun either on duty or off duty.  That's a United States government credential to the Border Patrol agent.
>
> And then, you have State law.  The Code of Criminal Procedure and the Penal Code to not list a Border Patrol agent as – as a law enforcement agent authorized to carry a firearm while off duty.
>
> If you have those two laws in conflict, which one were you trained to follow?

A.    State law.

Q.    Okay.  And you believed that the State law would trump over Federal law?

A.    Yes.

(Exhibit B, at 19:21 - 20:11).

Third, Defendants' proposed interpretation of the law makes no sense.  Defendants claim that under Texas law, the only persons who can carry a gun or those who are defined as "peace officers" by Texas Code of Criminal Procedure Article 2.12.  However, Article 2.12 only includes officers commissioned by the State of Texas or one of its political subdivisions; it does not include **any** Federal law enforcement officers (on duty or off duty).  Therefore, under this view of the law, not only Border Patrol agents, but FBI, DEA and other Federal law enforcement officers could not legally carry firearms, whether on-duty or off-duty.  Defendants try to avoid this nonsensical interpretation by asserting that a Border Patrol agent can carry a gun while on duty, or while going to and from work.  However, there is no legal authority to support such a view; Defendants made it up from whole cloth.  It is not objectively reasonable to ignore Federal law and instead make up one's own legal regime.

The evidence also shows that Bolch was subjectively acting in bad faith when he arrested Gilbert.  First, Defendant Bolch knew that John Gilbert was a Border Patrol Agent.  Prior to the arrest, John Gilbert had, in his capacity as a Border Patrol Agent, backed up Defendant Bolch 50 times.  (Exhibit A, at 83:9 - 20).  In fact, John Gilbert backed up Defendant Bolch the night before the arrest.  (Exhibit A, at 89:11-17).   Further, before Defendant Bolch arrested him, John Gilbert showed Defendant Bolch his credentials, which plainly showed that the United States government authorized him to "carry firearms."  (Exhibit A, at 90:12-19).  Bolch, showing his disdain for John Gilbert's federal rights, replied, "Well I don't care what your authority says.  You're in Texas right

now. And as long as you're in Texas, you're going to go by Texas law." (Exhibit A, at 90:20-24); 91:14-16).

The fact that Defendant Bolch arrested John Gilbert – who had broken no laws – and did not arrest the passenger in his vehicle – who did violate Texas law by not wearing a seat belt – also shows that he was acting in bad faith. Bolch's subjective bad faith is also evidenced by the fact that during the arrest he told Plaintiff, "I've wanted to do this for a long time." (Exhibit A, at 96:6-7). The truth is that Defendant Bolch had no reason to arrest John Gilbert. John Gilbert did not present a danger to anyone, and was not causing any problems. Further, if Defendant Bolch was really just being a draconian lawman who wanted to make sure he arrested anyone who violated any law, he would have arrested the passenger as well.

**D.       There Was No Probable Cause To Arrest Gilbert for Disorderly Conduct**

Defendant Bolch also arrested John Gilbert on a charge of disorderly conduct. Bolch claims that, during his interrogation of Gilbert, Gilbert told him, "Y'all never do shit anyway." Gilbert testified that he never made that statement. (Exhibit A, at 148:12-17 - 149:9). John Gilbert's testimony that he did not utter the phrase "Y'all never do shit anyway" is sufficient to defeat summary judgment. Defendant Bolch testified that the only way in which Gilbert engaged in disorderly conduct was by using the word "shit." (Exhibit B, at 75:9-19). Because there is a genuine issue of material fact as to whether Gilbert actually used that phrase, summary judgment is improper.

Further, even if Gilbert did utter the phrase, under clearly established law it did not constitute disorderly conduct. Texas law does not criminalize every utterance of profanity; only "fighting words." *Spiller v. City of Texas City*, 130 F.3d 162, 165 (5th Cir. 1997). "Fighting words" are those "likely to cause an average addressee to fight." *Ross v. Texas*, 802 S.W.2d 308, 314 (Tex. App.–Dallas 1990). Telling a police officer to move his "damn truck," or calling a police officer

"estupido" or an "idiot" does not constitute fighting words. *See Spiller*, 130 F.3d at 165 (holding that Plaintiff could maintain a Section 1983 claim for false arrest where he was arrested for telling a police officer to move his "damn truck"); *Duran v. Furr's Supermarkets, Inc.*, 921 S.W.2d 778, 785 (Tex. App.–El Paso 1996, writ denied) (holding that a woman who called a police officer "estupido" or an "idiot" during a parking dispute could not be arrested for disorderly conduct). Further, a police officer should "reasonably be expected to exercise a higher degree of restraint than an average citizen, and thus be less likely to respond belligerently to fighting words." *Spiller*, 130 F.3d at 165, *quoting Lewis v. New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 973, 39 L. Ed. 2d 214 (1974). Therefore, no one could reasonably believe that telling a police officer, "y'all never do shit anyway" would cause an average police officer to fight, and there was no probable cause to arrest Gilbert.

Bolch is also not entitled to qualified immunity for charging Gilbert with disorderly conduct. First, there is summary judgment evidence that Gilbert did not in fact use the word "shit" during the arrest. Given that this alleged utterance was Bolch's only justification for the disorderly conduct, if the jury believes that word was not, in fact, uttered, then there would be no justification whatsoever for charging Gilbert with disorderly conduct.

Further, even if the jury believes that Gilbert did use the word "shit," Bolch still isn't entitled to qualified immunity. As the cases cited above show, the law was clear long before Gilbert's arrest that an officer could not arrest someone for mere profanity that did not rise to the level of fighting words. In fact, the *Spiller* case, decided before Gilbert's arrest, specifically allowed a Section 1983 claim for a similar arrest. Therefore, there is no qualified immunity.

**E.     Municipal Liability**

Failing to train law enforcement officers is the kind of policy, practice, or custom that can

give rise to municipal liability. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (holding that "the failure to provide proper training may fairly be said to represent a policy for which the city may be held liable"); *Brown v. Bryan County, Ok.*, 219 F.3d 450, 457 (5th Cir. 2000) (noting, "It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability"). By the same token, if officers are trained to violate citizens' Constitutional rights, then that training program should also constitute a policy that imposes municipal liability.

In order to impose municipal liability for lack of, or improper, training, Gilbert must show that his rights were violated as a result of a municipal custom or policy of deliberate indifference to his rights. *McClendon v. City of Columbia*, 258 F.3d 432, 442 (5th Cir. 2001). This deliberate indifference can be proven by "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Id.* In other words, Gilbert must show that it is obvious that the failure to train will lead to this particular injury. *Id.*

It is obvious that the training given Jim Hogg County sheriff's deputies will lead to off-duty Border Patrol officers being arrested. There is a large Border Patrol presence in Jim Hogg County. (Exhibit C, at 9:19-21). As a result, Sheriff Ybanez knew that his deputies would end up working with Border Patrol agents. (Exhibit C, at 9:22 - 10:4). Therefore, it is obvious that the deputies would frequently encounter both on-duty and off-duty Border Patrol officers.

As Plaintiff has shown above, Federal law authorizes Border Patrol agents to carry firearms, both on-duty and off-duty. *See* 8 U.S.C. §1357(a); 8 C.F.R. § 287(f); INS Administrative Manual Firearms Policy. However, Jim Hogg County sheriff's deputies were taught that Border Patrol agents could not legally carry weapons when they were off duty. Sheriff Ybanez testified:

Q.    Did you ever give your deputies any training as to whether a Border Patrol agent

could carry a firearm?

A.   Well, they all knew they are not peace officers.

Q.   How do they know that?

A.   The book says they're not peace officers.

Q.   What book says that?

A.   The law book, any book of law enforcement says they are not peace officers.

Q.   Okay.

A.   They carry their weapons on duty.  Off duty it all depends on their boss or whoever is training them how to carry them.  But they're not peace officers.  After duty they're not supposed to be carrying one.

Q.   And was that the official policy of the Jim Hogg County Sheriff's Department, that Border Patrol agents off duty were not allowed to carry firearms?

A.   It's not only Jim Hogg County, but the State of Texas, all of them.

Q.   I'm not asking you about the State of Texas.  I'm asking you just about Jim Hogg County.  That was the policy?

A.   Well, I don't have it written, but they know.

Q.   That was – that's what your deputies were trained to understand?

A.   Well, yes, in a way.

(Exhibit C, at 11:22 - 12:22).  Similarly, Bolch was trained that State law preempted Federal law; therefore, he believed that Texas law trumped Gilbert's right to carry a firearm.  (Exhibit B, at 16:17 - 18:22).  Further, he was never trained that Border Patrol agents could carry firearms off duty; in fact, he was trained that they could not.  (Exhibit B, at at 62:24 - 63:20; 66:6-23).  Bolch testified that his belief that "State law would trump over Federal law" was based on the training he received.  (Bolch Dep 20:9-14; 63:12-23).

Given that Bolch was improperly trained that it was illegal for Border Patrol agents to carry

firearms off duty, combined with the fact that there was a large Border Patrol presence in Jim Hogg County, it was obvious that if Bolch was never given training to teach him that Border Patrol agents could carry weapons he would arrest one sooner or later. This evidence is sufficient to impose failure-to-train liability on Jim Hogg County. *See McClendon*, 258 F.3d at 442.

Similarly, it was obvious that law enforcement officers would encounter profanity (especially while arresting people), and Jim Hogg County is liable for failing to train them that not every utterance of offensive language constitutes disorderly conduct. Bolch testified that he was trained that the use of profanity constituted disorderly conduct if "somebody could be offended." (Exhibit B, at 73:24 - 75:9). This training caused Bolch to erroneously believe that a lot of Constitutionally-protected speech was in fact criminal speech. It is obvious that such training would result in the arrest of innocent (albiet foulmouthed) people. Therefore, this deficient training is sufficient to impose failure-to-train liability on Jim Hogg County. *See McClendon*, 258 F.3d at 442.

## V.

## PLAINTIFF'S JAIL CONDITIONS CLAIM

Counties have an affirmative duty to provide for detainees' basic human needs, such as food, clothing, shelter, medical care, and reasonable safety. *See DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *see also Tesch v. County of Green Lake,* 157 F.3d 465, 472 (7th Cir.1998). The Constitution prohibits counties from punishing detainees by depriving them of their basic needs. "Unlike convicted prisoners whose constitutional protections are primarily based in the Eighth Amendment's prohibition on cruel and unusual punishment, state pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment." *Tesch,* 157 F.3d at 472 (citations omitted). A pretrial detainee's Due Process Clause protections are "at least as great as the Eighth Amendment protections available to

a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Tesch;* 157 F.3d at 473. Thus, courts rely on Eighth Amendment prisoner cases in deciding Fourteenth Amendment detainee cases. A particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose. *Rapier v. Harris,* 172 F.3d 999, 1004 (7th Cir.1999).

The jail conditions set out in the complaint are so deplorable that they constitute impermissible punishment. There was a complete lack of sanitation, which is a health hazard. There were feces in and around the toilet, pubic hairs embedded in the mattress cover, and the mattress had not been washed in a long time. (Exhibit F)  Defendants also failed to segregate Plaintiff; they put him in a cell with detainees he arrested. (Exhibit F). There is no non-punitive government purpose that could even arguably be served by these conditions. These jail conditions are unconstitutional, and the evidence is sufficient to defeat summary judgment.

## VI.

## PLAINTIFF'S EXCESSIVE FORCE CLAIM

Although Defendants' Motion for Summary Judgment does not address Gilbert's excessive force claim, it is discussed here because Defendant asked that Plaintiff's entire suit be dismissed. Plaintiff alleged that Defendant Bolch violated his rights under the Fourth and Fourteenth Amendment to the United States Constitution by slamming a car door on his knee. (First Amended Complaint, at ¶ 5.3). Plaintiff's deposition testimony and affidavit provide evidence that Bolch did, in fact, injure Plaintiff's knee with the car door. (Exhibit A, at 92:10 - 95:4; 148:18 - 149:1; Exhibit F). Plaintiff has produced a photograph of the knee, which clearly shows the bruising caused by the

incident. (Exhibit E). This wholly unnecessary force is sufficient to support a Section 1983 claim. *See Graham v. Connor*, 490 U.S. 386, 395-96, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

## VII.

## PLAINTIFF'S COMMON LAW CLAIMS

### A.    False Imprisonment/False Arrest

The summary judgment evidence is sufficient to support Plaintiff's false imprisonment cause of action. Under Texas law, the elements of false imprisonment are:

1.    The defendant willfully detained the plaintiff;

2.    The detention was without the plaintiff's consent; and

3.    The detention was without legal authority or justification.

*Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). A false arrest is an arrest made without justification or authority of law. *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex. App.–Corpus Christi 1998, pet. denied). An arrest is illegal and unjustified when no probable cause exists showing that Plaintiff committed the crimes for which he was arrested.

Defendant Bolch willfully detained Plaintiff without Plaintiff's consent; he stopped him and arrested him. Further, as is shown above in the discussion of Plaintiff's Section 1983 claims, this arrest was made without probable cause; Plaintiff clearly committed no crimes. Therefore, Bolch committed the torts of false arrest and false imprisonment.

Further, Bolch is not entitled to the defense of official immunity. In order to establish the defense of official immunity, Bolch must show that he acted in good faith, and within the scope of his authority. The test for good faith is "objective legal reasonableness;" which is analogous to the test for qualified immunity under Federal law. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656-57 (Tex. 1994). Although the cases sometimes refer to the doctrine of qualified "good faith"

immunity, the test is one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith–"whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Id.* Bolch's arrest was objectively unreasonable because Federal law clearly permitted Gilbert to carry a firearm, because the firearm was not within Gilbert's reach, and because Gilbert did not engage in any disorderly conduct. *Cf. Kistner v. Pfannstiel*, — S.W.3d —, 2002 WL 384149 (Tex. App.–San Antonio 2002).

**B.    Slamming a Car Door on Gilbert's Knee Constitutes Assault and Negligence**

Defendants do not address Plaintiff's assault and negligence claims in their motion for summary judgment. Therefore, the Court cannot grant a summary judgment on those claims. However, in an abundance of caution, Plaintiff will set out the evidence supporting these claims.

After arresting Gilbert, Defendant Bolch put him in the back of the police car. Gilbert's knee and lower leg were stuck between the door and the post of the cage. Bolch then slammed the door, which caught Gilbert's knee between the post of the cage and the door, injuring Gilbert's knee. (Exhibit A, at 92:10 - 95:4; 148:18 - 149:1; Exhibit F). Plaintiff has produced a photograph of the knee, which clearly shows the bruising caused by the incident. (Exhibit E).

It is negligent to injure a detainee's knee by slamming a door on it. Therefore, the evidence is sufficient to defeat summary judgment on Plaintiff's negligence claim. Further, Bolch's act of slamming the door was intentional and knowing, and it should be considered reckless to slam a car door when someone's leg is in the way. Therefore, there is sufficient evidence to support an assault claim.

**C.    Bolch's Conduct Constituted Intentional Infliction of Emotional Distress**

Under Texas law, the elements of a cause of action for intentional infliction of emotional

distress are that a defendant intentionally or recklessly engaged in extreme and outrageous conduct that causes Plaintiff to suffer severe emotional distress. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999). In this case, the evidence shows that Bolch intentionally arrested Gilbert. This arrest constituted extreme and outrageous conduct because it was illegal. As a result, Gilbert suffered severe emotional distress. (Exhibit F).

**D.      Defamation, Joint Enterprise, and Conspiracy**

Based upon his initial investigation, Plaintiff pled defamation, joint enterprise and conspiracy. However, after completing discovery, Plaintiff realizes that there is not enough evidence to support these theories. Plaintiff therefore abandons his defamation, joint enterprise and conspiracy claims.

## VIII.

## SUMMARY JUDGMENT EVIDENCE

Plaintiff has attached the following exhibits as summary judgment evidence:

Exhibit A - Deposition of John Gilbert

Exhibit B - Deposition of Isaac Bolch

Exhibit C - Deposition of Gilberto Ybanez

Exhibit D - INS Firearms Policy

Exhibit E - Photographs of John Gilbert's Knee

Exhibit F - Affidavit of John Gilbert

Exhibit G - Arrest Report

## IX.

## CONCLUSION

Plaintiff's evidence is sufficient to create factual issues that preclude summary judgment.

Therefore, the Court should deny Defendants' Motion for Summary Judgment and let a jury decide this case.

RESPECTFULLY SUBMITTED,

MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____
Michael R. Cowen
S.D. Tex. ID No. 19967
Texas Bar No. 00795306

## CERTIFICATE OF SERVICE

I, Michael R. Cowen, hereby certify that I have sent a copy of this motion to opposing counsel by facsimile (without exhibits) and regular mail (with exhibits) on this the 28[rd] day of October, 2002.

_____
Michael R. Cowen

# EXHIBIT A

# DEPOSITION OF JOHN GILBERT

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN GILBERT | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-054 |
| | § | |
| JIM HOGG COUNTY, TEXAS, ET AL | § | |

---

CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF JOHN ANTHONY GILBERT

JUNE 10, 2002

---

*PREPARED FOR MR. COWEN BY:*

## SCHWAB COURT REPORTING SERVICE



2900 CENTRAL BOULEVARD, SUITE C
P. O. BOX 3665
BROWNSVILLE, TEXAS 78520

**(956) 544-5126 • FAX (956) 542-8842**



Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                BROWNSVILLE DIVISION

 3  JOHN GILBERT                  )
                                  )
 4  VS.                           )  CIVIL ACTION NO. B-01-054
                                  )
 5  JIM HOGG COUNTY, TEXAS,       )
    ISAAC BOLCH, in his           )
 6  Individual and Official       )
    Capacities, and GILBERT       )
 7  YBANEZ, in his                )
    Individual and Official       )
 8  Capacities                    )

 9

10              ORAL DEPOSITION OF

11            JOHN ANTHONY GILBERT

12               June 10, 2002

13

14

15      ORAL DEPOSITION of JOHN ANTHONY GILBERT,

16  produced as a witness at the instance of the

17  Defendants, and duly sworn, was taken in the

18  above-styled and numbered cause on the 10th day of

19  June, 2002 before Renee W. Crouch, Certified

20  Shorthand Reporter in and for the State of Texas,

21  reported by computerized stenotype machine, at the

22  offices of Michael R. Cowen, P.C., 765 East 7th

23  Street, Suite A, Brownsville, Texas, pursuant to the

24  Federal Rules of Civil Procedure and the provisions

25  stated on the record or attached hereto.
```

Page 2

```
 1        A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFF:

 4      Michael R. Cowen
        MICHAEL R. COWEN, P.C.
 5      765 East 7th Street, Suite A
        Brownsville, Texas  78520
 6

 7  FOR THE DEFENDANTS:

 8      Eileen M. Leeds
        WILLETTE & GUERRA, L.L.P.
 9      International Plaza
        3505 Boca Chica Boulevard, Suite 460
10      Brownsville, Texas  78521

11

12

13

14              INDEX

15

16  JOHN ANTHONY GILBERT

17  Questions by Ms. Leeds..........................3

18  Witness' Signature Page/Corrections...........160

19  Reporter's Certificate........................162

20

21

22
```

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Copy of CRF | 108 |
| No. 2 | Firearms Policy | 110 |

Page 3

```
 1          JOHN ANTHONY GILBERT,
```
2  having been first duly sworn, testified as follows:

3              EXAMINATION

4      Q  (BY MS. LEEDS)  Would you please state

5  your name for the record.

6      A  John Anthony Gilbert.

7      Q  Mr. Gilbert, we are here today for a

8  lawsuit that you have filed against Jim Hogg County,

9  correct?

10      A  Yes, ma'am.

11      Q  Have you been deposed before?

12      A  In this particular --

13      Q  No, just any deposition.

14      A  Ever?

15      Q  Yes.

16      A  Yes, ma'am.

17      Q  Okay.  Under what circumstances?

18      A  Numerous ones.  I'm a border patrol agent,

19  so I've gone -- I've been deposed numerous times.

20      Q  Okay.  I'm not talking about court

21  testimony.  Are you talking about court testimony?

22      A  Like depose me as the defendant's

23  attorneys come talk to me.

24      Q  Under oath?

25      A  Yes.

Page 4

1      Q  Okay.  So you have been in this situation

2  before where there have been attorneys that ask you

3  questions and you have been placed under oath and

4  those responses are supposed to be given under oath?

5      A  Yes, ma'am.

6      Q  Okay.  How many times have you testified

7  in a court of law?

8      A  I couldn't give you an exact number.

9      Q  More or less.

10      A  Ten.

11      Q  Okay.  Where have these been?

12      A  Laredo.  Wilmington.  North Carolina.

13  Corpus, I believe, a couple of times.

14      Q  Okay.  What about down here in the Valley?

15      A  In Brownsville?  No, ma'am.

16      Q  McAllen?

17      A  No, ma'am.  Nowhere in the lower Valley.

18      Q  Okay.  Where do you currently live?

19      A  I currently live at 1216 Squaw Valley.

20  And that is in Brownsville, Texas.

21      Q  How long have you lived there?

22      A  Oh, two weeks.

23      Q  Okay.

24      A  I just sold my home.  I sold my home.  And

25  I also own that home as well.  So I moved out of one

Page 5

1  and moved into the other.
2  Q  Where did you live before Squaw Valley?
3  A  1781 Royal Oak.
4  Q  Brownsville?
5  A  Yes, ma'am.
6  Q  How long did you live there?
7  A  A little over a year.
8  Q  And prior to that where did you live?
9  A  1204 Squaw Valley.
10 Q  Okay.  And how long did you live at that
11 residence?
12 A  From the time I entered on duty here in
13 Brownsville.  I think it was 1999.  I'm not quite
14 sure exactly, but it was -- I know it was '99.
15 Q  When you moved to Brownsville, that's
16 where you moved?
17 A  It was 1204-B Squaw Valley, yeah.  And
18 then from there, I built my house and I sold it, and
19 then I moved into this location.
20 Q  Okay.  Where did you go to high school?
21 A  James Pace High.
22 Q  And what year did you graduate?
23 A  '84.
24 Q  Okay.  Did you go to college after that?
25 A  Yes.

Page 6

1  Q  Where?
2  A  Texas Southmost College.
3  Q  In Brownsville?
4  A  Yes, ma'am.
5  Q  How long did you stay there?
6  A  A couple of semesters.
7  Q  Did you get any kind of degree or
8  certificate while you were there?
9  A  No, ma'am.
10 Q  Okay.  Have you had any other formal
11 academic training --
12 A  Yes, ma'am.
13 Q  -- after Texas Southmost?
14 A  Yes, ma'am.
15 Q  What has that been?
16 A  Hallmark Aviation of Aeronautics.
17 Q  Okay.  That's a technical training, is it
18 not?
19 A  But it's formal training and it's
20 academically accredited to other schools.
21 Q  But, I mean, you know, like a liberal arts
22 college --
23 A  No, ma'am.
24 Q  -- university --
25 A  No, ma'am.

Page 7

1  Q  -- those kinds of things?
2  A  No, ma'am.
3  Q  Okay.  Now the question is:  What other
4  formal training have you had?  The Hallmark
5  Aviation --
6  A  School of Aeronautics.
7  Q  Where is that located?
8  A  San Antonio, Texas.
9  Q  And when did you go there?
10 A  1985.
11 Q  Until when?
12 A  '86.
13 Q  Okay.  And how long is that program?
14 A  It was 18 months.
15 Q  What is the purpose of the program?
16 A  The purpose of the program is to get your
17 certification and license in air frame and power
18 plant mechanics, turban and rotary, and
19 reciprocating engines on aircrafts, fixed wing.
20 Q  Is that to become -- to be able to be
21 employed in aircraft maintenance?
22 A  That is correct.
23 Q  Okay.  And you received a certificate from
24 that school?
25 A  No, ma'am, I didn't.

Page 8

1  Q  What happened?
2  A  I was tentatively offered a job with the
3  Border Patrol, so I went ahead and got out of the
4  school, came back to Brownsville to take care of
5  some of the things that I needed to take care of
6  before I was going to leave to the Border Patrol
7  Academy.
8  And then subsequently I never got
9  called again.  So I got another job working with the
10 Cameron County Sheriff's Department from 1987 to
11 1991, I believe, and I worked for Cameron County.
12 Q  Okay.  Hang on.  Let's back up a little
13 bit.  Did you go to Texas Southmost right after you
14 graduated from Pace?
15 A  Several months afterwards.
16 Q  Okay.  I'm not talking, you know, like you
17 graduate in May and you start in June.
18 A  Exactly.
19 Q  Did you start the next August, that next
20 semester?
21 A  No.  It was, as I said before, six months
22 after.  Also, I never graduated from high school.  I
23 took my GED.
24 Q  Okay.  When did you leave high school?
25 What year did you -- or what grade did you leave

Page 9

1 high school?
2   A My 11th year.
3   Q You left high school in your 11th year,
4 but you obtained your GED in '84?
5   A Yes.
6   Q Okay. Why did you leave high school?
7   A My father passed away.
8   Q Okay. And ...
9   A And what?
10   Q I mean, why did that cause you to leave
11 high school?
12   A Well, because my mother and father were on
13 a fixed income at that time. And when my father
14 passed away -- my father was the sole provider of
15 the home, so my mother had to get a job. And being
16 that I was the oldest, I went ahead and got out of
17 school to help my mom with all the --
18   Q How many brothers and sisters do you have?
19   A I have one younger brother and one younger
20 sister.
21   Q How much younger?
22   A My sister is 34, and my brother is 32.
23   Q And you are? What's your date of birth?
24   A 37, I believe. '66.
25   Q Okay.

Page 10

1   A 35 -- 36.
2   Q What's your date of birth?
3   A 4/6 of 1966.
4   Q Okay.
5   A '66, '76, '86, '96.
6   Q No. I'm thinking. 6/66?
7   A Oh, no. I know. People look at that, and
8 they're like, "Wow." At least it's not June 6,
9 1966. Then we would --
10   Q Right.
11   A I would have to look in the mirror to see
12 if I didn't have any marks on my head.
13   Q Okay. So we go to Texas Southmost. Did
14 you have some time in between Texas Southmost and
15 Hallmark?
16   A To be honest with you, ma'am, I can't
17 remember that. It was 20 years ago.
18   Q Okay. What about -- in Hallmark -- you
19 said you left Hallmark -- how much time did you have
20 to go in the Hallmark program?
21   A I would say I was more than halfway
22 through the program.
23   Q Okay. And you said you got a tentative
24 offer?
25   A I had applied with the Border Patrol. And

Page 11

1 after I applied with the Border Patrol, I got my
2 results back. Upon receiving my results, I passed
3 the entrance exam.
4       So then I was waiting for the
5 interview process. And I knew that the interview
6 was going to take place in the original location
7 where I had applied, which was back in Brownsville.
8 So I came back to Brownsville waiting for the oral
9 interview.
10       And then subsequent to that, Congress
11 had put a freeze, so they didn't hire again for like
12 the next four or five years. So in that four or
13 five year time span, I went -- you know, obviously I
14 couldn't wait, so I went ahead and applied with the
15 Cameron County Sheriff's Department, and then I was
16 hired.
17   Q Why didn't you go back and finish
18 Hallmark?
19   A Once again, my mother, you know, she
20 didn't have the financial resources, so I decided to
21 come back and help my mother.
22   Q Where is the Hallmark school?
23   A I couldn't tell you the physical address.
24 I know it's on the southwest side of San Antonio.
25   Q San Antonio?

Page 12

1   A Actually, it's right next to the
2 San Antonio Police Department Academy.
3   Q Okay.
4   A Stinson Airfield.
5   Q Stinson?
6   A I think it's Stinson, S-T-I --
7   Q S-T-I?
8   A I believe.
9   Q Okay.
10   A Back then. It might not be there now.
11   Q No. I understand. You think it was
12 around 1987 that you joined the Cameron County
13 Sheriff's Department?
14   A More or less.
15   Q Okay.
16   A I know it was '92 when I quit.
17   Q When you left? Okay.
18   A And I was there for about four to five
19 years, so it was about that time span.
20   Q Okay. In what capacity were you hired?
21   A As -- with the Sheriff's Department?
22   Q Yes.
23   A I started out as a detention officer. And
24 by the time I quit my employment with them, I had
25 worked up to a booking officer.

**Page 13**

1 Q So you were associated with the jail the
2 whole time?
3 A Yes, ma'am.
4 Q Okay. You never became a peace officer?
5 A No, ma'am.
6 Q Who was your supervisor while you were at
7 the jail?
8 A Abel Garcia was my first line -- or my
9 immediate supervisor. The chief jailer was -- last
10 name was Masso, M-A double S-O. I believe his first
11 name was Carlos Masso. And obviously the sheriff at
12 that time was Alex Perez.
13 Q Did you remain during a change in sheriff?
14 In other words --
15 A No, no. I was there only during his
16 course of the elections.
17 Q So you weren't there during Lucio's
18 tenure?
19 A No, ma'am.
20 Q Okay.
21 A I got there just about the time the
22 sheriff was elected, and then I left afterwards and
23 he was still there.
24 Q Okay. What were your duties as a
25 detention officer?

**Page 14**

1 A As a detention officer? Provided security
2 in the jail, made sure that the inmates didn't
3 escape, made sure there was no narcotics or any type
4 of contraband coming in or going out of the jail.
5 Q Are you fluent in Spanish?
6 A Fluent?
7 Q Do you speak Spanish?
8 A Yes.
9 Q Okay.
10 A Yes, I do.
11 Q You get by?
12 A Yes, ma'am.
13 Q So you could communicate with the inmates?
14 A Oh, yes, ma'am.
15 Q Okay.
16 A I'm adequate.
17 Q Is booking officer a higher position than
18 a detention officer?
19 A Yes, it is.
20 Q Okay. Why?
21 A Pay.
22 Q All right. Did you hold any other
23 positions during your move to booking?
24 A I went from booking -- or from the
25 detention officer to booking, and then I remained at

**Page 15**

1 booking.
2 Q Okay. What are your duties as a booking
3 officer?
4 A Process all the biographical information
5 on subjects that are coming off the streets,
6 classifying them, putting them in different
7 locations. If they are suicidal risks, you know,
8 you put them in the infirmary. If they are law
9 enforcement, you know, you don't want to put them in
10 the general population with everybody else, so stuff
11 like that.
12 Q Do you remember what your rate of pay was?
13 A Oh, no, ma'am.
14 Q Okay. So what happens in 1992?
15 A February 4th of 1992, I am hired with the
16 United States Border Patrol.
17 Q Okay. And where do you go?
18 A Brunswick, Georgia. Glynco, Georgia.
19 Q Glen or Glan?
20 A It's G-L-A-N-Y-C-O -- G-L-Y-N-C-O. I'm
21 sorry.
22 Q Okay. Georgia?
23 A Yes, ma'am.
24 Q Okay. What is there?
25 A The Federal Law Enforcement Training

**Page 16**

1 Center.
2 Q And what agencies train their people
3 there?
4 A Border Patrol, Bureau of Prisons, U.S.
5 Marshals, Secret Service, F -- no, not the FBI.
6 Social Security investigators, Customs, Immigration,
7 IRS. I'm sure there's more. I couldn't tell you.
8 Q Okay. How big was your class? Do you
9 know? Do you remember?
10 A My class? 52.
11 Q Do you know what the dropout rate is,
12 approximately?
13 A The dropout --
14 Q How many people graduated?
15 A I want to say there was 46 of us that
16 graduated.
17 Q Okay. How long is the program?
18 A Five -- it just depends what time of year.
19 For instance, if it's during the winter months,
20 Christmas, Thanksgiving, New Year's, then you're
21 there a lot longer than you would be if it was --
22 Q Well, the program itself --
23 A The actual program --
24 Q -- is going to be the same, right?
25 A Yes, five and a half months.

SCHWAB COURT REPORTING SERVICE (956) 544-5126

**Page 17**

1 Q Five and a half months?
2 A (Nodding)
3 Q And is that where you get your formal
4 training to become a border patrol agent?
5 A Yes, ma'am. That's where it initiates.
6 Q Is there any other school like that that
7 you have to go to for an extended period of time
8 after you graduate from this one?
9 A Yes, ma'am.
10 Q What's that?
11 A It's on the job for one year. You are in
12 a classroom environment -- I don't know now, but
13 when I came through 10 years ago, it was -- I
14 believe it was three days in the field, and then
15 your two days, you'd go -- we would go to the
16 university or to the college in Laredo and we would
17 have two classroom days, eight hours structured on
18 both days.
19 Q Okay. Now, you say the college in Laredo.
20 What's the name of that college?
21 A I knew you were going to ask me that.
22 Laredo --
23 Q It's associated with the police academy,
24 is it not?
25 A Yes. It's like Texas A&M -- it's got this

**Page 18**

1 big long --
2 Q But there's a particular school in Laredo
3 that is for law enforcement, peace officer type
4 training?
5 A Yes. But our training had nothing to do
6 with that. We had our own federal agents -- they
7 just pretty much lent us a room at the university.
8 Q Oh, okay.
9 A And we had our classroom instruction
10 there.
11 Q Okay. So you were being trained by border
12 patrol people?
13 A Yes, ma'am, by instructors.
14 Q Okay. Where did you live when you were in
15 high school?
16 A At 2155 Central Boulevard.
17 Q Is that a home or an apartment?
18 A At the time it was a mobile home park.
19 Q Is your mom still alive?
20 A Yes, she is.
21 Q Where does she live now?
22 A She lives at 4008 North Expressway 83 in
23 Brownsville, Texas.
24 Q Is that a house?
25 A Yes.

**Page 19**

1 Q And where is your -- what's your sister's
2 last name? What's your sister's name?
3 A Her married name or -- her married name is
4 Sherrie Gomez.
5 Q With an "S," Sherrie?
6 A Yes, S-H-E-R-R-I-E.
7 Q I-E?
8 A Yes, ma'am. Sherrie Lynn.
9 Q And your brother?
10 A Daniel Gilbert.
11 Q Are either of them living in town?
12 A No, ma'am.
13 Q Where does Sherrie live?
14 A South Padre Island. Well, I guess that's
15 town.
16 Q I meant -- I should say Cameron County.
17 A Okay. Yes, ma'am. Sherrie Gilbert.
18 Q She lives on South Padre?
19 A Yes.
20 Q And her husband's name is?
21 A Steve Gomez.
22 Q Does she work?
23 A My sister works -- they own a company.
24 Q Okay.
25 A They are self-employed.

**Page 20**

1 Q On the Island?
2 A Yes. It's Steve Gomez & Associates.
3 Q What about Daniel? Where does he live?
4 A He lives in San Antonio.
5 Q Okay. Does Sherrie have any children?
6 A No.
7 Q Do you have any children?
8 A Yes.
9 Q How many?
10 A One.
11 Q What age?
12 A 4.
13 Q And are you married?
14 A Yes.
15 Q Okay. What is your wife's name?
16 A Nelly.
17 Q How long have you been married?
18 A Eight months.
19 Q Is Nelly the mother of the child?
20 A No.
21 Q Who's the mother of the child?
22 A Rosie Bradley.
23 Q And where does Rosie live?
24 A That's a good question. She lives in San
25 Benito. I don't know exactly where. Sometimes she

Page 21

1  lives in San Benito. Sometimes she lives in
2  Brownsville. She's a very difficult person to track
3  down.
4      Q  Okay. And does she go by the name
5  Bradley?
6      A  I assume she does. Well, no, I think she
7  might have remarried and --
8      Q  Do you know what name she goes by?
9      A  I'm sorry. I sure don't.
10     Q  Okay. Do you see your child at all?
11     A  Who?
12     Q  Your child.
13     Q  I'm the sole managing conservator of the
14 child.
15     Q  So you have -- the child lives with you?
16     A  Yes.
17     Q  All right. And now with Nelly?
18     A  Yes.
19     Q  Okay. And Nelly's maiden name?
20     A  Herrera.
21     Q  Where is she from?
22     A  Los Fresnos.
23     Q  What's her father and mother's name? And
24 let me just ask you -- let me tell you why I'm
25 asking you these questions.

Page 22

1      A  Because I was about to ask you.
2      Q  The reason we ask these is because if in
3  the jury pool there are people that have these
4  names, we try to find out if they are related to
5  you --
6      A  In any way.
7      Q  And those names, you know, click. If I
8  were to see a Bradley in the jury pool, I'm going to
9  find out if it's a Rosie Bradley. If I were to see
10 an Herrera in the jury pool from Los Fresnos, I'm
11 going to find out if they are related to Nelly.
12 That's why we ask this.
13     A  I understand.
14     Q  Not because I care. But that's why.
15     A  Okay.
16     Q  What are Nelly's parents' names?
17     A  Juana is the mother. Father, I don't
18 know. They are divorced and I have no contact with
19 him.
20     Q  Okay. Does Nelly have brothers and
21 sisters?
22     A  Oh, yes.
23     Q  Just name their first --
24     A  There's 13 of them, so I --
25     Q  Okay. Are all of them in the Los Fresnos

Page 23

1  area or in Cameron County?
2      A  With the exception of one.
3      Q  Okay. And Daniel, you said, lives in
4  San Antonio?
5      A  Yes, ma'am.
6      Q  Okay. Is your mom alone in that home?
7      A  Yes.
8      Q  Does anybody else live with you and Nelly
9  besides your son? Did you say son?
10     A  Son, yes, ma'am. No, ma'am.
11     Q  And what's your son's name?
12     A  John Robert.
13     Q  Okay. Your first year in Border Patrol is
14 also a probationary year, is it not?
15     A  (Indicating)
16     Q  Three years?
17     A  First three years. You're career
18 conditional.
19     Q  Is that what they call it?
20     A  It's career conditional for the first
21 three years. For the first year it's a probationary
22 period.
23     Q  Okay.
24     A  Then after three years, you are career
25 status.

Page 24

1      Q  If you pass? I mean, if you haven't
2  screwed up along the way?
3      A  Exactly.
4      Q  That first -- is the period of time in
5  which you have the three days in the field and two
6  days in classroom, how long does that last?
7      A  One year.
8      Q  The whole year?
9      A  Yes.
10     Q  Okay. And that's your probationary period
11 as well also, right?
12     A  Yes, ma'am.
13     Q  Do you have --
14     A  After you graduate from the academy, you
15 have a six and a half month exam that is a pass or
16 fail. Upon passing it, then you continue your
17 employment. If by some reason you should not pass
18 your six and a half, then you are dismissed from the
19 U.S. Border Patrol.
20     Q  Okay. What about after --
21     A  Then there's another one at 10 months.
22 And then after you pass your 10 month, then you have
23 an additional two months that you have to --
24     Q  Complete?
25     A  -- complete, stay low, don't get in any

## Page 25

1 kind of trouble at all, and then you're off
2 probation. And then you have a remainder of two
3 years that you're career conditional.
4    Q Okay. These exams, are they written,
5 oral, or practical?
6    A Yes, all three.
7    Q Okay. What do they entail?
8    A Immigration law, statutory law, criminal
9 law, deportation law, exclusionary law, amendments.
10    Q And when you say amendments, you mean to
11 the Constitution?
12    A Yes.
13    Q The U.S. Constitution?
14    A Yes.
15    Q You don't have to learn the Texas
16 amendments?
17    A The Texas amendments? No, because we're a
18 federal agency, so --
19    Q I'm being facetious. Texas has a billion
20 amendments.
21    A No.
22    Q Okay. You mentioned immigration law,
23 statutory law. What do you mean by statutory law?
24    A Where you derive your authority to carry
25 out your responsibilities as a border patrol agent.

## Page 26

1    Q And the reason I'm asking you, does
2 statutory law differ from immigration law?
3    A Oh, yes. All those statutes of law that I
4 just cited out are totally different from one
5 another.
6    Q Okay. How is -- you said where you derive
7 your authority to do what you need to do. What is
8 it that immigration law tells you that's different
9 from statutory law?
10    A Well, in the sense --
11      MR. COWEN: I'm going to object to
12 the form of that question as asking for a legal
13 conclusion beyond the training of this witness.
14      But you can answer.
15      THE WITNESS: The -- you need to be a
16 little more specific. When you say statutory --
17    Q (BY MS. LEEDS) Let's go back. When I
18 said what do you do in the classes, you mentioned
19 immigration law and then you said statutory law.
20      And I just want to know, when you say
21 statutory law, how is that different from the other
22 areas of law that you mentioned, like deportation
23 law? You mentioned exclusionary law. How are those
24 different and separate from the one you called
25 statutory law?

## Page 27

1    A Okay. Statutory law is -- I'll give you
2 an example. Statutory law is where I derive my
3 authority to enter onto private lands, where I have
4 my authority to stop and board a conveyance.
5    Q Okay.
6    A The immigration law tells me where I
7 derive my authority. And it's sections of law that
8 says, based on A, B, C, D, this is what you need in
9 order to enter, reside, remain, or be excluded from
10 the United States. This is under certain sections
11 of law --
12    Q And let me stop you for a moment. Those
13 are statutes too, right? When you refer to
14 immigration law, you're talking about statutes, are
15 you not? Or do you know what a statute is?
16    A You're talking about the INA, the
17 Immigration and Nationality Act.
18    Q And my question is: Is it a law No. 4
19 blah, blah, blah that you refer to when you are
20 talking about immigration -- let me try to make this
21 easy.
22      In our -- what we refer to as a
23 statute is a law, any law.
24    A Any law.
25    Q And what I'm trying to identify is if the

## Page 28

1 section that you say is statutory law is different
2 from, let's just use immigration law, even though
3 what you're calling immigration law --
4    A They are one in the same. Now I
5 understand. They are one in the same.
6    Q Okay. That's what I was trying to get at.
7 They are all statutes. They are all laws. They are
8 just different sections. And the one that you're
9 calling statutory maybe is a little more procedural
10 and broad. It doesn't directly go to immigration.
11 It doesn't directly go to deportation.
12    A Well, it directly gives you your
13 authorities under certain guidelines as to what your
14 specific job entails.
15    Q Okay. But these other ones are still
16 statutes --
17    A As well.
18    Q -- in the broad sense?
19    A Some are under the INA. Some are under
20 the Code of Federal Regulations. Some are under the
21 Immigration, IRCA --
22    Q Right. Don't worry. We're not --
23    A Immigration Reform Control --
24    Q -- testing you on that.
25    A -- Act of 1986 or --

Page 29

Q And it's changed?

A Yeah. Now it's 9O -- no. It's even gone -- now it's IRA, IRA 96.

Q Okay. And it keeps changing?

A I think IRA, IRA 96 -- I don't think it's changed yet.

Q But what I'm saying is that these laws change with the times, with the legislatures. You know, they evolve as our society evolves?

A Some do.

Q Okay. For example, they are talking about a bunch of amnesty programs right now, correct?

A Yes.

Q That would change a lot of what you do, maybe?

A A lot of things will change a lot of what a lot of people do, depending on whether or not the Congress, you know, enacts it and says, okay, yeah, let's do it.

Q Exactly. If they give amnesty to all the workers that are over here right now, that will impact -- directly impact what you do?

A No.

Q No?

A (Nodding)

Page 30

Q Okay.

A Not the people that are already here. I mean, if they are already here, they are already here.

Q Do you not ever stop people just to determine their status?

A Yes.

Q Okay. And those people are already here, though, right?

A Yes, but that's now.

Q Right.

A The laws.

Q Right. Well, that's --

MR. COWEN: We're getting kind of --

MS. LEEDS: -- neither here nor there.

Q (BY MS. LEEDS) What kinds of things do they cover in the oral part of your examination?

A The oral part of the examination? For instance, Spanish.

Q Okay. They determine how eloquent you are?

A Exactly.

Q If you can communicate?

A If I'm the instructor and you're the

Page 31

1  trainee, I will give you a piece of paper and it's,
2  you know, tell me your true and complete name, when
3  you last entered the United States, blah, blah,
4  blah. And then you have -- and that's in the
5  English language.
6     Q Right.
7     A And you read it, and then you transpose
8  that verbally into the Spanish language.
9     Q Okay.
10    A And then I grade you on --
11    Q Your translations?
12    A -- your translations.
13    Q What about the practical part of the exam?
14 What do they cover there?
15    A Scenarios.
16    Q Such as stops?
17    A Stops. There's a multitude of things.
18    Q Does the Border Patrol have basic physical
19 requirements --
20    A Yes.
21    Q -- that they mandate that their agents
22 keep?
23    A Fitness for duty?
24    Q Yes.
25    A Yes.

Page 32

1     Q And if you fall below that, what happens
2  to you?
3     A If you do not pass any portion of the
4  training, you're removed from the service.
5     Q Okay. That's during those first three
6  tests, right?
7     A Yes.
8     Q What about after that? Do you get --
9  continue having to meet certain standards?
10    A I do. I don't know if there's a law that
11 says that I have to, but I do.
12    Q Well, that's what I meant. Does the
13 Border Patrol make you?
14    A I'm not sure. I wouldn't know.
15    Q There isn't like a yearly fitness test
16 that you have to take to keep your job?
17    A No.
18    Q Okay. After you pass those first three
19 tests that first year, are you examined again in a
20 formal capacity like that?
21    A You go to journeyman's school.
22    Q Where is that?
23    A Artesia.
24    Q What state is that in?
25    A New Mexico.

Page 33

1  Q  And what do you do there?
2  A  It's an update of everything that you've
3  learned from the time you entered on duty into the
4  Border Patrol up until the time that you go to
5  journeyman's school. Everything that you learn is
6  taught to you again just to make sure.
7       And then if there's any other
8  inserts, any type of updates in law that has changed
9  since you entered on duty, they will give you those
10  new sections of law.
11  Q  Does everybody that's here in the South
12  Texas area go to this school in New Mexico?
13  A  Everybody in the United States.
14  Q  There's only one place?
15  A  For journeyman's school, yes.
16  Journeyman's school is -- every border patrol agent
17  will go to that school.
18  Q  How frequently do you go to journeyman's
19  school?
20  A  After your three years -- your third year
21  you go in. Then you go again for your senior
22  school.
23  Q  Okay. Tell me about senior school.
24  A  Senior school is like journeyman's school,
25  but it's -- now you have more years in the patrol.

Page 34

1  Q  Right. When do you go to senior school?
2  A  When you become a GS-11.
3  Q  Maybe we ought to discuss that. I forgot.
4       When you start Border Patrol, what GS
5  rating are you?
6  A  It depends on your qualifications, your
7  skills.
8  Q  Even when you just go to the first year?
9  A  When you first apply, you can either --
10  you'll either enter on duty as a GS-5, which is the
11  lowest scale. Or if you've got college, military,
12  any type of background that pertains to that field
13  of work, then you can go in as a GS-7.
14  Q  Okay. When you get out of your first
15  year's training, or probation, I should say, do you
16  get bumped?
17  A  Yes. If you're a 5, you'll go to a 7.
18  Q  Two grades?
19  A  Yeah. That's how they work. It's 5, 7,
20  9, 11, 13, on and on.
21  Q  Okay. What about after your three years
22  of career conditional?
23  A  Then you go to a 9.
24  Q  A GS-9?
25  A  (Nodding)

Page 35

1  Q  Okay. When you go to journeyman's school,
2  are you a GS-9?
3  A  Yes.
4  Q  Is it just time that will get you to
5  GS-11?
6  A  No.
7  Q  What gets you --
8  A  It's a competitive scale.
9  Q  And is senior school only for GS-11s? Or
10  is that time associated?
11  A  GS-11's.
12  Q  Okay. So whether you've been there enough
13  time or not, it's not until you're a GS-11 that you
14  will go to senior school?
15  A  Exactly.
16  Q  Okay. And is senior school the same thing
17  as journeyman's school, only at a different level?
18  A  More advanced.
19  Q  Okay. What other schools are there?
20  A  There's an undeterminable amount of
21  schools that --
22  Q  Well, I mean, these formal kinds of things
23  that -- I know you've got training all the time.
24  A  All the time. All the time.
25  Q  I'm talking about schools, you know, these

Page 36

1  specific things that you will be going to or have
2  gone to. Have you gone -- what GS are you now?
3  A  I'm an 11-5.
4  Q  Okay. Have you gone to --
5  A  I've gone to all the schools.
6  Q  The senior school?
7  A  No. I'm up to go to the senior school, I
8  think, in August.
9  Q  This summer?
10  A  Yes.
11  Q  Okay.
12  A  And that's tentatively.
13  Q  Okay.
14  A  You know, you never know what -- I mean, I
15  might get detailed.
16  Q  No. I understand. Do you know if there
17  are any other schools like that that are -- you
18  know, that you do? Other than regular, you know,
19  staying on top of things, are there any other formal
20  schools that you know of?
21  A  There's a lot of formal advanced schools
22  that you can go to, but those are upon your request.
23  In other words, there's BORSTAR. There's BORTAC.
24  There's emergency response teams. There's SWAT
25  teams. There's all these -- those are formal

Page 37

1 schools that you go to.
2    Q But that would depend on your interests?
3    A Yes.
4    Q Does everybody have to go to journeyman's
5 school?
6    A Yes.
7    Q Does everybody that gets --
8    A Yes.
9    Q -- to GS-11 go to senior?
10    A Yes.
11    Q Okay. What is your position now?
12    A My title?
13    Q Yes.
14    A Senior patrol agent.
15    Q And what are your duties now?
16    A To enforce the immigration laws.
17    Q What do you do?
18    A What do I do? I apprehend narcotics,
19 undocumented aliens, smugglers attempting to enter
20 the country by means other than the port of entry.
21    Q Okay. Let's go to where you have been
22 posted. You graduate from Georgia. Where do you go
23 from there?
24    A To Hebbronville, Texas.
25    Q Did you request Texas? Or do they just

Page 38

1 send you where they want to send you?
2    A They put you where they want to send you.
3 Then. Now it's different.
4    Q Right. No. I mean when you graduate,
5 they send you where they want you?
6    A Wherever they want you.
7    Q Okay. Are your first postings a mandatory
8 amount of time? Do you know --
9    A Your career --
10    Q -- when you graduate -- where you get the
11 first --
12    A Where you're first stationed, that's where
13 you're going to stay unless you request to move.
14    Q Okay. How long were you in Hebbronville?
15 Is that where you stayed until you came to
16 Brownsville?
17    A Correct.
18    Q So you graduated in 1993 from Georgia?
19    A September 21st, 1993.
20    Q And you started at the Hebbronville -- who
21 was your -- I guess your training officer?
22    A My postacademy training officer? Is that
23 what you're --
24    Q Postacademy. The person that you would be
25 with during those three days in the field.

Page 39

1    A Okay. That's my field training officer.
2    Q That's what I meant, your field training
3 officer.
4    A Yeah, because the field training is the
5 guy on the three days. And then your postacademy is
6 the guy of the two days.
7    Q Okay. I want the field training guy.
8    A The field training officer? Carl Rhodes.
9    Q R-H-O?
10    A R-H-O-D-E-S.
11    Q How long had he been in Hebbronville? Do
12 you know?
13    A He's still there.
14    Q Okay. And did you change at all? Or was
15 he the guy you stayed with that whole year?
16    A He was the person I stayed with throughout
17 my whole field training.
18    Q Okay. And that was one year?
19    A Yes.
20    Q Okay. After that year how did your duties
21 change? I mean, was there a major change in --
22    A Other than that, you just are -- you're
23 not per se under another person's wing anymore.
24 You're out on your own. Your responsibilities,
25 everything that you do is on your own.

Page 40

1    Q Not necessarily with someone?
2    A Exactly.
3    Q After -- would you have called Mr. Rhodes
4 your immediate supervisor during that period of
5 time?
6    A Yes. He was my field training officer.
7    Q Okay. Did you have another person that
8 would have been a supervisor?
9    A Okay. The first line supervisor was --
10 God, it's been a long time. My very first first
11 line supervisor was Cruz Rodriguez.
12    Q Is he still there?
13    A No. He's in Brownsville now. He is the
14 patrol agent in charge for Brownsville -- I mean for
15 Port Isabel.
16    Q Okay. Do you remember who took his place
17 as your first line supervisor?
18    A Carl Rhodes, I believe.
19    Q Okay. Did you have anybody else who you
20 would call your direct supervisor, somebody that's,
21 you know, directly on top of you other than your
22 field training officer and your first line
23 supervisor?
24    A In what time span? At that --
25    Q During --

Page 41

```
 1     A   1993?
 2     Q   Yes.
 3     A   From him was the assistant patrol agent in
 4  charge.
 5     Q   Okay.  Do you remember who that was?
 6     A   His name is Fred Cordova.
 7     Q   And do you know where he is?
 8     A   He's still the acting patrol agent in
 9  charge -- or the assistant patrol agent in charge.
10     Q   Now, is this the person that you would
11  report to, or was this --
12     A   No.  Anything after the immediate first
13  line supervisor is upper management, and you never
14  even deal with them.
15     Q   Okay.  Well, Carl Rhodes was there the
16  whole time you were in Hebbronville, correct?
17     A   Yes.  And he's still there to this day.
18     Q   Was he a supervisor of yours the whole
19  time?
20     A   He was my field training officer when I
21  first got there.  He was an 11, a GS-11 field
22  training officer.  Then he became a GS-12
23  supervisory patrol agent.  And now he's a GS-13
24  field operation supervisor.  He's upper management
25  now.  And he is there.
```

Page 42

```
 1     Q   You are now a senior patrol agent,
 2  correct?
 3     A   Yes, ma'am.
 4     Q   What was your position while you were in
 5  Hebbronville?
 6     A   Well, my GS-11 senior patrol agent was a
 7  promotion to Brownsville.  So prior to that, I was a
 8  border patrol agent.
 9     Q   And that's what it's called?
10     A   Yeah, just a border patrol agent.
11     Q   And what GS were you --
12     A   Nine.
13     Q   Okay.  And your promotion was when?
14         MR. COWEN:  Can we take a one minute
15  break?
16         MS. LEEDS:  Okay.  No problem.
17         (Brief Recess)
18     Q   (BY MS. LEEDS) Do you remember when it
19  was that you were promoted, what date?
20     A   I got my instructions, I want to say, in
21  February.
22     Q   Of '99?
23     A   Of '98.
24     Q   '98?  Okay.  Because --
25     A   I think.
```

Page 43

```
 1     Q   Okay.  When did you move to Brownsville?
 2     A   '98, I think.
 3     Q   Okay.
 4     A   I think it was '98.
 5     Q   Well, close enough.
 6     A   When did the incident --
 7     Q   Let me get -- yeah.  Hang on.
 8     A   -- take place?  I think it was in '98.
 9     Q   Let's go from there.
10         MR. COWEN:  Sorry I left the file
11  over there.  I can grab it if you need it.
12         THE WITNESS:  No.
13         I'm almost sure it's '98.
14     Q   (BY MS. LEEDS) 4/7/99.
15     A   Okay.  Then it was in '99.
16     Q   Okay.  How close after this incident that
17  we're here on today did you move to Brownsville?
18     A   Maybe a month.
19     Q   Had you already gotten your orders?
20     A   Yeah.  I got my orders like in February,
21  and then I was waiting for the budget to go through
22  to fund it.
23     Q   Okay.  But physically you probably
24  moved -- this happened in April.  You probably moved
25  in May?
```

Page 44

```
 1     A   May.  As a matter of fact, I think it was
 2  May.
 3     Q   Okay.  What changed in your duties -- you
 4  know, and I know you're supposed to catch the bad
 5  guys.  But from your position in Hebbronville as
 6  border patrol agent to senior agent, what changed --
 7     A   More management type skills.  In other
 8  words, as a senior patrol agent now, I would
 9  manage -- or I manage the junior agents, the 9's and
10  the 7's out in the field.
11     Q   Okay.  Have you occupied the position of
12  field training officer?
13     A   Yes.
14     Q   Okay.  With how many people?
15     A   The class that I -- six, I believe.
16     Q   Have you been a first line supervisor?
17     A   I've been an acting first line supervisor.
18     Q   Here in Brownsville?
19     A   Brownsville -- yes.
20     Q   And when you say "acting," were you just
21  substituting for someone who was out?  Or had the
22  position been vacant and you were occupying it?
23     A   I would say more that somebody was just
24  absent for some time and I took -- I assumed the
25  duties of my first line supervisor.
```

Page 45

1   Q Okay. What difference is there in the
2   duties between a first line supervisor and, say,
3   your position now as senior patrol?
4   A Pay.
5   Q Okay. Do you do anything different?
6   A A senior patrol agent is pretty much --
7   they are molding you for the supervisory patrol
8   agent. I do more scheduling, end-of-the-month
9   reports. I do more management type activities.
10   Q Than being out in the field?
11   A Yes. And then when I am out in the field,
12   I'm more as a first line supe out in the field
13   because the first line supervisors are in the office
14   and they are doing all their paperwork and end of
15   the month I-50's and so on and so forth.
16       So as a senior agent, I'm the one
17   that's out in the field. And if anything needs to
18   take place or any decisions need to be made out in
19   the field, the agents will come to me and say, look,
20   this, and this, what do I do? And then I instruct
21   them as to what needs to take place or not take
22   place.
23   Q Okay. So you act as their supervisor out
24   in the field, even though --
25   A If there is not a first line supervisor

Page 46

1   out in the field at that time.
2   Q Right. Okay. What do you need to become
3   a first line supervisor?
4   A You have to take an assessment test. And,
5   again, by being a GS-11 senior patrol agent, you're
6   learning all these forms and protocol, what you need
7   to do for this and this and this. That way when you
8   go to take the assessment test, you're -- it's based
9   on how you score. The higher you score on the
10   assessment test, well, the higher up on the list you
11   are for the next supervisory patrol agent position.
12   Q Is that a fill them as they drop out kind
13   of level? In other words --
14   A Supervisor --
15   Q The first line.
16   A It's based on a lot of things. For every
17   so many GS-9's, there has to be so many GS-11's.
18   For however many GS-5, 7's, 9's, and 11's, there has
19   to be this many supervisors.
20   Q Gotcha. Okay. So the bigger your
21   standard manpower --
22   A Our agency grows, the larger the number of
23   supervisors, the larger the number of 11's and so on
24   and so forth.
25   Q So you will not necessarily have to wait

Page 47

1   for somebody to be promoted or leave. It could grow
2   just because the agency -- the particular area
3   grows?
4   A Provided that the area grows. It has to
5   be within this geographical area. I mean, if they
6   are hiring a bunch of people in California, well,
7   that doesn't affect me here at all.
8   Q What is your jurisdictional area right
9   now?
10   A The United States, Puerto Rico, Guam, and
11   the Virginia Islands.
12   Q Okay. That's as a border patrol agent,
13   correct?
14   A Yes, ma'am.
15   Q But you're in Brownsville.
16   A Okay.
17   Q Okay? What area do you patrol now?
18   A My area of responsibility? I really don't
19   have one. I mean, I can go -- I can go anywhere in
20   Brownsville. I can go to Harlingen, McAllen,
21   Corpus, Houston, Dallas.
22   Q Well --
23   A Just depends if that's where, you know,
24   they say, "You know what, we need a team. We've got
25   information, blah, blah, you guys run up to Dallas

Page 48

1   and go see if you can get Owens Hickory Farms and
2   see what you can get there," you know, and the       e
3   go there. So pretty much anywhere.
4   Q Okay. So you're not -- like you were in
5   Hebbronville. Now you're in Brownsville. It's not
6   a matter of, you know, you couldn't really do
7   anything in, say, Falfurrias. You could still go to
8   Falfurrias and carry out whatever you do here?
9   A Whatever I -- provided that they need me
10   over there.
11   Q Okay.
12   A But my area of responsibility is
13   Brownsville. Unless otherwise told different, the
14   I stay in Brownsville.
15   Q All right. And what other towns does that
16   encompass? Does that encompass Los Fresnos and
17   Isabel or --
18   A Well, now we've got another -- the Fort
19   Brown station. So the Fort Brown station no
20   care of anything east. As a general rule, you
21   it's just, you know, we don't want to go poac
22   That's what we call it. We don't want to go
23   poaching on the other agents.
24       So anything east of the expressway,
25   Fort Brown takes care of that, Southmost, Po

Page 49

1   Isabel. And then anything west, we take care of as
2   far as Harlingen. And then Harlingen station has
3   their own area.
4    Q   Okay. I was going to ask if there is a
5   Harlingen station.
6    A   Yes, there is.
7    Q   Is there a Willacy County station?
8    A   No. We go by sectors. There's a
9   station -- well, there's one sector. Like there's
10   McAllen sector. And then within the sector there's
11   stations.
12    Q   Right. Okay. I guess I should say is
13   there -- there's a Harlingen sector or station?
14    A   Harlingen station. Brownsville station.
15   Mercedes, I don't know which other ones there are.
16   And they are all within the McAllen sector.
17    Q   Sector. Who is your current direct
18   supervisor now?
19    A   Al Alcaraz.
20    Q   And what position is he in?
21    A   He's a first line supervisor.
22    Q   You report to him?
23    A   Every day.
24    Q   Okay. Do you have any other supervisor
25   that you report to, that you report to?

Page 50

1    A   No.
2    Q   Okay. Who determines your schedule?
3    A   Al Alcaraz.
4    Q   Who determined your schedule in
5   Hebbronville?
6    A   The first line supervisor.
7    Q   Okay. And that was Cruz Rodriguez?
8    A   At that time, yes.
9    Q   Okay. When you were in Hebbronville,
10   where did you live?
11    A   123 North Elm, Apartment -- they never had
12   numbers. It was the one downstairs on the left. I
13   think it was like maybe 3, I think. I would just
14   put 3 on my mailbox, you know, on my --
15    Q   It would get there?
16    A   And it would get there, but there was
17   really never a number there.
18    Q   Okay. Who did you live there with?
19    A   I lived there with David De La Rosa.
20    Q   Is he a border patrol agent?
21    A   He was. He just transferred.
22    Q   Transferred --
23    A   To a different agency.
24    Q   Okay. To where?
25    A   With the Federal Air Marshals, I think.

Page 51

1    Q   Your GS carries over, doesn't it, if you
2   stay in the federal system? Or do you know?
3    A   In some agencies it does.
4    Q   Okay. Did you live at 123 North Elm the
5   whole time you were in Hebbronville?
6    A   No. I lived at 214 Southwest Seventh
7   Street in Premont, Texas.
8    Q   Southwest which street?
9    A   Seventh.
10    Q   Seventh, Premont?
11    A   (Nodding)
12    Q   House or apartment?
13    A   House.
14    Q   Who did you live there with?
15    A   I lived by myself. I owned -- I bought
16   it.
17    Q   Have you sold that property?
18    A   Yes.
19    Q   How long did you live there?
20    A   About two years. And then I -- the drive
21   started getting too far, so I went ahead and just
22   rented it out. And then I moved back to 123 -- I
23   mean, to -- yeah, 123 North Elm.
24    Q   Okay. How long were you in Hebbronville?
25    A   From 1993 --

Page 52

1    Q   Six years?
2    A   -- to 1999. Almost seven years.
3    Q   Okay. I guess it's time to get down to
4   the nitty-gritty. We're here on a lawsuit that you
5   have filed complaining of a violation of your
6   constitutional rights, correct?
7    A   Correct.
8    Q   Okay. And do you recall your attorney
9   receiving some things called interrogatories? They
10   were questions that were sent about, you know, what
11   evidence do you have --
12    A   Yes.
13    Q   And you recall answering those?
14    A   Yes.
15    Q   Okay.
16    A   The ones that were applicable.
17    Q   Okay. And then your attorney sent them to
18   us. You did not type these, right?
19    A   No, ma'am.
20    Q   Okay. You have complained about a
21   conspiracy between the sheriff and Deputy Sheriff
22   Bolch?
23    A   Yes.
24    Q   Okay. What is it that they did together
25   that you claim is a conspiracy?

Page 53

MR. COWEN: I'd like to object to the form of that question as calling for legal conclusions.

But you can answer that question as you understand the word conspiracy. I'm just protecting the record. I'm not trying to --

THE WITNESS: No. I understand.

Well, conspiracy is one or more people conspiring --

Q (BY MS. LEEDS) To do something, right?

A Exactly.

Q Okay. What is it that you say that Mr. Bolch and Mr. Ybanez did to conspire against you?

A Arresting me.

Q Okay. You think they got together and talked about arresting you?

MR. COWEN: Objection to the form of the question.

You can answer.

MS. LEEDS: What's the objection?

MR. COWEN: Well, I was just trying to make it in such a way that wasn't going to lead him to answer. I don't think conspiracy actually, as we pled it, means they actually had to have

Page 54

discussed that specific act before.

THE WITNESS: I just feel that since he's the policy maker of that county, the sheriff and Isaac Bolch working for the sheriff knowing that I had every right in the world to carry that weapon and still arresting me for it.

Q (BY MS. LEEDS) Okay. But you are not making a claim that they got together specifically and talked about, "Let's go arrest John Gilbert"?

A John Gilbert or the border patrol agents --

Q John Gilbert.

A I couldn't answer what they -- what they said or what they conspired.

Q Okay. That's my question. You don't have any evidence that Sheriff Ybanez and Isaac Bolch got together --

A No.

Q -- and talked about, "Let's go arrest --"

A No. I have no evidence.

Q "-- John Gilbert"?

A Exactly.

Q And you don't know if that was a plan of theirs, to arrest you?

A No. I have no evidence to show that.

Page 55

1  Q All right. Do you have anything that
2  leads you to believe that Mr. Ybanez and Mr. Bolch
3  planned to arrest any border patrol agent?
4  A Can you ask that question one more time?
5  Q Yes. Do you have anything that would show
6  that Mr. Ybanez, the sheriff at the time, and
7  Mr. Bolch got together and planned to arrest any
8  border patrol agent?
9  A I have no evidence of that, no.
10 Q Okay. What is it that you're saying
11 that -- because you've also mentioned that they had
12 a policy of harassing border patrol agents. What is
13 it that you rely on to say that they were doing
14 this?
15 A Simply stopping marked border patrol
16 agents in marked vehicles on duty responding to
17 calls.
18 Q Which calls?
19 A Sensors, any traffic that another agent
20 might have called in and, "Hey, I need backup over
21 here."
22 Q When you say traffic, you mean radio
23 traffic, right?
24 A Radio traffic or --
25 Q I'm just getting the record clear.

Page 56

1  A Exactly.
2  Q Because we're not talking about cars, when
3  you said traffic. You're talking about radio --
4  A Exactly.
5  Q Okay. Do you know any border patrol agent
6  that was stopped, in your opinion, improperly?
7  A Michael McCarty.
8  Q What was he stopped for?
9  A I don't know -- I don't recall what the
10 stop was for. I know it was on duty in a marked
11 vehicle and it was -- the street was like North
12 Goodman, I believe. I don't know what the outcome
13 was of it.
14 Q Okay. Why is it that you say that the
15 stop was inappropriate?
16 A Well, if he's on duty in a marked border
17 patrol unit and he's en route from one location to
18 another on official business, I don't see the
19 justification as why he would stop to delay him any
20 longer than -- you know, if he's responding to this
21 call and it's a fellow agent that's in dire needs of
22 backup or assistance, you know, simply for the --
23 you know, I don't see what could have been so much
24 of an emergency that that deputy had to stop him
25 right then and there and not follow him to the

Page 57

1 location.
2    Q  Okay.  Do you know --
3    A  And then ask him what the --
4    Q  Okay.  This was Mr. McCarty?
5    A  Yeah.
6    Q  Or McCarthy?
7    A  McCarty.
8    Q  Okay.  Do you know if he had his lights or
9 siren on at the time this stop was made?
10   A  I don't know.
11   Q  Okay.  You're not saying that border
12 patrol agents in marked vehicles should not be
13 stopped if, say, they run a red light, should they?
14   A  No.  If it's a violation of a traffic law,
15 well, yeah, by all means.
16   Q  Okay.  Do you know why Mr. McCarty was
17 stopped?
18   A  No, I don't.
19   Q  Do you know if it was a violation of a
20 traffic law?
21   A  I'm not sure.
22   Q  Okay.  But, certainly, you would not argue
23 that even if you are in a marked border patrol car
24 and you violate a traffic law that a deputy would
25 have the right to stop you?

Page 58

1       MR. COWEN:  Objection, form, to the
2 extent it calls for a legal conclusion.
3       You can answer it to your
4 understanding of the law.
5       THE WITNESS:  Under my understanding,
6 provided that the agent is on official business and
7 he violates a law, or as you're saying, a violation
8 of some traffic law, if he's got his lights on, then
9 no, I don't think he has any justification to stop
10 the individual because it is an emergency vehicle.
11   Q  (BY MS. LEEDS)  Okay.  Let's --
12   A  So if he's responding to an emergency, no,
13 I guess -- I think he would be allowed -- in my
14 personal opinion would be allowed to run a light or
15 speed.
16   Q  Okay.  We're not talking about responding
17 to an emergency, because you don't know if
18 Mr. McCarty was responding to an emergency, right?
19   A  I also don't know that he wasn't.
20   Q  Correct.  But as we sit here today, you do
21 not know if he had his lights and siren on?
22   A  Once again, I don't know if he did not or
23 if he did.
24   Q  Did he have his lights and siren on?
25   A  I do not know.

Page 59

1    Q  Okay.  And in the absence of knowing that,
2 assume with me for a moment that he did not have his
3 lights and siren on so that it would not be apparent
4 to a law enforcement officer that he was on an
5 emergency call, okay?
6    A  Okay.
7    Q  And he runs a stop sign.
8    A  Okay.
9    Q  Does a deputy sheriff have justification
10 in stopping a marked border patrol car if a border
11 patrol car runs a stop sign?
12       MR. COWEN:  Objection to the form of
13 the question to the extent that it asks for a legal
14 conclusion.
15       You can answer as to what your
16 understanding of the law is.
17       THE WITNESS:  In my opinion, if the
18 agent is responding to a call that requires him not
19 to show up with lights and sirens and all this
20 racket to advise whoever he's going to go apprehend,
21 to let them know he's coming, yeah, I think he's --
22 in my opinion, I think he's justified in going
23 through a light without having any type of emergency
24 equipment on --
25   Q  (BY MS. LEEDS)  I said stop sign.

Page 60

1    A  Or stop sign, running a stop sign, if it's
2 going to hamper the agent's ability to effect his
3 arrest or his stop or his location.
4    Q  Okay.  Now, you keep saying in your
5 opinion.  Is there anything in your training or
6 anything that you have been told or cautioned on
7 that obviously -- strike that.
8       So, in your opinion, border patrol
9 agents in marked border patrol vehicles are allowed
10 to violate state traffic laws?
11   A  That's being vague.
12   Q  Well, you keep saying in your opinion he
13 can run a stop sign --
14   A  Under certain circumstances, yes.
15   Q  Okay.  Now --
16   A  I can give you an example to clarify that.
17   Q  Go ahead.
18   A  If there's a border patrol agent on duty
19 and he's responding to a call from another agent or
20 a sensor advising that there is possible narcotics
21 trafficking in progress, by the agent responding to
22 that call with lights going, sirens going, by the
23 time that agent arrives to that location, basically
24 he's advising the drug smugglers, "Hey, it's me, the
25 border patrol agent.  Here I come."

Page 57 - Page 60

Page 61

1  So by not turning the lights on, by
2  going in -- lights out is what we call it, stealth,
3  there is certain mitigating circumstances that would
4  allow you to do that. That doesn't mean not to be
5  cautious when you approach the --
6  Q  Okay. Where in your -- do you have any
7  policy manual or any law that you know of that gives
8  border patrol agents the authority to violate state
9  traffic laws?
0  A  Authority to violate, no.
1       MR. COWEN: I'm going to object to
2  that question insofar as we're not going to be
3  bound, if there is something, by his not memorizing
4  every form and regulation that exists. And we'll
5  always be free to find it and, if requested, produce
6  it.
7  Q  (BY MS. LEEDS) Do you know of any law,
8  policy as we sit here today that allows a border
9  patrol agent to run a stop sign under any
0  circumstances?
1  A  Under any circumstances?
2  Q  Uh-huh, something written, like your INS
3  firearms policy --
4  A  Exactly, or under the pursuit policy.
5  Q  Is there anything in there that says that

Page 62

1  you can run a traffic sign --
2  A  Or light or any --
3  Q  Stop sign, yes.
4       MR. COWEN: Same objection from the
5  last question.
6       THE WITNESS: Firearms policy. I'm
7  trying to remember. I wouldn't be able to answer
8  that at this very moment. I would have to look
9  through my firearms -- I mean, through my pursuit
0  policy to give you a more definite and accurate
1  answer to that.
2  Q  (BY MS. LEEDS) Okay. Have you reviewed
3  any documents in preparation for your deposition
4  today?
5  A  Just my -- the memorandum that I wrote
6  back in 1999.
7  Q  After this happened?
8  A  Yes.
9  Q  Okay. Who did you write that memorandum
0  to?
1  A  I believe it was the chief patrol agent.
2  Q  About the incident that was the subject of
3  the memorandum?
4  A  Yes, ma'am.
5  Q  Okay. But just so that we can clarify,

Page 63

1  without looking, you do not know if there is
2  anything out there that you can point to that says a
3  border patrol agent in a marked car can't be stopped
4  by a deputy sheriff for a traffic violation?
5  A  No, I can't. There's nothing that I can
6  think of at this time that says that.
7  Q  Okay. Other than Michael McCarty, do you
8  know of anybody else who you think has been or has
9  told you that they have been inappropriately
10  stopped?
11  A  David De La Rosa.
12  Q  And that was your ex --
13  A  Roommate.
14  Q  -- roommate?
15       When and where was he stopped?
16  A  In Hebbronville, Texas by the Jim Hogg
17  County Sheriff's Department.
18  Q  Okay. And when did this occur?
19  A  During my tenure. I would say like in
20  maybe '97.
21  Q  Okay. Tell me about that stop.
22  A  Well, just that David De La Rosa told me,
23  you know, "A guy stopped me because he said that --"
24  I can't remember. To be -- I can't recall. I'm not
25  going to speculate.

Page 64

1  Q  Do you remember --
2  A  I just remember David telling --
3  Q  -- what he said --
4  A  -- me, "Yeah, you know, the county is out
5  again."
6  Q  Okay. How many times had he been stopped?
7  A  That I know of, once.
8  Q  Okay. Was he in a border patrol car?
9  A  No. This was in his own personal vehicle.
10  Q  Do you remember what he was stopped for?
11  A  No, I don't.
12  Q  Okay. Was he charged with anything?
13  A  I do not recall.
14  Q  What about Mr. McCarty? Did anything
15  happen to him that you know of?
16  A  I don't recall.
17  Q  Okay. Aside from McCarty and De La Rosa,
18  can you think of anybody else who's been
19  inappropriately stopped?
20  A  Gonzo, Javier Gonzalez, another agent.
21  Q  Do you know the circumstances of this
22  stop?
23  A  No, I do not. All of these are just
24  agents that have -- at muster say, "Yeah, you know,
25  county stopped me again, you know, because --" I

Page 65

1  think one was -- and I don't remember who, but it
2  was the sticker that's on the window --
3    Q  Registration or the inspection?
4    A  The inspection sticker.  They stopped him
5  for that.  And two vehicles traveling head on, you
6  know, one traveling 55 miles an hour and the other
7  one going 55, that particular agent couldn't see
8  how, at a combined speed of 110 miles an hour, that
9  that sheriff's deputy would have been able to see a
10  3 by 3 piece of paper and stopped him.
11    Q  Okay.  Do you know if he was ticketed or
12  anything?
13    A  I don't know.
14    Q  Okay.  Anybody else?
15    A  Off the top of my head right now I can't
16  recall.
17    Q  Okay.  How many agents are in the
18  Hebbronville office?
19    A  Now?  I have no idea.  I've been gone for
20  the last three years or so, so I don't know how many
21  are there.
22    Q  How many were there when this incident
23  happened?
24    A  Forty.
25    Q  Do they all live in pretty much that area?

Page 66

1    A  They live either in Hebbronville, Laredo,
2  Premont, or Fal.
3    Q  How long does it take to get from Laredo
4  to Hebbronville?
5    A  About one hour.
6    Q  Okay.  Do you know what a joint enterprise
7  is?
8    A  Define it.
9    Q  I'm asking you if you know what it is.
10  And if you don't know, that's fine.
11    A  That's fine.
12        MR. COWEN:  Does that have something
13  to do with drug smuggling?  Sorry.  Bad joke.
14    Q  (BY MS. LEEDS)  You have made the claim
15  that you have been defamed by what occurred here.
16    A  Yes, ma'am.
17    Q  You -- and we asked you what form was the
18  publication.
19        And the answer is a little -- I'm not
20  sure I understand your answer, and that's why I'm
21  asking you this, because the question was, "Please
22  describe in detail all factual information,
23  statements you have obtained, and materials in your
24  possession for which you have accessed which show or
25  tend to show that Defendants Bolch and Ybanez

Page 67

1  defamed you."
2        Do you understand what defamation is?
3    A  Defamation of character.
4    Q  Okay.  And it says, "Include in your
5  answer the form of the publication, whether oral or
6  written, and to whom it was communicated."
7        What is it that you say Mr. Bolch or
8  Mr. Ybanez did to defame you?
9    A  Arresting --
10        MR. COWEN:  I'm going to object to
11  the question to the extent that it calls for him to
12  have a legal knowledge of Texas tort law that he may
13  not have.
14        However, you can answer as to your
15  understanding, but with the understanding that we're
16  not going to be bound if he doesn't understand what
17  a fact is that we can't go in and add that fact in
18  later.
19    Q  (BY MS. LEEDS)  You're suing them for
20  defamation, correct?
21    A  Correct.
22    Q  What do you understand defamation to be?
23    A  To defame someone's character.
24    Q  Okay.  You just reused the word.  Change
25  the word defame.  To do what?  What have they done

Page 68

1  to you?
2    A  The simple fact that I was arrested.
3    Q  No.  What have they done to you?  Not what
4  caused it.  What have they done to you?  When you
5  say defame your character, what do you mean?
6    A  By placing me under arrest, arresting me
7  in front of a high school, junior high where I'm the
8  drug awareness officer at a time where parents,
9  teachers, and the children were coming out of the
10  school, they all -- Hebbronville is a very small
11  town, so they all know who I am.
12        To see me being handcuffed, the
13  weapon taken away, my gun, my badge, leaning over
14  the hood of a vehicle, or the trunk of a vehicle in
15  handcuffs, and then placed in a sedan where I'm
16  confined to a cage in the presence of all those
17  people, in my understanding, is being defamed.
18    Q  Okay.  Do you know if Mr. Bolch or
19  Mr. Ybanez have ever spoken badly about you to third
20  parties?
21    A  Yes.
22    Q  Whom have they talked to?
23    A  To a gentleman by the name of Shoan.
24    Q  Shoan?
25    A  Shoan.

Page 69

1   Q   Who is he?

2   A   He's a border patrol agent. He's no
3   longer in Hebbronville. I believe he is in
4   Falfurrias now.

5   Q   Okay. What did they tell him?

6   A   That they did not like me, Bolch.

7   Q   Who said that? Bolch?

8   A   Bolch told Shoan.

9   Q   Okay.

10  A   Robert Shoan I believe was his name.

11  Q   Okay. What about Mr. Ybanez?

12  A   What has he --

13  Q   Said --

14  A   -- said to --

15  Q   -- about you?

16  A   I have no firsthand knowledge.

17  Q   Okay. Do you know if Mr. Bolch has ever
18  written anything that you would consider defamatory
19  about you?

20  A   To my knowledge, no.

21  Q   Okay. What about Mr. Ybanez? Do you know
22  if he has written anything that you would consider
23  defamatory towards you?

24  A   To my knowledge, no.

25  Q   So basically you're saying what happened,

Page 70

1   the act of what happened is what has defamed you?

2       MR. COWEN: Objection to the extent
3   it calls for a legal conclusion to which he's not
4   qualified to render.

5       You can answer the question as you
6   understand the word defamation.

7   Q   (BY MS. LEEDS) Is that what you're
8   saying? What happened to you is what defamed you?

9       MR. COWEN: Same objection.

10      THE WITNESS: Yes.

11  Q   (BY MS. LEEDS) Okay. Now, what -- when
12  was it that you attempted to get in the K-9 corps?

13  A   I don't have an exact date. It was just
14  prior to -- I had put in for the position.

15  Q   Where is that position?

16  A   It was -- it would have been in
17  Hebbronville. There was a K-9 position open.

18  Q   Okay. When? When did it open?

19  A   That's what I'm saying. I don't know the
20  exact date.

21  Q   Okay.

22  A   It was in '99.

23  Q   All right. What is it that you have to
24  put in for a position?

25  A   A memorandum.

Page 71

1   Q   Do you have to --

2   A   Based on your qualifications, skills.

3   Q   Okay. How do you go about doing that?

4   A   You just submit a memorandum. And in that
5   memorandum, you write down all the skills and
6   abilities that you have and that you feel make you
7   eligible for the K-9 position.

8   Q   Okay. What kind of raise would that
9   have -- would it have entailed a raise?

10  A   Oh, yes.

11  Q   Okay. What kind of raise?

12  A   Monetary-wise?

13  Q   Yes, or position-wise.

14  A   Seven to $10,000.

15  Q   A year?

16  A   A year.

17  Q   Okay. How --

18  A   And a government vehicle.

19  Q   You were a GS-9, right? Would you have
20  stayed as a GS-9?

21  A   Yes, but with a higher pay scale. Because
22  within the 9's, eleven grades, there's step
23  increases. So, for instance, I would have went from
24  a GS-9-4 to possibly a GS-9-7.

25  Q   Who determines that?

Page 72

1   A   That, as in the step grades?

2   Q   Right.

3   A   That comes from Region, I believe, which
4   is in Washington.

5   Q   And do all the K-9 agents have an
6   increase of seven to 10,000 a year?

7   A   Yes, some more.

8   Q   When was it -- okay.

9   A   And I can clarify that a little more. The
10  reason, as a K-9, you're on call now all the time.

11  Q   Okay.

12  A   So if --

13  Q   24 hours?

14  A   Yes. So if you get -- and not only our
15  agency, but DPS, Jim Hogg County Sheriff's
16  Department, any other agency that needs K-9 to
17  search a vehicle, they would call us.

18  Q   Okay.

19  A   And then that agent would, you know, get
20  out of bed or whatever he was doing, get his dog,
21  that's the reason why you get a government vehicle,
22  a take home vehicle.

23  Q   Right.

24  A   And then you go to wherever the call is.

25  Q   So you're on call for all the law

Page 73

1  enforcement agencies?
2      A  For all of them.
3      Q  Okay.
4      A  But it has to go through our dispatcher.
5      Q  Right.  Okay.  I asked you when had the
6  K-9 position become open.  Do you remember when it
7  was that you applied for it?
8      A  No, ma'am, I don't.
9      Q  Okay.  Do you have to go to a training for
10 that?
11     A  Yes, ma'am.
12     Q  And when and where was the training?
13     A  When would be immediately after being
14 selected for the position.  Where is in El Paso,
15 Texas.  The amount of time, I believe, is eight
16 weeks.
17     Q  Was anybody selected for the position?
18     A  Yes.
19     Q  Who?
20     A  I don't recall, but I know the position
21 was filled.
22     Q  And you don't remember when?
23     A  No, I don't.
24     Q  Do you know if that person filled that
25 position before or after you came to Brownsville?

Page 74

1      A  I don't recall.
2      Q  Okay.  So are you saying that the training
3  is -- you're selected first and then you train?
4      A  Yes.
5      Q  How many people put in for the position?
6      A  I wouldn't be able to -- I can tell you I
7  put in for it.  I don't know how many people --
8      Q  You don't know how many competitors you
9  had?
10     A  I don't know how many competitors I had.
11 I know it's a very desirable position simply
12 because, you know, it is an increase in pay and
13 you're allotted a government vehicle.
14     Q  Okay.  How much money were you making when
15 you were in Hebbronville at the end?
16     A  At the end?  Gross, 55, maybe.
17     Q  Okay.  And that was at a GS step 4 -- GS-9
18 step 4?
19     A  GS-9.  I think it was either GS-9 step 4
20 or 5, somewhere in that area.
21     Q  Okay.  And when you were --
22     A  And that's gross.  That's not my base --
23 you know, that's --
24     Q  No.  I understand.
25     A  -- weekends, holidays, night differential.

Page 75

1  All these other --
2      Q  Right.  What -- well, your base is based
3  on the GS-9, though, right?
4      A  Yes.
5      Q  You don't recall what that was?
6      A  No, I don't.
7      Q  Okay.  When you were transferred to
8  Brownsville and became a GS-11, what was your pay?
9      A  I came in as an 11/1, a GS-11 step 1.
10 Here recently there's been a pay increase.  So at
11 that time, I want to say my base pay was forty-two.
12     Q  Okay.
13     A  Base pay.
14     Q  You don't know what your gross was?
15     A  When I -- like one year after I got here?
16     Q  Right.
17     A  Probably sixty.
18     Q  Okay.  How much extra -- I mean, where
19 does this extra money come from --
20     A  What do you mean?
21     Q  -- over your base?
22     A  Night differential, holiday pay, weekend
23 pay, administrative uncontrolled overtime.
24     Q  So you get paid more if you have to work
25 on weekends or nights?

Page 76

1      A  On Sundays.  Sunday is a premium day.
2      Q  How -- so you're not just salaried?
3      A  No.
4      Q  So when are -- what days -- what is it --
5  when can you work where you get paid more?  You said
6  holidays.  Nights?
7      A  Nights.
8      Q  How much more do you get paid if you work
9  nights?
10     A  I wouldn't be able to tell you.  I don't
11 know.
12     Q  Okay.  Sundays?
13     A  A Sunday pay.
14     Q  What other days -- so if you --
15     A  45 Act.
16     Q  What's that?
17     A  Overtime.
18     Q  Okay.
19     A  And then there's AUO, which is
20 administrative uncontrolled overtime.
21     Q  That's when there's a situation, right?
22     A  No.  That's -- okay.  The pay scale is
23 kind of difficult to explain, but I'll give it a
24 shot.
25     Q  Well, I'm just trying to figure out what

**Page 77**

1 administrative --
2   A  What -- that's AUO.
3   Q  We can't both talk at the same time, so
4 she yells at us.
5   I'm trying to find out what
6 administrative uncontrolled overtime would be
7 separate from overtime.  How do they differ?
8   A  Administration uncontrolled overtime means
9 basically that's it.  Administration has no control
10 over it.  Your base pay is -- like let's say my base
11 pay is -- I'll give you an example, easy figure,
12 40,000.  That's for eight hours a day five days a
13 week.
14   If you maintain two hours of overtime
15 every day out of those five days, then you receive
16 25 percent AUO.  That 25 percent is 25 percent of
17 your annual base pay.  So then you would get
18 25 percent of 40,000, which is 10,000, and add that
19 to your 40,000 base.  So that brings you to 50,000.
20 But you're required to work, instead of an
21 eight-hour day, you have to work a ten-hour day.
22   Q  Oh, so you kind of can get into that.  You
23 can establish that -- you cause yourself to work a
24 ten-hour day?
25   A  If we want to get paid, yes.

**Page 78**

1   Q  Oh, okay.
2   A  And then the difference between that and
3 overtime is your sixth or seventh day is --
4   Q  Real overtime?
5   A  That's like overtime, overtime.
6   Q  Okay.
7   MR. COWEN:  If you look at the case
8 law, it's actually a lot more complicated than that.
9   MS. LEEDS:  I don't want to know any
10 more than that.  That was complicated enough.
11   THE WITNESS:  It gets really --
12   Q  (BY MS. LEEDS) Were you at Mr. Bolch's
13 deposition?
14   A  No, I was not.
15   Q  Okay.  Have you read it?
16   A  No, I don't think I have.
17   Q  Do you know why it is that he says he
18 stopped you?
19   A  He alleges that the reason he stopped me
20 was because the passenger in my vehicle was not
21 wearing a seat belt, I believe, and because -- I
22 think because I revved the engine or something like
23 that --
24   Q  Okay.
25   A  -- was what he said.

**Page 79**

1   Q  Have you heard that he also stopped you
2 because you didn't have a front license plate?
3   MR. COWEN:  Objection to the form of
4 the question.
5   You can answer.
6   Q  (BY MS. LEEDS) Do you know that he has
7 said that?
8   A  Do I know that he -- no.  He never
9 mentioned that.
10   Q  He didn't mention it to you.  But do you
11 know if he has said that that was one of the reasons
12 that he stopped you?
13   A  I don't recall.
14   Q  Okay.  Do you know if you had a front
15 license plate?
16   A  Yes.
17   Q  Did you?
18   A  Yes.
19   Q  You did have a front license plate?
20   A  It had a front license plate.
21   Q  This vehicle, whose was it?
22   A  Norberto Monarrez.
23   Q  And who is he?
24   A  He is a border patrol agent.
25   Q  And where does he live?

**Page 80**

1   A  In Laredo -- who has since transferred.
2 He's not in Hebbronville anymore.  He was
3 transferred to Laredo.
4   Q  Okay.  Was he in Hebbronville at the time
5 of --
6   A  Yes.
7   Q  -- the incident?
8   And did he live with you?
9   A  Yes, he did.
10   Q  Okay.  How many roommates have you had?
11   A  Two.
12   Q  Norberto and David?
13   A  Norberto Morales and David De La Rosa.
14   Q  Were they there at the same time or
15 different times?
16   A  Different times.  David was there first
17 and then he moved out and bought a house, and then
18 Norbert moved in.
19   Q  And this was Norbert's car?
20   A  Yes.
21   Q  Did you have a vehicle of your own?
22   A  Yes, I did.
23   Q  What kind of vehicle did you have?
24   A  I had a Ford F-350 four-door four-wheel
25 drive diesel.

Page 81

1    Q  And why weren't you driving your own
2  vehicle?
3    A  It's too long to park in the -- Marie's
4  parking lot for lunch.
5    Q  Okay.  Who was your passenger?
6    A  Ms. Garcia.
7    Q  And what's her first name?
8    A  Melissa.
9    Q  Where had you two been?
10   A  Marie's Restaurant.
11   Q  There was only two of you in the car,
12  right?
13   A  That's it.
14   Q  Okay.  And where is Marie's Restaurant
15  located?
16   A  On North Smith in Hebbronville.
17   Q  In Hebbronville?
18   A  On the north end of town.
19   Q  And what had you gone there for?
20   A  Lunch.
21   Q  Who is -- what kind of relationship do you
22  have with Ms. Garcia?
23   A  Then or now?
24   Q  Then.
25   A  Then, she was a friend of mine.

Page 82

1    Q  Is she no longer a friend of yours?
2    A  Well, I haven't -- since I moved here, I
3  don't --
4    Q  Okay.  How good of a friend?  Would you
5  have called her a girlfriend?  Were you dating her
6  or just a friend?
7    A  Well, we like dated on and off.
8    Q  Okay.  Do you know how many different --
9  or just tell me:  How many women did you date while
10  you were in Hebbronville?
11   A  I have no idea.
12   Q  Would you say -- how many women between
13  the ages of 18 and 35 are there in Hebbronville,
14  single women?
15   A  Between ages 18 and 35, single?  Not many.
16  I mean, the town is a small town.
17   Q  I understand.  Do you know?
18   A  Do I --
19   Q  I mean, are there many?
20   A  An actual number?  Not many.
21   Q  Okay.  But Melissa was one of these,
22  right?
23   A  Yes.
24   Q  Okay.  Did you find that women liked going
25  out with guys with badges in uniforms?  Were they

Page 83

1  drawn to that?  Do you think they are?
2    A  I would think that they were drawn to the
3  individual behind the badge, not just the badge.
4    Q  Well, that's what you would like.
5    A  Well, yeah.
6    Q  But do you know if that --
7    A  Well, that's what I think.  I mean, as far
8  as I'm concerned --
9    Q  Okay.  Did you know Mr. Bolch in any kind
10  of social capacity?
11   A  No, not really.
12   Q  Okay.  How many times had you met him?
13   A  Fifty.
14   Q  Under what circumstances?
15   A  On duty.
16   Q  Doing what?
17   A  Backing him up on traffic stops, him
18  coming to the checkpoint to pick up intoxicated deer
19  hunters, or people having car trouble.  Just a
20  multitude of things.
21   Q  Do you know how long -- do you know
22  how long he was in Hebbronville?
23   A  Two years, maybe.  I really don't know.
24   Q  Okay.  Other than just seeing him on duty,
25  did you ever see him in any kind of social capacity

Page 84

1  at all?
2    A  I would see him, not speak to him.  But I
3  mean, like if he was off duty, I mean, I knew what
4  kind of car he drove and he knew what kind of car I
5  drove and, you know --
6    Q  Okay.  How long was Norbert in
7  Hebbronville?
8    A  He got there much after I did.  I would
9  say he's been in the Border Patrol maybe seven to
10  eight years, which he spent all of that time there.
11   Q  In Hebbronville?
12   A  In Hebbronville.  And then after I
13  transferred, he stayed there.  And then he got a
14  promotion to Laredo after I left, I believe.
15   Q  This car was -- what kind of car was it?
16   A  It was a Mustang.
17   Q  What color?
18   A  Black.
19   Q  What year, do you know?
20   A  Probably mid Nineties.
21   Q  Okay.  Did you pick up Melissa?
22   A  I don't recall.
23   Q  Where were you headed when you were
24  stopped?
25   A  Back to my house.  No.  She picked -- I

Page 81 - Page 84

Page 85

1  picked her up at my house. In other words, I was at
2  home, she showed up, left her car there. And then
3  we got in Norbert's car, and then we went to Marie's
4  Restaurant, went to go eat. After we ate, we were
5  on our way back to the house so she could pick up
6  her truck.
7      Q  Okay. Have you talked to Melissa at all
8  since you have filed this lawsuit?
9      A  I've spoken to her a couple of times when
10 I've gone to Hebbronville to, you know, just to go
11 visit friends and stuff, I've run into her a couple
12 of times.
13     Q  Okay. But specifically have you talked to
14 her about the lawsuit?
15     A  I told her that I -- I think I told her
16 that I had contemplated it or I had already done it,
17 but I'm not sure.
18     Q  Okay. Since -- well, you filed the
19 lawsuit in 2001. Do you think you've talked to her
20 since then about it?
21     A  No. Actually, it was before that that I
22 talked to another attorney prior to --
23         MR. COWEN: Yeah. Don't talk
24 about --
25         MS. LEEDS: Well, I'm not talking --

Page 86

1          MR. COWEN: -- your conversations
2  with attorneys.
3      Q  (BY MS. LEEDS) -- about attorneys. I'm
4  not talking about attorneys. I'm talking about to
5  Melissa. Do you know if you've talked to Melissa
6  since 2001, because that's when you filed the
7  lawsuit.
8      A  Since 2001? That was just last year.
9  Maybe once or twice.
10     Q  Okay. Did she ever get out of the car
11 during this stop?
12     A  No. Well, that's not true. She got out
13 of the car after Mr. Bolch gave her the keys and
14 said, "Okay, you can go."
15     Q  Okay. To drive the car?
16     A  To drive the car away, yes.
17     Q  But while he was talking to you, she
18 remained in the car?
19     A  Yes.
20     Q  Okay. Did Mr. Bolch -- did you see
21 Mr. Bolch talk to her?
22     A  He came around the passenger's side of the
23 vehicle. I don't know what was said or not said
24 because I was at the back of the vehicle.
25     Q  In the back of which vehicle?

Page 87

1      A  Not in the vehicle, at the back of the
2  vehicle that I was driving, because he told me to
3  step out of the car and go to the back, so I went to
4  the back.
5      Q  Okay. Where was his car parked?
6      A  Behind my vehicle.
7      Q  And you were behind your vehicle?
8      A  Yeah. In other words, we were like this,
9  and I was in between the two vehicles.
10     Q  That was my question. When you saw
11 Mr. Bolch go talk to Ms. Garcia -- you saw him go
12 over there, but you did not hear their conversation?
13     A  I don't know what was said, no.
14     Q  Okay. Had she ever told you if anything
15 was said between them?
16     A  No.
17     Q  They obviously must have talked about her
18 driving the car home, though, right?
19     A  I would imagine that's what was discussed.
20     Q  Tell me about what happened. Just in your
21 words, what happened?
22     A  Well, we were coming back from eating
23 lunch. I got stopped by Isaac Bolch. I was
24 traveling in one direction, he was traveling in
25 another direction. He turned around, got behind me,

Page 88

1  pulled me over in front of the high school.
2          I rolled the windows down -- or my
3  window down. I rolled my window down. He
4  approached the vehicle from the driver's side and he
5  said that the reason he had stopped me was because
6  the passenger in my vehicle wasn't wearing seat
7  belt and that I had revved the engine.
8          And then after that he asked me for
9  my driver's license and proof of insurance. And he
10 did identify himself to me, told me who he was. I
11 already knew who he was.
12         And he asked me for my driver's
13 license, proof of insurance. I got my driver's
14 license. And since it wasn't my car, I didn't know
15 exactly where the insurance was at. And it's
16 Mustang, there was like a little center console.
17 I opened that little center console and I saw the
18 insurance in there and I grabbed it. And when I
19 grabbed it, I remembered that I had my pistol in the
20 back seat -- not in the back seat, on the floor
21 of the back seat driver's side.
22         So I turned around, I handed him my
23 driver's license and my insurance, and I said, "
24 Isaac, I just want to let you know that I have a
25 pistol, you know, in my -- in the back here.

Page 89

1  And he says, "Okay." He says, "Do
2  you have a concealed handgun permit?"
3  And I said, "No, I don't."
4  He says, "Are you a law enforcement
5  officer?"
6  And I looked at him and I said
7  something like, "Isaac, it's me," or something to
8  that effect. And I thought for a second and I said,
9  "Okay. Yes, I am a law enforcement officer."
10  He says, "Who do you work for?"
11  And I said, "I work with the Border
12  Patrol." And the whole time I'm thinking why is he
13  asking me? I had just -- the night before I had
14  just -- he had had a traffic stop and I backed him
15  up on that traffic stop. And then I reasoned to
16  myself, well, maybe he just doesn't recognize me
17  because I'm not in a uniform.
18  So then he says, "Are you a law
19  enforcement officer?"
20  And I said, "Yes, I am."
21  And he says, "Who do you work for?"
22  And I said, "Border Patrol."
23  And he says, "Are you on duty right
24  now?" No. He says, "Are you on your way to work,"
25  I think he said.

Page 90

1  And I said "No."
2  He says, "Are you coming from work?"
3  And I said "No."
4  Then he said, "Are you on duty at
5  this time?"
6  And I said, "No, Isaac. It's my day
7  off. I'm coming from Marie's Restaurant."
8  And he says, "Did you know that I
9  could arrest you for unlawful carrying of a weapon?"
10  No. Before that he says, "You have no authority to
11  carry your weapon."
12  He says -- I said, "Well, as a matter
13  of fact, I do, Isaac." And I pulled out my badge
14  and I showed it to him and I showed him where it
15  says that, you know, the United States
16  Immigration -- I can't remember the exact wording,
17  but it says, you know, effect warrantless arrests,
18  carry a firearm and under the authority of the
19  Attorney General of the United States.
20  His response to that was, "Well, I
21  don't care what your authority says. You're in
22  Texas right now. And as long as you're in Texas,
23  you're going to go by Texas laws."
24  So I said, "Okay, Mr. Bolch. Let me
25  ask you a question. What country is Texas in?"

Page 91

1  And he says, Well, it's in the United
2  States."
3  And I said, "Well, I work for the
4  United States Government." I said, "I understand
5  that the Texas Penal Code does not recognize a
6  border patrol agent as a peace officer, but the
7  Texas Penal Code also doesn't recognize an FBI agent
8  as a Texas peace officer."
9  And I said, "I mean, I understand
10  what you're telling me," I said, "but I don't fall
11  under the Texas Penal Codes. I fall under the Code
12  of Federal Regulations and the Immigration and
13  Nationality Act."
14  And then, once again, he says, "Well,
15  you're in Texas right now. As long as you're in
16  Texas, you're going to go by Texas laws."
17  So I said "Okay."
18  And he kept on going back and telling
19  me, you know, he could do this and he could do that.
20  And finally I said, "Look, listen, Isaac, I'm not
21  going to sit here and argue with you as to who has
22  more authority to do what. Apparently you know your
23  authority and where you derive it from, and I know
24  my authority and where I derive it from." I said,
25  so -- and by now there's you know, people standing

Page 92

1  in front of the high school and everybody is looking
2  and seeing what's going on. And I said, "Look, you
3  know, I'm not going to stand here in front of all
4  these people that I deal with and argue with you."
5  "If you feel the need to
6  arrest me, then go ahead and do so. Otherwise, put
7  me back in the car, give me my ticket or whatever
8  you need to do and let me go. But I'm not going to
9  stand here and argue with you anymore."
10  And at that time he asked me to turn
11  around, lean up against the car, place my hands
12  behind my back. I did that. Then he turned me
13  around, he walked me to the vehicle, and he opened
14  the driver's side rear door of his sedan, and I
15  attempted to get in the sedan. But getting in the
16  vehicle with your hands behind your back, and that
17  cage being so close to the seat, it was kind of
18  difficult for me to get in, so I kind of got in
19  sideways.
20  And where the door opens and closes
21  right here, there's like a post -- actually, the
22  door hinge where the door opens and closes. Well,
23  right next to that there's a steel pipe and it's the
24  frame to the cage that goes all the way around the
25  vehicle.

Page 93

1  Well, as I got in the vehicle, I was
2 trying to get my left leg inside and it got hung up
3 where that cage comes down between my knee. And as
4 I was putting my foot in, Isaac reached around and
5 he slammed the door. And the door actually locked
6 and it caught between the post of the cage and the
7 door, and it wedged my knee in there, and I began to
8 yell very loud, because he had the air conditioner
9 on in the vehicle and all the doors were closed. So
10 I started actually screaming really loud, "Open the
11 door, open the door."
12       And he was kind of -- I could see by
13 the expression on his face that he either couldn't
14 hear me or -- because he just kept looking at me.
15 And then finally he opened the door and I was able
16 to get my foot all the way in, and then he re-closed
17 it again. And then after that --
18   Q Okay. Hang on just a second. You lost me
19 there. Your foot all the way in? Your foot wasn't
20 in the --
21   A No. No. My foot --
22   Q Your foot was outside the door?
23   A No. My foot was -- it's hard for me to
24 explain. I'd have to actually get and show you --
25   Q Okay. I have the picture --

Page 94

1   A I don't think you've ever seen the back --
2   Q I have the picture of the pole and the
3 door. Where was your foot?
4   A My foot was between the cage and --
5   Q That U-bar?
6   A And the -- yeah. Here. Do you have a --
7   Q Yeah. There's -- a rollover protection
8 deal, right?
9       MR. COWEN: Don't draw unless
10 you're --
11       THE WITNESS: Oh, okay.
12   Q (BY MS. LEEDS) Is that what we're
13 talking about? That --
14   A Yes.
15   Q It's a rollover protection?
16   A So it got me --
17   Q Okay.
18   A -- from here all the way -- all this part
19 of my leg was between the door and the cage. So he
20 had to open the door so I could move my leg in so he
21 could close it, and it closed.
22   Q Okay. Well, I just -- when you said "my
23 foot all the way in," I thought, wait a minute, your
24 foot wasn't outside the door?
25   A Oh, no. He would have cut it off.

Page 95

1   Q Okay. It was just stuck between --
2   A Between the cage --
3   Q -- the cage and the door?
4   A -- and the door, correct.
5   Q Okay. Go ahead. I'm sorry. I just had
6 to clarify that little piece. Then what happened?
7   A Well, I sat in the vehicle for a little
8 bit. And he stayed out -- and he was searching the
9 car, I don't know what. After that, I don't know
10 what transpired verbally.
11       I could just see him leaning over in
12 the car. And he had opened the driver's door and he
13 had gotten my gun out of the bag and he had it on
14 the roof and he -- my badge was up there. And he
15 was looking around through the car for a little bit.
16       And then Melissa got out of the car,
17 walked around to the driver's side, and she kind of
18 looked at me, and I -- you know, I motioned like go
19 home, go to my house. And so she went -- I guess
20 she went to my house. Who knows. But she took off.
21       And then he got in the car and we
22 started driving to the -- to the jail. And I said,
23 "Isaac, why are you taking me to jail?" I don't
24 remember the exact wording that I used, but
25 something to that effect.

Page 96

1       And he said, "You'll see when you get
2 there. You'll see when you get there."
3       And then I said to him, "Isaac, are
4 you sure that's what you want to do? You want to
5 take me to jail?"
6       And he says, "Oh, I'm more than sure
7 I've been wanting to do this for a long time."
8       And I said "Okay." So -- and then
9 I -- he started asking me questions. And I said,
10 "Do you know what, I have nothing I want to say to
11 you at all. I don't want to speak to you. Nothing
12 at all."
13       We got to the jail. When we got to
14 the jail, the booking officers and stuff were there
15 and they were kind of surprised to see me walk in.
16       I asked the booking officer, you
17 know, why I was being placed in jail. And then you
18 know, he said, "Well, for unlawful carrying of a
19 weapon."
20       And I said "Okay."
21       And then they took the handcuffs off
22 me, and then Bolch went away, I don't know where
23 went to. I guess to start his report. And I stood
24 there and I asked the booking officer if I could
25 speak with the sheriff.

Page 93 - Page 96

Page 97

1    He says, "Yeah, okay," and then he
2  left. And he came back a little while later and he
3  says, you know, "The sheriff is busy right now."
4    I said "Okay."
5    Then they took everything off me,
6  they strip-searched me, they took my clothes off,
7  they -- a full search.
8  Q  Uh-huh.
9  A  Then they fingerprinted me, made me sign
10  my fingerprints I guess to submit them off to the
11  FBI. Then they photographed me and then they put me
12  in a little holding cell. I was in that holding
13  cell -- I don't have an accurate time of all of this
14  stuff because everything was taken from me. I
15  didn't have a watch. I didn't have anything. So
16  these are all just estimated times. So I was there,
17  I guess, two hours in that cell.
18    And then I waited -- I waited for
19  some time. And then the booking officer came out
20  and opened the little holding cell thing and told me
21  to follow him. And then he took me into another
22  room and he got me this big hairy mattress.
23    And I said, "What is this for?"
24    And he says, "Well, so we can put you
25  in a cell."

Page 98

1    And I said, "You know, you can't put
2  me in a cell. There's all these people in this
3  cell. And I would say 70 percent of the people that
4  are in that cell I know them. I mean, I put them --
5  I arrested them and had them incarcerated. And if
6  you --" and I think I might have used the words, "If
7  you put me in this cell, that would be the
8  equivalent of putting a rabbit in a cage with a
9  bunch of pit bulls. I mean, if they find out who I
10  am, they are going to kill me."
11    And he was like, "Well, you know, I'm
12  just following orders. That's what they told me to
13  do." But he never told me who gave him that order
14  to do it.
15    And then I said "Okay." Well, I
16  mean, there's not much I could do about that. So
17  they put me in the cell. And while I was in that
18  cell, there were people that were roaming around
19  free. I guess it was like a trustee that's allowed
20  to walk around.
21    They put me in the cell. There was
22  other people walking up and down that little
23  corridor. The cell that I was in had feces in and
24  around the outskirts of the commode area. That
25  mattress -- when I said hairy earlier, I meant there

Page 99

1  was pubic hairs imbedded in this little mattress.
2  Q  How many people were in this cell that
3  they put you in?
4  A  I don't recall.
5  Q  How many beds were there or places to put
6  mattresses?
7  A  I couldn't tell you. I didn't really
8  count them. I pretty much just sat there minding my
9  own business, didn't talk to anybody.
10  Q  Okay. Well, is this the cell that
11  supposedly you -- the person is going to stay in,
12  sleep in?
13  A  Yes.
14  Q  Okay.
15  A  Because it had a bunk and I don't remember
16  how many -- you know, and it had a commode and it
17  had a toilet.
18  Q  That was my question.
19  A  Yes.
20  Q  Do you remember how many bunks were in
21  there?
22  A  No. I don't know.
23  Q  Okay. When -- was there any problem --
24  did you object at all when they were going to
25  fingerprint you?

Page 100

1  A  I asked them what the fingerprints were
2  for. I said, "Why are you guys fingerprinting me?"
3    And they said, "Well, because they
4  need to be -- we are going to submit them to the
5  FBI."
6  Q  Did you refuse to be fingerprinted at any
7  time?
8  A  No.
9  Q  Do you remember the name of the booking
10  guy?
11  A  There were several of them there. I
12  remember one person's name. I don't know who --
13  Q  Okay. Which one do you remember?
14  A  Ruiz.
15  Q  Ruiz?
16  A  Ruiz or something.
17  Q  Okay.
18  A  As a matter of fact, I think he was the
19  same individual that I had asked, "Hey, can I talk
20  to the sheriff?" And I think he was -- because he
21  was like the cool -- I mean, he was nice to me. He
22  was -- well, they all were. All the whole -- the
23  whole --
24  Q  Jail?
25  A  -- booking officer staff, you know,

Page 97 - Page 100

Page 101

1 those -- they were all polite, because I know them.
2 I know them more -- or at the time, on a social
3 basis, than I did, you know --
4   Q Did Melissa ever tell you what Bolch told
5 her? Did you ever talk to her after this happened?
6   A No. I never --
7   Q What did she say to you?
8   A -- asked her what he said or did not say.
9   Q Okay. You have claimed that the -- what
10 they did to you -- or being in that cell violated
11 your constitutional rights, correct?
12   A Yes.
13   Q Okay. What is it about what happened to
14 you in the jail that you say violated your
15 constitutional rights?
16      MR. COWEN: I'm going to object to
17 the form of the question insofar as it calls for
18 knowledge of tort law that he doesn't have. He can
19 answer as to his understanding of the law.
20      THE WITNESS: The simple fact that I
21 was incarcerated.
22   Q (BY MS. LEEDS) Okay. But do the jail
23 conditions in any way, in your opinion, violate --
24 did they violate your constitutional rights?
25   A Yes.

Page 102

1      MR. COWEN: Same objection.
2   Q (BY MS. LEEDS) How?
3   A The feces in and around the commode.
4   Q Okay.
5   A The pubic hairs imbedded in the mattress.
6   Q What is it about that that you say
7 violates your constitutional rights?
8      MR. COWEN: Same objection.
9      THE WITNESS: The inhumane living
10 conditions.
11   Q (BY MS. LEEDS) Okay. Anything else?
12   A That I can think of, no.
13   Q Okay. You have made a claim to a right to
14 free speech, that that was violated. Can you tell
15 me more about that?
16      MR. COWEN: Same objection.
17      THE WITNESS: The right to -- I
18 wasn't allowed --
19   Q (BY MS. LEEDS) Well, let me ask you
20 this: Did you try to speak out about something of,
21 you know, public importance and were not allowed to?
22      MR. COWEN: Objection, form, as to
23 the legal definition you're giving.
24      You can answer as to your
25 understanding of the law.

Page 103

1      THE WITNESS: Could you ask me the
2 question again, please?
3   Q (BY MS. LEEDS) Yeah. Did you try to say
4 something to someone and were prevented from doing
5 so?
6      MR. COWEN: Same objection.
7      THE WITNESS: The sheriff. I wanted
8 to speak with the sheriff and was not allowed.
9   Q (BY MS. LEEDS) Okay. What is your
10 concept of your right to free speech?
11   A My concept to the right of free speech?
12 The ability to speak out and voice my opinion.
13   Q Okay. Did you try to do that in any way
14 in this situation other than complain about the fact
15 that you were arrested? Okay. Put that one aside.
16 Did you try to speak out about anything else in this
17 situation and were not allowed to?
18   A I tried to speak out to the jail personnel
19 and advise them, "Hey, look, you know, I need --"
20 but I was --
21   Q But this was about your arrest?
22   A Yes.
23   Q Okay. And my question is: Did you try to
24 speak out --
25   A About something else?

Page 104

1   Q -- about something else?
2   A No.
3   Q Okay. You were -- the times you tried to
4 speak out were to complain about the fact that you
5 were there, that you had been arrested?
6   A Yes.
7   Q Okay. Did you know any of the people that
8 were in the cell you were in?
9   A Personally? No.
10   Q Did you know any of their names?
11   A I recognized the faces.
12   Q Okay. Did you ever discover any of the
13 names of the people that were there with you?
14   A No, I didn't. As I said before, I kept my
15 mouth shut, looked down, didn't say anything.
16   Q Now, you were once a booking officer once,
17 right?
18   A Yes, ma'am.
19   Q When you book somebody into jail, it is
20 standard procedure to take away all their
21 belongings, correct?
22   A Yes.
23   Q Okay. Was there anything about the way
24 they booked you or the way they processed you into
25 the jail that you claim violated your rights?

Page 105

1  MR. COWEN: Objection to the form of
2  the question as far as he's not a legal scholar
3  subject and does not have knowledge of all the legal
4  standards of what may or may not constitute a
5  constitutional violation. However, he may answer as
6  to his understanding.
7  Q  (BY MS. LEEDS) Do you remember the
8  question?
9  A  Could you repeat the question?
10  Q  Sure. You used to book people into jails.
11  A  Yes, ma'am.
12  Q  Okay. Was there anything about the way
13  they booked you into this jail that you say is --
14  violated your constitutional rights?
15  MR. COWEN: Same objection.
16  THE WITNESS: The simple fact that I
17  was booked in. And that's my understanding.
18  Q  (BY MS. LEEDS) That -- I got --
19  A  The simple fact that I was booked in and
20  there was no justified cause to even arrest me in
21  the first place, in my understanding, is violation.
22  MS. LEEDS: Okay. I need to object.
23  Nonresponsive.
24  Q  (BY MS. LEEDS) I'm not asking you about
25  the fact that you were booked in. I'm asking you

Page 106

1  about the procedures that they followed, the way
2  they did it. Was there anything wrong with the way
3  they did it?
4  A  The actual booking process itself?
5  Q  In other words, when Bolch left you there,
6  from then until the time you left, was there
7  anything that anybody did and the way they did it
8  that you would have said was wrong?
9  A  To my knowledge, no.
10  Q  Okay. And I'm asking you that because you
11  used to do that very thing.
12  A  Exactly.
13  Q  So the way they took your name, the way
14  they -- the fact that they took all your belongings,
15  they are supposed to do all of that?
16  A  Yes.
17  Q  If they are booking you into jail, right?
18  A  Yes.
19  Q  Okay. Why did you have your gun with you?
20  A  I carry my gun with me all the time.
21  Q  Okay. What is it that you claim gives you
22  the authority to carry your gun all the time?
23  A  What is it that I -- Section 287-A --
24  Q  Well, does --
25  A  -- of the Code of Federal Regulations.

Page 107

1  Q  Does that say that a border patrol
2  agent --
3  A  On duty and non-duty hours I can carry the
4  weapon.
5  Q  Is that what the --
6  A  Yes.
7  Q  -- Federal Regulation says? Or is that
8  what your INS policy says?
9  A  No, both.
10  Q  Both?
11  MR. COWEN: And just for the record,
12  I'm going to object to any questioning on what the
13  law says or doesn't say. The law is what it is and
14  that's a matter for the court to decide, not for the
15  cross-examination of witnesses. But if you want to
16  waste our time doing it, you're certainly welcome to
17  do so.
18  Q  (BY MS. LEEDS) While I'm looking for
19  this, you are not a Texas peace officer, correct?
20  A  No, ma'am.
21  THE WITNESS: Could I take like just
22  a --
23  MS. LEEDS: Yes. I'm sorry.
24  THE WITNESS: I have to go to the
25  rest room.

Page 108

1  MS. LEEDS: Yeah. We haven't even
2  taken a break. Yes, please. I'm sorry.
3  (Recess taken)
4  Q  (BY MS. LEEDS) Mr. Bolch, you had
5  mentioned a particular CFR that is --
6  MR. COWEN: Object to the form.
7  Q  (BY MS. LEEDS) -- a federal regulation,
8  did you not?
9  MR. COWEN: He's not Mr. Bolch.
10  Q  (BY MS. LEEDS) Oh, you're not Mr. Bolch?
11  I thought I was deposing -- I'm sorry.
12  Mr. Gilbert, you mentioned a
13  particular CFR. Could you repeat that number?
14  A  It's 287-A, I believe.
15  Q  And let me hand you what we will mark as
16  Gilbert 1 and ask you if this is the section that
17  you are referring to that authorizes you to carry
18  firearms?
19  MR. COWEN: I'm just going to object
20  to the question as far as it calls for a legal
21  conclusion.
22  But you can answer it as you
23  understand the law.
24  THE WITNESS: Yes, ma'am.
25  Q  (BY MS. LEEDS) Okay. And that is

Page 109

1 CFR-287, right?
2    A  Yes, ma'am.
3    Q  Is there anything in here that talks about
4 you carrying on and off duty?
5    A  No, ma'am.
6    Q  Is there another law that you know of that
7 specifically authorizes you to carry on and off
8 duty?
9        MR. COWEN:  Same objection.
10       THE WITNESS:  We have a firearms
11 policy.
12   Q  (BY MS. LEEDS)  I understand that.  I'm
13 asking you about a law.
14       MR. COWEN:  Object to the form of the
15 question to the extent that it assumes that a
16 firearms policy duly issued by the federal
17 government of the United States is not a law.
18       Subject to that objection, you can
19 answer the question.
20       THE WITNESS:  Okay.
21   Q  (BY MS. LEEDS)  Do you know of some other
22 law, statute --
23   A  No.
24   Q  -- that -- let me finish the question so
25 we'll get a record -- that authorizes you to carry

Page 110

1 firearms on and off duty?
2    A  No.
3    Q  Does your INS policy mention -- does the
4 INS policy specifically authorize you to carry off
5 duty?  Or does it just mention if you're carrying
6 off duty?
7        MR. COWEN:  Objection to the form of
8 the question.  I don't think it's fair to quiz him
9 on a document that's not in front of him.  He's not
10 required to memorize these things.
11   Q  (BY MS. LEEDS)  Do you remember,
12 Mr. Gilbert?
13   A  If you showed it to me I could --
14   Q  Oh, I know you could read it to me.  I'm
15 asking you if you remember if the policy actually
16 says you are authorized to carry firearms off duty.
17   A  I don't know the specific wording
18 verbatim.  However, I am quite sure that it does say
19 during duty and non-duty hours.
20   Q  Okay.
21   A  I believe.
22   Q  Let me show you what we'll mark as
23 Deposition Exhibit No. 2.  And I'll tell you that --
24 well, let's ask you:  Do you recognize this document
25 that I'm holding up here?

Page 111

1    A  Yes.
2    Q  Okay.  This is the INS firearms policy,
3 correct?
4    A  Yes, ma'am.
5    Q  And does this refer -- do the statements
6 that are made herein apply to you?
7    A  Yes, ma'am.
8    Q  Okay.  And in Section 6, there's a
9 subsection called Guidelines for Carrying Firearms,
10 correct?
11   A  Yes, ma'am.
12   Q  Now, in that section, does it specifically
13 say that you can carry weapons off duty?
14   A  Let me look at it.
15   Q  Sure.
16   A  Yes, it does.
17   Q  It specifically says you can carry them
18 off duty?  Or is that section --
19   A  The wording says -- to be specific, it
20 says "The officer is authorized to carry the handgun
21 during duty and non-duty hours until such time --"
22   Q  Where are you reading that?
23   A  "During duty and non-duty hours."
24   Q  Okay.  That -- okay.  I don't want to
25 argue with you.  But you have taken that out of

Page 112

1 context, have you not?
2    A  I do not believe I have.  It's
3 self-explanatory.
4    Q  Okay.  Let's read the whole --
5        MR. COWEN:  What's the real point of
6 arguing over --
7        MS. LEEDS:  I'm not --
8        MR. COWEN:  -- what the law is when
9 the judge is going to --
10       MS. LEEDS:  Are you objecting?
11       MR. COWEN:  -- determine that?
12       I'm objecting to it as a waste of
13 time and as misleading.
14   Q  (BY MS. LEEDS)  Let's read the whole
15 sentence.  "Where an officer is authorized under
16 Subsection 21 to carry a standard service issued or
17 approved handgun exclusively for approved undercover
18 operation, the officer is authorized to carry the
19 handgun during duty and non-duty hours."
20       So you kind of read that out of
21 context because it's referring to a specific type of
22 gun in an undercover operation, correct?
23   A  Well, it is a specific type of weapon.  It
24 is a service issued Beretta 940 Brigadier which is
25 issued to me by the Service.

**Page 113**

1     Q Okay. But the second half of that
2 sentence which you read is referring to the kind of
3 gun you can carry for an approved undercover
4 operation.
5     A Exactly. And during my non-duty hours if
6 I'm required to -- while I'm off duty, I am still
7 on duty, because at any time, I can be activated
8 onto immediate duty right then and there simply by a
9 phone call to say, "Mr. Gilbert, do you know what,
10 you're back on the clock. You need to come to work
11 right now."
12       So, therefore, I have to have access
13 to my gun at all times in the event that I need to
14 go to whatever it is that they may require me to do,
15 whether it's an undercover --
16     Q Where does this policy say that? Where
17 does this policy say that?
18     A This policy does not say that.
19     Q Okay. And I'm talking specifically about
20 the sentence that you read.
21     A Yeah.
22     Q The part you read, which was, "The officer
23 is authorized to carry the handgun during duty and
24 non-duty hours until such time as the undercover
25 operation is completed" refers to somebody that's

**Page 114**

1 doing an undercover operation, right, that sentence?
2     A If -- yes, if you want to single out that
3 one sentence, yes.
4     Q Okay. Is there --
5       MR. COWEN: Eileen, I'd like to
6 object to this whole line of questioning as being
7 misleading. And I'm allowed -- because that's not
8 the section, as you may know if you've read the
9 whole thing, I don't know if you have or you have
10 not, but that is not the section that empowers the
11 officer to carry one.
12       MS. LEEDS: Objection to the sidebar.
13       MR. COWEN: I am not -- may I finish
14 my objection, please?
15       MS. LEEDS: No, you can't.
16       MR. COWEN: I am going to finish my
17 objection. The preceding page --
18       MS. LEEDS: You cannot --
19       MR. COWEN: -- on page 10 --
20       MS. LEEDS: I understand --
21       MR. COWEN: No. You're asking
22 misleading questions. And when --
23       MS. LEEDS: Excuse me. You don't
24 have to yell.
25       MR. COWEN: I can finish --

**Page 115**

1       MS. LEEDS: I'll yell louder than you
2 will, Michael.
3       MR. COWEN: Well, Eileen --
4       MS. LEEDS: I can ask the question --
5       MR. COWEN: Eileen, you're going to
6 let me finish making my objection --
7       MS. LEEDS: You can't object.
8       MR. COWEN: I can object. I can make
9 whatever objection --
10       MS. LEEDS: You cannot talk on the
11 record.
12       MR. COWEN: I can. This is not state
13 court. This is federal court, number one. And,
14 number two, even in state court when you're asking
15 these kind of misleading questions --
16       MS. LEEDS: I am not asking
17 misleading questions.
18       MR. COWEN: Yes, you are. Let me --
19       MS. LEEDS: I am asking --
20       MR. COWEN: -- please finish --
21       MS. LEEDS: -- him to --
22       MR. COWEN: -- my objection.
23       MS. LEEDS: -- read --
24       MR. COWEN: Eileen, let me finish my
25 objection --

**Page 116**

1       MS. LEEDS: -- the sentence.
2       MR. COWEN: -- or we're going to end
3 the deposition right now if you don't let me finish
4 a sentence without interrupting me.
5       MS. LEEDS: Fine.
6       MR. COWEN: Now, my objection is when
7 you ask about a -- you're asking him about a
8 provision other than the provision we have cited as
9 authorizing him to carry a gun, and then you're
10 trying to trick him by using a different section
11 into saying that the law is something other than
12 what it is. And that is wholly improper.
13       MS. LEEDS: I am not trying to trick
14 him. I am talking about a sentence, a portion of a
15 sentence that he read out of context. I did not
16 trick him with asking him to read --
17       MR. COWEN: But you're asking him --
18       MS. LEEDS: -- this section.
19       MR. COWEN: -- about Section 6 --
20       MS. LEEDS: Yes, I --
21       MR. COWEN: -- instead of Section 5.
22       MS. LEEDS: -- know there is another
23 section, Michael.
24       MR. COWEN: Then why are you wasting
25 our time with it, then?

Page 117

1  MS. LEEDS: I'm talking about a
2  phrase read out of context.
3  MR. COWEN: But your whole question
4  to begin with --
5  MS. LEEDS: It doesn't matter --
6  MR. COWEN: -- was out of context.
7  MS. LEEDS: -- what the question is.
8  It was read --
9  MR. COWEN: Okay. It's just that I
10  have better things to --
11  MS. LEEDS: -- out of context.
12  MR. COWEN: -- do with my time than
13  sit here --
14  MS. LEEDS: Well, too bad. We're
15  here, and I can be all day if I want to.
16  MR. COWEN: And you can be all day if
17  you want to.
18  MS. LEEDS: Okay. Well, then your
19  arguing isn't making it any better.
20  If he reads it --
21  MR. COWEN: I'm going to make
22  whatever --
23  MS. LEEDS: -- out of context --
24  MR. COWEN: -- objections I'm going
25  to make for the record --

Page 118

1  MS. LEEDS: If he reads it --
2  MR. COWEN: -- that I believe --
3  MS. LEEDS: -- out of context, I can
4  put it back into context --
5  MR. COWEN: And I can --
6  MS. LEEDS: -- which is all I'm
7  doing.
8  MR. COWEN: And I can make any
9  objection I think is proper. That's my job as --
10  MS. LEEDS: Well, you can't --
11  MR. COWEN: -- his lawyer.
12  MS. LEEDS: -- instruct him either.
13  MR. COWEN: I did not instruct him to
14  do a darn thing.
15  MS. LEEDS: Okay.
16  MR. COWEN: I have a job to do and
17  I'm going to do it well.
18  Q  (BY MS. LEEDS) Would you agree with me
19  that the section that you read was out of context,
20  in that one portion it refers to undercover
21  operations, would you not?
22  A  In my opinion, no.
23  Q  The sentence you read does not refer to
24  undercover operations?
25  A  Oh, yeah, the sentence does, yeah.

Page 119

1  Q  That's what I'm talking about,
2  Mr. Gilbert. Nothing more.
3  MR. COWEN: Object to your tone of
4  voice towards my witness.
5  Q  (BY MS. LEEDS) I'm just saying that
6  sentence refers to undercover operations, right?
7  A  Exactly.
8  Q  Okay. So the part you read doesn't refer
9  to everybody, it just refers to undercover
10  operations?
11  A  In this section it does.
12  Q  In that --
13  A  In that section.
14  Q  -- sentence. I'm not even --
15  A  Or even in --
16  Q  -- saying section.
17  A  -- that sentence.
18  MR. COWEN: Please refrain from
19  using --
20  Q  (BY MS. LEEDS) I'm saying --
21  MR. COWEN: -- that tone of voice
22  with my witness.
23  Q  (BY MS. LEEDS) -- sentence.
24  A  Even in that sentence, yes.
25  Q  Okay. Okay. Now, that particular

Page 120

1  section, Guidelines for Carrying Firearms, does not
2  say that you are authorized to carry firearms off
3  duty, does it?
4  A  That particular sentence --
5  Q  Section 6. That Section 6 does not say
6  you are authorized to carry firearms off duty, does
7  it?
8  A  No.
9  Q  Okay. Now, Section 5 -- if you would,
10  find Section 5.
11  A  Okay.
12  Q  -- says, "The following immigration
13  officers who have successfully completed basic
14  immigration law enforcement training as defined in
15  Subsection 3.6 are authorized and designated to
16  exercise the power conferred in Section 287-A of the
17  Immigration Nationality Act to carry firearms during
18  duty and non-duty hours, provided they are
19  individually qualified by training and have
20  demonstrated their ability to handle and safely
21  operate the firearms that they are permitted to
22  carry," correct?
23  A  Correct.
24  Q  Now, this is your INS policy, correct?
25  A  Yes.

**SCHWAB COURT REPORTING SERVICE  (956) 544-5126**

Page 121

1  Q  Okay.  And it --
2  A  Well, yes, it is.
3  Q  All right.  And it refers to the law,
4  Section 287 that we talked about before?
5  A  Yes.
6  Q  Okay.  The law does not say you can carry
7  on and off duty.
8      MR. COWEN: Objection to the form.
9  Calls for interpretation of statute and legal
10 opinion.
11 Q  (BY MS. LEEDS)  This Exhibit No. 1 does
12 not say you can carry on and off duty, does it?
13     MR. COWEN: Objection to the form.
14 That's not the law that the statute -- that the
15 section refers to.
16 Q  (BY MS. LEEDS)  Does Exhibit 1 say you
17 can carry on and off duty?
18     MR. COWEN: Objection to the form to
19 the context of the question we're having.  And I'd
20 like to just say for the record, Exhibit 1 is 8-CFR,
21 which is the Code of Federal Regulation.  It's not a
22 statute.
23     Subject to that, you can answer the
24 question.
25 Q  (BY MS. LEEDS)  Better yet.  Does

Page 122

1  Exhibit 1 say you can carry on or off duty?
2  A  It says neither way whether it's on or off
3  duty, no.
4  Q  Okay.  It doesn't say you can carry --
5  well--
6  A  It doesn't say you can carry it on duty or
7  it doesn't say that you can carry it off duty and it
8  doesn't say that you cannot carry it off duty.  So
9  it's how you interpret it, how you want to interpret
10 it.  It simply says that you can carry a firearm.
11 Q  You are authorized to --
12 A  To carry --
13 Q  -- carry a firearm?
14 A  -- a firearm.  It does not specify whether
15 it's during duty or non-duty.  So it's an
16 interpretation --
17 Q  So you --
18 A  -- as to what --
19 Q  -- would agree --
20 A  I interpret it as in --
21 Q  You would agree with me that the words
22 that are on this paper here do not say you are
23 authorized to carry a firearm off duty.  Those words
24 do not --
25 A  That exact wording, correct, I agree with

Page 123

1  that.
2  Q  And we'll need to -- okay.  Now, are you
3  familiar with the Texas Concealed Weapons law?
4  A  No, ma'am.
5  Q  Do you know -- what are elements of an
6  offense?
7      MR. COWEN: Objection to the extent
8  it asks for a legal conclusion.
9      You can answer the question.
10     THE WITNESS: Of an offense?
11 Q  (BY MS. LEEDS)  When you arrest somebody,
12 what is it that you try to find out?
13 A  Whether the individual had the knowledge,
14 the ability, and the intent.
15 Q  Of what?
16 A  To commit whatever offense it is that he
17 committed.
18 Q  Okay.  What is it that you're trying to
19 find out about that offense?
20 A  Well, if a crime, in fact, took place.
21 Q  Okay.  And you ask them questions
22 regarding what kinds of facts?
23 A  Just articulable facts, leading up to
24 whatever reasonable or probable cause is to stop
25 that -- or stop, detain, whatever.

Page 124

1  Q  Whatever it is that you're doing?
2  A  Exactly.
3  Q  Right.  Okay.  Do you know those to be
4  elements of an offense?  In other words, you have
5  to -- for you to have probable cause to stop,
6  detain, et cetera, there are certain things that
7  you've got to find out if they did?
8  A  Articulable facts.
9  Q  So that's correct, right?
10 A  Now, are you referring -- I have no idea
11 how state law is.
12 Q  No.  I'm not asking you state law.
13 A  Okay.  As long as we were on the same
14 sheet of music.
15 Q  Right.  Yes.
16 A  For federal?  Yes.
17 Q  Yeah.  You find out --
18 A  Articulable facts --
19 Q  -- what they did?
20 A  -- leading up to what --
21 Q  You try to find out what they did.
22 A  Exactly.
23 Q  Okay.  And if they fit -- you know, if you
24 can check off enough boxes, there's probable cause?
25 A  Yes.

Page 125

1  Q  Okay.  Do you know if, in fact, that's
2  what Mr. Bolch did with you?
3      MR. COWEN: Objection.  Form.  Calls
4  for speculation.
5      THE WITNESS:  I cannot answer on
6  his --
7  Q  (BY MS. LEEDS) Did you know any of the
8  people that you say gathered in the area?
9  A  Personally?
10  Q  Uh-huh.  Do you know the names of anybody?
11  A  I do know the names.  I just cannot recall
12  if they actually heard, what they saw.
13  Q  Okay.  Well, then, tell me the names.
14  A  Cathy.
15  Q  Cathy what?
16  A  Rhodes.  She's a schoolteacher there.
17  Q  Anybody else?
18  A  There's a bunch of them, all the little
19  kids, but there were so many, I can't remember --
20  Q  Well, the reason I need to know is if any
21  of these people are going to come testify at trial,
22  I need to know them now.
23  A  No.
24  Q  Okay.  Did Cathy Rhodes see what happened?
25      MR. COWEN: Objection.  Calls for

Page 126

1  speculation.
2  Q  (BY MS. LEEDS) If you know.
3  A  I was about to say --
4  Q  If you know.
5  A  I don't know.  I do know she teased me
6  about it.
7  Q  Okay.  What did she say?
8  A  I don't remember.
9  Q  By any chance, is she Carl's --
10  A  Wife.
11  Q  Wife?
12  A  Yes.
13  Q  Okay.  Anybody else that you know of that
14  witnessed what happened besides Ms. Garcia?
15  A  No, ma'am.
16  Q  Okay.  Now, we asked one of these
17  questions that was, "How have you lost or suffered a
18  loss of earning capacity?"  And one of the things
19  you said was that if you are asked if you've been
20  charged with a firearms violation, you're going to
21  have to answer yes.
22  A  Yes.
23  Q  Were you ever charged with any violation?
24  A  Well, yes.  I was charged with unlawful
25  carrying of a weapon.

Page 127

1  Q  Okay.  What's the difference between a
2  charge and an arrest?
3      MR. COWEN: Objection.  Form.  Calls
4  for a legal conclusion.
5      You can answer as you understand the
6  law.
7      THE WITNESS:  I don't see a
8  difference between charge and arrest.
9  Q  (BY MS. LEEDS) Okay.  You were arrested
10  for unlawfully carrying a weapon, correct?
11  A  And charged with it.
12  Q  Okay.  You believe you were charged with
13  it.  Okay.
14      Have you ever applied anywhere other
15  than -- well, have you applied anywhere where you've
16  had to answer that question?
17  A  Not yet.
18  Q  Do you have any plans to?
19  A  Yes, I do.
20  Q  Where?
21  A  Supervisory position.
22  Q  Like a first line supervisor?
23  A  Yes, ma'am.  And also there's a continuing
24  investigation that goes on with every federal agent
25  every five years.  My five-year background

Page 128

1  investigation is up for renewal again.  And during
2  that background investigation, I will be asked, you
3  know, have you ever been charged with I believe the
4  wording is firearms or explosives.
5  Q  Have you known anybody to have answered
6  yes to that question and been reprimanded or somehow
7  had an adverse action occur to them?
8  A  Let me think about that one.  As in
9  answering on the application yes and then not be
10  hired?  Or already be hired --
11  Q  I'm talking about the situation you're
12  talking about.  Do you know of anybody that's been
13  in your situation that has had something happen to
14  them and they have answered the question yes and
15  something bad has happened to them?
16  A  To my knowledge, no.
17  Q  You've been in Border Patrol how long,
18  now?
19  A  Ten years.
20  Q  Coming up on ten years?
21  A  September 21st of this year will be ten
22  years.
23  Q  Is that when they do your second
24  five-year -- you said every five years?
25  A  Let me see.  They do the preliminary one

Page 129

1 when you first get hired. And there's no set --
2 because it's such a long investigation, sometimes
3 they take five years. Sometimes it may take longer.
4 It just depends how often you've moved, credit
5 history. All different types of things.
6    Q How is your credit history?
7    A To my knowledge it's well.
8    Q Is there anything else that could keep you
9 from becoming a first line supervisor if you sought
10 the position other than, as you claim, this
11 particular incident?
12    A No.
13    Q Have you had any other kind of write-ups
14 or disciplinary problems at all?
15    A Let me see. Yes.
16    Q Tell me about them.
17    A I lost my binoculars during the course of
18 my duties.
19    Q Okay. What else?
20    A I think that's it.
21    Q So if we get your personnel file, you
22 should just have one write-up in there for losing
23 your binoculars?
24    A That's what I'm thinking. In ten -- to my
25 knowledge -- I mean, it's possible that I might have

Page 130

1 something in my file that I don't know about.
2    Q That you don't know about? Okay.
3    A I have a government credit card that -- I
4 was detailed, came back on detail -- from detail and
5 then you have to submit a voucher. I was counseled
6 on that, but it was beyond my control simply because
7 I submitted my voucher at the allotted time.
8       However, it took Region up in
9 Washington five or six months to reimburse me, so it
10 took that five or six months for me to pay back my
11 government credit card. And I was given just some
12 oral admonishment and told, "Don't do it again."
13    Q Okay. Anything else?
14    A To my knowledge, no.
15    Q Okay. Have you sought any K-9 position
16 while you've been in Brownsville?
17    A No. There's no positions available. They
18 are filled.
19    Q Have you seen any medical personnel or
20 healthcare practitioner of any kind as a result of
21 this incident?
22    A No, ma'am.
23    Q Meaning mental health or physician?
24    A No, ma'am.
25    Q Did you see any doctor as a result of the

Page 131

1 injury to your knee?
2    A No, ma'am.
3    Q When were those pictures taken?
4    A The day I got out of jail, I went back to
5 the house. It was the next morning I took the
6 picture. I didn't have access to a camera.
7    Q Okay. What day of the week did this occur
8 on?
9    A I'm not -- I don't know, ma'am.
10    Q Okay. How long --
11    A It was the day after my birthday. That's
12 all I remember. It was my birthday gift from the
13 county.
14    Q How long did you stay in jail?
15    A I had no concept of time because I didn't
16 have a watch. I could give you a -- what I felt.
17 It felt to me, I don't know, ten hours.
18    Q How long did it really take? What time
19 did this happen?
20    A I don't know.
21    Q What time did --
22    A I think it was -- it was about the time
23 kids were getting out of school, so it was between
24 3:00 and 4:00.
25    Q What time did you get out of jail?

Page 132

1    A It was dark. I think it -- maybe 7:00,
2 maybe.
3    Q P.M.?
4    A Yes.
5    Q Okay. What happened for you to get out of
6 jail? I mean, what -- did you call somebody? What
7 happened?
8    A After being in jail for a while, I was
9 allowed to use the phone. And the first person I
10 called was my first line -- or I called a first line
11 supervisor, which was George Diaz. And I told him
12 that I was in jail and I had been arrested and
13 charged with unlawful carrying of a weapon.
14       And he told me that he would be right
15 over to get me out. But I never saw -- he never
16 showed up. And I don't know what transpired. Some
17 more time went by and then they took me out of the
18 cell and they took me into this little room, and
19 there was a J.P. there. He was charging me with the
20 unlawful carrying of a weapon.
21       And then while I was in that waiting
22 area, that was when the sheriff came into the
23 office. Apparently -- and this is speculation.
24 This is secondhand, after the fact that my
25 supervisor told me that the sheriff called to the

Page 133

Border Patrol station and advised Mr. Diaz that I was incarcerated. And Mr. Diaz told him that he was aware of that. And the sheriff asked Mr. Diaz was there some law that gave us the authority to carry the weapon.

He said yes, there was.

And he said, "Do you have a copy of it?"

The sheriff -- I don't know if it was faxed or he went and picked it up, but he obtained a copy of it somehow and he came back in, he spoke to the J.P. for a little while. And the J.P. came back to me and said, "You know, do you realize how much trouble you're in?"

And I said --

Q The J.P. said that?

A The J.P. told me that. And then he proceeded to say, you know, how this is a very serious charge against you.

And I said that I was aware of that.

And he said, "However, the sheriff is --" I don't know his exact wording but something to the effect of, "The sheriff decided that he's going to drop the charge of unlawful carrying of a weapon. And as soon as you pay your 100-dollar fine

Page 134

for disorderly conduct, you are free to go." And that was the very first time that I ever had knowledge of being charged with the disorderly conduct.

And then he came back and said, "No, we're dropping it to a disorderly conduct," when earlier, you know, he had said that I was being charged with unlawful carrying of a weapon and disorderly conduct. And then they --

Q When you said earlier, earlier when?

A When the J.P. and the sheriff were standing there. They didn't tell me this. I could hear them talking. They were in the same room. They were talking.

And at first they said, you know, "Well, what do you have him for?"

And then he says, "For the unlawful carrying of a weapon and disorderly conduct."

And then they came back and said no, it was unlawful carrying of a weapon being reduced to disorderly conduct.

Q Who said that?

A The J.P. The J.P. told me that.

Q Okay.

A And that as soon as I paid my 100-dollar

Page 135

1 fine for the disorderly conduct that I was free to
2 go.
3 So at the time I told the J.P., "With
4 all due respect, I'm not going to pay $100 because
5 at no time was I ever disorderly. I acted
6 professional the whole time. And I just cannot --
7 you know, I would rather stay here than to pay the
8 $100 because I was not disorderly ever."
9 So then the sheriff intervened again
10 and then pulled the J.P. away and then they went to
11 the corner and they started talking again. And the
12 J.P. came back and the J.P. says, well -- I don't
13 remember the wording but something like, you know,
14 "The sheriff is in a good mood," or something like
15 that and he has decided to go ahead and just drop
16 the whole thing.
17 And I said "Okay."
18 So then the J.P. walked away and then
19 the sheriff came in. And the sheriff told me, "You
20 know, John --" I believe 55 is what he called me
21 because back then it was my star number. So that
22 was my nickname. So he said, "You know, I know we
23 don't have the best relationship and I know a lot of
24 the times blah, blah, blah, but what we need to do
25 is let's get a bunch of our deputies together and

Page 136

1 we'll get a bunch of the agents together and we'll
2 go out to the ranch and we'll have a big barbecue
3 and we'll just let bygones be bygones."
4 And I didn't say anything to that
5 response. I might have nodded my head yes or
6 something. And I was then taken back into the jail
7 and I was given like a little yellow folder or a bag
8 and it had my watch and all my personal belongings.
9 They took me out of there and they took me into
10 another room and then they gave me my gun and
11 badge and everything and they opened the front
12 and let me out. And Bolch did make a comment
13 me --
14 Q When?
15 A Before I left. And I don't know what his
16 exact words were verbatim, but it was something
17 the effect of, "If it was up to me, you would still
18 be in here." And I didn't say anything to him
19 I, you know --
20 Q How did you get home?
21 A I walked.
22 Q How far did you live from the jail?
23 A Fifty yards.
24 Q Okay.
25 A So I know they all -- I mean, Bolch knew

Page 137

1 who I was.
2    Q You've made the claim that kind of like
3 the sheriff was out to get you because you had
4 arrested a relative of his. Why is it that you're
5 making that claim?
6    A It was -- the time span was just, to me,
7 so coincidental after arresting the sheriff's family
8 member that --
9    Q Do you know how close of a family member
10 he is?
11    A I believe it was his nephew.
12    Q When was it that you arrested him?
13    A Just prior to me being arrested. I
14 couldn't give you an exact date. I don't recall.
15    Q Okay. Do you know if Bolch knew about
16 this arrest?
17    A I don't know.
18    Q Are you just assuming that because you had
19 arrested a member of the sheriff's family that all
20 the deputies knew and then that's why they were out
21 to get you?
22    A Well, I knew that the sheriff -- that the
23 deputies knew that his family member had been
24 arrested.
25    Q How is it that you know that?

Page 138

1    A Because for some unknown reason, the Drug
2 Enforcement Administration was -- when you asked me
3 earlier what day of the week it was, I think it was
4 a weekend.
5    Q Weekend?
6    A I think.
7    Q Okay.
8    A And that's all just totally off the wall
9 from --
10    Q Just a memory popped in.
11    A Yes. For some unknown reason, DEA had
12 declined the prosecution on the marijuana and the
13 cocaine, and we were told to turn the case over to
14 the Jim Hogg County Sheriff's Department.
15    Q Who told you?
16    A The Drug Enforcement Administration who --
17 the individuals that I spoke with over the phone
18 with the Drug Enforcement Administration, the DEA,
19 were actual Jim Hogg County sheriff's deputies that
20 were assigned to the DEA task force. And they said
21 decline the prosecution -- or they declined the
22 case, and so then we were told to turn the case over
23 to the Jim Hogg County Sheriff's Department.
24    Q Okay. Do you know what happened to it?
25    A To what?

Page 139

1    Q The case.
2    A No, I don't.
3    Q Do you know if they were prosecuted?
4    A I know that the marijuana, the cocaine,
5 the vehicle, and the nephew and another individual
6 that was in the vehicle, I can't recall what his
7 name was, they were all turned over to the sheriff.
8 What happened to -- I know that --
9    Q My question was: Were they prosecuted?
10 Do you know?
11    A I don't know. . I know they were --
12    Q Okay. I mean, you did your part of the
13 job. You don't know what happened after that?
14    A Yeah. I don't know what happened after
15 that.
16    Q Okay. Who were the deputies that were
17 assigned to the task force?
18    A Johnny Guardian and Sammy Torres, I think.
19    Q Do you know if they are still with the
20 task force?
21    A I have no idea.
22    Q Have you filed any other lawsuits?
23    A No, ma'am.
24    Q Have you ever been arrested for anything
25 else?

Page 140

1    A I got arrested when I was like 15, 16.
2    Q Okay. After 18 have you been arrested?
3    A After 18? I got arrested for reckless
4 driving.
5    Q When was that?
6    A '99. It was here. It was since I got
7 here.
8    Q Okay. Brownsville?
9    A Yes, ma'am.
10    Q Where did this occur?
11    A In Brownsville.
12    Q I know but --
13    A Oh, the actual stop?
14    Q The stop, uh-huh.
15    A Was on 802 and -- is it Robindale? Is
16 that like where the hospital used to be?
17    Q Yes. And what happened to that? Did he
18 give you a ticket?
19    A Yes.
20    Q Did you pay the fine?
21    A Yes. Well, actually, that was the end
22 result was that I was charged -- or I was -- they
23 initially had stopped me for a DWI. I refused to
24 take the Intoxilyzer, so based on that refusal, I
25 was automatically charged with the DWI. And they

Page 141

1 went to -- we went to court and after we went to
2 court, the judge -- well, to be honest with you, I
3 never went to court. I just -- my attorney had gone
4 and --
5     Q  Who was your attorney?
6     A  Noe Garza. And they looked at the video
7 and then they came back and said, "Well, we will
8 drop it and give you -- charge you with reckless
9 driving if you -- you know, if you're willing to
10 accept that."
11          And I wasn't, but I just didn't have
12 the financial resources to continue, so I accepted
13 it and I was -- that was the only time I had been
14 arrested.
15     Q  So you were fined, though, for the
16 reckless driving?
17     A  I think I was fined like $200.
18     Q  Okay.
19     A  I think.
20     Q  And you've paid that?
21     A  Oh, yes, ma'am.
22     Q  Okay. Anything else?
23     A  No, ma'am.
24     Q  Do you know your driver's license number?
25     A  10824600.

Page 142

1     Q  And what's your Social Security number?
2     A  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.
3     Q  And your -- you have a Border Patrol --
4 no, you don't. You don't have a specific Border
5 Patrol number? Or do you?
6     A  Well, there's an ID number on that --
7 yeah, it's right there.
8     Q  Is that this number there?
9     A  Well, that's just my ID number as far as
10 the badge is concerned or the credentials are
11 concerned. My ID number within the Department of
12 Justice is your Social Security number.
13     Q  Okay. Are there any -- other than the K-9
14 position, are there any other promotions or moves or
15 any other kind of changes that you have sought to
16 make in your employment that you think you were not
17 given because of this incident?
18     A  Not yet, no.
19     Q  In the DWI incident, did they take your
20 license?
21     A  No. He never took it away from me. I had
22 it the whole time.
23     Q  And did you identify yourself to him as a
24 border patrol agent?
25     A  Yeah. He knew who I was.

Page 143

1     Q  Okay. Do you remember who --
2     A  No, ma'am, I don't.
3     Q  Okay. Do you keep any journals?
4     A  No, ma'am.
5     Q  Diaries?
6     A  No, ma'am.
7     Q  Have you had any expenses associated --
8 out-of-pocket expenses associated with this lawsuit?
9     A  Just annual leave days off that I've had
10 to take to consult with attorneys.
11     Q  Do you have any videos, photographs,
12 pictures, other than the picture of your knee,
13 regarding anything having to do with this lawsuit?
14     A  No, ma'am, just the pictures.
15     Q  We talked about three individuals that
16 you've heard were stopped by Jim Hogg County
17 Sheriff's Department. Do you know of any other
18 incidents other than traffic stops that you are
19 going to claim is evidence of the department
20 harassing border patrol agents?
21     A  To my knowledge, no.
22     Q  Okay. So the traffic stops would be the
23 extent of it?
24     A  To my knowledge, yes.
25     Q  Okay. Now, you said you were a DARE

Page 144

1 officer near the school -- of the school where you
2 were stopped.
3     A  Yes, ma'am.
4     Q  Where were you -- what is the name of the
5 school that you were a DARE officer of?
6     A  Hebbronville High School.
7     Q  Hebbronville High School. Do you know the
8 address of the high school?
9     A  I'm sorry. I don't.
10     Q  Okay. What is it that you do as a DARE
11 officer?
12     A  Educate the children on the results of
13 illicit drugs, using drugs, selling drugs, taking
14 drugs; prevention.
15     Q  And it's your testimony that you believe
16 you were stopped near the high school?
17     A  Yes, at that -- at that time -- the high
18 school is not there anymore. It's been moved.
19 it's somewhere else. But at the time of the stop
20 yeah. I think that like the high school, the junior
21 high, and the elementary are all the same school
22     Q  Okay. Do you have any documents which
23 would support your claim that you have suffered a
24 loss in earning capacity as a result of this
25 incident?

Page 145

1    A  On my person, no.
2    Q  Well, what about anyplace?
3    A  The SF-86, the national security
4  questionnaire that states, you know, do you -- or
5  have you ever been charged with or arrested for --
6    Q  Okay.  That's a maybe in the future,
7  right?
8    A  Yes.
9    Q  Okay.  I'm talking about now --
10    A  Now, no.
11    Q  -- are there any documents that would show
12  that right now you have -- you have suffered a loss
13  in earning capacity?
14        MR. COWEN:  Objection to the form of
15  the question as to how it defines loss of earning
16  capacity.
17        Subject to that, you can answer.
18        THE WITNESS:  No.
19    Q  (BY MS. LEEDS) Do you have any documents
20  or any evidence that would show that what happened
21  here was intentional?
22    A  No.
23    Q  Do you have any restrictions on your
24  driver's license?
25    A  No.

Page 146

1    Q  And you -- the car wasn't yours, so you
2  don't have the title to it.
3    A  No, ma'am.
4    Q  You mentioned that you had -- you've
5  arrested many people for carrying weapons without
6  permits?
7    A  No, I never said that, not right now at
8  any time during this --
9    Q  Oh, no, no, no.  I'm talking about in your
10  responses.
11    A  Oh, yes, ma'am.  I've arrested people for
12  numerous violations of different types and as a
13  result of that had weapons with them.
14    Q  Okay.  Have you ever arrested anybody
15  for --
16    A  Specifically, no.
17    Q  -- illegally carrying a firearm?  Not just
18  that you're being, you know, it's a stop and they
19  happen to have a weapon.
20    A  And it's a big load of dope?
21    Q  Right, right.
22    A  No, ma'am.
23    Q  Okay.  But not specifically for the
24  firearms violation?
25    A  No, ma'am.

Page 147

1    Q  Okay.  You wanted to add something?  I
2  heard a breath.
3    A  Well, I was going to mention that the --
4  me personally, no.  Once the case has been done, if
5  there is, let's say, a large amount of drugs and the
6  individual carrying the drugs has a weapon, well,
7  then it becomes an aggravated and then we won't, but
8  the district attorney or the U.S. attorney will file
9  a --
10    Q  A separate charge?
11    A  Yeah.
12    Q  Okay.  Yeah, I gotcha.
13        You have made the claim that
14  Mr. Bolch was not justified in arresting you.  Are
15  you aware that he has stated that you said or that
16  you voiced something at the scene which caused him
17  to arrest you for disorderly conduct?
18    A  Well, as I said before, I was not charged
19  with disorderly conduct.  It was --
20    Q  That wasn't my question.  My question is:
21  Are you aware that he --
22    A  Your question was --
23    Q  -- said that you made a statement?
24    A  And that's why he charged me with
25  disorderly conduct.  And I'm saying that I was not

Page 148

1  charged with disorderly conduct.  I was only charged
2  with unlawful carrying of a weapon.  That was
3  dropped to the disorderly conduct.  But at the time,
4  no.
5    Q  I'm talking about when you and Mr. Bolch
6  are out there.
7    A  Yes.
8    Q  Okay.  He has made the statement that you
9  said something which additionally caused him to
10  arrest you, besides the weapon incident.
11    A  What statement was that?
12    Q  Okay.  Did you ever say in the discussions
13  that you were having with him, "You-all never do
14  shit anyways"?
15    A  No.
16    Q  You did not make that statement?
17    A  No.  No, ma'am.
18    Q  Okay.  Are you aware at all that when he
19  arrested you, he arrested you for -- you want to
20  clarify something?
21    A  Well, at no time did I ever lose my
22  composure or say anything to that nature until I had
23  a door wedged between my knee.  But I never said
24  anything to that -- you know.  Excuse my language,
25  but I might have said like, "Open the fucking door,"

Page 149

1 because it hurt.
2    Q  Once -- right. I'm saying when you guys
3 were standing outside.
4    A  No, no, no.
5    Q  Okay. You never said anything to --
6    A  No.
7    Q  -- him to imply that, "You're just a
8 sheriff deputy, you-all don't do shit anyways"?
9    A  No, never.
10    Q  Are you aware that that was one of the
11 reasons he was taking you in?
12        MR. COWEN: Objection. Calls for
13 speculation.
14        You can answer the question.
15        THE WITNESS: No.
16    Q  (BY MS. LEEDS) Okay. Did he -- are you
17 aware of what allows you to be arrested under the
18 traffic laws in the state of Texas?
19    A  No. I'm not a peace officer.
20    Q  Well, I'm just asking if you know anyway.
21    A  No, ma'am. No, ma'am, I don't.
22    Q  All right. Do you know that if the
23 traffic stop for a traffic violation is valid, they
24 can arrest you if they want?
25    A  Do I know that?

Page 150

1    Q  Do you know that?
2        MR. COWEN: Objection. Calls for a
3 legal conclusion.
4        You can answer as to your knowledge.
5        THE WITNESS: No.
6    Q  (BY MS. LEEDS) I'm not saying that you
7 should. I'm just asking you if you know --
8    A  If I'm aware.
9    Q  -- if they stop you for a busted red
10 light, they could even arrest you. Do you know that
11 that's --
12    A  A law? No, I did not know that.
13    Q  Okay. When you have discussed in your
14 answers to interrogatories the fact that you feel
15 you weren't given the K-9 position because of this,
16 do you have anything more tangible than you feel?
17    A  No, ma'am.
18    Q  Okay. It's just a hunch you have?
19    A  Yes, ma'am.
20    Q  Okay. Would you have been making more
21 money, had you taken that position?
22    A  Yes, ma'am.
23    Q  Or are you making more money now?
24    A  I'm making -- well, see, that's like
25 apples and oranges. I'm an 11 now. I was a 9 then.

Page 151

1    Q  Correct.
2    A  If I was an 11 now, as a K-9, yes, I would
3 be making a significant amount more.
4    Q  Okay. If you had taken the K-9 position,
5 you'd still be in Hebbronville?
6    A  Not necessarily.
7    Q  But that's where the position was open?
8    A  At that time, yes.
9    Q  Okay. And, I mean, you could have been in
10 Laredo, for that matter, if there was another K-9
11 position open?
12    A  Yes.
13    Q  But you could have only moved if there was
14 a K-9 position open? Had you taken the K-9 and
15 gotten -- do you have to pass a test for K-9?
16    A  Yes, ma'am. You have to go to a school.
17    Q  The El Paso school?
18    A  Yes, ma'am.
19    Q  And after that, you've got to prove --
20    A  You're a K-9 -- yes, ma'am.
21    Q  Yeah. But don't you have to prove with
22 your dog that you two work well?
23    A  Well, that's part of the training.
24 That's -- you are -- you are going to work well with
25 your dog. It's not a --

Page 152

1    Q  You can't flunk it?
2    A  Well, you could flunk it, yes. You could
3 flunk it. But after you've taken the training and
4 once you graduate and you get your certificate from
5 El Paso, you are a dog handler forever.
6    Q  Okay. So if you and the dog don't jive,
7 that --
8    A  Then they will get rid of that dog and
9 find another one --
10    Q  Find another one. Okay.
11    A  -- because they are like humans.
12    Q  I'm curious the way they do that is select
13 the human before you find out if they are a team?
14    A  Exactly, because the dog has a personality
15 just like a human. And there are some that just
16 will not match.
17    Q  Correct.
18    A  So they will get rid of that one and bring
19 a different one and find one that bonds with you.
20    Q  Okay. But if you had gotten that
21 position, the position that you were going to get
22 would have been in Hebbronville?
23    A  That was one of the openings. There was
24 one like in Hebbronville -- I think there was two in
25 Hebbronville. There was like two in Laredo, two

Page 153

1 here, and two there. And then --
2   Q And from then on, you would stay within
3 K-9 and go wherever those positions were available
4 to you?
5   A Wherever they needed me, yes.
6   Q Okay. And do you think you're excluded
7 from applying for a K-9 position here in
8 Brownsville?
9   A Excluded from applying? No. I can apply.
10 Whether I get the position, well, that's, you know,
11 speculation. I have no idea.
12   Q Have you -- did you apply for this
13 promotion?
14   A For -- yes, I did.
15   Q Okay. And you got that one?
16   A Yes. Prior to this incident.
17   Q Have you applied to -- for anything else
18 since this incident?
19   A Bike patrol.
20   Q Okay.
21   A The bicycle patrol.
22   Q And what happened there?
23   A But it's not a promotion. It's just a
24 collateral duty. And I was selected. I'm on the
25 bike patrol now.

Page 154

1   Q You are on the bike patrol. That's why
2 you cycle?
3   A That's where the 200 miles a week come in.
4   Q That helps.
5   A I'm the guy with the white on the bicycle
6 drenched. That's me.
7   Q Do you know what you applied for first,
8 the promotion to Brownsville or K-9?
9   A I applied for -- I've been applying for
10 Brownsville since the day I got to Hebbronville, you
11 know. I was like, "I don't want to be here no
12 more."
13     So in answer to your question, I
14 mean, yeah, I applied for --
15   Q Brownsville.
16   A -- Brownsville way before -- I got to
17 Hebbronville and the next day I was applying for
18 Brownsville.
19   Q Was that something that you had to --
20 could you only apply when there were openings? Or
21 did you just have like --
22   A There has to be a vacancy.
23   Q So do you remember -- and the same thing
24 in K-9, right?
25   A Exactly. There has to be a vacancy.

Page 155

1   Q Do you know which occurred first for what
2 happened?
3   A Well, I had put in several -- I had put in
4 for several Brownsville, Harlingen, the whole
5 Valley. And at that time, I just -- I didn't have
6 enough time in service and I was, per se, the low
7 man on the totem pole, so I would always get passed
8 up and passed up and passed up.
9     The K-9 position, I had more than
10 enough seniority, more than enough time for the
11 position, and I was not given the position. I was
12 not told why I wasn't given the position. It was
13 given to a junior -- somebody that had less time in
14 than me, somebody that had less experience than I.
15   Q Who?
16   A I don't know what the name -- I mean, I
17 just know I was the senior guy, you know. Out of
18 the 40 of us, you know, I was like highest of the
19 troops.
20   Q Okay. And you don't recall when that was
21 in relation to when you applied for the Brownsville
22 transfer?
23   A I applied -- let me see. I got -- got my
24 notice in February, on or about. It usually takes
25 six months, maybe, so six months.

Page 156

1   Q You mean to move?
2   A No. You apply --
3   Q Oh, okay.
4   A -- and it takes about six months before --
5 you know, because you've got thousands of people
6 throughout the United States that are putting in for
7 the same job. So they have to review every
8 applicant, so it takes about six months.
9     MR. COWEN: I need to tell them to go
10 ahead and wait for me.
11     MS. LEEDS: I'm almost done.
12     MR. COWEN: Well, it's already 1:40,
13 so I just need to let them know they need to wait
14 for me.
15   Q (BY MS. LEEDS) Okay. You said that it
16 takes about six months --
17   A Six months.
18   Q -- for the application to be processed,
19 right?
20   A To be processed. And I got selected in
21 February, so go --
22   Q In February.
23   A -- six months back from that, more or
24 less.
25   Q Gotcha. And in relation to that, do you

Page 157

1 know when you applied for K-9? Was it during those
2 six months? Or you don't remember?
3    A I don't remember.
4    Q I mean, if you don't remember, you don't
5 remember.
6    A No, I don't remember.
7    Q Okay. But that was a written application?
8    A For the K-9, yes.
9    Q Yeah. So that would be -- we could find
10 that out from your file?
11   A Yeah. It's documented somewhere.
12   Q And the application for the Brownsville
13 transfer was also a written --
14   A Yes, ma'am.
15   Q -- application?
16   A Yes, ma'am.
17   Q Okay. I think I am done.
18      Do any of your supervisors in
19 Brownsville, are any of them aware of what occurred
20 in Hebbronville?
21   A Yes, ma'am.
22   Q Okay. How is it that they are aware?
23   A I've told them.
24   Q Okay. And what has their reaction been?
25   A I really haven't gotten a reaction out of

Page 158

1 anybody other than, you know, "Give me details, tell
2 me --" you know, but --
3    Q But they know you're suing the county?
4    A Yes.
5    Q Did you have to sign anything when you
6 left the jail?
7    A I think I signed --
8    Q Your exit papers?
9    A I think I -- no. I signed for my personal
10 belongings, I think. That little envelope that
11 everything -- I think I had to sign for that saying
12 that they turned it over to me.
13   Q And being familiar with jail procedure,
14 you, do you know if you were there long enough for
15 them to have put you on their log?
16   A Yes.
17   Q As you know --
18   A Yes.
19   Q You were?
20   A Yes. They log you in right then and
21 there.
22   Q Okay. So those documents should be in the
23 jail?
24   A Yes.
25   Q That at least show you were there for

Page 159

1 however long you were there?
2    A They should be.
3    Q Well, they weren't part of the file that
4 they sent me.
5    A Yeah. I know TCLEOSE requires that you --
6 you know, every individual that's incarcerated --
7    Q That comes in?
8    A -- you have to have, you know, time in,
9 time out, fingerprints, and photograph.
10   Q Okay. What's your baby's Social Security
11 number? I'm kidding. I'm done.
12      MR. COWEN: You don't have to answer
13 that.
14      MS. LEEDS: I think I'm done for now,
15 Mr. Gilbert. Thank you very much for your time.
16
17 (Space for signature provided for on errata sheet)
18
19
20
21
22
23
24
25

Page 160

1      CHANGES AND SIGNATURE
2 PAGE LINE      CHANGE          REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 161

```
 1
 2        I, JOHN ANTHONY GILBERT, have read the
          foregoing deposition and hereby affix my signature
 3        that same is true and correct, except as noted
          above.
 4
 5
 6                      JOHN ANTHONY GILBERT
 7
 8
 9
10   THE STATE OF                  )
11   COUNTY OF                     )
12
13        Before me,                      , on this day
          personally appeared JOHN ANTHONY GILBERT, known to
14   me (or proved to me on the oath of
     _____ or through
15   _____ (description of identity
     card or other document)) to be the person whose name
16   is subscribed to the foregoing instrument and
     acknowledged to me that he executed the same for the
17   purposes and consideration therein expressed.
18        (Seal) Given under my hand and seal of office
     this      day of          ,       .
19
20
21                 NOTARY PUBLIC IN AND FOR
                   THE STATE OF
22
23
24
25
```

Page 162

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3   JOHN GILBERT         )
                          )
 4   VS.                  )   CIVIL ACTION NO. B-01-054
                          )
 5   JIM HOGG COUNTY, TEXAS, )
     ISAAC BOLCH, in his   )
 6   Individual and Official )
     Capacities, and GILBERT )
 7   YBANEZ, in his        )
     Individual and Official )
 8   Capacities            )
 9
10             REPORTER'S CERTIFICATION
           ORAL DEPOSITION OF JOHN ANTHONY GILBERT
11                    JUNE 10, 2002
12        I, Renee W. Crouch, Certified Shorthand
13   Reporter in and for the State of Texas, hereby
14   certify to the following:
15        That the witness, JOHN ANTHONY GILBERT, was
16   duly sworn by the officer and that the transcript of
17   the deposition is a true record of the testimony
18   given by the witness;
19        That the deposition transcript was submitted on
20   _____ to the witness or to the attorney
21   for the witness for examination, signature, and
22   returned to Schwab Court Reporting Service by
23   _____;
24        I further certify that I am neither counsel
25   for, related to, nor employed by any of the parties
```

Page 163

```
 1   in the action in which this proceeding was taken,
 2   and further that I am not financially or otherwise
 3   interested in the outcome of this action.
 4        Further certification requirements pursuant to
 5   the Federal Rules of Civil Procedure will be
 6   complied with after they have occurred.
 7        CERTIFIED to by me this 24th day of June, 2002.
 8
 9
10
11                 Renee W. Crouch
                   Texas CSR 5645
12                 Expiration Date: 12/31/03
                   SCHWAB COURT REPORTING SERVICE
13                 2900 Central Boulevard, Suite C
                   P.O. Box 3665
14                 Brownsville, Texas  78520
                   (956) 544-5126
15
16
17
18
19
20
21
22
23
24
25
```

Page 164

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3   JOHN GILBERT         )
                          )
 4   VS.                  )   CIVIL ACTION NO. B-01-054
                          )
 5   JIM HOGG COUNTY, TEXAS, )
     ISAAC BOLCH, in his   )
 6   Individual and Official )
     Capacities, and GILBERT )
 7   YBANEZ, in his        )
     Individual and Official )
 8   Capacities            )
 9
10          ORAL DEPOSITION OF JOHN ANTHONY GILBERT
11                    JUNE 10, 2002
12             FURTHER CERTIFICATION
13
14        The original deposition was/was not returned to
15   Schwab Court Reporting Service by            ;
16        If returned, the attached Changes and Signature
17   page(s) contain(s) any changes and the reasons
18   therefor;
19        If returned, the original deposition was
20   delivered to Ms. Eileen M. Leeds, Custodial
21   Attorney;
22        That the deposition was delivered in accordance
23   with the Federal Rules of Civil Procedure, and that
24   a copy of this certificate was served on all parties
25   shown herein.
```

Page 165

1    CERTIFIED to by me this _____ day of

2    _____, 2002.

3

4

5        Eric Schwab
         Texas CSR 401
         Expiration Date:  12/31/02
6        SCHWAB COURT REPORTING SERVICE
         2900 Central Boulevard, Suite C
7        P.O. Box 3665
         Brownsville, Texas  78520
8        (956) 544-5126

9

0

1

2

3

4

5

6

7

8

9

0

1

2

3

4

5

**-$-**

| | |
|---|---|
| $10,000 [1] | 71:14 |
| $100 [2] | 135:4   135:8 |
| $200 [1] | 141:17 |

**-'-**

| | |
|---|---|
| '66 [2] | 9:24   10:5 |
| '76 [1] | 10:5 |
| '84 [2] | 5:23   9:4 |
| '86 [2] | 7:12   10:5 |
| '92 [1] | 12:16 |
| '96 [1] | 10:5 |
| '97 [1] | 63:20 |
| '98 [6] | 42:23   42:24   43:2   43:4   43:8   43:13 |
| '99 [5] | 5:14   42:22   43:15   70:22   140:6 |

**-1-**

| | |
|---|---|
| 1 [7] | 2:23   75:9   108:16   121:11   121:16   121:20   122:1 |
| 10 [7] | 1:12   17:13   24:21   24:22   114:19   162:10   164:10 |
| 10,000 [2] | 72:6   77:18 |
| 100-dollar [2] | 133:25   134:25 |
| 108 [1] | 2:23 |
| 10824600 [1] | 141:25 |
| 10th [1] | 1:18 |
| 11 [4] | 34:20   41:21   150:25   151:2 |
| 11's [2] | 46:18   46:23 |
| 11-5 [1] | 36:3 |
| 11/1 [1] | 75:9 |
| 110 [2] | 2:23   65:8 |
| 11th [2] | 9:2   9:3 |
| 12/31/02 [1] | 165:5 |
| 12/31/03 [1] | 163:11 |
| 1204 [1] | 5:9 |
| 1204-B [1] | 5:17 |
| 1216 [1] | 4:19 |
| 123 [4] | 50:11   51:4   51:22   51:23 |
| 13 [2] | 22:24   34:20 |
| 15 [1] | 140:1 |
| 16 [1] | 140:1 |
| 160 [1] | 2:17 |
| 162 [1] | 2:18 |
| 1781 [1] | 5:3 |
| 18 [5] | 7:14   82:13   82:15   140:2   140:3 |
| 1966 [2] | 10:3   10:9 |
| 1985 [1] | 7:10 |
| 1986 [1] | 28:25 |
| 1987 [2] | 8:10   12:12 |
| 1991 [1] | 8:11 |
| 1992 [2] | 15:14   15:15 |
| 1993 [4] | 38:18   38:19   41:1   51:25 |

| | |
|---|---|
| 1999 [3] | 5:13   52:2   62:16 |
| 1:40 [1] | 156:12 |

**-2-**

| | |
|---|---|
| 2 [2] | 2:23   110:23 |
| 20 [1] | 10:17 |
| 200 [1] | 154:3 |
| 2001 [3] | 85:19   86:6   86:8 |
| 2002 [6] | 1:12   1:19   162:10   163:7   164:10   165:2 |
| 21 [1] | 112:16 |
| 214 [1] | 51:6 |
| 2155 [1] | 18:16 |
| 21st [2] | 38:19   128:21 |
| 24 [1] | 72:13 |
| 24th [1] | 163:7 |
| 25 [4] | 77:16   77:16   77:16   77:18 |
| 287 [1] | 121:4 |
| 287-A [3] | 106:23   108:14   120:16 |
| 2900 [2] | 163:12   165:6 |

**-3-**

| | |
|---|---|
| 3 [5] | 2:16   50:13   50:14   65:10   65:10 |
| 3.6 [1] | 120:15 |
| 32 [1] | 9:22 |
| 34 [1] | 9:22 |
| 35 [3] | 10:1   82:13   82:15 |
| 3505 [1] | 2:9 |
| 36 [1] | 10:1 |
| 3665 [2] | 163:13   165:7 |
| 37 [1] | 9:24 |
| 3:00 [1] | 131:24 |

**-4-**

| | |
|---|---|
| 4 [5] | 20:12   27:18   74:17   74:18   74:19 |
| 4/6 [1] | 10:3 |
| 4/7/99 [1] | 43:14 |
| 40 [1] | 155:18 |
| 40,000 [3] | 77:12   77:18   77:19 |
| 4008 [1] | 18:22 |
| 401 [1] | 165:5 |
| 45 [1] | 76:15 |
| 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 [1] | 142:2 |
| 46 [1] | 16:15 |
| 460 [1] | 2:9 |
| 4:00 [1] | 131:24 |
| 4th [1] | 15:15 |

**-5-**

| | |
|---|---|
| 5 [6] | 34:17   34:19   74:20   116:21   120:9   120:10 |
| 50,000 [1] | 77:19 |
| 52 [1] | 16:10 |
| 544-5126 [2] | 163:14   165:8 |

| | |
|---|---|
| 55 [4] | 65:6   65:7   74:16   135:20 |
| 5645 [1] | 163:11 |

**-6-**

| | |
|---|---|
| 6 [5] | 10:8   111:8   116:19   120:5   120:5 |
| 6/66 [1] | 10:6 |

**-7-**

| | |
|---|---|
| 7 [2] | 34:17   34:19 |
| 7's [2] | 44:10   46:18 |
| 70 [1] | 98:3 |
| 765 [2] | 1:22   2:5 |
| 78520 [2] | 2:5   163:13   165:7 |
| 78521 [1] | 2:10 |
| 7:00 [1] | 132:1 |
| 7th [2] | 1:22   2:5 |

**-8-**

| | |
|---|---|
| 8-CFR [1] | 121:20 |
| 802 [1] | 140:15 |
| 83 [1] | 18:22 |

**-9-**

| | |
|---|---|
| 9 [3] | 34:20   34:23   150:25 |
| 9's [3] | 44:9   46:18   71:22 |
| 940 [1] | 112:24 |
| 956 [2] | 163:14   165:8 |
| 96 [2] | 29:3   29:5 |
| 9O [1] | 29:2 |

**-A-**

| | |
|---|---|
| A&M [1] | 17:25 |
| Abel [1] | 13:8 |
| abilities [1] | 71:6 |
| ability [4] | 60:2   103:12   120:20   123:11 |
| able [6] | 7:20   62:7   65:9   74:6   76:10   93:15 |
| above [1] | 161:3 |
| above-styled [1] | 1:18 |
| absence [1] | 59:1 |
| absent [1] | 44:24 |
| academic [1] | 6:11 |
| academically [1] | 6:20 |
| academy [4] | 8:7   12:2   17:23   24:14 |
| accept [1] | 141:10 |
| accepted [1] | 141:12 |
| access [2] | 113:12   131:6 |
| accessed [1] | 66:24 |
| accordance [1] | 164:22 |
| accredited [1] | 6:20 |
| accurate [2] | 62:10   97:13 |
| acknowledged [1] | 161:16 |
| act [8] | 27:17   28:25   45:23   54:1   70:1   76:15   91:13 |

| | |
|---|---|
| 120:17 | |
| acted [1] | 135:5 |
| acting [3] | 41:8   44:17   44:20 |
| action [6] | 1:4   128:7   162:4   163:1   163:3   164:4 |
| activated [1] | 113:7 |
| activities [1] | 45:9 |
| actual [5] | 16:23   82:20   106:4   138:19   140:13 |
| add [3] | 67:17   77:18   147:1 |
| additional [1] | 24:23 |
| additionally [1] | 148:9 |
| address [2] | 11:23   144:8 |
| adequate [1] | 14:16 |
| Administration [5] | 77:8   77:9   138:2   138:16   138:18 |
| administrative [4] | 75:23   76:20   77:1   77:6 |
| admonishment [1] | 130:12 |
| advanced [2] | 35:18   36:21 |
| adverse [1] | 128:7 |
| advise [2] | 59:20   103:19 |
| advised [1] | 133:1 |
| advising [2] | 60:20   60:24 |
| Aeronautics [2] | 6:16   7:6 |
| affect [1] | 47:7 |
| affix [1] | 161:2 |
| afterwards [2] | 8:15   13:22 |
| again [17] | 8:9   11:11   11:19   32:19   33:6   33:21   46:5   58:22   64:5   64:25   91:14   93:17   103:2   128:1   130:12   135:9   135:11 |
| against [4] | 3:8   53:13   92:11   133:19 |
| age [1] | 20:11 |
| agencies [3] | 16:2   51:3   73:1 |
| agency [6] | 25:18   46:22   47:2   50:23   72:15   72:16 |
| agent [49] | 3:18   17:4   25:25   33:16   37:14   40:14   41:3   41:8   41:9   41:23   42:1   42:6   42:8   42:10   44:6   44:6   44:8   45:6   45:8   45:16   46:5   46:11   47:12   50:20   55:3   55:8   55:19   56:5   56:21   58:6   59:18   60:18   60:19   60:21   60:23   60:25   61:19   62:21   63:3   64:20   65:7   69:2   72:19   79:24   91:6   91:7   107:2   127:24   142:24 |
| agent's [1] | 60:2 |
| agents [16] | 18:6   31:21   44:9   45:19   48:23   54:11   55:12   55:16   57:12   60:9   61:8   64:24   65:17   72:5   136:1   143:20 |
| ages [2] | 82:13   82:15 |
| aggravated [1] | 147:7 |
| ago [2] | 10:17   17:13 |

agree [4]            118:18   122:19
122:21   122:25

ahead [9]            8:3      9:16
11:14    51:21    60:17    92:6
95:5     135:15   156:10

air [3]    7:17    50:25    93:8

aircraft [1]         7:21

aircrafts [1]        7:19

Airfield [1]         12:4

Al [2]    49:19    50:3

Alcaraz [2]          49:19    50:3

Alex [1] 13:12

aliens [1]           37:19

alive [1] 18:19

alleges [1]          78:19

allotted [2]         74:13    130:7

allow [1]            61:4

allowed [10]         58:13    58:14
60:9     98:19    102:18   102:21
103:8    103:17   114:7    132:9

allows [2]           61:18    149:17

almost [3]           43:13    52:2
156:11

alone [1]            23:6

along [1]            24:2

always [2]           61:15    155:7

amendments [5]                9:59
25:10    25:16    25:17    25:9

amnesty [2]          29:12    29:20

amount [5]           35:20    38:8
73:15    147:5    151:3

annual [2]           77:17    143:9

answer [31]          26:14    53:4
53:20    53:24    54:13    58:3
59:15    62:7     62:11    66:19
66:20    67:5     67:14    70:5
79:5     101:19   102:24   105:5
108:22   109:19   112:23   123:9
125:5    126:21   127:5    127:16
145:17   149:14   150:4    154:13
159:12

answered [2]         128:5    128:14

answering [2]        52:13    128:9

answers [1]          150:14

Anthony [11]         1:11     1:15
2:15     3:1      3:6      161:2
161:6    161:13   162:10   162:15
164:10

Antonio [6]          7:8      11:24
11:25    12:2     20:4     23:4

anyplace [1]         145:2

anyway [1]           149:20

anyways [2]          149:14   149:8

apartment [3]        18:17    50:11
51:12

apparent [1]         59:3

appeared [1]         161:13

apples [1]           150:25

applicable [1]       52:16

applicant [1]        156:8

application [5]      128:9    156:18
157:7    157:12   157:15

applied [14]         10:25    11:1

11:7     11:14    73:7     127:14
127:15   153:17   154:7    154:9
154:14   155:21   155:23   157:1

apply [6]                     34:9     111:6
153:9    153:12   154:20   156:2

applying [4]         153:7    153:9
154:9    154:17

apprehend [1]        37:18    59:20

approach [1]         61:5

approached [1]       88:4

approved [2]         112:17   112:17
113:3

April [1]            43:24

area [15] 23:1       33:12    47:2
47:4     47:5     47:8    47:17
47:18    48:12    49:3    65:25
74:20    98:24    125:8    132:22

areas [1]            16:22

argue [5]            57:22    91:21
92:4     92:9     111:25

arguing [2]          112:6    117:19

arrest [19]          54:9     54:19
54:24    55:3     55:7    60:3
68:6     90:9     92:6    103:21
105:20   123:11   127:2   127:8
137:16   147:17   148:10  149:24
150:10

arrested [23]        68:2     98:5
103:15   104:5    127:9   132:12
137:4    137:12   137:13  137:19
137:24   139:24   140:1   140:2
140:3    141:14   145:5   146:5
146:11   146:14   148:19  148:19
149:17

arresting [7]        53:15    53:17
54:6     67:9     68:6    137:7
147:14

arrests [1]          90:17

arrives [1]          60:23

Artesia [1]          32:23

articulable [3]      123:23   124:8
124:18

arts [1]  6:21

aside [2] 64:17      103:15

asks [2]  59:13      123:9

assessment [3]       46:4     46:8
46:10

assigned [2]         138:20   139:17

assistance [1]       56:22

assistant [2]        41:3     41:9

associated [5]       13:1     17:23
35:10    143:7    143:8

Associates [1]       20:2

assume [2]           21:6     59:2

assumed [1]          44:24

assumes [1]          109:15

assuming [1]         137:18

ate [1]   85:4

attached [2]         1:25     164:16

attempted [2]        70:12    92:15

attempting [1]       37:19

attorney [10]        52:4     52:17
85:22    90:19    141:3   141:5
147:8    147:8    162:20  164:21

attorneys [6]        3:23     4:2
86:2     86:3     86:4   143:10

August [2]           8:19     36:8

AUO [3]              76:19    77:2
77:16

authorities [1]      28:13

authority [15]       25:24    26:7
27:3     27:4     27:7   61:8
61:10    90:10    90:18  90:21
91:22    91:23    91:24  106:22
133:4

authorize [1]        110:4

authorized [10]      110:16   111:20
112:15   112:18   113:23  120:2
120:6    120:15   122:11  122:23

authorizes [3]       108:17   109:7
109:25

authorizing [1]      116:9

automatically [1]             140:25

available [2]        130:17   153:3

Aviation [2]         6:16     7:5

aware [10]           133:3    133:20
147:15   147:21   148:18  149:10
149:17   150:8    157:19  157:22

awareness [1]        68:8

away [1]  9:7        9:14
68:13    86:16    96:22  104:20
135:10   135:18   142:21

-B-

B [1]     27:8

B-01-054 [3]         1:4      162:4
164:4

baby's [1]           159:10

backed [1]           89:14

background [3] 34:12   127:25
128:2

Backing [1]          83:17

backup [2]           55:20    56:22

bad [4]  44:4        66:13   117:14
128:15

badge [7]            68:13    83:3
83:3     90:13    95:14  136:11
142:10

badges [1]           82:25

badly [1]            68:19

bag [2]  95:13       136:7

barbecue [1]         136:2

base [9] 74:22       75:2     75:11
75:13    75:21    77:10  77:10
77:17    77:19

based [6]            27:8     46:8
46:16    71:2     75:2   140:24

basic [2]            31:18    120:13

basis [1] 101:3

became [2]           13:4     41:22
75:8

become [5]           7:20     17:4
34:2     46:2     73:6

becomes [1]          147:7

becoming [1]         129:9

bed [1]   72:20

beds [1]  99:5

began [1]            93:7

begin [1]            117:4

behind [6]           8:3      87:6
87:7     87:25    92:12  92:16

belongings [4]       104:21   106:14
136:8    158:10

below [1]            32:1

belt [2] 78:21       88:7

Benito [2]           20:25    21:1

Beretta [1]          112:24

best [1] 135:23

better [3]           117:10   117:19
121:25

between [18]         10:14    45:2
52:21    78:2     82:12  82:15
87:9     87:15    93:3   93:6
94:4     94:19    95:1   95:2
127:1    127:8    131:23 148:23

beyond [2]           26:13    130:6

bicycle [2]          153:21   154:5

big [5]  16:8        18:1     97:22
136:2    146:20

bigger [1]           46:20

bike [3] 153:19      153:25   154:1

billion [1]          25:19

binoculars [2]       129:17   129:23

biographical [1]              15:4

birth [2] 9:23       10:2

birthday [2]         131:11   131:12

bit [2]   8:13       95:8     95:15

Black [1]            84:18

blah [11] 27:19      27:19    27:19
31:3     31:3     31:4   47:25
47:25    135:24   135:24 135:24

board [1]            27:4

Boca [1] 2:9

Bolch [35]           1:5      52:22
53:13    54:4     54:16  55:2
55:7     66:25    67:7   68:18
69:6     69:7     69:8   69:17
83:9     86:13    86:20  86:21
87:11    87:23    90:24  96:22
101:4    106:5    108:4  108:9
108:10   125:2    136:12 136:25
137:15   147:14   148:5  162:5
164:5

Bolch's [1]          78:12

bonds [1]            152:19

book [2] 104:19      105:10

booked [1]           104:24   105:13
105:17   105:19   105:25

booking [6]          12:25    14:17
14:23    14:24    14:25  15:1
15:2     96:14    96:16  96:24
97:19    100:9    100:25 104:16
106:4    106:17

border [54]          3:18     8:3
8:6      10:25    11:1   15:16
16:4     17:4     18:11  23:13
24:19    25:25    31:18  32:13
33:4     33:16    34:4   42:8
42:10    44:6     47:12  50:20
54:10    55:3     55:8   55:12
55:15    56:5     56:16  57:11
57:23    59:10    59:10  60:8

60:9    60:18    60:25    61:8
61:18    63:3    64:8    69:2
79:24    84:9    89:11    89:22
91:6    107:1    128:17    133:1
142:3    142:4    142:24    143:20

BORSTAR [1] 36:23
BORTAC [1] 36:23
bought [2]    51:15    80:17
Boulevard [4]    2:9    18:16
163:12    165:6
bound [2]    61:13    67:16
Box [2] 163:13    165:7
boxes [1]    124:24
Bradley [4]    20:22    21:5
22:8    22:9
break [2]    42:15    108:2
breath [1] 147:2
Brief [1] 42:17
Brigadier [1]    112:24
bring [1] 152:18
brings [1]    77:19
broad [2]    28:10    28:18
brother [3]    9:19    9:22
19:9
brothers [2]    9:18    22:20
Brown [3]    48:19    48:19
48:25
Brownsville [48]    1:2
1:23    2:5    2:10    4:15
4:20    5:4    5:13    5:15
6:3    8:4    11:7    11:8
18:23    21:2    38:16    40:13
40:14    42:7    43:1    43:17
44:18    44:19    47:15    47:20
48:5    48:13    48:14    49:14
73:25    75:8    130:16    140:8
140:11    153:8    154:8    154:10
154:15    154:16    154:18    155:4
155:21    157:12    157:19    162:2
163:13    164:2    165:7
Brunswick [1]    15:8
budget [1]    43:21
built [1] 5:18
bulls [1] 98:9
bumped [1]    34:16
bunch [6]    29:12    47:6
98:9    125:18    135:25    136:1
bunk [1] 99:15
bunks [1]    99:20
Bureau [1]    16:4
business [3]    56:18    58:6
99:9
busted [1]    150:9
busy [1] 97:3
bygones [2]    136:3    136:3

-C-

C [4]    2:1    27:8    163:12
165:6
cage [10] 68:16    92:17    92:24
93:3    93:6    94:4    94:19
95:2    95:3    98:8
California [1]    47:6

calls [13]    55:17    55:18
58:2    67:11    70:3    101:17
108:20    121:9    125:3    125:25
127:3    149:12    150:2
camera [1]    131:6
Cameron [6]    8:10    8:11
11:15    12:12    19:16    23:1
cannot [4]    114:18    115:10
122:8    125:5    125:11    135:6
Capacities [5]    1:6    1:8
162:6    162:8    164:6    164:8
capacity [8]    12:20    32:20
83:10    83:25    126:18    144:24
145:13    145:16
car [31]    57:23    59:11    59:11
63:3    64:8    80:19    81:11
83:19    84:4    84:4    84:15
84:15    85:2    85:3    86:10
86:13    86:15    86:16    86:18
87:3    87:5    87:18    88:14
92:7    92:11    95:9    95:12
95:15    95:16    95:21    146:1
card [3] 130:3    130:11    161:15
care [7] 8:4    8:5    22:14
48:20    48:25    49:1    90:21
career [2]    23:17    23:20
23:24    25:3    34:22    38:9
Carl [3] 39:8    40:18    41:15
Carl's [1]    126:9
Carlos [1]    13:11
Carolina [1]    4:12
carries [1]    51:1
carry [39]    25:24    48:8
54:5    90:11    90:18    106:20
106:22    107:3    108:17    109:7
109:25    110:4    110:16    111:13
111:17    111:20    112:16    112:18
113:3    113:23    114:11    116:9
120:2    120:6    120:17    120:22
121:6    121:12    121:17    122:1
122:2    122:6    122:7    122:8
122:10    122:12    122:13    122:23
133:4
carrying [18]    90:9    96:18
109:4    110:5    111:9    120:1
126:25    127:10    132:13    132:20
133:24    134:8    134:18    134:20
146:5    146:17    147:6    148:2
cars [1] 56:2
case [6] 78:7    138:13    138:22
138:22    139:1    147:4
catch [1]    44:4
Cathy [1]    125:14    125:15
125:24
caught [1]    93:6
caused [3]    68:4    147:16
148:9
cautioned [1]    60:6
cautious [1]    61:5
cell [18] 97:12    97:13    97:17
97:20    97:25    98:2    98:3
98:4    98:7    98:17    98:18
98:21    98:23    99:2    99:10
101:10    104:8    132:18
center [3]    16:1    88:16
88:17

Central [3]    18:16    163:12
165:6
certain [6]    27:10    28:13
32:9    60:14    61:3    124:6
certainly [2]    57:22    107:16
certificate [5]    2:18    6:8
7:23    152:4    164:24
certification [4]    7:17
162:9    163:4    164:12
Certified [4]    1:19    162:12
163:7    165:11
certify [2]    162:14    162:24
cetera [1]    124:6
CFR [2] 108:5    108:13
CFR-287 [1]    109:1
chance [1]    126:9
change [9]    13:13    29:8
29:14    29:16    39:14    39:21
39:21    67:24    160:2
changed [5]    29:1    29:6
33:8    44:3    44:6
changes [4]    142:15    160:1
164:16    164:17
changing [1]    29:4
character [3]    67:3    67:23
68:5
charge [10]    40:14    41:4
41:9    41:9    127:2    127:8
133:19    133:24    141:8    147:10
charged [17]    64:12    126:20
126:23    126:24    127:11    127:12
128:3    132:13    134:3    134:8
140:22    140:25    145:5    147:18
147:24    148:1    148:1
charging [1]    132:19
check [1]    124:24
checkpoint [1]    83:18
Chica [2] 2:9
chief [2] 13:9    62:21
child [6] 20:19    20:21    21:10
21:12    21:14    21:15
children [4]    20:5    20:7
68:9    144:12
Christmas [1]    16:20
circumstances [7]    3:17
60:14    61:3    61:20    61:21
64:21    83:14
cited [2] 26:4    116:8
Civil [6] 1:4    1:24    162:4
163:5    164:4    164:23
claim [12]    52:25    54:8
66:14    102:13    104:25    106:21
129:10    137:2    137:5    143:19
144:23    147:13
claimed [1]    101:9
clarify [5]    60:16    62:25
72:9    95:6    148:20
class [3] 16:8    16:10    44:15
classes [1]    26:18
classifying [1] 15:6
classroom [4]    17:12    17:17
18:9    24:6
clear [1] 55:25
click [1] 122:7

clock [1]    113:10
close [5] 43:5    43:16    92:17
94:21    137:9
closed [1]    93:9    94:21
closes [2]    92:20    92:22
clothes [1]    97:6
cocaine [2]    138:13    139:4
Code [6] 28:20    91:5    91:7
91:11    106:25    121:21
Codes [1]    91:11
coincidental [1]    137:7
collateral [1]    153:24
college [7]    5:24    6:2
6:22    17:16    17:19    17:20
34:11
color [1] 84:17
combined [1]    65:8
coming [9]    14:4    15:5
59:21    68:9    83:18    87:22
90:2    90:7    128:20
comment [1]    136:12
commit [1]    123:16
committed [1]    123:17
commode [3]    98:24    99:16
102:3
communicate [2]    14:13
30:24
communicated [1]    67:6
company [1]    19:23
competitive [1] 35:8
competitors [2] 74:8    74:10
complain [1]    103:14    104:4
complained [1] 52:20
complaining [1]    52:5
complete [3]    24:24    24:25
31:2
completed [2]    113:25    120:13
complicated [2]    78:8
78:10
complied [1]    163:6
composure [1]    148:22
computerized [1]    1:21
concealed [2]    89:2    123:3
concept [3]    103:10    103:11
131:15
concerned [3]    83:8    142:10
142:11
conclusion [8]    26:13    58:2
59:14    70:3    108:21    123:8
127:4    150:3
conclusions [1] 53:3
conditional [4] 23:18    23:20
25:3    34:22
conditioner [1] 93:8
conditions [1]    101:23    102:10
conduct [12]    134:1    134:4
134:6    134:9    134:18    134:21
135:1    147:17    147:19    147:25
148:1    148:3
conferred [1]    120:16
confined [1]    68:16
Congress [2]    11:10    29:18

onservator [1] 21:13
consider [2] 69:18   69:22
consideration [1] 161:17
console [2] 88:16   88:17
conspiracy [5] 52:21   52:25
53:5   53:8   53:24
conspire [1] 53:13
conspired [1] 54:14
conspiring [1] 53:9
constitute [1] 105:4
Constitution [2] 25:11
25:13
constitutional [7] 52:6
101:11   101:15   101:24   102:7
105:5   105:14
consult [1] 143:10
ontact [1] 22:18
ontain [1] 164:17
ontemplated [1] 85:16
ontext [11] 112:1   112:21
116:15   117:2   117:6   117:11
117:23   118:3   118:4   118:19
121:19
ontinue [3] 24:16   32:9
141:12
ontinuing [1] 127:23
ontraband [1] 14:4
ontrol [3] 28:23   77:9
130:6
onversation [1] 87:12
onversations [1] 86:1
onveyance [1] 27:4
ool [1] 100:21
opy [4] 2:23   133:7   133:11
164:24
Cordova [1] 41:6
orner [1] 135:11
orps [1] 70:12
Corpus [2] 4:13   47:21
orrect [28] 3:9   7:22
29:12   38:17   41:16   42:2
47:13   52:6   52:7   58:20
67:20   67:21   95:4   101:11
104:21   107:19   111:3   111:10
112:22   120:22   120:23   120:24
122:25   124:9   127:10   151:1
152:17   161:3
orridor [1] 98:23
ounsel [1] 162:24
ounseled [1] 130:5
ount [1] 99:8
ountry [23] 37:20   90:25
ounty [23] 1:5   3:8
3:10   8:11   11:15   12:12
19:16   23:1   49:7   54:3
63:17   64:4   64:25   72:15
131:13   138:14   138:19   138:23
143:16   158:3   161:11   162:5
164:5
ouple [4] 4:13   6:6
35:9   85:11
ourse [2] 13:16   129:17
ourt [17] 1:1   3:20

3:21   4:7   107:14   115:13
115:13   115:14   141:1   141:2
141:3   162:1   162:22   163:12
164:14   164:15   165:6
cover [2] 30:18   31:14
Cowen [90] 1:22   2:4
2:4   26:11   30:14   42:14
43:10   53:1   53:18   53:22
58:1   59:12   61:11   62:4
66:12   67:10   70:2   70:9
78:7   79:3   85:23   86:1
94:9   101:16   102:1   102:8
102:16   102:22   103:6   105:1
105:15   107:11   108:6   108:9
108:19   109:9   109:14   110:7
112:5   112:8   112:11   114:5
114:13   114:16   114:19   114:21
114:25   115:3   115:5   115:8
115:12   115:18   115:20   115:22
115:24   116:2   116:6   116:17
116:19   116:21   116:24   117:3
117:6   117:9   117:12   117:16
117:21   117:24   118:2   118:5
118:8   118:11   118:13   118:16
119:3   119:18   119:21   121:8
121:13   121:18   123:7   125:3
125:25   127:3   145:14   149:12
150:2   156:9   156:12   159:12
credentials [1] 142:10
credit [4] 129:4   129:6
130:5   130:11
CRF [1] 2:23
crime [1] 123:20
criminal [1] 25:8
cross-examination [1] 107:15
Crouch [3] 1:19   162:12
163:10
Cruz [2] 40:11   50:7
CSR [2] 163:11   165:5
curious [1] 152:12
current [1] 49:17
Custodial [1] 164:20
Customs [1] 16:6
cut [1] 94:25
cycle [1] 154:2

-D-

D [1] 27:8
Dallas [2] 47:21   47:25
Daniel [3] 19:10   20:3
23:3
DARE [3] 143:25   144:5
144:10
dark [1] 132:1
darn [1] 118:14
date [9] 9:23   10:2   42:19
70:13   70:20   82:9   137:14
163:11   165:5
dated [1] 82:7
dating [1] 82:5
David [7] 50:19   63:11
63:22   64:2   80:12   80:13
80:16
days [14] 17:14   17:15
17:17   17:18   24:5   24:6

38:25   39:5   39:6   76:4
76:14   77:12   77:15   143:9
De [5] 50:19   63:11   63:22
64:17   80:13
DEA [3] 138:11   138:18   138:20
deal [3] 41:14   92:4   94:8
decide [1] 107:14
decided [3] 11:20   133:23
135:15
decisions [1] 45:18
decline [1] 138:21
declined [2] 138:12   138:21
deer [1] 83:18
defamation [5] 67:2   67:3
67:20   67:22   70:6
defamatory [2] 69:18   69:23
defame [4] 67:8   67:23
67:25   68:5
defamed [5] 66:15   67:1
68:17   70:1   70:8
defendant's [1] 3:22
Defendants [3] 1:17   2:7
66:25
Define [1] 66:8
defined [1] 120:14
defines [1] 145:15
definite [1] 62:10
definition [1] 102:23
degree [1] 6:7
delay [1] 56:19
delivered [2] 164:20   164:22
demonstrated [1] 120:20
department [12] 8:10
11:15   12:2   12:13   12:21
63:17   72:16   138:14   138:23
142:11   143:17   143:19
depend [1] 37:2
depending [1] 29:17
deportation [3] 25:9   26:22
28:11
depose [1] 3:22
deposed [2] 3:11   3:19
deposing [1] 108:11
deposition [15] 1:10   1:15
3:13   62:13   78:13   110:23
116:3   161:2   162:10   162:17
162:19   164:10   164:14   164:19
164:22
deputies [5] 135:25   137:20
137:23   138:19   139:16
deputy [5] 52:21   56:24
57:24   59:9   63:4   65:9
149:8
derive [6] 25:24   26:6
27:2   27:7   91:23   91:24
describe [1] 66:22
description [2] 2:22   161:15
designated [1] 120:15
desirable [1] 74:11
detail [2] 66:22   130:4
130:4
detailed [2] 36:15   130:4

details [1] 158:1
detain [2] 123:25   124:6
detention [5] 12:23   13:25
14:1   14:18   14:25
determine [3] 30:6   30:21
112:11
determined [1] 50:4
determines [2] 50:2   71:25
Diaries [1] 143:5
Diaz [4] 132:11   133:1   133:2
133:3
diesel [1] 80:25
differ [2] 26:2   77:7
difference [4] 45:1   78:2
127:1   127:8
different [19] 15:6   26:4
26:8   26:21   26:24   28:1
28:8   35:17   38:3   45:5
48:13   50:23   80:15   80:16
82:8   116:10   129:5   146:12
152:19
differential [2] 74:25   75:22
difficult [3] 21:2   76:23
92:18
dire [1] 56:21
direct [2] 40:20   49:17
direction [2] 87:24   87:25
directly [5] 28:10   28:11
28:12   29:22   40:21
disciplinary [1] 129:14
discover [1] 104:12
discuss [1] 34:3
discussed [3] 54:1   87:19
150:13
discussions [1] 148:12
dismissed [1] 24:18
disorderly [14] 134:1   134:3
134:6   134:9   134:18   134:21
135:1   135:5   135:8   147:17
147:19   147:25   148:1   148:3
dispatcher [1] 73:4
district [7] 1:1   1:1
147:8   162:1   162:1   164:1
164:1
DIVISION [3] 1:2   162:2
164:2
divorced [1] 22:18
doctor [1] 130:25
document [3] 110:9   110:24
161:15
documented [1] 157:11
documents [5] 62:13   144:22
145:11   145:19   158:22
doesn't [16] 28:10   28:11
47:7   51:1   61:4   67:16
89:16   91:7   101:18   107:13
117:5   119:8   122:4   122:6
122:7   122:8
dog [7] 72:20   151:22   151:25
152:5   152:6   152:8   152:14
done [9] 67:25   68:3   68:4
85:16   147:24   156:11   157:17
159:11   159:14
door [21]   92:14   92:20

GILBERT VS. JIM HOGG COUNTY — Multi-Page — doors - fine
Case 4:01-cv-00054   Document 42   Filed in TXSD on 10/28/2002   Page 69 of 230
JOHN ANTHONY GILBERT   6/10/02

| | | |
|---|---|---|
| 92:22 | 92:22 | 93:5 | 93:5 |
| 93:7 | 93:11 | 93:11 | 93:15 |
| 93:22 | 94:3 | 94:19 | 94:20 |
| 94:24 | 95:3 | 95:4 | 95:12 |
| 136:11 | 148:23 | 148:25 | |

**doors** [1] 93:9
**dope** [1] 146:20
**double** [1] 13:10
**down** [10]   4:14   21:3
52:3   71:5   88:2   88:3
88:3   93:3   98:22   104:15
**downstairs** [1] 50:12
**DPS** [1] 72:15
**draw** [1] 94:9
**drawn** [2]   83:1   83:2
**drenched** [1] 154:6
**drive** [4] 51:20   80:25   86:15
86:16
**driver's** [11]   88:4   88:9
88:12   88:13   88:21   88:23
92:14   95:12   95:17   141:24
145:24
**driving** [7]   81:1   87:2
87:18   95:22   140:4   141:9
141:16
**drop** [4] 46:12   133:24   135:15
141:8
**dropout** [2]   16:11   16:13
**dropped** [1] 148:3
**dropping** [1] 134:6
**drove** [2]   84:4   84:5
**drug** [6] 60:24   66:13   68:8
138:1   138:16   138:18
**drugs** [6]   144:13   144:13
144:13   144:14   147:5   147:6
**due** [1] 135:4
**duly** [4]   1:17   3:2   109:16
162:16
**during** [23]   13:13   13:15
13:17   14:23   16:19   32:5
38:25   40:4   40:25   63:19
86:11   110:19   111:21   111:23
112:19   113:5   113:23   120:17
122:15   128:1   129:17   146:8
157:1
**duties** [8]   13:24   15:2
37:15   39:20   44:3   44:25
45:2   129:18
**duty** [45]   5:12   31:23
33:3   33:9   34:10   55:16
56:10   56:16   60:18   83:15
83:24   84:3   89:23   90:4
107:3   109:4   109:8   110:1
110:5   110:6   110:16   110:19
111:13   111:18   111:21   111:23
112:19   113:6   113:7   113:8
113:23   120:3   120:6   120:18
121:7   121:12   121:17   122:1
122:3   122:6   122:7   122:8
122:15   122:23   153:24
**DWI** [3] 140:23   140:25   142:19

**E** [2]   2:1   2:1
**earning** [4]   126:18   144:24

---

**145:13   145:15**
**east** [4]   1:22   2:5   48:20
48:24
**easy** [2] 27:21   77:11
**eat** [1] 85:4
**eating** [1] 87:22
**Educate** [1] 144:12
**effect** [6]   60:2   89:8
90:17   95:25   133:23   136:17
**eight** [5] 17:17   20:18   73:15
77:12   84:10
**eight-hour** [1] 77:21
**Eileen** [6]   2:8   114:5
115:3   115:5   115:24   164:20
**either** [7]   19:11   34:9
34:10   66:1   74:19   93:13
118:12
**El** [3]   73:14   151:17   152:5
**elected** [1] 13:22
**elections** [1] 13:16
**elementary** [1] 144:21
**elements** [2] 123:5   124:4
**eleven** [1] 71:22
**eligible** [1] 71:7
**Elm** [3] 50:11   51:4   51:23
**eloquent** [1] 30:21
**emergency** [8] 36:24   56:24
58:10   58:12   58:17   58:18
59:5   59:23
**employed** [2] 7:21   162:25
**employment** [3]   12:24
24:17   142:16
**empowers** [1] 114:10
**en** [1]   56:17
**enacts** [1] 29:18
**encompass** [2] 48:16   48:16
**end** [6] 45:14   74:15   74:16
81:18   116:2   140:21
**end-of-the-month** [1] 45:8
**enforce** [1] 37:16
**enforcement** [12]   15:9
15:25   18:3   59:4   73:1
89:4   89:9   89:19   120:14
138:2   138:16   138:18
**engine** [2] 78:22   88:7
**engines** [1] 7:19
**English** [1] 31:5
**entail** [1] 25:7
**entailed** [1] 71:9
**entails** [1] 28:14
**enter** [4] 27:3   27:9   34:10
37:19
**entered** [4]   5:12   31:3
33:3   33:9
**enterprise** [1] 66:6
**entrance** [1] 11:3
**entry** [1] 37:20
**envelope** [1] 158:10
**environment** [1]   17:12
**equipment** [1] 59:24
**equivalent** [1] 98:8

---

**Eric** [1] 165:4
**errata** [1]   159:17
**escape** [1] 14:3
**establish** [1] 77:23
**estimated** [1] 97:16
**et** [1] 124:6
**event** [1]   113:13
**everybody** [7]   15:10   33:11
33:13   37:4   37:7   92:1
119:9
**evidence** [7]   52:11   54:16
54:20   54:25   55:9   143:19
145:20
**evolve** [1] 29:9
**evolves** [1] 29:9
**ex** [1] 63:12
**exact** [9]   4:8   70:13
70:20   90:16   95:24   122:25
133:22   136:16   137:14
**exactly** [21]   5:14   8:18
20:25   24:3   29:20   30:23
35:15   40:2   53:11   54:22
56:1   56:4   61:24   88:15
106:12   113:5   119:7   124:2
124:22   152:14   154:25
**exam** [3]   11:3   24:15
31:13
**examination** [4]   3:3
30:18   30:19   162:21
**examined** [1] 32:19
**example** [2]   27:2   29:11
60:16   77:11
**exams** [1] 25:4
**except** [1] 161:3
**exception** [1] 23:2
**excluded** [3]   27:9   153:6
153:9
**exclusionary** [2]   25:9
26:23
**exclusively** [1] 112:17
**Excuse** [2]   114:23   148:24
**executed** [1] 161:16
**exercise** [1] 120:16
**Exhibit** [6]   2:22   110:23
121:11   121:16   121:20   122:1
**EXHIBITS** [1] 2:20
**exists** [1]   61:14
**exit** [1] 158:8
**expenses** [2]   143:7   143:8
**experience** [1] 155:14
**Expiration** [2] 163:11   165:5
**explain** [1]   76:23   93:24
**explosives** [1] 128:4
**expressed** [1] 161:17
**expression** [1] 93:13
**expressway** [2] 18:22   48:24
**extended** [1] 17:7
**extent** [7]   58:2   59:13
67:11   70:2   109:15   123:7
143:23
**extra** [2] 75:18   75:19

---

**F** [1]   16:5
**F-350** [1]   80:24
**face** [1] 93:13
**faces** [1] 104:11
**facetious** [1]   25:19
**fact** [17] 44:1   67:17   67:17
68:2   90:13   100:18   101:20
103:14   104:4   105:16   105:19
105:25   106:14   123:20   125:1
132:24   150:14
**facts** [4] 123:22   123:23   124:8
124:18
**factual** [1]   66:22
**fail** [1] 24:16
**fair** [1] 110:8
**Fal** [1] 66:2
**Falfurrias** [3]   48:7   48:8
69:4
**fall** [3]   32:1   91:10   91:11
**familiar** [2]   123:5   158:13
**family** [4]   137:7   137:9
137:19   137:23
**far** [7] 49:2   51:21   83:7
105:2   108:20   136:22   142:9
**Farms** [1]   48:1
**father** [6]   9:7   9:13
9:13   9:14   21:23   22:17
**faxed** [1]   133:10
**FBI** [4] 16:5   91:7   97:11
100:5
**February** [6]   15:15   42:21
43:20   155:24   156:21   156:22
**feces** [2] 98:23   102:3
**federal** [18]   1:24   15:25
18:6   25:18   28:20   50:25
51:2   91:12   106:25   107:7
108:7   109:16   115:13   121:21
124:16   127:24   163:5   164:23
**fellow** [1]   56:21
**felt** [2]   131:16   131:17
**field** [24]   17:14   24:5
34:12   38:25   39:1   39:2
39:4   39:7   39:8   39:17
40:6   40:22   41:20   41:21
41:24   44:10   44:12   45:10
45:11   45:15   45:17   45:19
45:24   46:1
**Fifty** [2] 83:13   136:23
**figure** [2]   76:25   77:11
**file** [6] 43:10   129:1   130:1
147:8   157:10   159:3
**filed** [6] 3:8   52:5   85:8
85:18   86:6   139:22
**fill** [1]   46:12
**filled** [3]   73:21   73:24
130:18
**finally** [2]   91:20   93:15
**financial** [1]   11:20   141:12
**financially** [1] 163:2
**fine** [6] 66:10   66:11   116:5
133:25   135:1   140:20

---

ned - higher

ned [2] 141:15 141:17
ngerprint [1] 99:25
ngerprinted [2] 97:9
:00:6
ngerprinting [1] 100:2
ngerprints [3] 97:10 100:1
:59:9
nish [1] 11:17 109:24
14:13 114:16 114:25 115:6
:15:20 115:24 116:3
rearm [6] 90:18 122:10
:22:13 122:14 122:23 146:17
rearms [19] 2:23 61:23
:2:6 62:9 108:18 109:10
.09:16 110:1 110:16 111:2
:11:9 120:1 120:2 120:6
:20:17 120:21 126:20 128:4
:46:24
st [50] 3:2 13:8 13:10
:2:23 23:13 23:17 23:20
:3:21 24:4 32:5 32:18
:32:19 34:8 34:9 34:14
:38:7 38:11 38:12 40:9
:40:10 40:17 40:20 40:22
:41:12 41:21 44:16 44:17
:44:25 45:2 45:12 45:13
:45:25 46:3 46:15 49:21
:50:6 74:3 80:16 81:7
:05:21 127:22 129:1 129:9
:32:9 132:10 132:10 134:2
:34:15 154:7 155:1
rsthand [1] 69:16
t [1] 124:23
tness [2] 31:23 32:15
ve [13] 11:12 11:13 12:18
:6:18 16:25 17:1 77:12
:77:15 127:25 128:24 129:3
:30:9 130:10
ve-year [2] 127:25 128:24
xed [2] 7:19 9:13
oorboard [1] 88:20
uent [2] 14:5 14:6
unk [3] 152:1 152:2
:52:3
older [1] 136:7
ollow [2] 56:25 97:21
ollowed [1] 106:1
ollowing [2] 98:12 120:12
:162:14
ollows [1] 3:2
oot [11] 93:4 93:16 93:19
:93:19 93:21 93:22 93:23
:94:3 94:4 94:23 94:24
orce [3] 138:20 139:17 139:20
ord [1] 80:24
oregoing [2] 161:2 161:16
orever [1] 152:5
orgot [1] 34:3
orm [21] 26:12 53:2
:56:17 58:12 61:14
:56:17 67:5 79:3 101:17
:102:22 105:1 108:6 109:14
:110:7 121:8 121:13 121:18
:125:3 127:3 145:14
ormal [9] 6:10 6:19

7:4 17:3 32:20 35:22
:36:19 36:21 36:25
forms [1] 46:6
Fort [3] 48:18 48:19 48:25
forth [2] 45:15 46:24
Forty [1] 65:24
forty-two [1] 75:11
four [3] 11:12 11:12 12:18
four-door [1] 80:24
four-wheel [1] 80:24
frame [2] 7:17 92:24
Fred [1] 41:6
free [7] 61:15 98:19 102:14
:103:10 103:11 134:1 135:1
freeze [1] 11:11
frequently [1] 33:18
Fresnos [4] 21:22 22:10
:22:25 48:16
friend [4] 81:25 82:1
:82:4 82:6
friends [1] 85:11
front [10] 68:7 79:2
:79:14 79:19 79:20 88:1
:92:1 92:3 110:9 136:11
fucking [1] 148:25
full [1] 97:7
fund [1] 43:22
future [1] 145:6

**-G-**

G-L-A-N-Y-C-O [1] 15:20
G-L-Y-N-C-O [1] 15:20
Garcia [5] 13:8 81:6
:81:22 87:11 126:14
Garza [1] 141:6
gathered [1] 125:8
GED [2] 8:23 9:4
general [3] 15:10 48:20
:90:19
gentleman [1] 68:23
geographical [1] 47:5
George [1] 132:11
Georgia [5] 15:18 15:18
:15:22 37:22 38:18
gift [1] 131:12
Gilbert [30] 1:3 1:6
:1:11 1:15 2:15 3:1
:3:6 3:7 19:10 19:17
:54:9 54:10 54:12 54:21
:108:12 108:16 110:12 113:9
:119:2 159:15 161:2 161:6
:161:13 162:3 162:6 162:10
:162:15 164:3 164:6 164:10
girlfriend [1] 82:5
given [10] 4:4 130:11
:136:7 142:17 150:15 155:11
:155:12 155:13 161:18 162:18
giving [1] 102:23
Glan [1] 15:19
Glen [1] 15:19
Glynco [1] 15:18
God [1] 40:10

goes [3] 21:8 92:24 127:24
Gomez [3] 19:4 19:21
:20:2
gone [10] 3:19 29:3
:36:2 36:2 36:4 36:5
:65:19 81:19 85:10 141:3
Gonzalez [1] 64:20
Gonzo [1] 64:20
good [3] 20:24 82:4 135:14
Goodman [1] 56:12
gotcha [3] 46:20 147:12
:156:25
government [7] 71:18 72:21
:74:13 91:4 109:17 130:3
:130:11
grab [1] 43:11
grabbed [2] 88:18 88:19
grade [2] 8:25 31:10
grades [3] 34:18 71:22
:72:1
graduate [8] 5:22 8:17
:17:8 24:14 37:22 38:4
:38:10 154:4
graduated [5] 8:14 8:22
:16:14 16:16 38:18
gross [3] 74:16 74:22
:75:14
grow [1] 47:1
grows [3] 46:22 47:3
:47:4
GS [5] 34:4 36:2 42:11
:51:1 . 74:17
GS-11 [9] 34:2 35:5
:35:13 37:9 41:21 42:6
:46:5 75:8 75:9
GS-11's [2] 35:11 46:17
GS-11s [1] 35:9
GS-12 [1] 41:22
GS-13 [1] 41:23
GS-5 [2] 34:10 46:18
GS-7 [1] 34:13
GS-9 [8] 34:24 35:2
:71:19 71:20 74:17 74:19
:74:19 75:3
GS-9's [1] 46:17
GS-9-4 [1] 71:24
GS-9-7 [1] 71:24
Guam [1] 47:10
Guardian [1] 139:18
GUERRA [1] 2:8
guess [10] 19:14 38:21
:49:12 52:3 58:13 95:19
:96:23 97:10 97:17 98:19
guidelines [3] 28:13 111:9
:120:1
gun [10] 68:13 95:13 106:19
:106:20 106:22 112:22 113:3
:113:13 116:19 136:10
guy [8] 39:5 39:6 39:7
:39:15 63:23 100:10 154:5
:155:17
guys [5] 44:5 47:25 82:25
:100:2 149:2

**-H-**

hairs [1] 99:1 102:5
hairy [2] 97:22 98:25
half [5] 16:25 17:1 24:15
:24:18 113:1
halfway [1] 10:21
Hallmark [8] 6:16 7:4
:10:15 10:18 10:19 10:20
:11:18 11:22
hamper [1] 60:2
hand [2] 108:15 161:18
handcuffed [8] 68:12
handcuffs [2] 68:15 96:21
handed [1] 88:22
handgun [5] 89:2 111:20
:112:17 112:19 113:23
handle [1] 120:20
handler [1] 152:5
hands [2] 92:11 92:16
Hang [1] 8:12 43:7
:93:18
harassing [2] 55:12 143:20
hard [1] 93:23
Harlingen [7] 47:20 49:2
:49:2 49:5 49:13 49:14
:155:4
head [4] 10:12 65:5 65:15
:136:5
headed [1] 84:23
health [1] 130:23
healthcare [1] 130:20
hear [3] 87:12 93:14 134:13
heard [4] 79:1 125:12
:143:16 147:2
Hebbronville [40] 37:24
:38:14 38:20 39:11 41:16
:42:5 44:5 48:5 50:5
:50:9 51:5 51:24 63:16
:65:18 66:1 66:4
:69:3 70:17 74:15
:80:4 81:16 81:17 8:.9
:82:13 83:22 84:7 84:11
:84:12 85:10 144:6 144:7
:151:5 152:22 152:24
:154:10 154:17 157:20
help [2] 9:17 11:21
helps [1] 154:4
hereby [2] 161:2 162.13
herein [2] 111:6
hereto [1] 1:25
Herrera [2] 21:20
Hey [5] 55:20 60:24 88
:100:19 103:19
Hickory [1] 48:1
high [20] 5:20 5:21
:8:24 9:1 9:3
:9:11 18:15 68:7
:88:1 92:1 144:6
:144:8 144:16 144:17
:144:21
higher [4] 14:17
:46:10 71:21

highest [1]  155:18
himself [1]  88:10
hinge [1]  92:22
hire [1]  11:11
hired [6] 11:16  12:20  15:15
128:10  128:10  129:1
hiring [1]  47:6
history [2]  129:5  129:6
Hogg [10]  1:5  3:8
63:16  72:15  138:14  138:19
138:23  143:16  162:5  164:5
hold [1] 14:22
holding [4]  97:12  97:12
97:20  110:25
holiday [1]  75:22
holidays [2]  74:25  76:6
home [12]  4:24  4:24
4:25  9:15  18:17  18:18
23:6  72:22  85:2  87:18
95:19  136:20
honest [2]  10:16  141:2
hood [1] 68:14
hospital [1]  140:16
hour [3] 65:6  65:8  66:5
hours [14]  17:17  72:13
77:12  77:14  97:17  107:3
110:19  111:21  111:23  112:19
113:5  113:24  120:18  131:17
house [11]  5:18  18:24
51:12  51:13  80:17  84:25
85:1  85:5  95:19  95:20
131:5
Houston [1]  47:21
human [2]  152:13  152:15
humans [1]  152:11
hunch [1]  150:18
hung [1] 93:2
hunters [1]  83:19
hurt [1]  149:1
husband's [1]  19:20

-I-

I-50's [1]  45:15
I-E [1]  19:7
ID [3]  142:6  142:9  142:11
idea [5] 65:19  82:11  124:10
139:21  153:11
identify [3]  27:25  88:10
142:23
identity [1]  161:15
illegally [1]  146:17
illicit [1]  144:13
imagine [1]  87:19
imbedded [2]  99:1  102:5
immediate [4] 13:9  40:4
41:12  113:8
immediately [1]  73:13
immigration [21]  16:6
25:8  25:22  26:2  26:8
26:19  27:6  27:14  27:17
27:20  28:2  28:3  28:10
28:21  37:16  90:16

impact [2]  29:22  29:22
imply [1]  149:7
importance [1] 102:21
improper [1]  116:12
improperly [1]  56:6
INA [2] 27:16  28:19
inappropriate [1]  56:15
inappropriately [1]  63:9
64:19
incarcerated [4]  98:5
101:21  133:2  159:6
incident [13]  43:6  43:16
62:22  65:22  80:7  129:11
130:21  142:17  142:19  144:25
148:10  153:16  153:18
incidents [1]  143:18
Include [1]  67:4
income [1]  9:13
increase [3]  72:6  74:12
75:10
increases [1]  71:23
INDEX [1]  2:13
Indicating [1]  23:15
individual [13] 1:6  1:7
58:10  83:3  100:19  123:13
139:5  147:6  159:6  162:6
162:7  164:6  164:7
individually [1]  120:19
individuals [2] 138:17  143:15
infirmary [1]  15:8
information [2] 15:4  47:25
66:22
inhumane [1]  102:9
initiates [1]  17:5
injury [1]  131:1
inmates [2]  14:2  14:13
INS [2]  61:22  107:8  110:3
110:4  111:2  120:24
inserts [1]  33:8
inside [1]  93:2
insofar [1]  61:12  101:17
inspection [2]  65:3  65:4
instance [1]  1:16  16:19
30:20  71:23
instead [1]  77:20  116:21
instruct [1]  45:20  118:12
118:13
instruction [1]  18:9
instructions [1]  42:20
instructor [1]  30:25
instructors [1]  18:13
instrument [1] 161:16
insurance [5]  88:9  88:13
88:15  88:18  88:23
intent [1] 123:14
intentional [1]  145:21
interested [1]  163:3
interests [1]  37:2
International [1]  2:9
interpret [3]  122:9  122:9

interpretation [2]  121:9
122:16
interrogatories [1]  52:9
150:14
interrupting [1]  116:4
intervened [1]  135:9
interview [3]  11:5  11:5
11:9
intoxicated [1] 83:18
Intoxilyzer [1]  140:24
investigation [4]  127:24
128:1  128:2  129:2
investigators [1]  16:6
IRA [4]  29:3  29:3  29:5
29:5
IRCA [1]  28:21
IRS [1]  16:7
Isaac [14]  1:5  54:4
54:16  87:23  88:24  89:7
90:6  90:13  91:20  93:4
95:23  96:3  162:5  164:5
Isabel [3]  40:15  48:17
49:1
Island [1]  19:14  20:1
Islands [1]  47:11
issued [4]  109:16  112:16
112:24  112:25
itself [2]  16:22  106:4

-J-

J.P [13]  132:19  133:12  133:12
133:16  133:17  134:11  134:23
134:23  135:3  135:10  135:12
135:12  135:18
jail [29]  13:1  13:7  14:2
14:4  95:22  95:23  96:5
96:13  96:14  96:17  100:24
101:14  101:22  103:18  104:19
104:25  105:13  106:17  131:4
131:14  131:25  132:6  132:8
132:12  136:6  136:22  158:6
158:13  158:23
jailer [1]  13:9
jails [1]  105:10
James [1]  5:21
Javier [1]  64:20
Jim [10]  1:5  3:8  63:16
72:15  138:14  138:19  138:23
143:16  162:5  164:5
jive [1]  152:6
job [10]  8:2  8:9  9:15
17:11  28:14  32:16  118:9
118:16  139:13  156:7
John [20]  1:3  1:11
1:15  2:15  3:1  3:6
23:12  54:9  54:10  54:12
54:21  135:20  161:2  161:6
161:13  162:3  162:10  162:15
164:3  164:10
Johnny [1]  139:18
joined [1]  12:12
joint [1] 66:6
joke [1] 66:13

journals [1]  143:3
journeyman's [9]  32:21
33:5  33:15  33:16  33:18
33:24  35:1  35:17  37:4
Juana [1]  22:17
judge [2]  112:9  141:2
June [7]  1:12  1:19  8:17
10:8  162:10  163:7  164:10
junior [4]  44:9  68:7
144:20  155:13
jurisdictional [1]  47:8
jury [3]  22:3  22:8  22:10
Justice [1]  142:12
justification [3]  56:12
58:9  59:9
justified [3]  59:22  105:20
147:14

-K-

K-9 [24]  70:12  70:17  71:7
72:5  72:10  72:16  73:6
130:15  142:13  150:15  151:2
151:4  151:10  151:14  151:14
151:15  151:20  153:3  153:7
154:8  154:24  155:9  157:1
157:8
keep [6]  31:22  32:16  60:4
60:12  129:8  143:9
keeps [1]  29:4
kept [3]  91:18  93:14  104:14
keys [1]  86:13
kidding [1]  159:11
kids [2]  125:19  131:23
kill [1]  98:10
kind [27]  6:7  25:1
30:14  46:12  71:8  71:11
76:23  77:22  80:23  81:21
83:9  83:25  84:4  84:4
84:15  92:17  92:18  93:12
95:17  96:15  112:10  113:2
115:19  129:13  130:20  137:2
142:15
kinds [4]  7:1  30:17
35:22  123:22
knee [5]  93:3  93:7  131:1
143:12  148:23
knew [11]  11:5  17:21
84:3  84:4  88:11  136:25
137:15  137:20  137:22  137:23
142:25
knowing [2]  54:4  59:1
knowledge [16] 67:12  69:16
69:20  69:24  101:18  105:3
106:9  123:13  128:16  129:7
129:25  130:14  134:3  143:21
143:24  150:4
known [1]  128:5  161:13
knows [1]  95:20

-L-

L.L.P [1]  2:8
lands [1]  27:3
language [3]  31:5  31:8
148:24

Laredo [12]    4:12    17:16
17:19    17:22    18:2    66:1
66:3    80:1    80:3    84:14
151:10    152:25

large [1] 147:5

larger [2]    46:22    46:23

ast [1] 13:9    19:2    24:6
31:3    62:5    65:20    86:8

aw [78] 4:7    15:8    15:25
18:3    25:8    25:8    25:9
25:9    25:9    25:22    25:23
25:23    26:2    26:2    26:8
26:8    26:9    26:19    26:19
26:21    26:22    26:23    26:23
26:25    27:1    27:2    27:6
27:7    27:11    27:14    27:18
27:23    27:23    27:24    28:1
28:2    28:3    32:10    33:8
33:10    57:14    57:20    57:24
58:4    58:7    58:8    59:4
59:16    61:7    61:17    67:12
72:25    78:8    89:4    89:9
89:18    101:18    101:19    102:25
107:13    107:13    108:23    109:6
109:13    109:17    109:22    112:8
116:11    120:14    121:3    121:6
121:14    123:3    124:11    124:12
127:6    133:4    150:12

aws [9] 28:7    29:7    30:12
37:16    60:10    61:9    90:23
91:16    149:18

awsuit [8]    3:8    52:4
85:8    85:14    85:19    86:7
143:8    143:13

awsuits [1]    139:22

awyer [1]    118:11

ead [1] 53:23

eading [1]    123:23    124:20

eads [1] 55:2

ean [1] 92:11

eaning [1]    68:13    95:11

earn [2] 25:15    33:5

earned [1]    33:5

earning [1]    46:6

east [2] 10:8    158:25

eave [7]    8:6    8:24
8:25    9:6    40:14    47:1
143:9

eeds [99]    2:8    2:16
3:4    26:17    30:15    30:17
42:16    42:18    43:14    53:10
53:21    54:7    58:11    59:25
61:17    62:12    66:14    67:19
70:7    70:11    78:9    78:12
79:6    85:25    86:3    94:12
101:22    102:2    102:11    102:19
103:3    103:9    105:7    105:18
105:22    105:24    107:18    107:23
108:1    108:4    108:7    108:10
108:25    109:12    109:21    110:11
112:7    112:10    112:14    114:12
114:15    114:18    114:20    114:23
115:1    115:4    115:7    115:10
115:16    115:19    115:21    115:23
116:1    116:5    116:13    116:18
116:20    116:22    117:1    117:5
117:7    117:11    117:14    117:18
117:23    118:1    118:3    118:6

left [14] 9:3    10:19    12:17
13:22    43:10    50:12    84:14
85:2    93:2    97:2    106:5
106:6    136:15    158:6

leg [3] 94:3    94:19    94:20

legal [14]    26:12    53:2
58:2    59:13    67:12    70:3
102:23    105:2    105:3    108:20
121:9    123:8    127:4    150:3

legislatures [1] 29:8

lent [1] 18:7

less [5] 4:9    12:14    155:13
155:14    156:24

level [2] 35:17    46:13

liberal [1]    6:21

license [12]    7:17    79:2
79:15    79:19    79:20    88:9
88:13    88:14    88:23    141:24
142:20    145:24

light [3] 57:13    58:14    59:23
62:2    150:10

lights [9]    57:8    58:8
58:21    58:24    59:3    59:19
60:22    61:1    61:2

liked [1] 82:24

line [2] 13:8    40:9    40:11
40:17    40:22    41:13    44:16
44:17    44:25    45:2    45:12
45:13    45:25    46:3    46:15
49:21    50:6    114:6    127:22
129:9    132:10    132:10    160:2

list [1]    46:10

listen [1]    91:20

live [22] 4:18    4:19    5:2
5:6    5:8    5:10    18:14
18:21    19:13    20:3    20:23
23:8    50:10    50:18    51:4
51:14    51:19    65:25    66:1
79:25    80:8    136:22

lived [4] 4:21    50:19    51:6
51:15

lives [8] 18:22    19:18    20:4
20:24    21:1    21:1    21:15
23:3

living [2]    19:11    102:9

load [1] 146:20

located [2]    7:7    81:15

location [6]    5:19    11:6
56:17    57:1    60:3    60:23

locations [1]    15:7

locked [1]    93:5

log [2]    158:15    158:20

longer [5]    16:21    56:20
69:3    82:1    129:3

look [10] 10:7    10:11    45:19
62:8    78:7    91:20    92:2
103:19    111:14

looked [4]    89:6    95:18
104:15    141:6

looking [5]    63:1    92:1

93:14    95:15    107:18
Los [4]    21:22    22:10    22:25
48:16

lose [1] 148:21

losing [1]    129:22

loss [4] 126:18    144:24    145:12
145:15

lost [3] 93:18    126:17    129:17

loud [2] 93:8    93:10

louder [1]    115:1

low [2] 24:25    155:6

lower [1]    4:17

lowest [1]    34:11

Lucio's [1]    13:17

lunch [3]    81:4    81:20
87:23

Lynn [1]    19:8


-M-

M [2]    2:8    164:20

M-A [1] 13:10

ma'am [80]    3:10    3:16
4:5    4:15    4:17    5:5
6:4    6:9    6:12    6:14
6:23    6:25    7:2    7:25
10:16    13:3    13:5    13:19
14:12    14:14    15:13    15:23
17:5    17:9    18:13    19:8
19:12    19:17    23:5    23:10
23:10    24:12    42:3    47:14
52:19    62:24    66:16    73:8
73:11    104:18    105:11    107:20
108:24    109:2    109:5    111:4
111:7    111:11    123:4    126:15
127:23    130:22    130:24    131:2
131:9    139:23    140:9    141:21
141:23    143:2    143:4    143:6
143:14    143:3    146:3    146:11
146:22    146:25    148:17    149:21
149:21    150:17    150:19    150:22
151:16    151:18    151:20    157:14
157:16    157:21

machine [1]    1:21

maiden [1]    21:19

mailbox [1]    50:14

maintain [1]    77:14

maintenance [1]    7:21

major [1]    39:21

maker [1]    54:3

man [1] 155:7

manage [2]    44:9    44:9

management [4]    41:13
41:24    44:7    45:9

managing [1]    21:13

mandate [1]    31:21

mandatory [1]    38:7

manpower [1]    46:21

manual [1]    61:7

Marie's [5]    81:3    81:10
81:14    85:3    90:7

marijuana [2]    138:12    139:4

mark [2] 108:15    110:22

marked [9]    55:15    55:16

56:10    56:16    57:12    57:23
59:10    60:9    63:3

marks [1]    10:12

married [4]    19:3    19:3
20:13    20:17

Marshals [1]    16:5    50:25

Masso [2]    13:10    13:11

match [1]    152:16

materials [1]    66:23

matter [7]    44:1    48:6
90:12    100:18    107:14    117:5
151:10

mattress [1]    97:22    98:25
99:1    102:5

mattresses [1]    99:6

may [8] 41:7    43:25    44:1
44:2    67:12    105:4    105:4
105:5    113:14    114:8    114:13
129:3

McAllen [4]    4:16    47:20
49:10    49:16

McCarthy [1]    57:6

McCarty [6]    56:7    57:4
57:7    57:16    58:18    63:7
64:14    64:17

mean [39]    6:21    9:10
24:1    25:10    25:23    30:3
35:22    36:14    38:4    39:21
40:14    47:5    47:19    51:23
55:22    61:4    62:9    68:5
75:18    75:20    82:16    82:19
83:7    84:3    84:3    91:9
98:4    98:9    98:16    100:21
129:25    132:6    136:25    139:12
151:9    154:14    155:16    156:1
157:4

Meaning [1]    130:23

means [4]    37:20    53:25
57:15    77:8

meant [4]    19:16    32:12
39:2    98:25

mechanics [1]    7:18

medical [1]    130:19

meet [2] 32:9

Melissa [3]    81:8    82:21
84:21    85:7    86:5    86:5
95:16    101:4

member [2]    137:8    137:9
137:19    137:23

memorandum [6]    62:15
62:19    62:23    70:25    71:4
71:5

memorize [1]    110:10

memorizing [1] 61:13

memory [1]    138:10

mental [1]    130:23

mention [4]    79:10    110:3
110:5    147:3

mentioned [9]    25:22    26:18
26:22    26:23    55:11    79:9
108:5    108:12    146:4

Mercedes [1]    49:15

met [2] 83:12

Mexico [2]    32:25    33:12

Michael [7]    1:22    2:4

| | | | |
|---|---|---|---|
| 2:4 | 56:7 | 63:7 | 115:2 |
| 116:23 | | | |

**mid** [1]    84:20

**might** [8]    12:10    21:7
36:15    55:20    98:6    129:25
136:5    148:25

**miles** [3]    65:6    65:8
154:3

**military** [1]    34:11

**minding** [1]    99:8

**mine** [1] 81:25

**minute** [2]    42:14    94:23

**mirror** [1]    10:11

**misleading** [3] 112:13    114:7
114:22    115:15    115:17

**mitigating** [1]    61:3

**mobile** [1]    18:18

**molding** [1]    45:7

**mom** [3] 9:17    18:19    23:6

**moment** [2]    27:12    59:2
62:8

**Monarrez** [1]    79:22

**Monetary-wise** [1]    71:12

**money** [2]    74:14    75:19
150:21    150:23

**month** [4]    24:15    24:22
43:18    45:15

**months** [19]    7:14    8:15
8:21    16:19    16:25    17:1
20:18    24:21    24:23    130:9
130:10    155:25    155:25    156:4
156:8    156:16    156:17    156:23
157:2

**mood** [1]    135:14

**Morales** [1]    80:13

**morning** [1]    131:5

**mother** [7]    9:12    9:15
11:19    11:21    20:19    20:21
22:17

**mother's** [1]    21:23

**motioned** [1]    95:18

**mouth** [1]    104:15

**move** [6]    14:23    38:13
43:1    43:17    94:20    156:1

**moved** [14]    4:25    5:1
5:15    5:16    5:19    43:24
43:24    51:22    80:17    80:18
82:2    129:4    144:18    151:13

**moves** [1]    142:14

**Ms** [102] 2:16    3:4    26:17
30:15    30:17    42:16    42:18
43:14    53:10    53:21    54:7
58:11    59:25    61:17    62:12
66:14    67:19    70:7    70:11
78:9    78:12    79:6    81:6
81:22    85:25    86:3    87:11
94:12    101:22    102:2    102:11
102:19    103:3    103:9    105:7
105:18    105:22    105:24    107:18
107:23    108:1    108:4    108:7
108:10    108:25    109:12    109:21
110:11    112:7    112:10    112:14
114:12    114:15    114:18    114:20
114:23    115:1    115:4    115:7
115:10    115:16    115:19    115:21

| | | | |
|---|---|---|---|
| 115:23 | 116:1 | 116:5 | 116:13 |
| 116:18 | 116:20 | 116:22 | 117:1 |
| 117:5 | 117:7 | 117:11 | 117:14 |
| 117:18 | 117:23 | 118:1 | 118:3 |
| 118:6 | 118:10 | 118:12 | 118:15 |
| 118:18 | 119:5 | 119:20 | 119:23 |
| 121:11 | 121:16 | 121:25 | 123:11 |
| 125:7 | 126:2 | 126:14 | 127:9 |
| 145:19 | 149:16 | 150:6 | 156:11 |
| 156:15 | 159:14 | 164:20 | |

**multitude** [2]    31:17    83:20

**music** [1]    124:14

**must** [1] 87:17

**Mustang** [2]    84:16    88:16

**muster** [1]    64:24

**-N-**

**N** [1]    2:1

**name** [28]    3:5    13:10
13:11    17:20    19:2    19:2
19:3    19:3    19:20    20:15
21:4    21:8    21:19    21:23
22:23    23:11    31:2    41:6
68:23    69:10    81:7    100:9
100:12    106:13    139:7    144:4
155:16    161:15

**names** [8]    22:4    22:7
22:16    104:10    104:13    125:10
125:11    125:13

**narcotics** [3]    14:3    37:18
60:20

**national** [1]    145:3

**Nationality** [3] 27:17    91:13
120:17

**nature** [1]    148:22

**near** [2] 144:1    144:16

**necessarily** [3] 40:1    46:25
151:6

**need** [24]    26:7    26:15
27:8    43:11    45:18    46:2
46:6    47:24    48:9    55:20
92:5    92:8    100:4    103:19
105:22    113:10    113:13    123:2
125:20    125:22    135:24    156:9
156:13    156:13

**needed** [2]    8:5    153:5

**needs** [4]    45:17    45:21
56:21    72:16

**neither** [3]    30:15    122:2
162:24

**Nelly** [6]    20:16    20:19
21:17    22:11    22:20    23:8

**Nelly's** [2]    21:19    22:16

**nephew** [2]    137:11    139:5

**never** [19]    8:8    8:22
13:4    36:14    41:13    50:11
50:17    79:8    98:13    101:6
132:15    132:15    141:3    142:21
146:7    148:13    148:23    149:5
149:9

**new** [4]    16:20    32:25    33:10
33:12

**next** [8]    8:19    8:19    11:12
12:1    46:11    92:23    131:5
154:17

**nice** [1]    100:21

**nickname** [1]    135:22

**night** [3] 74:25    75:22    89:13

**nights** [4]    75:25    76:6
76:7    76:9

**Nine** [1] 42:12

**Nineties** [1]    84:20

**nitty-gritty** [1] 52:4

**nodded** [1]    136:5

**Noe** [1]    141:6

**non-duty** [9]    107:3    110:19
111:21    111:23    112:19    113:5
113:24    120:18    122:15

**Nonresponsive** [1]    105:23

**nor** [2]    30:15    162:25

**Norbert** [3]    80:18    84:6

**Norbert's** [2]    80:19    85:3

**Norberto** [3]    79:22    80:12
80:13

**north** [8]    4:12    18:22
50:11    51:4    51:23    56:11
81:16    81:18

**NOTARY** [1]    161:21

**noted** [1]    161:3

**nothing** [5]    18:5    63:5
96:10    96:11    119:2

**notice** [1]    155:24

**now** [67] 7:3    12:10    17:12
17:19    18:21    21:17    28:4
29:2    29:3    29:12    29:21
30:10    33:25    36:2    37:11
37:15    38:3    40:13    41:10
41:23    41:25    42:1    44:8
45:3    47:9    47:17    48:5
48:18    48:19    49:18    60:4
60:15    65:15    65:19    69:4
70:11    72:10    81:23    89:24
90:22    91:15    91:25    97:3
104:16    111:12    113:11    116:3
116:6    119:25    120:9    120:24
123:2    124:10    125:22    126:16
128:18    143:25    144:18    145:9
145:10    145:12    146:7    150:23
150:25    151:2    153:25    159:14

**Nowhere** [1]    4:17

**number** [18]    4:8    46:22
46:23    50:17    82:20    108:13
115:13    115:14    135:21    141:24
142:1    142:5    142:6    142:8
142:9    142:11    142:12    159:11

**numbered** [1]    1:18

**numbers** [1]    50:12

**numerous** [3]    3:18    3:19
146:12

**-O-**

**Oak** [1]    5:3

**oath** [4]    3:24    4:3    4:4
161:14

**object** [15]    26:11    53:1
61:11    67:10    99:24    101:16
105:22    107:12    108:6    108:19
109:14    114:6    115:7    115:8
119:3

**objecting** [2]    112:10    112:12

**objection** [37]    53:18    53:21

| | | | |
|---|---|---|---|
| 58:1 | 59:12 | 62:4 | 70:2 |
| 70:9 | 79:3 | 102:1 | 102:8 |
| 102:16 | 102:22 | 103:6 | 105:1 |
| 105:15 | 109:9 | 109:18 | 110:7 |
| 114:12 | 114:14 | 114:17 | 115:6 |
| 115:9 | 115:22 | 115:25 | 116:6 |
| 118:9 | 121:8 | 121:13 | 121:18 |
| 123:7 | 125:3 | 125:25 | 127:3 |
| 145:14 | 149:12 | 150:2 | |

**objections** [1]    117:24

**obtained** [3]    9:4    66:23
133:10

**obviously** [4]    11:13    13:11
60:7    87:17

**occupied** [1]    44:11

**occupying** [1]    44:22

**occur** [3]    63:18    128:7
131:7    140:10

**occurred** [4]    66:15    155:1
157:19    163:6

**off** [34]    15:5    25:1    65:15
82:7    84:3    90:7    94:25
95:20    96:21    97:5    97:6
97:10    109:4    109:7    110:1
110:4    110:6    110:16    111:13
111:18    113:6    120:2    120:6
121:7    121:12    121:17    122:1
122:2    122:7    122:8    122:23
124:24    138:8    143:9

**offense** [5]    123:6    123:10
123:16    123:19    124:4

**offer** [1] 10:24

**offered** [1]    8:2

**office** [4]    45:13    65:18
132:23    161:18

**officer** [43]    12:23    12:25
13:4    13:25    14:1    14:17
14:18    14:25    15:3    18:3
38:21    38:22    39:1    39:3
39:8    40:6    40:22    41:20
41:22    44:12    59:4    68:8
89:5    89:9    89:19    91:6
91:8    96:16    96:24    97:17
100:25    104:16    107:19    111:20
112:15    112:18    112:23    114:11
144:1    144:5    144:11    149:19
162:16

**officers** [2]    96:14    120:13

**offices** [1]    1:22

**official** [8]    1:6    1:7
56:18    58:6    162:6    162:7
164:6    164:7

**often** [1] 129:4

**oldest** [1]    9:16

**once** [10]    11:19    58:22
64:7    86:9    91:14    104:16
104:16    147:4    149:2    152:4

**one** [53]    4:25    9:19    9:19
17:8    17:11    20:10    23:2
24:7    24:21    26:4    26:24
28:4    28:6    28:8    33:14
38:18    42:14    45:16    47:19
49:9    50:12    53:8    55:4
56:17    65:1    65:6    65:7
66:5    75:15    79:11    82:21
87:24    100:12    100:13    103:15
114:3    114:11    115:13    118:20
126:16    126:18    128:8    128:25

Multi-Page™                                         GILBERT VS. JIM HOGG COUNTY

JOHN ANTHONY GILBERT   6/10/02

...es - process

...nes [4] 3:18     28:15   49:15
...52:16

...nto [2] 27:3     113:8

pen [10]           70:17   70:18
...3:6   93:10      93:11   94:20
...48:25 151:7      151:11  151:14

...pened [6]        88:17   92:13
...93:15 95:12      97:20   136:11

...penings [2]      152:23  154:20

...pens [2]         92:20   92:22

...perate [1]       120:21

...peration [6]     41:24   112:18
...12:22 113:4      113:25  114:1

...perations [4]    118:21  118:24
...19:6  119:10

...pinion [11]      56:6    58:14
...59:17 59:22      60:5    60:8
...60:12 101:23     103:12  118:22
...21:10

...ral [11] 1:10    1:15    11:8
...25:5  30:18      30:19   67:5
...130:12 162:10    164:10

...ranges [1]       150:25

...rder [2]         27:9    98:13

...rders [3]        43:19   43:20
...8:12

...riginal [3]      11:6    164:14
...64:19

...therwise [3]     48:13   92:6
...63:2

...ught [1]         34:3

...t-of-pocket [1]           143:8

...utcome [2]       56:12   163:3

...utside [3]       93:22   94:24
...49:3

...tskirts [1]      98:24

...vertime [11]     75:23   76:17
...6:20  77:7       77:7    77:8
...7:14  78:3       78:4    78:5
...8:5

...wens [1]         48:1

...wn [10] 4:25     18:6    19:23
...9:24  39:25      49:3    64:9
...60:21 81:1       99:9

...wned [1]         51:15


-P-

...[2]     2:1       2:1
...C [2]   1:22      2:4
...M. [1]  132:3
...O [2]   163:13    165:7
...ace [2] 5:21      8:14
...adre [2]          19:14   19:18
...age [5] 2:22      114:17  114:19
...age/Corrections [1]       2:17
...aid [6] 75:24     76:5    76:8
...7:25  134:25     141:20
...aper [3]          31:1    65:10
...22:22

papers [1]         158:8
paperwork [1]      45:14
parents [1]        68:8
parents' [1]       22:16
park [2] 18:18     81:3
parked [1]         87:5
parking [1]        81:4
part [9] 30:18     30:19   31:13
94:18  113:22      119:8   139:12
151:23 159:3
particular [9]     3:12    18:2
47:2   65:7        108:5   108:13
119:25 120:4       129:11
parties [5]        68:20   162:25
164:24
Paso [2] 73:14     151:17  152:5
pass [7] 24:1      24:15   24:17
24:22  32:3        32:18   151:15
passed [6]         9:7     9:14
11:2   155:7       155:8   155:8
passenger [3]      78:20   81:5
88:6
passenger's [1] 86:22
passing [1]        24:16
patrol [75]        3:18    8:3
8:6    10:25       11:1    15:16
16:4   17:4        18:12   23:13
24:19  25:25       31:18   32:13
33:4   33:16       33:25   34:4
37:14  40:14       41:3    41:8
41:9   41:23       42:1    42:6
42:8   42:10       44:6    44:8
45:3   45:6        45:7    46:5
46:11  47:12       47:17   50:20
54:10  55:3        55:8    55:12
55:15  56:5        56:17   57:12
57:23  59:10       59:11   60:8
60:9   60:18       60:25   61:8
61:19  62:21       63:3    64:8
69:2   79:24       84:9    89:12
89:22  91:6        107:1   128:17
133:1  142:3       142:5   142:24
143:20 153:19      153:21  153:25
154:1
pay [21] 14:21     15:12   45:4
71:21  74:12       75:8    75:10
75:11  75:13       75:22   75:23
76:13  76:22       77:10   77:11
77:17  130:10      133:25  135:4
135:7  140:20
peace [6]          13:4    18:3
91:6   91:8        107:19  149:19
Penal [2]          91:5    91:7
91:11
people [31]        10:7    16:2
16:14  18:12       22:3    29:17
30:2   30:5        30:8    44:14
47:6   53:9        68:17   74:5
74:7   83:19       91:25   92:4
98:2   98:3        98:18   98:22
99:2   104:7       104:13  105:10
125:8  125:21      146:5   146:11
156:5
per [2] 39:23      155:6
percent [5]        77:16   77:16
77:16  89:23       98:3
Perez [1]          13:12

period [5]         17:7    23:22
24:4   24:10       40:4
permit [1]         89:2
permits [1]        146:6
permitted [1]      120:21
person [10]        21:2    38:24
39:16  40:7        41:10   73:24
99:11  132:9       145:1   161:15
person's [1]       39:23   100:12
personal [4]       58:14   64:9
136:8  158:9
personality [1] 152:14
personally [4]     104:9   125:9
147:4  161:13
personnel [3]      103:18  129:21
130:19
pertains [1]       34:12
phone [3]          113:9   132:9
138:17
photograph [1] 159:9
photographed [1]           97:11
photographs [1]            143:11
phrase [1]         117:2
physical [2]       11:23   31:18
physically [1]     43:23
physician [1]      130:23
pick [3] 83:18     84:21   85:5
picked [2]         84:25   85:1
133:10
picture [4]        93:25   94:2
131:6  143:12
pictures [2]       131:3   143:12
143:14
piece [3]          31:1    65:10
95:6
pipe [1] 92:23
pistol [2]         88:19   88:25
pit [1] 98:9
place [10]         11:6    33:14
40:16  43:8        45:18   45:21
45:22  92:11       105:21  123:20
placed [3]         4:3     68:15
96:17
places [1]         99:5
placing [1]        68:6
PLAINTIFF [1]              2:3
plan [1] 54:23
planned [2]        55:3    55:7
plans [1]          127:18
plant [1] 17:18
plate [4] 79:2     79:15   79:19
79:20
Plaza [1]          2:9
pled [1] 53:25
poaching [2]       48:21   48:23
point [2]          63:2    112:5
pole [1] 94:2      155:7
police [2]         12:2    17:23
policy [20]        2:23    54:3
55:12  61:7        61:18   61:23
61:24  62:6        62:10   107:8
109:11 109:16      110:3   110:4

110:15 111:2       113:16  113:17
113:18 120:24
polite [1]         101:1
pool [3] 22:3      22:8    22:10
popped [1]         138:10
population [1] 15:10
port [4] 37:20     40:15   48:16
48:25
portion [1]        32:3    116:14
118:20
position [39]      14:17   37:11
42:4   44:5        44:11   44:22
45:3   46:11       49:20   70:14
70:15  70:17       70:24   71:7
73:6   73:14       73:17   73:20
73:25  74:5        74:11   127:21
129:10 130:15      142:14  150:15
150:21 151:4       151:7   151:11
151:14 152:21      152:21  153:7
153:10 155:9       155:11  155:11
155:12
position-wise [1]          71:13
positions [3]      14:23   130:17
153:3
possession [1] 66:24
possible [2]       60:20   129:25
possibly [1]       71:24
post [2] 92:21     93:6
postacademy [1]            38:22
38:24  39:5
posted [1]         37:22
postings [1]       38:7
power [2]          7:17    120:16
practical [2]      25:5    31:13
practitioner [1] 130:20
preceding [1]      114:17
preliminary [1] 128:25
premium [1]        76:1
Premont [2]        51:7    51:10
66:2
preparation [1] 62:13
presence [1]       68:16
pretty [5]         18:7    45:6
48:3   65:25       99:8
prevented [1]      103:4
prevention [1] 144:14
Prisons [1]        16:4
private [1]        27:3
probable [3]       123:24  124:5
124:24
probation [2]      25:2    34:15
probationary [3]           23:14
23:21  24:10
problem [2]        42:16   99:23
problems [1]       129:14
procedural [1] 28:9
procedure [5]      1:24    104:20
158:13 163:5       164:23
procedures [1] 106:1
proceeded [1]      133:18
proceeding [1] 163:1
process [3]        11:5    15:4
106:4

processed [3]   104:24   156:18
156:20
produce [1]   61:15
produced [1]   1:16
professional [1]   135:6
program [8]   7:13   7:15
7:16   10:20   10:22   16:17
16:22   16:23
programs [1]   29:12
progress [1]   60:21
promoted [2]   42:19   47:1
promotion [4]   42:7   42:13
84:14   153:13   153:23   154:8
promotions [1]   142:14
proof [2]   88:9   88:13
proper [1]   118:9
property [1]   51:17
prosecuted [2]   139:3   139:9
prosecution [2]   138:12   138:21
protecting [1]   53:6
protection [2]   94:7   94:15
protocol [1]   46:6
prove [2]   151:19   151:21
proved [1]   161:14
provided [6]   14:1   47:4
48:9   58:6   120:18   159:17
provider [1]   9:14
provision [2]   116:8   116:8
provisions [1]   1:24
pubic [2]   99:1   102:5
public [2]   102:21   161:21
publication [2]   66:18   67:5
Puerto [1]   47:10
pulled [3]   88:1   90:13
135:10
purpose [2]   7:15   7:16
purposes [1]   161:17
pursuant [1]   1:23   163:4
pursuit [2]   61:24   62:9
put [24]   11:11   15:8   15:9
38:2   50:14   70:14   70:24
74:5   74:7   92:6   97:11
97:24   98:1   98:4   98:7
98:17   98:21   99:3   99:5
103:15   118:4   155:3   155:3
158:15
putting [4]   15:6   93:4
98:8   156:6

## -Q-

qualifications [2]   34:6
71:2
qualified [2]   70:4   120:19
questioning [2]   107:12   114:6
questionnaire [1]   145:4
questions [10]   2:16   4:3
21:25   52:10   96:9   114:22
115:15   115:17   123:21   126:17
quit [2]   12:16   12:24
quite [2] 5:13   110:18
quiz [1]   110:8

## -R-

R [4]   1:22   2:1   2:4
2:4
R-H-O [1]   39:9
R-H-O-D-E-S [1]   39:10
rabbit [1]   98:8
racket [1]   59:20
radio [3] 55:22   55:24   56:3
raise [3] 71:8   71:9   71:11
ranch [1]   136:2
rate [2]   15:12   16:11
rather [1]   135:7
rating [1]   34:5
re-closed [1]   93:16
reached [1]   93:4
reaction [1]   157:24   157:25
read [19] 31:7   78:15   110:14
112:4   112:14   112:20   113:2
113:20   113:22   114:8   115:23
116:15   116:16   117:2   117:8
118:19   118:23   119:8   161:2
reading [1]   111:22
reads [2]   117:20   118:1
real [2]   78:4   112:5
realize [1]   133:13
really [10]   47:18   48:6
50:17   78:11   83:11   83:23
93:10   99:7   131:18   157:25
rear [1]   92:14
reason [11]   22:2   24:17
26:1   72:10   72:21   78:19
88:5   125:20   138:1   138:11
160:2
reasonable [1]   123:24
reasoned [1]   89:15
reasons [3]   79:11   149:11
164:17
receive [1]   77:15
received [1]   7:23
receiving [2]   11:2   52:9
recently [1]   75:10
Recess [2]   42:17   108:3
reciprocating [1]   7:19
reckless [3]   140:3   141:8
141:16
recognize [4]   89:16   91:5
91:7   110:24
recognized [1]   104:11
record [10]   1:25   3:5
53:6   55:25   107:11   109:25
115:11   117:25   121:20   162:17
red [1]   57:13   150:9
reduced [1]   134:20
refer [6] 27:13   27:19   27:22
111:5   118:23   119:8
referring [4]   108:17   112:21
113:2   124:10
refers [6]   113:25   118:20
119:6   119:9   121:3   121:15
Reform [1]   28:23
refrain [1]   119:18

refusal [1]   140:24
refuse [1]   100:6
refused [1]   140:23
regarding [2]   123:22   143:13
Region [2]   72:3   130:8
Registration [1]   65:3
regular [1]   36:18
regulation [4]   61:14   107:7
108:7   121:21
Regulations [3]28:20   91:12
106:25
reimburse [1]   130:9
related [3]   22:4   22:11
162:25
relation [2]   155:21   156:25
relationship [2]   81:21
135:23
relative [1]   137:4
rely [1]   55:13
remain [2]   13:13   27:9
remainder [1]   25:2
remained [2]   14:25   86:18
remarried [1]   21:7
remember [35]   10:17   15:12
16:9   40:16   41:5   42:18
62:7   63:24   64:1   64:2
64:10   65:1   73:6   73:22
90:16   95:24   99:15   99:20
100:9   100:12   100:13   105:7
110:11   110:15   125:19   126:8
131:12   135:13   143:1   154:23
157:2   157:3   157:4   157:5
157:6
remembered [1]   88:19
removed [1]   32:4
render [1]   70:4
Renee [2]   1:19   162:12
renewal [1]   128:1
rented [1]   51:22
repeat [2]   105:9   108:13
report [5]   41:11   49:22
49:25   49:25   96:23
reported [1]   1:21
Reporter [2]   1:20   162:13
Reporter's [2]   2:18   162:9
Reporting [4]   162:22   163:10
164:15   165:6
reports [1]   45:9
reprimanded [1]   128:6
request [3]   36:22   37:25
38:13
requested [1]   61:15
require [1]   113:14
required [3]   77:20   110:10
113:6
requirements [2]   31:19
163:4
requires [2]   59:18   159:5
reside [1]   27:9
residence [1]   5:11
resources [2]   11:20   141:12

respect [1]   135:4
responding [8]   55:16   56:20
58:12   58:16   58:18   59:18
60:19   60:21
response [3]   36:24   90:20
136:5
responses [2]   4:4   146:10
responsibilities [2]   25:25
39:24
responsibility [2]   47:18
48:12
rest [1]   107:25
Restaurant [5]   81:10   81:14
85:4   90:7
restrictions [1]   145:23
result [5]   130:20   130:25
140:22   144:24   146:13
results [2]   11:2   11:2
144:12
returned [4]   162:22   164:14
164:16   164:19
reused [1]   67:24
review [1]   156:7
reviewed [1]   62:12
revved [1]   78:22   88:7
Rhodes [6]   39:8   40:3
40:18   41:15   125:16   125:24
Rico [1]   47:10
rid [2]   152:8   152:18
right [78]   8:13   10:10
12:1   14:22   16:24   21:17
24:11   27:13   28:22   29:12
29:21   30:9   30:11   30:13
31:6   32:6   34:1   38:4
46:2   47:8   48:15   49:12
52:18   53:10   54:5   55:1
55:23   56:25   57:25   58:18
65:15   70:23   71:19   72:2
72:23   73:5   75:2   75:3
75:16   76:21   81:12   82:22
92:21   92:23   94:8   97:3
102:13   102:17   103:10   103:11
104:17   106:17   109:1   113:8
113:11   114:1   116:3   119:6
121:3   124:3   124:9   124:15
132:14   142:7   145:7   145:12
146:7   146:21   146:21   149:2
149:22   154:24   156:19   158:20
rights [7]   52:6   101:11
101:15   101:24   102:7   104:25
105:14
risks [1] 15:7
roaming [1]   98:18
Robert [2]   23:12   69:10
Robindale [1]   140:15
Rodriguez [2]   40:11   50:7
rolled [2]   88:2   88:3
rollover [2]   94:7   94:15
roof [1]   93:3
room [6] 18:7   97:22   107:25
132:18   134:13   136:10
roommate [2]   63:3   63:14
roommates [1]   80:10
Rosa [5] 50:19   63:11   63:22

64:17    80:13

Rosie [3]    20:22    20:23
22:9

tary [1]    7:18

oute [1] 56:17

loyal [1]    5:3

uiz [3] 100:14    100:15    100:16

ule [1] 48:20

ules [1]    1:24    163:5
164:23

un [7]    47:25    57:13    58:14
50:13    61:19    62:1    85:11

unning [1]    60:1

ans [2] 59:7    59:11


-S-

[4]    2:1    19:5    164:17
164:17

-H-E-R-R-I-E [1]    19:6

-O [1]    13:10

-T-I [2]    12:6    12:7

afely [1]    120:20

alaried [1]    76:2

ammy [1]    139:18

an [8]    7:8    11:24    11:25
2:2    20:4    20:24    21:1
3:4

at [2]    95:7    99:8

aw [5]    87:10    88:17
.25:12    132:15

ays [41] 27:8    29:18    32:11
1:25    63:2    63:6    67:4
8:17    89:1    89:1    89:4
9:10    89:18    89:21    89:23
9:24    90:2    90:8    90:10
0:12    90:15    90:17    90:21
1:1    91:14    96:6    97:1
7:3    97:24    107:7    107:8
.07:13    110:16    111:17    111:19
.11:20    120:12    122:2    122:10
34:17    135:12

cale [4] 34:11    35:8    71:21
6:22

cenarios [1]    31:15

cene [1]    147:16

chedule [1]    50:2    50:4

cheduling [1]    45:8

cholar [1]    105:2

chool [52]    5:20    7:6
:24    8:4    8:22    8:24
:1    9:3    9:6    9:11
:17    11:22    17:6    18:2
8:15    32:21    33:5    33:12
3:15    33:16    33:17    33:19
3:22    33:23    33:24    33:24
4:1    35:1    35:9    35:14
5:16    35:17    36:6    36:7
7:5    68:7    68:10    88:1
2:1    131:23    144:1    144:1
44:5    144:6    144:7    144:8
44:16    144:18    144:20    144:21
51:16    151:17

chools [9]    6:20    35:19
5:21    35:25    36:5    36:17
6:20    36:21    37:1

schoolteacher [1]    125:16

Schwab [5]    162:22    163:12
164:15    165:4    165:6

score [2]    46:9    46:9

screaming [1]    93:10

screwed [1]    24:2

se [2]    39:23    155:6

seal [2]    161:18    161:18

search [2]    72:17    97:7

searching [1]    95:8

seat [6]    78:21    88:6    88:20
88:20    88:21    92:17

second [2]    89:8    93:18
113:1    128:23

secondhand [1] 132:24

Secret [1]    16:5

section [25]    28:1    106:23
108:16    111:8    111:12    111:18
114:8    114:10    116:10    116:18
116:19    116:21    116:23    118:19
119:11    119:13    119:16    120:1
120:5    120:5    120:9    120:10
120:16    121:4    121:15

sections [4]    27:7    27:10
28:8    33:10

sector [6]    49:9    49:10
49:10    49:13    49:16    49:17

sectors [1]    49:8

security [6]    14:1    16:6
142:1    142:12    145:3    159:10

sedan [3]    68:15    92:14
92:15

see [26]    10:11    21:10    22:8
22:9    48:1    48:2    56:18
56:23    65:7    65:9    68:12
83:25    84:2    86:20    93:12
95:11    96:1    96:2    96:15
125:24    127:7    128:25    129:15
130:25    150:24    155:23

seeing [2]    83:24    92:2

select [1]    152:12

selected [5]    73:14    73:17
74:3    153:24    156:20

self-employed [1]    19:25

self-explanatory [1]    112:3

selling [1]    144:13

semester [1]    8:20

semesters [1]    6:6

send [4] 38:1    38:1    38:2
38:5

senior [20]    33:21    33:23
33:24    34:1    35:9    35:14
35:16    36:6    36:7    37:9
37:14    42:1    42:6    44:6
44:8    45:3    45:6    45:16
46:5    155:17

seniority [1]    155:10

sense [2]    26:10    28:18

sensor [1]    60:20

Sensors [1]    55:19

sent [3] 52:10    52:17    159:4

sentence [17]    112:15    113:2
113:20    114:1    114:3    116:1
116:4    116:14    116:15    118:23

118:25    119:6    119:14    119:17
119:23    119:24    120:4

separate [3]    26:24    77:7
147:10

September [2]    38:19    128:21

serious [1]    133:19

served [1]    164:24

service [10]    16:5    32:4
112:16    112:24    112:25    155:6
162:22    163:12    164:15    165:6

set [1]    129:1

seven [4]    52:2    71:14
72:6    84:9

seventh [4]    51:6    51:9
51:10    78:3

several [4]    8:15    100:11
155:3    155:4

SF-86 [1]    145:3

sheet [2] 124:14    159:17

sheriff [31]    13:11    13:13
13:22    52:21    52:21    54:3
54:4    54:16    55:6    59:9
63:4    96:25    97:3    100:20
103:7    103:8    132:22    132:25
133:3    133:9    133:21    133:23
134:11    135:9    135:14    135:19
135:19    137:3    137:22    139:7
149:8

sheriff's [13]    8:10    11:15
12:13    12:21    63:17    65:9
72:15    137:7    137:19    138:14
138:19    138:23    143:17

Sherrie [6]    19:4    19:5
19:8    19:13    19:17    20:5

shit [2]    148:14    149:8

Shoan [5]    68:23    68:24
68:25    69:8    69:10

Shorthand [2]    1:20    162:12

shot [1]    76:24

show [5]    54:25    55:5
59:19    66:24    66:25    93:24
110:22    145:11    145:20    158:25

showed [5]    85:2    90:14
90:14    110:13    132:16

shown [1]    164:25

shut [1] 104:15

side [6]    11:24    86:22    88:4
88:21    92:14    95:11

sidebar [1]    114:12

sideways [1]    92:19

sign [12] 59:7    59:11    59:25
60:1    60:1    60:13    61:19
62:1    62:3    97:9    158:5
158:11

signature [2]    2:17    159:17
160:1    161:2    162:21    164:16

signed [2]    158:7    158:9

significant [1]    151:3

simple [4]    68:2    101:20
105:16    105:19

simply [6]    55:15    56:22
74:11    113:8    122:10    130:6

single [3]    82:14    82:15
114:2

siren [4] 57:9    58:21    58:24

59:3

sirens [2]    59:19    60:22

sister [3]    9:20    9:22
19:23

sister's [2]    19:1    19:2

sisters [2]    9:18    22:21

sit [4]    58:20    61:18    91:21
117:13

situation [6]    4:1    76:21
103:14    103:17    128:11    128:13

six [15]    8:21    24:15    24:18
44:5    52:1    130:9    130:10
155:25    155:25    156:4    156:8
156:16    156:17    156:23    157:2

sixth [1] 78:3

sixty [1] 75:17

skills [4]    34:7    44:7
71:2    71:5

slammed [1]    93:5

sleep [1] 99:12

small [2]    68:10    82:16

Smith [1]    81:16

smugglers [2]    37:19    60:24

smuggling [1]    66:13

social [7]    16:6    83:10
83:25    101:2    142:1    142:12
159:10

society [1]    29:9

sold [4]    4:24    4:24    5:18
51:17

sole [2]    9:14    21:13

someone [3]    40:1    44:21
103:4

sometimes [4]    20:25    21:1
129:2    129:3

somewhere [3] 74:20    144:19
157:11

son [3]    23:9    23:9    23:10

son's [1]    23:11

soon [2] 133:25    134:25

sorry [9] 15:21    21:9    43:10
66:13    95:5    107:23    108:2
108:11    144:9

sought [3]    129:9    130:15
142:15

South [3]    19:14    19:18
33:11

SOUTHERN [3]    1:1
162:1    164:1

Southmost [6]    6:2    6:13
8:13    10:13    10:14    48:25

southwest [3]    11:24    51:6
51:8

Space [1]    159:17

span [4] 11:13    12:19    40:24
137:6

Spanish [4]    14:5    14:7
30:20    31:8

speak [11]    14:7    84:2
96:11    96:25    102:20    103:8
103:12    103:16    103:18    103:24
104:4

specific [9]    26:16    28:14
36:1    54:1    110:17    111:19

specifically [9] 54:8    85:13
112:21  112:23  142:4
109:7  110:4  111:12  111:17
113:19  146:16  146:23
specify [1]    122:14
speculate [1]    63:25
speculation [5] 125:4    126:1
132:23  149:13  153:11
speech [3]    102:14  103:10
103:11
speed [2]    58:15  65:8
spent [1]    84:10
spoke [2]    133:11  138:17
spoken [2]    68:19  85:9
Squaw [4]    4:19    5:2
5:9    5:17
staff [1] 100:25
stand [2]    92:3    92:9
standard [3]    46:21  104:20
112:16
standards [2]    32:9    105:4
standing [3]    91:25  134:12
149:3
star [1]    135:21
start [4] 8:17    8:19    34:4
96:23
started [7]    12:23  38:20
51:21  93:10  95:22  96:9
135:11
state [13]    1:20    3:4
32:24  60:10  61:8  115:12
115:14  124:11  124:12  149:18
161:10  161:21  162:13
statement [4]    147:23  148:8
148:11  148:16
statements [2]    66:23  111:5
states [15]    1:1    15:16
27:10  31:3  33:13  47:10
90:15  90:19  91:2  91:4
109:17  145:4  156:6  162:1
164:1
station [10]    48:19  48:19
49:2  49:5  49:7  49:9
49:13  49:14  49:14  133:1
stationed [1]    38:12
stations [1]    49:11
status [2]    23:25  30:6
statute [6]    27:15  27:23
109:22  121:9  121:14  121:22
statutes [5]    26:3    27:13
27:14  28:7  28:16
statutory [13]    25:8  25:23
25:23  26:2  26:9  26:16
26:19  26:21  26:25  27:1
27:2  28:1  28:9
stay [9]  6:5    24:25  38:13
48:14  51:2  99:11  131:14
135:7  153:2
stayed [7]    38:15  39:15
39:16  71:20  84:13  95:8
96:23
staying [1]    36:19
stealth [1]    61:2
steel [1] 92:23

stenotype [1]    1:21
step [7]  71:22  72:1  74:17
74:18  74:19  75:9  87:3
Steve [2]    19:21  20:2
sticker [2]    65:2  65:4
still [13] 13:23  18:19  28:15
39:13  40:12  41:8  41:17
48:7  54:6  113:6  136:17
139:19  151:5
Stinson [3]    12:4    12:5
12:6
stop [33] 27:4    27:12  30:5
56:10  56:16  56:19  56:24
57:9  57:25  58:9  59:7
59:11  59:25  60:1  60:1
60:3  60:13  61:19  62:3
63:21  64:22  86:11  89:14
89:15  123:24  123:25  124:5
140:13  140:14  144:19  146:18
149:23  150:9
stopped [25]    56:6    56:8
57:13  57:17  63:3  63:10
63:15  63:23  64:6  64:10
64:19  64:25  65:4  65:10
78:18  78:19  79:1  79:12
84:24  87:23  88:5  140:23
143:16  144:2  144:16
stopping [2]    55:15  59:10
stops [5]    31:16  31:17
83:17  143:18  143:22
street [5]    1:23    2:5
51:7  51:8  56:11
streets [1]    15:5
strike [1]    60:7
strip-searched [1]    97:6
structured [1]    17:17
stuck [1]    95:1
stuff [4] 15:10  85:11  96:14
97:14
subject [5]    62:22  105:3
109:18  121:23  145:17
subjects [1]    15:5
submit [4]    71:4  97:10
100:4  130:5
submitted [2]    130:7  162:19
subscribed [1]    161:16
subsection [3]    111:9  112:16
120:15
subsequent [1]    11:10
subsequently [1]    8:8
substituting [1]    44:21
successfully [1]    120:13
such [5] 31:16  53:23  111:21
113:24  129:2
suffered [3]    126:17  144:23
145:12
suicidal [1]    15:7
suing [2]    67:19  158:3
Suite [5] 1:23  2:5  2:9
163:12  165:6
summer [1]    36:9
Sunday [2]    76:1  76:13
Sundays [2]    76:1  76:12
supe [1] 45:12

supervisor [28] 13:6    13:9
40:4  40:8  40:9  40:11
40:17  40:20  40:23  41:13
41:18  41:24  44:16  44:17
44:25  45:2  45:23  45:25
46:3  46:14  49:18  49:21
49:24  50:6  127:22  129:9
132:11  132:25
supervisors [4] 45:13    46:19
46:23  157:18
supervisory [4] 41:23    45:7
46:11  127:21
support [1]    144:23
supposed [3]    4:4    44:4
106:15
supposedly [1] 99:11
surprised [1]    96:15
SWAT [1]    36:24
sworn [3]    1:17    3:2
162:16
system [1]    51:2

-T-

takes [6] 48:19  48:25  155:24
156:4  156:8  156:16
taking [1]    95:23  144:13
149:11
talks [1] 109:3
tangible [1]    150:16
task [3] 138:20  139:17  139:20
taught [1]    33:6
TCLEOSE [1]    159:5
teachers [1]    68:9
team [7] 47:24  152:13
teams [2]    36:24  36:25
teased [1]    126:5
technical [1]    6:17
telling [1]    64:2  91:10
91:18
tells [2]  26:8  27:6
ten [6]  4:10  128:19  128:20
128:21  129:24  131:17
ten-hour [2]    77:21  77:24
tend [1] 66:25
tentative [1]    10:23
tentatively [2]  8:2    36:12
tenure [2]    13:18  63:19
test [2]  32:15  46:4  46:8
46:10  151:15
testified [2]    3:2    4:6
testify [1]    125:21
testimony [4]    3:21    3:21
144:15  162:17
testing [1]    28:24
tests [2] 32:6    32:19
Texas [48]    1:1    1:5
1:20  1:23  2:5  2:10
4:20  6:2  6:13  7:8
8:13  10:13  10:14  17:25
18:23  25:15  25:17  25:19
33:12  37:24  37:25  51:7
63:16  67:12  73:15  90:22
90:22  90:23  90:25  91:5

91:7  91:8  91:11  91:15
91:16  91:16  107:19  123:3
149:18  162:1  162:5  162:13
163:11  163:13  164:1  164:5
165:5  165:7
Thank [1]    159:15
Thanksgiving [1]    16:20
theirs [1]    54:24
therefor [1]    164:18
therefore [1]    113:12
therein [1]    161:17
thinking [3]    10:6    89:12
129:24
third [2] 33:20    68:19
thought [3]    89:8    94:23
108:11
thousands [1]    156:5
three [15]    17:14  23:16
23:17  23:21  23:24  24:5
25:6  32:5  32:18  33:20
34:21  38:25  39:5  65:20
143:15
through [9]    10:22  17:13
43:21  59:23  62:9  62:9
73:4  95:15  161:14
throughout [2]    39:16  156:6
ticket [2]    92:7  140:18
ticketed [1]    65:11
times [14]    3:19    4:6
4:13  29:8  64:6  80:15
80:16  83:12  85:9  85:12
97:16  104:3  113:13  135:24
title [2]  37:12  146:2
today [3]    3:7    43:17
58:20  61:18  62:14
together [7]    52:24  53:16
54:8  54:17  55:7  135:25
136:1
toilet [1]    99:17
tone [2]  119:3  119:21
too [4]  27:13  51:21  81:3
117:14
took [19] 8:23  40:16  44:24
95:20  96:10  97:5  97:6
97:21  106:13  106:14  123:20
130:8  130:10  131:5  132:17
132:18  136:9  136:9  142:21
top [3]  36:19  40:21  65:15
Torres [1]    139:18
tort [2]  67:12  101:18
totally [2]    26:4  138:8
totem [1]    155:7
towards [1]    69:23  119:4
town [6] 19:11  19:15  68:11
81:18  82:16  82:16
towns [1]    48:15
track [1] 21:2
traffic [21]    55:19  55:22
55:23  55:24  56:3  57:14
57:20  57:24  58:8  60:10
61:9  62:1  63:4  83:17
89:14  89:15  143:18  143:22
149:18  149:23  149:23
trafficking [1]    60:21

train – wrote
JOHN ANTHONY GILBERT  6/10/02    Multi-Page™    GILBERT VS. JIM HOGG COUNTY

**train** [2] 16:2    74:3

**trained** [1]    18:11

**trainee** [1]    31:1

**training** [33]    6:11    6:17
6:19    7:4    15:25    17:4
18:4    18:5    26:13    32:4
34:15    35:23    38:21    38:22
39:1    39:2    39:4    39:7
39:8    39:17    40:6    40:22
41:20    41:22    44:12    60:5
73:9    73:12    74:2    120:14
120:19    151:23    152:3

**transcript** [2]    162:16    162:19

**transfer** [1]    155:22    157:13

**transferred** [6]    50:21    50:22
75:7    80:1    80:3    84:13

**translations** [2] 31:11    31:12

**transpired** [2]    95:10    132:16

**transpose** [1]    31:7

**traveling** [4]    65:5    65:6
87:24    87:24

**trial** [1]    125:21

**trick** [3] 116:10    116:13    116:16

**tried** [2] 103:18    104:3

**troops** [1]    155:19

**trouble** [3]    25:1    83:19
133:14

**truck** [1]    85:6

**true** [4]    31:2    86:12    161:3
162:17

**trunk** [1]    68:14

**trustee** [1]    98:19

**try** [9]    22:4    27:20    102:20
103:3    103:13    103:16    103:23
123:12    124:21

**trying** [11]    27:25    28:6
53:6    53:22    62:7    76:25
77:5    93:2    116:10    116:13
123:18

**turban** [1]    7:18

**turn** [3] 92:10    138:13    138:22

**turned** [5]    87:25    88:22
92:12    139:7    158:12

**turning** [1]    61:1

**twice** [1]    86:9

**two** [23]    4:22    17:15    17:17
24:5    24:23    25:2    34:18
39:6    51:20    65:5    77:14
80:11    81:9    81:11    83:23
87:9    97:17    115:14    151:22
152:24    152:25    152:25    153:1

**type** [10] 14:3    18:3    33:8
34:12    44:7    45:9    52:18
59:23    112:21    112:23

**types** [2]    129:5    146:12

### -U-

**U-bar** [1]    94:5

**U.S** [4]    16:4    24:19    25:13
147:8

**uncontrolled** [4]    75:23
76:20    77:6    77:8

**under** [23]    3:17    3:24
4:3    4:4    27:10    28:13

**28:19**    28:19    28:20    39:23
58:5    60:14    61:19    61:21
61:24    68:6    83:14    90:18
91:11    91:11    112:15    149:17
161:18

**undercover** [10]112:17    112:22
113:3    113:15    113:24    114:1
118:20    118:24    119:6    119:9

**understand** [19] 12:11    22:13
28:5    36:16    53:5    53:7
66:20    67:2    67:16    67:22
70:6    74:24    82:17    91:4
91:9    108:23    109:12    114:20

**undeterminable** [1]    35:20

**undocumented** [1]    37:19

**uniform** [1]    89:17

**uniforms** [1]    82:25

**unit** [1]    56:17

**United** [14]    1:1    15:16
27:10    31:3    33:13    47:10
90:15    90:19    91:1    91:4
109:17    156:6    162:1    164:1

**university** [3]    6:24    17:16
18:7

**unknown** [2]    138:1    138:11

**unlawful** [10]    90:9    96:18
126:24    132:13    132:20    133:24
134:8    134:17    134:20    148:2

**unlawfully** [1]    127:10

**unless** [2]    38:13    48:13
94:9

**up** [31]    8:12    12:25    24:2
33:4    36:7    46:10    47:25
59:19    83:17    83:18    84:21
85:1    85:2    85:5    89:15
92:11    93:2    95:14    98:22
110:25    123:23    124:20    128:1
128:20    130:8    132:16    133:10
136:17    155:8    155:8    155:8

**update** [1]    33:2

**updates** [1]    33:8

**upper** [2]    41:13    41:24

**used** [5] 95:24    98:6    105:10
106:11    140:16

**using** [3]    116:10    119:19
144:13

**usually** [1]    155:24

### -V-

**vacancy** [2]    154:22    154:25

**vacant** [1]    44:22

**vague** [1]    60:11

**valid** [1] 149:23

**Valley** [7]    4:14    4:17
4:19    5:2    5:9    5:17
155:5

**vehicle** [32]    56:11    58:10
64:9    68:14    68:14    71:18
72:17    72:21    72:22    74:13
78:20    79:21    80:21    80:23
81:2    86:23    86:24    86:25
87:1    87:2    87:6    87:7
88:4    88:6    92:13    92:16
92:25    93:1    93:9    95:7
139:5    139:6

**vehicles** [5]    55:16    57:12
60:9    65:5    87:9

**verbally** [2]    31:8    95:10

**verbatim** [2]    110:18    136:16

**video** [1]    141:6

**videos** [1]    143:11

**violate** [6]    57:24    60:10
61:8    61:10    101:23    101:24

**violated** [5]    101:10    101:14
102:14    104:25    105:14

**violates** [2]    58:7    102:7

**violation** [11]    52:5    57:14
57:19    58:7    63:4    105:5
105:21    126:20    126:23    146:24
149:23

**violations** [1]    146:12

**Virginia** [1]    47:11

**visit** [1] 85:11

**voice** [3]    103:12    119:4
119:21

**voiced** [1]    147:16

**voucher** [2]    130:5    130:7

**VS** [3]    1:4    162:4    164:4

### -W-

**W** [3]    1:19    162:12    163:10

**wait** [5]    11:14    46:25    94:23
156:10    156:13

**waited** [2]    97:18    97:18

**waiting** [2]    11:4    11:8
43:21    132:21

**walk** [2] 96:15    98:20

**walked** [4]    92:13    95:17
135:18    136:21

**walking** [1]    98:22

**wall** [1] 138:8

**wanting** [1]    96:7

**warrantless** [1] 90:17

**was/was** [1]    164:14

**Washington** [2]    72:4
130:9

**waste** [2]    107:16    112:12

**wasting** [1]    116:24

**watch** [3]    97:15    131:16
136:8

**weapon** [20]    54:5    68:13
90:9    96:11    96:19    107:4
112:23    126:25    127:10    132:13
132:20    133:3    133:25    134:8
134:18    134:20    146:19    147:6
148:2    148:10

**weapons** [4]    111:13    123:3
146:5    146:13

**wearing** [2]    78:21    88:6

**wedged** [2]    93:7    148:23

**week** [4]77:13    131:7    138:3
154:3

**weekend** [3]    75:22    138:4
138:5

**weekends** [2]    74:25    75:25

**weeks** [2]    4:22    73:16

**welcome** [1]    107:16

**west** [1] 49:1

**wherever** [4]    38:6    72:24
153:3    153:5

**white** [1]    154:5

**whole** [19]    13:2    24:8
39:15    39:17    41:16    41:18
51:5    89:12    100:22    100:23
112:4    112:14    114:6    114:9
117:3    135:6    135:16    142:22
155:4

**wholly** [1]    116:12

**Wife** [2] 126:10    126:11

**wife's** [1]    20:15

**Willacy** [1]    49:7

**WILLETTE** [1]    2:8

**willing** [1]    141:9

**Wilmington** [1]    4:12

**window** [3]    65:2    88:3
88:3

**windows** [1]    88:2

**wing** [2] 7:19    39:23

**winter** [1]    16:19

**within** [6]    47:5    49:10
49:16    71:22    142:11    153:2

**without** [2]    59:23    63:1
116:4    146:5

**witness** [39]    1:16    26:13
26:15    43:12    53:7    54:2
58:5    59:17    62:6    70:10
78:11    94:11    101:20    102:9
102:17    103:1    103:7    105:16
107:21    107:24    108:24    109:10
109:20    119:4    119:22    123:10
125:5    127:7    145:18    149:15
150:5    162:15    162:18    162:20
162:21

**Witness'** [1]    2:17

**witnessed** [1]    126:14

**witnesses** [1]    107:15

**women** [4]    82:9    82:12
82:14    82:24

**word** [4] 53:5    67:24    67:25
70:6

**wording** [8]    90:16    95:24
110:17    111:19    122:25    128:4
133:22    135:13

**words** [13]    13:14    36:23
44:8    46:13    85:1    87:8
87:21    98:6    106:5    122:21
122:23    124:4    136:16

**worked** [2]    8:11    12:25

**workers** [1]    29:21

**works** [1]    19:23

**world** [1]    54:5

**worry** [1]    28:22

**Wow** [1]    10:8

**write** [2] 62:19    71:5

**write-up** [1]    129:22

**write-ups** [1]    129:13

**written** [7]    25:4    61:22
67:6    69:18    69:22    157:7
157:13

**wrong** [2]    106:2    106:8

**wrote** [1]    62:15

Index Page 14

**SCHWAB COURT REPORTING SERVICE  (956) 544-5126**

Case 1:01-cv-00054    Document 42    Filed in TXSD on 10/28/2003    Page 79 of 230

**-Y-**

**yards** [1]      136:23
**Ybanez** [12]    1:7       53:13
  54:16   55:2    55:6    66:25
  67:8    68:19   69:11   69:21
  162:7   164:7

**year** [26] 5:7    5:22    8:25
  9:2     9:3     11:13   16:18
  17:11   23:13   23:14   23:21
  24:7    24:8    32:19   33:20
  34:8    39:15   39:18   39:20
  71:15   71:16   72:6    75:15
  84:19   86:8    128:21

**year's** [2]     16:20   34:15
**yearly** [1]     32:15
**years** [24]     10:17   11:12
  12:19   17:13   23:16   23:17
  23:21   23:24   25:3    33:20
  33:25   34:21   51:20   52:1
  52:2    65:20   83:23   84:10
  127:25  128:19  128:20  128:22
  128:24  129:3

**yell** [3]  93:8    114:24  115:1
**yellow** [1]     136:7
**yells** [1] 77:4
**yet** [4]  29:6    121:25  127:17
  142:18

**you-all** [2]    148:13  149:8
**younger** [3]    9:19    9:19
  9:21
**yourself** [2]   77:23   142:23

# EXHIBIT B

# DEPOSITION OF ISAAC BOLCH

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN GILBERT,                    §
     PLAINTIFF          §
                        §
VS.                              §     CIVIL ACTION NO.
                        §     B-01-54
JIM HOGG COUNTY, TEXAS,          §
ET AL,                           §     JURY DEMANDED
     DEFENDANTS         §

VIDEOTAPED AND ORAL DEPOSITION OF:

ISAAC BOLCH

AUGUST 29, 2001

# COMPRESSED COPY

# *Compex Legal Services*

*Houston    San Antonio    Dallas    Austin*

*(800) 969-6424*

JOHN GILBERT VS. JIM HOGG COUNTY         ISAAC BOLCH                                    08/29/01

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION
3    _____
                                   )
4    JOHN GILBERT,                 )
          PLAINTIFF                )
5                                  )    CIVIL ACTION NO.
     VS.                           )    B-01-54
6                                  )
     JIM HOGG COUNTY, TEXAS,       )
7    ET AL,                        )    JURY DEMANDED
          DEFENDANTS               )
8    _____)
9
10
11
12

          ORAL/VIDEOTAPED DEPOSITION OF ISAAC BOLCH
13
                      AUGUST 29, 2001
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1   A P P E A R A N C E S
2  FOR THE PLAINTIFF(S):
      MR. MICHAEL R. COWEN
3     LAW OFFICES OF MICHAEL R. COWEN
      Attorney at Law
4     765 East 7th Street, Suite A
      Brownsville, Texas 78520
5     Telephone: (956) 541-4981
      Fax: (956) 504-3674
6
   FOR THE DEFENDANT(S):
7     MS. AMY LAWLER GONZALES
      WILLETTE & GUERRA
8     Attorneys at Law
      3505 Boca Chica Boulevard, Suite 460
9     Brownsville, Texas 78521
      Telephone: (956) 541-1846
10    Fax: (956) 541-1893
11
      RYAN HAGGE,
12    The Videographer
13    ISAAC BOLCH,
      The Witness; and
14
      ANGELITA JIMENEZ,
15    Certified Shorthand Reporter.
16
17
18
19
20
21
22
23
24
25

Page 3

1       DEPOSITION of ISAAC BOLCH, taken on the 29th day of
2  August, 2001, between the hours of 3:02 o'clock p.m. and
3  4:46 o'clock p.m., in the offices of COMPEX LEGAL SERVICES,
4  INC., 3300 Nacogdoches, Suite 220, San Antonio, Texas,
5  before ANGELITA JIMENEZ, a Certified Shorthand Reporter in
6  and for the County of Bexar, State of Texas pursuant to
7  Notice, the Federal Rules of Civil Procedure and the
8  following stipulations:
9
10        S T I P U L A T I O N S
11      IT IS STIPULATED and agreed by and between counsel for
12  the respective parties hereto that the original of the
13  deposition of ISAAC BOLCH shall be sent to the Witness at
14  427 McNeel, San Antonio, Texas 78228, for the purpose of
15  obtaining the signature of the witness thereon before any
16  Notary Public.
17
18
19
20
21
22
23
24
25

Page 4

1              INDEX
2  Appearances . . . . . . . . . . . . . . . . . .2
   Stipulations . . . . . . . . . . . . . . . . . .3
3
4
   ISAAC BOLCH
5
6      Direct Examination by Mr. Cowen . . . . .5
7  Signature and Changes . . . . . . . . . . . . :. . . .100
8  Reporter's Certificate . . . . . . . . . . . . .101
9
           EXHIBITS
10
   NO.     DESCRIPTION              PAGE
11
       NO EXHIBITS MARKED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1           THE VIDEOGRAPHER:  Okay.  We're on the
2  record.  The time is 3:02, August 29th, 2001.
3           ISAAC BOLCH,
4  having being first duly sworn, testified as follows:
5           MR. COWEN:  Ready?
6           THE VIDEOGRAPHER:  Yeah.  We're on.
7           DIRECT EXAMINATION
8  BY MR. COWEN:
9      Q   Okay.  Good afternoon.  Your name's Isaac Bolch;
10  is that correct?
11     A   That's correct.
12     Q   How do you -- How do you spell that?
13     A   The first name is I-S-A-A-C.  The last name is
14  "B," as in "boy," O-L-C-H.
15     Q   And we're in San Antonio, Texas; is that correct?
16     A   That's correct.
17     Q   And you realize that we're here for your
18  deposition?
19     A   Yes, sir.
20     Q   And you've had a chance to meet with your lawyer
21  before this deposition?
22     A   Yes, sir.
23     Q   And that's Amy Gonzales, who is sitting here right
24  next to you?
25     A   That's correct.

JOHN GILBERT VS. JIM HOGG COUNTY     ISAAC BOLCH     08/29/01

Page 6

1   Q   And so, you know, basically, what -- what -- what
2 we're going to go through here in a deposition?
3   A   Yes, sir.
4   Q   Okay. Just for formality, if you need to take a
5 break for any reason, let me know and I'll let you take a
6 break. I'm here to ask the questions, not to torture you.
7   A   Thank you.
8   Q   Where do you live right now?
9   A   I live at 4803 Sid -- 2 words, Sid Katz, S-I-D,
10 second word, K-A-T-Z, Drive, San Antonio, Texas.
11   Q   How long have you lived there?
12   A   It's been about eight months, or so.
13   Q   Where'd you live before that?
14   A   I lived -- Before that, I lived at 227 Lewis
15 Street, San Antonio, Texas.
16   Q   How long did you live there?
17   A   It was, approximately, five or six months.
18   Q   And before that?
19   A   I lived at the 1200 block of North Smith in
20 Hebbronville, Texas. I don't remember the exact address.
21   Q   Okay. That's fine. How long did you live there?
22   A   Just a couple of months.
23   Q   Is -- Sid Katz Drive, is that a home?
24   A   It's the manager's apartment for the Ronald
25 McDonald House Charities.

Page 7

1   Q   And how about the street on the -- the Lewis
2 Street residence? Was that a home?
3   A   Well, that was the manager's house of the downtown
4 Ronald McDonald House.
5   Q   And how'd you end up there?
6   A   My mother is the manager of the Ronald McDonald
7 House, previously the -- the downtown and now the Medical
8 area -- Center area.
9   Q   Well, that's a worthy job.
10   A   Excuse me?
11   Q   That is a worthy job. I'm -- I'm complimenting
12 your mother's job.
13   A   Thank you.
14   Q   What is the address on your driver's license?
15   A   427 McNeel Road.
16   Q   Okay. And what city?
17   A   San Antonio, Texas.
18   Q   Okay. And of course, you -- when was the last
19 time you lived at that address?
20   A   That's my mailing address; that's where I receive
21 mail. I cannot receive mail at 4803 Sid Katz or 227 Lewis
22 Street.
23   Q   Okay. The McNeel Road address, what is it? I
24 mean, what --
25   A   It's my grandmother's house.

Page 8

1   Q   Okay. So, the -- the mail would go to your
2 grandmother's house?
3   A   Correct.
4   Q   And if someone was to call your grandmother's
5 house and asked if you lived there, they'd say "no" because
6 you don't?
7   A   Right. That's why I have give the number --
8 telephone number to the manager's apartment at the Ronald
9 McDonald House.
10   Q   Okay. Thank you. What year did you get out of
11 high school?
12   A   1993.
13   Q   What high school?
14   A   Thomas Jefferson here in San Antonio.
15   Q   You graduated?
16   A   Yes, sir.
17   Q   What'd you do after you graduated?
18   A   I went to Laredo, Texas, where my father had a oil
19 field service company, and I worked for him from '93 to.
20 approximately. '96, I believe.
21   Q   What were your job duties there at the oil field
22 service company?
23   A   Well, I started out as the janitor, and then I
24 became what's called an operator's helper, which is an oil
25 field -- they go out to the locations and test oil wells.

Page 9

1 And then, after sometime, I became the communications
2 manager.
3   Q   And you left that job in '96?
4   A   Right.
5   Q   And you were a communications manager. at that
6 time?
7   A   That's correct.
8   Q   Then what was your position or employment?
9   A   My next position from there was working for the
10 United Independent -- Correction. I worked for ITS Security
11 in Laredo as a security guard.
12   Q   How long did you do that?
13   A   I would say for about a year.
14   Q   About '96 to '97, more or less?
15   A   Yes.
16   Q   And did you do anything between working for your
17 dad's oil field company and working for ITS Security?
18   A   No. As a matter of fact, I held both jobs for a
19 short period of time.
20   Q   Okay. But there was no gap of --
21   A   No.
22   Q   There's no gap between the -- the employments?
23   A   No, sir.
24   Q   Did you have any position with ITS Security, other
25 than security guard?

3 (Pages 6 to 9)

Page 10

1    A   No, sir.
2    Q   What kind of training did you receive at ITS
3  Security?
4    A   Very minimal training.
5    Q   What -- What training?  What did they do?
6    A   It consisted of watching videos on
7  security-related matters and how one should deal with those.
8    Q   You just watched a few videos; that was all the
9  training?
10   A   Definitely.
11   Q   You were just a security guard.  There was no real
12  law enforcement type --
13   A   No, not at all.
14   Q   You weren't commissioned?
15   A   No.
16   Q   You didn't have a -- a badge?
17   A   I had a Texas Private Investigators & Security
18  Commission license.
19   Q   Okay.  So, you did get licensed as a private
20  investigator, at that time?
21   A   No.  As a -- As a -- By that commission, as a
22  unarmed security officer.
23   Q   Okay.  And you didn't have a gun then?
24   A   No.
25   Q   Okay.  Then, what was your next position after

Page 11

1  working at ITS?
2    A   With the United Independent School District Campus
3  Police as a security officer.
4    Q   Is that in Laredo?
5    A   Yes, sir.
6    Q   And what were your job duties as a campus security
7  officer?
8    A   I was a security officer at one of the local high
9  schools there in Laredo.  It was our job to work closely
10  with administrators and the campus police to ensure the
11  safety and well being of the school and the students and
12  faculty and administrators, etc.
13   Q   Were you -- Were you an actual peace officer?
14   A   No.
15   Q   Did they have actual peace officers working for
16  the --
17   A   Yes.  They did.
18   Q   Did you get any training at that job?
19   A   Yes.
20   Q   What kind of training did you get?
21   A   The peace officers -- The training officers in --
22  in particular would hold seminars and continuing
23  education-type classes on weaponless defense strategy,
24  verbal techniques for deescalating situations and -- and
25  similar -- similar-type deals.

Page 12

1    Q   Did you carry a gun at that --
2    A   No.
3    Q   -- job?  Did you make arrests at that job?
4    A   No.  Detentions only.
5    Q   Did you have any training on -- on when you could
6  or could not arrest somebody at that job?
7    A   We had limited training when we could detain
8  people.
9    Q   Okay.  And what --
10   A   Students.
11   Q   What kind of training was that?
12   A   As I mentioned before, it was with our training
13  officer, who would go over the Education -- Texas Education
14  Code and give us our scope of authority and limitations.
15   Q   Okay.  How long did you hold that job?
16   A   I -- I would say it was about a year to a
17  year-and-a-half, or so.
18   Q   Yeah.  And these don't have to be exact dates.
19   A   Yeah.  I don't -- I don't remember exactly.
20   Q   If we wanted to get exact dates, we could go over
21  the -- your employment records.
22   A   Okay.
23   Q   So, we're just trying to get a basic feel for it.
24   A   Okay.
25   Q   And anytime you don't want to held to a date, just

Page 13

1  tell me "approximately" and then I'm stuck with
2  "approximately."
3    A   Okay.
4    Q   If you don't tell me "approximately," I might be a
5  jerk later and try to say, Well, you said this --
6    A   Okay.
7    Q   -- and then you'll be stuck with it.  What did you
8  do after -- I'm assuming after.  What was your next job
9  after you started at United ISD?
10   A   Well, actually, while I was at United Independent
11  School District, I became acquainted with an individual who
12  was the lieutenant of reserve officers with the Webb County
13  Sheriff's Department, who -- upon several conversations,
14  we -- we decided that it would be a -- in my best interest
15  or a good idea that I attend the police academy in Laredo as
16  a reserve officer with Webb County Sheriff's Department.
17       So, after that, while -- while I was still with UISD, I
18  was going to a reserve police academy at night, and
19  towards -- towards the end of my academy, I -- I resigned
20  from UISD so that I could devote my full attention to the
21  academy; that would be until early August, 1998.  I think
22  December -- Now that I'm thinking back, I think December '97
23  was my departure date from UISD, approximately.
24   Q   So, you think around December of '97 is when you
25  left?  And --

4 (Pages 10 to 13)

COMPEX LEGAL SERVICES, (800) 969-6424

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                          . 08/29/01

---

Page 14

1   A   (Witness nods affirmatively.)
2   Q   And when did you graduate from the Laredo Police
3   Academy.
4   A   Early August of 1998.
5   Q   Who was the -- your friend, the lieutenant there
6   at the Webb County Sheriff's --
7   A   His name is -- Boy, I can't remember, but he was
8   also the -- the principal of Alexander B. -- I mean, John B.
9   Alexander High School in Laredo, Texas.  I -- His name
10  escapes me right at this point.
11  Q   You can't remember a first name or a last name?
12  A   My goodness.  Raul -- I think his name was Raul.
13  I know his first name was Raul.  I don't remember his last
14  name.
15  Q   Okay.  That's fine.  So, how long was the police
16  academy?  How many months, more or less?
17  A   It was from September of 1997 until August 1998.
18  September 23rd, 1997, until early August '98.
19  Q   Between graduating high school and starting the
20  police -- the police academy, did you have any other kind of
21  education?
22  A   I attended, on and off, Laredo Community College.
23  Q   What kind of courses did you take?
24  A   Mainly your core curriculum basics with -- I was
25  leaning towards a business-type degree, at that time.

---

Page 15

1   Q   Did you take anything in criminal justice or law
2   enforcement?
3   A   Not at all.
4   Q   What kind of training did you get there in the --
5   How many hours a week -- Let me start all over again.  How
6   many hours a week was the police academy?
7   A   Sixteen.
8   Q   Sixteen hours a week?
9   A   Yes, sir.
10  Q   What kind of things did you do at the police
11  academy?
12  A   We did intensive study of the Texas Penal Code,
13  Code of Criminal Procedure, arrest, search and seizure, use
14  of force, dealing with individuals with mental disability,
15  multicultural diversity and other TCLEOSE, Texas Commission
16  on Law Enforcement Officer Education Standard training,
17  patrol procedures.
18  Q   Were you taught anything about working with
19  Federal law enforcement?
20  A   Yes.
21  Q   What were you taught about working with Federal
22  law enforcement?
23  A   Specifically --
24  Q   I'm sorry (phone ringing).
25  A   Specifics escape me at this -- this point, but in

---

Page 16

1   a lot -- a lot of the instructors -- as a matter of fact, a
2   few of the instructors were Federal law enforcement agents,
3   either retired or doing that on a part-time basis, and --
4   and a lot of our training was based on examples throughout
5   their career, etc.
6   Q   Did you get -- ever have any training regarding --
7   at the police academy, regarding the need or desire to
8   cooperate with Federal law enforcement?
9   A   Specifically, no.
10  Q   Okay.  Were you ever taught about which Federal
11  law enforcement agents could carry a firearm?
12  A   No.  Oh, well, yes, we were, in our Code of
13  Criminal Procedures class and our Penal Code class.
14  Q   Okay.  So, you learned the Penal Code definition
15  of who could and could not carry a firearm?
16  A   Correct.
17  Q   Were you ever taught that there might be some kind
18  of Federal law about authorizing or not authorizing certain
19  agents to carry firearms?
20  A   Well, to that extent, all we were taught, as far
21  as that, is that State law can be stricter, not less
22  restrictive, than Federal law.  So, in other words -- Let me
23  give you an example they gave us.
24  Q   Okay.
25  A   Whereas -- And this is how they put it.  Whereas

---

Page 17

1   you can burn the flag of the United States in Washington,
2   DC, and protest, it is a violation of the Texas Penal Code.
3   So, Texas law could be more strict, not less strict.
4   Q   And were you taught that it would be okay to
5   arrest somebody for burning the -- the Texas -- the
6   United -- the United States flag in Texas?
7   A   Yes.  It was -- If you acted under the -- your
8   powers vested by the Code of Criminal Procedure, while
9   enforcing a Texas law, that you acted in good faith and it
10  was a valid arrest.
11  Q   And they never told you that maybe the first
12  amendment of the United States Constitution would trump the
13  Texas law if the two conflicted?
14  A   It's not my -- As a peace officer, it was not our
15  duty to interpret to an extent; that's for the courts to
16  decide.  We just went on the elements of the offense.
17  Q   Okay.
18  A   If each element of the offense was met, then that
19  individual had violated Texas law and could be arrested.
20  Q   Right.  And this is something that's just real
21  important, I mean, in the training they gave you.  I mean --
22  A   Okay.
23  Q   They never taught you, for example, that the
24  United States court says you have a constitutional right to
25  burn a flag and that any State law saying that's

---

Page 18

1  illegal is unconstitutional and any arrest therefore would
2  be unconstitutional? They never taught you that?
3     A  They went over several Federal case law --
4  precedent case laws, but I guess I'm not understanding your
5  question. Can you --
6     Q  Well, it sounds to me like they told you that you
7  could arrest someone for burning a flag; correct?
8     A  Correct.
9     Q  Okay. And how about if there was a Federal law
10  saying a Border Patrol agent could carry a gun, it was your
11  understanding that the State law would trump that?
12     A  That's correct. It could -- I believe it's the --
13  the Tenth Amendment. the Police Powers Amendment, said that
14  the -- And I'm -- I'm -- I've been out of the game for
15  awhile. But it -- it states that the State law could be
16  more restrictive than Federal law.
17     Q  All right. And if -- if there is a conflict
18  between a Federal statute -- And I just want to know -- You
19  know, we're not asking what the law is. We're asking you --
20  I'm asking you what you were trained.
21     If there is a conflict between a Federal law that says
22  a Border Patrol officer can carry a gun and the State law
23  saying he can't, then the State law would win and the State
24  law would be the one that you would follow?
25     A  Only way I can answer that question is by using

Page 19

1  examples.
2     Q  Okay.
3     A  Another example that we were given is, at the
4  time, mind you, the Health and Safety Code -- Well, the US
5  Government Code said that you could bring back prescription
6  drugs from Mexico as long as you had a prescription from a
7  Mexican doctor; however, State law said that that was a
8  violation, you could be arrested for having a prescription
9  from a Mexican doctor if he didn't -- did not have a Drug
10  Enforcement Agency number. DEA number.
11     Q  Okay.
12     A  That's just an example.
13     Q  Well, let me give you -- This is the example that
14  matters in this case.
15     A  Okay.
16     Q  I -- And I don't want you to admit any of this is
17  true. I want you just to assume -- I'm just giving you a
18  hypothetical situation --
19     A  Okay.
20     Q  -- and we can argue about the exact facts, whether
21  they're true or not, later. But assume that the United
22  States government gives a credential to a Border Patrol
23  agent saying "Border Patrol agent, you are authorized by the
24  Federal government to carry a gun either on duty or off
25  duty." That's a United States government credential to the

Page 20

1  Border Patrol agent.
2     And then, you have State law. The Code of Criminal
3  Procedure and the Penal Code do not list a Border Patrol
4  agent as -- as a law enforcement agent authorized to carry a
5  firearm while off duty.
6     If you have those two laws in conflict, which one were
7  you trained to follow?
8     A  State law.
9     Q  Okay. And you believed that the State law would
10  trump over the Federal law?
11     A  Yes.
12     Q  And that's based on the training that you
13  received?
14     A  That's correct.
15     Q  And no one at Jim Hogg County ever told you
16  anything different about that?
17     A  That's correct.
18     Q  And you never were trained in anything about the
19  supremacy clause of the United States Constitution. that the
20  Federal law was the supreme law of the land? You never were
21  told that?
22     A  Apparently not.
23     Q  Okay. When you graduated from the police
24  academy -- What was the next job you got after you started
25  the police academy?

Page 21

1     A  After I started the police academy --
2     Q  You got a job at some point after that. I just
3  didn't want to limit the question in case you were working
4  while you were in the police academy, other than United ISD.
5     A  Well, I -- like I said, I resigned so I could
6  dedicate myself full time. Upon completion of the
7  academy --
8     Q  Okay.
9     A  -- is the next time I got a job.
10     Q  And where was that job?
11     A  San Diego Police Department in San Diego, Texas.
12     Q  Is that Duvall County?
13     A  Yes, sir.
14     Q  How big is that department?
15     A  It was a very small department.
16     Q  About how many officers?
17     A  At the time that I joined, there were -- Well, the
18  position that I filled made -- The position -- Including me,
19  there was four officers and one chief.
20     Q  How long did you work there?
21     A  Approximately, four months.
22     Q  And what was your position?
23     A  Police officer.
24     Q  What was the pay?
25     A  $6.33 an hour.

6 (Pages 18 to 21)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                08/29/01

Page 22

1   Q   Did you get to receive any training while you were
2   at the Duvall -- I'm sorry -- the San Diego Police
3   Department?
4   A   No.
5   Q   Did you ever have to work in conjunction with
6   Border Patrol agents there?
7   A   Yes.
8   Q   Did you ever work with John Gilbert --
9   A   No. Never.
10  Q   -- at that time?
11  A   Never.
12  Q   Had you ever met him while you were at the San
13  Diego Police Department?
14  A   No.
15  Q   What kind of things would you do with Border
16  Patrol agents?
17  A   Basically, in San Diego, we didn't have as much
18  contact with Border Patrol as we did in Hebbronville because
19  the station was in Freer, Texas, which is a good ways down
20  the road.
21      So, basically, if we ever -- if we ever had any contact
22  with them, it was informal contact, just, you know, late
23  shift, we'd see them park or they'd see us park and we'd
24  just chat.
25  Q   You never worked on the same bust together or none

Page 23

1   of that?
2   A   At one point, one of our officers was fired upon
3   by an individual and Border Patrol agents assisted in
4   backing up our department, Duvall County. And it was San
5   Diego PD, Duvall County and Border Patrol.
6   Q   Okay. And -- But John Gilbert was one -- not one
7   officer you worked with there?
8   A   No.
9   Q   And did you receive any kind of training while you
10  were there?
11  A   No.
12  Q   Where was your next job?
13  A   The Duvall County Sheriff's Department.
14  Q   Why'd you -- Why'd you switch from San Diego PD to
15  Duvall County?
16  A   On December 31st, 1998, the position was
17  eliminated by the City Council, due to budgetary reasons.
18  They didn't have enough money.
19  Q   Did you have any problems with San Diego?
20  A   No.
21  Q   So, it was a friendly termination?
22  A   Yes.
23  Q   Did you ever get disciplined while you were there?
24  A   Never.
25  Q   Never written up for anything?

Page 24

1   A   No.
2   Q   How long did it take you to get a job with
3   Duvall -- I'm sorry. You said Duvall County Sheriff?
4   A   Yes, sir.
5   Q   Okay. How long did it take you to get a job with
6   the Duvall County Sheriff?
7   A   I think the next day. As a matter of fact, it --
8   it was a couple of days later because that was New Year's
9   Day. There was no staff. I waited until the sheriff came
10  back, which was probably the day after that.
11  Q   Was it a full-time job?
12  A   Yes, sir.
13  Q   What was your position?
14  A   Jailer and transport officer.
15  Q   And what were your -- your duties?
16  A   In the jail, my duties were to take care of the
17  inmates, provide for them their meals, medication, and also
18  to maintain order in the jail, which we never really had
19  much problem with because it was such a small jail. We
20  didn't have very many inmates.
21  Q   Okay. And transport officer?
22  A   If there was ever a need for an individual to be
23  transported, say, to a prison with the State -- the Texas
24  Department of Corrections, or even hospital visits, court
25  dates, etc., we would -- we would be in charge of -- I would

Page 25

1   be in charge of transporting them where they needed to go.
2   Q   Did you -- Did you apprehend suspects in this
3   position?
4   A   No.
5   Q   How long did you have that position?
6   A   About a month.
7   Q   Did you receive any training during that month?
8   A   No.
9   Q   What was your next position?
10  A   Deputy sheriff with Jim Hogg County Sheriff's
11  Department.
12  Q   Why'd you switch jobs?
13  A   Because I wanted to be a patrol officer. I wanted
14  to be out on the street again.
15  Q   What did they pay you at Duvall County?
16  A   It was in the $7.00 -- 6.50 to $7.00, 7.50 range,
17  between there. I don't recall exactly.
18  Q   They don't pay you much to risk your life, do
19  they?
20  A   No. They don't. It wasn't about the money.
21  Q   I guess not. I tell my staff that they should be
22  grateful they don't have to have people shoot at them. What
23  did -- So, what was your position with Jim Hogg County?
24  A   Deputy sheriff.
25  Q   And how much did you get paid at that?

7 (Pages 22 to 25)

---

**Page 26**

1    A    $8.80 an hour when I started. And then, once I
2    was removed from probation status, it was 9.42 an hour.
3    Q    How long did it take -- How long were you on
4    probation?
5    A    I think six or seven months.
6    Q    And when you said "probationary status," that's --
7    every new employee is on probationary status, not because
8    you did something wrong --
9    A    Right.
10    Q    -- they put you on probation?
11    A    That's correct.
12    Q    It was up to nine what?
13    A    9.42, I believe.
14    Q    Okay. And just approximately.
15    A    Right.
16    Q    If you're off by a few pennies, it's not a big
17    deal. How many hours a week would you get?
18    A    At least 40?
19    Q    Would you sometimes get overtime?
20    A    Yes, sir.
21    Q    Would they pay you overtime?
22    A    They gave us Comp. time, which was time off at
23    a -- at a -- for every hour that we worked we'd get 1.5.
24    hours off time for later.
25    Q    Instead of paying you the overtime?

---

**Page 27**

1    A    Right.
2    Q    You know that Cameron County people just got a
3    bunch of money for -- Never mind. That's --
4    A    Backpay?
5    Q    For overtime pay. What were your job duties as a
6    deputy sheriff?
7    A    They were numerous. Order maintenance --
8    Q    What do you mean by "order maintenance"?
9    Maintaining order?
10    A    Maintaining order -- For example, directing
11    traffic, if need be. We would -- We would cross school
12    children; we would act as crossing guards; we would respond
13    to calls for service; we -- we -- we did just about
14    everything.
15    Q    Would you also -- Would you do anything like
16    criminal investigations?
17    A    Yes.
18    Q    Would you do traffic stops?
19    A    Yes.
20    Q    Would you arrest people you suspected -- that you
21    had probable cause to arrest for suspected criminal
22    activity?
23    A    Yes.
24    Q    Did you receive any training through the Jim Hogg
25    County Sheriff's Department?

---

**Page 28**

1    A    Yes, sir.
2    Q    What training did you receive?
3    A    My continuing education hours through
4    TCLEOSE-approved courses that satisfied the -- the required
5    courses that I need -- needed.
6    Q    What did you take continuing education in?
7    A    I believe I took a class on victims of crime, like
8    a victims advocacy program. also a Texas Alcoholic Beverage
9    Commission class, and I believe that's about it.
10    Q    No -- No training on use of force?
11    A    No.
12    Q    No training on arrest by detentions?
13    A    Not formalized training on any of those subjects,
14    no.
15    Q    Okay. Or on whether or not a Border Patrol
16    officer is authorized to carry a firearm?
17    A    No. Never.
18    Q    You said no formalized training. Did you get any
19    kind of informal training?
20    A    I was trained by Sergeant Navarez as my field
21    training officer, when I first started with the department.
22    for about a week.
23    Q    So, you'd ride around him for about a week (sic)?
24    A    (Witness nods affirmatively.)
25    Q    Is that correct?

---

**Page 29**

1    A    That's correct.
2    Q    What'd you learn?
3    A    Basically, the -- the purpose for that training
4    was just to get me familiar with the streets and the area;
5    that was about all that was.
6    Q    They figured you already knew the law of search,
7    seizure, arrest, use of force and that stuff?
8    A    That's correct.
9    Q    And they did not provide any additional training?
10    A    That's correct.
11    Q    Well, how long were you at the Jim Hogg County
12    Sheriff's Department?
13    A    From February of 1999 to August of 1999.
14    Q    Why'd you leave?
15    A    I wanted to go back to school.
16    Q    And where'd you go back to school?
17    A    The University of Texas San Antonio.
18    Q    Did you have -- Did you have any kind of problems
19    while you were there?
20    A    At school?
21    Q    No. No, at -- I'm sorry. At the Jim Hogg County
22    Sheriff's Department.
23    A    No.
24    Q    Were you ever disciplined?
25    A    Never.

---

8 (Pages 26 to 29)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                          08/29/01

Page 30

1    Q   Were you ever accused, other than possibly the
2  arrest of John Gilbert, where you're accused of conduct not
3  becoming an officer?
4    A   Never.
5    Q   What's Sergeant Navarez' first name?
6    A   David.
7    Q   Do you know if he still works there?
8    A   Yes. He's captain now.
9    Q   So, in August 1999, you left to go back to school
10  at UTSA?
11   A   That's correct.
12   Q   And you moved back to San Antonio?
13   A   Yes.
14   Q   Did you get a job while you were there at UTSA?
15   A   Yes. I did.
16   Q   What was the next job you had?
17   A   Smith Legacy Security.
18   Q   And what was that?
19   A   The position?
20   Q   Well, what is Smith Legacy? Is that a security
21  guard company?
22   A   Yes.
23   Q   Were you a security guard?
24   A   Yes.
25   Q   And what'd you do as a security guard?

Page 31

1    A   Well, I -- my post, so to speak, was at a hotel in
2  downtown San Antonio.
3    Q   Which one?
4    A   The Woodfield Suites.
5    Q   And what'd you do there?
6    A   I was -- I was a security officer.
7    Q   Did you ever have any problems?
8    A   No.
9    Q   How long did you work there?
10   A   Let's see, from -- for about two years. Almost
11  two years.
12   Q   Did you carry a firearm?
13   A   No.
14   Q   Did you own a firearm?
15   A   Yes.
16   Q   Did you have a Concealed Weapons permit?
17   A   No.
18   Q   Were you still a licensed peace officer?
19   A   Yes.
20   Q   Are you still a licensed peace officer to this
21  day?
22   A   For about two more days.
23   Q   And you have been continuously since -- since you
24  were first licensed?
25   A   Right, but my -- my commission's not active.

Page 32

1    Q   Okay. Well, how long has it been inactive?
2    A   Since I resigned with Jim Hogg County.
3    Q   Okay. Could you legally carry a concealed weapon
4  after you --
5    A   No.
6    Q   -- left Jim Hogg County? Did you ever get in
7  trouble for carrying a concealed weapon after that?
8    A   No.
9    Q   Have you ever been arrested after that, for any
10  reason?
11   A   No.
12   Q   What was your next job after Smith Legacy
13  Security?
14   A   Well, I'm currently employed by Smith Legacy
15  Security, and I volunteer one weekend a month at the Ronald
16  McDonald House.
17   Q   Have you had any other employment since you left
18  Jim Hogg County?
19   A   No.
20   Q   And you're moving?
21   A   Right.
22   Q   And where are you moving to?
23   A   Las Vegas, Nevada.
24   Q   That's fun. What are you going to do there?
25   A   I intend to further my education at the University

Page 33

1  of Nevada Las Vegas.
2    Q   Why that school?
3    A   I have a friend that -- that I worked with at
4  Smith Legacy Security who moved over there, and basically
5  change of scenery.
6    Q   Okay. That's a nice change. Do you have a job
7  lined up there, yet?
8    A   I have a job unofficially with the -- He's a
9  security officer at a casino, and basically, I could have a
10  job there. I'm -- I'm also weighing other options.
11   Q   That probably pays better than Smith Legacy,
12  doesn't it?
13   A   Yes.
14   Q   I've always heard in Las Vegas you make some --
15  you make some money. I mean, there's nothing wrong with
16  making money. I'm not criticizing you. I want to go back
17  now to -- to Jim Hogg County.
18   A   Sure.
19   Q   Did you have any training, with regard to the --
20  or working with the Border Patrol when you were at Jim Hogg
21  County?
22   A   No.
23   Q   Did you ever work with the Border Patrol?
24   A   Yes.
25   Q   What kind of things would you do with the Border

9 (Pages 30 to 33)

Page 34

1  Patrol?
2     A   If they were behind a vehicle that they felt was
3  suspicious, they would let us know, to see if we could
4  assist them with establishing some sort of probable cause to
5  make a stop on the vehicle.
6     Many times, also, they would have what they called
7  "bailouts," where a vehicle that they were behind would be
8  full of undocumented workers and that vehicle would pull
9  over and there would be a bailout of individuals.  And --
10    Q   You'd help them catch them in that?
11    A   Yes.  If they ever had -- If they were ever on a
12 traffic stop, and vice versa, if we were ever on a traffic
13 stop and we were passing by, we'd pull over to back them up.
14    Q   Had you ever met John Gilbert before you arrested
15 him?
16    A   Yes.
17    Q   When did you first meet John Gilbert?
18    A   I don't -- It was in my early days.  I think I was
19 still being trained in the field by Sergeant Navarez.  I met
20 him very briefly at the Maverick Market convenient store.  I
21 was on duty with either David Navarez or another deputy and
22 several Border Patrol agents came in.
23    He struck up a conversation with me, which at the time
24 of the -- the stop that this lawsuit revolves around, I had
25 forgotten all about my meeting, but my memory was refreshed.

Page 35

1     Q   Okay.  What kind of conversation did you have?
2     A   He claimed that somebody had either broken into
3  his apartment or trespassed in someway, burglarized his
4  apartment, something to that effect, and I told him -- I
5  told him if he wanted me to take an official report I would
6  be more than happy to do that, at which -- at which time he
7  declined.
8     Q   Do you have any idea why?
9     A   No.
10    Q   What was his personality like when you first met
11 him?  What -- How -- How did he seem to you?
12    A   He seemed like a normal individual.
13    Q   Did you ever meet him again after that?
14    A   Never.  Well, the traffic stop.
15    Q   So, the traffic stop was the next time you met
16 him?
17    A   Right.
18    Q   When you stopped him, did you know he was an
19 officer?
20    A   Once he told me, then I remembered that I had
21 spoken to him before.
22    Q   Prior to you arresting him, you knew he was a
23 Border Patrol officer?
24    A   Yes.
25    Q   Can you describe the relationship between Jim Hogg

Page 36

1  County Sheriff's Department and the Border Patrol, while you
2  were working there.
3     A   While I was working there, Border Patrol and Jim
4  Hogg County Sheriff's Department had a -- a relatively good
5  relationship.  Interdepartment relations can sometimes be
6  strained because one or both agencies or departments will
7  withhold information or just -- There are just different
8  conflicts, as you can imagine, with two separate
9  organizations.  But other than -- than, you know, stuff like
10 that, we had a -- good relationship.
11    Q   Did you ever hear anyone saying that Jim Hogg
12 County Sheriff's deputies were harassing the Border Patrol
13 officers?
14    A   I never heard that.
15    Q   Ever heard of a Border Patrol officer being pulled
16 over while in a Border Patrol vehicle?
17    A   I believe that happened after -- I'm not sure, but
18 I heard about that at -- at some point.  I think it might
19 have been after I arrested Gilbert.  I don't know if it
20 occurred after or I heard about it after, but --
21    Q   What'd you hear about it?
22    A   I heard that a Border Patrol agent in a marked
23 Border Patrol vehicle was not wearing his safety belt and he
24 was pulled over and cited for that.
25    Q   Isn't that unusual, for a law enforcement agency

Page 37

1  to pull over another law enforcement officer while in a law
2  enforcement vehicle?
3     A   I wouldn't say it was unusual.  I would think it
4  would be more unusual that the Border Patrol agent was
5  violating State law and Border Patrol policy.
6     Q   But you don't think it's unusual?  How about --
7  Anything other than -- Had you heard anything else about --
8     A   No.
9     Q   -- Border Patrol and -- and the Jim Hogg County
10 Sheriff's deputies having problems?
11    A   Not at all.
12    Q   Do you know how much Border Patrol agents make?
13    A   Yeah.  As a matter of fact, I know they make in
14 the range of 40, 50.  I don't know.  Something like that.
15    Q   That make considerably more than a Jim Hogg County
16 Sheriff's Deputy?
17    A   Oh, sure.
18    Q   How big is Hebbronville?
19    A   I think -- I'm not sure.  I think it's about a
20 population of 6,000.  Or that might be the county, though.
21 I'm not sure.
22    Q   It's a -- It's a sparsely populated area?
23    A   Definitely.
24    Q   Do you have any idea what the population of s
25 women under 35 is?

10 (Page    to 37)

JOHN GILBERT VS. JIM HOGG COUNTY        ISAAC BOLCH        08/29/01

---

Page 38

1   A   No, not at all.
2   Q   Or over 18 -- Between 18 and 35?
3   A   No. I don't know.
4   Q   It would be a fairly small number, wouldn't it?
5   A   Oh, I'm sure. Unfortunately.
6   Q   Had you ever heard of any kind of animosity that
7   the Border Patrol guys were using their superior salaries to
8   date the local women, rather than having them date the Jim
9   Hogg County guys?
10  A   Well, as far as I knew every Jim Hogg County
11  deputy that I knew was either married or in a committed
12  relationship, as I was, so I don't -- I don't -- I never
13  heard of anything like that, but --
14  Q   Have you ever heard of law enforcement officers in
15  South Texas dating single women, regardless of the fact that
16  they're married or in a committed relationship?
17  A   Have I ever heard of --
18  Q   Of that happening.
19  A   I've heard of -- Not necessarily just law
20  enforcement officers. Yes, I've heard of that.
21  Q   I mean, that, unfortunately, is a common
22  occurrence in our culture.
23  A   Definitely.
24  Q   But you weren't doing that?
25  A   Right.

Page 39

1   Q   Do you know if anyone in the Jim Hogg County
2   Sheriff's Department had any ties to any narcotics or alien
3   smuggling organizations?
4   A   Not that I know of.
5   Q   Had you heard any rumors about that?
6   A   Not until I was shown this lawsuit.
7   Q   Okay. And you don't know whether or not Border
8   Patrol withheld information from Jim Hogg County Sheriff's
9   Department because they were worried it would get back to
10  some kind of narcotics trafficking organization?
11  A   I don't understand.
12  Q   Do you have any -- Do you have any knowledge, one
13  way or another, as to whether Border Patrol would withhold
14  information from Jim Hogg County Sheriff's people because
15  they were worried it would get back to the -- to the drug
16  traffickers?
17  A   That Border Patrol withheld information from Jim
18  Hogg, thinking that Jim Hogg might disclose this --
19  Q   Right.
20  A   -- to the -- I had never heard of that, but
21  it's --
22  Q   Do you know who Jose Ibanez is?
23  A   Not personally. I read about him in this lawsuit.
24  Q   Had you ever heard about him before?
25  A   No.

Page 40

1   Q   You didn't -- You don't know what kind of
2   relationship -- what relation he had with the sheriff?
3   A   No. Well, he's related to the sheriff, I believe.
4   Q   But you don't know what the relationship is?
5   A   Nephew, cousin, something. I'm not sure.
6   Q   You had never heard that the sheriff had a
7   relative that had been busted with dope?
8   A   No, never heard that.
9   Q   That's something that would normally have made
10  news in a small town, wouldn't it?
11  A   Well, I'm sure it -- I'm sure it would, but I
12  was -- according to this lawsuit, I was not employed at the
13  time that occurred.
14  Q   Right. You didn't start until February '99;
15  correct?
16  A   That's correct.
17  Q   And I think the arrest happened on August 6th of
18  '98.
19  A   Right.
20  Q   So, you -- you weren't employed at the arrest and
21  it's your position that you didn't know about the arrest?
22  A   Right.
23  Q   Did you -- Before you arrested Mr. Gilbert, did
24  you call in and talk to anybody back at the station?
25  A   No. I believe I ran his driver's license, but

Page 41

1   that was -- that was the extent of it.
2   Q   You made the decision to arrest him all on your
3   own?
4   A   Yes.
5   Q   How -- How many -- How big was the Jim Hogg County
6   Sheriff's Department when you were there?
7   A   I couldn't tell you exactly. There was 15, 16
8   deputies and some supervisory personnel, along with jailers,
9   dispatchers, etc.
10  Q   And who was the sheriff?
11  A   Gilbert -- Gilberto Ibanez. Gilbert Ibanez.
12  Q   Tell me about the stop of Mr. Gilbert.
13  A   The stop of Mr. Gilbert occurred on -- I believe
14  it was April 7th, as the law states -- the lawsuit
15  stipulates, and we were -- we were approaching each other on
16  a -- it was either a two- or a four-lane street, with a
17  30-mile-per-hour speed limit. I had noticed -- And I
18  unfortunately, omitted it from my report, but the first
19  thing I noticed was that the 1994 black Mustang GT in
20  question was missing a front license plate.
21  As it got closer, I noticed that the passenger was not
22  wearing a safety belt, and when I became parallel with
23  Mr. Gilbert's vehicle, I heard him rev the engine. After
24  that, I -- when it was safe to do so, I turned around,
25  started following Mr. Gilbert, ran his -- while I called in

11 (Pages 38 to 41)

Page 42

1  his license plate and hit the overheads.
2     Q   Okay.  And -- But you didn't put in your written
3  report that he was missing a front license plate?
4     A   Right.
5     Q   How do you remember that?
6     A   Well, I remembered it after I submitted my report
7  and I didn't want to go back and change anything.
8     Q   Did you put it in writing anywhere?
9     A   No.
10    Q   Have you told anyone about that, other than me
11  here today before now?
12    A   Well, I'm sure at the time.
13    Q   Who did you tell?
14    A   I don't know.  Other deputies.  I'm sure I
15  expressed my dissatisfaction with myself, that I omitted it,
16  with a dispatcher or -- or somebody like that.
17    Q   And do you believe that a car without a front
18  license you'd have probable cause to pull that over?
19    A   Yes.
20    Q   Okay.  And do you believe that you have probable
21  cause for pulling over a car for passengers not wearing a
22  seat belt?
23    A   Yes.
24    Q   Were the windows tinted on the Mustang?
25    A   Yes.

Page 43

1     Q   Could you see through the -- the passengers
2  through those windows?
3     A   Not through those windows, through the windshield
4  because we're approaching.  The windshield was not tinted --
5     Q   Right.
6     A   -- and that's where I -- I gained visual acuity
7  that the passenger was not wearing a seat belt.
8     Q   So, it's your testimony you saw the passenger not
9  wearing a seat belt as you approached face-to-face?
10    A   That's correct.
11    Q   And you saw them -- saw her through the
12  windshield?
13    A   Yes.
14    Q   What did you see -- Did he pull right over?
15    A   After I put on my overheads, yes, he pulled over
16  within a reasonable amount of time.
17    Q   No complaints about his pulling over?
18    A   No.
19    Q   Okay.  Then what happened?  What did you do next
20  after -- He pulled over to the side of the road.  You -- I
21  assume you pulled over behind him?
22    A   Right.
23    Q   Then what do you do?
24    A   I approached the vehicle.  He rolled down his
25  window and I identified my -- I went through the seven-step

Page 44

1  violater contact.
2     Q   Well, let's -- let's go through that.
3     A   Through that --
4     Q   Let's go through that.
5     A   I -- I identified my -- I -- I did the greeting.
6  I said "Good afternoon.  Jim Hogg County Sheriff's
7  Department, Deputy Bolch.  The reason I --" And then I
8  informed him the reason I pulled him over, because his
9  passenger was not wearing a safety belt and because he
10  revved his engine.
11    Q   Okay.
12    A   Then, I asked him for his driver's license and
13  proof of financial responsibility.
14    Q   Did he provide those?
15    A   Yes.  He did.
16    Q   Okay.  Did he say anything back to you, at this
17  point?
18    A   Well, almost -- He said what did -- He got -- I
19  wouldn't say so much irate, but he got very confrontational
20  immediately upon my making contact with him.  He -- He
21  demanded -- After I had just told him what I pulled him over
22  for, he said "What are you pulling me over for?"
23    Q   Okay.
24    A   And I told him because he revved his engine and --
25    Q   Is there anything illegal about revving an engine?

Page 45

1     A   Yes.
2     Q   Okay.  What is the -- the violation?
3     A   It's a traffic code.  I don't remember the exact
4  statute, but it says that a vehicle must have a muffler in
5  good working condition, that continually works to prevent
6  excessive or unusual noise from the muffler.
7     Q   And do you believe that there was something wrong
8  with his muffler?
9     A   No.  I believed his muffler was in perfect shape.
10    Q   So, you think revving your engine --
11    A   It's --
12    Q   -- somehow --
13    A   It's --
14    Q   -- violates that code?
15    A   Yes.  It's excessive.
16    Q   Because of the noise that it produces?
17    A   Yes.
18    Q   Okay.  Any -- Any -- Anything else wrong with
19  revving an engine, other than making noise that -- that, in
20  your view, violates the muffler standard?
21    A   Other than?
22    Q   Other than the noise that it makes.
23    A   Well, there's also a statute called Exhibition
24  of -- of Speed or Acceleration, which sometimes it's been
25  cited as an arrest title for a citation -- writing a

COMPEX LEGAL SERVICES, (800) 969-6424

Page 46

1  citation based on somebody -- revving their engine is what
2  they -- they -- they term exhibition of speed.
3      Q   It's "Exhibition of Acceleration," actually, I
4  believe.
5      A   "Exhibition."
6      Q   But don't you actually have to accelerate, not
7  just rev the engine but you've got to take off (descriptive
8  sound)?
9      A   Well, that why I didn't -- did not pull him over.
10  I was not sure about that.  I was sure that his -- The way
11  in which he was using his automobile, he was in violation of
12  the muffler.
13      Q   So, as far as your probable cause to pull him
14  over, what was it?
15      A   No front license plate --
16      Q   Okay.
17      A   -- no seat belt front seat passenger --
18      Q   Okay.
19      A   -- and revving his engine or the muffler statute.
20      Q   Violation of the --
21      A   Right.
22      Q   -- muffler -- muffler standard?  And as far as
23  anything that he would have done personally, it would have
24  been the no front license plate and the revving of the
25  engine, violating the muffler standard, according to you?

Page 47

1      A   That's correct.
2      Q   No other reason to pull him over?
3      A   No.
4      Q   Okay.  So, he was somewhat confrontational with
5  you.  He wanted to know why you pulled him over?
6      A   That's correct.
7      Q   And how did you respond?
8      A   I -- I -- I restated what I had stated before,
9  that I pulled him over because his passenger was not wearing
10  her seat belt and because he revved his engine.
11      Q   Did you mention the no front license plate to him?
12      A   I don't believe so.
13      Q   Okay.
14      A   It slipped my mind.
15      Q   Okay.
16      A   Or I might have.  I -- I don't know.
17      Q   You don't know one way or another?
18      A   Right.
19      Q   How did -- How did it make you feel when he used
20  that kind of tone of voice with you?
21      A   At the time, I was pretty much used to it; that's
22  my job.  And I didn't know him from any other traffic stop
23  that I've ever made, so I extended as much courtesy and
24  professionalism as I could.
25      After I had made those initial -- the initial contact,

Page 48

1  he informed me that he had a weapon in the car, and I asked
2  him where it was and he said it was in the rear seat.
3      Q   Okay.  Did he tell you that he was a Border Patrol
4  agent before he told you he had the weapon?
5      A   No.  He said "I have a weapon in the vehicle."
6  And I said "Where is it," because I didn't want him reaching
7  for it --
8      Q   Right.
9      A   -- because I didn't know who he was.  I said
10  "Where is it?"  And he said "In the back."  And I said "What
11  do you have a weapon for?"  And he said that he was a Border
12  Patrol agent.
13      Q   And there -- Would you have ever known he had a
14  weapon in that car if he hadn't have told you he was a
15  Border Patrol agent?
16      A   Yes.
17      Q   How would you have known that?
18      A   Because it was sitting on the backseat in plain
19  view.
20      Q   And you would have looked in the backseat?
21      A   Definitely.
22      Q   Why would you have looked in the backseat during a
23  traffic stop?
24      A   I look around the whole vehicle to make sure that
25  the situation is safe for me and the other passenger --

Page 49

1      Q   Okay.
2      A   -- or the occupants of the vehicle.
3      Q   Do you consider it a -- a courtesy for one officer
4  to tell another one, when he gets pulled over, that there's
5  a weapon in the car?
6      A   I -- I consider it a courtesy, if that's the way
7  you want to term it, for anybody, regardless of whether
8  they're an officer or not, to inform a peace officer or any
9  kind of law enforcement officer that's effecting a lawful
10  detention, via a traffic stop, to inform somebody that they
11  have a weapon in the vehicle.
12      Q   That's something you should -- It's not a threat.
13  It's something you should tell the officer, so he'll know?
14      A   Definitely.
15      Q   And you didn't view it as a threat when he told
16  you there was a weapon in the car?
17      A   No.  I did not.
18      Q   It was just a piece of information he was giving
19  you.
20      A   Right.
21      Q   It's much better for you to hear it from him than
22  for you to notice it and worry --
23      A   Right.
24      Q   -- what's this guy going to do?
25      A   Right.  That's correct.

Page 50

1 Q It lets you keep control of the situation
2 somewhat?
3 A That's correct.
4 Q And so, he tells you -- You asked him "Why do you
5 have the weapon," and he tells you he's Border Patrol. What
6 kind of tone of voice is he using?
7 A He -- He, pretty much, maintained or escalated
8 his -- his unhappiness throughout the -- the traffic stop;
9 so, it was about the same as when he confronted me about why
10 I was pulling him over in the first place.
11 Q And people tend to be unhappy during traffic
12 stops, don't they?
13 A Usually.
14 Q Most people aren't delighted to see you when you
15 pull them over?
16 A Well, I'm sure.
17 Q Did he -- Did he give you any indication as to why
18 he was upset that you pulled him over?
19 A No.
20 Q Do you have any theory as to why he was upset that
21 you pulled him over?
22 A I would not wish to speculate on that.
23 Q Okay. I just don't want you coming to trial and
24 saying -- with a new theory if you don't know one today.
25 A Well, he was upset, quite possibly because --

Page 51

1 Well, like I said, I don't -- I wouldn't like to speculate,
2 at this point.
3 Q Would you have pulled over a fellow Jim Hogg
4 County Sheriff's deputy if their girlfriend didn't have a
5 seat belt on?
6 A Yes.
7 Q Would you have pulled over a fellow Jim Hogg
8 County Sheriff's deputy for revving an engine?
9 A Yes. I would.
10 Q Okay. What happened next? He tells you he's a --
11 You ask him why he has a gun and he says it's because he's a
12 Border Patrol officer.
13 A That's correct.
14 Q What happens next?
15 A I -- Due to the -- Due to the circumstances, that
16 there's a weapon in the vehicle and that there is oncoming
17 traffic that -- I'm right out almost in a lane of traffic --
18 I asked him to the step to the rear of the vehicle. We go
19 back behind his vehicle, so as not to stand in between
20 his vehicle and my vehicle, which is also patrol procedure.
21 We stood off to the grass area to the right, the passenger
22 side.
23 Q You didn't trust a Border Patrol agent to be in
24 the same vehicle as the weapon when you're --
25 A On a traffic stop -- Well, you know, I'm not going

Page 52

1 to assume anything. There's no such thing as a routine
2 traffic stop. And at that point, maybe I had recalled that
3 he was a Border Patrol agent, but maybe not. I hadn't seen
4 his credentials as of yet.
5 Q Did you ask him to see his credentials?
6 A No.
7 Q Did he ever -- At anytime during this stop, did he
8 show you his credentials?
9 A No, never.
10 Q Did he ever offer to show you his credentials?
11 A Yes.
12 Q Okay. But you just said you didn't need to see
13 them?
14 A Right.
15 Q Okay. Well, let's go on with the stop.
16 A Okay.
17 Q So, next, you ask him to get out of the vehicle.
18 Does he comply?
19 A Yes.
20 Q Does he argue with you, "No. I don't need to do
21 this," or anything like that or does he just get out?
22 A Well, not verbally, but his --
23 Q He made a face?
24 A -- his body language and his facial expression.
25 Q He was visibly annoyed at being pulled over?

Page 53

1 A Definitely. And being asked to step out of the
2 vehicle.
3 Q Do you usually ask someone to step out of the
4 vehicle during a routine traffic stop?
5 A As I mentioned just --
6 Q There's no such thing.
7 A Yes. Right.
8 Q Okay. In the majority of traffic stops, do you
9 ask someone to step out of the vehicle?
10 A If I'm standing in a lane of traffic, yes, I will.
11 Q So, you have him step out of the vehicle, you step
12 out of the vehicle, you go on one side of the vehicle,
13 out -- I guess, in the -- in the shoulder or out on the side
14 of the road?
15 A Right. It was -- There was grass and a sidewalk
16 on that.
17 Q Okay. Was there a school anywhere near here?
18 A Yes. It was --
19 Q Where was the school in relation to where you're
20 pulling him over?
21 A We were right -- The actual school building itself
22 or the premises?
23 Q The premises.
24 A We were about six or seven feet away from the
25 fence line.

14 (Pages 50 to 53)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                          08/29/01

Page 54

1    Q   And what time was this?
2    A   About fourish, 4:00 clock.
3    Q   What time was -- What school was that?
4    A   I believe it was an elementary school.
5    Q   Do you know what time school got out there?
6    A   No. I don't.
7    Q   Were there any students around?
8    A   No.
9    Q   Any parents around?
10   A   Not that I'm aware of.
11   Q   Okay. Did you know that he was the DARE officer
12   at that school? Not until now?
13   A   No. Actually, that's -- that's debatable,
14   whether he was or not, but --
15   Q   Why do you say that?
16   A   He didn't claim -- Because as I understand it, the
17   DARE program only has one representative for each area --
18   Q   Okay.
19   A   -- and the DARE officer position was filled, at
20   that time, by an individual in State government, not a
21   Federal agent. It's very highly --
22   Q   Who -- Who filled it?
23   A   I've heard that it was -- I've heard two -- two
24   different.
25   Q   Okay.

Page 55

1    A   I've heard that it was -- And -- And he never
2    claimed -- Let me first be -- He never claimed to be a DARE
3    officer on that stop at all.
4    Q   Okay.
5    A   I never learned anything about that until I was
6    served with the first lawsuit.
7    Q   Okay.
8    A   But there was a Judge Salinas out of San Diego --
9    Q   Okay.
10   A   -- area. And then, we had our own DARE officer at
11   the Jim Hogg -- Jim Hogg County Sheriff's Department.
12   Q   Okay. So, you -- you -- So, you -- you -- You
13   don't --
14   A   Not --
15   Q   You don't know, one way or another, for sure
16   whether he had any involvement in that school?
17   A   Right.
18   Q   But you doubt that he was actually the DARE
19   officer?
20   A   Right. But he never even brought that up, so it
21   wasn't really an issue.
22   Q   At the time, it was not an issue?
23   A   Right.
24   Q   Okay. So, you've got him standing there. He's
25   out -- He leaves the gun in the car; correct?

Page 56

1    A   Right.
2    Q   You don't feel threatened by -- that he's going to
3    shoot you at -- at anytime during the stop, do you?
4    A   No.
5    Q   Okay. So, what happens next?
6    A   At that time, I asked him a series of questions to
7    see if he had any defenses to prosecution under unlawful
8    carrying of a weapon.
9    Q   So, you -- Well, you had him stand over there.
10   You were already considering arresting him and you were
11   going to ask him the questions to see if he had a defense;
12   is that correct?
13   A   Actually, I was just -- I was just seeing if there
14   was a law being broken --
15   Q   Okay.
16   A   -- at that time. I already knew that he had
17   revved his engine.
18   Q   Right.
19   A   That was a violation. I knew that his passenger
20   was not wearing a seat belt. I knew that was a violation.
21   And there was no front plate.
22   Q   All right. Would you -- Would you have arrested
23   him for the revving of the engine?
24   A   No, probably not.
25   Q   Would you have arrested him for the no front

Page 57

1    license plate?
2    A   You know, I have arrested people for no license
3    plate light in the back, that were not law enforcement
4    officers of any type. You can take an individual as long as
5    it's not -- Well -- And it's about to change -- Open
6    container or speeding, you have to issue a citation. Any
7    other offense, you can arrest, take them in to stand there
8    before the magistrate.
9    Q   But why --
10   A   So, it's possible.
11   Q   But would you --
12   A   Yes. It is possible.
13   Q   Realistically --
14   A   Yes.
15   Q   -- tell the truth, would you have arrested him?
16   A   Well, I just told you that I've arrested people
17   for less.
18   Q   Okay. So, is it your -- anytime you saw a car
19   driving with no front license plate, you'd pull them over
20   and arrest them?
21   A   Not everytime, no.
22   Q   Why would you do it sometimes?
23   A   It depends on how, in my opinion, the ends of
24   justice could best be served.
25   Q   I mean, let's be honest, if -- if you have a hunch

15 (Pages 54 to 57)

Page 58

1  they have dope in the trunk and you can find a technical
2  violation to arrest them and you arrest them and you do an
3  inventory search and find the dope, isn't that what -- why
4  you arrest people for those technical violations?
5      A   No, that's not why I arrest people for those
6  technical violations.
7      Q   So, how do you justify arresting someone for not
8  having a front license plate on their car if they have a
9  rear license plate on their car?
10     A   I don't know. I've never arrested for somebody --
11 somebody for no front license plate, to my knowledge.
12     Q   All right. Have you -- Have you ever seen a
13 vehicle with no front license plate?
14     A   Yes.
15     Q   Okay. And -- But you didn't pull them over and
16 arrest them?
17     A   I've cited many people.
18     Q   But you didn't -- You did not arrest them?
19     A   No.
20     Q   And really and truly, if all he had was no front
21 license plate and he had been polite to you, you would not
22 have arrested him?
23     A   I don't -- I don't know that that's correct,
24 because I did not arrest him for -- I got --
25     Q   That's not the reason you arrested him anyway?

Page 59

1      A   Right.
2      Q   I'm saying: But supposing he didn't have a gun, I
3  mean, and he -- all you pulled him over for was the no front
4  license plate, you would not have taken him to jail that
5  day?
6      A   Probably not.
7      Q   The thing you took him to jail for was on carrying
8  a weapon?
9      A   And disorderly conduct.
10     Q   And the disorderly conduct was arguing with you?
11     A   No. The disorderly conduct, as you will find in
12 my -- my incident report, was when he used profanity --
13     Q   Okay.
14     A   -- in public.
15     Q   And you think it is -- Like, for example, if I
16 tell you right now "fuck you," do you think that's
17 disorderly conduct?
18     A   In this situation, no, I do not.
19     Q   If you pull me over, and I shoot the finger at you, do
20 you think that's disorderly conduct?
21     A   It depends on if anybody else can be offended by
22 that.
23     Q   Okay. Was there anyone else that could hear you
24 when you were talking to him?
25     A   Well, there was a whole -- It was a residential

Page 60

1  area on this side (indicating).
2      Q   Okay.
3      A   There was a whole bunch of -- There was a whole
4  bunch of houses there, so there could have been people
5  that were offended.
6      Q   Well, did you see anyone that heard him? When he
7  used profanity at you, did you see anybody -- Did you have
8  knowledge that anyone besides you heard him use that
9  profanity?
10     A   No. I didn't have direct knowledge.
11     Q   Okay. So, as far as you knew, when he later used
12 profanity with you, you were the only one that heard it;
13 correct.
14     A   Can you restate that?
15     Q   When he used profanity to you later on -- And
16 we'll get to that later on -- you're the only one that heard
17 that profanity?
18     A   You mean on the traffic stop?
19     Q   On the traffic stop.
20     A   To my knowledge, at that time, yes.
21     Q   Okay. Have you since learned that other people
22 heard it?
23     A   No.
24     Q   So, as far as -- You don't have any evidence, one
25 way or another, as to whether or not anyone else heard it?

Page 61

1      A   Right.
2      Q   Okay. Well, let's go back into this traffic stop.
3  Okay. So, you're sitting there, you're going to ask him
4  some questions to see whether or not, in your mind, he has a
5  right to carry a firearm?
6      A   That's correct.
7      Q   What do you ask him?
8      A   I asked him if he was currently a Certified Texas
9  Peace Officer, not a law enforcement officer, as it states
10 in here.
11     Q   Okay.
12     A   I asked him if he was -- where he was going and
13 coming from, to see if he would meet the exemption of
14 travelling --
15     Q   Okay.
16     A   -- which he was making several stops there in
17 town, so --
18     Q   Okay.
19     A   I asked him if he had a Concealed Handgun Carrier
20 Permit.
21     Q   Okay.
22     A   I asked him if he was going to or coming from or
23 on duty as a Border Patrol agent.
24     Q   Okay.
25     A   He said "No." And I -- I believe that was it.

16 (Pages 58 to 61)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29/01

Page 62

1    Q   Did he -- Did you ask to see his credentials as a
2  Border Patrol agent, at that time?
3    A   No. I didn't.
4    Q   Did he offer to let you see his credentials as a
5  Border Patrol agent, at that time?
6    A   Yes. He did.
7    Q   Did you look at them?
8    A   No. I didn't.
9    Q   Why not?
10   A   Because I'm familiar with what -- what they say.
11   Q   What do they say?
12   A   The person -- I'm paraphrasing here. The -- The
13 person named above is entitled to effect arrest, carry a
14 firearm, etc., etc., while in the performance of official
15 duties.
16   Q   So, you don't think it says he can carry a firearm
17 otherwise?
18   A   Right.
19   Q   You've never seen the -- the Immigration
20 Naturalization Service for Firearms policy, have you?
21   A   Policy?
22   Q   Yeah.
23   A   No. I have not seen that.
24   Q   So, you're not aware that Federal law permits a
25 Border Patrol agent to carry firearms during both duty and

Page 63

1  no duty hours -- nonduty hours?
2    A   And that was Federal law?
3    Q   Federal law.
4    A   What was the code? I'm sorry?
5    Q   It's part of -- It's in the Federal regulations,
6  under the INS Firearms policy.
7    A   Policy?
8    Q   Right.
9    A   Okay.
10   Q   I'm asking you: Did you ever know that?
11   A   No.
12   Q   And as far as you're concerned -- With the
13 training you got, even if that was the Federal regulation,
14 as far as you're concerned, the State law would trump the
15 Federal law?
16   A   Right.
17   Q   And you'd follow State law and not Federal law?
18   A   That's correct.
19   Q   Because that's what you were trained to do?
20   A   Right.
21   Q   And nothing from Jim Hogg County trained you to do
22 anything different?
23   A   No. Correct.
24   Q   If that's a constitutional violation, that's the
25 fault of your training, not your fault?

Page 64

1    A   If -- If I violated somebody's constitutional
2  rights?
3    Q   By doing that. If in fact, the -- the
4  Constitution of -- of the United States says Federal law is
5  supreme and overrides the State law, it's not really your
6  fault. It's the fault of the training you got that told you
7  to do it?
8    A   I would have to say that I'm responsible for my
9  own actions --
10   Q   Okay.
11   A   -- and I acted in good faith --
12   Q   But as far as the --
13   A   -- due to my knowledge, training and experience.
14   Q   But your training taught you to do what you did;
15 correct?
16   A   My -- My knowledge, training and experience, yes.
17   Q   But you were trained to do what you did; is that
18 correct?
19   A   Yes.
20   Q   And if -- if in doing what you did was illegal,
21 it's because you were trained to do something that was
22 illegal? I'm not asking you to admit it was illegal.
23 Hypothetically, if what you did was illegal, it's because
24 you were trained to do it?
25   A   I would have a -- hard time answering that

Page 65

1  because. to this day, I've only seen now -- And I haven't
2  even seen it -- but a policy, you know, regulations --
3    Q   I'm not asking you to admit it's illegal. The
4  judge is going to decide what's legal and illegal.
5    A   Okay.
6    Q   I'm saying: Assuming, without admitting that it
7  was illegal, if it was, you did it because you were trained
8  to do it, not because you decided to do something illegal on
9  your own?
10   A   It was a totality of the circumstances involving
11 my knowledge, training, experience and education.
12   Q   But your training was one of the --
13   A   One of the things, yes.
14   Q   You trained -- You told me you were trained --
15   A   Right.
16   Q   -- that State law trumped Federal law; correct?
17         THE REPORTER: I'm sorry. I can't --
18         MR. COWEN: I'm sorry.
19         THE REPORTER: He's speaking lower --
20         MR. COWEN: Okay.
21         THE REPORTER: -- than you are, and I
22 apologize --
23         THE WITNESS: Okay.
24         THE REPORTER: -- but I didn't get the end.
25         THE WITNESS: It's one of the things -- The

17 (Pages 62 to 65)

Page 66

1 training is one of the things that led me or would hold me
2 responsible.
3     Q (BY MR. COWEN): Because you were trained that State
4 law trumps Federal law; correct?
5     A Right. And --
6     Q And that Border Patrol officers were not allowed
7 to carry firearms off duty?
8     A I was trained under the -- No. This is what I was
9 trained. See, I think this is where --
10     Q Okay.
11     A -- we might be a little confused. I was trained
12 that if an individual did not meet the criteria of a
13 defense, there is certain elements of the law, which
14 unlawful carrying is carrying a firearm, and they do not
15 have these exemptions -- The only people that are -- this
16 law is nonapplicable, under 46.15 of the Penal Code, are
17 peace officers.
18     Code of Criminal Procedures 2.12 states who are peace
19 officers. So, I used my own interpretation of what I had
20 learned, in conjunction with my training and experience,
21 that Border Patrol agents are not peace officers under State
22 law; therefore, they are not exempt from the unlawful
23 carrying of a weapon law that's in the Texas Penal Code.
24     Q And you were never trained to know that a Federal
25 credential or a Federal law would trump any State law? You

Page 67

1 were never trained about that?
2     A Well, I -- I could have been; that's possible.
3     Q You don't remember being trained about that?
4     A I don't.
5     Q And you can't say that you were?
6     A I can't say that I wasn't.
7     Q But you can't say that you were?
8     A Right.
9     Q Okay. So, what happens next? You -- You asked
10 him the questions; he's giving you -- he's not giving you an
11 answer that would establish, in your mind, a defense. What
12 do you do next?
13     A Well, that -- we're kind of -- Let me go back a
14 little bit.
15     Q Okay.
16     A At -- At that point, I told him that he could be
17 arrested for that, and at that time he also -- Excuse me --
18 he also used profanity in a public place.
19     Q What did he say?
20     A He said, What for? Y'all never do shit anyways --
21     Q Okay.
22     A -- quote.
23     Q And what do you think he meant by that?
24     A At the time, I can't say a hundred percent what
25 was going through my mind, but I'm sure it was he doesn't

Page 68

1 know me personally and I don't think it was a racial remark;
2 therefore, I'm assuming that he meant my department, because
3 most people it's -- it's about the badge. It's not about
4 anything else.
5     Q Right. And when he said your department didn't do
6 shit anyways, what do you think he was trying to say?
7     A Well, he didn't say the department. He said
8 "y'all."
9     Q But he said "but y'all," but he meant -- Well,
10 you -- you -- you took it to mean your department doesn't do
11 shit anyways; correct?
12     A Right.
13     Q What did you take that to mean?
14     A I took that to mean that he was a hostile
15 individual --
16     Q Okay.
17     A -- with a firearm, in violation of State law, and
18 that justice would be served best by arresting him for that
19 offense.
20     Q Okay. And do you believe that he committed a
21 crime by saying the word "shit"?
22     A Yes.
23     Q Okay. What crime did he commit?
24     A In a public place, where people could be offended
25 by it, he committed disorderly conduct.

Page 69

1     Q Okay. Even if the only person that could be
2 offended by it was you?
3     A No.
4     Q Did you -- Did you -- Did you know of anyone else
5 that heard him say that?
6     A What I just -- Let me --
7     A I'm not -- Let me -- My question is very specific.
8     A Okay.
9     Q Other than you, did you, at the time, have
10 knowledge of anyone, other than you, hearing him say the
11 word "shit"?
12     A The law says "could."
13     A I'm not --
14     A And there could have been people.
15     Q That wasn't my question to you. My question to
16 you was: Were you aware of anyone, other than you, that
17 heard him say the word "shit"?
18     A Okay. I -- I thought I was answering a question.
19 You asked me why --
20     Q All right. That was a few questions ago. My
21 question to you right now --
22     A Okay.
23     Q I mean, I don't want to have to call the judge to
24 get you to answer my questions. My question to you right
25 now is: Other than you, are you -- at the time, were you

18 (Pages 66 to 69)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29/01

Page 70

1  aware of anyone else who heard him say the word "shit"?
2      A   I'll answer like I did a while back. I've already
3  answered this question about twice. No. I do not
4  believe -- To my knowledge, there was nobody else around --
5      Q   Okay.
6      A   -- to my knowledge.
7      Q   And so -- But your belief, because it was a public
8  place and there was a -- hypothetically, someone could have
9  heard him, that was enough to arrest him for it?
10     A   Well, there was a school right there. He could
11 have incited immediate breach of the peace or offended
12 somebody by using these words.
13     Q   How do you incite an immediate breach of the peace
14 by saying "Y'all don't do shit"?
15     A   Well, when you use offensive language towards a
16 peace officer who is lawfully detaining you, people could --
17 could take great offense.
18     Q   What will they do? I mean, what are you worried
19 about? Are you worried about everyone joining in and --
20 and -- and bum-rushing you because this guy said you don't
21 do shit and they're all going to say "Yeah. That's right.
22 He doesn't do shit. Let's go get him."
23     A   Actually, I was just using the wording that they
24 use in the Texas Penal Code.
25     Q   Okay.

Page 71

1      A   I was not worried about -- about an immediate
2  breach of the peace, but that's how it's worded. I was
3  worried that somebody could -- since he was standing feet
4  away from a school, somebody could have been offended.
5      Q   If you're sitting in a restaurant and you hear
6  someone else at the next table saying "Oh, that
7  motherfucker," would you have arrested him?
8      A   It's quite possible.
9      Q   For using the word "motherfucker" in conversation
10 at a restaurant?
11     A   Yes. It's possible.
12     Q   And if I said, for example, "George Bush, he's
13 full of shit," you might arrest me for that, too?
14     A   It depends on who you're talking to or the
15 circumstances.
16     Q   Okay. Well, let's say I'm at a restaurant, I'm
17 drinking a beer with my friend and you're sitting at the
18 next table having a cup of coffee, you're on duty and I said
19 "That George Bush doesn't know shit," would you have
20 arrested me?
21     A   It's possible.
22     Q   And I say it, you know, where people can hear
23 me --
24     A   It's possible.
25     Q   -- at the next table?

Page 72

1      A   It's possible.
2      Q   And you think there's nothing wrong with that?
3      A   Well, there's other -- I'm assuming there's other
4  people in this restaurant, besides just you and I?
5      Q   Oh, yeah. Absolutely, there are people in the
6  restaurant that would probably hear me.
7      A   Yes.
8      Q   You think it's fine to arrest them?
9      A   It's possible.
10     Q   And --
11             MS. GONZALES: Mr. Cowen. could we take a
12 short break now?
13             MR. COWEN: Yeah.
14             MS. GONZALES: Thank you. I'm sorry.
15             MR. COWEN: It's okay.
16             MS. GONZALES: I need to use the restroom.
17             THE VIDEOGRAPHER: We're off the record. The
18 time is 4:12.
19             (Recess from 4:12 p.m. to 4:18 p.m.)
20             THE VIDEOGRAPHER: We're back on the record.
21 The time is 4:18.
22     Q   (BY MR. COWEN): Have you ever received any kind of
23 training in constitutional rights that people have?
24     A   Yes, sir.
25     Q   Other than their Fourth Amendment rights, like

Page 73

1  Miranda and stuff?
2      A   Yes.
3      Q   Any of the training involve free speech?
4      A   Yes.
5      Q   What kind of training did you get regarding
6  freedom of speech?
7      A   We -- Basically, in the Laredo Regional Police
8  Academy, we went over the First Amendment of the
9  Constitution.
10     Q   What'd you learn?
11     A   It's a pretty broad question.
12     Q   Yeah. It's a very broad question.
13     A   Okay. Well, the -- the class was several hours
14 long and we learned quite a bit about it. People are
15 entitled to freedom of expression as long as -- And the
16 age-old example they give is cannot yell "Fire!" in a
17 crowded theater, for example.
18     Q   Right. How about as far as profanity? Did you
19 ever learn that profanity can be protected speech?
20     A   Yes.
21     Q   Cuss words, even in a public place, can be
22 protected speech?
23     A   They can be, yes.
24     Q   And -- And how did you -- What kind of training
25 did you get as to whether or not you should arrest someone

19 (Pages 70 to 73)

Page 74

1  or not for using a word like "shit" that may or may not be
2  protected?
3      A   If -- We learned that under Chapter 38, I believe,
4  of the Penal Code, Disorderly Conduct, if someone else could
5  be offended by the use of profanity, or as I stated earlier,
6  if it -- or -- or words that tend to incite immediate breach
7  of the peace, if somebody used profanity and somebody could
8  be offended by that, then it's a violation of -- it's a
9  Class "C" misdemeanor.
10     Q   And there's no constitutional provision that would
11 keep you from making that arrest?
12     A   Well, I'm -- In my interpretation, it was some --
13 it's similar to yelling "fire" there a crowded theater
14 because it -- it can -- it can be harmful, and it was -- I
15 guess in the -- in the circumstance that we're talking
16 about, I felt that being in such close proximity --
17 proximity to a school --
18     Q   Okay.
19     A   -- and that there was a whole bunch of -- Like you
20 said, it's small town and when somebody is being stopped on
21 a traffic stop, everybody -- other cars passing at slow
22 rates of speed, windows down, somebody could have been
23 offended, in my opinion, yes.
24     Q   And in your view, as far as the United States
25 Constitution is concerned, if someone -- there's nothing

Page 75

1  unconstitutional about pulling someone over -- I'm sorry --
2  arresting someone for using a cuss word that could have
3  offended someone that heard it?
4      A   That's correct.
5      Q   And you never received any training to the
6  contrary?
7      A   Not to my knowledge, no, other than what I've
8  stated.
9      Q   Okay.  What happens next?  He says y'all never do
10 shit anyway.  What is your response?
11     A   Basically, after his driver's license came back
12 clear and motor vehicle registration came back clear and
13 valid, I -- I told him I was placing him under arrest for
14 unlawful carrying of a weapon --
15     Q   Okay.
16     A   -- and for disorderly conduct.
17     Q   And the disorderly conduct, once again, was saying
    y'all never do shit anyways?
19     A   That's correct.
20     Q   Okay.  Then, what did you do?
21     A   I told him to turn around and place his hands
22 behind his back --
23     Q   Okay.
24     A   -- which he reluctantly did.
25     Q   Okay.

Page 76

1      A   And before I got the handcuffs on him, he started
2  to turn around again --
3      Q   Okay.
4      A   -- so, I told him not to resist, that it would
5  just be an additional charge.  So, at that time, he
6  complied.
7      Q   Did he say anything, at that point?
8      A   No.
9      Q   And he never tried to run away?
10     A   No.
11     Q   Never tried to hit you?
12     A   No.
13     Q   Never threatened to get his gun?
14     A   No.
15     Q   Didn't use additional profanity before you got him
16 in the car?
17     A   No.
18     Q   Okay.  Then, you -- you cuff him.  What -- What do
19 you do next?
20     A   I walk around to the driver's side, when it was
21 safe to do so, and I opened the driver's side -- I -- the
22 driver's side rear door and I asked him to get into the
23 vehicle.
24     Q   Of -- Of your vehicle?
25     A   Right.

Page 77

1      Q   So, you ask him to get in.  Does he get in the
2  vehicle?
3      A   Yes.  I told him to mind his head --
4      Q   Okay.
5      A   -- so he didn't hit his head on the frame of the
6  car --
7      Q   Okay.
8      A   -- the roof of the car.  And then, once he got in,
9  I told him to scoot over and be mindful of his legs.
10     Q   Okay.
11     A   And then, I closed the door.
12     Q   Okay.  Did anything happen when you closed the
13 door?
14     A   No.
15     Q   Did you ever hit his knee with the door?
16     A   Never.
17     Q   Do you know if his knee was bruised?
18     A   No.
19     Q   Do you know how his knee could have come to be
20 bruised in this incident?
21     A   No.
22     Q   And if he says that you hit -- hit his leg with
23 the door, you say he's lying?
24     A   Yes.
25     Q   Okay.  And if he had a photograph of the bruised

20 (Pages 74 to 77)

Page 78

1  knee, it had to have been something -- from something else?
2  A  Yes.
3  Q  Do you have any idea that that something else
4  could have been?
5  A  No.
6  Q  Did you have --
7  A  He's --
8  Q  Did you have any --
9  A  Wait.  Can I answer that question?
10  Q  Yes.
11  A  I'd like to -- As a law enforcement officer, I --
12  I can -- if you're asking me to speculate how he could have
13  gotten it, he could have been involved in some kind of
14  altercation or work-related incident where he bruised his
15  knee, if he had one.
16  Q  Let's just speculate.  But you're not aware that
17  he was -- wasn't actually in one that could have bruised his
18  knee?
19  A  Oh, I'm sorry.  I thought you were asking me --
20  Q  No.  I was asking for speculation.
21  A  All right.
22  Q  Now, I'm asking a follow-up question.
23  A  Okay.  Which is?
24  Q  Were you aware that -- Do you have any knowledge
25  as to whether or not he was in such an incident that could

Page 79

1  have bruised his knee around that time?
2  A  No.
3  Q  You just know, as a fellow officer, that that is a
4  possibility?
5  A  Yes.  I've had many scrapes and bruises, bite
6  marks.
7  Q  You would have had no justification for hitting
8  his knee?
9  A  No.
10  Q  I mean, he didn't try to get out of the car and
11  you had to slam it to keep him in there?
12  A  No.
13  Q  So -- Okay.  You get him in the car.  What do you
14  do next?
15  A  I sit down in the driver's side -- Mind you, I'm
16  still having to keep an eye on an occupied vehicle that's on
17  a traffic stop, with another offender that's in the front
18  seat of -- of that vehicle still.  So, I'm -- I'm sitting in
19  the front seat.
20  Q  The other offender?  That's the person that didn't
21  have the seat belt on; right?
22  A  Correct.
23  Q  And you call them "offenders"?
24  A  Right.
25  Q  Okay.  So, you got the offender -- seat belt

Page 80

1  violater is still in there with a gun with the car; right?
2  A  Right.  So --
3  Q  Okay.  You -- You didn't take the gun out before
4  this?
5  A  No.  Actually, I probably -- Once I got the
6  handcuffs -- I'm not sure if I secured -- I think I
7  secured -- I'm not sure.  I probably, when he stepped out of
8  the vehicle, got it and put it on the -- the trunk of the
9  car or something of that nature, but like I said, I couldn't
10  be a hundred percent sure.
11  But if not, at the time I put the handcuffs, I either
12  sat down in the front -- I think I sat down in the front
13  seat with -- with my eyes on the passenger occupant of the
14  vehicle, while asking him a few more questions, such as --
15  or -- No.  I Mirandised him later.  But I asked him
16  questions to make sure he didn't have any defense to
17  prosecution.  I was already, pretty much, sure or I was
18  getting some information about whose -- whose vehicle it was
19  or something, because the registration didn't come back to
20  his name, as I recall it.
21  Q  Okay.  Do you know whose car it was?
22  A  No.
23  Q  You never arrested the passenger, did you?
24  A  No.
25  Q  You never ticketed the passenger, did you?

Page 81

1  A  No.
2  Q  Well --
3  A  I gave her a verbal -- verbal warning.
4  Q  Why'd you give her a warning, but you arrested a
5  Border Patrol officer?
6  A  Because -- Well, it's two-fold.  Number one, I did
7  not believe that the offense -- I -- I had other things to
8  deal with, number one.  I had an arrest.  I had arrested
9  in -- person in my custody in the back of my vehicle.
10  I did not feel that it was a good thing to do to waste
11  more time, especially considering the irate nature of
12  Mr. Gilbert, to take the time to write out a citation or
13  even a written warning.  So -- And also, I -- I didn't want
14  to have to tow the vehicle, so if -- if I arrested her, too,
15  which -- if I would have arrested her, I would have had to
16  tow the vehicle, as well.
17  Q  But if you had gave her a ticket, you wouldn't
18  have to tow the vehicle?
19  A  Right.  But I --
20  Q  How long -- How long would it take you to give her
21  a ticket?
22  A  Well, it would -- it would have taken a while.  It
23  would have taken ten -- maybe ten minutes.
24  Q  Well, why does it take ten minutes to give someone
25  a ticket?

21 (Pages 78 to 81)

**Page 82**

1    A   Number one, I had to obtain her driver's license,
2  run her driver's license; number two, I'd have to write out
3  the citation; number three, I'd have to go back and explain
4  the conditions of the ticket, get her to sign the promise to
5  appear, inform her of her court -- court date and what
6  Justice of the Peace she was going to, etc., etc.
7    Q   But you had Gilbert cuffed in the backseat of the
8  car. He's not going anywhere, is he?
9    A   He's becoming increasingly irate. I didn't want
10  to --
11    Q   How do you -- How do you know -- If you're in the
12  Mustang and he's in the police car, how do you know he's
13  becoming increasingly irate?
14    A   I wasn't in the Mustang.
15    Q   Okay.
16    A   I never -- This is a scenario --
17    Q   Okay.
18    A   -- if I wrote the ticket. I was sitting in the
19  patrol vehicle.
20    Q   Okay. And what's -- How do you know he's getting
21  increasingly irate?
22    A   Just his -- his overall demeanor, I would say.
23    Q   Just the look on his face?
24    A   Well, that and there was some -- I wouldn't call
25  it so much small talk, but it was conversation that was

**Page 83**

1  irrelevant to -- to the stop, but it led me to believe
2  that -- that I needed to get this individual --
3    Q   Word for word, what'd he tell you?
4    A   Well, I just said it wasn't material, therefore I
5  didn't --
6    Q   I don't care if it was material or not. What
7  do -- I mean, if he -- if he told you something --
8    A   I don't -- I just said twice I don't recall
9  exactly.
10    Q   What was the nature of what he told you?
11    A   I -- I don't remember.
12    Q   Just his tone of voice is what worried you?
13    A   Yeah, basically.
14    Q   Describe his tone of voice.
15    A   He was -- He was very confrontational, not so much
16  loud, but -- I don't -- I don't exactly know how to explain
17  it, but --
18    Q   If you were authorized -- If you believed that you
19  were legally authorized to carry a firearm and were arrested
20  for carrying it, wouldn't you be upset?
21    A   If I mistakenly believed that I was --
22    Q   Well, let's -- First of all, if you mistakenly
23  believed it, would you be upset --
24    A   Yes.
25    Q   -- if you believed it?

**Page 84**

1    A   Uh-huh.
2    Q   And if you were right and the officer arresting
3  you is wrong, you'd be upset, too?
4    A   Definitely.
5    Q   I mean, if you got arrested for something that
6  wasn't illegal, that would upset you, wouldn't it?
7    A   That's correct.
8    Q   And -- Okay. Okay. So, do you have any
9  conversations with the woman in the car, the passenger?
10    A   Well, first of all, I -- even though it was not
11  Mr. Gilbert's car, he was in control of it by operating
12  it --
13    Q   Okay.
14    A   -- so, I asked him if it was okay if I released
15  the car to his passenger. He said "Yes."
16    Q   And then?
17    A   So, I walked to the -- the passenger and I -- I
18  told her that Mr. Gilbert was being arrested and that if --
19  that he release the car to her if -- if she would drive it;
20  if not, I was going to have to tow it. And I believe -- I'm
21  not a hundred percent, but I believe that it was a -- a
22  standard transmission vehicle --
23    Q   All right.
24    A   -- so -- and she kind of hesitated, so I said, "Do
25  you know how to drive standard?" And she said "Yes --"

**Page 85**

1    Q   Okay.
2    A   -- if -- if -- if it was. And so, I think, by
3  that time, I had already had the weapon. I said, "Okay.
4  You're free to go." I walked -- started walking back to the
5  patrol unit and she came back and says that she's having
6  problems, she can't -- the seat's too far back and she can't
7  adjust the seat. So, I went over there and I helped her
8  move the seat up, because she was shorter than Mr. Gilbert,
9  I believe.
10    Q   What'd she look like?
11    A   Hispanic female, twenties.
12    Q   Attractive?
13    A   I don't recall.
14    Q   How tall was she?
15    A   Like I -- Like I said, I don't know. I'm assuming
16  she's shorter than --
17    Q   Than Mr. Gilbert?
18    A   -- Mr. Gilbert.
19    Q   Did you have any conversations with Mr. Gilbert as
20  you -- From there, you got in the car and took him to the
21  jail; right?
22    A   Uh-huh.
23    Q   Have any conversations with him while he was in --
24  while you were transporting him?
25    A   Not -- Not really. Not -- Not that I can recall.

COMPEX LEGAL SERVICES, (800) 969-6424

Page 86

1    Q    He didn't sit there and cuss at you or nothing?
2    A    No. No.
3    Q    Did he complain, or argue, or threaten you in any
4    way?
5    A    No.
6    Q    Okay. What happened -- Okay. What happens when
7    you get to the -- Do you get to the station or where do you
8    go?
9    A    I took him to the -- Our -- Our department was
10   located with the jail, so I -- I was taking him to the jail.
11   I pulled up to -- We have a electronic door -- operated door
12   that -- I called the dispatcher and told her to open the
13   sallyport so that I could drive in. The gate closed behind
14   us. And that's just standard procedure so nobody can
15   escape.
16   Q    Right.
17   A    And then, I opened the door for him, I helped him
18   out, I checked my weapon into the -- There's lockers
19   provided --
20   Q    All right.
21   A    -- when entering the -- the jail. I checked my
22   weapon. I took him back to where the jailer -- the jailer's
23   office, which is right across from the holding cell, and I
24   told the jailer that he was under arrest. And he -- The
25   jailer already knew, I'm sure, because the dispatch office

Page 87

1    is real close to the jailer's office and whenever there was
2    going to be an arrestee coming in, the dispatcher would tell
3    the jailer that there is an arrestee coming in so -- to kind
4    of get, you know, things started.
5    A    -- A copy of his driver's license would be printed by
6    the -- the dispatcher, if somebody was being arrested, so
7    that the jailer could get started on the -- the personal
8    information of the arrested individual.
9    Q    All right.
10   A    And I turned the -- the -- Mr. Gilbert over to the
11   jailer. I told him the charges and the classifications, so
12   he would know first because he has to do a security
13   assessment. And I walked back -- I left him in the custody
14   of the jailer, and I walked back to the -- the deputy's
15   office to start doing the -- the complaint that I had to
16   sign and some other limited paperwork on the detention and
17   then write my arrest report.
18   Q    Now, when you were taking him from the car to the
19   jailer, did he give you any problems?
20   A    No.
21   Q    Did he say anything?
22   A    No.
23   Q    Did he appear to be uncooperative in any way, at
24   that point in time?
25   A    No.

Page 88

1    Q    Okay. Up to the point where you got back to go
2    start writing your complaint, did you hear him say anything?
3    A    Can you repeat that? I missed that.
4    Q    Up -- Up to the point -- From the time you left
5    the vehicle until the time you got back --
6    A    To the deputy's room --
7    Q    -- Yeah -- to start writing your complaint, did
8    you hear Mr. Gilbert say anything?
9    A    No. Nothing.
10   Q    Did you see him uncooperative in any way, shape,
11   or form?
12   A    No.
13   Q    Did you have -- hear him say anything else after
14   that? I mean, did you ever --
15   A    No. I never had contact with him after that.
16   Q    Well, you said he was not cooperative with Jailer
17   Rene Ruiz. How do you -- How did you know that?
18   A    Because the jailer told me later.
19   Q    So, as far as things that you have personal
20   knowledge of, that's -- we've kind of reached the end;
21   right?
22   A    Yes.
23   Q    Anything else, you know, from here on out is
24   things you've heard from other people?
25   A    Excuse me?

Page 89

1    Q    If I ask you questions about things that happened
2    later in time --
3    A    Right.
4    Q    -- it's going to have to be things you've heard
5    from other people?
6    A    That's correct.
7    Q    Okay. You heard he was noncooperative. What'd
8    you hear about that?
9    A    He resisted on submitting to fingerprints --
10   Q    What did he do?
11   A    -- as far as I know. He told them he didn't want
12   to do it, he wasn't going do it. And then, the jailer
13   finally -- or -- And like I said, this is all secondhand
14   knowledge. The jailer finally told him, Hey, you know, you
15   have to get fingerprinted, that's policy, and you can't be
16   released.
17        Even if the -- the JP was there -- right then and
18   there, he couldn't be released until he was fingerprinted,
19   which -- which so happens that the JP was there quickly.
20   Q    Okay. So -- But he did consent to being
21   fingerprinted?
22   A    Yes.
23   Q    He just said he didn't want to and wasn't going
24   to?
25   A    Well, he was hesitant.

23 (Pages 86 to 89)

**Page 90**

1    Q   Okay.  Do you know if he cussed at him?
2    A   No.  I don't know if he did or not.
3    Q   Other than the one time that he told you -- used
4  the word "shit" with you, are you aware of any other
5  profanity he used during this entire incident?
6    A   I'm not.  No.
7    Q   Okay.  And the jailer was Rene Ruiz?
8    A   That's correct.
9    Q   Are you aware of what happened to the charges that
10  you brought against him?
11    A   Later on, I -- I found -- And it wouldn't have
12  been the first time that charges as -- Well, how do I --
13  Sometimes charges were just dropped, let's just say, or --
14  and especially citations.
15    Q   Why is that?
16    A   I would -- I would have to say for political
17  reasons.
18    Q   Okay.  Because, you know that for -- as far as you
19  were concerned, the interest of justice was for him to have
20  been arrested --
21    A   Definitely.
22    Q   -- and then convicted of these crimes?
23    A   Yes.
24    Q   And you know that as a law enforcement officer,
25  having a criminal conviction is not good for your career?

**Page 91**

1    A   That's true.
2    Q   And you thought that, as a law enforcement
3  officer, he deserved to have this conviction on his record?
4    A   No.
5    Q   Okay.
6    A   I -- I decided that because he was in violation of
7  the law -- And, basically, when -- I say that the ends of
8  justice were best served by his arrest because, at the time,
9  I really didn't have a lot of other options, due to the --
10  the nature of his behavior.
11    Q   What do you mean you didn't have a lot of other
12  options?  I mean, you couldn't have just written him a
13  ticket?
14    A   At the time, no.  He was so upset, irate that I
15  felt that that would not be a safe thing to do.
16    Q   So, you felt it would have been unsafe for you to
17  write him a ticket?
18    A   Definitely.
19    Q   What were you worried he'd do?
20    A   Well, I wouldn't like to speculate.  But I know
21  that the best thing for me to do was to get control of him,
22  lawful custodial arrest --
23    Q   And --
24    A   -- and transport him to the jail.
25    Q   And what is the evidence that you can give me that

**Page 92**

1  you were worried about having control over him, other than
2  some facial expressions and saying y'all never do shit
3  anyway?
4    A   Where he slightly resisted when I told him that he
5  was being placed under arrest.
6    Q   Okay.  That's after you arrested him.  Before you
7  arrested him?
8    A   Well, his -- his mannerisms, his -- his -- his --
9    Q   Well, give me -- give me some -- Don't just say
10  his mannerisms.  What mannerisms?
11    A   Well, his --
12    Q   I mean, you're throwing a Federal law enforcement
13  agent in jail.  I want some good reasons for that.  Why are
14  you doing it --
15    A   Because --
16    Q   -- as far as his mannerisms?
17    A   Because he violated Texas law.
18    Q   Okay.  Other than that.  But what are his
19  mannerisms that caused you to decide to arrest him, rather
20  than give him a ticket?
21    A   Well, other than him committing a --
22    Q   Other than -- What -- What are his mannerisms that
23  made you decide "I'm going to go ahead and arrest this guy"?
24    A   Well, if he wasn't in violation of a Class "A"
25  misdemeanor --

**Page 93**

1    Q   I'm not asking you about the law.  I'm asking you
2  about his mannerisms.  What mannerisms did he exhibit to you
3  that caused you to say he should be arrested, that it's not
4  safe for me to just give him a ticket?
5    A   Before you cut me off this time, let me finish
6  because it might satisfy your -- your question.  If there
7  was not a violation of -- in my opinion, a little more
8  serious than a traffic citation, I wouldn't have arrested
9  him as irate as he was, but there was a Class "A"
10  misdemeanor that he was in violation of, which -- Actually,
11  that was a weapons-free zone, so that was a felony, and I
12  felt -- If that wasn't there, the felony or a Class "A"
13  misdemeanor, however you want to classify it, which I -- I
14  put on there Class "A" misdemeanor, because later I found
15  out that it was a weapons-free zone -- if that wasn't there,
16  I would have -- I would have released him.
17     He has a weapon in his vehicle.  Border Patrol agent or
18  not, law enforcement officers all the time -- Federal, State
19  and local -- have -- have been known to, kind of, you kn...
20  go off, and he seemed like he was going off, at that point.
21    Q   So, you were worried he was going to shoot you if
22  you gave him a ticket?
23    A   What's that?
24    Q   Were you worried he was going to shoot if he -- if
25  he -- you gave him a ticket?

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                                    08/29/01

Page 94

```
 1     A    No.
 2     Q    Okay.
 3     A    I didn't said say that.
 4     Q    All right.  What mannerisms is the question.  You
 5   said he had mannerisms that caused you to believe --
 6     A    His body language, his facial expression, his
 7   tone, his selection of -- of words.
 8     Q    Okay.  Well, let's go to body language.  What body
 9   language did he exhibit?
10     A    Well, when we're -- when we're speaking in the
11   back of the patrol -- Correction -- in front of the patrol
12   vehicle and behind his vehicle, he had a tense, standoffish,
13   aggressive -- what I would consider a -- a threat -- a
14   threatening stance.
15     Q    All right.  Did you do anything to address that?
16     A    Well, I'm sure I told him to relax; that usually
17   was my --
18     Q    Okay.  Okay.  That's body language.  Gestures?
19   What gestures did he use that -- that caused you to think
20   that he might be a -- you know, a problem?
21     A    Well, as I was trained, when you're -- when you're
22   trying to deescalate a situation, you use hand gestures with
23   your palms facing up, like in a pleading motion with that
24   individual, whereas his fists were closed tightly or
25   pointing, which is directly confrontational; that -- that
```

Page 95

```
 1   would be his -- How did you phrase it, as --
 2     Q    Gestures.
 3     A    -- gestures.
 4     Q    Okay.  Facial expressions?  What facial
 5   expressions were there that gave you concern?
 6     A    Well, he had his brow furled.  I believe that's
 7   the term.  He -- He had a -- And you know, he was upset, and
 8   I -- I know that, too.  A lot of people, as you stated
 9   earlier, get upset on traffic -- traffic stops, but he
10   seemed almost -- almost irate and he -- his facial
11   expressions were of -- they were similar to other facial
12   expressions that I had seen just before, you know, somebody
13   does something that's not too great for me or anybody else.
14     Q    Now, are you positive that he said the words
15   "Y'all never do shit anyways" before you arrested him?
16     A    Yes.  I'm positive.
17     Q    Okay.  In your report, you said "Mr. Gilbert was
18   advised that he could be placed under arrest for unlawful
19   carrying of a weapon.  Mr. Gilbert then stated 'Y'all never
20   do shit anyways.'"
21     So, you told him he might possibly be arrested, but
22   then he said that and then you arrested him; correct?
23     A    That's correct.
24     Q    Okay.  Did you hear anything else about any kind
25   of bad conduct he had at the jail, other than not wanting
```

Page 96

```
 1   his prints taken?
 2     A    No.  Well, I've heard what -- what he alleges
 3   or -- he alleges through you.
 4     Q    Well, I'm talking about as far as things that he
 5   did.
 6     A    Have I heard anything?
 7     Q    Yeah.
 8     A    Not that I can recall; that's over two years ago.
 9     Q    Didn't you have better things to do than pull
10   someone over for revving their engines and arresting
11   somebody -- a Border Patrol agent for having a gun?
12     A    At the time?
13     Q    Yeah.
14     A    No.  I had nothing better to do.
15     Q    Do you think that this arrest and detention was a
16   good use of taxpayer dollars?
17     A    Yes.  I -- I -- That's kind of -- Considering
18   the -- the time and effort that it took and the considerable
19   amount of taxpayer dollars, if -- if that's what -- I don't
20   think it was very many taxpayer dollars, and yes, I do think
21   it was appropriate and --
22     Q    You'd do it again?
23     A    Yes.
24     Q    And you refused to look at his credentials?  You
25   never looked at them?
```

Page 97

```
 1     A    Well, I looked at them later on.
 2     Q    After you arrested him?
 3     A    Yes.
 4     Q    And they did say that he had the right to carry a
 5   gun?
 6     A    While in the performance of duty.
 7     Q    You're sure that's what it says?
 8     A    I'm sure that's what it said.
 9     Q    Let's see if I still have them or if I left them
10   in Brownsville.  Did anyone -- After you arrested
11   Mr. Gilbert, were you ever reprimanded for doing so?
12     A    Never.
13     Q    Did they ever tell you you did anything wrong?
14     A    No.
15     Q    Did anyone ever tell you that it's -- it's not
16   okay to arrest someone for saying the word "shit"?
17     A    Nobody told me that.  Was I right?
18     Q    What?  It says in the performance of those duties
19   he can carry a gun.
20     A    Right.
21     Q    And you interpret that to mean only while he's on
22   duty?
23     A    Well, you're not performing your duties if you're
24   not on duty.
25     Q    And if you're not sure, you just go ahead and
```

25 (Pages 94 to 97)

Page 98

1  arrest him and let the courts sort it out for you?
2    A  I was sure he was not. I asked him. That's why I
3  asked him.
4    Q  But, I mean, if you're not sure whether or not
5  he's authorized by the Federal law to carry a gun, go ahead
6  and arrest him anyway?
7    A  No. I was sure.
8    Q  You're still sure to this day you --
9    A  I --
10    Q  -- it was okay for you to arrest him?
11    A  Because -- Although, what you're -- I'm -- I'm --
12  I'm very positive that you know what you're talking about
13  with the supremacy clause, but I also know that the Texas
14  legislators would not make a law that would contradict the
15  Federal law.
16    Q  You're positive that --
17    A  Well, not -- not -- In this case, I haven't -- I
18  still haven't seen it and --
19    Q  Okay.
20    A  -- and that's policy. The only thing that -- It
21  might be policy, but that policy might be in contradiction
22  of the Texas State law.
23        MR. COWEN: I'll pass the witness.
24        MS. GONZALES: I have no questions at this
25  time.

Page 100

AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared ISAAC BOLCH, who after being duly sworn, states that he has read the foregoing deposition transcript, and states that he wishes to make the following corrections and changes to the transcript for the following reasons

PAGE    LINE    CHANGE       REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

He further states that the deposition transcript is otherwise true and correct

ISAAC BOLCH  _____

THE STATE OF TEXAS      *

COUNTY OF BEXAR      *

SUBSCRIBED AND SWORN TO BEFORE ME on this the _____ day of _____, 2001

_____
Notary Public, State of Texas
My Commission Expires: _____

Page 99

1        MR. COWEN: Okay.
2        THE VIDEOGRAPHER: We're off the record. The
3  time is 4:46.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 101

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2          BROWNSVILLE DIVISION
3  _____
              )
4  JOHN GILBERT,          )
      PLAINTIFF        )
5                      ) CIVIL ACTION NO.
    VS.                ) B-01-54
6                      )
  JIM HOGG COUNTY, TEXAS,    )
7  ET AL,              ) JURY DEMANDED
      DEFENDANTS        )
8  _____)
9
10  THE STATE OF TEXAS    *
11  COUNTY OF BEXAR      *
12    I, ANGELITA JIMENEZ, a Certified Shorthand Reporter duly
13  commissioned and qualified in and for the County of Bexar,
14  State of Texas, do hereby certify that, pursuant to Notice,
15  there came before me on the 29th day of August A.D., 2001.
16  at 3:02 o'clock p.m., in the offices of COMPEX LEGAL
17  SERVICES, INC., 3300 Nacogdoches, Suite 220, San Antonio,
18  Texas 78217, the following named person, to-wit: ISAAC
19  BOLCH, who was by me duly sworn to testify to the truth and
20  nothing but the truth of his knowledge touching and
21  concerning the matters in controversy in this cause; that he
22  was thereupon carefully examined upon his oath and his
23  examination reduced to computer-aided transcription by me or
24  under my supervision; that the deposition is a true record
25  of the testimony given by the witness; and that the said

26 (Pages 98 to 101)

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                    08/29/01

Page 102

1  witness read the same and subscribed his name thereto.
2      I further certify that I am neither attorney or counsel
3  for, nor related to or employed by, any of the parties to
4  the action in which this deposition is taken, and further
5  that I am not a relative or employee of any attorney or
6  counsel employed by the parties hereto or financially
7  interested in the action.
8      IN WITNESS WHEREOF, I have hereunto set my hand and
9  affixed my Seal of Office on this the _____ day of
10  _____, A.D. 2001.
11
12
13
            _____
14          ANGELITA JIMENEZ, Certified
            Court Reporter in
            and for the State of Texas
15
    Certificate No. of Reporter: 6016
16  Expiration of Current Certification: 12/31/02
    Business Address:  Compex Legal Services, Inc.
17                     3300 Nacogdoches, Suite 220
                       San Antonio, Texas 78217
18  Telephone No.:    (210) 646-6424
19
20
21
22
23
24
25

27 (Page 102)

COMPEX LEGAL SERVICES, (800) 969-6424

**A**

about 6:12 7:1 9:13,14
  12:16 15:18,21 16:10
  16:18 18:9 19:20
  20:16,18 21:16 25:6
  25:20 27:13 28:9,22
  28:23 29:5 31:10,22
  34:25 36:18,20,21
  37:6,7,19 39:5,23,24
  40:21 41:12 42:10
  43:17 44:25 46:10
  50:9,9 53:24 54:2
  55:5 57:5 67:1,3 68:3
  68:3 70:3,19,19 71:1
  71:1 73:14,18 74:16
  75:1 80:18 89:1,8
  92:1 93:1,2 95:24
  96:4 98:12
above 62:13
Absolutely 72:5
academy 13:15,18,19
  13:21 14:3,16,20 15:6
  15:11 16:7 20:24,25
  21:1,4,7 73:8
accelerate 46:6
Acceleration 45:24
  46:3
according 40:12 46:25
accused 30:1,2
acquainted 13:11
across 86:23
act 27:12
acted 17:7,9 64:11
action 1:5 101:5 102:4
  102:7
actions 64:9
active 31:25
activity 27:22
actual 11:13,15 53:21
actually 13:10 46:3,6
  54:13 55:18 56:13
  70:23 78:17 80:5
  93:10
acuity 43:6
additional 29:9 76:5,15
address 6:20 7:14,19
  7:20,23 94:15 102:16
adjust 85:7
administrators 11:10
  11:12
admit 19:16 64:22 65:3
admitting 65:6
advised 95:18
advocacy 28:8
affirmatively 14:1
  28:24
affixed 102:9
after 8:17 9:1 10:25
  13:8,8,9,17 20:24
  21:1,2 24:10 32:4,7,9
  32:12 35:13 36:17,19
  36:20,20 41:23 42:6
  43:15,20 44:21 47:25
  75:11 88:13,15 92:6
  97:2,10 100:3

afternoon 5:9 44:6
again 15:5 25:14 35:13
  75:17 76:2 96:22
against 90:10
agencies 36:6
agency 19:10 36:25
agent 18:10 19:23,23
  20:1,4,4 36:22 37:4
  48:4,12,15 51:23 52:3
  54:21 61:23 62:2,5,25
  92:13 93:17 96:11
agents 16:2,11,19 22:6
  22:16 23:3 34:22
  37:12 66:21
age-old 73:16
aggressive 94:13
ago 69:20 96:8
agreed 3:11
ahead 92:23 97:25 98:5
AL 1:7 101:7
Alcoholic 28:8
Alexander 14:8,9
alien 39:2
alleges 96:2,3
allowed 66:6
almost 31:10 44:18
  51:17 95:10,10
along 41:8
already 29:6 56:10,16
  70:2 80:17 85:3
  86:25
altercation 78:14
Although 88:11
always 33:14
amendment 17:12
  18:13,13 72:25 73:8
amount 43:16 96:19
amy 2:7 5:23
ANGELITA 2:14 3:5
  101:12 102:13
animosity 38:6
annoyed 52:25
another 19:3 34:21
  37:1 39:13 47:17
  49:4 55:15 60:25
  79:17
answer 18:25 67:11
  69:24 70:2 78:9
answered 70:3
answering 64:25 69:18
Antonio 3:4,14 5:15
  6:10,15 7:17 8:14
  29:17 30:12 31:2
  101:17 102:17
anybody 40:24 49:7
  59:21 60:7 95:13
anyone 36:11 39:1
  42:10 59:23 60:6,8,25
  69:4,10,16 70:1 97:10
  97:15
anything 9:16 15:1,18
  20:16,18 23:25 27:15
  37:7,7 38:13 42:7
  44:16,25 45:18 46:23
  52:1,21 55:5 63:22
  68:4 76:7 77:12

87:21 88:2,8,13,23
  94:15 95:24 96:6
  97:13
anytime 12:25 52:7
  56:3 57:18
anyway 58:25 75:10
  92:3 98:6
anyways 67:20 68:6,11
  75:18 95:15,20
anywhere 42:8 53:17
  82:8
apartment 6:24 8:8
  35:3,4
apologize 65:22
Apparently 20:22
appear 82:5 87:23
Appearances 4:2
appeared 100:2
apprehend 25:2
approached 43:9,24
approaching 41:15
  43:4
appropriate 96:21
approximately 6:17
  8:20 13:1,2,4,23
  21:21 26:14
April 41:14
area 7:8,8 29:4 37:22
  51:21 54:17 55:10
  60:1
argue 19:20 52:20 86:3
arguing 59:10
around 13:24 28:23
  34:24 41:24 48:24
  54:7,9 70:4 75:21
  76:2,20 79:1
arrest 12:6 15:13 17:5
  17:10 18:1,7 27:20,21
  28:12 29:7 30:2
  40:17,20,21 41:2
  45:25 57:7,20 58:2,2
  58:4,5,16,18,24 62:13
  70:9 71:13 72:8
  73:25 74:11 75:13
  81:8 86:24 87:17
  91:8,22 92:5,19,23
  95:18 96:15 97:16
  98:1,6,10
arrested 17:19 19:8
  32:9 34:14 36:19
  40:23 56:22,25 57:2
  57:15,16 58:10,22,25
  67:17 71:7,20 80:23
  81:4,8,14,15 83:19
  84:5,18 87:6,8 90:20
  92:6,7 93:3,8 95:15
  95:21,22 97:2,10
arrestee 87:2,3
arresting 35:22 56:10
  58:7 68:18 75:2 84:2
  96:10
arrests 12:3
asked 8:5 44:12 48:1
  50:4 51:18 53:1 56:6
  61:8,12,19,22 67:9
  69:19 76:22 80:15

84:14 98:2,3
asking 18:19,19,20
  63:10 64:22 65:3
  78:12,19,20,22 80:14
  93:1,1
assessment 87:13
assist 34:4
assisted 23:3
assume 19:17,21 43:21
  52:1
assuming 13:8 65:6
  68:2 72:3 85:15
attend 13:15
attended 14:22
attention 13:20
attorney 2:3 102:2,5
Attorneys 2:8
Attractive 85:12
august 1:13 3:2 5:2
  13:21 14:4,17,18
  29:13 30:9 40:17
  101:15
authority 12:14 100:2
authorized 19:23 20:4
  28:16 83:18,19 98:5
authorizing 16:18,18
automobile 46:11
aware 54:10 62:24
  69:16 70:1 78:16,24
  90:4,9
away 53:24 71:4 76:9
awhile 18:15
A.D 101:15 102:10

**B**

B 5:14 14:8,8
back 13:22 19:5 24:10
  29:15,16 30:9,12
  33:16 34:13 39:9,15
  40:24 42:7 44:16
  48:10 51:19 57:3
  61:2 67:13 70:2
  72:20 75:11,12,22
  80:19 81:9 82:3 85:4
  85:5,6 86:22 87:13,14
  88:1,5 94:11
backing 83:4
Backpay 27:4
backseat 48:18,20,22
  82:7
bad 95:25
badge 10:16 68:3
bailout 34:9
bailouts 34:7
based 16:4 20:12 46:1
basic 12:23
basically 6:1 22:17,21
  29:3 33:4,9 73:7
  75:11 83:13 91:7
basics 14:24
basis 16:3
became 8:24 9:1 13:11
  41:22
becoming 30:3 82:9,13
beer 71:17

before 3:5,15 5:21 6:13
  6:14,18 12:12 34:14
  35:21 39:24 40:23
  42:11 47:8 48:4 57:8
  76:1,15 80:3 92:6
  93:5 95:12,15 100:2
  100:21 101:15
behavior 91:10
behind 34:2,7 43:21
  51:19 75:22 86:13
  94:12
being 5:4 11:11 34:19
  36:15 52:25 53:1
  56:14 67:3 74:16,20
  84:18 87:6 89:20
  92:5 100:3
belief 70:7
believe 8:20 18:12
  26:13 28:7,9 36:17
  40:3,25 41:13 42:17
  42:20 45:7 46:4
  47:12 54:4 61:25
  68:20 70:4 74:3 81:7
  83:1 84:20,21 85:9
  94:5 95:6
believed 29:9 45:9
  83:18,21,23,25
belt 36:23 41:22 42:22
  43:7,9 44:9 46:17
  47:10 51:5 56:20
  79:21,25
besides 60:8 72:4
best 13:14 57:24 68:18
  91:8,21
better 33:11 49:21 96:9
  96:14
between 3:2,11 9:16,22
  14:19 18:18,25 25:17
  35:25 38:2 51:19
Beverage 28:8
bexar 3:6 100:19
  101:11,13
big 21:14 26:16 37:18
  41:5
bit 67:14 73:14
bite 79:5
black 41:19
block 6:19
Boca 2:8
body 52:24 94:6,8,8,18
bolch 1:12 2:13 3:1,13
  4:4 5:3,9 44:7 100:3
  100:17 101:19
Border 18:10,22 19:22
  19:23 20:1,3 22:6,15
  22:18 23:3,5 28:15
  33:20,23,25 34:22
  35:23 36:1,3,12,15,16
  36:22,23 37:4,5,9,12
  38:7 39:7,13,17 48:3
  48:11,15 50:5 51:12
  51:23 52:3 61:23
  62:2,5,25 66:6,21
  81:5 93:17 96:11
both 9:18 36:6 62:25
Boulevard 2:8

JOHN GILBERT VS. JIM HOGG COUNTY     ISAAC BOLCH     08/29/01

Page 2

boy 5:14 14:7
breach 70:11,13 71:2 74:6
break 6:5,6 72:12
briefly 34:20
bring 19:5
broad 73:11,12
broken 35:2 56:14
brought 55:20 90:10
brow 95:6
brownsville 1:2 2:4,9 97:10 101:2
bruised 77:17,20,25 78:14,17 79:1
bruises 79:5
budgetary 23:17
building 53:21
bum-rushing 70:20
bunch 27:3 60:3,4 74:19
burglarized 35:3
burn 17:1,25
burning 17:5 18:7
Bush 71:12,19
Business 102:16
business-type 14:25
bust 22:25
busted 40:7
B-01-54 1:5 101:5

**C**

C 2:1 74:9
call 8:4 40:24 69:23 79:23 82:24
called 8:24 34:6 41:25 45:23 86:12
calls 27:13
came 24:9 34:22 75:11 75:12 85:5 101:15
Cameron 27:2
campus 11:2,6,10
captain 30:8
car 42:17,21 48:1,14 49:5,16 55:25 57:18 58:8,9 76:16 77:6,8 79:10,13 80:1,9,21 82:8,12 84:9,11,15,19 85:20 87:18
care 24:16 83:6
career 16:5 90:25
carefully 101:22
Carrier 61:19
carry 12:1 16:11,15,19 18:10,22 19:24 20:4 28:16 31:12 32:3 61:5 62:13,16,25 66:7 83:19 97:4,19 98:5
carrying 32:7 56:8 59:7 66:14,14,23 75:14 83:20 95:19
cars 74:21
case 18:3,4 19:14 21:3 98:17
casino 33:9
catch 34:10

cause 27:21 34:4 42:18 42:21 46:13 101:21
caused 92:19 93:3 94:5 94:19
cell 86:23
Center 7:8
certain 16:18 66:13
Certificate 4:8 102:15
Certification 102:16
Certified 2:15 3:5 61:8 101:12 102:13
certify 101:14 102:2
chance 5:20
change 33:5,6 42:7 57:5 100:5,5
changes 4:7 100:4
Chapter 74:1
charge 24:25 25:1 76:5
charges 87:11 90:9,12 90:13
Charities 6:25
chat 22:24
checked 86:18,21
Chica 2:8
chief 21:19
children 27:12
circumstance 74:15
circumstances 51:15 65:10 71:15
citation 45:25 46:1 57:6 81:12 82:3 93:8
citations 90:14
cited 36:24 45:25 58:17
city 7:16 23:17
civil 1:5 3:7 101:5
claim 54:16
claimed 35:2 55:2,2
class 16:13,13 28:7,9 73:13 74:9 92:24 93:9,12,14
classes 11:23
classifications 87:11
classify 93:13
clause 20:19 98:13
clear 75:12,12
clock 54:2
close 74:16 87:1
closed 77:11,12 86:13 94:24
closely 11:9
closer 41:21
code 12:14 15:12,13 16:12,13,14 17:2,8 19:4,5 20:2,3 45:3,14 63:4 66:16,18,23 70:24 74:4
coffee 71:18
College 14:22
come 77:19 80:19
coming 50:23 61:13,22 87:2,3
commission 10:18,21 15:15 28:9 100:24
commissioned 10:14 101:13
commission's 31:25

commit 68:23
committed 38:11,16 68:20,25
committing 92:21
common 38:21
communications 9:1,5
Community 14:22
Comp 26:22
company 8:19,22 9:17 30:21
compex 3:3 101:16 102:16
complain 86:3
complaint 87:15 88:2,7
complaints 43:17
completion 21:6
complied 76:6
complimenting 7:11
comply 52:18
computer-aided 101:23
concealed 31:16 32:3,7 61:19
concern 95:5
concerned 63:12,14 74:25 90:19
concerning 101:21
condition 45:5
conditions 82:4
conduct 30:2 59:9,10 59:11,17,20 68:25 74:4 75:16,17 95:25
conflict 18:17,21 20:6
conflicted 17:13
conflicts 36:8
confrontational 44:19 47:4 83:15 94:25
confronted 50:9
confused 66:11
conjunction 22:5 66:20
consent 89:20
consider 49:3,6 94:13
considerable 96:18
considerably 37:15
considering 56:10 81:11 96:17
consisted 10:6
Constitution 17:12 20:19 64:4 73:9 74:25
constitutional 17:24 63:24 64:1 72:23 74:10
contact 22:18,21,22 44:1,20 47:25 88:15
container 57:6
continually 45:5
continuing 11:22 28:3 28:6
continuously 31:23
contradict 98:14
contradiction 98:21
contrary 75:6
control 50:1 84:11 91:21 92:1
controversy 101:21
convenient 34:20

conversation 34:23 35:1 71:9 82:25
conversations 13:13 84:9 85:19,23
convicted 90:22
conviction 90:25 91:3
cooperate 16:8
cooperative 88:16
copy 87:5
core 14:24
correct 5:10,11,15,16 5:25 8:3 9:7 16:16 18:7,8,12 20:14,17 26:11 28:25 29:1,8,10 30:11 40:15,16 43:10 47:1,6 49:25 50:3 51:13 55:25 56:12 58:23 60:13 61:6 63:18,23 64:15,18 65:16 66:4 68:11 75:4,19 79:22 84:7 89:6 90:8 95:22,23 100:15
Correction 9:10 94:11
corrections 24:24 100:4
Council 23:17
counsel 3:11 102:2,6
county 1:6 3:6 13:12,16 14:6 20:15 21:12 23:4,5,13,15 24:3,6 25:10,15,23 27:2,25 29:11,21 32:2,6,18 33:17,21 36:1,4,12 37:9,15,20 38:9,10 39:1,8,14 41:5 44:6 51:4,8 55:11 63:21 100:19 101:6,11,13 couple 6:22 24:8
course 7:18
courses 14:23 28:4,5
court 1:1 17:24 24:24 82:5,5 101:1 102:14
courtesy 47:23 49:3,6
courts 17:15 98:1
cousin 40:5
cowen 2:2,3 4:6 5:5,8 65:18,20 66:3 72:11 72:13,15,22 98:23 99:1
credential 19:22,25 66:25
credentials 52:4,5,8,10 62:1,4 96:24
crime 28:7 68:21,23
crimes 90:22
criminal 15:1,13 16:13 17:8 20:2 27:16,21 66:18 90:25
criteria 66:12
criticizing 33:16
cross 27:11
crossing 27:12
crowded 73:17 74:13
cuff 76:18
cuffed 82:7

culture 38:22
cup 71:18
Current 102:16
currently 32:14 61:8
curriculum 14:24
cuss 73:21 75:2 86:1
cussed 90:1
custodial 91:22
custody 81:9 87:13
cut 93:5

**D**

D 100:1
dad's 9:17
DARE 54:11,17,19 55:2,10,18
date 12:25 13:23 38:8,8 82:5
dates 12:18,20 24:25
dating 38:15
David 30:6 34:21
day 3:1 24:7,9,10 31:21 59:5 65:1 98:8 100:21 101:15 102:9
days 24:8 31:22 34:18
DC 17:2
DEA 19:10
deal 10:7 26:17 81:8
dealing 15:14
deals 11:25
debateable 54:13
December 13:22,22,24 23:16
decide 17:16 65:4 92:19,23
decided 13:14 65:8 91:6
decision 41:2
declined 35:7
dedicate 21:6
deescalate 94:22
deescalating 11:24
DEFENDANTS 1:7 101:7
DEFENDANT(S) 2:6
defense 11:23 56:11 66:13 67:11 80:16
defenses 56:7
Definitely 10:10 37:23 38:23 48:21 49:14 53:1 84:4 90:21 91:18
definition 16:14
degree 14:25
delighted 50:14
demanded 1:7 44:21 101:7
demeanor 82:22
department 13:13,16 21:11,14,15 22:3,13 23:4,13 24:24 25:11 27:25 28:21 72:19,22 36:1,4 39:2,9 41:6 44:7 55:11 68:2,5,7 68:10 86:9

departments 36:6
departure 13:23
depends 57:23 59:21
   71:14
deposition 1:12 3:1,13
   5:18,21 6:2 100:3,14
   101:24 102:4
deputies 36:12 37:10
   41:8 42:14
deputy 25:10,24 27:6
   34:21 37:16 38:11
   44:7 51:4,8
deputy's 87:14 88:6
describe 35:25 83:14
DESCRIPTION 4:10
descriptive 46:7
deserved 91:3
desire 16:7
detain 12:7
detaining 70:16
detention 49:10 87:16
   96:15
detentions 12:4 28:12
devote 13:20
Diego 21:11,11 22:2,13
   22:17 23:5,14,19 55:8
different 20:16 36:7
   54:24 63:22
direct 4:6 5:7 60:10
directing 27:10
directly 94:25
disability 15:14
disciplined 23:23 29:24
disclose 39:18
disorderly 59:9,10,11
   59:17,20 68:25 74:4
   75:16,17
dispatch 86:25
dispatcher 42:16 86:12
   87:2,6
dispatchers 41:9
dissatisfaction 42:15
district 1:1,1 11:2
   13:11 101:1,1
diversity 15:15
DIVISION 1:2 101:2
doctor 19:7,9
doing 16:3 38:24 64:3
   64:20 87:15 92:14
   97:11
dollars 96:16,19,20
done 46:23
door 76:22 77:11,13,15
   77:23 86:11,11,17
dope 40:7 58:1,3
doubt 55:18
down 22:19 43:24
   74:22 79:15 80:12,12
downtown 7:3,7 31:2
drinking 71:17
drive 6:10,23 84:19,25
   86:13
driver's 7:14 40:25
   44:12 75:11 76:20,21
   76:22 79:15 82:1,2
   87:5

driving 57:19
dropped 90:13
drug 19:9 39:15
drugs 19:6
due 23:17 51:15,15
   64:13 91:9
duly 5:4 100:3 101:12
   101:19
during 25:7 48:22
   50:11 52:7 53:4 56:3
   62:25 90:5
duties 8:21 11:6 24:15
   24:16 27:5 62:15
   97:18,23
duty 17:15 19:24,25
   20:5 34:21 61:23
   62:25 63:1 66:7
   71:18 97:6,22,24
Duval 21:12 22:2 23:4
   23:5,13,15 24:3,3,6
   25:15

E

E 2:1,1
each 17:18 41:15 54:17
earlier 74:5 95:9
early 13:21 14:4,18
   34:18
East 2:4
education 12:13,13
   14:21 15:16 28:3,6
   32:25 65:11
education-type 11:23
effect 35:4 62:13
effecting 49:9
effort 96:18
eight 6:12
either 16:3 19:24 34:21
   35:2 38:11 41:16
   80:11
electronic 86:11
element 17:18
elementary 54:4
elements 17:16 66:13
eliminated 23:17
employed 32:14 40:12
   40:20 102:3,6
employee 26:7 102:5
employment 9:8 12:21
   32:17
employments 9:22
end 7:5 13:19 65:24
   88:20
ends 57:23 91:7
enforcement 10:12
   15:2,16,19,22 16:2,8
   16:11 19:10 20:4
   36:25 37:1,2 38:14,20
   49:9 57:3 61:9 78:11
   90:24 91:2 92:12
   93:18
enforcing 17:9
engine 41:23 44:10,24
   44:25 45:10,19 46:1,7
   46:19,25 47:10 51:8

56:17,23
engines 96:10
enough 23:18 70:9
ensure 11:10
entering 86:21
entire 90:5
entitled 62:13 73:15
escalated 50:7
escape 15:25 86:15
escapes 14:10
especially 81:11 90:14
establish 67:11
establishing 34:4
ET 1:7 101:7
etc 11:12 16:5 24:25
   41:9 62:14,14 82:6,16
even 24:24 55:20 63:13
   65:2 69:1 73:21
   81:13 84:10 89:17
ever 16:6,10,17 20:15
   22:5,8,12,21,21 23:23
   24:22 29:24 30:1
   31:7 32:6,9 33:23
   34:11,11,12,14 35:13
   36:11,15 38:6,14,17
   39:24 47:23 48:13
   52:7,10 58:12 63:10
   72:22 73:19 77:15
   88:14 97:11,13,15
every 26:7,23 38:10
everybody 74:21
everyone 70:19
everything 27:14
everytime 57:21
evidence 60:24 91:25
exact 6:20 12:18,20
   19:20 45:3
exactly 12:19 25:17
   41:7 83:9,16
examination 4:6 5:7
   101:23
examined 101:22
example 16:23 17:23
   19:3,12,23 27:10
   59:15 71:12 73:16,17
examples 16:4 19:1
excessive 45:6,15
Excuse 7:10 67:17
   88:25
exempt 66:22
exemption 61:13
exemptions 66:15
exhibit 93:2 94:9
exhibition 45:23 46:2,3
   46:5
EXHIBITS 4:9,11
experience 64:13,16
   65:11 66:20
Expiration 102:16
Expires 100:24
explain 82:3 83:16
expressed 42:15
expression 52:24 73:15
   94:6
expressions 92:2 95:4,5
   95:11,12

extended 47:23
extent 16:20 17:15 41:1
eye 79:16
eyes 80:13

F

F 100:1,1
face 52:23 82:23
face-to-face 43:9
facial 52:24 92:2 94:6
   95:4,4,10,11
facing 94:23
fact 9:18 16:1 24:7
   37:13 38:15 64:3
facts 19:20
faculty 11:12
fairly 38:4
faith 17:9 64:11
familiar 29:4 62:10
far 16:20 38:10 46:13
   46:22 60:11,24 63:12
   63:14 64:12 73:18
   74:24 85:6 88:19
   89:11 90:18 92:16
   96:4
father 8:18
fault 63:25,25 64:6,6
Fax 2:5,10
February 29:13 40:14
Federal 3:7 15:19,21
   16:2,8,10,18,22 18:3
   18:9,16,18,21 19:24
   20:10,20 54:21 62:24
   63:2,3,5,13,15,17
   64:4 65:16 66:4,24,25
   92:12 93:18 98:5,15
feel 12:23 47:19 56:2
   81:10
feet 53:24 71:3
fellow 51:3,7 79:3
felony 93:11,12
felt 34:2 74:16 91:15,16
   93:12
female 85:11
fence 53:25
few 10:8 16:2 26:16
   69:20 80:14
field 8:19,21,25 9:17
   28:20 34:19
figured 29:6
filled 21:18 54:19,22
finally 89:13,14
financial 44:13
financially 102:6
find 58:1,3 59:11
fine 6:21 14:15 72:8
finger 59:19
fingerprinted 89:15,18
   89:21
fingerprints 89:9
finish 93:5
fire 73:16 74:13
firearm 16:11,15 20:5
   28:16 31:12,14 61:5
   62:14,16 66:14 68:17

83:19
firearms 16:19 62:20
   62:25 63:6 66:7
fired 23:2
first 5:4,13 14:11,13
   17:11 28:21 30:5
   31:24 34:17 35:10
   41:18 50:10 55:2,6
   73:8 83:22 84:10
   87:12 90:12
fists 94:24
five 6:17
flag 17:1,6,25 18:7
follow 18:24 20:7 63:17
following 3:8 41:25
   100:4,4 101:18
follows 5:4
follow-up 78:22
force 15:14 28:10 29:7
foregoing 100:3
forgotten 34:25
form 88:11
formality 6:4
formalized 28:13,18
found 90:11 93:14
four 21:19,21
fourish 54:2
Fourth 72:25
four-lane 41:16
frame 77:5
free 73:3 85:4
freedom 73:6,15
Freer 22:19
friend 14:5 33:3 71:17
friendly 23:21
from 8:19 9:9 13:20,23
   14:2,17 19:6,6,9
   20:23 23:14 26:2
   29:13 31:10 39:8,14
   39:17 41:18 45:6
   47:22 49:21 53:24
   61:13,22 63:21 66:22
   71:4 72:19 74:11
   78:1 85:20 86:23
   87:18 88:4,23,24 89:5
front 41:20 42:3,17
   46:15,17,24 47:11
   56:21,25 57:19 58:8
   58:11,13,20 59:3
   79:17,19 80:12,12
   94:11
fuck 59:16
full 13:20 21:6 34:8
   71:13
full-time 24:11
fun 32:24
furled 95:6
further 32:25 100:14
   102:2,4

G

gained 43:6
game 18:14
gap 9:20,22
gate 86:13

gave 16:23 17:21 26:22
  81:3,17 93:22,25 95:5
George 71:12,19
gestures 94:18,19,22
  95:2,3
gets 49:4
getting 80:18 82:20
gilbert 1:4 22:8 23:6
  30:2 34:14,17 36:19
  40:23 41:11,11,12,13
  41:25 81:12 82:7
  84:18 85:8,17,18,19
  87:10 88:8 95:17,19
  97:11 101:4
Gilberto 41:11
Gilbert's 41:23 84:11
girlfriend 51:4
give 8:7 12:14 16:23
  19:13 50:17 73:16
  81:4,20,24 87:19
  91:25 92:9,9,20 93:4
given 19:3 101:25
gives 19:22
giving 19:17 49:18
  67:10,10
go 6:2 8:1,25 12:13,20
  25:1 29:15,16 30:9
  33:16 42:7 44:2,4
  51:18 52:15 53:12
  61:2 67:13 70:22
  82:3 85:4 86:8 88:1
  92:23 93:20 94:8
  97:25 98:5
going 6:2 13:18 32:24
  49:24 51:25 56:2,11
  61:3,12,22 65:4 67:25
  70:21 82:6,8 84:20
  87:2 89:4,12,23 92:23
  93:20,21,24
gonzales 2:7 5:23 72:11
  72:14,16 98:24
good 5:9 13:15 17:9
  22:19 36:4,10 44:6
  45:5 64:11 81:10
  90:25 92:13 96:16
goodness 14:12
gotten 78:13
government 19:5,22,24
  19:25 54:20
graduate 14:2
graduated 8:15,17
  20:23
graduating 14:19
grandmother's 7:25
  8:2,4
grass 51:21 53:15
grateful 25:22
great 70:17 95:13
greeting 44:5
GT 41:19
guard 9:11,25 10:11
  30:21,23,25
guards 27:12
GUERRA 2:7
guess 18:4 25:21 53:13
  74:15

gun 10:23 12:1 18:10
  18:22 19:24 51:11
  55:25 59:2 76:13
  80:1,3 96:11 97:5,19
  98:5
guy 49:24 70:20 92:23
guys 38:7,9

H
HAGGE 2:11
hand 94:22 102:8
handcuffs 76:1 80:6,11
Handgun 61:19
hands 75:21
happen 77:12
happened 36:17 40:17
  43:19 51:10 86:6
  89:1 90:9
happening 38:18
happens 51:14 56:5
  67:9 75:9 86:6 89:19
happy 35:6
harassing 36:12
hard 64:25
harmful 74:14
having 5:4 19:8 37:10
  38:8 58:8 71:18
  79:16 85:5 90:25
  92:1 96:11
head 77:3,5
Health 19:4
hear 36:11,21 49:21
  59:23 71:5,22 72:6
  88:2,8,13 89:8 95:24
heard 33:14 36:14,15
  36:18,20,22 37:7 38:6
  38:13,14,17,19,20
  39:5,20,24 40:6,8
  41:23 54:23,23 55:1
  60:6,8,12,16,22,25
  69:5,17 70:1,9 75:3
  88:24 89:4,7 96:2,6
hearing 69:10
Hebbronville 6:20
  22:18 37:18
held 9:18 12:25
help 34:10
helped 85:7 86:17
helper 8:24
her 43:11 47:10 81:3,4
  81:14,15,17,20 82:1,2
  82:4,5,5 84:18,19
  85:7 86:12
hereto 3:12 102:6
hereunto 102:8
hesitant 89:25
hesitated 84:24
Hey 89:14
he'll 49:13
high 8:11,13 11:8 14:9
  14:19
highly 54:21
Hispanic 85:11
hit 42:1 76:11 77:5,15
  77:22,22

hitting 79:7
hogg 1:6 20:15 25:10
  25:23 27:24 29:11,21
  32:2,6,18 33:17,20
  35:25 36:4,11 37:9,15
  38:9,10 39:1,8,14,18
  39:18 41:5 44:6 51:3
  51:7 55:11,11 63:21
  101:6
hold 11:22 12:15 66:1
holding 86:23
home 6:23 7:2
honest 57:25
hospital 24:24
hostile 68:14
hotel 31:1
hour 21:25 26:1,2,23
hours 3:2 15:5,6,8
  26:17,24 28:3 63:1,1
  73:13
house 6:25 7:3,4,7,25
  8:2,5,9 32:16
houses 60:4
how'd 7:5
hunch 57:25
hundred 67:24 80:10
  84:21
hypothetical 19:18
hypothetically 64:23
  70:8

I
Ibanez 39:22 41:11,11
idea 13:15 35:8 37:24
  78:3
identified 43:25 44:5
illegal 18:1 44:25 64:20
  64:22,22,23 65:3,4,7
  65:8 84:6
imagine 36:8
immediate 70:11,13
  71:1 74:6
immediately 44:20
Immigration 62:19
important 17:21
inactive 32:1
inc 3:4 101:17 102:16
incident 59:12 77:20
  78:14,25 90:5
incite 70:13 74:6
incited 70:11
Including 21:18
increasingly 82:9,13,21
Independent 9:10 11:2
  13:10
INDEX 4:1
indicating 60:1
indication 50:17
individual 13:11 17:19
  23:3 24:22 35:12
  54:20 57:4 66:12
  68:15 83:2 87:8
  94:24
individuals 15:14 34:9
inform 49:8,10 82:5

informal 22:22 28:19
information 36:7 39:8
  39:14,17 49:18 80:18
  87:8
informed 44:8 48:1
initial 47:25,25
inmates 24:17,20
INS 63:6
Instead 26:25
instructors 16:1,2
intend 32:25
intensive 15:12
Interdepartment 36:5
interest 13:14 90:19
interested 102:7
interpret 17:15 97:21
interpretation 66:19
  74:12
inventory 58:3
investigations 27:16
investigator 10:20
Investigators 10:17
involve 73:3
involved 78:13
involvement 55:16
involving 65:10
irate 44:19 81:11 82:9
  82:13,21 91:14 93:9
  95:10
irrelevant 83:1
isaac 1:12 2:13 3:1,13
  4:4 5:3,9 100:3,17
  101:18
ISD 13:9 21:4
issue 55:21,22 57:6
I-S-A-A-C 5:13

J
jail 24:16,18,19 59:4,7
  85:21 86:10,10,21
  91:24 92:13 95:25
jailer 24:14 86:22,24
  86:25 87:3,7,11,14,19
  88:16,18 89:12,14
  90:7
jailers 41:8
jailer's 86:22 87:1
janitor 8:23
Jefferson 8:14
jerk 13:5
jim 1:6 20:15 25:10,23
  27:24 29:11,21 32:2,6
  32:18 33:17,20 35:25
  36:3,11 37:9,15 38:8
  38:10 39:1,8,14,17,18
  41:5 44:6 51:3,7
  55:11,11 63:21 101:6
JIMENEZ 2:14 3:5
  101:12 102:13
job 7:9,11,12 8:21 9:3
  11:6,9,18 12:3,3,6,15
  13:8 20:24 21:2,9,10
  23:12 24:2,5,11 27:5
  30:14,16 32:12 33:6,8
  33:10 47:22

jobs 9:18 25:12
john 1:4 14:8 22:8 23:6
  30:2 34:14,17 101:4
joined 21:17
joining 70:19
Jose 39:22
JP 89:17,19
judge 55:8 65:4 69:23
JURY 1:7 101:7
just 6:4,22 10:8,11
  12:23,25 17:16,20
  18:18 19:12,17,17
  21:2 22:22,24 26:14
  27:2,13 29:4 36:7,7
  38:19 44:21 46:7
  49:18 50:23 52:12,21
  53:5 56:13,13 57:16
  69:6 70:23 72:4 76:5
  78:16 79:3 82:22,23
  83:4,8,12 86:14 89:23
  90:13,13 91:12 92:9
  93:4 95:12 97:25
justice 15:1 57:24
  68:18 82:6 90:19
  91:8
justification 79:7
justify 58:7

K
Katz 6:9,23 7:21
keep 50:1 74:11 79:11
  79:16
kind 10:2 11:20 12:11
  14:20,23 15:4,10
  16:17 22:15 23:9
  28:19 29:18 33:25
  35:1 38:6 39:10 40:1
  47:20 49:9 50:6
  67:13 72:22 73:5,24
  78:13 84:24 87:3
  88:20 93:19 95:24
  96:17
knee 77:15,17,19 78:1
  78:15,18 79:1,8
knew 29:6 35:22 38:10
  38:11 56:16,19,20
  60:11 86:25
know 6:1,5 14:13 18:18
  18:19 22:22 27:2
  30:7 34:3 35:18 36:9
  36:19 37:12,13,14
  38:3 39:1,4,7,22 40:1
  40:4,21 42:14 47:5,16
  47:17,22 48:9 49:13
  50:24 51:25 54:5,11
  55:15 57:2 58:10,23
  63:10 65:2 66:24
  68:1 69:4 71:19,22
  77:17,19 79:3 80:21
  82:11,12,20 83:16
  84:25 85:15 87:4,12
  88:17,23 89:11,14
  90:1,2,18,24 91:20
  93:19 94:20 95:7,8,12
  98:12,13

JOHN GILBERT VS. JIM HOGG COUNTY — Case 1:01-cv-00054 Document 42 Filed in TXSD on 10/28/2002 Page 113 of 230 — ISAAC BOLCH 08/29/01

Page 5

**knowledge** 39:12 58:11 60:8,10,20 64:13,16 65:11 69:10 70:4,6 75:7 78:24 88:20 89:14 101:20
**known** 48:13,17 93:19
**K-A-T-Z** 6:10

**L**

**L** 3:10
**land** 20:20
**lane** 51:17 53:10
**language** 52:24 70:15 94:6,8,9,18
**Laredo** 8:18 9:11 11:4 11:9 13:15 14:2,9,22 73:7
**Las** 32:23 33:1,14
**last** 5:13 7:18 14:11,13
**late** 22:22
**later** 13:5 19:21 24:8 26:24 60:11,15,16 80:15 88:18 89:2 90:11 93:14 97:1
**law** 2:3,3,8 10:12 15:1 15:16,19,22 16:2,8,11 16:18,21,22 17:3,9,13 17:19,25 18:3,9,11,15 18:16,19,21,22,23,24 19:7 20:2,4,8,9,10,20 20:20 29:6 36:25 37:1,1,5 38:14,19 41:14 49:9 56:14 57:3 61:9 62:24 63:2 63:3,14,15,17,17 64:4 64:5 65:16,16 66:4,4 66:13,16,22,23,25,25 68:17 69:12 77:11 90:24 91:2,7 92:12,17 93:1,18 98:5,14,15,22
**lawful** 49:9 91:22
**lawfully** 70:16
**LAWLER** 2:7
**laws** 18:4 20:6
**lawsuit** 34:24 39:6,23 40:12 41:14 55:6
**lawyer** 5:20
**leaning** 14:25
**learn** 29:2 73:10,19
**learned** 16:14 55:5 60:21 66:20 73:14 74:3
**least** 26:18
**leave** 29:14
**leaves** 55:25
**led** 66:1 83:1
**left** 9:3 13:25 30:9 32:6 32:17 87:13 88:4 97:9
**leg** 77:22
**Legacy** 30:17,20 32:12 32:14 33:4,11
**legal** 3:3 65:4 101:16 102:16
**legally** 32:3 83:19

**legislators** 98:14
**legs** 77:9
**less** 9:14 14:16 16:21 17:3 57:17
**let** 6:5,5 15:5 16:22 19:13 34:3 55:2 62:4 67:13 69:6,7 93:5 98:1
**lets** 50:1
**let's** 31:10 44:2,2,4 52:15 57:25 61:2 70:22 71:16 78:16 83:22 90:13 94:8 97:9
**Lewis** 6:14 7:1,21
**license** 7:14 10:18 40:25 41:20 42:1,3,18 44:12 46:15,24 47:11 57:1,2,19 58:8,9,11 58:13,21 59:4 75:11 82:1,2 87:5
**licensed** 10:19 31:18,20 31:24
**lieutenant** 13:12 14:5
**life** 25:18
**light** 57:3
**like** 18:6 21:5 27:15 28:7 35:10,12 36:9 37:14 38:13 42:16 51:1,1 52:21 59:15 70:2 72:25 74:1,19 78:11 80:9 85:10,15 85:15 89:13 91:20 93:20 94:23
**limit** 21:3 41:17
**limitations** 12:14
**limited** 12:7 87:16
**line** 53:25 100:5
**lined** 33:7
**list** 20:3
**little** 66:11 67:14 93:7
**live** 6:8,9,13,16,21
**lived** 6:11,14,14,19 7:19 8:5
**local** 11:8 38:8 93:19
**located** 86:10
**locations** 8:25
**lockers** 86:18
**long** 6:11,16,21 9:12 12:15 14:15 19:6 21:20 24:2,5 25:5 26:3,3 29:11 31:9 32:1 57:4 73:14,15 81:20,20
**look** 48:24 62:7 82:23 85:10 96:24
**looked** 48:20,22 96:25 97:1
**lot** 16:1,1,4 91:9,11 95:8
**loud** 83:16
**lower** 65:19
**lying** 77:23

**M**

**made** 21:18 40:9 41:2 47:23,25 52:23 92:23
**magistrate** 57:8
**mail** 7:21,21 8:1
**mailing** 7:20
**Mainly** 14:24
**maintain** 24:18
**maintained** 50:7
**Maintaining** 27:9,10
**maintenance** 27:7,8
**majority** 53:8
**make** 12:3 33:14,15 34:5 37:12,13,15 47:19 48:24 80:16 98:14 100:4
**makes** 45:22
**making** 33:16 44:20 45:19 61:16 74:11
**manager** 7:6 9:2,5
**manager's** 6:24 7:3 8:8
**mannerisms** 92:8,10,10 92:16,19,22 93:2,2 94:4,5
**many** 14:16 15:5,6 21:16 24:20 26:17 34:6 41:5 58:17 79:5 96:20
**marked** 4:11 36:22
**Market** 34:20
**marks** 79:6
**married** 38:11,16
**material** 83:4,6
**matter** 9:18 16:1 24:7 37:13
**matters** 10:7 19:14 101:21
**Maverick** 34:20
**may** 74:1,1
**maybe** 17:11 52:2,3 81:23
**McDonald** 6:25 7:4,6 8:9 32:16
**McNeel** 3:14 7:15,23
**meals** 24:17
**mean** 7:24 14:8 17:21 17:21 27:8 33:15 38:21 57:25 59:3 60:18 68:10,13,14 69:23 70:18 79:10 83:7 84:5 88:14 91:11,11,12 92:12 97:21 98:4
**meant** 67:23 68:2,9
**Medical** 7:7
**medication** 24:17
**meet** 5:20 34:17 35:13 61:13 66:12
**meeting** 34:25
**memory** 34:25
**mental** 15:14
**mention** 47:11
**mentioned** 12:12 53:5
**met** 17:18 22:12 34:14 34:19 35:10,15
**Mexican** 19:7,9
**Mexico** 19:6

**MICHAEL** 2:2,3
**might** 13:4 16:17 36:18 37:20 39:18 47:16 66:11 71:13 93:6 94:20 95:21 98:21,21
**mind** 19:4 27:3 47:14 61:4 67:11,25 77:3 79:15
**mindful** 77:9
**minimal** 10:4
**minutes** 81:23,24
**Miranda** 73:1
**Mirandised** 80:15
**misdemeanor** 74:9 92:25 93:10,13,14
**missed** 88:3
**missing** 41:20 42:3
**mistakenly** 83:21,22
**money** 23:18 25:20 27:3 33:15,16
**month** 25:6,7 32:15
**months** 6:12,17,22 14:16 21:21 26:5
**more** 9:14 14:16 17:3 18:16 31:22 35:6 37:4,15 80:14 81:11 93:7
**most** 50:14 68:3
**mother** 7:6
**motherfucker** 71:7,9
**mother's** 7:12
**motion** 94:23
**motor** 75:12
**move** 85:8
**moved** 30:12 33:4
**moving** 32:20,22
**much** 22:17 24:19 25:18,25 37:12 44:19 47:21,23 49:21 50:7 80:17 82:25 83:15
**muffler** 45:4,6,8,9,20 46:12,19,22,22,25
**multicultural** 15:15
**must** 45:4
**Mustang** 41:19 42:24 82:12,14
**myself** 21:6 42:15

**N**

**N** 2:1 3:10
**Nacogdoches** 3:4 101:17 102:17
**name** 5:13,13 14:7,9,11 14:11,12,13,14 30:5 80:20 102:1
**named** 62:13 101:18
**name's** 5:9
**narcotics** 39:2,10
**Naturalization** 62:20
**nature** 80:9 81:11 83:10 91:10
**Navarez** 28:20 30:5 34:19,21
**near** 53:17
**necessarily** 38:19

**need** 6:4 16:7 24:22 27:11 28:5 52:12,20 72:16
**needed** 25:1 28:5 83:2
**neither** 102:2
**Nephew** 40:5
**Nevada** 32:23 33:1
**never** 17:11,23 18:2 20:18,20 22:9,11,25 23:24,25 24:18 27:3 28:17 29:25 30:4 35:14 36:14 38:12 39:20 40:6,8 52:9 55:1,2,5,20 58:10 62:19 66:24 67:1,20 75:5,9,18 76:9,11,13 77:16 80:23,25 82:16 88:15 92:2 95:15,19 96:25 97:12
**new** 24:8 26:7 50:24
**news** 40:10
**next** 5:24 9:9 10:25 13:8 20:24 21:9 23:12 24:7 25:9 30:16 32:12 35:15 43:19 51:10,14 52:17 56:5 67:9,12 71:6,18 71:25 75:9 76:19 79:14
**nice** 33:6
**night** 13:18
**nine** 26:12
**nobody** 70:4 86:14 97:17
**nods** 14:1 28:24
**noise** 45:6,16,19,22
**nonapplicable** 66:16
**noncooperative** 89:7
**nonduty** 63:1
**none** 22:25
**normal** 35:12
**normally** 40:9
**North** 6:19
**Notary** 3:16 100:23
**nothing** 33:15 63:21 72:2 74:25 86:1 88:9 96:14 101:20
**notice** 3:7 49:22 101:14
**noticed** 41:17,19,21
**number** 8:7,8 19:10,10 38:4 81:6,8 82:1,2,3
**numerous** 27:7

**O**

**O** 3:10
**oath** 101:22
**obtain** 82:1
**obtaining** 3:15
**occupant** 80:13
**occupants** 49:2
**occupied** 79:16
**occurred** 36:20 41:13
**occurrence** 38:22
**off** 14:22 19:24 20

JOHN GILBERT VS. JIM HOGG COUNTY          ISAAC BOLCH                          08/29/01

Page 6

26:16,22,24 46:7
51:21 66:7 72:17
93:5,20,20 99:2
offended 59:21 60:5
68:24 69:2 70:11
71:4 74:5,8,23 75:3
offender 79:17,20,25
offenders 79:23
offense 17:16,18 57:7
68:19 70:17 81:7
offensive 70:15
offer 52:10 62:4
office 86:23,25 87:1,15
102:9
officer 10:22 11:3,7,8
11:13 12:13 13:16
15:16 17:14 18:12
21:23 23:7 24:14,21
25:13 28:16,21 30:3
31:6,18,20 33:9 35:19
35:23 36:15 37:1
49:3,8,8,9,13 51:12
54:11,19 55:3,10,19
61:9,9 70:16 78:11
79:3 81:5 84:2 90:24
91:3
officers 11:15,21,21
13:12 21:16,19 23:2
36:13 38:14,20 57:4
66:6,17,19,21 93:18
offices 2:3 3:3 101:16
official 35:5 62:14
Oh 16:12 37:17 38:5
71:6 72:5 78:19
oil 8:18,21,24,25 9:17
omitted 41:18 42:15
once 26:1 35:20 75:17
77:8 80:5
oncoming 51:16
one 10:7 11:8 18:24
20:6,15 21:19 23:2,2
23:6,6 31:3 32:15
36:9 39:12 47:17
49:3,4 50:24 53:12
54:17 55:15 60:12,16
60:24 65:12,13,25
66:1 78:15,17 81:6,8
82:1 90:3
only 12:4 18:25 54:17
60:12,16 65:1 66:15
69:1 97:21 98:20
open 57:5 86:12
opened 76:21 86:17
operated 86:11
operating 84:11
operator's 8:24
opinion 57:23 74:23
93:7
options 33:10 91:9,12
ORAL/VIDEOTAPED
1:12
order 24:18 27:7,8,9,10
organization 39:10
organizations 36:9
39:3
original 3:12

other 9:24 14:20 15:15
16:22 21:4 30:1
32:17 33:10 36:9
37:7 41:15 42:10,14
45:19,21,22 47:2,22
48:25 57:7 60:21
69:9,10,16,25 72:3,3
72:25 74:21 75:7
79:20 81:7 87:16
88:24 89:5 90:3,4
91:9,11 92:1,18,21,22
95:11,25
otherwise 62:17 100:15
out 8:10,23,25 18:14
25:14 51:17 52:17,21
53:1,3,9,11,12,13,13
54:5 55:8,25 79:10
80:3,7 81:12 82:2
86:18 88:23 93:15
98:1
over 12:13,20 15:5 18:3
20:10 33:4 34:9,13
36:16,24 37:1 38:2
42:18,21 43:14,15,17
43:20,21 44:8,21,22
46:9,14 47:2,5,9 49:4
50:10,15,18,21 51:3,7
52:25 53:20 56:9
57:19 58:15 59:3,19
73:8 75:1 77:9 85:7
87:10 92:1 96:8,10
overall 82:22
overheads 42:1 43:15
overrides 64:5
overtime 26:19,21,25
27:5
own 31:14 41:3 55:10
64:9 65:9 66:19
o'clock 3:2,3 101:16
O-L-C-H 5:14

P

P 2:1,1 3:10
PAGE 4:10 100:5
paid 25:25
palms 94:23
paperwork 87:16
parallel 41:22
paraphrasing 62:12
parents 54:9
park 22:23,23
part 63:5
particular 11:22
parties 3:12 102:3,6
part-time 16:3
pass 98:23
passenger 41:21 43:7,8
44:9 46:17 47:9
48:25 51:21 56:19
80:13,23,25 84:9,15
84:17
passengers 42:21 43:1
passing 34:13 74:21
patrol 15:17 18:10,22
19:22,23 20:1,3 22:6

22:16,18 23:3,5 25:13
28:15 33:20,23 34:1
34:22 35:23 36:1,3,12
36:15,16,22,23 37:4,5
37:9,12 38:7 39:8,13
39:17 48:3,12,15 50:5
51:12,20,23 52:3
61:23 62:2,5,25 66:6
66:21 81:5 82:19
85:5 93:17 94:11,11
96:11
pay 21:24 25:15,18
26:21 27:5
paying 26:25
pays 33:11
PD 23:5,14
peace 11:13,15,21
17:14 31:18,20 49:8
61:9 66:17,18,21
70:11,13,16 71:2 74:7
82:6
Penal 15:12 16:13,14
17:2 20:3 66:16,23
70:24 74:4
pennies 26:16
people 12:8 25:22 27:2
27:20 39:14 50:11,14
57:2,16 58:4,5,17
60:4,21 66:15 68:3,24
69:14 70:16 71:22
72:4,5,23 73:14 88:24
89:5 95:8
percent 67:24 80:10
84:21
perfect 45:9
performance 62:14
97:6,18
performing 97:23
period 9:19
permit 31:16 61:20
permits 62:24
person 62:12,13 69:1
79:20 81:9 101:18
personal 87:7 88:19
personality 35:10
personally 39:23 46:23
68:1 100:2
personnel 41:8
phone 15:24
photograph 77:25
phrase 95:1
piece 49:18
place 50:10 67:18
68:24 70:8 73:21
75:21
placed 92:5 95:18
placing 75:13
plain 48:18
PLAINTIFF 1:4 101:4
PLAINTIFF(S) 2:2
plate 41:20 42:1,3
46:15,24 47:11 56:21
57:1,3,19 58:8,9,11
58:13,21 59:4
pleading 94:23
point 14:10 15:25 21:2

23:2 36:18 44:17
51:2 52:2 67:16 76:7
87:24 88:1,4 93:20
pointing 94:25
police 11:3,10 13:15,18
14:2,15,20,20 15:6,10
16:7 18:13 20:23,25
21:1,4,11,23 22:2,13
73:7 82:12
policy 37:5 62:20,21
63:6,7 65:2 89:15
98:20,21,21
polite 58:21
political 90:16
populated 37:22
population 37:20,24
position 9:8,9,24 10:25
21:18,18,22 23:16
24:13 25:3,5,9,23
30:19 40:21 54:19
positive 95:14,16 98:12
98:16
possibility 79:4
possible 57:10,12 67:2
71:8,11,21,24 72:1,9
possibly 30:1 50:25
95:21
post 31:1
powers 17:8 18:13
precedent 18:4
premises 53:22,23
prescription 19:5,6,8
pretty 47:21 50:7 73:11
80:17
prevent 45:5
previously 7:7
principal 14:8
printed 87:5
prints 96:1
Prior 35:22
prison 24:23
private 10:17,19
probable 27:21 34:4
42:18,20 46:13
probably 24:10 33:11
56:24 59:6 72:6 80:5
80:7
probation 26:2,4,10
probationary 26:6,7
problem 24:19 94:20
problems 23:19 29:18
31:7 37:10 85:6
87:19
procedure 3:7 15:13
17:8 20:3 51:20
86:14
procedures 15:17
16:13 66:18
produces 45:16
profanity 59:12 60:7,9
60:12,15,17 67:18
73:18,19 74:5,7 76:15
90:5
professionalism 47:24
program 28:8 54:17
promise 82:4

proof 44:13
prosecution 56:7 80:17
protected 73:19,22
74:2
protest 17:2
provide 24:17 29:9
44:14
provided 86:19
provision 74:10
proximity 74:16,17
public 3:16 59:14 67:18
68:24 70:7 73:21
100:23
pull 34:8,13 37:1 42:18
43:14 46:9,13 47:2
50:15 57:19 58:15
59:19 96:9
pulled 36:15,24 43:15
43:20,21 44:8,21 47:5
47:9 49:4 50:18,21
51:3,7 52:25 59:3
86:11
pulling 42:21 43:17
44:22 50:10 53:20
75:1
purpose 3:14 29:3
pursuant 3:6 101:21
put 16:25 26:10 42:2,8
43:15 80:8,11 93:14
p.m 3:2,3 72:19,19
101:16

Q

qualified 101:13
question 18:5,25 21:3
41:20 69:7,15,15,18
69:21,24 70:3 73:11
73:12 78:9,22 93:6
94:4
questions 6:6 56:6,11
61:4 67:10 69:20,24
80:14,16 89:1 98:24
quickly 89:19
quite 50:25 71:8 73:14
quote 67:22

R

R 2:1,2,3
racial 68:1
ran 40:25 41:25
range 25:16 37:14
rates 74:22
rather 38:8 92:19
Raul 14:12,12,13
reached 88:20
reaching 48:6
read 39:23 100:3 102:1
Ready 5:5
real 10:11 17:20 87:1
Realistically 57:13
realize 5:17
really 24:18 55:21
58:20 64:5 85:25
91:9
rear 48:2 51:18 58:9

| | | | | |
|---|---|---|---|---|
| 76:22 | resisted 89:9 92:4 | Salinas 55:8 | separate 36:8 | six 6:17 26:5 53:24 |
| reason 6:5 32:10 44:7,8 | respective 3:12 | sallyport 86:13 | September 14:17,18 | Sixteen 15:7,8 |
| 47:2 58:25 100:5 | respond 27:12 47:7 | same 22:25 50:9 51:24 | Sergeant 28:20 30:5 | slam 79:11 |
| reasonable 43:16 | response 75:10 | 102:1 | 34:19 | slightly 92:4 |
| reasons 23:17 90:17 | responsibility 44:13 | San 3:4,14 5:15 6:10,15 | series 56:6 | slipped 47:14 |
| 92:13 100:4 | responsible 64:8 66:2 | 7:17 8:14 21:11,11 | serious 93:8 | slow 74:21 |
| recall 25:17 80:20 83:8 | restate 60:14 | 22:2,12,17 23:4,14,19 | served 55:6 57:24 | small 21:15 24:19 38:4 |
| 85:13,25 96:8 | restated 47:8 | 29:17 30:12 31:2 | 68:18 91:8 | 40:10 74:20 82:25 |
| recalled 52:2 | restaurant 71:5,10,16 | 55:8 101:17 102:17 | service 8:19,22 27:13 | Smith 6:19 70:17,20 |
| receive 7:20,21 10:2 | 72:4,6 | sat 80:12,12 | 62:20 | 32:12,14 33:4,11 |
| 22:1 23:9 25:7 27:24 | restrictive 16:22 18:16 | satisfied 28:4 | services 3:3 101:17 | smuggling 39:3 |
| 28:2 | restroom 72:16 | satisfy 93:6 | 102:16 | some 16:17 21:2 33:14 |
| received 20:13 72:22 | retired 16:3 | saw 43:8,11,11 57:18 | set 102:8 | 33:15 34:4 36:18 |
| 75:5 | rev 41:23 46:7 | saying 17:25 18:10,23 | seven 26:5 53:24 | 39:10 41:8 61:4 |
| Recess 72:19 | revolves 34:24 | 19:23 36:11 50:24 | seven-step 43:25 | 74:12 78:13 80:18 |
| record 5:2 72:17,20 | revved 44:10,24 47:10 | 59:2 65:6 68:21 | several 13:13 18:3 | 82:24 87:16 92:2,9,13 |
| 91:3 99:2 101:24 | 56:17 | 70:14 71:6 75:17 | 34:22 61:16 73:13 | somebody 12:6 17:5 |
| records 12:21 | revving 44:25 45:10,19 | 92:2 97:16 | shape 45:9 88:10 | 35:2 42:16 46:1 |
| reduced 101:23 | 46:1,19,24 51:8 56:23 | says 17:24 18:21 45:4 | sheriff 24:3,6,9 25:10 | 49:10 58:10,11 70:12 |
| refreshed 34:25 | 96:10 | 51:11 62:16 64:4 | 25:24 27:6 40:2,3,6 | 71:3,4 74:7,7,20,22 |
| refused 96:24 | ride 28:23 | 69:12 75:9 77:22 | 41:10 | 87:6 95:12 96:11 |
| regard 33:19 | right 5:23 6:8 8:7 9:4 | 85:5 97:7,18 | Sheriff's 13:13,16 14:6 | somebody's 64:1 |
| regarding 16:6,7 73:5 | 14:10 17:20,24 18:17 | scenario 82:16 | 23:13 25:10 27:25 | somehow 45:12 |
| regardless 38:15 49:7 | 26:9,15 27:1 31:25 | scenery 33:5 | 29:12,22 36:1,4,12 | someone 8:4 18:7 53:3 |
| Regional 73:7 | 32:21 35:17 38:25 | school 8:11,13 11:2,11 | 41:6 44:6 51:4,8 | 53:9 58:7 70:8 71:6 |
| registration 75:12 | 39:19 40:14,19,22 | 13:11 14:9,19 27:11 | 55:11 | 73:25 74:4,25 75:1,2 |
| 80:19 | 42:4 43:5,14,22 46:21 | 29:15,16,20 30:9 33:2 | shift 22:23 | 75:3 81:24 96:10 |
| regulation 63:13 | 47:18 48:8 49:20,23 | 53:17,19,21 54:3,4,5 | shit 67:20 68:6,11,21 | 97:16 |
| regulations 63:5 65:2 | 49:25 51:17,21 52:14 | 54:12 55:16 70:10 | 69:11,17 70:1,14,21 | something 17:20 26:8 |
| related 40:3 102:3 | 53:7,15,21 55:17,20 | 71:4 74:17 | 70:22 71:13,19 74:1 | 35:4 37:14 40:5,9 |
| relation 40:2 53:19 | 55:23 56:1,18,22 | schools 11:9 | 75:10,18 90:4 92:2 | 45:7 49:12,13 64:21 |
| relations 36:5 | 58:12 59:1,16 61:1,5 | scoot 77:9 | 95:15,20 97:16 | 65:8 78:1,1,3 80:9,19 |
| relationship 35:25 36:5 | 62:18 63:8,16,20 | scope 12:14 | shoot 25:22 56:3 59:19 | 83:7 84:5 95:13 |
| 36:10 38:12,16 40:2,4 | 65:10 66:5 67:8 68:5 | scrapes 79:5 | 93:21,24 | sometime 9:1 |
| relative 40:7 102:5 | 68:12 69:20,21,24 | Seal 102:9 | short 9:19 72:12 | sometimes 26:19 36:5 |
| relatively 36:4 | 70:10,21 73:18 76:25 | search 15:13 29:6 58:3 | shorter 85:8,16 | 45:24 57:22 90:13 |
| relax 94:16 | 78:21 79:21,24 80:1,2 | seat 42:22 43:7,9 46:17 | Shorthand 2:15 3:5 | someway 35:3 |
| release 84:19 | 81:19 84:2,23 85:21 | 46:17 47:10 48:2 | 101:12 | somewhat 47:4 50:2 |
| released 84:14 89:16 | 86:16,20,23 89:7 | 51:5 56:20 79:18,19 | shoulder 53:13 | sorry 15:24 22:2 24:3 |
| 89:18 93:16 | 88:21 89:3,17 94:4,15 | 79:21,25 80:13 85:7,8 | show 52:8,10 | 29:21 63:4 65:17,18 |
| reluctantly 75:24 | 97:4,17,20 | seat's 85:6 | shown 39:6 | 72:14 75:1 78:19 |
| remark 68:1 | rights 64:2 72:23,25 | second 6:10 | sic 28:23 | sort 34:4 98:1 |
| remember 6:20 12:19 | ringing 15:24 | secondhand 89:13 | Sid 6:9,9,23 7:21 | sound 46:8 |
| 14:7,11,13 42:5 45:3 | risk 25:18 | secured 80:6,7 | side 43:20 51:22 53:12 | sounds 18:6 |
| 67:3 83:11 | road 7:15,23 22:20 | security 9:10,11,17,24 | 53:13 60:1 76:20,21 | South 38:15 |
| remembered 35:20 | 43:20 53:14 | 9:25 10:3,11,17,22 | 76:22 79:15 | SOUTHERN 1:1 101:1 |
| 42:6 | rolled 43:24 | 11:3,6,8 30:17,20,23 | sidewalk 53:15 | sparsely 37:22 |
| removed 26:2 | Ronald 6:24 7:4,6 8:8 | 30:25 31:6 32:13,15 | sign 82:4 87:16 | speak 31:1 |
| Rene 88:17 90:7 | 32:15 | 33:4,9 87:12 | signature 3:15 4:7 | speaking 65:19 94:10 |
| repeat 88:3 | roof 77:8 | security-related 10:7 | similar 11:25 74:13 | specific 69:7 |
| report 35:5 41:18 42:3 | room 88:6 | see 22:23,23 31:10 34:3 | 95:11 | Specifically 15:23 16:9 |
| 42:6 59:12 87:17 | routine 52:1 53:4 | 43:1,14 50:14 52:5,12 | similar-type 11:25 | Specifics 15:25 |
| 95:17 | Ruiz 88:17 90:7 | 56:7,11 60:6,7 61:4 | since 31:23,23 32:2,17 | speculate 50:22 51:1 |
| reporter 2:15 3:5 65:17 | Rules 3:7 | 61:13 62:1,4 66:9 | 60:21 71:3 | 78:12,16 91:20 |
| 65:19,21,24 101:12 | rumors 39:5 | 88:10 97:9 | single 37:24 38:15 | speculation 78:20 |
| 102:14,15 | run 76:9 82:2 | seeing 56:13 | sir 5:19,22 6:3 8:16 | speech 73:3,6,19,22 |
| Reporter's 4:8 | RYAN 2:11 | seem 35:11 | 9:23 10:1 11:5 15:9 | speed 41:17 45:24 46:2 |
| representative 54:17 | | seemed 35:12 93:20 | 21:13 24:4,12 26:20 | 74:22 |
| reprimanded 97:11 | **S** | 95:10 | 28:1 72:24 | speeding 57:6 |
| required 28:4 | S 2:1 3:10,10 | seen 52:3 58:12 62:19 | sit 79:15 86:1 | spell 5:12 |
| reserve 13:12,16,18 | safe 41:24 48:25 76:21 | 62:23 65:1,2 95:12 | sitting 5:23 48:18 61:3 | spoken 35:21 |
| residence 7:2 | 91:15 93:4 | 98:18 | 71:5,17 79:18 82:18 | staff 24:9 25:21 |
| residential 59:25 | safety 11:11 19:4 36:23 | seizure 15:13 29:7 | situation 19:18 48:25 | stance 94:14 |
| resigned 13:19 21:5 | 41:22 44:9 | selection 94:7 | 50:1 59:18 94:22 | stand 51:19 56:9 57:7 |
| 32:2 | salaries 38:7 | seminars 11:22 | situations 11:24 | standard 15:16 45:20 |
| resist 76:4 | | sent 3:13 | | 46:22,25 84:22,25 |

86:14
standing 53:10 55:24
71:3
standoffish 94:12
start 15:5 40:14 87:15
88:2,7
started 8:23 13:9 20:24
21:1 26:1 28:21
41:25 76:1 85:4 87:4
87:7
starting 14:19
state 3:6 16:21 17:25
18:11,15,22,23,23
19:7 20:2,8,9 24:23
37:5 54:20 63:14,17
64:5 65:16 66:3,21,25
68:17 93:18 98:22
100:18,23 101:10,14
102:14
stated 47:8 74:5 75:8
95:8,19
states 1:1 17:1,6,12,24
18:15 19:22,25 20:19
41:14 61:9 64:4
66:18 74:24 100:3,3
100:14 101:1
station 22:19 40:24
86:7
status 26:2,6,7
statute 18:18 45:4,23
46:19
step 51:18 53:1,3,9,11
53:11
stepped 80:7
still 13:17 30:7 31:18
31:20 34:19 79:16,18
80:1 97:9 98:8,18
STIPULATED 3:11
stipulates 41:15
stipulations 3:8 4:2
stood 51:21
stop 34:5,12,13,24
35:14,15 41:12,13
47:22 48:23 49:10
50:8 51:25 52:2,7,15
53:4 55:3 56:3 60:18
60:19 61:2 74:21
79:17 83:1
stopped 35:18 74:20
stops 27:18 50:12 53:8
61:16 95:9
store 34:20
strained 36:6
strategy 11:23
street 2:4 6:15 7:1,2,22
25:14 41:16
streets 29:4
strict 17:3,3
stricter 16:21
struck 34:23
stuck 13:1,7
students 11:11 12:10
54:7
study 15:12
stuff 29:7 36:9 73:1
subjects 28:13

submitted 42:6
submitting 89:9
subscribed 100:21
102:1
Suite 2:4,8 3:4 101:17
102:17
Suites 31:4
superior 38:7
supervision 101:24
supervisory 41:8
supposing 59:2
supremacy 20:19 98:13
supreme 20:20 64:5
sure 33:18 36:17 37:17
37:19,21 38:5 40:5,11
40:11 42:12,14 46:10
46:10 48:24 50:16
55:15 67:25 80:6,7,10
80:16,17 86:25 94:16
97:7,8,25 98:2,4,7,8
suspected 27:20,21
suspects 25:2
suspicious 34:3
switch 23:14 25:12
sworn 5:4 100:3,21
101:19
S-I-D 6:9

**T**
T 3:10,10 100:1
table 71:6,18,25
take 6:4,5 14:23 15:1
24:2,5,16 26:3 28:6
35:5 46:7 57:4,7
68:13 70:17 72:11
80:3 81:12,20,24
taken 3:1 59:4 81:22,23
96:1 102:4
taking 86:10 87:18
talk 40:24 82:25
talking 59:24 71:14
74:15 96:4 98:12
tall 85:14
taught 15:18,21 16:10
16:17,20 17:4,23 18:2
64:14
taxpayer 96:16,19,20
TCLEOSE 15:15
TCLEOSE-approved
28:4
technical 58:1,4,6
techniques 11:24
telephone 2:5,9 8:8
102:18
tell 13:1,4 25:21 41:7
41:12 42:13 48:3
49:4,13 57:15 59:16
83:3 87:2 97:13,15
tells 50:4,5 51:10
ten 81:23,23,24
tend 50:11 74:6
tense 94:12
Tenth 18:13
term 46:2 49:7 95:7
termination 23:21

test 8:25
testified 5:4
testify 101:19
testimony 43:8 101:25
texas 1:1,6 2:4,9 3:4,6
3:14 5:15 6:10,15,20
7:17 8:18 10:17
12:13 14:9 15:12,15
17:2,3,5,6,9,13,19
21:11 22:19 24:23
28:8 29:17 38:15
61:8 66:23 70:24
92:17 98:13,22
100:18,23 101:1,6,10
101:14,18 102:14,17
Thank 6:7 7:13 8:10
72:14
theater 73:17 74:13
their 16:5 24:17 38:7
46:1 51:4 58:8,9
72:25 96:10
theory 50:20,24
thereon 3:15
thereto 102:1
they'd 8:5 22:23
thing 41:19 52:1 53:6
59:7 81:10 91:15,21
98:20
things 15:10 22:15
33:25 65:13,25 66:1
81:7 87:4 88:19,24
89:1,4 96:4,9
think 13:21,22,24
14:12 24:7 26:5
34:18 36:18 37:3,6,19
37:19 40:17 45:10
59:15,16,20 62:16
66:9 67:23 68:1,6
72:2,8 80:6,12 85:2
94:19 96:15,20,20
thinking 13:22 39:18
Thomas 8:14
though 37:20 84:10
thought 69:18 78:19
91:2
threat 49:12,15 94:13
threaten 86:3
threatened 56:2 76:13
threatening 94:14
three 82:3
through 6:2 27:24 28:3
43:1,2,3,3,11,25 44:2
44:3,4 67:25 96:3
throughout 16:4 50:8
throwing 92:12
ticket 81:17,21,25 82:4
82:18 91:13,17 92:20
93:4,22,25
ticketed 80:25
ties 39:2
tightly 94:24
time 5:2 7:19 9:6,19
10:20 14:25 19:4
21:6,9,17 22:10 26:22
26:22,24 34:23 35:6
35:15 40:13 42:12

43:16 47:21 54:1,3,5
54:20 55:22 56:6,16
60:20 62:2,5 64:25
67:17,24 69:9,25
72:18,21 76:5 79:1
80:11 81:11,12 85:3
87:24 88:4,5 89:2
90:3,12 91:8,14 93:5
93:18 96:12,18 98:25
99:3
times 34:6
tinted 42:24 43:4
title 45:25
today 42:11 50:24
together 22:25
told 17:11 18:6 20:15
20:21 35:4,5,20 42:10
44:21,24 48:4,14
49:15 57:16 64:6
65:14 67:16 75:13,21
76:4 77:3,9 83:7,10
84:18 86:12,24 87:11
88:18 89:11,14 90:3
92:4 94:16 95:21
97:17
tone 47:20 50:6 83:12
83:14 94:7
torture 6:6
totality 65:10
touching 101:20
tow 81:14,16,18 84:20
towards 13:19,19 14:25
70:15
town 40:10 61:17 74:20
to-wit 101:18
traffic 27:11,18 34:12
34:12 35:14,15 45:3
47:22 48:23 49:10
50:8,11 51:17,17,25
52:2 53:4,8,10 60:18
60:19 61:2 74:21
79:17 93:8 95:9,9
traffickers 39:16
trafficking 39:10
trained 18:20 20:7,18
28:20 34:19 63:19,21
64:17,21,24 65:7,14
65:14 66:3,8,9,11,24
67:1,3 94:21
training 10:2,4,5,9
11:18,20,21 12:5,7,11
12:12 15:4,16 16:4,6
17:21 20:12 22:1
23:9 25:7 27:24 28:2
28:10,12,13,18,19,21
29:3,9 33:19 63:13,25
64:6,13,14,16 65:11
65:12 66:1,20 72:23
73:3,5,24 75:5
transcript 100:3,4,14
transcription 101:23
transmission 84:22
transport 24:14,21
91:24
transported 24:23
transporting 25:1

85:24
travelling 61:14
trespassed 35:3
trial 50:23
tried 76:9,11
trouble 32:7
true 19:17,21 91:1
100:15 101:24
truly 58:20
trump 17:12 18:11
20:10 63:14 66:25
trumped 65:16
trumps 66:4
trunk 58:1 80:8
trust 51:23
truth 57:15 101:19,20
try 13:5 79:10
trying 12:23 68:6 94:22
turn 75:21 76:2
turned 41:24 87:10
twenties 85:11
twice 70:3 83:8
two 17:13 20:6 31:10
31:11,22 36:8 41:16
54:23,23 82:2 96:8
two-fold 81:6
type 10:12 57:4

**U**
U 3:10
Uh-huh 84:1 85:22
UISD 13:17,20,23
unarmed 10:22
unconstitutional 18:1,2
75:1
uncooperative 87:23
88:10
under 16:7 37:25 56:7
63:6 66:8,16,21 74:3
75:13 86:24 92:5
95:18 101:24
undersigned 100:2
understand 39:11
54:16
understanding 18:4,11
undocumented 34:8
unfortunately 38:5,21
41:18
unhappiness 50:8
unhappy 50:11
unit 85:5
united 1:1 9:10 11:2
13:9,10 17:1,6,6,12
17:24 19:21,25 20:19
21:4 64:4 74:24
101:1
University 29:17 32:25
unlawful 56:7 66:14,22
75:14 95:18
unofficially 33:8
unsafe 91:16
until 13:21 14:17,18
24:9 39:6 40:14
54:12 55:5 88:5
89:18

unusual 36:25 37:3,4,6 45:6
upset 50:18,20,25 83:20,23 84:3,6 91:14 95:7,9
use 15:13 28:10 29:7 60:8 70:15,24 72:16 74:5 76:15 94:19,22 96:16
used 47:19,21 59:12 60:7,11,15 66:19 67:18 74:7 90:3,5
using 18:25 38:7 46:11 50:6 70:12,23 71:9 74:1 75:2
usually 50:13 53:3 94:16
UTSA 30:10,14

**V**

V 100:1
valid 17:10 75:13
Vegas 32:23 33:1,14
vehicle 34:2,5,7,8 36:16 36:23 37:2 41:23 43:24 45:4 48:5,24 49:2,11 51:16,18,19 51:20,20,24 52:17 53:2,4,9,11,12,13 58:13 75:12 76:23,24 77:2 79:16,18 80:8,14 80:18 81:9,14,16,18 82:19 84:22 88:5 93:17 94:12,12
verbal 11:24 81:3,3
verbally 52:22
versa 34:12
very 10:4 21:15 24:20 34:20 44:19 54:21 69:7 73:12 83:15 96:20 98:12
vested 17:8
via 49:10
vice 34:12
victims 28:7,8
videographer 2:12 5:1 5:6 72:17,20 99:2
videos 10:6,8
view 45:20 48:19 49:15 74:24
violated 17:19 64:1 92:17
violater 44:1 80:1
violates 45:14,20
violating 37:5 46:25
violation 17:2 19:8 45:2 46:11,20 56:19 56:20 58:2 63:24 68:17 74:8 91:6 92:24 93:7,10
violations 58:4,6
visibly 52:25
visits 24:24
visual 43:6
voice 47:20 50:6 83:12

83:14
volunteer 32:15
VS 1:5 101:5

**W**

Wait 78:9
waited 24:9
walk 76:20
walked 84:17 85:4 87:13,14
walking 85:4
want 12:25 18:18 19:16 19:17 21:3 33:16 42:7 48:6 49:7 50:23 69:23 81:13 82:9 89:11,23 92:13 93:13
wanted 12:20 25:13,13 29:15 35:5 47:5
wanting 95:25
warning 81:3,4,13
Washington 17:1
wasn't 25:20 55:21 67:6 69:15 78:17 82:14 83:4 84:6 89:12,23 92:24 93:12 93:15
waste 81:10
watched 10:8
watching 10:6
way 18:25 39:13 46:10 47:17 49:6 55:15 60:25 86:4 87:23 88:10
ways 22:19
weapon 32:3,7 48:1,4,5 48:11,14 49:5,11,16 50:5 51:16,24 56:8 59:8 66:23 75:14 85:3 86:18,22 93:17 95:19
weaponless 11:23
Weapons 31:16
weapons-free 93:11,15
wearing 36:23 41:22 42:21 43:7,9 44:9 47:9 56:20
Webb 13:12,16 14:6
week 15:5,6,8 26:17 28:22,23
weekend 32:15
weighing 33:10
well 7:3,9 8:23 11:11 13:5,10 16:12,20 18:6 19:4,13 21:5,17 29:11 30:20 31:1 32:1,14 35:14 38:10 40:3,11 42:6,12 44:2:18 45:23 46:9 50:16,25 51:1,25 52:15,22 56:9 57:5,16 59:25 60:6 61:2 67:2 67:13 68:7,9 70:10,15 71:16 72:3 73:13 74:12 81:2,6,16,22,24 82:24 83:4,22 84:10 88:16 89:25 90:12

91:20 92:8,9,11,21,24 94:8,10,16,21 95:6 96:2,4 97:1,23 98:17
wells 8:25
went 8:18 17:16 18:3 43:25 73:8 85:7
were 8:21 9:5 10:11 11:6,13,13 15:8,21 16:2,10,12,17,20 17:4 18:20 19:3 20:6,18,20 21:3,4,17 22:1,12 23:10,23 24:15,16 26:3 27:5,7 29:11,19 29:24 30:1,14,23 31:18,24 33:20 34:2,7 34:11,12,13 36:2,12 38:7 39:9,15 41:6,15 41:15 42:24 53:21,24 54:7 56:10,10 57:3 59:24 60:5,12 63:19 64:17,21,24 65:7,14 66:3,6,24 67:1,5,7 69:16,25 78:19,24 83:18,19,19 84:2 85:24 87:18 90:13,19 91:8,19 92:1 93:21,24 94:24 95:5,11,11 97:11
weren't 10:14 38:24 40:20
we'll 60:16
we're 5:1,6,15,17 6:2 12:23 18:19,19 43:4 67:13 72:17,20 74:15 94:10,10 99:2
we've 88:20
what'd 8:17 29:2 30:25 31:5 36:21 73:10 83:3 85:10 89:7
WHEREOF 102:8
where'd 6:13 29:16
while 13:10,17,17 17:8 20:5 21:4 22:1,12 23:9,23 29:19 30:14 36:1,3,16 37:1 41:25 62:14 70:2 80:14 81:22 85:23,24 97:6 97:21
whole 48:24 59:25 60:3 60:3 74:19
Why'd 23:14,14 25:12 29:14 81:4
WILLETTE 2:7
win 18:23
window 43:25
windows 42:24 43:2,3 74:22
windshield 43:3,4,12
wish 50:22
wishes 100:4
withheld 39:8,17
withhold 36:7 39:13
witness 2:13 3:13,15 14:1 28:24 65:23,25 98:23 101:25 102:1,8
woman 84:9

women 37:25 38:8,15
Woodfield 31:4
word 6:10 68:21 69:11 69:17 70:1 71:9 74:1 75:2 83:3,3 90:4 97:16
worded 71:2
wording 70:23
words 6:9 16:22 70:12 73:21 74:6 94:7 95:14
work 11:9 21:20 22:5,8 31:9 33:23
worked 8:19 9:10 22:25 23:7 26:23 33:3
workers 34:8
working 9:9,16,17 11:1 11:15 15:18,21 21:3 33:20 36:2,3 45:5
works 30:7 45:5
work-related 78:14
worried 39:9,15 70:18 70:19 71:1,3 83:12 91:19 92:1 93:21,24
worry 49:22
worthy 7:9,11
wouldn't 37:3 38:4 40:10 44:19 51:1 81:17 82:24 83:20 84:6 90:11 91:20 93:8
write 81:12 82:2 87:17 91:17
writing 42:8 45:25 88:2 88:7
written 23:25 42:2 81:13 91:12
wrong 26:8 33:15 45:7 45:18 72:2 84:3 97:13
wrote 82:18

**Y**

yeah 5:6 12:18,19 37:13 62:22 70:21 72:5,13 73:12 83:13 88:7 96:7,13
year 8:10 9:13 12:16
years 31:10,11 96:8
Year's 24:8
year-and-a-half 12:17
yell 73:16
yelling 74:13
y'all 67:20 68:9 70:14 75:9,18 92:2 95:15,19

**Z**

zone 93:11,15

**$**

$6.33 21:25
$7.00 25:16,16
$8.80 26:1

**1**

1.5 26:23
100 4:7
101 4:8
12/31/02 102:16
1200 6:19
15 41:7
16 41:7
18 38:2,2
1993 8:12
1994 41:19
1997 14:17,18
1998 13:21 14:4,17 23:16
1999 29:13,13 30:9

**2**

2 4:2 6:9
2.12 66:18
2001 1:13 3:2 5:2 100:21 101:15 102:10
210 102:18
220 3:4 101:17 102:17
227 6:14 7:21
23rd 14:18
29 1:13
29th 3:1 5:2 101:15

**3**

3 4:2
3:02 3:2,5 101:16
30-mile-per-hour 41:17
31st 23:16
3300 3:4 101:17 102:17
35 37:25 38:2
3505 2:8
38 74:3

**4**

4:00 54:2
4:12 72:18,19
4:18 72:19,21
4:46 3:3 99:3
40 26:18 37:14
427 3:14 7:15
46.15 66:16
460 2:8
4803 6:9 7:21

**5**

5 4:6
50 37:14
504-3674 2:5
541-1846 2:9
541-1893 2:10
541-4981 2:5

**6**

6th 40:17
6,000 37:20
6.50 25:16
6016 102:15
646-6424 102:

JOHN GILBERT VS. JIM HOGG COUNTY                ISAAC BOLCH                                    08/29/01

| 7 | | | | |
|---|---|---|---|---|
| **7th** 2:4 41:14 | | | | |
| **7.50** 25:16 | | | | |
| **765** 2:4 | | | | |
| **78217** 101:18 102:17 | | | | |
| **78228** 3:14 | | | | |
| **78520** 2:4 | | | | |
| **78521** 2:9 | | | | |

| 9 | | | | |
|---|---|---|---|---|
| **9.42** 26:2,13 | | | | |
| **93** 8:19 | | | | |
| **956** 2:5,5,9,10 | | | | |
| **96** 8:20 9:3,14 | | | | |
| **97** 9:14 13:22,24 | | | | |
| **98** 14:18 40:18 | | | | |
| **99** 40:14 | | | | |

# EXHIBIT C

# DEPOSITION OF GILBERTO YBANEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

JOHN GILBERT,              ) (

       Plaintiff        ) (

                        ) (

VS.                   ) (   CIVIL ACTION NO. B-01-54

                        ) (

JIM HOGG COUNTY, TEXAS,  ) (

ET AL.,                ) (

       Defendants      ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF

GILBERTO S. YBANEZ

OCTOBER 21, 2002

---

     ORAL AND VIDEOTAPED DEPOSITION OF GILBERTO S. YBANEZ, produced as a witness at the instance of the PLAINTIFF, taken in the above styled and numbered cause on OCTOBER 21, 2002, reported by CORINNA N. GARCIA, Certified Court Reporter No. 5210, in and for the State of Texas, at the offices of Michael R. Cowen, P.C., 765 East 7th Street, Suite A, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure.

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFF:
MICHAEL R. COWEN
-and-
MICHAEL BLANCHARD
MICHAEL R. COWEN, P.C.
765 East 7th Street, Suite A
Brownsville, Texas 78520
(956) 541-4981

COUNSEL FOR DEFENDANTS:
AMY GONZALES
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
(956) 541-1846

ALSO PRESENT:

Gilbert Lopez, Videographer

---

**Page 3**

INDEX

PAGE

Appearances ..................................... 2
GILBERT S. YBANEZ
Examination by Mr. Cowen ........................ 4
Examination by Ms. Gonzales ..................... 48
Examination by Mr. Cowen ........................ 48
Errata Sheet/Signature Page ..................... 50
Reporter's Certificate .......................... 51
Attached to the end of the transcript: Stipulations

EXHIBITS

PAGE

NUMBER  DESCRIPTION                    MARKED

(No Exhibits Marked)

---

**Page 4**

1        GILBERTO S. YBANEZ,
2   having been duly sworn, testified as follows:
3        EXAMINATION
4   BY MR. COWEN:
5        Q.  What's your name?
6        A.  Gilberto Ybanez.
7        Q.  Where do you reside?
8        A.  Hebbronville, Texas.
9        Q.  How long have you resided there?
10       A.  All my life, 65 years.
11       Q.  Are you currently employed?
12       A.  Yes, sir.
13       Q.  How are you currently employed?
14       A.  Employed with Duval County Sheriff's
15   Department.
16       Q.  In what position?
17       A.  Deputy sheriff.
18       Q.  When did you go to work for Duval County
19   Sheriff's Department?
20       A.  The first of this month, October the 1st.
21       Q.  2002?
22       A.  Yes, sir.
23       Q.  Prior to that, what was your last employment?
24       A.  I was with Jim Wells County Sheriff's
25   Department as a deputy.

---

**Page 5**

1        Q.  How long were you deputy at Jim Wells?
2        A.  Almost a year and a half, since last April of
3   2001. First of April 2001 until the 26th of September
4   of this year.
5        Q.  Why did you go from Jim Wells to Duval?
6        A.  I'll be closer to home.
7        Q.  And prior to that, what was your employment?
8        A.  I was a sheriff for Jim Hogg County,
9   Hebbronville, Texas.
10       Q.  How long were you sheriff of Jim Hogg County?
11       A.  20 years.
12       Q.  20 years?
13       A.  Yes, sir.
14       Q.  From what year to what year?
15       A.  981 -- 1981 to 2000.
16       Q.  Did you have any law enforcement experience
17   before you became Jim Hogg County sheriff?
18       A.  Yes, sir.
19       Q.  What was your previous job before you were Jim
20   Hogg County sheriff?
21       A.  Deputy sheriff in 1971.
22       Q.  Okay. Through '81?
23       A.  Well, until '75, and I quit for another job,
24   came back in '77 as a chief deputy.
25       Q.  Okay. '77 to what?

**Page 6**

1     A. '79.
2     Q. And '79 to '81 what were you doing?
3     A. I was working with a mud company/oil company in
4 Hebbronville, IMC Drilling Company.
5     Q. Okay. And from '75 to '77 what were you doing?
6     A. I was working with Alamo Express in Laredo.
7     Q. And what's that?
8     A. Alamo Express is freight line.
9     Q. Okay. Prior to being a sheriff's deputy -- was
10 that in Jim Hogg County -- '71 to '75 and '77 to '79,
11 was that Jim Hogg County where you were a deputy?
12     A. I was a deputy, yes, sir.
13     Q. In Jim Hogg County?
14     A. Yes, sir.
15     Q. And '77 to '79 you were a chief deputy in Jim
16 Hogg County?
17     A. Yes, sir.
18     Q. Prior to '71 did you have any law enforcement
19 experience?
20     A. '71? Not to my knowledge.
21     Q. Okay. During all this time have you had any
22 law enforcement training?
23     A. Besides the -- from '71 to --
24     Q. To now. Have you had any training in that
25 period at all?

**Page 7**

1     A. Oh, yes.
2     Q. What kind of training have you had?
3     A. Everything that we need, you know, in law
4 enforcement.
5     Q. What is everything you need? I want you to
6 list it out for me.
7     A. Well, I'd need to have the book here. I don't
8 have it, you know, but I can -- well, the first is to
9 serve and protect, you know, and law enforcement civil
10 cases and how to arrest people, how to talk to people,
11 and other things, you know, that I need to see in a
12 book, you know.
13     Q. What book are you talking about?
14     A. The law enforcement book.
15     Q. Do you have a book that you have of what you
16 should and shouldn't do?
17     A. Well, yes, there is rules and regulations, sir.
18     Q. Where? Who keeps those?
19     A. The sheriff himself.
20     Q. So Jim Hogg County has a set of rules and
21 regulations?
22     A. Yes, sir, should have.
23     Q. And those are kept by the sheriff?
24     A. Yes, sir. Well, every -- excuse me. Every
25 deputy or officer or employee has a copy of it when he

**Page 8**

1 gets employed. Should have a copy.
2     Q. As far as your training, where have you been
3 trained?
4     A. My first training, it's been in Laredo Junior
5 College Police Academy.
6     Q. Okay. When did you graduate from the police
7 academy?
8     A. '72.
9     Q. What other training have you had?
10     A. Well, just, like I said, firearms.
11     Q. Okay. Where did you get training on firearms?
12     A. Laredo. Laredo in --
13     Q. Was that after '72?
14     A. Oh, yes, sir. That's every year.
15     Q. Every year you go back for additional training?
16     A. You have to take it, yes, sir. You have to be
17 trained. You have to be certified to be a --
18     Q. You get annual training?
19     A. Yes, sir.
20     Q. What kind of training was required for your
21 deputies when you were sheriff?
22     A. The first one is to -- well, I need to see the
23 book, sir. I might be wrong on what I've been asked,
24 you know, but I need to see the book. If I would have
25 known, I would have brought the book, you know. But

**Page 9**

1 there is so many trainings you have to go to, you know.
2     Q. They're supposed to go to annual training?
3     A. Well, yes, sir. You have to have at least 40
4 hours of training every two years to keep your
5 certification as a peace officer of Texas.
6     Q. And you required your deputies to be certified
7 peace officers?
8     A. Yes, sir.
9     Q. And so they were required to get at least 40
10 hours of training every two years?
11     A. Yes, sir, and before that, they will have to be
12 certified peace officer, before you pin a badge on them
13 or give them a job.
14     Q. Do sheriff's deputies in Jim Hogg County have
15 to work at all with Border Patrol agents ever?
16     A. Do they have to work?
17     Q. Yeah.
18     A. Upon helping them, yes.
19     Q. There is a lot of -- there is a large Border
20 Patrol presence in Jim Hogg County, isn't there?
21     A. Oh, yes.
22     Q. And you know -- or you knew when you were
23 sheriff that your deputies would end up working with
24 Border Patrol officers?
25     A. Yes, I start -- I know that ever since I was

Page 10

1   starting as a deputy myself way back in '71 because
2   that's -- the way we started, it's an -- it's not an
3   agreement, but it's just to have a communication
4   between us to help each other.
5       Q.  And there is a lot of drugs that people try to
6   run through Jim Hogg County?
7       A.  Oh, yes, sir.
8       Q.  And a lot of aliens that try to go through Jim
9   Hogg County?
10      A.  Oh, yes, sir, a lot of them.
11      Q.  There is a road that goes through there that
12  does not have a regular INS checkpoint; is that
13  correct?
14          MS. GONZALES:  Objection, relevancy.
15      A.  County road or state road?
16      Q.  I'm not -- I know that, for example, if you
17  want to take 35 from Laredo to San Antonio, every
18  single vehicle has to stop at a permanent INS
19  checkpoint.  Are you aware of that?
20      A.  That's 35, yes, sir.
21      Q.  Whereas there is a road that goes through Jim
22  Hogg County where you can go north and you can go from
23  the border to wherever you want without going through
24  any checkpoints.
25      A.  Let me put it this way, sir. I'll answer that

Page 11

1   question. On Highway 16, South 16 and North 16, there
2   is one right now, and there has been there for the past
3   ten years. And before that on 1017 there was a Border
4   Patrol checkpoint. They took it off when they put the
5   16.
6       Q.  Okay.
7       A.  Now they started again way back about two years
8   ago because I asked them because we needed it. And I
9   asked the Border Patrol agents, head man in McAllen,
10  Laredo, that we needed one on 1017. They finally got
11  it.
12      Q.  Okay. Did you ever talk to any of your
13  deputies about dealing with Border Patrol agents?
14      A.  As far as helping them, yes, sir.
15      Q.  What would you tell them?
16      A.  To help them out any way they can, in cases, in
17  whatever cases, and they even help us on cases too.
18      Q.  They would help you on cases?
19      A.  Yes, sir.
20      Q.  They'd sometimes back you up on a stop?
21      A.  Stops and arrests and whatever, yes, sir.
22      Q.  Did you ever give your deputies any training as
23  to whether a Border Patrol agent could carry a firearm?
24      A.  Well, they knew they are not peace officers.
25      Q.  How do they know that?

Page 12

1       A.  The book says they're not peace officers.
2       Q.  What book says that?
3       A.  The law book, any book of law enforcement says
4   that they are not peace officers.
5       Q.  Okay.
6       A.  They carry their weapons on duty. Off duty it
7   all depends on their boss or whoever is training them
8   how to carry them. But they're not peace officers.
9   After duty they're not supposed to be carrying one.
10      Q.  And was that the official policy of the Jim
11  Hogg County Sheriff's Department, that Border Patrol
12  agents off duty were not allowed to carry firearms?
13      A.  It's not only Jim Hogg County, but the State of
14  Texas, all of them.
15      Q.  I'm not asking you about the State of Texas.
16  I'm asking you just about Jim Hogg County. That was
17  the policy?
18      A.  Well, I don't have it written, that policy, but
19  they know.
20      Q.  That was -- that's what your deputies were
21  trained to understand?
22      A.  Well, yes, in a way.
23      Q.  Well, either that's what you train them to --
24      A.  No, I didn't train them. They know about it.
25  We didn't train them. They know because there was no

Page 13

1   school -- that's what you're trying to tell me. There
2   is no school on that as far in training that the Border
3   Patrol has to have a gun, no, sir.
4       Q.  Okay.
5       A.  But knowledge that they know that they are not
6   peace officers. That's what I'm trying to tell you,
7   sir.
8       Q.  So the custom or practice of the Jim Hogg
9   County Sheriff's Department was to consider an off duty
10  border patrol officer a nonpeace officer who could not
11  legally carry a firearm?
12          MS. GONZALES:  Objection, asked and
13  answered.
14      Q.  You still have to answer it.
15      A.  The what, sir?
16      Q.  You still have to answer the question even when
17  she objects.
18      A.  Do I have to answer the question?
19      Q.  Yes.
20      A.  Well, I'd answered they are -- would you --
21      Q.  I was not asking you about your interpretation
22  of law. I was asking you about the customs and
23  practices of the Jim Hogg County Sheriff's Department.
24  The custom and practice of the Jim Hogg Sheriff's
25  Department was to consider a Border Patrol agent off

Page 14

1   duty as a nonpeace officer who could not legally carry
2   a firearm; is that correct?
3       A. It's just like I said before, I never did tell
4   them that. They know themselves that they are not
5   peace officers. When they go to school, that's what
6   they are taught. But myself, personally myself, I
7   never told them anything about that, sir.
8       Q. But you believe that's what they were trained?
9       A. Well, whatever it is. But myself, myself, I
10  try to keep them together, communications together to
11  work together.
12      Q. Can you think of any reason for arresting an
13  off duty patrol -- an off duty border patrol officer
14  who had a service weapon in the car?
15      A. To have any reason?
16      Q. Can you think of any reason for arresting a
17  border patrol --
18      A. Any reason, probable cause to stop anybody. If
19  you're talking about somebody -- I wouldn't know who a
20  Border Patrol is.
21      Q. Right.
22      A. If I stopped him, I stopped him because there
23  is probable cause to stop him.
24      Q. I'm not asking about probable cause. I'm
25  asking you, you stop a Border Patrol agent for whatever

Page 15

1   reason and he is off duty and he has his service weapon
2   in the car. I'm just talking about common sense. Is
3   there any reason to arrest him for having that gun?
4       A. Well, it all depends on his behavior too.
5       Q. Okay. What in his behavior would give cause?
6       A. It all depends on how he responds to the deputy
7   or the officer. It could be a DPS, it could be anybody
8   in law enforcement.
9       Q. Well, what are the factors, in your opinion,
10  that would make it okay to justify arresting him for
11  having the service weapon in the car?
12      A. First of all, they ain't supposed to be
13  carrying a weapon. The second is on the behavior. The
14  behavior stands on where -- how he talks back to the
15  deputy. The deputy is trying to I.D. himself, whatever
16  it is, and starts talking, "Well, I'm a border
17  patrolman," whatever it is, and then all of a sudden
18  they get into it, see?
19      Q. And if they get into it, well, then it's okay
20  to arrest him for carrying --
21      A. No, no. No, sir.
22      Q. I mean, most of the time when a law enforcement
23  officer stops a Border Patrol guy and the Border Patrol
24  guy says, "Hey, I've got my service gun in the back
25  seat," they're usually not going to arrest him; isn't

Page 16

1   that true?
2       A. It all depends on the deputy and how the
3   behavior is too, sir.
4       Q. And did you ever give your deputies any kind of
5   instructions or training on this situation?
6       A. No, sir, not on that, sir.
7       Q. None whatsoever?
8       A. None whatsoever, not to my knowledge.
9       Q. Who is Jose Ybanez?
10      A. Jose Ybanez? Jose Ybanez was my uncle, and he
11  passed away.
12      Q. Is he the same Jose Ybanez that was arrested by
13  John Gilbert on August 6, 1998?
14      A. I don't think so.
15      Q. Do you have any relatives that were arrested by
16  John Gilbert?
17      A. I know a relative Jose Ybanez that lives up in
18  Duval County.
19      Q. Okay. Are you aware that on August 6th, 1998
20  John Gilbert arrested an Ybanez with cocaine and
21  marijuana?
22      A. I didn't know that until I got the letter from
23  this certain individual. You know, I got the letter,
24  the arrest, about this, you know, then it came to my
25  mind that he was being arrested by Border Patrol and

Page 17

1   then transferred to my office or my department, and
2   that was about it. Whether he got a bond -- I'm pretty
3   sure he got a bond, and I don't remember who got him a
4   bond. They have to write the bond. You know, that's
5   about it.
6       Q. Do you know who got the charges dismissed
7   against him?
8       A. No, sir.
9           MS. GONZALES: Objection, assumes facts
10  not in evidence.
11          MR. COWEN: That's not a proper --
12      A. I don't have any evidence on that. He was
13  charged with that. Whether he was punished for that, I
14  wouldn't know. I wish I would know. We can ask the DA
15  about it.
16      Q. He was one of your relatives, though?
17      A. We're talking about this particular person?
18  I've got a relative that lives in Freer by the name of
19  Jose or Joe, whatever his last name. I haven't seen
20  him.
21      Q. Okay. But you were aware before Mr. Gilbert
22  was arrested by Mr. Bolch that Mr. Gilbert had arrested
23  your relative Jose?
24      A. He arrested -- Mr. Bolch or deputy arrested
25  this fellow because of his wrongdoing.

Page 18

1    Q. I'm not asking you what caused what. I'm
2  asking you in time. Your relative was arrested by
3  Mr. Gilbert on August 6th, 1998. Months later, on
4  April 7th, 1999, Mr. Bolch arrested Mr. Gilbert.
5       Now, what I'm asking you is prior to April
6  7th, 1999, were you aware of the arrest of your
7  relative?
8    A. I was aware. Yes, I was aware of that, yes.
9  But when he was arrested, I didn't know he was arrested
10  until about 45 minutes later. That's when he called
11  me. I'm talking about the deputy. But if you're
12  insinuating that I put him to arrest him because of
13  that, that's wrong. If he did the wrong, he'd be
14  punished.
15    Q. Your relative or Mr. Gilbert?
16    A. No, no, no, I'm talking about my relative, if
17  you want to call him a relative.
18    Q. Well, he's either related to you or he's not.
19    A. Well, he is. I'm pretty sure he is. He's the
20  son of a first cousin, but that doesn't mean that
21  because he's a relative of mine I'm going to let him go
22  free. Hell, no. Excuse the word.
23    Q. You can use whatever words you want.
24    A. If he's wrong, he's wrong. He's got to be
25  punished.

Page 19

1    Q. Did you give your deputies any training on what
2  language constituted disorderly conduct or what
3  language was prohibited by the First Amendment?
4    A. No.
5       MS. GONZALES: Objection.
6    Q. Was protected by the First Amendment?
7       MS. GONZALES: Objection, calls for legal
8  opinion.
9    Q. Did you give any training on that issue?
10    A. I don't have to answer that.
11    Q. Yes, you do. You have to answer unless she
12  tells you not to answer. She's just makes objections
13  for later.
14    A. Okay. I'll tell you what, sir, I never did
15  give any training on that, sir.
16    Q. You never what?
17    A. Never did give any --
18    Q. Training on that issue?
19    A. -- training on that, sir.
20    Q. Okay.
21    A. But they went to training on that. Myself, I
22  never did talk to them about that, but they went to
23  training.
24    Q. What training did they go to on that?
25    A. Laredo. I'm pretty sure Laredo or Corpus,

Page 20

1  whatever they training, you know.
2    Q. And are you sure that that training included
3  what language constituted disorderly conduct and what
4  language --
5    A. Well, if you go to training, sir, that's the
6  first thing they say, not to do or whatever had to --
7  we're here to protect and serve, not to ruin anybody,
8  you know. But if he's wrong, he's wrong, and that's
9  it, you know.
10    Q. What is your opinion as a law enforcement
11  officer as to when you can arrest somebody for
12  disorderly conduct? What are the requirements?
13    A. In other words, if you talk to him nicely and
14  then he starts talking to you in another manner, that's
15  something, "Hey, come on, slow down." It happened too
16  many times, but I took them home instead of to jail.
17  But that's something else here. It was not me. It was
18  my deputy. So whatever happened there, it happened.
19  And if he's wrong, he's wrong. He's taken.
20    Q. My question to you, though -- no offense, sir,
21  but your answer and my question had very little to do
22  with each other. My question to you is what is your
23  understanding under Texas law as to what is required to
24  arrest somebody for disorderly conduct?
25       MS. GONZALES: Objection, calls for a

Page 21

1  legal opinion.
2       THE WITNESS: Do I have to answer that?
3       MS. GONZALES: Yes.
4    A. In other words, if the individual is -- excuse
5  me -- is in that behavior where the officer has enough
6  reason to arrest him, why not?
7    Q. Okay. What behavior is required to constitute
8  disorderly conduct?
9    A. In other words, he starts -- I don't think he
10  said bad words. We're talking about this individual,
11  we're talking about --
12    Q. I'm talking about in general.
13    A. -- in general. Whatever it is, okay.
14    Q. What is required? Is saying the word "shit"
15  enough for disorderly conduct?
16    A. Well, in other words -- in other words, what --
17  it's up to -- put yourself in his position. What would
18  you do?
19    Q. My question to you is what is your
20  understanding of the law. Is using the word "shit" in
21  front of a police officer enough to arrest him?
22    A. No, I don't think so. It all depends on how
23  much patience you have on -- yourself on the people,
24  you know.
25    Q. Okay. Well, is the -- whether or not a person

Page 22

1   who is stopped tries the defendant -- I'm sorry, the
2   deputy's patience, is that the test for what
3   constitutes disorderly conduct?
4          MS. GONZALES: Objection, calls for a
5   legal opinion.
6      A. It all depends on the officer. If he's going
7   to stand for that, fine. If he don't, I don't think
8   so. I don't think he's going to take him in, not for
9   saying what you said, "shit," whatever it is. It takes
10  bigger words than that.
11     Q. Okay. If he just says, "Go ahead and arrest
12  me. You all never do shit anyway," is that enough to
13  constitute disorderly conduct?
14     A. Well, it all depends on the officer.
15     Q. Well, why -- so do you think that's -- do you
16  know if it has to be fighting words, or can it just be
17  an obscenity?
18         MS. GONZALES: Objection, calls for a
19  legal opinion. Go ahead and answer the question.
20     A. Okay. I'll tell you what, you know, on this
21  here, you just said it, you know, it all depends on the
22  words. You say, "shit," I don't think it's enough.
23     Q. Okay. So what do you need? I mean, you're the
24  one that is in charge of the sheriff's department.
25  You've got people having to -- you know, violating

Page 23

1   people's constitutional rights by falsely arresting
2   them or knowing what they can and can't arrest people
3   for. You ought to know this stuff.
4          Now, what is required, under your
5   understanding of Texas law, to arrest somebody for
6   disorderly conduct?
7      A. Like I said before, it all depends on his
8   behavior. His behavior says, "shit," I don't think
9   that will be enough, you know. But it all depends on
10  that officer. It's not me arrested him. It's him.
11  We're talking about this particular person. He
12  arrested this other guy, whatever it is, it's -- I
13  wasn't there. If I was to be there, maybe it would
14  have been different as a sheriff.
15     Q. What I'm asking you, though, is what kind of
16  behavior is required to constitute disorderly conduct?
17     A. Well, I don't -- I don't have an answer on that
18  right now, sir.
19     Q. You don't know?
20     A. No, I wouldn't know. Excuse me.
21     Q. As far as carrying -- arresting somebody for
22  carrying a weapon under Texas law, do you know what the
23  rule is on how close or how far away they have to be
24  from the weapon?
25     A. No.

Page 24

1          MS. GONZALES: Objection, calls for
2   speculation.
3      A. I wouldn't know anything about that, sir. It
4   all depends, but I wouldn't know.
5      Q. Do you understand that it has to be within
6   their reach at least?
7      A. Yes, sir.
8      Q. And if a weapon is not within their reach, then
9   they're not carrying it?
10         MS. GONZALES: Objection, calls for a
11  legal opinion.
12         THE WITNESS: Go ahead.
13         MS. GONZALES: Answer the question if you
14  know the answer.
15     A. If you're at reach of it, fine. If not, I
16  don't see anything wrong with that, but the thing about
17  this is that he was carrying a weapon.
18     Q. Do you know where Mr. Gilbert had the weapon?
19     A. According to report, it was in the back seat.
20     Q. Is the back seat necessarily within reach if
21  it's immediately --
22     A. It all depends on the car, sir.
23     Q. So there are some circumstances that you'd
24  agree where someone could have a weapon in the back
25  seat but they wouldn't be carrying it because it would

Page 25

1   not be within their reach; is that correct?
2      A. Yes, sir.
3      Q. And you don't personally know exactly where
4   Mr. Gilbert had that gun?
5      A. No, sir, just on the back seat. I need to go
6   back to the report and see what kind of car was it.
7      Q. Are you aware of any other incidences in which
8   employees of the Jim Hogg County Sheriff's Department
9   have stopped or arrested Border Patrol agents?
10     A. Not to my knowledge, sir.
11     Q. Are you aware of them pulling over a marked
12  Border Patrol vehicle?
13     A. Not to my knowledge.
14     Q. No one ever told you about that?
15     A. No, sir.
16     Q. Do you give your deputies training on how to
17  write reports?
18     A. I do give them. They go to school.
19     Q. One of the things they're trained to do is
20  they're supposed to put ever reason -- every part of
21  probable cause is supposed to go on the report, every
22  reason they're arresting someone is supposed to go on
23  the report; is that correct?
24     A. Well, it should be correct. It all depends on
25  the deputy too, sir.

Page 26

1    Q. That's what they're trained to do?
2    A. Yes, sir.
3    Q. There might be some deputies that don't do what
4  they're trained to do, but what they're trained to do
5  is put everything in the report?
6    A. Yes, sir, correct.
7    Q. And you wouldn't expect a deputy who said he
8  pulled someone over for one reason to come up with
9  another reason two years later?
10   A. I don't think so, sir.
11   Q. When did you first hear that Mr. Gilbert had
12  been pulled over by Mr. Bolch on April 7th, 1999?
13   A. That same day, about 45 minutes before he was
14  released.
15   Q. Where were you?
16   A. My office.
17   Q. And where was Mr. Gilbert?
18   A. Probably in jail.
19   Q. Okay. Do you know how long he had been in
20  custody at that point?
21   A. According to my report, what I heard, no less
22  than two hours.
23   Q. At least two hours he'd been in jail?
24   A. That's the way I read it.
25   Q. Okay. Do you know if he'd already been before

Page 27

1  the justice of the peace or municipal judge?
2    A. No, sir. They called me when he -- the judge
3  came in.
4    Q. Okay. What were you told when you first found
5  out? You're sitting at your office, you get a phone
6  call. Who calls you?
7    A. The jailer calls me that there is --
8    Q. Is that Rene Ruiz?
9    A. I guess so, yes, sir.
10   Q. Okay. And what does he tell you?
11   A. That they were having -- that the judge was
12  going to come in. And then I didn't know anything
13  about this or that he was incarcerated, you know.
14   Q. Okay.
15   A. And that's when I called Mr. -- Deputy Bolch
16  asking him what was the deal. He told me that he had
17  stopped him because of the seatbelt and then when he
18  got down, he gunned the engine, you know, he kind of
19  revved it on him, and there was no need for that.
20        Anyway, he asked him -- he I.D.ed himself,
21  whatever it is, and he said, "I stopped you because of
22  the seatbelt," and then that's when the weapon came
23  out, that he had a weapon there.
24   Q. Okay.
25   A. And after that, that's when the arguing started

Page 28

1  about the disorderly conduct. That's why he was taken
2  in.
3    Q. Because he was arguing about the weapon?
4    A. The weapon and the -- yeah.
5    Q. And do you know who it was that wasn't wearing
6  their seatbelt?
7    A. No, sir, I wouldn't know. I know that there
8  was a female.
9    Q. It was the female that wasn't wearing the
10  seatbelt. Do you have any idea why Mr. Bolch wouldn't
11  have arrested her too?
12       MS. GONZALES: Objection, calls for
13  speculation.
14   A. I wouldn't know on that, sir. She was the
15  passenger.
16   Q. Do you know whether he gave her a ticket for
17  not wearing the seatbelt?
18   A. I don't think she ever got a ticket on that. I
19  don't remember seeing a ticket on that, sir.
20   Q. Don't you think it's odd to pull someone over
21  because the passenger is not wearing a seatbelt, yet
22  not ticket the passenger and arrest the driver?
23   A. Well, it is --
24       MS. GONZALES: Objection, calls for
25  speculation.

Page 29

1    A. Excuse me. It is, sir, but what did happen
2  there, maybe he forgot to give, you know, or not, you
3  know, because of that, because of what happened with
4  the gun and what he was told by the driver.
5    Q. So what did Mr. Bolch tell you happened?
6    A. Just, like I said, he stopped him because of
7  that, the seatbelt, and then he asked him to I.D.
8  himself, and he said, "How about the gun you have?" He
9  start I.D.ing himself, and that's when the arguing
10  started, you know, and -- not argument, dispute between
11  them about the -- because knowing him, Mr. Isaac, I
12  don't think he's the kind of guy who said anything, but
13  the other guy maybe he -- because I know that he had
14  been there before, twice before, when he came into
15  Hebbronville, twice he was at my office telling me that
16  he was stopped.
17   Q. Mr. Gilbert had twice complained to your office
18  about being stopped?
19   A. That my officer had stopped him on Highway 285
20  coming from Falfurrias.
21   Q. Okay.
22   A. Why? Speeding. So I called the officer at
23  that time -- I don't remember who the officer was. It
24  was a long time ago. It's about three or four years
25  ago. He said he's speeding, doing 85 miles an hour,

Page 30

1 and then he gave him a warning. So I just got the
2 paperwork and tore them up. I said, "Don't worry about
3 it." So the second time tambien. So he'd been stopped
4 twice for speeding. It's like I told him, "Nobody is
5 above the law."
6 Q. So is that a reason to arrest him?
7 A. How would this -- that was different deputies,
8 and this new deputy that arrested him the last time was
9 a new deputy. He didn't even know the other deputies.
10 Q. Had John Gilbert done anything to piss off
11 anyone at the sheriff's department?
12 A. I didn't hear that.
13 Q. Had he done anything to piss off anybody at the
14 sheriff's department?
15        MS. GONZALES: Calls for speculation.
16 A. I don't think so.
17 Q. They weren't wanting to put him in his place
18 because he was complaining about being stopped for
19 speeding before?
20 A. No, sir.
21        MS. GONZALES: Calls for speculation.
22 A. I don't think so.
23 Q. Did Mr. Bolch at that time give you any other
24 reason that he pulled over Mr. Gilbert?
25 A. No, sir, just because of that.

Page 31

1 Q. The seatbelt and revving -- he pulled him over
2 for the seatbelt and revving the engine, correct?
3 A. Right.
4 Q. And then he arrested him for his language and
5 for having a firearm in the car?
6 A. Unlawfully carrying a weapon.
7 Q. And that's it. He didn't tell you anything
8 about license plates or anything else?
9 A. No, not to my knowledge. Maybe he did. I
10 don't remember that, sir.
11 Q. You remember everything else?
12 A. No, sir.
13 Q. What happened next? You get the call, the
14 officer tells you -- Officer Bolch tells -- or Deputy
15 Bolch tells you about the arrest. What do you do next?
16 A. I went up down to the back room where the judge
17 and Mr. John Gilbert were.
18 Q. Okay. What happened next?
19 A. So the judge was telling him about this, you
20 know. So I came in the room and I said, "Judge, can I
21 speak to you for a second?"
22 Q. What did you hear the judge telling him?
23 A. That he was arrested for doing whatever he had
24 done, you know, and the weapon, whatever it is.
25 Q. Okay. So you asked to speak to the judge in

Page 32

1 private?
2 A. No. Well, not privately, just a little ways
3 from where he was, right there on the door.
4 Q. Where Mr. Gilbert couldn't hear?
5 A. He was there.
6 Q. Okay. And what did you tell the judge?
7 A. Just told him to let it be. We've been working
8 with -- I've been working with Border Patrol since 1971
9 together, and they help us, we help them, whatever it
10 is, and I think -- nothing, just let it be. So the
11 judge said, "If you want that, Sheriff, I'll agree with
12 you."
13        "Fine. Let it be."
14 Q. And did they let him go at that point?
15 A. Yes, sir.
16 Q. Do you know if he was fingerprinted?
17 A. No, I don't know. I'm pretty sure he was, sir.
18 Q. If someone is fingerprinted, do those prints
19 get sent in to the F.B.I. as a matter of course?
20 A. I think they were not -- I think they were left
21 there. They were not sent in.
22 Q. Do you know if the arrest would go on
23 Mr. Gilbert's record?
24 A. I don't think it's in record.
25 Q. Do you know one way or another?

Page 33

1 A. Well, I'm pretty sure if we check on his
2 license, whatever it is, on history, I don't think it's
3 there. It was never sent out.
4 Q. When did you check?
5 A. I haven't checked lately, but when I came out
6 in that year, '99, I knew it was not on record. If
7 it's on record, well, somebody made a mistake. But I
8 told the dispatcher not to -- the jailer and secretary
9 not to send it out.
10 Q. Have you ever had any training or education on
11 the supremacy clause of the United States Constitution?
12 A. No, sir.
13 Q. Do you know if there is a federal law saying
14 the Border Patrol agent can carry a firearm on duty
15 and a state law saying he can't, which one controls?
16        MS. GONZALES: Objection, calls for a
17 legal opinion.
18        THE WITNESS: Go ahead.
19        MS. GONZALES: You can answer the question
20 if you know the answer.
21 A. Well, not really on that, sir, no. It's just
22 that I know that they are not peace officers, and I'll
23 be honest with you, I don't think they should be
24 carrying a weapon off duty.
25 Q. Why not?

Page 34

1    A. Because they're not peace officers.
2    Q. Because the State of Texas doesn't allow them
3  to do it?
4    A. Well, if Texas says that, that's the way it
5  should be.
6    Q. Do you know -- do you have any idea what the
7  federal law says on whether border patrol agents can
8  carry --
9    A. I haven't seen it yet, sir.
10   Q. So you've never had any idea what it was?
11   A. No, sir.
12   Q. So your agents were trained that the Border
13  Patrol agents were not peace officers and that they
14  should not carry weapons off duty. They could not
15  legally do that, correct?
16   A. Who said we were praying for that?
17   Q. Trained. I said trained.
18   A. Trained. Oh, I'm sorry about that.
19   Q. I didn't say pray. I said trained.
20   A. Sorry about that. Apologies on that.
21   Q. That's okay.
22   A. No, sir.
23   Q. They weren't trained on that?
24   A. (Moving head side to side)
25   Q. They all -- everyone understood that, correct?

Page 35

1    MS. GONZALES: Objection, calls for
2  speculation.
3    Q. Well, you said that that's what everybody knew.
4    A. When I'm talking about the officer himself, I'm
5  pretty sure all officers in the State of Texas know
6  that they're not peace officers. Whether they're
7  carrying weapons or not, that's going to be upon their
8  officers, higher officers, you know.
9    Q. Okay. Now, what I'm saying is did you ever --
10  I mean, you knew that there were going to be Border
11  Patrol agents in your county. Did you ever look to see
12  what the federal law was on whether or not they could
13  carry weapons?
14   A. No, sir, I never got into it, you know.
15   Q. Okay. Do you know if your deputies ever did?
16   A. They might have.
17   Q. Did you ever ask anyone to do it, to find out?
18   A. No, sir, I never did.
19   Q. To this day, have you looked?
20   A. No, sir, I haven't had the time to do it, sir,
21  no. I wish there is a law so I can see it.
22   Q. If there was a law saying that Border Patrol
23  agents could carry firearms, would that change your
24  opinion?
25    MS. GONZALES: Calls for speculation.

Page 36

1    A. It all depends, sir.
2    Q. I mean, if there is a United States statute and
3  United States administrative code saying they can carry
4  weapons, you think they should get arrested?
5    A. Well, the law is the law, sir.
6    Q. Well, there is federal law and there is state
7  law, correct?
8    A. Yes, I understand, you know, but --
9    Q. I'm just asking you a question. If there is
10  federal law and there is state law and they're
11  different, which one should be followed?
12    MS. GONZALES: Objection, calls for legal
13  opinion.
14   A. It all depends on that, sir, too, you know, and
15  that Texas law, whatever it is, and federal law, you
16  know. But just like I said a while ago, nobody is
17  above the law. And if it said they can't wear a
18  weapon -- I say -- until this date I say that they are
19  not peace officers and shouldn't be carrying a weapon
20  off duty.
21   Q. And if there is a federal law that says
22  different, it doesn't matter because state law says
23  they can't?
24   A. Well, if there is -- if there is a law in
25  federal, well, that's something --

Page 37

1    Q. Would the federal law prevail over the state
2  law?
3    MS. GONZALES: Objection, calls for a
4  legal opinion.
5    A. It all depends on that, sir. I'm not going to
6  say "yes" or "no" on that, you know.
7    Q. You don't know one way or another?
8    A. Well, I wouldn't know. But if there is a law
9  that they should be carrying a weapon off duty, fine.
10   Q. How about if the Border Patrol agents were
11  trained and given papers by the INS saying they could
12  carry a gun off duty, would that make a difference to
13  you?
14    MS. GONZALES: Objection, calls for
15  speculation.
16   A. It all depends too, you know, sir, on whatever
17  it is, but I would say, no, to my knowledge, no.
18   Q. To your knowledge, it doesn't matter if the INS
19  firearms control -- if it's the INS firearms policy
20  that they train their officer under and they're saying,
21  "Look, under federal law you can carry a gun off duty,"
22  does that make a difference to you?
23   A. Is it on the book, on the Texas law book? It's
24  got to be there under Texas law book or their books,
25  you know, where we can see it, you know. If I don't --

1  I haven't seen it yet. If I see it, I'll say, "Well,
2  fine. Let it be."
3  Q. But you never looked before this arrest?
4  A. No, because I don't think it's there. If it's
5  there, fine. But I've never looked because I don't
6  think it's there.
7  Q. I'm just going to show you this. This is the
8  INS firearms policy.
9  A. Yes, sir.
10  Q. And if I'm correct in reading this, it says,
11  "The following officers who have successfully completed
12  basic immigration law enforcement training are
13  authorized and designated to exercise the power
14  conferred by section 27A in the Immigration and
15  Nationality Act, to carry firearms during duty and
16  nonduty hours." And that includes border patrol
17  agents. Would that change your mind as to whether or
18  not they should be carrying guns off duty?
19      MS. GONZALES: Objection, calls for a
20  legal opinion.
21  A. Well, if it's there --
22      MS. GONZALES: Go ahead and answer if you
23  know the answer.
24  Q. I'll show it to you.
25  A. Well, I don't know. Well, if it's there,

1  sir -- I don't have no doubts. If it's there -- you're
2  reading it. If it's there, you know, I'll go along
3  with it, you know.
4  Q. Okay. And would you agree that that would
5  control over the state law?
6      MS. GONZALES: Objection, calls for a
7  legal opinion.
8  A. It all depends, but I'm pretty sure it will,
9  you know, because it's just -- well, let me ask you the
10  question when was this written in?
11  A. 1996.
12  Q. Okay.
13  Q. I mean, you can understand why a Border Patrol
14  agent who INS gives him a gun and says, "You're allowed
15  to carry it off duty," would be pretty upset if he were
16  arrested for doing what the federal government told him
17  he was allowed to do, wouldn't you?
18      MS. GONZALES: Objection, mischaracterizes
19  the evidence and calls for speculation.
20  A. I'll tell you what, it all depends on his
21  behavior too, you know.
22  Q. What about his behavior would it depend on?
23  A. Just like you said a while ago.
24  Q. Well, I'll give you an example. Peace officers
25  are allowed to carry weapons on or off duty; is that

1  correct?
2  A. Well, that's the state law.
3  Q. Right. And if you were arrested for carrying a
4  firearm -- a lot of times they actually want you to
5  carry a firearm at all times in case you have to get
6  called on to duty; isn't that true?
7  A. That's the way it is.
8  Q. And if somebody pulled you over and arrested
9  you for carrying a firearm that you knew you could
10  legally carry, wouldn't you be upset?
11  A. In a way, yes.
12  Q. And if you showed them your badge and said,
13  "Look, I'm a peace officer," and they said, "I'm going
14  to arrest you anyway," wouldn't that upset you?
15  A. If they arrest me for that only, yes. But if
16  they arrest me for disorderly conduct or other things,
17  that would be something else, license plate or whatever
18  it is. That would be different.
19  Q. And, of course, if the disorderly conduct was
20  you being mad about the fact that they're arresting you
21  on the firearms violation, well, that might make you
22  ever madder, wouldn't it?
23  A. Well, no, not exactly, if I know how it is. I
24  don't think so, not on my opinion. You know, on the
25  license plate, whatever it is, I knew I had to put it

1  on, you know, so why not put it on.
2  Q. The license plate, you told me before he didn't
3  say anything about it?
4  A. No, no, you said it a while ago. I don't say
5  it. You said it a while ago.
6  Q. Right. There is nothing -- you never heard
7  anything about a license plate?
8  A. No, but you said it a while ago.
9  Q. Right. And I'm not saying --
10  A. Okay. Well, you said --
11  Q. I think Mr. Bolch made that up after this
12  lawsuit was filed because I don't see it anywhere on
13  this police report.
14  A. But you said it. I just get if from you, sir.
15  If you hadn't said it, I wouldn't have said it myself.
16  Q. Because you had never heard license plates
17  before this deposition, right?
18  A. No, I just said it because you said it a while
19  ago, sir.
20  Q. Right. I've got to finish and you've got to
21  talk, just so we'll be clear for the record.
22  A. Yes, sir.
23  Q. Prior to this deposition you'd never heard
24  anything about Mr. Gilbert being -- not having a
25  license plate on the front of the car, correct?

Page 42

1   A. No, sir. I said "no" a while ago.
2   Q. No, you'd never heard that?
3   A. No, sir.
4   Q. So when you're saying no, no, no, you didn't
5   hear that, that sounds like a double negative. Had you
6   heard that before this deposition?
7   A. This one?
8   Q. Had anyone -- before this deposition had anyone
9   ever told you that Mr. Gilbert was -- did not have a
10   front license plate?
11   A. No, sir.
12   Q. No, they did not?
13   A. I just got it from you, sir, a while ago.
14   Q. Okay. How did Mr. Gilbert appear at the time
15   when he was in court?
16   A. While he was in court with the judge, while he
17   was sitting there?
18   Q. Yes.
19   A. He was doing all right.
20   Q. Did he look mad?
21   A. Not to my knowledge. He shaked hands with me.
22   I said, "Gilbert, how are you going, sir?" Because I
23   knew him because he had gone to my office. But, no, to
24   me he was doing all right. He didn't talk -- he didn't
25   speak to me. He spoke to the judge, you know, and just

Page 43

1   left.
2   Q. Where did he go from the courtroom?
3   A. I don't have knowledge. He was still in jail,
4   you know, on the office, my office, you know, in the
5   back, you know, but he was not in jail. He was just
6   there on the -- where we print, wherever it is, take
7   pictures, you know, but he was not incarcerated. He
8   was up where the judge is.
9   Q. At that point?
10   A. At that point, at that time.
11   Q. But he had been somewhere else before that,
12   hadn't he?
13   A. I'm pretty sure he had, yes, sir.
14   Q. Where would he have been?
15   A. Been in jail.
16   Q. The county jail?
17   A. He was in jail, yes.
18   Q. Do you know if he was segregated?
19   A. I wouldn't know, sir.
20   Q. You don't know how -- what the conditions were
21   in the jail?
22   A. No. The conditions in jail? Oh, yes, I know
23   the condition of jail, you know.
24   Q. What was it like?
25   A. They was clean. They're always clean.

Page 44

1   Q. Perfectly clean?
2   A. Well, not perfectly, but nobody is perfect,
3   sir.
4   Q. Right. Do you know anything about whether --
5   when the mattress had last been washed?
6   A. The mattresses are washed there about every two
7   or three weeks, you know.
8   Q. Every two or three weeks? Do you know if there
9   were any pubic hairs from other people in the mattress?
10   A. There might have been, sir. There might have
11   been on that, you know, because, you know, whoever was
12   there before him might have had it, you know.
13   Q. And if the person before had left some feces on
14   the toilet seat or something, they could have still
15   been there?
16   A. I wouldn't know, sir.
17   Q. You wouldn't know one way or another?
18   A. No.
19   Q. Do you know anything about Mr. Bolch slamming
20   the door on John Gilbert's knee?
21   A. Huh-uh.
22   Q. You don't know one way or another?
23   A. No, sir, first time I heard of it.
24   Q. Do know if John Gilbert's knee was injured one
25   way or the other?

Page 45

1   A. No, sir.
2   Q. You've never seen any pictures of the bruises
3   on his knee?
4   A. No, sir.
5   Q. Was Mr. Bolch reprimanded in any way for
6   arresting John Gilbert?
7   A. No, sir.
8   Q. Was he ever told anything he did was improper?
9   A. I just asked him after I let him go what does
10   he think about this. "Sheriff, whatever happened
11   happened there," you know, "but you're the boss. You
12   said let him go, I let him go, but he was wrong. He
13   was wrong in that," you know. "Not saying on the gun,
14   fine, but the disorderly conduct about the seatbelt."
15   Now, coming back to the seatbelt, sir, that's something
16   else, you know, whether he got a ticket or not.
17   Q. And you never told him he was wrong?
18   A. Well, no, actually --
19   Q. Did you tell him he was right?
20   A. Well, not right, but I said -- I didn't say
21   "You're right" or not. I didn't congratulate him. You
22   know, I just said, "You're doing a good job." That's
23   it, you know.
24   Q. You told him he was doing a good job?
25   A. Well, yes, he was doing his job. Yes, sir.

Page 46

1    Q. You didn't tell him that -- as far as you were
2  concerned, his interpretation of law was correct?
3    A. As far as I see it, yes. Now that the gun
4  is -- I saw the law about the gun, it was something
5  else, sir.
6    Q. Okay. Do you know what time -- do you know
7  where the arrest took place, whether it was in front of
8  a school?
9    A. According to a report I read, sir, yes, sir.
10   Q. Do you know what school it was?
11   A. High school. Not high school. It was -- it
12  must have been about, let's see, 2:00 o'clock, I guess,
13  a little after 2:00 or something like that.
14   Q. Do you know what time high school gets out?
15   A. At least 3:30.
16   Q. 3:30?
17   A. Yes, sir. It all depends, 3:30 in high school,
18  and it's 3:00 o'clock in junior -- elementary.
19   Q. Okay. Do you have trustees in the county jail?
20   A. Yes, sir. I had them.
21   Q. What are trustees?
22   A. Trustees are people that you have clean, do
23  whatever is needed to be done in jail, on the kitchen,
24  on the front office, whatever they clean up.
25   Q. And they're able to walk around a little bit,

Page 47

1  more than someone who is not a trustee, and they can
2  get out of their cell and go do the cleaning and stuff?
3    A. It all depends on what hour it is, sir.
4    Q. Right. They're not allowed to, obviously, just
5  leave the jail, but as far as within the jail --
6    A. No, no, no way.
7    Q. -- they have a lot more freedom to move?
8    A. Well, yes, because they're inside and they have
9  to knock or ring the bell to get them out, you know.
10  They have to come in through the dispatcher and the
11  jailer and then they go out there. And when they're
12  out there, the jailer is there with them.
13   Q. Right.
14   A. Or myself. I was there many times with them.
15   Q. How about within the jail behind that door?
16   A. In the jail?
17   Q. Yeah.
18   A. The camera is there, sir.
19   Q. But they're able to walk around?
20   A. Well, if they're cleaning, yes. Yes, sir.
21   Q. I mean, that's -- every jail does that. There
22  is nothing wrong.
23   A. Well, I've seen it. I've seen it in Nueces
24  County, here in --
25   Q. Cameron does it.

Page 48

1    A. -- Brownsville. I've seen them here because
2  I've been here in the jail many times.
3    Q. As a law enforcement officer?
4    A. Yes, sir.
5    Q. Just making sure.
6    A. I hope so.
7      MR. COWEN: I'll pass the witness.
8         EXAMINATION
9  BY MS. GONZALES:
10   Q. I only have one question. Have you ever had
11  any legal training, Mr. Ybanez?
12   A. Legal training, yes.
13   Q. Have you trained to be an attorney, in other
14  words?
15   A. No, no, no.
16   Q. Okay. That's the only question I have.
17   A. No, ma'am. Never tried it.
18         EXAMINATION
19  BY MR. COWEN:
20   Q. As a law enforcement officer, you're expected
21  to have a basic understanding of Texas law; isn't that
22  correct?
23   A. Yes, sir.
24      MR. COWEN: I'll pass the witness.
25      MS. GONZALES: Nothing further.

Page 49

1      MR. COWEN: That's it.
2  (Deposition concluded)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 50

```
 1        ERRATA SHEET/SIGNATURE PAGE
 2   PAGE LINE CHANGE              REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14      I, GILBERTO S. YBANEZ, have read the foregoing
     deposition and hereby affix my signature that same is
15   true and correct, except as noted above.
                                    _____
16            GILBERTO S. YBANEZ
     THE STATE OF TEXAS
17
     COUNTY OF _____
18
        BEFORE ME, _____, on this day
19   personally appeared GILBERTO S. YBANEZ, known to me or
     proved to me to be the person whose name is subscribed
20   to the foregoing instrument and acknowledged to me that
     said witness executed the same for the purposes and
21   consideration therein expressed.
22      Given under my hand and seal of office this _____
     day of _____, 2002.
23
     _____
24       Notary Public in and for the State of Texas
25
```

Page 51

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              BROWNSVILLE DIVISION
 3   JOHN GILBERT,          )(
          Plaintiff         )(
 4                          )(
     VS.                    )( CIVIL ACTION NO. B-01-54
 5                          )(
     JIM HOGG COUNTY, TEXAS, )(
 6   ET AL.,                )(
          Defendants        )(
 7
 8        REPORTER'S CERTIFICATE
 9
        I, CORINNA N. GARCIA, Certified Court
10   Reporter, certify that the witness, GILBERTO S. YBANEZ,
     was duly sworn by me, and that the deposition is a true
11   and correct record of the testimony given by the
     witness on OCTOBER 21, 2002; that the deposition was
12   reported by me in stenograph and was subsequently
     transcribed under my supervision.
13        I FURTHER CERTIFY that I am not a
     relative, employee, attorney or counsel of any of the
14   parties, nor a relative or employee of such attorney or
     counsel, nor am I financially interested in the action.
15        WITNESS MY HAND on this the _____ day of
     _____, 2002.
16
17        CORINNA N. GARCIA, CSR NO. 5210
          Expiration Date: 12/31/03
18        Bryant & Stingley, Inc.
          2010 East Harrison
19        Harlingen, Texas 78550
          (956) 428-0755
20
21
22
23
24
25
```

# EXHIBIT D

# INS FIREARMS POLICY

**U.S. Department of Justice**
Immigration and Naturalization Service

# INS FIREARMS POLICY



*AUGUST 1996*

ADMINISTRATIVE MANUAL SECTION 20.012

# Memorandum



HQNFU 50/15.1.1–P

| Subject | Date |
|---|---|
| Implementation of the Immigration and Naturalization Service Firearms Policy | AUG – 8 1996 |

**To**
Headquarters Management Team
Firearms Review Board
  Members/Alternates
Director of Training
Chief, Border Patrol Academy
Chief, Immigration Officer Academy
Regional Directors
District Directors
Chief Patrol Agents
Officers in Charge
Patrol Agents in Charge
Port Directors

**From**
Office of the Commissioner

Attached is the final version of the revised Immigration and Naturalization Service (INS) Firearms Policy, Section 20.012 of the Administrative Manual.  This policy has been negotiated with both the National Immigration and Naturalization Council and the National Border Patrol Council, and incorporates all changes agreed upon by the Service and the Unions.  Field input was included prior to negotiations with the Union.

This version of the INS Firearms Policy supersedes all previous policies regarding the Service's Firearms Program and shall be effective immediately.

The revised Firearms Policy provides needed standardization in the issuance, control, carrying, and use of firearms.  It will ensure the continuance of disciplined and professional conduct by all immigration officers involved in the enforcement of the immigration laws.  The revised Policy will also demonstrate the Service's commitment to promote and protect the human rights of all individuals and to ensure the immigration laws are enforced fairly and with compassion.  All of us must rededicate ourselves to upholding the highest standards of conduct.  I am fully committed to ensuring that allegations of abuse or misconduct are aggressively pursued and that, when proven malfeasance occurs on the part of any immigration employee, appropriate disciplinary action will be taken.

Page 2

    You are required to disseminate the INS Firearms Policy and a copy of this memorandum to all officer personnel as outlined in Subsection 8 of the policy.  Within 30 days copies of the policy will be provided to your office by the National Firearms Unit for distribution to each employee.

Doris Meissner
Commissioner

Attachment

ADMINISTRATIVE MANUAL SECTION 20.012

IMMIGRATION AND NATURALIZATION SERVICE FIREARMS POLICY

| SUBSECTION | | PAGE NUMBER |
|---|---|---|
| 1 | Purpose ............................................................ | 1 |
| 2 | Authority of Immigration Officers to Carry Firearms........................ | 1 |
| 3 | Definitions | |
| | Authorizing Officials..................................................... | 2 |
| | Immediate Subordinate Official (of an Authorizing Official) .... | 2 |
| | Basic Immigration Law Enforcement Training....................... | 2 |
| | INS Firearms Program................................................... | 3 |
| | Basic Marksmanship Instruction and Practical Pistol.............. | 3 |
| | Courses (BMI/PPC) | |
| | Semi-Automatic Pistol Transition Training (SATT) Course..... | 3 |
| | Tactical Firearms Instruction (TFI)................................... | 3 |
| | Reportable Shooting Incidents......................................... | 3 |
| 4 | Responsibilities | |
| | Commissioner............................................................. | 4 |
| | Chairman, Firearms Review Board...................................... | 4 |
| | Administrator, National Firearms Unit................................ | 5 |
| | The Office of Internal Audit (OIA)................................... | 6 |
| | Shooting Incident Review Committee (SIRC)....................... | 7 |
| | Authorizing Officials.................................................... | 7 |
| | Firearms Control Officers (FCO)...................................... | 8 |
| | Ammunition Control Officers (ACO)............................... | 8 |
| | Firearms Instructions.................................................... | 9 |
| | Range Safety Officers ................................................. | 10 |
| | Individual Service Officers Authorized to Carry Firearms..... | 10 |
| 5 | Service Officers Authorized to Carry Firearms............................. | 10 |
| 6 | Guidelines for Carrying Firearms........................................... | 11 |
| 7 | Deadly Force Involving Firearms........................................... | 13 |
| 8 | Compliance with the INS Firearms Policy................................. | 14 |
| 9 | Firearms Aboard Commercial Aircraft..................................... | 15 |
| 10 | Firearms in Foreign Assignments.......................................... | 17 |
| 11 | Reporting of Shooting Incidents............................................ | 17 |
| 12 | Investigation of Reportable Shooting Incidents | |
| | Authorizing Officials.................................................... | 19 |
| | Immediate Subordinate Official...................................... | 21 |

| SUBSECTION | | PAGE NUMBER |
|---|---|---|
| 13 | Service Personnel Involved in a Shooting Incident........................ | 22 |
| 14 | Shooting Incident Review Committee (SIRC)............................. | 23 |
| 15 | Service Firearms Review Board............................................. | 23 |
| 16 | National Firearms Unit (NFU).............................................. | 24 |
| 17 | Issuance of Firearms........................................................ | 24 |
| 18 | Approved Firearms.......................................................... | 25 |
| 19 | Holsters and Ammunition Carriers......................................... | 27 |
| 20 | Automatic Weapons........................................................... | 28 |
| 21 | Undercover Operations...................................................... | 29 |
| 22 | Issuance and Expenditure of Ammunition............................ ..... | 30 |
| 23 | Firearms Training | |
| |     Basic Firearms Training............................................... | 32 |
| |     Quarterly Training....... ...................................... ..... | 33 |
| |     Remedial Training | |
| |         General...................................................... | 34 |
| |         Basic Trainee Officers.................................... | 34 |
| |         Other INS Officers......................................... | 35 |
| |     Firearms Instructor and Range Officer Training.............. | 35 |
| |         Firearms Instructors.................................... | 36 |
| |         Range Safety Officers ..... | 36 |
| |         Certification Requirements............................ | 36 |
| |     Night (Low-Level Light) Firearms Training.............. ..... | 37 |
| |     Precision Shooting (Counter Sniper) Firearms Training..... | 37 |
| |     Distribution of Information to the Firearms Instructors...... | 38 |
| 24 | Firearms Qualifications | |
| |     Proficiency Requirement ... ............. . ....... .... | 38 |
| |     Firearms Qualification Courses........................................ | 39 |
| |     Revocation of Authorization to Carry a Firearm Due to | |
| |       Inability to Demonstrate Acceptable Proficiency............. | 39 |
| |     Revocation of Authorization to Carry a Firearm Due to | |
| |       Non-Participation in Quarterly Firearms Qualifications... | 40 |
| |     Firearms Qualification of Detailed Officers........ ........ | 40 |
| |     Officers Unable to Qualify Due to a Temporary | |
| |       Physical Condition.... .............................. | 41 |
| |     Requirement to Qualify with Duty or Hazard-Free | |
| |       Ammunition................................................ ... . | 41 |
| |     Requirement to Use a Hip Holster During Quarterly | |
| |       Qualification and Live-Fire Training. ........ ..... ....... | 42 |
| |     Use of a Holster That is Not a Hip Holster.. ..... ... ..... | 42 |
| |     Record of Quarterly Qualifications............ .......... | 42 |
| |     Conducting Quarterly Qualifications...... .. ...... ... | 43 |
| |     Marksmanship Awards Program............................. ..... | 44 |

| SUBSECTION | | PAGE NUMBER |
|---|---|---|
| 25 | Service Armory Operations.................................. | 44 |
| 26 | Shipment of Firearms for Repair........................... | 45 |
| 27 | Maintenance and Repairs of Firearms..................... | 46 |
| 28 | Authority for Service Training Specialist/Armorers to Possess Service Firearms at other than Government-owned Locations...... | 47 |
| 29 | Firearms Program Field (Site) Inspections................ | 47 |
| 30 | Firearms Inspection at Field (Site) Locations............ | 48 |
| 31 | Authorized Levels of Firearms Reserves................... | 48 |
| 32 | Transfers of Service-Issued Firearms..................... | 49 |
| 33 | Storage and Maintenance of Firearms, Ammunition and Related Equipment................................ | 49 |
| 34 | Seized Firearms.......................................... | 50 |
| 35 | Firearms and Ammunition Acquisition...................... | 50 |
| 36 | Lost or Stolen Service Firearms.......................... | 50 |
| 37 | Asset Management Information System, Firearms Inventory Module (AMIS/FIM)................................ | 51 |
| 38 | Firearms Safety......................................... | 51 |

Appendix 1A

List of INS Authorized Firearms.......................... 53
   (Prior to the Effective Date of this Policy)

Appendix 1B

List of INS Authorized Firearms.......................... 56
   (After the Effective Date of this Policy)

Appendix 2

Notice to Service Officers of Personal Responsibility Under the INS Firearms Policy.......................... 59

Appendix 3

Shooting Incident Reports................................ 60

<u>SUBSECTION</u>

<u>PAGE NUMBER</u>

<u>Appendix 4</u>

Guidelines for Use of Service Rifles and Automatic Weapons...................................... 61

<u>Appendix 5</u>

Request for Authorization to Carry a Personnally-Owned
   Service Approved Firearm............................................................... 63

<u>Appendix 6</u>

Department of Justice Policy Governing the Use of Deadly Force...................................... 64

# IMMIGRATION AND NATURALIZATION SERVICE FIREARMS POLICY

### Administrative Manual Section 20.012

**NOTE:** Nothing in this policy shall be construed in a manner that conflicts with any provision of law, government-wide rules or regulations, or the provisions of the applicable Collective Bargaining Agreement, including those dealing with the obligation of the Service concerning physically disabled employees, including but not limited to, the Rehabilitation Act of 1973 and the Pregnancy Discrimination Act of 1978.

1.  <u>Purpose</u>: Section 20.012 of the Administrative Manual provides policy and procedural information regarding all aspects of the Service's Firearms Program. Accordingly, this document performs the following functions:

    A.  Describes the authorities and responsibilities of Service officers in regard to the Service's Firearms Program;

    B.  Provides guidance for the issuance, control, carrying and use of firearms by Service officers;

    C.  Provides guidelines for the use of deadly force, and the reporting and reviewing of incidents involving the discharge of firearms;

    D.  Provides procedures for the acquisition of firearms, ammunition, and related equipment;

    E.  Describes the Service's firearms training and qualification programs;

    F.  Describes the functions and responsibilities of the Firearms Review Board (FRB);

    G.  Describes the functions and responsibilities of the National Firearms Unit (NFU);

    H.  Describes the functions and responsibilities of the Shooting Incident Review Committee (SIRC);

    I.  Supersedes the November 1989 revision of the INS Firearms Policy in Section 4210 of the Administrative Manual.

2.  <u>Authority of Immigration Officers to Carry Firearms</u>

    A.  The authority of certain Immigration Officers to carry firearms is derived from the Attorney General's statutory responsibility for the enforcement of the immigration laws. The Attorney General is empowered by Section 103 of the Immigration and Nationality Act to control and guard the boundaries of the United States against the illegal entry of aliens. This authority has been delegated to the Commissioner pursuant to 28 C.F.R. Section 105 and 8 C.F.R. Section 2.1.

    B.  Section 287 of the Act empowers Immigration Officers to perform certain acts and duties, including the arrest of illegal aliens, and certain felons, without a warrant and to execute any warrant or other process issued by any officer under any law regulating the admission, exclusion, or expulsion of aliens.

C.    Section 287(a)(5) of the Act provides that, under regulations prescribed by the Attorney General, an officer of the Service may carry firearms. The General Arrest Authority regulations under Section 287(a)(5) list the categories of officers who may carry a firearm.

D.    The 1980 Authorization Act, P.L. 96-132, under which the Service now operates, authorizes the expenditure of funds for the purchase of firearms and ammunition and attendance at firearms matches.

3.    Definitions:

A.    Authorizing Officials:

The following managers are designated as Authorizing Officials:

(1)    Commissioner;

(2)    Deputy Commissioner;

(3)    Director, Office of Internal Audit

(4)    Executive Associate Commissioner for Field Operations;

(5)    Executive Associate Commissioner for Programs;

(6)    Associate Commissioners for Enforcement and Examinations;

(7)    Assistant Commissioners for Border Patrol, Detention and Deportation, Inspections, Intelligence, and Investigations;

(8)    Regional Directors;

(9)    District Directors;

(10)    Chief Patrol Agents, including the Chief of the Border Patrol Academy;

(11)    Chief of the Immigration Officer Academy (IOA)

B.    Immediate Subordinate Official (of an Authorizing Official)

The Immediate Subordinate Official of an Authorizing Official is the highest level manager serving under the direct supervision of an Authorizing Official. At the District level it is normally the Deputy District Director and at the Sector level it is normally the Deputy Chief Patrol Agent.

C.    Basic Immigration Law Enforcement Training

(1)    Basic Immigration Law Enforcement Training means the successful completion of one of the following courses of training:

(a)    Immigration Officer Academy after 1971;

      (b)     Border Patrol Basic Training Course after 1950;

      (c)     Immigration Detention Enforcement Officer Basic Training Course after 1977; or,

      (d)     Other than Permanent Full-time (OTP) Immigration Inspector Basic Training Course after 1991 in the case of individuals who are OTP inspectors.

D.     <u>INS Firearms Program</u> - The INS Firearms Program means the INS program which encompasses all aspects of the Service's activities related to firearms, ammunition, and related equipment.

E.     <u>Basic Marksmanship Instruction and Practical Pistol Courses (BMI/PPC)</u> - The terms "Basic Marksmanship Instruction" and "Practical Pistol Course" relate to the firearms training that is conducted as part of the Basic Immigration Law Enforcement Training provided by the Border Patrol Academy:and Immigration Officer Academy:or training substantially equivalent thereto as determined by the Commissioner with the approval of the Deputy Attorney General.  Substantially equivalent training includes the Federal law enforcement basic firearms training programs provided at the Federal Law Enforcement Training Center (FLETC) or other similar law enforcement programs which are approved by the Director of Training on a case-by-case basis.  It includes training in the appropriate use of deadly force, marksmanship, firearms handling and operating techniques, immediate action drills, tactical use of firearms, and judgement firearms training.  In order to successfully complete the Basic Marksmanship Instruction and Practical Pistol Courses, an officer must achieve a minimum score of 70% on the INS handgun qualification course.  In addition, an officer must achieve a score of 100% in the judgement portion of the Judgement Pistol Shooting (JPS) course and minimum score of 70% on the marksmanship portion of that course.

F.     <u>Semi-Automatic Pistol Transition Training (SATT) Course</u> - The INS course developed to train INS Officers who have previously successfully completed the revolver-based Basic Marksmanship Instruction and Practical Pistol Courses in the different skills required with a semi-automatic pistol.  Completion of the SATT course does not satisfy the Basic Marksmanship Instruction and Practical Pistol Courses training requirements.

G.     <u>Tactical Firearms Instruction (TFI)</u> - Tactical Firearms Instruction means Academy and post-Academy training that includes basic firearms retention, the use of cover and concealment, proper reloading procedures, the use of firearms in searches, tactical maneuvering with a firearm, tactical live-fire drills, proper defensive positioning when in contact with a suspect, and the use of voice commands and physical actions to control situations.

H.     <u>Reportable Shooting Incident</u> - A reportable shooting incident means any incident involving the discharge of a firearm which occurs as described in Subsection 3.H.(1)-(4).  Such an incident must be reported in accordance with the instructions contained in Subsection 11.  Reportable shooting incidents are defined as:

     (1)     Any incident which involves the discharge of a firearm by a Service employee, either intentional or unintentional, which occurs under the following circumstances:

          (a)     While on duty (except for intentional discharges which occur during firearms training, practice, or qualification, and do not cause any injury to a person or animal, or damage to private, public, or government property); or,

    (b)    While off duty, and causes any injury to any person, or any damage to either private, public, or government property in violation of any law or ordinance, or causes an investigation by any law enforcement agency; or,

    (c)    At any time, regardless of the Service officer's duty status, and regardless of the location or outcome of the incident, when a Service-issued or approved firearm is, or reasonably appears to be, discharged in an unsafe or reckless manner due to impairment caused by the consumption of alcohol or another drug.

    (2)    Any incident which involves the discharge of a Service-issued or approved firearm by any person other than a Service employee, and causes any injury to any person, or any damage to any private, public, or government property in violation of any law or ordinance, or causes an investigation by any law enforcement agency.

    (3)    Any incident which involves the discharge of a firearm as an act of assault against any Service employee, and the assault is, or reasonably appears to be, related to his or her Service employment.

    (4)    Any incident which involves the discharge of a firearm by a law enforcement officer other than a Service officer when the discharge occurs during multi-agency operations involving INS officers.

4.    Responsibilities:

    A.    Commissioner

    The Commissioner of the INS has overall responsibility for all aspects of the Service Firearms Program.

    B.    Chairman, Firearms Review Board

    The Chairman of the Firearms Review Board (FRB) is responsible for overseeing all actions taken by the FRB, and shall ensure that the actions of the FRB are in compliance with laws, rules, and government-wide regulations and the INS Firearms Policy. Additional responsibilities include:

    (1)    The oversight of the overall development and implementation of the Service's Firearms Program, including training;

    (2)    The evaluation and assessment of the Service's firearms policy, identification of areas of concern, and initiation of implementation of changes in the policy;

    (3)    The review and analysis of all shooting incident reports for determining the need for changes in Service policy, training or equipment;

    (4)    Ensuring the timely dissemination of information related to the Firearms Program to all levels of the Service and appropriate outside entities.

C.    Administrator, National Firearms Unit

(1)    The Administrator of the National Firearms Unit (NFU) is responsible for the development and implementation of administrative and operational procedures related to the Firearms Program.

(2)    Under the direction of the Firearms Review Board, the responsibilities of the Administrator of the National Firearms Unit include:

(a)    Standardizing firearms, ammunition, and related equipment Service-wide;

(b)    Correcting deficiencies and resolving issues and concerns within the INS Firearms Program;

(c)    Assisting the field in reducing unnecessary officer-involved shootings;

(d)    Conducting ongoing research, development and testing on firearms, ammunition, and related equipment; conducting market surveys; and acquiring all firearms and ammunition;

(e)    Based upon that research, development and testing, determining which firearm(s) or related equipment are suitable for procurement and issuance to Service officers;

(f)    Updating the list of approved personally-owned firearms which may be purchased and carried by officers on and off duty;

(g)    Managing the Service's Asset Management Information System, Firearms Inventory Module (AMIS/FIM), including the oversight of all acquisition, transfer, and disposal of firearms;

(h)    Operating the Service's armories and overseeing all maintenance, repair and alteration of all Service-owned firearms, as well as any Service-approved firearms sent in by Service officers for inspection, maintenance, modification, and/or repair.  Responsibilities shall include the training, skills development, equipping and technical oversight of armorers located at the NFU, Service Academies, and designated field locations;

(i)    Determining Service-wide firearms, ammunition, and target inventory requirements and distributing firearms, ammunition, and targets to INS offices and the INS staff at the Service Academies;

(j)    Receiving all seized and excess firearms from INS offices, and determining disposition;

(k)    Assisting the Firearms Review Board with the analysis of shooting incidents for the purpose of recommending changes regarding firearms-related equipment, policy, or training;

(l)     Assisting the Shooting Incident Review Committee with the analysis of shooting incidents to determine compliance with the INS Firearms Policy, and identifying factors related to firearms-related equipment, policy, or training;

(m)     Coordinating, with the Training Division, the development and implementation of all firearms training, including basic and advanced courses, field-level training courses, instructor development, tactical firearms training, and familiarization and qualification courses of fire;

(n)     Coordinating, with the Headquarters Facilities and Engineering Division and the Training Division, the development and implementation of the program to determine the Service's requirements for firearms training facilities. Activities shall include:

(i)     Identifying individual field office firearms training requirements;

(ii)     Coordinating the development and implementation of Service-wide standard specifications for indoor and outdoor firing ranges;

(iii)     Coordinating the development of budgetary requirements necessary to obtain funding for the acquisition of real property and facilities to be used for firearms training by Service officers;

(iv)     Where feasible, initiating Headquarter level contacts with other Federal agencies leading to the joint funding and development of interagency firearms training facilities to be jointly managed and used by Federal agency field offices located in the same geographical area;

(v)     Overseeing the use of Service-owned, commercial, or other agency range facilities by INS field offices, including the management of risks related to Service liability for environmental and officer health hazards.

D.     The Office of Internal Audit (OIA)

(1)     The Office of Internal Audit is responsible for providing oversight and guidance to field offices to ensure that all of the Service's reportable shooting incidents are reported in accordance with Subsection 11 and investigated in accordance with Subsection 12 of this policy.

(2)     The OIA shall act as an objective administrative check and balance for the shooting incident reporting and investigative process as defined as in Subsections 11 and 12 of this policy.

(3)     The OIA will receive and compile documentation relating to the local INS investigation of each reportable shooting incident and will disseminate the documentation to the Shooting Incident Review Committee.

(4)     The OIA will ensure that the INS Executive Management Team and appropriate entities within the Department of Justice have been notified whenever a reportable shooting incident occurs.

E.   **Shooting Incident Review Committee (SIRC)**

   (1)   The SIRC functions as a subcommittee of the Firearms Review Board and will review shooting incident investigations to determine the following:

   (a)   The Authorizing Official's local INS investigation of the reportable shooting incident has been properly and competently conducted;

   (b)   The Authorizing Official's proposed final report of the local INS investigation of the reportable shooting incident is complete in every detail;

   (c)   The level of force used by individual INS officers who are involved in the incident was appropriate and consistent with the INS deadly force and non-deadly force policies;

   (d)   The Authorizing Official's proposed disposition of the incident, including any corrective and/or disciplinary action, is appropriate and consistent with the circumstances of the incident, and is consistent with final dispositions resulting from similar incidents which have previously occurred within the Service.

   (2)   Upon completion of the review of the proposed final report and disposition, the SIRC shall provide the Authorizing Official with appropriate analyses, observations, and recommendations regarding the reporting, investigation, and disposition of the incident;

   (3)   The SIRC shall periodically review the reasonableness of the INS deadly force policies and standards and provide recommendations to the FRB as necessary.

F.   **Authorizing Officials**

   (1)   Authorizing Officials are responsible for all aspects of the Service's firearms program as it relates to offices and personnel under their supervision, and for ensuring compliance with the INS Firearms Policy by all officers within their jurisdiction.

   (2)   Authorizing Officials shall establish and maintain a single, coordinated Firearms Program within their jurisdiction. At Headquarters and each Regional and District Office, one program shall be assigned lead responsibility for the Firearms Program within that jurisdiction. The lead program shall designate one firearms instructor as the Senior Firearms Instructor.

   (3)   Authorizing Officials shall designate a Firearms Control Officer as described in Subsection 4.G. and an Ammunition Control Officer as described in Subsection 4.H.

   (4)   The authority of an Authorizing Official will not be exercised by any person temporarily assigned to the position normally held by the Authorizing Official unless the authority is specifically conveyed in writing by the Authorizing Official or higher authority.

   (5)   Authorizing Officials shall be responsible for selecting a combination of journeyman and supervisory Border Patrol Agents or Special Agents from within their jurisdiction to conduct Service investigations of reportable shooting incidents involving Service employees. Authorizing Officials are also responsible for ensuring that these officers

successfully complete specialized training developed and provided jointly by the NFU and the OIA prior to being assigned to conduct any such investigation(s).

NOTE: Concurrent with the implementation of this policy, the NFU and the OIA will develop courses and provide training in the investigation of shooting incidents to all selected Border Patrol Agents and Special Agents. Pending availability of such training, Authorizing Officials will conduct investigations in accordance with Subsection 12.

(6)     Authorizing Officials are not personally exempt from any requirement within this policy and may not waive or alter any portion of the policy.

G.     Firearms Control Officers (FCO)

(1)     Firearms Control Officers (FCO) are individuals, designated in writing by the Authorizing Official, who are responsible for the physical and administrative control of firearms within the Authorizing Official's area of accountability. A copy of this designation shall be provided to the National Firearms Unit and appropriate property management officials. The FCO acts as an agent of the Authorizing Official and is the Accountable Officer for purposes of firearms within the jurisdiction of the Authorizing Official. At the discretion of the Authorizing Official, the FCO may also serve as the Ammunition Control Officer (ACO) as described in Subsection 4.H.(1) and (2).

(2)     Firearms Control Officers shall be responsible for:

(a)     Overseeing the shipment, receipt, and issuance of firearms, and ensuring that the appropriate property transfer data is entered into the Asset Management Information System, Firearms Inventory Module (AMIS/FIM);

(b)     Ensuring the entry of information pertaining to all firearms seized within the District or Sector into AMIS/FIM;

(c)     Overseeing the entry of quarterly qualifications data into AMIS/FIM;

(d)     Conducting periodic physical inventories of Service-issued or approved firearms and entering the data into AMIS/FIM.

H.     Ammunition Control Officers (ACO)

(1)     Ammunition Control Officers are individuals, designated in writing by the Authorizing Official, who are responsible for the physical and administrative control of ammunition within the Authorizing Official's area of accountability. A copy of this designation shall be provided to the National Firearms Unit and appropriate property management officials. The ACO acts as an agent of the Authorizing Official and is the Accountable Officer for purposes of ammunition within the Authorizing Official's jurisdiction. At the discretion of the Authorizing Official, the ACO may also serve as the Firearms Control Officer (FCO) as described in Subsection 4.G.(1) and (2).

(2)    Ammunition Control Officers shall be responsible for:

    (a)    Overseeing the receipt of ammunition, and posting notice of receipt of ammunition into the Asset Management Information System, Firearms Inventory Module (AMIS/FIM);

    (b)    Directing the issuance of ammunition, and oversight of the maintenance of up-to-date records of issuance of each type of ammunition for each program on the Ammunition Log Sheet, Form G-484;

    (c)    Overseeing the entry of data in AMIS/FIM of monthly ammunition usage by each program within each office in their area of accountability;

    (d)    Conducting periodic physical inventories of ammunition and entering the data into AMIS/FIM.

I.    <u>Firearms Instructors</u>

(1)    Authorizing Officials shall designate INS officers to perform full-time or collateral duties as Firearms Instructors.  Subsection 23.D(4)(a)-(f) outlines training for officers designated as Firearms Instructors.

(2)    Designation of Firearms Instructors shall be based on the following criteria:

    (a)    A working knowledge of firearms and firearms training;

    (b)    An aptitude for providing instruction in firearms; and,

    (c)    A score of 85% or higher on the last two quarterly qualifications for all firearms that the individual is authorized to carry.

(3)    Firearms Instructors are responsible for conducting firearms training, practice and qualification activities within their assigned area of jurisdiction.

    (a)    During firearms training, practice or qualification sessions, Firearms Instructors are responsible for taking all reasonable steps to ensure the safety and security of all involved Service personnel and property.  They are also authorized to remove any person from the range who refuses to comply with safety instructions or otherwise poses a safety risk.

    (b)    Firearms Instructors shall have absolute authority to resolve disputes regarding the scoring of targets.

    (c)    The Senior Firearms Instructor at each location is responsible for scheduling other Firearms Instructors and Range Safety Officers to assist with firearms training, practice or qualification sessions.

    (d)    The responsibilities of the Senior Firearms Instructor shall include acquisition of local range facilities, training and qualifications, and consolidation of orders for firearms, ammunition and related equipment.

J.    Range Safety Officers

(1)    Authorizing Officials shall designate INS officers to perform collateral duties as Range Safety Officers. Designation of these officers shall be based on the following criteria:

(1)    A knowledge of firearms and firearms safety;

(2)    An aptitude for maintaining firearms safety during training, practice and qualifications.

(2)    Range Safety Officers are responsible for assisting Firearms Instructors during firearms training, practice or qualification sessions.

K.    Individual Service Officers Authorized to Carry Firearms

Individual Service officers authorized to carry firearms pursuant to this policy are responsible for being familiar with this policy and adhering to all relevant aspects thereof.

5.    Service Officers Authorized to Carry Firearms:

A.    The following Immigration Officers who have successfully completed Basic Immigration Law Enforcement Training, as defined in Subsection 3.C., are authorized and designated to exercise the power conferred by Section 287(a) of the Immigration and Nationality Act to carry firearms, during duty and non-duty hours, provided they are individually qualified by training and have demonstrated their ability to handle and safely operate the firearms that they are permitted to carry; maintain proficiency in the use of firearms; and adhere to the provisions of the policy governing the use of force.

(1)    Border Patrol Agents, including Border Patrol Aircraft Pilots;

(2)    Special Agents and Immigration Agents;

(3)    Deportation Officers, including Deportation Aircraft Pilots;

(4)    Detention Enforcement Officers;

(5)    Immigration Inspectors;

(6)    Adjudications Officers (See note below);

NOTE: The authority of Adjudications Officers to carry a firearm is specifically limited to those officers who have successfully completed the Service's Basic Marksmanship Instruction and Practical Pistol Courses as defined in Subsection 3.E. and are assigned to perform duties as an Inspector in a location which requires the carrying of a handgun. This authority permits transporting a handgun to and from such duty assignments, including training and quarterly qualifications, but may not be expanded to include carrying the handgun while off duty. Adjudications Officers are temporarily issued handguns only for those assignments which require the carrying of a handgun. Upon return to the office, the handgun will be turned in. Each office employing Adjudications

Officers to perform inspectional duties requiring the carrying of a handgun will maintain a sufficient quantity of unassigned Inspections Program handguns for this purpose.

(7)     Immigration Officers and other Service employees who are granted the authority to carry a firearm, either individually or as a class, by the Commissioner with the approval of the Deputy Attorney General; and,

(8)     Officers who are responsible for supervising the activities of those officers listed above.

6.     Guidelines for Carrying Firearms:

A.     (1)     Service authorization to carry a personally-owned handgun during duty hours or non-duty hours shall be limited specifically to Service-approved handguns in accordance with Subsection .18 and Appendix .1 (A and B). Where an officer is authorized under Subsection 21 to carry a non-standard Service-issued or approved handgun exclusively for an approved undercover operation, the officer is authorized to carry the handgun during duty and non-duty hours until such time as the undercover operation is completed or terminated.

B.     (1)     Service officers listed in Subsection 5.A.(1)-(8) are required to carry a Service-issued or approved handgun, and may be required to carry other firearms, during duty hours in the performance of their normal duties.

       (2)     Exceptions to this requirement are:

              (a)     Immigration Inspectors who were employed prior to November 1, 1989, and were granted a written personal exemption from the requirement prior to that date; and,

              (b)     Adjudications Officers who are not assigned to conduct inspections.

       (3)     This subsection is not intended to require a Service officer to carry a handgun or other firearm while performing duties where the carrying of a firearm is inappropriate, such as performing routine office work, testifying in court, etc.

       (4)     Additionally, as outlined in Subsection 17.B., except in emergency situations, officers may decline to carry a longarm.

C.     Service-issued or approved firearms shall be carried loaded with the Service-designated number of rounds for that firearm. Only Service-issued ammunition is authorized for duty carry and use by INS officers.

D.     As described in Subsection 24, INS officers must be able, at any time, to demonstrate an acceptable level of proficiency with each type of firearm they are authorized to carry.

E.     INS officers must be able to demonstrate an acceptable knowledge of the elements necessary to justify the use of deadly force.

F.     The authority of either a single officer or a group of officers to carry a firearm during duty and/or non-duty hours may be withdrawn or restricted by the Authorizing Official when the withdrawal

or restriction is in the best interests of the Service and/or the officer(s). A written notification, including a statement of the reason(s) for the revocation, shall be served upon the officer(s) as soon as practicable, and may either precede or follow the action. In all cases where the authority of an officer to carry a firearm while in the performance of duty is withdrawn or restricted, supervisors will ensure that the officer is not assigned to duties that normally require the carrying of a handgun.

G.    Except as provided herein, Service officers shall carry only one handgun on their person at a time. If an officer needs to carry two handguns at the same time, the officer must obtain written permission from his or her Authorizing Official prior to doing so. Authorization to carry more than one handgun will be based on factors including, but not limited to, types of duty performed, location of assignment, and justification submitted. Such written authorizations may be continuing in nature, and may apply to more than one officer, such as a group of officers assigned to the same type of duty or assignment. A copy of all such authorizations shall be placed in the Official Personnel File of each of the officers authorized to carry two handguns at the same time. A copy shall also be provided to the local Senior Firearms Instructor and the National Firearms Unit.

H.    Authorizations for personally-owned handguns granted prior to November 1, 1989 which were "grandfathered" in accordance with the November 1, 1989 revision of the INS Firearms Policy will be revoked in accordance with the Service Pistol Issuance Policy.

I.    Authorizations for personally-owned handguns granted between November 1, 1989 and the effective date of this policy are restricted to those handguns listed in Appendix 1A, and will be revoked in accordance with the Service Pistol Issuance Policy.

J.    Authorizations for personally-owned handguns granted after the effective date of this policy are limited to those handguns listed in Appendix 1B. The list of Service-approved, personally-owned handguns will be periodically revised by the National Firearms Unit.

K.    Authorizations for longarms, including all shotguns, rifles and submachine guns, are limited to those firearms that are listed in Appendix 1(A or B). No officer shall be authorized to train with, qualify with, or carry any type of longarm that has not been approved in writing by the appropriate Assistant Commissioner for use by officers in that program. In accordance with Subsection 18.N., Service officers are not authorized to carry or use personally-owned longarms on official duty.

L.    Service officers who are not members of a specialized tactical team which has been approved by the Special Response Team Review Board are not authorized to carry any firearm that is listed as a "Special Weapon" in Appendix 1(A or B). Special weapons are authorized for special operations only by officers specifically trained in their use and are not authorized for general use by Service officers.

M.    When acting under INS authority, Service officers shall not carry a firearm while under the influence of illegal drugs (as described in the INS Drug Free Workplace Plan) or intoxicating alcoholic beverages. Additionally, Service officers acting under INS authority shall not carry a firearm while taking prescription medication which renders them unable to safely carry a firearm.

N.    Service officers are to act in a professional manner and therefore will not carelessly or unnecessarily display firearms. The authority to carry firearms carries with it an obligation and

responsibility to exercise discipline, restraint, and good judgement in their use.  Firearms will not be used to unlawfully coerce a person.

7.    Deadly Force Involving Firearms

NOTE:  Appendix 6 contains the Department of Justice policy which governs the use of deadly force by all Department of Justice employees.  The policy statement and commentaries are to be read jointly and are considered to comprise the Department of Justice Deadly Force Policy.  This Subsection is the supplemental deadly force policy negotiated between the INS and its Unions, and applies to all INS officers:

A.    Discharging a firearm shall be done only with the intent of stopping a person or animal from continuing the threatening behavior which justifies the use of deadly force.  When deadly force is justified an officer may use any level of force necessary, up to and including deadly force.

B.    Firearms may be discharged under the following circumstances:

   (1)    When the officer reasonably believes that the person at whom the firearm is to be discharged possesses the means, the intent, and the opportunity of causing death or grievous bodily harm upon the officer or another person;

   (2)    At the driver or other persons inside a vehicle who the officer reasonably believes presents an imminent danger of death or grievous bodily harm to the officer or another person.  The hazard of an uncontrolled moving vehicle, as well as the possibility of injury to other persons concealed in the vehicle, must be taken into consideration before firing;

   (3)    When confronted by an animal which presents an immediate threat to the officer or another person;

   (4)    When an animal is encountered that appears to be so seriously injured that it should be destroyed to prevent additional suffering.  In the case of domesticated animals, officers should attempt to contact the owner prior to destroying the animal, if feasible;

   (5)    At a firearms sporting event or organized shooting competition; hunting for game and/or target practice on privately-owned land with permission of the owner; on public lands where the discharging of a firearm is not in violation of any law or ordinance and all reasonable safety procedures can be followed; or at a commercial, public, or government-owned firing range.

C.    Firearms shall not be discharged under the following circumstances:

   (1)    As a warning shot.

   (2)    At a moving vehicle for purposes of stopping the vehicle.

   (3)    In any situation where it appears likely that an innocent person will be injured.

D.    Officers shall draw their handgun only when justified by the circumstances.  Officers are not required to provide oral or written justifications for such actions unless requested by a supervisor.

All oral or written statements solicited by a supervisor from bargaining unit employees regarding such actions shall be governed by the applicable provisions of the law and the Collective Bargaining Agreement.

8.    Compliance with the INS Firearms Policy:

    A.      Within thirty days of the implementation of this INS Firearms Policy, Authorizing Officials shall provide a complete copy of the policy to all Service officers who are authorized to carry a firearm.

    B.      Trainee officers in positions listed in Subsection 5.A.(1)-(8) shall be issued a complete copy of the Firearms Policy during their basic training at the Academy and provided a course of instruction to ensure their awareness of the elements of the policy and their personal responsibility to comply with the policy.

    C.      Officers from another agency who enter the Service in a position described in Subsection 5.A.(1)-(8) at a grade level which precludes their attendance at one of the Service Academies shall be provided a complete copy of the INS Firearms Policy.

    D.      All officers will be given an opportunity to read this document during duty hours, ask questions pertaining to the policy, and receive answers in order to ensure their understanding of their role and responsibilities under this policy.

    E.      If questions regarding this policy cannot be answered to the satisfaction of the officer at the Service Academy or the duty station, the officer may submit the question in writing via telefacsimile to the National Firearms Unit, which shall provide an answer within three regular work days. The National Firearms Unit will periodically issue clarification of the policy based upon questions submitted.

    F.      Officers who encounter field situations that are unclear or not addressed in this policy are expected to exercise reasonable judgment. Following the resolution of the situation, officers are encouraged to report situations that are still unclear or that the officer feels should be addressed in the policy. Officers may contact the NFU for this purpose in accordance with Subsection 8.E.

    G.      Authorizing Officials shall ensure that supervisors and management officials under their supervision disseminate, review and discuss the contents of the Firearms Policy with each Service officer under their supervision.

    H.      All Service officers employed in a position listed in Subsection 5.A.(1)-(8), including Basic Trainee officers, shall sign a statement (see Appendix 2) signifying possession of a copy of this policy, and his or her personal obligation to comply with the policy. Following initial implementation of this policy, on an annual basis, a new statement will be signed by each officer. The original signed copy will be forwarded to the officer's Servicing Human Resources Office for inclusion in the officer's Official Personnel File (OPF). A copy of the signed statement shall be forwarded to the Authorizing Official in charge of the officer's permanent duty station. These statements shall be retained in both files for a period of four years. At any time that the Firearms Policy is revised, a copy of the revised portion of the policy shall be provided to all Service officers. Any Service officer who requests a copy of the Firearms Policy at the time he or she is required to sign a statement signifying possession thereof shall be provided with a complete copy of the policy without cost or other consequences to him or her.

I.    The penalties for non-compliance of the INS Firearms Policy shall be determined by the Department of Justice Table of Offenses and Penalties. These penalties can range from a verbal reprimand to termination of employment, depending upon the offense.

9.    **Firearms Aboard Commercial Aircraft:**

A.    The following guidelines are based on Federal Aviation Regulations (FAR):

(1)    Service officers are authorized to carry Service-approved handguns in the cabin of a commercial aircraft while in performance of their official duties in accordance with the conditions contained in Subsection 9.A.(3)(a)-(e). Service officers may also transport unloaded firearms in checked luggage.

(2)    In conjunction with their official duties, Service officers are authorized to carry handguns on board commercial aircraft at any time while the aircraft is parked at the gate or ramp. Upon boarding the aircraft, the officer shall identify himself or herself to the flight crew and notify them of his or her intention of either conducting an inspection of passengers, crew, or other workers on board the aircraft, or conducting other INS enforcement activities.

(3)    The carrying of firearms in the cabin of a commercial aircraft is limited to the following circumstances:

(a)    when a Service officer is required to carry a firearm in conjunction with an official duty assignment; or

(b)    when a Service officer is conducting hazardous surveillance operations in conjunction with his or her official duty assignment; or

(c)    when a Service officer is assigned protective prisoner escort; or

(d)    when a Service officer is providing protective escort such as a dignitary or a witness protection assignment; or,

(e)    when a Service officer is required to report to another location, armed and immediately prepared for duty.

(4)    When armed and acting in an undercover capacity, a Service officer shall not attempt to deceive airline or airport security personnel to preserve the officer's cover. Service officers performing surveillance duties or other duties that will require inconspicuous passage through an airport metal detector or security checkpoint shall prearrange clearance.

(5)    All officers authorized to carry firearms shall receive FAA-approved, Service-provided training regarding carrying firearms on board commercial aircraft as either part of their basic training at the Academy, or as part of another course of formal training provided by the Service.

(6)    Service officers may transport an unloaded firearm in checked luggage. The following procedures shall be followed:

(a) The firearm shall be secured in a locked, hard sided carrying case that may be placed inside hard or soft-sided luggage.

(b) The airline ticket agent shall be notified that the checked luggage contains an <u>unloaded</u> firearm.

(c) Pursuant to FAA regulations, airlines are required to place notifications of unloaded firearms only <u>inside</u> checked luggage. Officers should request that no identification that the luggage contains a firearm be placed on the outside of the luggage. If the issue cannot be resolved in a reasonable and professional manner, the officer should request assistance from the airline's Ground Security Coordinator (GSC) or schedule another flight.

(d) Firearms shall not be stowed in the crew compartment(s) of an aircraft.

(7) FAA regulations require that Service officers present themselves to the airline at least one hour in advance of the flight and complete all required airline forms and check-ins. Failure to do so may result in the officer not being allowed to board that flight.

(8) Under no circumstances shall Service officers relinquish a firearm to the pilot or any member of the flight crew. Firearms shall not be left unattended in the aircraft.

(9) In accordance with FAA regulations, Service officers carrying a firearm within the cabin of an aircraft shall not consume alcoholic beverages within eight hours prior to departure of any flight or at any time during a flight.

(10) Non-uniformed Service officers shall conceal their handgun from view from passengers except when circumstances justify the use of a firearm in accordance with INS and FAA policies. Officers shall remain alert and maintain secure control of their firearm at all times.

(11) Pursuant to FAA guidelines, if an officer is on board an aircraft and a disturbance occurs that involves a passenger other than an INS-escorted prisoner, the officer shall take <u>no</u> action unless requested by a uniformed crew member.

B.    Instructions for Reporting Problems with Airline Personnel

(1) Pilots and air crew members have no authority to take personal custody of a Service officer's firearm. However, if a pilot refuses to accept the armed officer as a passenger, the officer should:

(a) Ensure that he or she is in compliance with INS guidelines and FAA regulations outlined herein; and,

(b) Properly secure the firearm and have it stowed in the officer's checked baggage (if practicable); or

(c) Request assistance from the carrier's Ground Security Coordinator; or

(d) Schedule another flight.

*Administrative Manual Section 20.012 - INS Firearms Policy*

16

(2)     Any refusal by a pilot, or other airline or airport security personnel, to allow an armed Service officer to board an aircraft shall be documented in a written report by the officer and forwarded through official channels to his or her Authorizing Official. The Authorizing Official shall forward the report to the National Firearms Unit and to the appropriate airline carrier, with a copy to the Authorizing Official with jurisdiction over the airport at which the incident occurred.

10.     Firearms in Foreign Assignments:

A.     The statutory and implied authorities for an INS Officer to carry a firearm do not apply in any foreign assignment. Accordingly, Service officers serving in foreign assignments shall not carry a firearm without the specific written concurrences of all of the following managers:

(1)     Foreign District Director;

(2)     Director, Office of International Affairs;

(3)     Executive Associate Commissioner for Field Operations; and

(4)     Deputy Commissioner.

In addition to the above approvals, all authorizations to carry firearms in a foreign assignment are subject to the approval of the Department of State and the host country.

B.     District Directors serving in foreign countries shall ensure compliance with this policy and the laws of the host country.

C.     The guidelines in Subsections 10(A) and (B) do not apply to temporary entries by on-duty officers into Mexico or Canada. These entries shall be coordinated through the Office of International Affairs. All such arrangements will be made in compliance with applicable Service policies.

11.     Reporting of Shooting Incidents

A.     Any Service employee who participates in or observes a reportable shooting incident, as defined in Subsection 3.H., shall orally report the incident to a supervisor. Unless the reporting employee is physically incapacitated or otherwise unable, the report shall be made within one hour of the time the incident occurs or within one hour of the time the employee becomes aware of the incident. If the incident occurs while the employee is on duty, the employee must report the incident prior to going off duty. The oral report shall be made either in person, or via radio or telephone and will be comprised of the following information, if known:

(1)     The date, time, and location of the shooting incident;

(2)     The identity and current location of any injured or deceased person(s), including an assessment of the extent of the injuries;

(3)     The identity, physical description, and current location of any individual(s) known to be involved in, or to have witnessed the incident, including suspects who are at large;

(4)     The description and location of vehicles involved in the incident, including any suspect vehicle(s);

(5)     A brief description of the incident, including any unusual circumstance(s) which might cause additional conflict(s) or confrontation(s);

(6)     The operational activity in which the Service employee(s) involved in the incident were engaged;

(7)     The type of firearm(s) used, the number of shots fired, and the current location of all firearms used in the incident;

(8)     Any other information that is needed to assure that the operational responsibilities of the Service related to the security of human life and Service equipment are properly carried out.

B.     Following the initial reporting of the incident, an employee who learns of additional information concerning the items listed in Subsection 11.A.(1)-(8) shall promptly make an oral report of such information to a supervisor.

C.     Any supervisory or management official who is notified of the occurrence of a reportable shooting incident shall make an initial supervisory report to the appropriate Authorizing Official in accordance with the following:

(1)     Incidents involving personnel assigned to a District or Sector, or any subordinate office within a District or Sector, will be reported to the District Director or Chief Patrol Agent;

(2)     Incidents involving personnel assigned to an office or activity which is directly under the jurisdiction of INS Headquarters, e.g., BORTAC, El Paso Flight Operations, National Firearms Unit, Service Academies etc., will be reported to the District or Sector Authorizing Official with geographic and programmatic jurisdiction where the incident occurred.  The Authorizing Official to whom the report is made will have jurisdiction over the investigation and will assume responsibility as if the employee(s) involved were part of the Authorizing Official's organization.

(3)     The initial supervisory report shall contain all information known about the incident and shall be made within one hour of receipt of the first employee report, and may be made orally, either in person, or via radio or telephone. Whenever practical, the report shall be made through official channels, but the report shall not be delayed when observance of the chain-of-command is impractical.

(4)     Following the submission of the initial supervisory report, any supervisor or other Service management official who receives additional information regarding the incident shall report the information to the Authorizing Official as soon as practicable.

D.     Any Authorizing Official who is notified of a reportable shooting incident shall report it to the appropriate Regional Director in accordance with Regional guidelines for the reporting of significant incidents and within one hour of the occurrence of the incident, or as close to that time

as practical, to the INS Command Center at (202) 616-5000. The report should contain all information known about the incident at the time.

(1)     In any shooting incident where there is a death, serious injury, evidence of criminal misconduct by a Service employee, or an allegation of criminal misconduct by a Service employee, the Authorizing Official shall ensure that the incident has been reported to the law enforcement authorities having jurisdiction.

(2)     Until the incident is resolved, the Authorizing Official shall be responsible for responding to requests for information about the incident from the public, the media, and other agencies with a "need to know" after coordinating such information releases with the appropriate Office of Press Information.

(3)     Following the initial report of the incident and during the Service investigation, the Authorizing Official shall ensure that copies of all investigative reports, any other pertinent documents and copies of all printed and televised media reports are provided to the appropriate Regional Director and to the Office of Internal Audit.

(4)     Upon completion of the local Service investigation of the incident, and prior to the initiation of any disciplinary action(s), the Authorizing Official shall send a copy of the proposed final report to the Office of Internal Audit for preparation and submission to the Shooting Incident Review Committee (SIRC). The Authorizing Official shall delay the initiation of disciplinary action until the recommendation of the SIRC is received.

(5)     The Authorizing Official shall also provide a written report of the final disposition of the incident to the Office of Internal Audit.

E.     Upon receipt of a report of a shooting incident, the INS Command Center will immediately notify the Office of Internal Audit (HQOIA).

F.     The Office of Internal Audit shall evaluate the initial report of the incident, contact the Authorizing Official to confirm receipt of the report, and notify appropriate Headquarters and Department of Justice offices.

G.     Following receipt of the Authorizing Official's final report of the Service investigation of a reportable shooting incident, the Office of Internal Audit shall provide a copy to the National Firearms Unit for permanent retention. The NFU shall be immediately informed by the OIA of any incident that involves officer safety.

12.     Investigation of Reportable Shooting Incidents

A.     Authorizing Officials

(1)     In any incident where a law enforcement agency other than INS has the primary investigative jurisdiction, the Authorizing Official shall ensure that only the following actions are taken until contact with the responsible law enforcement agency has been made:

(a)     Collect and report shooting incident information in accordance with Subsection 11;

    (b)    Ensure that medical attention is provided for any individual injured;

    (c)    Preserve the shooting incident scene and all relevant evidence;

    (d)    Identify witnesses; and,

    (e)    Exchange information with other law enforcement investigative agencies and advise them of the desire of the INS to maintain liaison during the investigation.

(2)    Following contact with the law enforcement agency with primary investigative jurisdiction, the following actions will be taken: (In any incident where INS has the primary investigative jurisdiction, or the law enforcement agency with primary jurisdiction has relinquished it to the INS, these actions will be taken immediately.)

    (a)    The Authorizing Official is responsible for the completion of a local Service investigation of the incident. In incidents involving personnel from more than one Service jurisdiction, the responsibility to conduct the investigation shall be agreed upon among all Authorizing Officials with officers involved in the incident.

    (b)    The Authorizing Official shall immediately notify the Immediate Subordinate Official of the incident and direct that he or she initiate the local Service investigation of the incident.

    (c)    The local Service investigation of the incident is intended to determine the following:

        (i)    Were the actions of all Service employee(s) involved in the incident appropriate and in accordance with this policy and other Service and Department of Justice guidelines?

        (ii)    Are there any factors which may indicate criminal misconduct by any Service employee(s)?

        (iii)    Are there any factors which should be referred to the INS General Counsel concerning potential litigation?

        (iv)    Are there any factors which indicate a need for a change in this policy or any other policy or guideline, or change in training or equipment, or which may be useful as a training aid for other Service employees?

(3)    Upon completion of the local Service investigation of the incident, the Authorizing Official shall review the proposed final investigative report and, if applicable, reports prepared by other law enforcement agencies, and the proposing official's recommended disposition of the incident. Upon acceptance of the report and the proposed disposition, the Authorizing Official shall send the original to the OIA in accordance with the instructions contained in Subsection 11.D(5).

**B.**   **Immediate Subordinate Officials**

(1)   Upon notification that a reportable shooting incident has occurred and that an investigation has been directed by the Authorizing Official, the Immediate Subordinate Official shall:

(a)   Open a file on the incident, obtain an incident tracking number from the OIA, and comply with the other instructions contained in Appendix 3 and/or the INS Shooting Incident Investigation Manual.

(b)   Assign at least two investigating officers, as defined in Subsection 4.F.(5), to conduct the local Service investigation of the incident. No investigating officer who has a conflicting relationship with the involved employee(s) shall be assigned to the investigation.

(c)   Direct that the investigating officers respond to the scene of the incident as soon as possible and initiate the investigation.

(d)   Ensure that when any bargaining unit employee is compelled by or through the Agency to provide any information that could reasonably lead to disciplinary action against him or her (other than the initial verbal notification outlined herein), he or she is advised in writing of his or her right to Union representation in accordance with the applicable provisions of the law and the governing Collective Bargaining Agreement. Under normal circumstances, the decision by a bargaining unit employee to obtain Union representation prior to providing the requested report or statement shall not delay the employee's response longer than 48 hours, as set forth in the Collective Bargaining Agreement.

(e)   Ensure that supervisory or investigative officers involved in the local INS investigation of the shooting incident are aware that any information provided by any employee under threat of disciplinary action by the Service or through any other means of coercion cannot be used against such employee in any type of action other than administrative action(s) taken by the Service consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1966).

(f)   Direct that supervisory personnel present at the scene:

(i)   Remind Service employees of their rights to Union representation and of their Constitutional protections against self-incrimination.

(ii)   Ensure that all Service employees who are involved in the incident have been identified and advised that they will be interviewed by the investigating officers and that they are to remain on duty until the initial interview has been completed or they are released by a supervisor. (If the interview cannot be conducted within a reasonable period of time or the employee is physically or mentally unable to participate in the interview, the Immediate Subordinate Official shall direct the necessary rescheduling for this requirement.) Employees directed to remain on

duty shall be compensated under the appropriate overtime statute for all hours beyond the end of their scheduled shift.

(g)    Ensure that supervisory personnel or INS investigating officers are aware that employees involved in a shooting incident shall <u>not</u> be required or allowed to submit a written statement of the circumstances surrounding the incident. All written statements regarding the incident shall be prepared by the local INS investigating officers and shall be based upon an interview of the INS employee.

(h)    Assume on-scene responsibility for media contacts and prevent media disruption of Service personnel who are present.

(2)    Within one hour of the arrival of the Service's investigative team at the scene of the incident, the Immediate Subordinate Official shall provide the Authorizing Official with a preliminary report of the status of the situation, including updated information regarding the condition of injured persons and the employee(s) involved in the incident.

(3)    Upon completion of the Service's investigation of the incident, the Immediate Subordinate Official shall ensure that a single, consolidated report of the incident is prepared by the investigating officers.

13.    <u>Service Personnel Involved in a Shooting Incident</u>

A.    When a Service officer's reportable use of a firearm, as defined in Subsection 3.H., either on or off duty, results in death or serious injury to a person, the officer shall immediately be placed on Administrative Leave with pay and/or regularly scheduled days off for three consecutive calendar days in order to participate in a confidential debriefing conducted by a counselor from the Employee Assistance Program (EAP). If periods of EAP counseling occur on scheduled days off duty, these periods shall be compensated as directed overtime. Requests for additional administrative leave for this and other related purposes shall be granted by the Authorizing Official on a case-by-case basis. The officer shall be available to assist in the completion of the local INS investigation to the extent that this does not conflict with the terms of the applicable Collective Bargaining Agreement.

B.    While on Administrative Leave following a shooting incident, those officers compensated with Administratively Uncontrollable Overtime or Law Enforcement Availability Pay shall continue to receive overtime pay and will be credited with excludable days in accordance with existing laws, government-wide regulations and Service policy.

C.    The Service shall ensure that all involved officer(s) are debriefed by an EAP counselor. This debriefing is mandatory, is confidential in accordance with 42 C.F.R. Part 2, and is not part of the investigative process. Its sole purpose is to assist the employee in dealing with the traumatic incident. The EAP uses a national network of police psychologists for specialized counseling in traumatic incident cases such as shootings.

D.    While the Service's internal investigation of the incident, or a criminal investigation of the incident, is being conducted, the Authorizing Official may, with the concurrence of the appropriate Regional Director, continue the officer on Administrative Leave with pay until either or both of the investigations are completed. If any such investigation lasts more than 30 days beyond the date of the shooting incident, the Authorizing Official will provide the affected employee with a

status report of the investigation(s) at 30 day intervals until the employee is returned to full duty status. The report may be oral or in writing, and will inform the employee of the status of the investigation(s) to the extent known by the Service and an estimated time of completion of the investigation(s).

E.   Service officers who are involved in shooting incidents may be tested in accordance with the Service's Drug-Free Workplace Program:

   (1)   Reasonable Suspicion testing may be required when there are articulable facts that the shooting incident was the result of illegal drug use. The decision to direct an INS officer to report for Reasonable Suspicion Testing in accordance with the INS Drug Free Workplace Plan shall be based on articulable information, facts, and circumstances which lead supervision to believe that reasonable suspicion exists that the officer is using illegal drugs as defined in the INS Drug Free Workplace Plan. All such determinations must be approved by a higher level of management than the level of management making the initial determination.

   (2)   Upon written request, an employee who has been tested for drugs in accordance with this Subsection will be provided a copy of the written justification (which may include such matters as the dates and times of reported drug related incidents, reliable/credible sources of information, and the rationale leading to the test) for such testing no later than 48 hours after the employee is sent for testing.

14.   Shooting Incident Review Committee (SIRC)

   A.   The membership of the Shooting Incident Review Committee shall be comprised of the following:

      (1)   Director, Office of Internal Audit, or the Assistant Director for Internal Investigations;

      (2)   Chairperson, Firearms Review Board;

      (3)   The Administrator of the INS National Firearms Unit, or his or her Deputy;

      (4)   The Executive Associate Commissioner for Field Operations, or his or her Deputy; and

      (5)   A representative from the Department of Justice, Office of the Deputy Attorney General;

   B.   Meetings of the SIRC shall be scheduled to occur on the same day as the FRB meetings.

15.   Service Firearms Review Board

   A.   The voting membership of the Service Firearms Review Board shall be comprised of the following:

      (1)   Director, Law Enforcement Support, (Chairperson);

      (2)   Associate Commissioner for Enforcement,

      (3)   Assistant Commissioners for Border Patrol, Detention and Deportation, Inspections, Intelligence and Investigations, or their Deputy;

(4)     The Administrator of the INS National Firearms Unit, or his or her Deputy;

(5)     Director, Office of Internal Audit, or the Assistant Director for Internal Investigations;

(6)     The Director of the Training Division or his or her designee;

(7)     The Executive Associate Commissioner, Office of Field Operations, or his or her Deputy; and

(8)     A representative from the Office of the General Counsel;

B.     The non-voting membership of the Board shall be comprised of the following:

(1)     The Executive Secretary, who shall organize the Firearms Review Board meetings, record the minutes, and prepare reports of the meeting;

(2)     One staff officer designated by each Assistant Commissioner. These officers shall comprise the Firearms Review Board Working Group.

C.     The Firearms Review Board shall make decisions based on a majority vote of those members present at meetings where at least two-thirds of the voting members are present. Alternate members are allowed to vote in the absence of the primary member.

D.     The Firearms Review Board shall meet on the first Thursday of each month unless there is a scheduling conflict, in which case the meeting shall be rescheduled as soon as possible. If the Chairperson is unavailable, the Administrator of the National Firearms Unit will act as Chairperson.

E.     Voting primary members, or their alternates, are required to attend each meeting in order to make decisions affecting their program, to receive individual program assignments, and to ensure that their program's designated staff member understands and completes assignments in a timely manner.

16.     National Firearms Unit (NFU)

A.     The INS National Firearms Unit shall operate as an extension of the Firearms Review Board in overseeing the Firearms Program. The National Firearms Unit shall be directed by the Administrator, National Firearms Unit.

B.     The National Firearms Unit shall prepare annual and periodic reports on all matters relating to the INS Firearms program. A copy of these reports will be provided to all appropriate INS offices, the National Border Patrol Council and the National Immigration and Naturalization Service Council.

17.     Issuance of Firearms

A.     Assistant Commissioners for the Enforcement Programs and Inspections are responsible for identifying the firearms that are appropriate to the mission of the Service officers within their program. A list of authorized Service-issued or Service-approved, personally-owned firearms for each job category is contained in Appendix 1(A or B). In addition, Assistant Commissioners for

the Enforcement Programs and Inspections are responsible for providing funding to the National Firearms Unit for the acquisition of Service firearms, ammunition, related equipment and supplies for their respective programs and coordinating the issuance of these items with the National Firearms Unit.

B.   Based on the duty assignment, Authorizing Officials shall issue officers under their jurisdiction firearms listed for the officer's job category in Appendix 1(A or B).  Except in emergency situations, officers may decline to carry a longarm.

C.   The Authorizing Official's decision on which longarms are appropriate for issuance for a particular duty assignment should be based on the performance characteristics of the firearm and cartridge, effective range or penetrating ability, environment, etc.  Guidelines for longarms are provided in Appendix 4.  These guidelines shall be updated periodically by the National Firearms Unit.

D.   Firearms shall be issued only to officers who have successfully completed Service-approved training as defined under Subsection 3.E., demonstrate proficiency (safe operating techniques and/or immediate action drills), and are currently qualified with that particular type of firearm.

E.   Offices issuing an employee a firearm shall record the issuance of the firearm on Form G-571, Defensive Weapons Control Card for Temporary Authorizations.  The Form G-571 will also be used to document the authorization of personally-owned handguns.

F.   In order to support and encourage participation of Service officers in competitive shooting events, the National Firearms Unit will issue competition shooting equipment when available.  When competition shooting equipment is received from the National Firearms Unit at an INS office, it shall be issued immediately to the Service officer to whom it was assigned.

(1)   The National Firearms Unit shall prepare a Form G-504, Record of Property Shipped-Received, showing that the competition shooting equipment was shipped to a particular INS officer.

(2)   A separate property card, Form G-571, listing only the competition shooting equipment shall be executed in duplicate and shall contain the following notation in capital letters:

COMPETITION SHOOTING EQUIPMENT - THIS EQUIPMENT IS NOT TO BE TRANSFERRED EXCEPT AS DIRECTED BY THE NATIONAL FIREARMS UNIT, UNLESS THE OFFICER IS TERMINATING EMPLOYMENT WITH THE SERVICE.

(3)   Both copies of the property card shall be initialled by the Service officer to whom the competition shooting equipment is issued.

(4)   The original property card shall be filed with the officer's regular property card and the duplicate shall be forwarded with a copy of the G-504 to the National Firearms Unit.

18.   Approved Firearms

A.   Authorization to carry handguns during duty or non-duty hours shall be limited specifically to those Service-approved handguns, by job category, as listed in Appendix 1(A or B) (See exception for undercover firearms in Subsection 21).

B.    Requests for non-standard firearms for operational use by INS field offices shall be forwarded to the appropriate Assistant Commissioner and the National Firearms Unit for concurrence, and to the Firearms Review Board for approval. If approved, the National Firearms Unit will coordinate the acquisition and distribution of the non-standard firearms. Non-standard firearms are defined as firearms not specifically listed in Appendix 1(A or B) that meet the criteria in Subsection 21, Undercover Operations.

C.    Authorization to carry any longarm shall be limited specifically to those Service-approved longarms listed in Appendix 1(A or B) for each job category.

D.    All Service issued or approved firearms shall have a blued, anodized, "Parkerized," phosphated, or other durable non-reflective finish. An exception is stainless steel handguns, which shall have a non-reflective matte finish.

E.    Firearms will have fixed or adjustable sights, and may be equipped with tritium "night" sights.

F.    No laser sights, passive optical sights or attached illumination devices are authorized unless the item has been evaluated and approved by the National Firearms Unit specifically for use by the requesting entity.

G.    Handguns with obtrusive thumb-rest type grips, or pearl, bone or other ostentatious grips shall not be carried.

H.    Since the implementation of the November 1, 1989 Firearms Policy, INS officers have not been authorized to carry single-action-only semi-automatic pistols either on or off duty under INS authority.

I.    Authorization to carry personally-owned handguns

   (1)    Service officers who desire to carry a personally-owned handgun in conjunction with their official duties are limited to those handguns listed in Appendix 1(A or B).

   (2)    Prior to carrying a personally-owned handgun in conjunction with their official duties, officers must obtain written authorization from the Authorizing Official using the form found in Appendix 5. Copies of the completed authorization form shall be distributed as shown on the bottom of the form.

   (3)    Handguns obtained for such use must meet the Service specifications established by the National Firearms Unit. Officers may not make modifications to these handguns except as outlined in this policy.

   (4)    Prior to submitting the request to the Authorizing Official, the requesting officer must obtain the concurrence of the District or Sector Senior Firearms Instructor.

   (5)    Prior to allowing an officer to qualify with a Service-approved, personally-owned handgun, the Firearms Instructor shall inspect the handgun to determine it to be in safe and serviceable condition and shall verify the descriptive data for the handgun contained on the request.

(6)    Prior to recommending approval of the request, the Firearms Instructor shall verify that the requesting officer has successfully completed the requisite INS firearms training course.

(7)    The requesting officer shall also be required to comply with the provisions in Subsection 24, which includes the demonstration of proficiency and satisfactory completion of the qualification course with the handgun.

J.    Authorizing Officials shall approve requests to carry a Service-approved, personally-owned handgun when such requests comply with this policy. The Firearms Control Officer shall create a Form G-571 Defensive Weapon Control Card for Temporary Authorizations for each authorized personally-owned handgun.

K.    When the transition to the Service pistol is completed, Service-issued or approved semi-automatic pistols in 40 S&W caliber will replace all other pistols listed in Appendix 1A. Appendix 1B reflects these changes. The National Firearms Unit shall update the list of authorized firearms contained in Appendix 1B on a periodic basis.

L.    The National Firearms Unit may immediately discontinue one or more of the firearms listed in Appendix 1(A or B) if a significant problem is discovered which affects the safety or reliability of the firearm.

M.    Officers may be authorized to have up to two Service-approved handguns to allow flexibility in choosing suitable duty firearms. The Service shall provide one Service-issued handgun to each officer. Officers who are authorized to carry a personally-owned handgun will not be required to surrender their Service-issued handgun.

N.    Because the Service provides appropriate longarms for specific duties, Service officers are not authorized to carry or use personally-owned shotguns or rifles on official duty.

O.    Authorizing Officials are required to ensure periodic inspections of each officer's authorized firearm(s) are conducted to determine compliance with this policy. These inspections shall be conducted by the Firearms Instructor or Range Safety Officer in conjunction with the function and safety inspections. Inspections of the general condition and functioning of firearms may also be performed by first-line supervisors. The inspections will include the overall condition and functioning of the firearm and verification of the model and serial number. In addition, the ammunition carried by the officer may also be inspected to ensure that it is Service-issued and in good condition.

19.    Holsters and Ammunition Carriers

A.    Holsters and ammunition carriers that are currently authorized shall remain authorized until an officer completes the transition to a .40 caliber semi-automatic pistol.

B.    Officers may purchase holsters and/or magazine carriers that meet the following specifications:

(1)    For standard uniformed duty:

(a)    Holsters must be direct-draw, belt-mounted on the strong-side, and equipped with a thumb-break retaining strap;

B.  The Form G-819 shall clearly describe the particular non-standard handgun to be carried and must contain a justification as to why that type of handgun is required. The justification shall be followed by a statement that the handgun has been inspected and approved by the District or Sector Firearms Instructor. Service officers approved to carry a non-standard handgun will be issued ammunition for practice, qualification and duty use. The undercover agent will be authorized to receive ammunition and qualify with the non-standard handgun upon approval of the Form G-819. The undercover officer must qualify and demonstrate proficiency before carrying the non-standard handgun.

C.  Ammunition for use in non-standard firearms used in undercover operations shall be procured by the National Firearms Unit. Upon receipt of a Form G-514 requisition containing a description of the required ammunition, with an attached copy of the approved Form G-819, the National Firearms Unit shall distribute such ammunition. Procurement and distribution of non-standard ammunition shall be in the limited quantities required to support undercover operations.

22.  Issuance and Expenditure of Service Ammunition:

A.  All Service-issued ammunition will be new, commercially manufactured, and procured by the National Firearms Unit through the Service's procurement process. No other Service entity shall conduct any research and development, test and evaluation, or procurement of any ammunition or component product.

B.  Only Service-issued ammunition shall be used in Service-owned firearms. Officers carrying Service-approved, personally-owned firearms may only use Service-issued ammunition for qualification or carrying under INS authority.

C.  Authorizing Officials shall issue each officer authorized to carry a handgun a minimum of 50 rounds of duty ammunition for carrying. Service officers shall rotate ammunition by expending, during quarterly qualifications, those rounds carried on duty. Replacement duty ammunition will be issued to each officer immediately following the officer's completion of the quarterly qualification.

D.  Service officers shall use duty or hazard-free ammunition for qualifications, practice, and training. Exceptions may occur if safety-related problems are discovered. Authorizing Officials will immediately notify the National Firearms Unit in writing if such ammunition cannot be used on a particular firing range. Exceptions to the requirement to use such ammunition for qualifications may also be granted by the National Firearms Unit upon determination that a safety or other problem exists with firearms or ammunition.

(1)  In addition to the handgun ammunition necessary for official quarterly qualifications, Authorizing Officials shall issue a total of 150 rounds of handgun practice ammunition per quarter to each Service officer authorized to carry a handgun.

(2)  If ammunition inventories are insufficient in a given quarter, the practice ammunition for that quarter shall be issued as soon as inventories permit.

(3)  The officer will initial Form G-484, Ammunition Log Sheet, in the column entitled "Issued To" upon receipt of his or her quarterly issuance.

F.    (1)    The Service's purpose in issuing practice ammunition is to enable officers to maintain proficiency and/or improve their shooting skills.

       (2)    It is expected that officers will expend this ammunition on a regular basis.

       (3)    In order to receive additional practice ammunition, officers are required to turn in expended casings. Other than the initial issuance of practice ammunition, replacement practice ammunition shall be issued upon receipt of expended casings totaling at least 50% of the amount of ammunition to be issued. In circumstances where officers practice on ranges that require that the expended casings be left behind, this fact shall be documented and this requirement shall not apply.

       (4)    While officers shall make reasonable efforts to locate all expended casings, it is recognized that a number of factors may make full recovery impossible. Officers are expected to turn in all expended cases located. If less than 50% of an individual's expended casings are turned in, the officer shall be required to submit an explanatory memorandum to the Ammunition Control Officer in order to receive additional practice ammunition.

       (5)    Service officers shall expend practice ammunition at appropriate locations and times in accordance with all applicable laws, ordinances, and policies.

G.    Based on the Firearms Instructor's assessment, Authorizing Officials shall provide additional handgun ammunition for supervised practice to Service officers who fail to qualify or are consistently marginal in demonstrating proficiency in order to improve their ability. This should be a reasonable amount, sufficient to qualify or improve marginal proficiency.

H.    Service officers may request ammunition for use in competitive handgun and rifle shooting events by submitting a memorandum to the Authorizing Official. If such ammunition is available in the local inventory and issuance will not cause a shortage for duty, training, practice, or qualification use, it shall be issued to the officer. Ammunition not in the inventory may be requisitioned through the National Firearms Unit. Approval of requests for the purchase of ammunition for competitive shooting is subject to availability of funding and concurrence of the Assistant Commissioner of the funding program. Ammunition issued for competitive shooting events is limited to ammunition available on INS contracts. Officers who receive ammunition for use in competitive shooting are required to maintain a record of the use of ammunition and submit evidence of participation in competitive events to the Ammunition Control Officer, who will forward a copy to the National Firearms Unit.

I.    Ammunition for practice and/or sighting-in with appropriate longarms shall be issued at the range prior to firing the quarterly qualification course as follows:

       (1)    12 gauge rifled slug            5 rounds
       (2)    12 gauge 00 Buck            5 rounds
       (3)    9mm or .40 caliber          20 rounds
       (4)    .223 55 grain FMJ-BT       20 rounds
       (5)    .308 150 grain FMJ-BT     20 rounds

J.    In accordance with Subsection 4.H., Ammunition Control Officers shall determine ammunition requirements for all programs within their jurisdiction based on specific guidelines issued by the

National Firearms Unit. The guidelines will be used to calculate annual ammunition requirements based on the number of officers in each program, types of firearms used by each officer in each program, types of ammunition used by each officer, current inventory by type of ammunition in each program, and projected usage based on practice, qualifications, competition, and training.

23.  Firearms Training

A.  Basic Firearms Training

(1)  All Service officers entering on duty as a trainee in one of the positions listed in Subsection 5.A.(1)-(8) shall receive the Service's Basic Marksmanship Instruction and Practical Pistol Courses during their basic academy training.

(2)  Service officers employed in one of the positions listed in Subsection 5.A.(1)-(8) shall not graduate from one of the Service Academies without successful completion of the Basic Marksmanship Instruction and Practical Pistol Courses.

(3)  The progress of all Basic Trainee officers in firearms training shall be documented by the appropriate Service Academy.

(4)  Upon request, Basic Trainee officers undergoing training at the Academy will be allowed to review their personal training file for the purpose of verifying their standing with regard to proficiency in firearms.

(5)  Any Service officer who initially enters on duty with the Service in one of the positions listed in Subsection 5.A.(1)-(8) at a grade level which does not require the officer to attend one of the Service's basic academies shall not be authorized to carry a firearm until either:

(a)  The officer has provided documentation of previous law enforcement firearms training to the Director of Training and received a certification of equivalency of training as defined in Subsection 3.E.; or,

(b)  The officer has completed an alternate course of basic firearms instruction developed by the INS Training Division and provided by INS Firearms Instructors. This course shall include all necessary curriculum components to provide the officer with a level of knowledge, skill, and ability equivalent to that of an officer who successfully completes the Service's requirements for BMI/PPC while undergoing Basic Immigration Law Enforcement Training.

(6)  Refresher training in the basic principals of firearms marksmanship shall be periodically provided on an on-going basis to all Service officers listed in Subsection 5.A.(1)-(8). Such training will be provided by INS Firearms Instructors and will be accomplished in a manner that reinforces the skills and abilities which were acquired by the officers while undergoing their initial firearms training with the Service.

(7)  The Training Division shall develop and disseminate appropriate lesson plans and training aids for the teaching of basic marksmanship. These items shall be periodically updated and provided to all Firearms Instructors who have successfully completed the Service's

requirements for instructor training and have been assigned to perform the full-time or part-time collateral duty of Firearms Instructor.

**B.    Quarterly Training**

(1)    In conjunction with the quarterly firearms qualifications for Service officers, Authorizing Officials shall schedule the remainder of the work day for additional firearms-related training. The training shall consist of a combination of classroom instruction and practical exercises and shall be accomplished during the regular work day. All hours spent in this training and related travel shall be compensated in accordance with applicable laws, government-wide regulations and policies. The training shall be provided by Service personnel who have been trained as instructors using a course of training that has been reviewed and approved by the Director of Training and the Firearms Review Board. This training may be conducted on any part of the Service's Firearms program. However, certain issues must be addressed bi-annually, such as the use of deadly force. The following topics are examples of subjects that shall be discussed in the training sessions:

(a)    Service policy on the use of deadly force;

(b)    Other subsections of the INS Firearms Policy that involve complex issues or require clarification;

(c)    Escalation of force, including training on the use of intermediate force devices;

(d)    Proper judgement in shoot/don't shoot situations;

(e)    Tactical use of firearms;

(f)    Practical firing exercises (other than standard INS qualification courses);

At the discretion of the Authorizing Official, other firearms related topics may be added as needed.

(2)    All training must be documented, with course guidelines and lesson plans developed in coordination with the Training Division, and retained in a separate quarterly training file. These files shall be subject to review during routine field inspections. Attendance logs shall be maintained that indicate that Service officers have received the above training.

The Training Division shall develop and disseminate the necessary lesson plans and training aids to be used during the Quarterly Training Day sessions. The attendance of all officers at this training must be documented and preserved by the Senior Firearms Instructor in a separate training file for each quarter. These files shall be subject to review during routine field inspections.

**C.**    Remedial Training

    **(1)**    General

        (a)    The Service shall provide remedial training to any Service officer who is unable to demonstrate the required degree of proficiency in the use of the handgun.

        (b)    The Training Division shall prepare lesson plans and training aids or materials necessary for the presentation of remedial training. These items shall be based on Service-approved Basic Marksmanship Instruction and Practical Pistol Course Lesson Plans, and shall include a combination of classroom instruction and live-fire training. Blocks of actual live-fire training shall not exceed 2 hours in length, with no more than 2 blocks of live-fire training per day. INS officers shall be provided with sufficient remedial training to allow them to qualify and/or improve their abilities, up to a maximum of 40 hours of live-fire remedial training per failure to demonstrate proficiency.

        (c)    Remedial training shall be conducted during normal duty hours and commence as soon as practicable.

        (d)    Remedial training shall also be given to all Service officers involved in unintentional discharges. Such training shall include a general component covering safe handling practices and procedures and specific component(s) directly relating to the probable cause of the incident as revealed by the investigation. In all cases, a record of the administration of remedial training shall be made a part of the Service investigation file of the incident.

    **(2)**    Basic Trainee Officers

        (a)    Basic Trainee officers whose employment is jeopardized by their inability to demonstrate proficiency with a handgun shall promptly be notified of this fact in writing. This notice shall also inform such employees of their right to consult with a Union representative. The Unions shall provide the Service with a list of Union officers designated to represent Basic Trainee officers in these matters. The Service shall provide this list to the aforementioned Basic Trainee officers concurrent with the service of the notice.

        (b)    Individual Basic Trainee officers who are required to carry a handgun and otherwise complete all other aspects of one of the Service Academies but fail to qualify with a handgun during the Basic Marksmanship Instruction and Practical Pistol Courses will be provided remedial training as outlined in Subsection 23.C.(1)(b) in order to assist them in successfully completing these courses. Such training will be conducted by the Academy, and will consist of 80 additional hours of training devoted exclusively to firearms instruction, unless the Basic Trainee officer successfully completes the BMI/PPC courses sooner, in which case he or she shall graduate immediately.

        (c)    To the extent possible, all remedial training will be scheduled to minimize adverse impact upon the training of Basic Trainee officers in their other areas of study

(d)     In each instance where a Basic Trainee officer fails to successfully complete the Basic Marksmanship Instruction and Practical Pistol Courses, the primary firearms instructors shall prepare a memorandum outlining the reasons for the officer's failure. The report will include the instructor's analysis of the reasons for the failure and any recommendations for improving the Basic Marksmanship Instruction and Practical Pistol Courses. These reports shall be submitted to the Director of Training through channels. The Director of Training shall ensure that a copy is promptly forwarded to the National Firearms Unit for appropriate dissemination and/or action.

(e)     During the first month of each quarter, the Director of Training will prepare a summary report specifying the number of Basic Trainee officers who failed to successfully complete the Basic Marksmanship Instruction and Practical Pistol Courses for the preceding quarter and the reasons for such failures. The report shall include a comparison of the rate of failure with the overall number of officers who successfully completed the Basic Marksmanship Instruction and Practical Pistol Courses during the same period. The report shall be forwarded to the National Firearms Unit, which will distribute copies of the report to the Firearms Review Board and both Union Councils.

(3)    <u>Other INS Officers</u>

     (a)     This subsection applies to INS officers who meet all of the following requirements:

         (i)     successful completion of Basic Marksmanship Instruction and Practical Pistol Courses as defined in Subsection 3.E.;

         (ii)     successful completion of the initial one year period of non-supervisory probationary employment; and

         (iii)     completion of remedial firearms training as described in Subsection 23.C.(1)(c).

     (b)     Those officers described in Subsection 23.C.(3)(a) who, for reasons beyond their control, continue to be unable to demonstrate an acceptable level of proficiency with the handgun may be reassigned to a position other than those listed in Subsection 5.A.(1)-(8) (with the exception of Adjudications Officer positions that do not require the performance of duties as an Immigration Inspector). Such reassignment shall not obligate the Service to pay relocation expenses and shall not involve reassignment to a position which has non-competitive promotion potential beyond the position from which the officer is reassigned.

     (c)     Those officers described in Subsection 23.C.(3)(a) who, for reasons which reasonably appear to be within their control, continue to be unable to demonstrate an acceptable level of proficiency with the handgun may be removed from employment in accordance with applicable laws, government-wide regulations and Service policies.

**D.**    Firearms Instructor and Range Safety Officer Training:

(1)    Except for INS Training Specialists/Armorers, only INS officers can serve as Firearms Instructors or Range Safety Officers or in any similar capacity.

(2)    Firearms Instructors:

Firearms Instructors are officers assigned the collateral or full-time duties of the position by the Authorizing Official in each District, Sector, or other Service location. They are authorized to conduct Service-approved firearms training, remedial training, and training in the use, care and maintenance of firearms. At each location, one Firearms Instructor shall be designated as the Senior Firearms Instructor and shall be responsible for all firearms-related training at that location. Firearms Instructors are required to provide training to Range Safety Officers. The Senior Firearms Instructor is also required to observe each Range Safety Officer under his or her jurisdiction conduct a minimum of one qualification annually; to provide on-going instruction to the Range Safety Officers, as necessary; and to ensure compliance with this policy.

(3)    Range Safety Officers:

Range Safety Officer(s) are officers assigned the collateral duties of the position by the Authorizing Official in each District, Sector, or other Service location. They are authorized to conduct quarterly qualifications, ensure safety on the range, and assist the Firearms Instructor in conducting firearms training. Range Safety Officer training shall be conducted at the local level and shall include proper operation of the range, instruction on conducting qualifications, range safety, basic marksmanship, and proper use of positions and cover.

(4)    Certification requirements:

(a)    Authorizing Officials shall designate officers to serve as Firearms Instructors and/or Range Safety Officers.

(b)    Prior to conducting qualifications, familiarization or training, all Service Firearms Instructors must be certified as having successfully completed the FLETC Firearms Instructor Training Program (FITP) course or the Border Patrol FITP course. In addition, Firearms Instructors shall be trained by the Service as instructors in the use of each type of firearm authorized for use by officers under their jurisdiction.

(c)    Firearms Instructors shall be required to be FITP re-certified at a minimum of every 5 years.

(d)    Firearms Instructors shall be required to attend a minimum of 16 hours of additional non-INS firearms training annually to retain their designated Firearms Instructor status. This training shall be provided by other law enforcement agencies, military or commercial organizations, and must be approved in advance by the National Firearms Unit. Upon completion of the training, a copy of the officer's training course certification shall be provided to the

National Firearms Unit for inclusion in their file and on the National Firearms Unit's database of Firearms Instructors.

(e)    Authorizing Officials shall ensure that Firearms Instructors within their jurisdiction meet the minimum annual training requirement. Authorizing Officials shall schedule attendance of additional firearms training courses for Firearms Instructors on regular duty time. Unless funded by a higher Service organizational level, all costs associated with firearms training will be funded at the local level.

(f)    Failure of INS Firearms Instructors to successfully complete the required minimum of non-INS annual training shall result in suspension of the Firearms Instructor's designation by the National Firearms Unit.

(g)    The foregoing certification requirements do not apply to Range Safety Officers.

(4)    All Service firearms training shall be in compliance with this policy and other INS training policies.

(5)    A database for all Firearms Instructors and Range Safety Officers shall be maintained by the National Firearms Unit. Updated information pertaining to firearms courses and training attended by Firearms Instructors and Range Safety Officers shall be included in the database.

E.    <u>Night (Low-Level Light) Firearms Training</u>

(1)    Authorizing Officials shall ensure that all officers under their jurisdiction participate in a minimum of one training session per year for the purpose of familiarizing officers with firing conditions found under night (low-level light) conditions.

The Training Division shall prepare and disseminate lesson plans and training aids and materials necessary to provide a uniform course of training for the use of firearms under night (low-level light) conditions on any of the various types of range facilities used throughout the Service.

(2)    Sunglasses or similar devices shall not be used to simulate night or low-level light conditions.

(3)    At a minimum, the familiarization course shall require officers to fire at least 50 rounds at distances not to exceed 25 yards.

(4)    The targets will be scored, but the scores shall not be recorded.

(5)    Authorizing Officials shall maintain records of officers who participate in this training.

F.    <u>Precision Shooting (Counter Sniper) Firearms Training</u>:

(1)    Acting through the National Firearms Unit, the Border Patrol Tactical Team (BORTAC) shall be responsible for overseeing all Precision Shooting (Counter Sniper) training for all Special Units in INS Enforcement and Inspections programs.

(2)     The BORTAC unit is responsible for developing the Service's Precision Shooting lesson plans in accordance with INS training policies, and obtaining approval for the lesson plans from the Director of Training, the National Firearms Unit, and the Firearms Review Board.

G.     Distribution of Information to the Firearms Instructors

Whenever practical, information shall be sent to Firearms Control Officers and Firearms Instructors through official channels. However, since observance of the chain-of-command is impractical when it pertains to safety alerts, FCO's and Firearms Instructors shall receive these directly from the National Firearms Unit.

24.    Firearms Qualifications

A.     Proficiency Requirement

(1)     An acceptable level of proficiency is based on all of the following:

(a)     Successful completion of the appropriate INS qualification or familiarization course of fire.

(i)     For those firearms for which a qualification course has been established, achieving at least the minimum numerical score;

(ii)    For those firearms for which no qualification course has been established, completion of the familiarization course of fire;

(b)     Demonstrating proper handling techniques and manual dexterity required to holster and unholster (if applicable), load, unload, and operate the firearm;

(c)     Demonstrating safe handling of the firearm and ammunition;

(d)     Demonstrating appropriate responses to the failure or malfunction of firearms or ammunition, including immediate action drills and safe unloading procedures.

(2)     Quarterly firearms qualifications and familiarization sessions shall be conducted in advance of the quarter for which the officer is granted authorization to carry a firearm. Revocations of authorization for failure to qualify may only be made in accordance with Subsections 6.F., 24.C., 24.D., and 24.F.

(3)     Service officers in a position listed in Subsection 5.A.(1)-(8), including Headquarters, Regional, District, Sector and Academy staff officers who are authorized to carry handguns shall be required to demonstrate their proficiency in the use of the handgun on a quarterly basis. Officers who fail to meet this requirement shall be provided remedial training in accordance with Subsection 23.C.

(a)     Service officers who are authorized to carry both a revolver and a semi-automatic pistol must qualify with both types of handguns due to their significant functional differences.

(b)    An officer who qualifies with any Service-issued or approved revolver shall be authorized to carry any other Service-issued or approved revolver.

(c)    Because of the similarity in the mechanical functioning and safety features, Service officers who are authorized to carry two Service-approved double-action-only semi-automatic pistols are not required to qualify with both pistols. Likewise, officers who are authorized to carry two Service-approved decocker type semi-automatic pistols are not required to qualify with both pistols. However, officers carrying a mixture of the two types of semi-automatic pistols are required to qualify with both.

(4)    Service officers, including Headquarters, Regional, District, Sector and Academy staff officers, who are authorized to carry firearms other than handguns shall, on a quarterly basis, be required to demonstrate their proficiency with each such type of firearm in order to carry the firearm. Officers who fail to demonstrate proficiency with any type of firearm shall not be issued or allowed to carry that type of firearm until such time as the officer demonstrates proficiency in the use of that type of firearm.

(a)    Where the operating characteristics of Service longarms are different, officers authorized to carry such longarms shall qualify quarterly with each different type of longarm.

B.    Firearms Qualification Courses

(1)    Only those qualification and familiarization courses that have been approved by the Firearms Review Board shall be used in determining firearms proficiency of INS officers.

(2)    No portion or stage of any firearms qualification or familiarization course may be waived or altered.

(3)    Officers, including Basic Trainees, who are unable to assume a required firing position because of a limited range of physical movement shall be allowed to utilize a safe adaptive shooting stance. Firearms Instructors shall work with these officers to develop an appropriate stance.

(4)    The successful completion of a firearms qualification course will not be based upon scoring of individual phases of the course, but rather the total scoring of the course.

C.    Revocation of Authorization to Carry a Firearm Due to Inability to Demonstrate Acceptable Proficiency

(1)    Unless one of the exceptions in Subsection 24 applies, in instances where a Service officer has been provided remedial training in accordance with Subsection 23.C. and remains unable to demonstrate acceptable proficiency with a handgun, the Authorizing Official shall provide the officer with written notice of revocation of the officer's authorization to carry the handgun. The revocation shall apply to the carrying of the handgun during duty and non-duty hours, regardless of whether the handgun is Service-issued or Service-approved, personally-owned. If the handgun is Service-issued, the Authorizing Official shall require the Service officer to turn it in. The officer shall not be assigned to duties that normally require the carrying of a handgun.

(2)     In instances where a Service officer is unable to demonstrate the required level of proficiency with a longarm and authority to carry is revoked, the officer shall not be assigned to duties that normally require the carrying of a longarm. However, if the officer is qualified to carry a handgun and is assignable to duties where the carrying of a longarm is not required, the officer may be assigned to those duties.

(3)     In accordance with Subsection 23.C., in instances where the carrying of a firearm is required as described in Subsection 6.B., officers in a position listed in Subsection 5.A.(1)-(8) who, following remedial training, are unable to demonstrate acceptable proficiency with the firearm may be subject to reassignment or removal.

D.     Revocation of Authorization to Carry a Firearm Due to Non-Participation in Quarterly Firearms Qualifications

(1)     In instances where a Service officer does not participate in the required quarterly firearms qualification, and is not eligible for an authorized absence as defined below, the Authorizing Official shall revoke the officer's authorization to carry a firearm until the officer successfully demonstrates the required level of proficiency. However, the Authorizing Official shall excuse a Service officer from the quarterly requirement to qualify where the officer is unable to participate in qualifications due to an authorized absence. Except as provided in Subsection 24.F., officers shall not be excused from the requirement to qualify for more than two consecutive quarters. An authorized absence includes a detail away from an officer's official duty station, any type of approved leave, or compensatory time off. Officers who are excused under these circumstances may continue to carry a firearm. Make-up qualifications should be scheduled in the same quarter as the regular qualification. Officers who are unable to attend a make-up qualification due to an excused absence shall be excused from the requirement to qualify for that quarter.

(2)     If an officer does not participate in the required quarterly firearms qualification for two consecutive quarters, the Authorizing Official shall revoke the officer's authority to carry a firearm. In the case of handguns, the Service officer shall be required to surrender his or her Service-issued handgun or Service authorization letter for a personally-owned handgun. The officer shall be re-issued his or her Service handgun, or letter of authorization, upon qualifying and demonstrating proficiency. The officer shall be provided a written notice at least five working days prior to such revocation.

E.     Firearms Qualification of Detailed Officers

(1)     In instances where a Service officer is detailed to another duty station and will miss the quarterly firearms qualification at his or her permanent duty station, the officer shall notify supervisory or management officials at the temporary duty station of his or her need to qualify during that quarter.

(2)     If the detailed Service officer is performing duties that normally require the carrying of a firearm, the Authorizing Official who is responsible for the officer's temporary duty station shall make reasonable efforts to provide the means and the opportunity for the officer to qualify during the quarter.

(3)    If the detailed Service officer is performing duties that are routinely performed by officers who do not carry a firearm, the officer may be exempted from the requirement to qualify until he or she returns to his or her permanent duty station.

F.    Officers Unable to Qualify Due to a Temporary Physical Condition

(1)    A Service officer <u>may</u> be granted an exception to Subsection 24.A.(1)(a), i.e., passing the quarterly firearms qualification with a handgun, due to a temporary physical condition which affects the officer's ability to qualify or makes it inadvisable to require the officer to qualify, but does not affect the officer's ability to properly utilize a handgun. Accordingly, an officer granted such an exception is excused from participating in quarterly qualifications for the period for which the exception is granted. A temporary physical condition may be caused by injury, surgery, illness or pregnancy, and normally will not exceed 180 days. On a case-by-case basis, extensions may be granted. <u>Under no circumstances will an exception be granted for more than 270 days.</u>

(2)    An exception shall not be granted for non-physical conditions or mental trauma related to mental illness deemed by a mental health professional to adversely affect the officer's judgement regarding the use of deadly force. Such mental disability shall require immediate revocation of authority to carry a firearm.

(3)    Officers granted an exception must be able, at any time, to demonstrate an acceptable level of proficiency with the requirements listed in Subsection 24.A.(1)(b)-(d).

(4)    Officers requesting an exception must provide the Authorizing Official with a written doctor's recommendation. The recommendation must describe the nature of the disability and the anticipated duration of the disability.

(5)    The Authorizing Official's decision regarding the granting of an exception and the duration thereof shall be based on all available relevant information. Such information may include the medical documentation submitted by the officer, records of the officer's prior firearms qualifications and the recommendations of the Firearms Instructor(s) and supervisory personnel.

(6)    The authority to grant exceptions is limited to Authorizing Officials.

(7)    Service officers granted an exception from qualifying quarterly shall receive a written authorization to continue carrying handgun(s). The written notice shall include a specific expiration date of the exception, and a description of the handgun(s) the officer is authorized to carry

(8)    Officers shall qualify within 30 days of the expiration of the exception.

G.    Requirement to Qualify with Duty or Hazard-Free Ammunition

The ammunition used for the qualification course shall be duty or hazard-free ammunition, unless the use of that ammunition is specifically prohibited due to range or other limitations, or a safety-related firearm or ammunition problem is discovered. Authorizing Officials will notify the National Firearms Unit in writing of such problems, prohibitions, or limitations.

**H.    Requirement to Use a Hip Holster During Quarterly Qualification and Live-Fire Training**

(1)    Due to safety considerations, officers engaged in quarterly firearms qualifications, supervised live-fire practice or training shall be required to use a belt-mounted, direct-draw hip holster, with the holster on the officer's "strong side." The holster shall be equipped in accordance with Subsection 19.B.

(2)    No live-fire training, including tactical training, shall be allowed with any holster type other than described in Subsection 24.H.(1) unless supervised one-on-one by a Firearms Instructor or Range Safety Officer.

**I.    Use of a Holster That is Not a Hip Holster**

(1)    In conjunction with the quarterly firearms qualification, officers who normally carry the handgun in another type of holster shall be required to demonstrate their ability to quickly and safely draw an underlined handgun, engage a target, and reholster the handgun.

(2)    These exercises should be developed locally by the Firearms Instructor, and shall be sufficient to make a reasonable determination of the officer's ability to safely use the holster.

(3)    Immediately prior to conducting any dry-fire exercise, the Firearms Instructor shall inspect each Service officer's handgun to ensure it is unloaded and safe to use.

(4)    Officers utilizing other than hip-mounted holsters should be made aware of potential problems regarding retention of their holstered handguns during an encounter with an assailant or other vigorous physical activity.

(5)    In any instance where the Firearms Instructor determines that an individual Service officer who uses a holster other than a hip-mounted holster is unable to demonstrate the ability to quickly and safely draw and reholster the handgun, the Firearms Instructor will advise the individual officer that the holster is unsafe or impractical for use. In these instances, the Firearms Instructor shall also prepare a memorandum to notify the Authorizing Official of the potentially unsafe or impractical use of the holster by the officer. The Authorizing Official shall prohibit the individual officer from using the holster.

**J.    Record of Quarterly Qualifications**

(1)    Promptly following each qualification, quarterly qualifications data shall be entered into the AMIS/FIM. Using the AMIS/FIM, a printed copy of the Form G-109, Record of Qualifications shall be generated. Firearms Instructors shall furnish a completed Form G-109 to the Authorizing Official for each type of firearm authorized for use in that location. The form shall list each officer by name, title, duty station, the last four digits of his or her Social Security number, and the officer's score with each type of firearm. The Form G-109 shall clearly indicate the make, model, and serial number of each firearm. The Form G-109 shall be certified to be correct by a Firearms Instructor.

(2)    The Authorizing Official, or a supervisory or management official, shall review the Form G-109 and direct further training for those officers who did not achieve a qualifying score

or are otherwise unable to demonstrate an acceptable level of proficiency. Upon completing the review, the Form G-109 for each location shall be signed by the Authorizing Official and retained for three years.

(3)    A copy of the Form G-109 with the signed certification shall also be sent to the National Firearms Unit, where it shall be retained indefinitely.

K.    Conducting Quarterly Qualifications

(1)    Failure of any officer to comply with safety instructions during quarterly qualifications may result in the removal of the officer from the range for that day by the Firearms Instructor or the Range Safety Officer.

(2)    Quarterly qualifications shall be conducted with a minimum ratio of one Firearms Instructor or Range Safety Officer for every six officers on the firing line.

(3)    Any officer who sees any condition that is unsafe or life threatening should immediately call "CEASE FIRE" in a voice that can be heard by all shooters.

(4)    At their discretion, Firearms Instructors may conduct the qualifications using a Hot Range or Cold Range. A Hot Range requires shooters to reload without command at the end of each string of fire unless instructed otherwise. Failure to reload prior to starting the next string of fire will not be an alibi. A Cold Range requires that the Firearms Instructor provide commands for loading and reloading.

(5)    Shooters are to keep their fingers outside the trigger guard unless they are ready to fire. Shooters should not anticipate the command to fire. All shooters shall stop firing immediately when the "CEASE FIRE" command is given.

(6)    Shooters are to keep their firearm(s) holstered, slung, or pointed in a safe direction downrange at all times.

(7)    The Ready Pistol, Ready Rifle, or Ready Shotgun position is 45 degrees down from the horizontal with the muzzle pointed down range.

(8)    Shooters shall not move forward of the firing line unless instructed to do so by the Firearms Instructor. If a shooter drops any item, including a firearm, cartridge, magazine, or speedloader, the shooter shall not pick the item up until the Firearms Instructor instructs the shooter to do so. Once on the firing line, shooters shall stay in place and not move away from the firing line unless instructed to do so by the Firearms Instructor. Shooters must be prepared by having all necessary equipment with them when on the firing line. Firearms Instructors shall ensure that all shooters are given clear instructions regarding all required equipment prior to instructing them to go to the firing line.

(9)    All loading and reloading shall be done on the firing line and will be done from speedloaders, magazines, speed loops, dump pouches or from the pocket(s). All loose ammunition must be carried in pockets or other carriers. No ammunition boxes or other unauthorized paraphernalia will be allowed on the firing line.

(10)  All officers shall be issued eye and ear protection for use at all times while on the range when shooting is in progress. At their discretion, shooters may wear both ear plugs and protective ear muffs simultaneously.

(11)  All officers shall write their full name and date on their target.

(12)  Targets will be scored by a Firearms Instructor or Range Safety Officer. No officer will score his or her own target. The scoring officer will mark the score on the target and sign his or her name next to the score. Any disagreements will immediately be referred to the Senior Firearms Instructor for review. The decision of the Senior Firearms Instructor is final.

(13)  Officers are required to fire the number of rounds specified in the qualification course in the required time frames. Alibis are not allowed for failure to fire all rounds during the time allotted unless there is a mechanical failure of the firearm, ammunition malfunction, or other circumstances beyond the control of the officer.

(14)  Alibis will be granted solely in the case of mechanical failure of the firearm, ammunition malfunction, or other circumstances beyond the control of the officer.

L.  Marksmanship Awards Program

(1)  A $200.00 cash incentive award will be given to the officer who has demonstrated the most improvement in firearms skills in each basic Academy class. This determination shall be made by the INS Firearms Coordinator for the class.

(2)  Every January, each Authorizing Official shall give a $200.00 cash incentive award to the officer in each District and Sector with the greatest increase in total score in handgun qualifications for the four consecutive quarters of the previous Fiscal Year as compared to the year before.

(3)  Concurrent with the issuance of the Commissioner's Annual Awards, the twenty INS officers having the highest total score for the preceding Fiscal Year shall be awarded a plaque recognizing them as one of the "Commissioner's Twenty." This determination shall be based upon a review of field office Forms G-109 by the National Firearms Unit. The National Firearms Unit shall be responsible for the preparation and delivery of the plaques

25.  Service Armory Operations

A.  The National Firearms Unit is responsible for overseeing all Service Armory operations. Service Armory operations include repairs and modifications of Service firearms, acquisition of replacement parts and repair equipment, storage and issuance of Service firearms and parts, and disposal of excess Service firearms.

B.  Service-owned firearms needing repair or modification shall be sent to the Service Armory at the National Firearms Unit. Service-approved, personally-owned firearms needing repair or modification may also be sent to the Service Armory. Firearms will not be sent to Glynco for repair or modification, nor will firearms component parts be shipped to Glynco for assembly.

C.   Training Specialists/Armorer(s) assigned to the Training Division shall conduct repairs to training firearms assigned to the Service Academies, those handguns issued to Basic Trainee officers while at the Academies, and those Service-issued or approved handguns issued to detailed instructors or Academy Training staff.

D.   The National Firearms Unit shall oversee the Field Armorer Program. This program will provide limited armorer training to Firearms Instructors, and certify that they have completed the necessary training to perform certain minor repairs on Service-approved or issued firearms. Firearms Instructors will be taught which repairs they are authorized to perform to ensure that Service firearms are in proper working order. Firearms Instructors Service-wide shall be trained through this program.

E.   Parts, tools and on-going training for Training Specialists/Armorers will be provided by the National Firearms Unit.

F.   Service Armorers at the National Firearms Unit shall inspect all new firearms received from vendors and all firearms shipped in for repair or re-issuance. Appropriate action shall be taken immediately when a firearm does not meet Service standards.

26.   Shipment of Firearms for Repair

A.   Firearms needing repair shall be processed into the AMIS/FIM in accordance with the INS Personal Property Operations Handbook, Chapter 21, and shipped via registered U.S. Mail, the Service's current contract delivery service, or bonded motor freight company to the Service Armory in accordance with the instructions in this Subsection.

(1)   The shipping office will tag each firearm to indicate the location code and name of the officer to whom it is issued or belongs, and a brief description of the problem or necessary repair.

(2)   All firearms forwarded for repair shall be listed on a Form G-504, Report of Property Shipped-Received, generated utilizing the AMIS/FIM. The office shipping the firearm (consignor) will make three copies of the Form G-504.

(a)   The original Form G-504 shall be mailed to the Service Armory and a copy enclosed with the firearms shipment. A copy will also be retained by the shipping office.

(b)   Upon receipt of the firearm, the Service Armory will return a signed copy of the Form G-504 to the shipping office.

(c)   Upon completion of repairs, the Service Armory will return the original Form G-504, including the armorer's repair comments, with the repaired firearm to the shipping office.

(d)   A copy of the Form G-504, also containing the armorer's repair comments, will be placed in the individual firearm file maintained by the Service Armory.

(3)   When the Service Armory receives a firearm which is not repairable, the armorer shall notate the original Form G-504 and immediately return the form to the shipping office.

(a)    The Service Armory will retain for disposal any Service-owned firearm which cannot be repaired or is unserviceable and will issue a replacement firearm on a separate Form G-504.

(b)    The shipping office shall ensure that the non-repairable firearm is removed from the property card of the officer to whom it was assigned and add the replacement firearm in its place.

(c)    The shipping office shall notate on the Form G-571 that the firearm was retained by the Service Armory as non-repairable.

(d)    The Service Armory shall return any unserviceable, non-repairable personally-owned firearms to the owner as soon as possible, along with a written notice describing the reasons.  A copy of the notice will be forwarded to the Authorizing Official with instructions to withdraw the authorization to carry the unserviceable personally-owned handgun.  A replacement firearm will be sent from the NFU to the shipping office.

27.    Maintenance and Repairs of Firearms

A.    Repairs or modifications to Service-approved, personally-owned handguns shall be made only by the Service Armory, the original manufacturer, or by a local factory-authorized gunsmith.

B.    Certain minor repairs and/or modifications will be authorized by the National Firearms Unit to be performed by Firearms Instructors who are provided armorer training conducted or approved by the National Firearms Unit.

C.    Detailed disassembly of Service-issued firearms beyond the major components described in operator or instruction manuals provided by the National Firearms Unit by personnel other than Service Armorers or the original manufacturer is not authorized.

D.    If a Service-issued or approved firearm is damaged in firing and/or indicates signs of excessive pressures or component failure, the firearm, all damaged components and the ammunition used shall be sent to the Service Armory along with a description of the circumstances.  In the case of a personally-owned handgun, the officer shall indicate whether or not he or she wants the Service Armory to attempt to repair the firearm.  All personally-owned handguns, regardless of their condition, shall be returned to the owner as soon as possible.

E.    The Service Armory is authorized to repair Service-approved, personally-owned firearms that have been worn or damaged.  Such repairs shall be provided at no cost to the Service officer.

F.    The disposition of worn, unserviceable, or unsafe firearms is governed by Subsection 26.A.(3).

G.    Modifications that officers are authorized to make to Service-issued or approved firearms are those external items that enhance shooting ability such as handgrips, sight adjustments, etc.  Service-approved, personally-owned handguns may be equipped with tritium sights if properly installed.

H.    Officers are responsible for normal cleaning and preventive maintenance of the Service firearms they use.  Maintenance should only be done in accordance with the instructions provided by the National Firearms Unit or as described in the operator manuals for that particular firearm.

Operator manuals shall be provided to all INS officers for all Service-owned and approved firearms that they are authorized to carry.

28. <u>Authority for Service Training Specialists/Armorers to Possess Service Firearms at other than Government-owned Locations.</u>

A. In conjunction with their official duties, Service Training Specialists/Armorers will be authorized to possess Service firearms during duty hours at other than Government-owned locations.

B. The official duties granting authority to possess Service firearms at other than Government locations to Service Training Specialists/Armorers shall be limited to transporting firearms, providing security for firearms, function-firing firearms sent in for evaluation or repair, conducting tests and evaluations of firearms, conducting field inspections of firearms, and conducting firearms training.

C. Firearms authorized for Service Training Specialists/Armorers are limited to those listed in Appendix 1(A-B).F.

D. In order to possess firearms in conjunction with their official duties, Training Specialists/Armorers must comply with this policy, including Subsection 3.E. pertaining to Basic Marksmanship Instruction and Practical Pistol Courses and 6.D. pertaining to demonstration of firearms proficiency. In addition, they must be Service-certified Firearms Instructors in compliance with Subsection 23.D.

E. Training Specialists/Armorers are not Immigration Officers and do not have the authority described in Section 287 of the Immigration and Nationality Act.

F. The authority of Training Specialists/Armorers to possess firearms in conjunction with their official duties shall not extend to off-duty hours.

G. A memorandum granting this authority, signed by the Chairman of the Firearms Review Board and the Administrator of the National Firearms Unit, shall be provided to each Training Specialist/Armorer.

H. This authority may be rescinded at any time as described in Subsection 6.F. when in the best interests of the Service.

29. <u>Firearms Program Field (Site) Inspections</u>

A. The Office of Internal Audit, through the Field Assessment Program, shall review field office practices relating to the INS policy on firearms, firearms training, quarterly qualifications, reporting of incidents regarding firearms, the storage, transfer, and safekeeping of firearms and ammunition, and compliance with other requirements described in the INS Firearms Policy.

B. Field inspections shall also be conducted by Service Armorers on a periodic basis to ensure compliance with the Firearms Policy and provide an assessment of the overall condition of Service firearms and ammunition in the field. In addition, an inspection will be conducted of firearms storage facilities in INS field offices.

C.   In cases of non-compliance, corrective actions, including imposition of disciplinary action, if warranted, shall immediately be initiated.

D.   Guidance for field inspections will be jointly developed and issued by the National Firearms Unit and the Office of Internal Audit. This guidance will be developed with the active participation of field office representatives and both Union Councils and shall supplement this subsection.

30.   **Firearms Inspections at Field (Site) Locations**

A.   Firearms Instructors or Range Safety Officers shall inspect each Service officer's handgun for overall condition and function at each quarterly qualification and record the results on Form G-109. In addition, Firearms Instructors shall inspect the handgun(s) of each Service officer who enters on duty at a new location, and conduct a similar inspection when a handgun is issued, exchanged, or turned in. Appropriate action shall be taken immediately when the handgun does not meet Service standards.

B.   Written reports of inspection shall be made by the Firearms Instructor or Range Safety Officer to the Authorizing Official in all cases where a revolver mainspring appears to have been lightened or weakened, or where there is any evidence of tampering, abuse or mechanical failure. These reports shall be forwarded to the Service Armory at the National Firearms Unit.

C.   Firearms Instructors shall periodically inspect Service longarms assigned to INS offices.

D.   Service officers will be provided with the appropriate training, proper equipment, and duty time to properly care for Service-issued or authorized firearms.

E.   Service officers who are provided adequate training, equipment and duty time to properly care for Service-issued firearms and fail to do so may be subject to disciplinary action. Service officers who are provided adequate training, equipment and duty time to properly care for Service-approved, personally-owned firearms and fail to do so may have their letter of authorization revoked.

F.   Any firearm that fails to pass a safety inspection shall not be used until properly repaired. Service-issued firearms that fail to pass the safety inspection shall be turned in for repairs by the Firearms Instructor. Service-approved, personally-owned handguns that fail to pass the safety inspection shall be repaired by the National Firearms Unit, the original manufacturer, or a factory-authorized gunsmith, at the option of the officer. In either case, a Service-issued firearm of the same type will be temporarily issued to the officer for qualification and use.

31.   **Authorized Levels of Firearms Reserves**

A.   Based on a survey of Enforcement and Inspections programs and field requirements, the National Firearms Unit will develop the Service's Table of Equipment (TOE) for approved levels of firearms. This TOE will be used as a guideline for firearms reserves at all INS offices and field locations.

B.   The number of Service-owned handguns authorized to be retained in reserve in the field shall not be less than two per District or Sector, plus an additional amount not to exceed 5% of the assigned officer force. The number of Service-owned handguns authorized to be retained in reserve at the NFU shall be 10% of the total officer force.

    C.      Handguns in excess of the allowable reserve shall be shipped promptly, on a continuing basis, to the Service Armory for retention and reissue within the purchasing program.

32.     <u>Transfers of Service-issued Firearms</u>

    A.      When an officer is transferred to a new duty station and remains within the same program element, the originally issued handgun shall be retained by the officer.

    B.      The property card of a transferring officer will be sent separately to the new duty location. An attached Form G-504 shall be used to document the transfer of the property card.

    C.      When an officer is transferred to another program, his or her issued firearm must be returned to the issuing program.

    D.      The Authorizing Official shall ensure that each acquisition, disposal, issuance, retrieval or transfer of a firearm is documented in accordance with guidelines contained in this policy. All such transactions shall immediately be entered in the Asset Management Information System, Firearms Inventory Module (AMIS/FIM) by the Firearms Control Officer or his or her designee.

33.     <u>Storage and Maintenance of Firearms, Ammunition, and Related Equipment</u>

    A.      Each Service officer who is authorized to carry a firearm is responsible for taking reasonable measures to ensure the safe storage, general care and maintenance of his or her issued firearm(s) and ammunition.

    B.      Offices shall be equipped with a sufficient number of individual secure gun lockers for the storage of each officer's firearm(s), ammunition and related equipment. Pending the availability of individual secure gun lockers, officers' firearm(s) should be secured in a locked container when not in use.

    C.      The Service shall provide locking security devices to secure shoulder weapons in all appropriate vehicles. If no such device is available, unattended shoulder weapons must be locked in the trunk of the vehicle or otherwise secured. Even if secured, Service-owned firearms shall not be left unattended in vehicles for extended periods of time unless there is no feasible alternative.

    D.      While off-duty, officers shall not leave Service-owned firearms in unattended vehicles unless the firearm is locked in the trunk of the vehicle or other secure area such as a locked glove box inside a locked vehicle.

    E.      All unissued, unattended Service firearms and ammunition shall be stored in locked firearms storage vaults or safes in a secure area. Unissued Service ammunition shall be kept in a cool, dry environment, and be rotated periodically. Unissued firearms shall be stored in a dry environment and shall not be stored in wall lockers, closets, or in other unsecured, unattended areas of Service facilities.

    F.      The Authorizing Official shall restrict access to unissued firearms to an individual officer designated as the Firearms Control Officer (FCO) in accordance with Subsection 4.G. Security controls shall not prevent emergency access by other authorized personnel.

G.     The Authorizing Official shall restrict access to unissued ammunition to an individual officer designated as the Ammunition Control Officer (ACO) in accordance with Subsection 4.H. Security controls shall not prevent emergency access by other authorized personnel.

34.     Seized Firearms

A.     The Bureau of Alcohol, Tobacco, and Firearms (BATF) shall be notified when a weapon is seized by the Service. This shall be accomplished by submission of BATF Form 1850.25. BATF shall be notified that the INS shall retain custody of all seized weapons.

B.     All firearms seized by the Service shall also be entered into the National Crime Information Center (NCIC) as having been seized by the Service. Offices entering this data are responsible for updating and/or cancelling these entries as appropriate.

C.     Upon completion of pending litigation or forfeiture proceedings, all seized or abandoned firearms shall be sent to the National Firearms Unit as soon as possible. This transfer shall be accomplished on a Form G-504 which identifies the previous owner/bearer of the firearm, case number, and any other pertinent information. A copy of the BATF Form 1850.25 shall be attached to the Form G-504.

D.     Districts or Sectors may request authorization for locally-seized firearms to be returned for display purposes. The request must be approved in writing by the appropriate Assistant Commissioner and the Firearms Review Board.

E.     Firearms which are approved for display purposes shall be destroyed by the National Firearms Unit and listed as such in the Asset Management Information System, Firearms Inventory Module. The destruction will be accomplished in such a manner as to not detract from the firearm's use in a display.

35.     Firearms and Ammunition Acquisitions

A.     The National Firearms Unit is responsible for acquiring all firearms and ammunition for the INS. Except for the personal purchase of Service authorized handguns, no Service program or individual officer or employee, other than the National Firearms Unit, is authorized to solicit, accept or otherwise acquire firearms or ammunition for any Service-related purpose. This includes arranging loan and transfer of firearms from any unit of the Department of Defense, or other organizations and agencies, commercial firearms manufacturers, distributors, dealers, or any other source. The National Firearms Unit is the only entry or exit point for all firearms in the INS inventory.

B.     The establishment of INS ammunition contracts, and the acquisition of ammunition for each program, shall be coordinated by the National Firearms Unit.

C.     Firearms may not be acquired through seizure, forfeiture or abandonment except through the National Firearms Unit.

36.     Lost or Stolen Service Firearms

A.     Lost or stolen Service-owned firearms shall be reported to a supervisor as soon as practicable upon discovering the loss. In addition, the officer reporting the loss shall submit a report through

channels to the Authorizing Official describing the circumstances surrounding the loss within 48 hours of the discovery. Extensions may be granted consistent with the Collective Bargaining Agreement.

B. The Authorizing Official, or a member of his or her staff, shall notify the local law enforcement authorities and the local Office of the Federal Bureau of Investigation (FBI) of the loss or theft of a firearm as soon as possible. The FBI should be requested to enter the missing firearm into the National Crime Information Center (NCIC) as soon as possible. The Authorizing Official shall initiate an administrative inquiry into the loss or theft of a Service-owned firearm.

C. When a Service-owned firearm is lost or stolen, a Form G-504 shall be prepared and forwarded to the National Firearms Unit for updating the Asset Management Information System, Firearms Inventory Module. A copy of all memorandums or reports related to the loss or theft of the firearm shall be attached to the Form G-504.

D. When a Service-owned firearm is lost or stolen, a Regional Board of Survey may be conducted in accordance with applicable property management regulations. A copy of the results of the Board of Survey shall be forwarded to the National Firearms Unit for updating of the AMIS/FIM.

37. Asset Management Information System, Firearms Inventory Module (AMIS/FIM)

A. The INS Asset Management Information System, Firearms Inventory Module is a main-frame computer-based system created to assist Service managers in the administration and control of the INS firearms inventory. The National Firearms Unit shall be responsible for maintaining the AMIS/FIM, entering information into the system about Service-issued or approved firearms, and tracking the transfer of firearms within the Service. Information concerning the acquisition, disposition, or transfer of firearms shall be reported to the National Firearms Unit using the Form G-504.

B. Authorizing Officials are responsible for conducting physical inventories of firearms biennially in accordance with the Justice Property Management Regulations (JPMR) under Section 128-1.5202.

C. In accordance with Subsection 4.G., Authorizing Officials shall designate an Assistant Chief, an appropriate Assistant District Director, or other appropriate senior management official as the Firearms Control Officer with primary responsibility for the overall inventory control, maintenance, and security of Service firearms.

D. Copies of the physical inventory report shall contain certifications by the actual personnel performing the physical inventory at each location. Copies shall be retained at the District, Sector, Region, Service Academy, Service Armory, and Headquarters levels for reference, should inventory discrepancies arise.

E. Boards of Survey shall be conducted in accordance with applicable property management regulations on any inventory discrepancies. A copy of the results of the Board of Survey shall be forwarded to the National Firearms Unit for updating of the AMIS/FIM.

38. Firearms Safety

A. Firearms safety rules are designed to prevent injury to innocent persons or property and to protect the officer from mental trauma and/or legal action resulting from unintentional injury to persons

or property. Each officer is directly responsible for the safe handling and storage of his firearms including, but not limited to, the following:

(1)    Service officers shall always inspect firearms for live ammunition when picked up or received from another person.

(2)    Service officers shall not knowingly accept a cocked weapon.

(3)    Service officers shall not cock a loaded firearm or place their fingers on the trigger unless they are intending to immediately discharge the weapon.

(4)    Except for training exercises under strictly controlled conditions involving unloaded firearms, Service officers shall not point a weapon, loaded or unloaded, at anyone or anything, unless intending to discharge the weapon.

(5)    Service officers shall not leave a loaded, unsecured firearm unattended at any time.

(6)    Firearms shall be unloaded before cleaning.

(7)    Dry-fire shall be conducted after a careful inspection of the firearm, and in an appropriate location.

(8)    If while firing, the officer notices a weak, or excessively heavy recoil, or hears or feels an unusual blast, he or she shall immediately cease fire. Officers should keep the firearm pointed down range, wait several seconds, unload and inspect the firearm for damage or barrel obstruction.

(9)    When stored in the home, reasonable and prudent measures shall be taken to secure Service firearms and ammunition from access by children or other family members.

(10)   Only authorized persons, as determined by an Authorizing Official, are permitted to use Service firing ranges. During qualifications or training on the firing range, firearms shall not be dry-fired except on the firing line, and then only as directed by the Firearms Instructor or Range Safety Officer.

(11)   Service officers should carefully inspect firearms prior to going on duty.

(12)   Longarms should not be carried in a vehicle with a round in the chamber. The recommended condition for carrying longarms is with the magazine loaded, the chamber empty, the safety off and the weapon uncocked.

(13)   Service officers are responsible for wearing eye and hearing protection when firing weapons. The Service shall issue each officer Service approved eye and hearing protection, and shall maintain sufficient quantities of such items at each Service range.

### APPENDIX 1A
### List of INS Authorized Firearms
### (Prior to the Effective Date of this Policy)

**NOTE:** No new authorizations for any handgun listed exclusively in this appendix shall be granted after the effective date of this policy.

Service officers are limited to carrying the firearms listed for each program and job category as follows:

A.  All Service officers listed under Subsection 5.A.(1)-(8) are authorized to carry the following handguns:

    (1)    Smith & Wesson .357 Magnum revolvers
    (2)    Ruger .357 Magnum revolvers
    (3)    Colt .357 Magnum revolvers
    (4)    Glock 17, 19 and 21 pistols
    (5)    SIG-Sauer P220, P225, P226 pistols
    (6)    Heckler & Koch P7 M8 and M14
    (7)    Walther P5 and P88

B.  The following classes of officers are also authorized to carry the Remington 870 Police shotgun:

    (1)    Border Patrol Agents, including Border Patrol Aircraft Pilots;
    (2)    Special Agents, including Special Agents Assigned to Sector Anti-smuggling Units and Immigration Agents;
    (3)    Deportation Officers;
    (4)    Detention Enforcement Officers;
    (5)    Immigration Inspectors.

C.  The following classes of officers are also authorized to carry the M-14 rifle or the Heckler and Koch MP5A2/A3 SMG or Colt SMG:

    (1)    Border Patrol Agents, including Border Patrol Aircraft Pilots.

D.  The following classes of officers are also authorized to carry the Colt AR-15A1/A2 rifle or the M16A1/A2 automatic weapon:

    (1)    Border Patrol Agents, including Border Patrol Aircraft Pilots;
    (2)    Investigations Division, Specialized Tactical Team (STT) members;
    (3)    Detention and Deportation Tactical Innovation and Control Team (TIAC) members.

E.  The following classes of officers are also authorized to carry special weapons:

    (1)    Investigations Division, Specialized Tactical Teams (STT);
    (2)    Border Patrol Division, Sector Emergency Response Teams (SERT) members;
    (3)    Border Patrol Tactical Team (BORTAC) members.

        (a)    Special weapons for those officers listed in E.(1) are limited to the following weapons:

|       |                                           |
|-------|-------------------------------------------|
| (i)   | Remington 700-P bolt-action rifle         |
| (ii)  | Remington M40 XBKS bolt-action rifle      |
| (iii) | Steyr SSG bolt-action rifle               |
| (iv)  | Gas launcher, Model M79                   |
| (v)   | Gas launcher, 37mm                        |

(b)    Special weapons for those officers listed in Appendix 1A.E.(2) include all weapons listed above, as well as the Remington 870 short-barreled shotgun with pistol grips.

(c)    Special weapons for those officers listed in Appendix 1A.E.(3) include all weapons listed above, as well as the Heckler and Koch HK33A2 or 53A2/A3 rifle and the M203 gas launcher.

F.    Service personnel employed as Training Specialists/Armorers assigned to the National Firearms Unit, may, while on duty and in conjunction with their official duties, possess, transport, maintain, or use, for the purpose of repairing, testing or evaluating, any firearm, either in the Service inventory, or under consideration by the Service for adoption or acquisition. This authority also extends to the Service personnel who are employed as the Administrator, Deputy Administrator, or an Assistant Administrator of the National Firearms Unit.

G.    Service personnel employed as Training Specialists/Armorers assigned to the Service Academies, may, while on duty and in conjunction with their official duties, possess, transport, maintain, or use, for the purpose of repairing any firearm in the Service inventory.

H.    Service officers, regardless of their job classification series or working title, currently assigned the collateral duty of Firearms Instructor, may, at the discretion of the Authorizing Official, when in the performance of their official duties as a Firearms Instructor, for training purposes only, possess, transport, maintain, or use, any firearm in the Service inventory.

(1)    This authorization is specifically intended to allow Authorizing Officials the discretion of permitting Firearms Instructors to train and practice with all firearms used by Service personnel in order to permit the Firearms Instructor to develop and retain a higher than normal level of performance with the firearm, and to ensure the Firearms Instructor's personal competence to provide instruction to other officers with all firearms those officers may be authorized to carry.

I.    Barrel Length of Service-issued Revolvers:

| Title | Barrel Length |
|-------|---------------|
| Border Patrol Agents | 4-inch barrel |
| BP Aircraft Pilots | 3-inch barrel |
| Special Agents | 3-inch barrel |
| Immigration Agents | 3-inch barrels |
| Deportation Officers | 3 or 4-inch barrel |
| Detention Officers | 3 or 4-inch barrel |
| Immigration Inspectors | 3 or 4-inch barrel |
| Immigration Examiners | 3 or 4-inch barrel |

(2)     Revolvers with other barrel lengths, not to exceed 4-inches, may be temporarily issued to officers conducting functions in which their assigned firearm is not appropriate.  For example, a Border Patrol Agent may be issued a 3-inch barrel revolver for plain clothes assignments.

**J.**     <u>Barrel Length of Service-Authorized Revolvers:</u>

(1)     Minimum barrel length - 1.75 inches

(2)     Maximum barrel length - 4 inches

### APPENDIX 1B
#### List of INS Authorized Firearms
#### (After the Effective Date of this Policy)

**NOTE:** New handgun authorizations approved after the effective date of this policy are limited to those handguns listed below in accordance with Subsection 16.

This list of authorized firearms shall be amended periodically by the National Firearms Unit.

A.  All Service officers listed under Subsection 5.A.(1)-(8) are authorized to carry the following handguns:

    (1)  Beretta Model 96D Brigadier Service Pistol
    (2)  SIG-Sauer P229 Double-Action-Only (DAO)
    (3)  Smith & Wesson .357 Magnum revolvers
    (4)  Ruger .357 Magnum revolvers
    (5)  Colt .357 Magnum revolvers

B.  The following classes of officers are also authorized to carry the Remington 870 Police shotgun:

    (1)  Border Patrol Agents, including Border Patrol Aircraft Pilots;
    (2)  Special Agents, including Special Agents Assigned to Sector Anti-smuggling Units and Immigration Agents;
    (3)  Deportation Officers;
    (4)  Detention Enforcement Officers;
    (5)  Immigration Inspectors.

C.  The following classes of officers are also authorized to carry the M-14 rifle or the Heckler and Koch MP5A2/A3 SMG or Colt SMG:

    (1)  Border Patrol Agents, including Border Patrol Aircraft Pilots.

D.  The following classes of officers are also authorized to carry the Colt AR-15A1/A2 rifle or the M16A1/A2 or M4 automatic weapons:

    (1)  Border Patrol Agents, including Border Patrol Aircraft Pilots;
    (2)  Investigations Division, Specialized Tactical Team (STT) members;
    (3)  Detention and Deportation Tactical Innovation and Control Team (TIAC) members;

E.  The following classes of officers are also authorized to carry special weapons:

    (1)  Investigations Division, Specialized Tactical Teams (STT);
    (2)  Border Patrol Division, Sector Emergency Response Teams (SERT) members;
    (3)  Border Patrol Tactical Team (BORTAC) members.

        (a)  Special weapons for those officers listed in E.(1) are limited to the following weapons:

| | | |
|---|---|---|
| (i) | Remington 700-P bolt-action rifle | |
| (ii) | Remington M40 XBKS bolt-action rifle | |
| (iii) | Steyr SSG bolt-action rifle | |
| (iv) | Gas launcher, Model M79 | |
| (v) | Gas launcher, 37mm | |

(b)     Special weapons for those officers listed in Appendix 1B.E.(2) include all weapons listed above, as well as the Remington 870 short-barreled shotgun with pistol grips.

(c)     Special weapons for those officers listed in Appendix 1B.E.(3) include all weapons listed above, as well as the Heckler and Koch HK33A2 or 53A2/A3 rifle and the M203 gas launcher.

F.     Service personnel employed as Training Specialists/Armorers assigned to the National Firearms Unit, may, while on duty and in conjunction with their official duties, possess, transport, maintain, or use, for the purpose of repairing, testing or evaluating, any firearm, either in the Service inventory, or under consideration by the Service for adoption or acquisition. This authority also extends to the Service personnel who are employed as the Administrator, Deputy Administrator, or an Assistant Administrator of the National Firearms Unit.

G.     Service personnel employed as Training Specialists/Armorers assigned to the Service Academies, may, while on duty and in conjunction with their official duties, possess, transport, maintain, or use, for the purpose of repairing any firearm in the Service inventory.

H.     Service officers, regardless of their job classification series or working title, currently assigned the collateral duty of Firearms Instructor, may, at the discretion of the Authorizing Official, when in the performance of their official duties as a Firearms Instructor, for training purposes only, possess, transport, maintain, or use, any firearm in the Service inventory.

(1)     This authorization is specifically intended to allow Authorizing Officials the discretion of permitting Firearms Instructors to train and practice with all firearms used by Service personnel in order to permit the Firearms Instructor to develop and retain a higher than normal level of performance with the firearm, and to ensure the Firearms Instructor's personal competence to provide instruction to other officers with all firearms those officers may be authorized to carry.

I.     Barrel Length of Service-issued Revolvers:

(1)

| Title | Barrel Length |
|---|---|
| Border Patrol Agents | 4-inch barrel |
| BP Aircraft Pilots | 3-inch barrel |
| Special Agents | 3-inch barrel |
| Immigration Agents | 3-inch barrels |
| Deportation Officers | 3 or 4-inch barrel |
| Detention Officers | 3 or 4-inch barrel |
| Immigration Inspectors | 3 or 4-inch barrel |
| Immigration Examiners | 3 or 4-inch barrel |

*Administrative Manual Section 20.012 — INS Firearms Policy*                                              57

(2)    Revolvers with other barrel lengths, not to exceed 4-inches, may be temporarily issued to officers conducting functions in which their assigned firearm is not appropriate.  For example, a Border Patrol Agent may be issued a 3-inch barrel revolver for plain clothes assignments.

J.    Barrel Length of Service-Authorized Revolvers:

(1)    Minimum barrel length – 1.75 inches

(2)    Maximum barrel length – 4 inches

## APPENDIX 2
## NOTICE TO SERVICE OFFICERS OF PERSONAL RESPONSIBILITY UNDER THE INS FIREARMS POLICY

As an INS Service Officer who is authorized to carry a firearm, you are required to comply with and be thoroughly familiar with all aspects of the INS Firearms Policy. You have been provided a complete copy of the INS Firearms Policy and have been given the opportunity to discuss the contents of this document with your supervisor or other management official. Due to the critical nature of certain aspects of the Firearms Policy, your attention is particularly directed to the following subsections:

Subsection 6. Carrying Firearms - This subsection specifically requires that no officer shall be authorized to carry a firearm unless that officer has successfully completed Basic Marksmanship Instruction and Practical Pistol Courses as defined in Subsection 3 of the INS Firearms Policy, demonstrated proficiency, and is currently qualified with that particular firearm. It specifically limits the authorization to carry personally-owned firearms during duty hours and non-duty hours to designated Service-approved revolvers and semi-automatic pistols.

Subsection 7. Deadly Force Involving Firearms - This subsection contains policy and guidelines for the use of deadly force regarding firearms.

Subsections 11 and 12. Reporting and Investigation of Shooting Incidents - These subsections outline the notification, reporting, and investigative procedures following a shooting incident. Responsibilities and assignments for all involved INS Service Officers are contained in these subsections and Appendix 3.

By signing this statement, you acknowledge your possession of a copy of the INS Firearms Policy and your personal obligation to comply with all sections of the policy.


_____                    _____
Officer's Name (Printed)                       Officer's Signature


_____                    _____
Date                                           Duty Station/Branch or Unit


_____                    _____
Supervisor's Name (Printed)                    Supervisor's Signature

## APPENDIX 3
### Shooting Incident Reports

1.    The Shooting Incident investigative report shall contain:

    A.    Cover sheet with table of contents;

    B.    Authorizing Official's investigative report of the incident, including G-166;

    C.    Memorandum of incident from the supervisor on scene;

    D.    Transcripts or synopses of oral statements from Service officer(s) involved in the shooting;

    E.    Form G-725, Report of Assault on Service Employee;

    F.    Criminal history record check results (National Crime Information Center);

    G.    Photographs of scene;

    H.    Diagrams of scene;

    I.    Shooting data including distances of INS officers and assailants, number of rounds fired, etc.;

    J.    Detailed information pertaining to firearms and ammunition used including makes, models, types and numbers of firearms used, ammunition make and type used, performance of ammunition if known, etc.;

    K.    Statements of witnesses;

    L.    Official reports from local investigating authority (e.g., FBI, Sheriff's Office, Police Department, etc.);

    M.    Medical reports; and,

    N.    Copies of printed and televised media reports of the incident.

2.    Shooting incident investigations should be completed within sixty days whenever possible. In the event that evidence critical to the investigation is not available within sixty days, updated status reports on open cases will be forwarded to the OIA.

## APPENDIX 4
## Guidelines for Use of Service Rifles
## and Automatic Weapons

I.    The following guidelines for issuance of Service rifles and automatic weapons are provided for Authorizing Officials.  This is based on information obtained from military units, other federal law enforcement agencies, manufacturers, and actual testing and is presented as an aid in clarifying appropriate usage.

A.    <u>9mm or .40 S&W caliber weapons</u> - 9mm or .40 S&W caliber automatic weapons such as the Heckler and Koch MP5 or Colt SMG are suitable for close range, urban and rural situations. Notable characteristics are as follows:

    (1)    The maximum effective range is approximately 100 yards in the semi-automatic mode and 25 to 35 yards in the automatic mode.

    (2)    These weapons are highly maneuverable.  Their compact size is excellent for restricted movement in close quarters or dense vegetation.

    (3)    These weapons are concealable, unobtrusive, and easily transportable.

    (4) .   These weapons possess a quick pointing ability which allows rapid target acquisition.

    (5)    They are controllable with minimal muzzle rise using proper techniques.

B.    <u>Caliber .223 Weapons</u> - .223 weapons, such as the M16, are suitable for short to medium range urban and rural situations.  Notable characteristics are as follows:

    (1)    The maximum effective range is approximately 300 yards in the semi-automatic mode and 50 to 80 yards in the automatic mode.

    (2)    These weapons are effective for routine patrol duties because of their light weight, overall size, and mild recoil.

    (3)    These weapons have a relatively flat trajectory, and sighting adjustments are generally not needed under 200 yards.

    (4)    They are highly maneuverable and relatively compact.

    (5)    They possess a quick pointing ability which allows relatively rapid target acquisition.

    (6)    This ammunition is able to defeat most body armor.

C.    <u>Caliber .308 Weapons</u> - .308 weapons, such as the M14 or the Remington 700-P, should be used in medium to long range rural situations.  Notable characteristics are as follows:

    (1)    These weapons are particularly effective when operating in an environment where greater range and penetration are desirable.

    (2)    The maximum effective range is approximately 600 yards.  The range is limited by positive target identification and operator skill.

(3)    These weapons are desirable for encounters in heavy brush, against barricaded suspects or suspects using the protection of vehicles or walls, or in long range confrontations.

(4)    The heavier bullet is superior to the .223 in maintaining velocity and energy at greater distances (not as affected by wind as the .223 bullet).

(5)    This ammunition is able to defeat most body armor.

D.    Weapons capable of full automatic fire should normally be used in the semi-automatic mode. The full automatic mode should be used only when dictated by the tactics, e.g., suppressive fire.

**Appendix 5**
**Request for Authorization to Carry a Personally-Owned, Service-Approved Firearm**

Date:_____

To:  Firearms Authorizing Official,_____
                                     (Enter name of duty station and District/Sector)

From:    Requesting Officer's Name:_____

         Requesting Officer's Title:_____

         Requesting Officer's Branch:_____

I request authorization to carry the below-listed Service-approved, personally-owned firearm in conjunction with my official duties as an Officer of the Immigration and Naturalization Service.  I certify the following: I am the legal owner of this handgun; it meets the requirements for personally-owned firearms contained in Subsection 18 of the Service's Firearms Policy; it is listed in Appendix 1B; and it has not been modified from the original factory condition except as allowed under the INS Firearms Policy.

Make:_____    Model:_____    Caliber:_____

Serial Number:_____

I understand that this authorization may be revoked at any time in accordance with the INS Firearms Policy.

Requesting Officer's Signature:_____

**Recommendation of Firearms Instructor or Senior Firearms Instructor**

Date:_____

I have inspected the above described firearm and certify that the description of the firearm is correct.  I also certify that the firearm is in proper operating condition and complies with all requirements of the Service's Firearms Policy.  If this request involves a semi-automatic pistol, I also certify that the Requesting Officer has successfully completed the Service's required semi-automatic pistol training course.  In accordance with this information, I recommend approval of this request.

Signature:_____

Printed Name:_____


**Action of Authorizing Official**

Date:_____

This request is:_____ Approved  _____ Denied

Signature:_____

Printed Name:_____

Title:_____


Dist:        Original - Official Personnel File of Requesting Officer, for permanent retention
             Copy - Authorizing Official, for personal retention
             Copy - Firearm Instructor or Senior Firearms Instructor, for personal retention
             Copy - Requesting Officer, for personal retention
             Copy - National Firearms Unit, for record purposes
             Copy - Local Firearms Inventory Control Officer, for record purposes

**Appendix 6**
**Department of Justice Policy Governing the Use of Deadly Force**

**See attached memorandum from the Director, Investiative Agency Policies to the The Deputy Attorney General dated October 16, 1995.**





Office of Investigative Agency Policies

RECEIVED
DEPARTMENT OF JUST.

95 OCT 17 AM 45

Washington, D.C. 20530

EXECUTIVE SECRETARIAT

October 16, 1995

**MEMORANDUM FOR THE ATTORNEY GENERAL**

THROUGH:        THE DEPUTY ATTORNEY GENERAL 10/17/95

FROM:           LOUIS J. FREEH
                DIRECTOR, INVESTIGATIVE AGENCY POLICIES

SUBJECT:        Resolution 14

PURPOSE:        To obtain approval for implementation of
                Resolution 14, which is attached

TIMETABLE:      Immediate

DISCUSSION:     Resolution 14 creates a uniform Department of
Justice deadly force policy.  This Resolution represents
consensus recommendations of the Executive Advisory Board of the
Office of Investigative Agency Policies.  No party to the
Resolution has advised that it wishes to appeal it.

RECOMMENDATION:  Approval 7

APPROVE         _____      Concurring component:

DISAPPROVE      Date: October 17, 1995        OLC  RBB 10/18/95

OTHER           _____



Office of Investigative Agency Policies

Washington, D.C. 20530

## RESOLUTION 14

Pursuant to the Attorney General's Order Number 1814-93, dated November 18, 1993, and in my capacity as Director of Investigative Agency Policies, I hereby issue the following resolution concerning the use of deadly force:

### Background

The Supreme Court has addressed the constitutional restrictions on the use of deadly force. In view of those precedents, the investigative agencies of the Department of Justice ("DOJ") have, over the years, adopted policies to govern their employees' use of deadly force. To date, however, those policies have not been standardized. The Attorney General requested that the Office of Investigative Agency Policies ("OIAP") consider whether there should be a uniform DOJ deadly force policy and, if so, to draft it for her consideration.

Attached to this Resolution is a uniform deadly force policy and accompanying commentaries. Attachment A sets forth the uniform deadly force policy. Attachment B sets forth the commentaries governing the use of deadly force in non-custodial and custodial situations.

The deadly force policy and commentaries have resulted from many months of discussion, negotiation, and analysis among personnel from: the Federal Bureau of Investigation; the Drug Enforcement Administration; the United States Marshal Service; the Immigration and Naturalization Service; the Bureau of Prisons; the Office of the Inspector General; and, DOJ's Criminal Division, Office of Legal Counsel, and Civil Rights Division.

### Discussion

According to the terms of the Order creating the OIAP, I have been authorized, "in the areas of overlapping jurisdiction of the criminal investigative agencies," to:

> [a]ssure, to the extent appropriate, consistent operational guidelines for the criminal investigative agencies of the Department [of Justice]; [and] ... [p]rovide advice to the Attorney General and the Deputy

1

Attorney   General   on   all   investigative
policies,   procedures   and   activities   that
warrant uniform treatment or coordination ...

Order Number 1814-93, Sections (b)(2) and (9).

I am satisfied that this policy and the commentaries uphold the sanctity of human life and provide clear direction to law enforcement officials who, in the face of extraordinary danger, must resort to the use of deadly force. I have reviewed them with members of the OIAP Executive Advisory Board ("EAB") and there are no objections to them.

## Conclusion

As I noted above, this Resolution and attachments have been approved by the EAB. Further, I have been advised that no OIAP member agency will appeal this Resolution or the attachments.

Dated:   October 16, 1995
         Washington, D.C.

LOUIS J. FREEH
Director of Investigative
Agency Policies

## POLICY STATEMENT

## USE OF DEADLY FORCE

I. **Permissible Uses.** Law enforcement officers and correctional officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person.

A. **Fleeing felons.** Deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe: (1) the subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death, and (2) the escape of the subject would pose an imminent danger of death or serious physical injury to the officer or to another person.

B. **Escaping prisoners.** 1. Unless force other than deadly force appears to be sufficient, deadly force may be used to prevent the escape of a prisoner committed to the custody of the Attorney General or the Bureau of Prisons

a. if the prisoner is escaping from a secure institution or is escaping while in transit to or from a secure institution; or

b. if the prisoner is otherwise effecting his or her escape in a manner that poses an imminent danger to the safety of other prisoners, staff, or the public (such as by attempting to ignite explosives).

2. The use of deadly force is not permitted if the subject is in a non-secure facility or a facility under the control of the Immigration and Naturalization Service, and (a) has not used or threatened the use of force likely to cause serious physical injury in his or her escape attempt, and (b) has not otherwise manifested an imminent threat of death or serious physical injury to the officer or community.

3. The use of deadly force is not permitted if the subject is in transit to or from a non-secure facility and is not accompanied by persons who are in transit to or from a secure facility and the subject (a) has not used or threatened the use of force likely to cause serious physical injury in his or her escape attempt, and (b) has not otherwise manifested an imminent threat of death or serious physical injury to the officer or community.

## II.  Definitions

Deadly force is the use of any force that is likely to cause death or serious physical injury.  When an officer of the Department uses such force in non-custodial situations, it may only be done consistent with this policy.  Force that is not likely to cause death or serious physical injury, but unexpectedly results in such harm or death, is not governed by this policy.

Probable cause, reason to believe or a reasonable belief, for purposes of this policy, means facts and circumstances, including the reasonable inferences drawn therefrom, known to the officer at the time of the use of deadly force, that would cause a reasonable officer to conclude that the point at issue is probably true.  The reasonableness of a belief or decision must be viewed from the perspective of the officer on the scene, who may often be forced to make split-second decisions in circumstances that are tense, unpredictable, and rapidly evolving.  Reasonableness is not to be viewed from the calm vantage point of hindsight.

## III.  Principles on Use of Deadly Force

The Department of Justice recognizes and respects the integrity and paramount value of all human life.  Consistent with that primary value, but beyond the scope of the principles articulated here, is the Department's full commitment to take all reasonable steps to prevent the need to use deadly force, as reflected in Departmental training and procedures.  Yet even the best prevention policies are on occasion insufficient, as when an officer serving a warrant or conducting surveillance is confronted with a threat to his or her life.  With respect to these situations and in keeping with the value of protecting all human life, the touchstone of the Department's policy regarding the use of deadly force is necessity.  Use of deadly force must be objectively reasonable under all the circumstances known to the officer at the time.

The necessity to use deadly force arises when all other available means of preventing imminent and grave danger to officers or other persons have failed or would be likely to fail.  Thus, employing deadly force is permissible when there is no safe alternative to using such force, and without it the officer or others would face imminent and grave danger.  An officer is not required to place him or herself, another officer, a suspect, or the public in unreasonable danger of death or serious physical injury before using deadly force.

Determining whether deadly force is necessary may involve instantaneous decisions that encompass many factors, such as the likelihood that the subject will use deadly force on the

· 2 ·

4.   After an escape from the facility or vehicle and its immediate environs has been effected, officers attempting to apprehend the escaped prisoner may not use deadly force unless such force would otherwise be authorized in accordance with this policy.

C.  Prison Unrest.  Deadly force may be used to maintain or restore control of a prison or correctional institution when the officer reasonably believes that the intended subject of the deadly force is participating in a disturbance in a manner that threatens the safety of other inmates, prison staff, or other persons.  The use of deadly force would be unreasonable and thus not permitted to quell a disturbance when force other than deadly force reasonably appears sufficient.

II.   Non-Deadly Force.  If other force than deadly force reasonably appears to be sufficient to accomplish an arrest or otherwise accomplish the law enforcement purpose, deadly force is not necessary.

III.   Verbal Warning.  If feasible and if to do so would not increase the danger to the officer or others, a verbal warning to submit to the authority of the officer shall be given prior to the use of deadly force.

IV.   Warning Shots.  Warning shots are not permitted outside of the prison context.  In the prison context, warning shots may be fired within or in the immediate environs of a secure facility if there is no apparent danger to innocent persons: (A) if reasonably necessary to deter or prevent the subject from escaping from a secure facility; or (B) if reasonably necessary to deter or prevent the subject's use of deadly force or force likely to cause grievous bodily harm.

V.   Vehicles.

A.   Weapons may not be fired solely to disable moving vehicles.

B.   Weapons may be fired at the driver or other occupant of a moving motor vehicle only when:

1.   The officer has a reasonable belief that the subject poses an imminent danger of death or serious physical injury to the officer or another, and

2

2. The public safety benefits of using such force outweigh the risks to the safety of the officer or other persons.

VI. **Vicious Animals.** Deadly force may be directed against dogs or other vicious animals when necessary in self-defense or defense of others.

VII. **Rights of Third Parties.** Nothing in this policy and the attached commentary is intended to create or does create an enforceable legal right or private right of action.

- 3 -

Warning shots and shooting to disable.  Warning shots
are not authorized.  Discharge of a firearm is usually considered
to be permissible only under the same circumstances when deadly
force may be used--that is, only when necessary to prevent loss
of life or serious physical injury.  Warning shots themselves may
pose dangers to the officer or others.

Attempts to shoot to wound or to injure are unrealistic
and, because of high miss rates and poor stopping effectiveness,
can prove dangerous for the officer and others.  Therefore,
shooting merely to disable is strongly discouraged.

Motor vehicles and their occupants.  Experience has
demonstrated that the use of firearms to disable moving vehicles
is either unsuccessful or results in an uncontrolled risk to the
safety of officers or others.  Shooting to disable a moving motor
vehicle is forbidden.

An officer who has reason to believe that a driver or
occupant poses an imminent danger of death or serious physical
injury to the officer or others may fire at the driver or an
occupant only when such shots are necessary to avoid death or
serious physical injury to the officer or another, and only if
the public safety benefits of using such force reasonably appear
to outweigh any risks to the officer or the public, such as from
a crash, ricocheting bullets, or return fire from the subject or
another person in the vehicle.

Except in rare circumstances, the danger permitting the
officer to use deadly force must be by means other than the
vehicle.

### V.  Miscellaneous

Deadly force may be directed against dogs or other
vicious animals when necessary in self-defense or defense of
others.

Nothing in this policy and the attached commentary is
intended to create or does create an enforceable legal right or
private right of action.

- 4 -

## Commentary Regarding the Use of Deadly Force
## in Non-Custodial Situations

### I.  Introduction

The Department of Justice hereby establishes a uniform policy with respect to the use of deadly force in both custodial and non-custodial situations.  This commentary does not address the use of deadly force upon subjects relinquished to persons or facilities responsible for detention or incarceration.  All other uses of deadly force are addressed in this commentary.  The policy and this commentary provide practical guidance for officers who must make grave decisions regarding the use of deadly force under the most trying of circumstances.  The policy also is intended to maintain uniformity among the various Departmental components and to achieve uniform standards and training with respect to the use of deadly force.  Although each component may still develop and conduct its own training on deadly force, the policy governs the use of deadly force under all circumstances.

The policy is the product of discussion among the various law enforcement agencies whose personnel are called upon to make decisions regarding the use of deadly force, of review of the current policies governing the use of force, and of advice of legal counsel from various Department components, including those charged with law enforcement, defense of civil actions filed against the government, enforcement of civil rights, and provision of constitutional advice.  In developing the policy, it became apparent that decisional law provides only limited guidance regarding the use of deadly force.[1]  In addition, as a matter of principle, the Department deliberately did not formulate this policy to authorize force up to constitutional or other legal limits.[2]

------

[1]  Many issues addressed in the policy and this memorandum have never been addressed in reported decisions or the law remains unresolved.  Courts would step outside their proper role if they formulated detailed policies with respect to the procedures governing deadly force; in contrast, the Department has the discretion to determine what the policy should be and to provide guidance to its employees with regard to these solemn issues.  Cases arise in procedural postures--typically civil tort or civil rights actions, or motions to dismiss or overturn criminal charges or convictions--in which a wrongful act on the part of the government may not lead to recovery or sanctions.  As a result, the court often does not reach the question of whether the use of force was wrongful.

[2]  The leading Fourth Amendment cases in this area are Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989).

matter of principle, the Department deliberately did not formulate this policy to authorize force up to constitutional or other legal limits.[2]

## II. Definitions

**Deadly force** is any force that is likely to cause death or serious physical injury. When an officer of the Department uses such force, it may only be done consistent with this policy. Force that is not intended to cause death or serious physical injury, but unexpectedly results in such injury or death, is not governed by this policy.

**Escape** for the purposes of this policy encompasses the concept of immediacy of an attempt to leave custody. A person in custody is escaping from a facility or vehicle when he or she is attempting to escape and is still within the facility's immediate environs. Hence the concept of escape is different under this policy than under 18 U.S.C. § 751 and 28 U.S.C. § 1826(c), which provide that escapes are continuing offenses.

**Probable cause, reason to believe or a reasonable belief**, for purposes of this policy, means facts and circumstances, including the reasonable inferences drawn therefrom, known to the officer at the time of the use of deadly force, that would cause a reasonable officer to conclude that the point at issue is probably true. The reasonableness of a belief or decision must be viewed from the perspective of the officer on the scene, who may often be forced to make split-second decisions in circumstances that are tense, unpredictable, and rapidly

---

the court often does not reach the question of whether the use of force was wrongful. Relatedly, the judicial deference paid to decisions of correctional officials in use-of-force situations, coupled with immunity doctrines, may at least as a theoretical matter result in upholding (or at least failing to sanction) conduct that might not have been undertaken as a matter of policy.

[2] The leading Eighth Amendment case, arising in the context of force used during prison unrest, is <u>Whitley v. Albers</u>, 475 U.S. 312(1986). The courts have not fully resolved the demarcations among the Fourth Amendment, the Fifth Amendment's due process clause, and the Eighth Amendment in limiting the use of force following an arrest. <u>See, e.g.</u>, <u>Graham v. Connor</u>, 490 U.S. 386(1989); <u>Albright v. Oliver</u>, 114 S. Ct. 1340(1994)(arrest without probable cause, no force involved); <u>Brothers v. Klevenhagen</u>, 28 F.3d 452 (5th Cir.), <u>cert. denied</u>, 115 S. Ct. 539(1994)(analyzing shooting of detainee under Fourteenth Amendment due process); <u>Wright v. Whiddon</u>, 951 F.2d 297 (11th Cir. 1992).

officer or others if such force is not used by the officer; the officer's knowledge that the subject will likely acquiesce in arrest or recapture if the officer uses lesser force or no force at all; the capabilities of the subject; the subject's access to cover and weapons; the presence of other persons who may be at risk if force is or is not used; and the nature and the severity of the subject's criminal conduct or the danger posed.

Deadly force should never be used upon mere suspicion that a crime, no matter how serious, was committed, or simply upon the officer's determination that probable cause would support the arrest of the person being pursued or arrested for the commission of a crime. Deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe:  (1) the subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death, and (2) the escape of the subject would pose an imminent danger of death or serious physical injury to the officer or to another person.

As used in this policy, "imminent" has a broader meaning than "immediate" or "instantaneous."  The concept of "imminent" should be understood to be elastic, that is, involving a period of time dependent on the circumstances, rather than the fixed point of time implicit in the concept of "immediate" or "instantaneous."  Thus, a subject may pose an imminent danger even if he or she is not at that very moment pointing a weapon at the officer if, for example, he or she has a weapon within reach or is running for cover carrying a weapon or running to a place where the officer has reason to believe a weapon is available.

## IV. Lesser Means

Intermediate force.  If force lesser than deadly force could reasonably be expected to accomplish the same end, such as the arrest of a dangerous fleeing subject, without unreasonably increasing the danger to the officer or to others, then it must be used.  Deadly force is not permissible in such circumstances, although the reasonableness of the officer's understanding at the time deadly force was used shall be the benchmark for assessing applications of this policy.

Verbal warnings.  Before using deadly force, if feasible, officers will audibly command the subject to submit to their authority.  Implicit in this requirement is the concept that officers will give the subject an opportunity to submit to such command unless danger is increased thereby.  However, if giving such a command would itself pose a risk of death or serious bodily harm to the officer or others, it need not be given.

- 3 -

deadly force in the exigent circumstances of a prison disturbance, an officer need not ascertain who is instigating or leading the disturbance before finding that someone is sufficiently participating in the disturbance. The reasonableness of an officer's determination to use deadly force may turn on the officer's vantage point and assignment. Deadly force may also be used when a single prisoner presents an imminent danger of serious physical injury to another person or persons.

## V.   Escapes

The Department's responsibility to protect the public is at its zenith when the Department, performing its custodial function, determines that a prisoner is to be confined in a secure facility. Acting in that capacity, the Department's obligation to ensure that prisoner's continued custody entails strict procedures including the threat of the use of deadly force should such a prisoner attempt to escape. Correctional officials may display firearms at federal correctional institutions to deter the escape of such prisoners. Officers may presume that a prisoner attempting an escape from a secure institution, as defined by the Bureau of Prisons, would pose an imminent danger of death or serious physical injury to members of the public if permitted to consummate the escape. Similarly, the use of deadly force is governed by the same principles in the case of prisoners in transit. If the prisoner is in transit to or from a secure facility, deadly force ordinarily would be necessary if no other means were reasonably likely to stop the escape from being consummated. A person attempting an escape is considered to be attempting an escape from a secure institution or in transit to or from it when the limits of such secure confinement have been specially extended, as, for instance, when the subject has been transferred to a hospital or permitted to attend a funeral under armed escort.

The presumption that those attempting to escape from secure facilities pose an imminent danger (and are thus subject to the use of deadly force) runs in the other direction if the facility is non-secure. A determination has already been made that, in non-secure facilities, persons would not pose an imminent danger to the public if the person escaped. Accordingly, and in the absence of other factors demonstrating an imminent threat, it would be unreasonable to use deadly force to prevent escapes of persons from non-secure facilities or to prevent escapes of persons in transit to or from a non-secure facility unless accompanied by persons going from or to a secure facility. Examples of factors demonstrating an imminent threat include the circumstances where the prisoner has become armed or has used or threatened to use force likely to cause serious physical injury. In making the "imminent threat" determination, it should be recognized that "imminent" has a broader meaning

- 4 -

## Commentary Regarding the Use of Deadly Force
## in Custodial Situations

### I.   Introduction

The Department of Justice hereby establishes a uniform policy with respect to the use of deadly force in both custodial and non-custodial situations.  This commentary addresses the use of deadly force in custodial situations including conditions of prison unrest and when a subject is escaping custody.  The policy and this commentary provide practical guidance for officers who must make grave decisions regarding the use of deadly force under the most trying of circumstances.  The policy also is intended to achieve uniformity among the various Departmental components, which previously had established their own standards for the use of deadly force.  Although each component may still develop and conduct its own training on deadly force, the policy governs the use of deadly force within any facility dedicated to the incarceration of persons or by any officer who is responsible for the transporting or custody of persons incarcerated or to be incarcerated.  Those portions of the policy which address custodial or prison situations specifically, do not apply to officers who are merely detaining an arrestee or transporting an arrestee from the place of arrest; nor do these portions of the policy apply to the transporting of an arrestee to a facility dedicated to incarceration.  In addition, the Immigration and Naturalization Service (INS) officers, in INS controlled facilities, are not authorized to use deadly force except in self-defense or defense of others.

The policy is the product of discussion among the various law enforcement agencies whose personnel are called upon to make decisions regarding the use of deadly force, of review of the current policies governing the use of force, and of advice of legal counsel from various Department components, including those charged with law enforcement, defense of civil actions filed against the government, enforcement of civil rights, and provision of constitutional advice.  In developing the policy, it became apparent that decisional law provides only limited guidance regarding the use of deadly force.[1]  In addition, as a

---

[1]   Many issues addressed in the policy and this memorandum have never been addressed in reported decisions or the law remains unresolved.  Courts would step outside their proper role if they formulated detailed policies with respect to the procedures governing deadly force in arrests, prison riots, and escapes; in contrast, the Department has the discretion to determine what the policy should be and to provide guidance to its employees with regard to these solemn issues.  Cases arise in procedural postures-- typically civil tort or civil rights actions, or motions to dismiss or overturn criminal charges or convictions--in which a wrongful act on the part of the government may not lead to recovery or sanctions.  As a result,

evolving.  Reasonableness is not to be viewed from the calm
vantage point of hindsight.

### III.  Deadly Force Generally

The Department of Justice recognizes and respects the
integrity and paramount value of all human life.  Consistent with
that primary value, but beyond the scope of the principles
articulated here, is the Department's full commitment to take all
reasonable steps to prevent the need to use deadly force as
reflected in Departmental training and procedures.  Yet even the
best prevention policies are on occasion insufficient, as when a
serious prison disturbance occurs, or when a prisoner confined to
a secure facility attempts to escape from custody.  With respect
to these situations and in keeping with the value of protecting
all human life, the touchstone of the Department's policy
regarding the use of deadly force is <u>necessity</u>.  Use of deadly
force must be objectively reasonable under all the circumstances
known to the officer at the time, including the nature and the
severity of prison disturbance, whether officers at the facility
carry firearms, the use or threat of use of force upon the
officer or others in any escape attempt, and the escapee's
response to any warning.

The necessity to use deadly force arises when all other
available means of preventing imminent and grave danger to
officers or other persons have failed or would be likely to fail.
Thus, employing deadly force is permissible when there is no safe
alternative to using such force, and without it the officer or
others would face imminent and grave danger.  An officer is not
required unreasonably to place his or her life, that of another
officer, another prisoner or suspect, or the public in danger of
death or serious injury before using deadly force.  Persons who
have been determined to require confinement in a secure facility
ordinarily pose such a danger when attempting to escape.

### IV.  Prison Control

No force, deadly or non-deadly, may be used wantonly,
maliciously or sadistically by prison officials against
prisoners.  Force may never be used solely for the purpose of
causing harm.  Deadly force may be used in maintaining or
regaining control of a prison, correctional institution, or any
portion or facility of such an institution, in the event of a
mutiny, rebellion, riot, or disturbance that threatens the safety
of inmates, prison staff, or other persons.  Deadly force may be
used only when it is necessary and the officer reasonably
believes that the subject is him or herself participating in a
disturbance.  Participation for these purposes is more than
simply being in the area where others are visibly creating the
disturbance, particularly if the subject has had no opportunity
to exit that area.  On the other hand, in considering the use of

- 3 -

than "immediate" or "instantaneous." The concept of "imminent"
should be understood to be elastic, that is, involving a period
of time dependent on the circumstances, rather than the fixed
point of time implicit in the concept of "immediate" or
"instantaneous." Thus, for example, a prisoner may pose an
imminent threat, even if he or she is not at that very moment in
possession of a weapon, if he or she is running to a place where
the officer has reason to believe a weapon is available.

Once an escape is no longer in progress, but has been
accomplished, that is, once the subject is no longer in the
immediate environs of the facility, officers must attempt to
effect a rearrest of the subject. In such cases, the policy
pertaining to escaping prisoners is no longer applicable. Deadly
force would then be authorized only consistent with the policy
governing the use of such force in circumstances other than those
of escaping prisoners.

## VI.   Destruction of Property

In accord with the policy permitting the necessary use
of deadly force to maintain control of prisons and correctional
institutions and to stop attempted escapes, deadly force may be
used when someone is destroying or attempting to destroy
property, if the loss of or damage to the property could
contribute directly to an escape or attempted escape, serious
physical injury, or death. Examples of this type of situation
include using explosives in order to effect an escape from prison
or attempting to disable a fire truck during a fire within an
institution. If the destruction of property does not reasonably
appear to be likely to so contribute to an escape, serious
physical injury, or death, using deadly force would probably be
unreasonable and thus forbidden.

## VI.   Lesser Means

Verbal warnings. The Department of Justice requires
that before using deadly force, if feasible, officers will
audibly command the subject to submit to their authority.
Implicit in this requirement is the concept that officers will
give the subject an opportunity to submit to such command unless
the danger is increased thereby. However, if giving such a
command would itself pose a risk of death or grievous bodily harm
to the officer or others, it need not be given.

Warning shots. Within or from the immediate environs
of a secure facility, warning shots may be fired as an
intermediate measure at the discretion of the officer if verbal
warnings are to no avail. If the officer determines that the
firing of a warning shot is a necessary step to deterring or
preventing an escape or preventing the loss of life or the
infliction of serious physical injury, the officer may fire

- 5 -

warning shots only if he or she can do so safely; that is, there is no apparent danger of injury to an innocent person.

### VII.  Limitation

Nothing in the policy and this commentary is intended to create or does create an enforceable legal right or private right of action.

- 6 -

# EXHIBIT E

# PHOTOGRAPHS OF JOHN GILBERT'S KNEE







# EXHIBIT F

# AFFIDAVIT OF JOHN GILBERT

STATE OF TEXAS       }
                             }
COUNTY OF CAMERON   }

### AFFIDAVIT OF JOHN GILBERT

On this day appeared before me, the undersigned Notary Public, John Gilbert, a person known to me, who deposed upon his oath as follows:

"My name is John Gilbert. I am over the age of twenty-one, have never been convicted of a felony, and am competent to give this affidavit. All of the facts set out herein are true and correct, and are within my personal knowledge.

I am a United States Border Patrol agent. In April 1999, I was stationed in Hebbronville, Texas. The United States Border Patrol issued a firearm to me. The United States Border Patrol also informed me that I could carry a firearm both on-duty and off-duty. Further, the INS Administrative Manual's Firearms Policy clearly stated that I could carry a firearm, both on-duty and off-duty.

On August 6, 1998, I arrested Jose Ybanez, a relative of Sheriff Ybanez, with approximately 13.88 pounds of cocaine and 203 pounds of marijuana.

On April 7, 1999, I was driving my friend's Mustang GT in Hebbronville, Texas. I was complying with Texas traffic laws while driving. The Mustang had a front license plate, and I did not rev the engine or make excessive muffler noise. The passenger in the front seat was not wearing her seatbelt, but the windows of the Mustang were darkly tinted, and no one outside the vehicle could have seen that the passenger was unbelted. I had my government-issued pistol on the floorboard of the back seat of the vehicle. The pistol was in a location where I could not reach it or get my hand on it without materially changing my position.

Despite the fact that I was not violating any laws, Defendant Bolch, a Jim Hogg County Sheriff's deputy, pulled me over. Bolch and I knew each other, and Bolch knew that I was a Border Patrol agent. I had backed Bolch up at least 50 times prior to the arrest. I had even backed him up on a traffic stop the day before.

After Bolch pulled him over, I politely informed Bolch that there was a pistol in the vehicle. At that point, Bolch began asking me questions that appeared to be an attempt to justify arresting me for possessing the U.S. government-issued firearm. He asked me if I had a concealed handgun permit. I replied that I did not, but I was a Border Patrol agent. Bolch then asked me whether I was on duty, or on my way to or from work. Bolch then told me that I had no authority to carry a weapon, and that I could be arrested for carrying it. In response, I told Bolch that I did, in fact, have authority to carry a weapon. I showed Bolch my badge and credentials from the INS, which explicitly stated that I could carry a firearm. Bolch replied, "Well, I don't care what your authority says. Your're in Texas right now. And as long as you're in Texas, you're going to go by Texas laws." Bolch then arrested me for carrying a firearm.

I did not use any profanity during the arrest.    Nevertheless, Bolch also charged me with disorderly conduct. At his deposition, Bolch claimed that he did so because I told him, prior to the arrest, "Y'all never do shit anyways." (Bolch Depo 75:9-19). However, I never made that statement. I also did nothing that could be construed as disorderly conduct.

Bolch told me to exit the Mustang, turn around, lean up against the car, and place my hands behind my back. Bolch then handcuffed my hands behind my back. Bolch then turned me around and walked me to the police car. Bolch opened the rear door of the police car, and told me to get in. There was a cage that separated the front seat and rear seat parts of the police car, and that cage had a steel frame that went next to the door. It was difficult for Gilbert–with my hands handcuffed behind my back–to get all the way inside the police car.  My left leg got hung up where the cage came down by the door. Bolch then slammed the door, which caught my leg between the post of the cage and the door. I screamed in pain. Bolch watched me for a while, and then opened the door, allowed me to get my foot all of the way in, and then re-closed the door.

Bolch then drove me to jail. During the drive, I asked Bolch, "Isaac, why are you taking me to jail?" Bolch replied, "You'll see when you get there." I then asked, "Isaac, are you sure that's what you want to do?  You want to take me to jail?" Bolch replied, "Oh, I'm more than sure.  I've been wanting to do this for a long time."

After Bolch took me to the jail, jail personnel photographed and fingerprinted me.  I asked why I was being fingerprinted.  The jailer responded, "We are going to submit them to the FBI." They then put me in a cell with an unwashed mattress.  There were public hairs imbedded in the mattress.  There was also feces in and around the toilet of the cell.  Worse, I was placed in a cell containing other inmates, some of whom I had arrested himself.  I complained to the jailer, "if you put me in this cell, that would be the equivalent of putting a rabbit in a cage with a bunch of pit bulls. I mean, if they find out who I am, they are going to kill me."  The jailer responded, "Well, you know, I'm just following orders.  That's what they told me to do."

I was incarcerated for a couple of hours. During that time, I endured these horrendous jail conditions, and was in great fear that another inmate would take my life. Since my arrest, I have also worried that it will affect my career. I will have to disclose and explain this arrest on a periodic basis for the rest of my career because the Border Patrol does a periodic review of its agents' records. This experience has caused me to suffer severe mental anguish, which continues to this very day."

JOHN GILBERT

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public, on this _25th_ day of October, 2002.

CEAN GARCIA
Notary Public, State of Texas
My Commission Expires
August 27, 2006

_____
Notary Public, State of Texas

# EXHIBIT G

# ARREST REPORT

# EXHIBIT G

# ARREST REPORT

**INCIDENT REPORT**

JIM HOGG CO. SHERIFF'S DEPARTMENT
211 E. GALBRAITH

------------------------------------------------------------

Incident # 990407803          Case # 99JH0224     Document #

------------------------------------------------------------

Suspect:
GILBERT, JOHN ANTHONY       BORDER PATROL            AGE:  33  SEX: M
103 N. ELM ST.              U.S. IMMIGRATION BORDER P  RACE: WHIT
HEBBRONVILLE     TX 78361   802 N. SIGRID AVE.         DOB: 04/06/66
                                                       DL#: 10824600
                            361-527-3256               SS#:

------------------------------------------------------------

Offense  : UNLAWFUL CARRYING WEAPON     UCR Code : 26
Date     : 04/07/99                     Time : 04:14P- 05:00P
Location : 1000 N. SMITH AVE.
Weapon   :
M / O    :

------------------------------------------------------------

| Vehicle Owner's Name | License# | Yr | Color | Model | Make | Style | In |
|---|---|---|---|---|---|---|---|
| NORBERTO MONARREZ | TGK78H | 94 | BLACK | MUSTANG GT | FORD | 2 DOOR | |

------------------------------------------------------------

On Wednesday, April 7, 1999 at approximately 4:14 P.M. this
reporting Deputy Isaac Bolch was on Traffic Enforcement Patrol. This
reporting Deputy observed a black Ford Mustang with two occupants. The
front seat passenger was not wearing a seatbelt. As the Mustang passed
this reporting Deputies Patrol Unit the operator apparently reved the
engine, because this reporting Deputy heard excessive or unusual noise from
the mufflers. This reporting Deputy initiated a traffic stop on the
vehicle. This reporting Deputy greeted the driver, identified himself as a
Peace Officer, and notified the driver of the reason of the stop. The
driver (identified as John Anthony Gilbert 04-06-1966), immediately began
arguing with this reporting Deputy. Mr. Gilbert then identified himself as
a Border Patrol Agent and stated that he (s) had a handgun in the vehicle.
Mr. Gilbert (s) was then asked to step out of the vehicle. This reporting
Deputy then asked if he (s) was going to or from work, or if he (Gilbert)
was on duty. Mr. Gilbert stated that he was not on duty and he was not
going to or coming from work. Mr. Gilbert (s) was advised that he could be
placed under arrest for Unlawful Carrying of a Weapon. Mr. Gilbert (s)
then stated, "Y'all never do shit anyways." At that point Mr. Gilbert was
placed under arrest for Unlawful Carrying of a Weapon and Disorderly
Conduct. Mr. Gilbert's weapon (Beretta .40 Cal. handgun Serial
#BER05857OM), was logged into evidence and receipt was issued to Mr.
Golbert (s). Unlawful Carrying of a Weapon under the Penal Code 46.02 only
exempts Peace Officers as defined by Code of Criminal Procedures 2.12. Mr.
Gilbert was transported to the Jim Hogg County Sheriff's Department and
booked. Mr. Gilbert was not cooperative with Jailer Rene Ruiz. Mr.
Gilbert (s) was Mirandized at 4:24 P.M. and charged with Unlawful Carrying
of a Weapon and Disorderly Conduct.

------------------------------------------------------------

Officer 1: BOLCH, ISAAC              Officer 2:
Disposition Code : AA